**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

_____

| | |
|---|---|
| United States of America, | ) |
| | ) |
| Plaintiff, | ) |
| | ) **CR15-00707-PHX-SRB(MHB)** |
| vs. | ) Phoenix, Arizona |
| | ) June 16, 2015 |
| **Abdul Malik Abdul Kareem,** | ) 4:03 P.M. |
| **aka Decarus Thomas,** | ) |
| | ) |
| Defendant. | ) |
| _____ | ) |

**BEFORE:  THE HONORABLE BRIDGET S. BADE, MAGISTRATE JUDGE**

**TRANSCRIPT OF PROCEEDINGS**

**DETENTION HEARING**

**APPEARANCES:**

**For the Government:**
U.S. ATTORNEY'S OFFICE
By:  **Kristen Brook, Esq.**
40 North Central Avenue, Suite 1200
Phoenix, AZ  85004

**For the Defendant Abdul Malik Abdul Kareem:**
MAYNARD, CRONIN, ERICKSON, CURRAN & REITER,PLC
By: **Daniel D. Maynard, Esq.**
3200 North Central Avenue, Suite 1800
Phoenix, AZ  85012

Transcriptionist:
Elizabeth A. Lemke
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, SPC. 34
Phoenix, Arizona  85003-2150
(602) 322-7247

Proceedings Recorded by Electronic Sound Recording
Transcript Produced by Transcriptionist

CR15-00707-PHX-SRB   DETENTION HEARING   6-16-15

1

2                          **INDEX OF WITNESSES**

3     **SPECIAL AGENT DINA McCARTHY:**

4     Direct examination by Ms. Brook              Page  4
      Cross examination by Mr. Maynard             Page 16
5     Redirect examination by Ms. Brook            Page 36

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CR15-00707-PHX-SRB   DETENTION HEARING   6-16-15

1        <u>P R O C E E D I N G S</u>

2        (Called to the order of court at 4:03 p.m.)

3            THE COURT:  Good afternoon.  You may be seated.

4            THE CLERK:  Criminal docket 15-707.  *United States*

5    *of America v. Abdul Malik Abdul Kareem* on for a detention

6    hearing.

7            MS. BROOK:  Good afternoon, Your Honor.  Kristen

8    Brook on behalf of the United States.  Seated next to me is

9    Special Agent Stewart Whitson with the FBI.

10           THE COURT:  Good afternoon.

11           MR. MAYNARD:  Good afternoon, Your Honor.  Dan

12   Maynard on behalf of Abdul Malik Abdul Kareem who is in

13   custody seated next to me.

14           THE COURT:  Good afternoon.  And good afternoon, Mr.

15   Abdul Malik Abdul Kareem.

16           This is the time set for a detention hearing.  I

17   received the Government's Brief in Support of Detention from

18   which I conclude that they are seeking detention.

19           Ms. Brook, how does the government wish to proceed

20   this afternoon?

21           MS. BROOK:  Thank you, Your Honor.

22           Your Honor, we have filed with the Court our memo,

23   our Brief in Support of Detention in this case.  And it

24   continues within it the facts that are proffered facts.

25           Bearing in mind that it is four o'clock in the

1    afternoon, the government intends to proceed by placing on the

2    stand Special Agent Dina McCarthy with the FBI who will

3    testify to eight particular points that are articulated within

4    the memo.  We believe her testimony to take all of about ten

5    minutes.

6         THE COURT:  All right.  If you would like to call

7    her, please do so.

8         MS. BROOK:  Thank you.

9         And the government calls Special Agent Dina McCarthy.

10        (Witness duly sworn).

11        THE COURT:  Thank you.  Please have a seat.

12        Please state your full name and spell it, please.

13        THE WITNESS:  Dina McCarthy.  D-I-N-A.  Last name

14   McCarthy.  M-c-C-A-R-T-H-Y.

15        THE COURT:  Thank you.

16        Please proceed, Ms. Brook.

17        MS. BROOK:  Thank you.

18        **SPECIAL AGENT DINA MCCARTHY, WITNESS, SWORN**

19                        **DIRECT EXAMINATION**

20   Q   What do you do for a living?

21   A   I am an investigator, so a special agent with the FBI,

22   Federal Bureau of Investigation.

23   Q   And how long have you been a special agent with the FBI?

24   A   A little over 14 years.

25   Q   And as a special agent with the FBI, are you currently

CR15-00707-PHX-SRB   DETENTION HEARING   6-16-15

1    assigned to any particular specialized units?

2    A    Yes, the Joint Terrorist and Task Force.

3    Q    In preparation for today's hearing, how have you prepared?

4    A    I have conferred and been briefed by the lead investigator

5    Special Agent Stewart Whitson, in addition to confirming the

6    facts that were contained in the memorandum prepared by the

7    prosecution.

8    Q    And in conjunction with this case, have you authored any

9    reports?

10   A    Yes, I have, one.

11   Q    And to your knowledge, that particular report, was it

12   disclosed to the defense prior to this hearing?

13   A    It was.

14   Q    Are you familiar with the Muhammad Art Exhibit and Contest

15   that was held in May in Garland, Texas?

16   A    I am.

17   Q    And can you please tell the Court a little bit about that

18   particular event.

19   A    Absolutely.  On May 3rd, 2015, an event was held at the

20   Curtis Culwell Center in Garland, Texas.  It was a contest

21   that was supposed to draw -- have a contest about drawing the

22   Prophet Muhammad.  Approximately 125 persons were in

23   attendance.

24        It started on or about 5:00 p.m. and ended on or

25   about 7:00 p.m.  At approximately 6:45, two persons,

CR15-00707-PHX-SRB  DETENTION HEARING  6-16-15

1   specifically Elton Simpson and Nadir Soofi exited the vehicle

2   which was located at the event and started firing their

3   weapon -- weapons.

4          During the course of the attack, both Simpson and

5   Soofi were killed by law enforcement and one security guard

6   was injured.

7   Q   And this particular contest, the Muhammad Art Exhibit and

8   Contest, it was set on May 3rd?

9   A   Yes, it was.

10  Q   Are you familiar with how far in advance it was

11  advertised?

12  A   I believe the -- it was first announced in February of

13  2015.

14  Q   And in the course of the investigation, after the shooting

15  and Simpson and Soofi were killed, did law enforcement

16  identify the weapons that Simpson and Soofi brought with them

17  when they drove to the Curtis Culwell Center that evening?

18  A   Yes.  There were six weapons; three rifles and three

19  handguns.

20  Q   And how much ammunition?

21  A   Approximately, 1500 rounds.

22  Q   Are you aware in this case of a three-count indictment

23  that was filed last week charging Abdul Malik Abdul Kareem?

24  A   Yes, I am.

25  Q   And stated in that particular Indictment is the date

CR15-00707-PHX-SRB  DETENTION HEARING  6-16-15

1    January 7th of this year, 2015.

2             In the course of this investigation, what date --

3    well, what relevance has that date?

4    A    That was the date of the Charlie Hebdo attack in France.

5    Paris, France.

6    Q    Can you tell the Court a little bit more about the Charlie

7    Hebdo attack?

8    A    There were a -- there was an attack by individuals on

9    the -- on the building or offices of Charlie Hebdo located in

10   Paris, France.  And through the attack there were a number of

11   persons that were killed and/or injured.

12   Q    What effect, if any, did the Charlie Hebdo attack have on

13   Abdul Malik Abdul Kareem based on the FBI's investigation in

14   this case?

15   A    As I understand it, it inspired him and/or motivated him

16   to conduct a western version of such attack.

17   Q    And how did the FBI learn that?

18   A    Through witnesses.

19   Q    Specifically, was there a source that reported that

20   information?

21   A    Yes.  CS-1.

22   Q    Additionally, did FBI learn in conjunction with the

23   investigation in this case that Kareem discussed going with

24   Simpson and Soofi to attack the Muhammad Art Exhibit and

25   Contest?

UNITED STATES DISTRICT COURT

```
 1   A   Yes.

 2   Q   And how is it that FBI learned that?

 3   A   Again, through witnesses, specifically, CS-1.

 4   Q   The government's memorandum to the court in this case

 5   discussed Kareem firing rifles in the desert this year in

 6   2015.

 7          Based upon the course of the FBI's investigation in

 8   this case, have any of those weapons that Kareem fired in the

 9   desert this year -- were any of those identified as weapons

10   that were found at the scene on May 3rd of 2015 in Garland,

11   Texas?

12   A   Yes.  There were three rifles that were found at the scene

13   of the Garland attack and those weapons were identified by

14   CS-1 -- no CW-1 as the exact weapons that were used to train

15   in the desert.

16   Q   And you referred to "CW-1."  Is that Confidential Witness

17   1?

18   A   Yes.

19   Q   And did -- in specifically talking about those three

20   weapons, did the confidential witness describe, give a verbal

21   description of what those weapons looked like?

22   A   Yes.  There were details, very specific details describing

23   those three rifles.  And then at a later point, law

24   enforcement provided photos of those rifles that were found at

25   the Garland, Texas, attack and that -- that witness identified
```

1    those as the ones that were used in the desert.

2    Q    How did the confidential witness know that those three

3    weapons identified from the scene of the Garland attack were

4    the same weapons that were used by Kareem in the desert?

5    A    That particular witness was there in the desert with

6    Kareem, Simpson, and Soofi.

7    Q    In the course of the investigation of this case, did the

8    FBI find .pdf files and videos on Kareem's computer and flash

9    drive?

10   A    Yes.

11   Q    And when was it that Kareem's computer and a flash drive

12   inside the computer was searched?

13   A    During the execution of a search warrant in 2012, the

14   residence of Kareem and two of his roommates, they discovered

15   both a computer that belonged to Kareem, as well as a flash

16   drive that was plugged into Kareem's computer.

17   Q    And so for clarity, it's an unrelated search warrant to

18   Kareem?

19   A    Yes.

20   Q    But nonetheless, his computer and a flash drive within it

21   was seized?

22   A    Yes.

23   Q    In reviewing the contents of the computer and the flash

24   drive, did the FBI find anything of note?

25   A    Yes.  Specifically, on the computer in the Recycle Bin

1   there was a document, a GIMF document, Global Islam Media

2   Front, I believe is what the acronym stands for.  This

3   document is an operational security document specifically

4   designed to be used by jihadists to evade the detection of law

5   enforcement and intelligence agencies.

6   Q   So that specific document, was it on the flash drive as

7   well as the computer?

8   A   I believe so.

9   Q   And was Kareem interviewed about whether or not that

10  computer and the flash drive were his?

11  A   Yes.  And he stated that the computer was his.

12  Q   Okay.  And what did he say about the flash drive?

13  A   That it was not his.

14  Q   The flash drive was inserted into the computer when it was

15  seized?

16  A   Yes.

17  Q   And on the flash drive, I want to talk about some of the

18  documents that were found.

19          Was there a few videos?

20  A   Yes.

21  Q   And did those videos include one by the title of "Training

22  That Makes Killing Civilians Acceptable"?

23  A   Yes.

24  Q   Was there another video entitled "When the Terrorist Were

25  Freedom Fighters"?

1   A   Yes.

2   Q   Additionally, on that flash drive was there a treatise

3   entitled, "A Treatise on the Legal Status of Using Weapons of

4   Mass Destruction Against Infidels"?

5   A   Yes.

6   Q   Were there also two copies of Inspire Magazine?

7   A   Yes.

8   Q   What's Inspire Magazine?

9   A   It is a magazine or publication published by al Qaeda.

10  Q   You mentioned that Kareem had stated the flash drive

11  wasn't his.  Did FBI return the computer to Kareem?

12  A   Yes, along with the flash drive.

13  Q   When Abdul Malik Abdul Kareem was arrested on June 20th --

14  or I'm sorry, June 10th of this year, just six days ago, did

15  he have any weapons or body armor in his possession?

16  A   Yes.

17  Q   What did he have?

18  A   He had a weapon in the vehicle that he was driving at the

19  time of his arrest.  And at a later time during that day,

20  after he was apprehended by law enforcement, he disclosed to

21  law enforcement that he also had additional weapons at his

22  residence.

23      During the course of the search we discovered one

24  weapon and then body armor, specifically a vest, that was in a

25  safe in his room.

1    Q    Did Kareem make any statements about whether or not those

2    weapons were his?

3    A    Yes.  He claimed that those weapons were his.

4    Q    Additionally, was any body armor located?

5    A    Yes, a vest that was in the safe, a gun safe in his room.

6    Q    In the course of FBI's investigation in this case, did --

7    has the FBI learned that Kareem made statements about wanting

8    to join ISIS?

9    A    Yes.

10   Q    What did the FBI learn?

11   A    He told a witness that he wanted to join ISIS, in addition

12   to watching ISIS videos with Simpson and Soofi.

13   Q    And that witness, was that the confidential source?

14   A    Yes, it was.

15   Q    The same individual who Kareem discussed going to -- well,

16   joining Simpson and Soofi for the attack on the Muhammad Art

17   Event and Contest?

18   A    Yes.

19   Q    Did the FBI learn in the course of this investigation that

20   Kareem discussed attacking other venues beyond the Muhammad

21   Art Exhibit?

22   A    Yes.  Specifically, the Super Bowl in 2015 which was

23   located in Phoenix, Arizona or Glendale.

24   Q    And were those statements made by Kareem this year?

25   A    Yes.

1    Q    And who reported -- who was the -- was it the source that

2    reported that?

3    A    Yes.  CS-1.

4    Q    This year in 2015 did Kareem attempt to acquire pipe

5    bombs?

6    A    Yes, he did.

7    Q    And what have you learned about that?

8    A    Through -- it was specifically during a New Year's

9    celebration in 2014, December 31st, last January 1st, 2015,

10   Simpson, Soofi, and Kareem were celebrating New Years.

11           They were lighting off fireworks.  And as part of

12   that there was a bottle that contained fireworks.  When that

13   was detonated, that intrigued Malik or Kareem.  And at that

14   point he asked CS-1 to help acquire and/or build the -- you

15   know, additional pipe bombs.

16   Q    Was that a one-time request by Kareem to the source to get

17   a pipe bomb?

18   A    No, that was ongoing.

19   Q    And was it ongoing this year?

20   A    Yes.

21   Q    On May 8th of this year did the FBI ask the source to

22   engage in a consensual recording?

23   A    Yes.

24   Q    And in that recording did the source report that Kareem

25   discussed pipe bombs?

1    A    Yes.

2    Q    How so?

3    A    That they had a conversation about the source assisting

4    Kareem in obtaining additional pipe bombs.   The conversation

5    though was a little convoluted in that it was -- it was used

6    or there was coded language.

7    Q    Explain to us what "coded language" means in this context.

8    A    Coded language is typically used by bad guys so that law

9    enforcement and others may not understand the real topic of

10   the conversation.

11   Q    And is that something, based upon your training and

12   experience over the years in FBI, that you have noted as a

13   trend with individuals who may be talking about discussing

14   illegal things?

15   A    Absolutely.

16   Q    And in this particular recorded call on May 8th of this

17   year, was the term "pipe bomb" ever specifically used?

18   A    Not to my knowledge.

19   Q    So how did the conversation evolve?

20   A    Would you like me to read it.

21   Q    Please.

22   A    CS-1:  "I found south things you asked me about a while

23   ago.":

24        Kareem:  "I know what you talking about.  What was

25   the number?"

CR15-00707-PHX-SRB   DETENTION HEARING   6-16-15

```
1              CS-1:  "Like, 350."

2              Kareem:  "For real?"

3              CS-1:  Yeah, but I mean, there are deeper ones.  I

4    just don't know --

5              THE COURT:  Let me stop you there.

6              Cheaper ones?

7    A   I'm sorry.

8              "...cheaper ones.  I just don't know.  That was just

9    for really nice one.  He had some for like a bill-fifty, a

10   hundred bucks."

11             Kareem:  "Yeah, we'll get together."

12             CS-1:  "All right."

13             Kareem:  "You think they'll still have them?"

14             CS-1:  "Yeah, they'll have them, it's like a solid

15   connect, I've already gone through them, like, twice now,

16   so..."

17             Kareem:  All right, that'll work.  That will

18   definitely work."

19   Q   Did CS-1 report to the FBI that this conversation in

20   particular, this segment that you just read, was, in fact, a

21   coded conversation about pipe bombs?

22   A   Yes.

23   Q   And following up on previous conversations and requests by

24   Kareem to provide pipe bombs?

25   A   Yes.
```

CR15-00707-PHX-SRB  DETENTION HEARING  6-16-15

1   Q   Did the source report that Kareem had requested to

2   purchase from the source any other weapons or items?

3   A   Yes.  Silencers and protective armor, yes, body armor.

4   Q   And was that back in January/February of this year?

5   A   Yes.

6   Q   And did the source provide to Kareem the silencers and

7   body armor that Kareem asked to purchase?

8   A   No.

9   Q   What was Kareem's response to that according to the

10  source?

11  A   He became angry.

12        MS. BROOK:  I don't have any other questions, Your

13  Honor.

14        THE COURT:  Mr. Maynard?

15        MR. MAYNARD:  A couple.

16                        **CROSS EXAMINATION**

17  BY MR. MAYNARD:

18  Q   Agent, it sounds like the majority of these charges or

19  this case stems from information you've got from this

20  confidential source?

21  A   To my knowledge.

22  Q   Okay.  When did this confidential source come to the FBI?

23  A   Well, there was CS-1 and there was CW-1.

24  Q   I understand.  And I understand the difference.  "CW" is

25  "confidential witness"?

1    A    Okay.

2    Q    "CS" is "confidential source," correct?

3    A    Yes.

4    Q    And through this testimony, you have told us all of these

5    things that the confidential source has told the FBI.  You

6    told us about one particular thing dealing with the

7    confidential witness, and that was that there were three guns

8    that he had seen out in the desert and you believe those were

9    the three guns that were used in Garland, Texas?

10   A    Yes.

11   Q    Okay.  That's really all you got from the confidential

12   witness?

13             MS. BROOK:  I object to misstating testimony.

14             THE COURT:  I'm going to overrule it.

15   BY MR. MAYNARD:

16   Q    I mean, the vast majority of what you've told us about so

17   far has been from the confidential source, correct?

18   A    Yes, a good portion, yeah.

19   Q    Okay.  Now, when did the confidential source become known

20   to the FBI?

21   A    On or about May 7th.

22   Q    How did the FBI learn of the confidential source?

23             MS. BROOK:  And, Your Honor, I'm going to object here

24   to make sure we tailor our questions to those that do not go

25   to identity or revealing identity.

1    THE COURT:  Well, Mr. Maynard hasn't asked for the

2 identity of the confidential source or the confidential

3 witness.  I'm going to allow his questions.

4    THE WITNESS:  Another law enforcement agency advised

5 or contacted the FBI regarding the existence of CS-1.

6 BY MR. MAYNARD:

7 Q   Was -- were or is the confidential source a Muslim?

8 A   I'm not aware of that.  I don't believe so.

9    MS. BROOK:  And, Your Honor, again, I would move to

10 strike as it goes to identity.

11    THE COURT:  It's fairly broad.  I don't think it

12 identifies your confidential source.  I'm going to overrule.

13 BY MR. MAYNARD:

14 Q   Was the -- had the confidential source been arrested by

15 some law enforcement agency in the Valley?

16 A   I am not aware of all the details of the confidential

17 source's illegal activity other than what's disclosed in this

18 memorandum in the footnote.

19 Q   Okay.  Well, the footnote discloses to us that the

20 confidential source was recently arrested on domestic violence

21 charges, correct?

22 A   If that's what that states in the memorandum, then, yes.

23 Q   Well, I don't want you to misstate anything.  Why don't

24 you look at page 8.

25 A   Okay.

1    Q    All right.  Look at the footnote.  That's what it says,

2    correct?

3    A    It is.

4    Q    Is that what you understand?

5    A    Yes.  That's what I understand.

6    Q    And do you understand that whoever had arrested him,

7    whatever agency that was, then came to the FBI and says:  I've

8    got somebody here with some information that you might want to

9    hear.

10   A    I don't know if that was the sequence of events.

11   Q    There would be somebody at the FBI who has more knowledge

12   than you do about these things?

13   A    Absolutely.

14   Q    And do you recall whether or not the confidential source

15   had also been arrested for kidnapping?

16   A    According to the footnote, yes; domestic violence charges

17   or kidnapping, yes.

18   Q    And adult sex trafficking?

19   A    Yes, according to the footnote, yes.

20   Q    And according to the footnote, the FBI then pays this

21   individual $500 for information?

22   A    A one-time payment, yes.

23   Q    A one-time so far at least?

24   A    Yes.

25   Q    Okay.  And according to the footnote, the FBI gave this

CR15-00707-PHX-SRB   DETENTION HEARING   6-16-15

```
 1   individual the $500 on May 15th, correct?
 2   A   I'm not certain what date that they paid.
 3   Q   Well, look at the footnote.  Let's make sure you're
 4   certain.
 5   A   Yes.
 6   Q   Okay.  And according to the footnote, the confidential
 7   source has also been involved with stolen vehicles and using
 8   illegal drugs in the past, correct?
 9   A   Yes.
10   Q   Do you know whether or not the confidential source had
11   been -- had ever lived with Mr. Abdul Kareem?
12        MS. BROOK:  Objection, Your Honor.  Continuing
13   objection to questions to elicit identification.
14        THE COURT:  I'm going to sustain that objection.
15   BY MR. MAYNARD:
16   Q   Now, the confidential source told you that he had been in
17   the desert and had seen Mr. Abdul Kareem shooting with Simpson
18   and Soofi; is that correct?
19   A   Yes.  Yes.
20   Q   Okay.  And the confidential witness that you have, the
21   other individual --
22   A   Uh-huh.
23   Q   -- did he tell you whether or not the confidential source
24   was there at the time that he was in the desert with them?
25   A   I'm unaware of that.
```

CR15-00707-PHX-SRB   DETENTION HEARING   6-16-15

1   Q   Okay.  And so you just don't know one way or the other?

2   A   Correct.

3   Q   All right.  Now, part of this memoranda tells us that Mr.

4   Abdul Kareem had been looking at -- or rather that there was

5   material, inflammatory material, advocating the use of weapons

6   of mass destruction towards civilians on his computer.

7           You're aware of that?

8   A   On the flash drive.

9   Q   Okay.  It's on the flash drive.  And the flash drive, he

10  contended, did not belong to him, correct?

11  A   Correct.

12  Q   But he told you the computer was his?

13  A   Correct.

14  Q   And all of this occurred back in 2012?

15  A   Yes.

16  Q   And at the time in 2012 are you aware whether or not Mr.

17  Abdul Kareem was living with Mr. Simpson?

18  A   I do not know.

19  Q   Do you know whether or not Mr. Abdul Kareem told the FBI

20  at that time that the flash drive wasn't his but it belonged

21  to Mr. Simpson?

22  A   I don't know that answer.

23  Q   You've never had that discussion with any of the other

24  agents that are involved in this case?

25           MS. BROOK:  Objection, Your Honor.  Asked and

CR15-00707-PHX-SRB   DETENTION HEARING   6-16-15

1    answered.

2              MR. MAYNARD:   Judge --

3              THE COURT:   You did ask her if she had discussed it

4    with any of the other agents.   You can rephrase it if you're

5    trying to elicit some different information.

6    BY MR. MAYNARD:

7    Q    All right.   Have you ever discussed with any of the other

8    agents who owns the flash drive?

9    A    No.

10   Q    And you've never heard any agent say that the flash drive

11   was owned by Mr. Simpson?

12   A    No.   I don't know the ownership.

13   Q    Okay.   Do you know that Mr. Abdul Kareem said that he

14   didn't own it but it was owned by Mr. Simpson?

15   A    I knew that Mr. Kareem said that it was not his, but I did

16   not know who he claimed it belonged to.

17   Q    All right.   Were you involved in that investigation back

18   in 2012?

19   A    I was not.

20   Q    When did you get involved in it?

21   A    Which case?

22   Q    When did you get involved in the investigation that has

23   resulted in us being here today?

24   A    On May 4th, essentially, after the -- the day after the

25   attack.

UNITED STATES DISTRICT COURT

```
 1   Q    Okay.  Are you aware whether or not the FBI had been

 2   following Mr. Simpson prior to May 4th of 2015?

 3   A    Yes.  I was aware that there was an investigation on

 4   Mr. Simpson.

 5   Q    And you were -- were you aware that prior to -- strike

 6   that.

 7        Were you aware that back in 2012 when the FBI got Mr.

 8   Abdul Kareem's computer, that he was living with Mr. Simpson?

 9   A    Um --

10        MS. BROOK:  Your Honor, again, asked and answered.

11   He's asked that question previously.

12        THE COURT:  I do have it in my notes that you asked

13   her that.

14   BY MR. MAYNARD:

15   Q    You were aware that Mr. Simpson and Mr. Abdul Kareem had

16   not lived together for several years?

17   A    I don't think I knew the length of time since they've

18   lived together, no.

19   Q    You're aware that they were not living together in 2015?

20   A    I believe so.

21   Q    You believe you were aware that they were not living

22   together?

23   A    Yes.

24   Q    I don't want a double negative.

25   A    No.  No.  I understand.
```

1            Yes, I believe so.

2   Q    All right.  When the FBI arrested Mr. Abdul Kareem

3   recently, they had a search warrant and they went to his

4   apartment, correct?

5   A    Yes.

6   Q    And there was a computer there, correct?

7   A    Yes.  Uh-huh.

8   Q    Is that a "yes"?

9   A    Yes.

10  Q    And did you look at the computer to determine whether or

11  not there was any of this inappropriate material concerning

12  mass killings or --

13  A    This was in 2015?

14  Q    Yes.

15  A    This recent search?

16  Q    Yes.

17  A    No.  We have not had a chance to review the computer.

18  Q    You mean you arrested him on June 10th.  We're here now on

19  the 16th.  And nobody has either turned on the computer or

20  looked at flash drives to determine whether or not there is

21  any material similar to what you saw in 2012?

22  A    No.  When we -- during the execution of the search

23  warrant, we only had an order to seize the computer.  We did

24  not have a search warrant to search the computer.

25  Q    So as of right now you haven't looked at the computer?  It

1    hasn't been turned on.  Is that your testimony?

2           MS. BROOK:  Your Honor, asked and answered.

3           THE COURT:  Sustained.

4           She answered the question.  She explained they had a

5    search warrant to seize it, not to search it, and they haven't

6    searched it.

7           MR. MAYNARD:  Judge, the last thing I ever want to do

8    is argue with a judge, but I thought she said that at the time

9    they executed the warrant that's all they had for it.

10          It's been six days since they executed it.  I'm

11   wondering in that six-day period if they looked at it?

12          THE COURT:  Well, I think what you need to ask her is

13   whether they have obtained a search warrant to search it or

14   whether they have searched it in the interim.

15          You didn't ask her that.  You asked her the same

16   question you asked before.

17   BY MR. MAYNARD:

18   Q   Have you obtained a search warrant and looked at the

19   computer since you obtained possession of it?

20   A   We have obtained a search warrant to search the computer.

21   I do not know if that -- that any review of the content of the

22   computer has been conducted.  It's a process.

23          Once we're able to start the search process, our

24   computer forensic experts have to go through a process to

25   review the documents before it's turned over, the items

1    contained on the computer before it's turned over to

2    investigators.

3              So I'm not sure at this point where that process is.

4    Q    Okay.  After the shooting in Garland, Texas, on May 3rd,

5    when did the FBI first learn about Mr. Abdul Kareem?

6    A    I don't know that answer.

7    Q    Were you involved in any interviews with him on either May

8    5th or May 6th?

9    A    No.

10   Q    Are you aware that someone from the FBI called him on May

11   5th and asked him to come to the FBI office?

12   A    Yes.

13             MS. BROOK:  I object to speculation -- I'll withdraw

14   my objection.

15             THE COURT:  Go ahead.

16             THE WITNESS:  Yes.

17   BY MR. MAYNARD:

18   Q    Are you aware that he came voluntarily to the FBI office

19   to be interviewed?

20   A    Yes.

21   Q    And are you aware that he did that on May 6th?

22   A    I'm not aware of May 6th.

23   Q    Okay.  Did you participate in that interview?

24   A    No.

25   Q    Is that interview recorded?

1  A   I don't know that answer.  I assume so, but I do not know

2  that answer.

3  Q   After he was interviewed, he was free to go, correct?  He

4  was not under arrest?

5  A   Correct.

6  Q   Okay.  If I understand correctly, then a day later the

7  confidential source comes -- becomes known to the FBI,

8  correct?

9  A   I believe so.

10  Q   And then the FBI has this confidential source make a

11  telephone call on May 8th to Mr. Abdul Kareem; is that

12  correct?

13  A   That is correct.

14  Q   Okay.  And the confidential source -- strike that.

15      Did you participate in interviewing the confidential

16  source prior to the telephone calls?

17  A   Not at all.

18  Q   Okay.  It's your understanding that the confidential

19  source has told the FBI that Mr. Abdul Kareem wanted to

20  purchase materials to build a pipe bomb?

21  A   Yes.

22  Q   Okay.  And that the confidential source then told you or

23  told the FBI that Mr. Abdul Kareem became angry when that

24  information or those materials were not sold to him; is that

25  correct?

CR15-00707-PHX-SRB   DETENTION HEARING   6-16-15

```
 1    A    Correct.
 2    Q    Okay.  Has the FBI done anything to confirm whether or not
 3    the confidential source knew how to build a pipe bomb?
 4    A    I'm unaware of -- I don't know.
 5    Q    You don't know?
 6    A    I don't know.
 7    Q    The confidential source also advised the FBI that Mr.
 8    Abdul Kareem asked him about buying silencers, correct?
 9    A    Correct.
10    Q    And has the FBI done anything to confirm whether or not
11    the confidential source had access to silencers?
12    A    I don't know that answer either.
13    Q    The confidential source also told you that Mr. Abdul
14    Kareem was asking about purchasing bulletproof vests or
15    jackets?
16    A    Uh-huh.  Yes.
17    Q    Correct?
18    A    Yes.  Correct.
19    Q    FBI done anything to confirm whether or not he even had
20    access to sell those?
21    A    I don't know that answer either.
22    Q    Has the FBI done a search of the confidential source's
23    residence?
24    A    I do not know that answer either.
25    Q    So I take it you don't -- do you know whether or not the
```

1    FBI's determined if the confidential source had any pipe

2    bombmaking material, silencers, or flack jackets or vests?

3    A    Yeah.  I don't know.

4    Q    You don't know.

5            What has the FBI done to corroborate what the

6    confidential source has told you about all of these

7    allegations?

8    A    Because I'm not the lead investigator, I'm just assisting,

9    I don't know that answer.

10   Q    Now, he told the FBI all of this on May 8th and it's not

11   until three -- two days later that Mr. Abdul Kareem was

12   arrested, correct?

13   A    Correct.

14   Q    During that 32-day period did the FBI follow Mr. Abdul

15   Kareem?

16   A    Yes.  I believe so.

17   Q    Did the FBI ever see him do anything that indicated that

18   he was going to try to build a pipe bomb?

19   A    That I don't know.

20   Q    Do you know whether or not it looked like he was trying to

21   do anything to buy any rifles or any type of other guns?

22   A    Again, I don't know.

23   Q    In fact, the day the FBI arrested him, he was driving a

24   moving van, correct?

25   A    Correct.

1    Q    And he owns a moving company?

2    A    Git-r Done.

3    Q    Git-r Done.  And he had gotten her done that morning by

4    loading up the truck for a woman, correct?

5    A    He did, correct.

6    Q    And he was stopped at a convenience store and was inside

7    buying water when the FBI pulled up?

8    A    That's my understanding, yes.

9    Q    And is it your understanding that he came out the front

10   door when he saw the FBI agents out front?

11   A    That I don't know.

12   Q    You're not aware of him having made any effort to try to

13   escape or run away or hide or go out the back door, are you?

14   A    Again, I'm not aware of that.

15   Q    Okay.  And during that 32-day period after the FBI had

16   interviewed him when he had shown up voluntarily at the FBI's

17   office, did the FBI ever see him do anything that indicated

18   that he was going to try to run, go to Mexico, go to Canada,

19   or even go to another state?

20   A    Again, I don't know those details.  I can't answer that.

21   Q    Excuse me just a moment, Your Honor.

22        Oh.  The telephone conversation that was recorded on

23   May 8th, this coded language used by bad guys?

24   A    Yes.

25   Q    That's what you said?

1  A   A good way to say it, yes.

2  Q   Okay.  Now what it says is:

3        "I found some things" --

4        The confidential source says -- and I'm looking at

5  page 10.

6  A   Yes.

7  Q   "I found some things you asked me about a while ago."

8        Kareem:  "I know what you talking about.  What was

9  the number?"

10        "Like, 350."

11        Okay.  Have you decoded this yet?  Is that the price

12  or the number or how many?

13  A   I believe it's the price.

14  Q   The price.

15        "For real?"

16        "Yeah, but I mean, there are cheaper ones.  I just

17  don't know.  That was just for a really nice one.  He had some

18  for like a bill-fifty, a hundred bucks."

19        "Yeah, we'll get together."

20        "All right."

21        "You think they'll still have them?"

22        "Yeah, they'll have them, it's like a solid connect.

23  I already gone through them, like, twice now."

24        "All right, that'll work.  That will definitely

25  work."

1    So what the FBI has determined from this coded

2  language by the bad guys is that he was looking to buy some

3  sort of pipe bomb for 350, but he could buy some cheaper

4  versions for either 150 or a hundred bucks?

5  A   That is my understand.

6  Q   Have you done anything -- has the FBI done anything to

7  determine where these alleged pipe bombs would have come from?

8  A   I don't know that answer.

9  Q   Your original testimony was that this confidential source

10  was going to teach him how to make pipe bombs.  Why is he now

11  calling this confidential source to buy pipe bombs that are

12  already made?

13        MS. BROOK:  Objection.  Speculation.

14        THE COURT:  I guess you can ask her the question

15  differently.

16        MR. MAYNARD:  Yes, ma'am.

17  BY MR. MAYNARD:

18  Q   Did you ask the confidential source why he was asking him

19  to buy already-made pipe bombs rather than making them

20  himself?

21  A   My understanding is Mr. Kareem wanted CS-1 to either

22  assist in acquisition of pipe bombs and/or help build pipe

23  bombs or provide instruction or guidance for them to build

24  pipe bombs.  So it was kind of a tri-fold effort.

25  Q   So CS-1, according to you, told the FBI that at some point

1    Mr. Abdul Kareem had asked him about showing him how to build

2    pipe bombs; and CS-1 had said, no, he wouldn't do it.

3            Mr. Abdul Kareem had asked CS-1 about buying

4    silencers; and he said, no, I won't do it.

5            He asked him about buying protective gear or flack

6    jackets; and he said, no, I wouldn't do it.

7            But yet on May 8th, two days after he's been

8    interviewed by the FBI, it's your understanding from CS-1 that

9    Mr. Abdul Kareem is talking to a guy that he's mad at because

10   he wouldn't do these things for him before, about buying

11   already-made pipe bombs?

12           MS. BROOK:  I would object to that question.

13   Misstating prior testimony in relation to the pipe bomb and

14   how the request for purchase first was made as well as the

15   evolution of the other discussions.

16           THE COURT:  Overruled.

17           MR. MAYNARD:  I'm sorry?

18           THE COURT:  I overruled her objection.  The witness

19   can answer.

20           MR. MAYNARD:  You can answer.

21           THE WITNESS:  Could you repeat that?

22           MR. MAYNARD:  Probably not.

23   BY MR. MAYNARD:

24   Q   Is it your understanding that CS-1 and Abdul Kareem had

25   had a falling out recently?

1  A   That I don't know.

2  Q   You don't know when this falling out occurred?

3       MS. BROOK:  Your Honor, objection.  Misstates

4  testimony.  Again, goes to identification.

5       THE COURT:  I'm going to sustain it with respect to

6  identification.

7       You can ask her about prior testimony -- I believe

8  what you're getting at, Mr. Maynard, is some discussion as to

9  whether Mr. Kareem was angry because the CS would not acquire

10 certain guns for him?

11      MR. MAYNARD:  Yes.

12      THE COURT:  So why don't you go back to that a little

13 more specifically?

14 BY MR. MAYNARD:

15 Q   Let me ask you.

16      Do you have an understanding of how long it had been

17 since the CS-1 had contacted Abdul Kareem prior to this phone

18 call?

19 A   I don't know that answer.

20 Q   Okay.  Let me -- you also know that not only does he own a

21 moving company Git-r Done, but he also does carpet cleaning,

22 correct?

23 A   That's my understanding.

24 Q   This could easily be about a carpet cleaner is between

25 $350 and $150?

```
 1   A   Other than CS-1 at a later point confirmed that this
 2   discussion was about pipe bombs.
 3   Q   Yeah.
 4           CS-1 seems to be the basis for all of this, correct?
 5           MS. BROOK:  Objection.  Misstates testimony.
 6           THE COURT:  Overruled.
 7           THE WITNESS:  I would not say that everything is
 8   based on CS-1.  It's a combination of a number of
 9   investigative techniques and -- so, no.
10   BY MR. MAYNARD:
11   Q   Well, the FBI certainly didn't think he was a threat on
12   May 6th when he came in and talked to them.
13           MS. BROOK:  Objection.  Speculation.
14           MR. MAYNARD:  Correct?
15           THE COURT:  Sustained.
16   BY MR. MAYNARD:
17   Q   I mean, they let him go, correct?
18   A   They did let him go.
19   Q   Did you -- from the 32 days, did you see any illegal
20   activity on his part?
21           MS. BROOK:  Asked and answered.
22           THE COURT:  I'm going to allow the question.
23           THE WITNESS:  Not to my knowledge -- I'm not certain.
24   BY MR. MAYNARD:
25   Q   As far as you know, did he stay in Maricopa County and
```

CR15-00707-PHX-SRB   DETENTION HEARING   6-16-15

```
 1    just carry on his day-to-day business and life?

 2              MS. BROOK:  Objection.  Speculation.

 3    BY MR. MAYNARD:

 4    Q   As far as you know?

 5              THE COURT:  She can answer the question.  Overruled.

 6              You can answer the question.

 7              THE WITNESS:  I don't know.

 8              MR. MAYNARD:  All right.  I don't have any further

 9    questions, Your Honor.

10              THE COURT:  Ms. Brook, do you have any redirect.

11              MS. BROOK:  Briefly.

12                         REDIRECT EXAMINATION

13    BY MS. BROOK:

14    Q   Six days ago on June 10th when the defendant Abdul Malik

15    Abdul Kareem was arrested, was he found in possession of a

16    bulletproof vest?

17    A   It was at his residence.

18    Q   And it was inside of his residence?

19    A   It was in his room in a safe.

20    Q   Additionally, you had spoken before about two weapons that

21    the defendant had identified as being his weapons?

22    A   Yes.

23              MR. MAYNARD:  Your Honor, objection.  It's beyond the

24    scope.  I never asked about weapons or the vest.

25              THE COURT:  That's true, but I'm going to allow it.
```

1    The evidentiary rules are somewhat relaxed in a detention

2    hearing.

3              Could you repeat that?

4    BY MS. BROOK:

5    Q    When he was arrested on June 10th of this year, six days

6    ago, was he found in possession of two weapons?

7    A    One weapon in the vehicle and one weapon at his residence.

8    Q    Is he permitted to own a weapon?

9    A    No.

10   Q    Why not?

11   A    He is a convicted felon.

12   Q    Defense counsel asked you about the computer and the flash

13   drive.  In 2012 you testified that the defendant's computer

14   and a flash drive that was in it was seized?

15   A    Correct.

16   Q    And who was it that took possession of the flash drive?

17   Who did the FBI give it to?

18   A    Mr. Kareem.

19   Q    And who did they give the computer to?

20   A    Mr. Kareem.

21   Q    Defense counsel asked you about documents and videos being

22   on the flash drive separate and apart from what was on the

23   computer?

24   A    Correct.

25   Q    And specifically, was there one document that was on both

1   devices, the computer and the flash drive?

2   A   Yes.

3   Q   And was that the GIMF, security and intelligence force?

4   A   Yes.

5   Q   Defense counsel asked you questions about the Confidential

6   Source No. 1, and specifically, about charges that the

7   Confidential Source No. 1 has filed currently against him?

8   A   Yes.

9   Q   Is it your understanding that those are still charges and

10  not a conviction?

11  A   Yes.

12  Q   Additionally, FBI in this case has paid that particular

13  source money as we've talked about?

14  A   Yes.

15  Q   Are you aware of the date that that money was paid?

16  A   I believe it was May 15th.

17  Q   And that was the $500?

18  A   Correct.

19  Q   And on May 7th were any promises or benefits conferred to

20  the source on that particular day in exchange for the

21  interview that occurred?

22  A   Not to my knowledge.

23  Q   Defense counsel asked you whether or not this case is just

24  based upon the confidential source's report.

25          Based upon your understanding of this case, is the

```
 1   case just based upon the confidential source?

 2   A   Absolutely, not.

 3   Q   Are there additional witnesses that we have not talked

 4   about here?

 5   A   Absolutely.

 6   Q   Is there additional evidence that we have not talked about

 7   here?

 8   A   Yes.

 9   Q   Forensic reviews of computers, can those happen

10   immediately?

11   A   No.  Generally, no.

12   Q   Do they take time?

13   A   Yes.  In my experience they do.

14   Q   And just for clarity sake, we spoke about the confidential

15   source.  We also spoke about the confidential witness,

16   Confidential Witness No. 1.

17   A   Yes.

18   Q   Is that the individual that identified the three weapons,

19   those rifles that the defendant Kareem shot with in the desert

20   this year alongside Simpson and Soofi?

21   A   Yes.

22   Q   And did that confidential witness identify those three

23   rifles as the same three rifle that's were found at the scene

24   of the Garland, Texas, shooting on May 3rd of this year?

25   A   Yes.
```

```
 1   Q   On that flash drive that was seized inside the defendant's
 2   computer in 2012, did it contain violent videos inciting
 3   violence against civilians?
 4           THE WITNESS:  Absolutely.
 5           MS. BROOK:  I don't have any other questions.
 6           THE COURT:  All right.  Thank you, Agent McCarthy.
 7   You can step down.
 8           THE WITNESS:  Thank you.
 9           THE COURT:  Ms. Brook, did you wish to call any other
10   witnesses?
11           MS. BROOK:  No, Your Honor.
12           THE COURT:  And you indicated you wished to proceed
13   by proffer as well.
14           What did you wish to proffer?
15           MS. BROOK:  May I proceed back to the podium?
16           THE COURT:  Yes, you may.
17           MS. BROOK:  Your Honor, you have had an opportunity
18   in this case to read our brief and I would like to focus in on
19   three main points which strike at the very heart of why Kareem
20   should be detained pending trial in this case.
21           The first, I would like to talk about the details
22   related to this crime.  And in particular, one word comes to
23   mind, which is "horrific."
24           This was an attempted mass murder and the defendant
25   Kareem had been indicted for facilitating that attempted mass
```

1   murder.

2          The May 2015 attack on the attendees of the Muhammad

3   Art Exhibit and Contest in Garland, Texas; the attack that

4   resulted in the death of Kareem's close associates, Simpson

5   and Soofi and the wounding of a law enforcement officer.

6          Special Agent Dina McCarthy testified that inside the

7   building at the time of the attack were roughly 125 people;

8   that that particular event was set to conclude within 15

9   minutes of the time Simpson and Soofi showed up with 1500

10  rounds of ammunition and six weapons, including three rifles

11  and two -- and three additional guns.

12         Your Honor, what's important about this crime, the

13  details are obviously horrific, but this was an

14  ideologically-motivated attempted mass murder which compels

15  the conclusion that Kareem is, in fact, a grave danger the

16  community and is a flight risk.

17         You have had heard testimony in this particular case

18  about the ripple effect of the Charlie Hebdo attack which

19  occurred in Paris, France, on January 7th of 2015; how that

20  motivated and upset the defendant.

21         But, Your Honor, there is more than just that one

22  first fact, the details of this crime which the defendant has

23  been indicted for facilitating to attempt.

24         The second is that this is not the only time that the

25  defendant has attempted to incite violence.  So we have heard

1    testimony here today that a search of his computer and the

2    flash drive that was inside of it showed videos, including one

3    that was entitled "Training That Makes Killing Civilians

4    Acceptable."

5         These videos were ones that were apt to incite

6    violence.

7         Additionally, you have heard testimony about how

8    these videos are inflammatory; and additionally, the videos

9    that advocate the use of weapons of mass destruction and

10   violence towards civilians.

11        You heard testimony today about how the defendants

12   attempted to purchase pipe bombs, bulletproof vests, and

13   silencers.  Additionally, how he discussed plans to attack

14   other venues, including the Super Bowl.

15        And even at the time that this defendant was

16   arrested, Kareem a prohibited possessor, he was himself in

17   possession of weapons and body armor.

18        This defendant, based upon all of these facts, is

19   dangerous.  He is off-the-charts dangerous.

20        A third point, Your Honor, which is also very

21   important, I hesitate to bring it up as the first two points

22   in this particular case are so powerful, but this is a

23   defendant that does not follow orders of the court.

24        Kareem has a long history of violating court orders,

25   violating terms of probation, driving drunk when he was on

probation for his last drunk driving offense, and even now

when he is a prohibited possessor, being arrested six days

ago.  He was illegally in possession of weapons.

So even if that danger calculus with the first two

points that we've talked about, the event itself, the fact

that this is an individual who is apt to incite violence, this

is also an individual who has not availed himself of court

orders before.

So the defendant has all of the hallmarks of someone

who is not going to follow court orders; and is, therefore,

somebody who is a flight risk.

Your Honor, in this case I want to address what

Pretrial Services has said in their report.  Pretrial Services

has agreed that he is a flight risk, that he is dangerous.

But they think that if they tell him not to do

something and that they are going to monitor him, it will stop

him.

Respectfully, Your Honor, this is an individual that

has been told by courts again and again how to act and time

and time again he disregards those court orders; driving drunk

while on probation, violating a court order in the most

flagrant way by breaking the law, not once, not twice, but

three times.

And if that wasn't enough, he's also been told time

and time again that he cannot possess weapons anymore.  But

```
 1    just six days ago he was arrested in possession of weapons.

 2              I would respectfully submit, Your Honor, that when

 3    you have somebody that is part of planning an

 4    ideologically-motivated attempted mass murder, a piece of

 5    paper telling him how to act is not going to reduce the risk

 6    to this community.  It's not going to ensure his presence for

 7    future court hearings.

 8              Your Honor, the government respectfully requests this

 9    Court to order that the defendant be detained pending the

10    duration of this case based on the fact that he is a grave

11    danger to the community and a flight risk where no condition

12    or combination of conditions can reasonably assure his

13    presence and the safety of our community.

14              Thank you.

15              THE COURT:  Thank you.

16              Mr. Maynard, did you wish to call any witnesses?

17              MR. MAYNARD:  No, Your Honor.

18              Proffer.

19              THE COURT:  Please come forward.

20              MR. MAYNARD:  Your Honor, I would be the last one to

21    argue that the allegations that the government has made are

22    not serious.  They are.

23              But my client is not a flight risk.  My client is not

24    a threat or a danger to this community.

25              The government has done its best in a very short
```

1    period of time in both the memoranda that it sent to you

2    either last night or early this morning and in the witness

3    that it put on today to try to frighten all of us that this is

4    a violent man and that there are no terms or conditions under

5    which you can impose that will make sure that he does not

6    commit violence and that he makes all of his court

7    appointments.  And that's just not the case.

8            Judge, Pretrial Services prepared a report and they

9    are the experts in this area.  And they go off and they look

10   and they make a determination as to whether or not there are a

11   set of terms and conditions under which the individual can be

12   released that will do the best we can to ensure that he will

13   make all of his court appointments and to protect the public.

14   And they have said that there are.

15           The government has just told you, as they said on

16   page 5 of their memoranda, that Pretrial Services correctly

17   concludes that Kareem poses a flight risk for several

18   independent reasons.  And they just told you that again.

19           Well, when I look at the Pretrial Service Report on

20   page 6 under Assessment of Nonappearance, I see nothing.

21           There is nothing there that says he's a flight risk.

22   In fact, what it says is he's a defendant with a long-time

23   residence -- resident of the District with financial and

24   family ties.

25           He has a brother that lives here.  He owns a company.

1   On the day he was arrested, he was working.

2           They go on to say:  He has no history of failures to

3   appear.  However, on three occasions, while either on

4   probation, reinstated, or continued, he didn't comply with

5   court orders.  Well, let's talk about that.

6           From 1997 to 2004 he had three DUIs.  He hasn't had

7   any conviction in the last eleven years.

8           When the government tells you that he doesn't comply

9   with court orders, they're talking about things that happened

10  over eleven years ago and they're exactly the same thing.

11  They are -- he was either told not to drink or not drive on a

12  suspended license and he did.

13          Now, that's not the kind of thing that makes him a

14  danger to the community if it hasn't happened in eleven years.

15          Pretrial went on to say Pretrial Service believes

16  there is a condition or combination of conditions to address

17  the above issues.  They don't say he's a flight risk.  It's

18  not there.  The government is disingenuous when it tells you

19  that they say it is.

20          Secondly, is he a danger to the community?

21          Judge, what we have is an individual who had his

22  computer taken back in 2012 and we're told what horrendous

23  material was on it.

24          He admitted that the computer was his.  He denied

25  that the drive was his.

1           If it was so bad, the government gave it back to him.

2     The government has been -- I would assume -- watching him off

3     and on.  I would hope so if they thought he was such a

4     dangerous individual since 2012.

5           He certainly hasn't committed any crimes.  He hasn't

6     done anything.  He hasn't left the country.  There's no

7     testimony that he has done anything of that nature to give

8     this Court pause or to make this Court think that he's going

9     to leave.

10          Him being a danger, Judge, these are fright tactics.

11     The government has just argued to you that, look at what

12     happened in France, Charlie Hebdo, look at what happened in

13     Garland, Texas.  There is no testimony that my client

14     purchased any of these guns that were found in Garland, Texas.

15     There's no testimony that he secured the guns from someone.

16          All of this revolves around this confidential source,

17     a confidential source who ends up getting arrested on May 7th,

18     makes a phone call that the government wants us to believe is

19     in some sort of coded message that my client is trying to buy

20     already-made pipe bombs.

21          For goodness sakes, anybody knows if you want to get

22     a pipe bomb, you can learn how to make it over the Internet.

23     Why in the world he would -- this ideological individual who's

24     wanting to travel across state lines to commit mass murder,

25     what the government wants you to believe is he's talking to

1    somebody who is a non-Muslim about buying these things, a guy

2    that the government tells you he had had a dispute with over

3    the same types of things.

4           This fellow -- this is your typical, typical

5    jailhouse snitch.  I got caught doing something.  And let me

6    tell you.  I know the guy who was in -- who was living with or

7    was involved with the two guys that just got killed in

8    Garland, Texas.

9           And what do we know about this individual, this

10   confidential source that is so reputable?  That he was

11   recently arrested on domestic violence charges for kidnapping

12   and adult sex trafficking which has not been adjudicated.

13          Why?  Because he's probably cutting a deal.

14          Now, the government can sit here and tell us all day

15   until they're blue in the face that they haven't cut a deal

16   with him.  But they turn around with a guy who's been charged

17   with kidnapping and adult sex trafficking and they pay him

18   $500, for goodness sakes.  How reliable is this guy?

19          But it's only a one-time payment.  And they paid it

20   on May 15th, seven days after he made this phone call that

21   tells us nothing.

22          This case is all smoke and mirrors based upon a

23   confidential source that is not reliable at all.  If my client

24   were a terrorist, if he were an idealogue as the government

25   wants you to believe, don't you think he would have done

1   something after he was interviewed by the government on May

2   6th?

3          They call him on May 5th.  He voluntarily goes to the

4   FBI headquarters up on 7th Street and he sits down for an

5   interview.

6          He may not be the brightest guy in the world because

7   he knows the FBI is out there following him and looking to him

8   and talking to him and he's carrying around -- they find a gun

9   in the vehicle that he's in.

10          But quite candidly, a lot of people that get felony

11   DUIs don't realize that that makes them so that they can't

12   have a weapon.

13          Nobody found anything -- there's been no testimony

14   that there was anything in his apartment, in his truck,

15   anywhere that indicated he was trying to build any bombs, pipe

16   bombs, or anything of that nature.

17          The presentence -- or the Pretrial Service Report

18   pointed out that several years ago he was robbed and he was

19   shot in the back.

20          That's the reason he had the vest in his safe.  He

21   wasn't wearing the vest.  He was out working.

22          He was conducting his business like he normally does.

23   He is a normal citizen who just happens to believe in a

24   different faith from most of us.  He's Muslim.  It's Ramadan.

25   He's out there working.  But everybody wants him to be a

1    bogeyman.

2            Judge, clearly, the easiest thing for you to do would

3    be to say he's detained, but it's not the right thing.  The

4    law is pretty clear.  You have to look to determine if there

5    are terms and conditions under which we can protect the public

6    to make sure that they're not harmed and to make sure that he

7    shows up.  Pretrial Services told you there are.

8            There's certainly -- there certainly are.  We can do

9    third-party release.  You can have him calling in.  We can put

10   him on electronic monitoring.  But he needs to be released so

11   that I can have access to him, reasonable access to him so I

12   don't have to drive 120 or 40 miles roundtrip to help defend

13   this case.

14           Right now there's one witness that seems to be the

15   backbone of this whole thing.  And I suggest to you that this

16   Court should not detain this American citizen based upon the

17   alleged testimony of this confidential source under these

18   circumstances.

19           THE COURT:  Thank you, Mr. Maynard.

20           Ms. Brook, is there anything you would like to offer

21   in response to Mr. Maynard?

22           MS. BROOK:  Your Honor, I'm going to start off by

23   reurging the argument that I already set forth in front of the

24   Court.  And I also want to highlight a couple of issues for

25   the Court's consideration.

1          Mr. Maynard's inconvenience in traveling to go see

2     his client in custody is not one of the factors set forth in

3     our consideration, Your Honor's consideration, of whether or

4     not the defendant should be detained as a flight risk and

5     detained as a danger to the community.

6          Mr. Maynard states that this entire case rests on

7     reports, information from a confidential source.  That is not

8     what the agent here testified to today.

9          In contrast, we know that it is more.  There are

10    probative facts from the confidential source that were

11    discussed today as they bare keenly upon the issue of whether

12    or not the defendant is a danger to this community, and, in

13    addition, whether or not this defendant is a risk.

14          And there are certain factors that we have

15    enumerated.

16          One, that the defendant this year has talked about

17    bombing and attacking other venues, including the Super Bowl.

18          That in this year the defendant has attempted to

19    purchase pipe bombs and vests from that particular individual.

20    We also know that the defendant when he was arrested just six

21    days ago was, in fact, in possession of a bulletproof vest.

22          Moreover, we know that the defendant also stated that

23    he intended to go with Simpson and Soofi to conduct this

24    attack in Garland, Texas.  Statements obviously that the

25    defendant made prior to the attack on May 3rd of this year.

1          Moreover, you heard testimony on the issue of the

2    defendant's dangerousness as it relates to reports from the

3    confidential witness, an individual who said that this year he

4    went shooting with the defendant and the defendant had with

5    him, as well as Simpson and Soofi, three rifles.

6          He described those rifles and then he visually

7    identified them from photographs as three rifles that the

8    defendant had with him in the past few months shooting in the

9    desert.

10          Those were three of the six weapons that were found

11    at the screen bought by Simpson and Soofi on May 3rd.

12          Your Honor, obviously, this presentation of facts for

13    Your Honor does not encompass all of the government's case in

14    this particular matter.  What the government is providing to

15    Your Honor today is testimony that bears upon the defendant's

16    dangerousness and the issue of the defendant's flight risk.

17          As it pertains to flight risk, Your Honor, defense

18    counsel states that the Pretrial Service Report does not

19    conclude that the defendant is a flight risk.  And I would

20    just turn to the language of the report itself which says that

21    this defendant has on three occasions either had probation

22    reinstated or continued for failure to comply with court

23    orders.

24          The defendant self-admitted to being a social

25    consumer of alcohol.  However, his arrest record includes four

1    arrests, three convictions for driving under the influence of

2    alcohol, indicating the defendant has a pattern of abusing

3    alcohol.

4           A further concern and went on to talk about the

5    post-traumatic stress syndrome, and then says that the

6    Pretrial Service Report writer believes that there is a

7    condition or combination of conditions to address the

8    above-noted issues.

9           The government points this out because defense

10   counsel stated that the government incorrectly asserted that

11   Pretrial Services concluded that the defendant was not a

12   flight risk.

13          And it's obvious from the Pretrial Services writer's

14   report that, in fact, she has concluded him to be a flight

15   risk but just believes there to be conditions or a combination

16   of conditions that can mitigate that risk.

17          The government strongly believes that this defendant

18   poses a great danger to the community, and in addition,

19   believes that he is a risk to not appear for future court

20   hearings.

21          And the government also believes that there are no

22   conditions or combinations of conditions that can mitigate

23   against the potential harm of an individual who has been

24   indicted for facilitating an attempted mass murder on an event

25   that had over 125 people inside.

CR15-00707-PHX-SRB  DETENTION HEARING  6-16-15

1          Additionally, Your Honor, a defendant who has shown

2    flagrant disregard for court orders, inability to comply with

3    conditions of probation, and in the most basic way which is by

4    committing additional unlawful acts.

5          With that, Your Honor, the government asks that the

6    court detain the defendant.

7          Thank you.

8          THE COURT:  Thank you.

9          I see that Ms. Foster is here from Pretrial Services.

10         Ms. Foster, other officers from Pretrial Services

11   have told me in other matters that your office does not

12   consider the strength of the government's evidence or the

13   evidence that may be offered in the case when preparing a

14   Pretrial Services Report; is that correct?

15         PRETRIAL SERVICES OFFICER FOSTER:  Yes, Your Honor.

16   That is correct.

17         THE COURT:  Did you, when preparing the Pretrial

18   Services preliminary report, consider any of the information

19   that the government presented either through testimony or

20   proffer to the Court today?

21         PRETRIAL SERVICES OFFICER FOSTER:  No, Your Honor.

22   Pretrial Services was not aware that the defendant was in

23   possession of weapons or the bulletproof vests or any of the

24   other items that were discussed today.

25         THE COURT:  And, Ms. Foster, I have read a fair

1   number of these preliminary Pretrial Services Reports.  And

2   when I get to the "concluding" sections where the officer

3   writing the report lists Assessment of Nonappearance or

4   Assessment of Danger, my experience has been that I find the

5   officer lists the factors that favor the defendant and the

6   factors that suggest that the defendant poses either a risk of

7   flight or danger and then goes on to state whether those risks

8   can be addressed by conditions.

9        When I read the language of this report, I have to

10   say bluntly that I agree with the government's assessment that

11   the Pretrial Services Officer preparing the report was

12   concluding that there was a risk of flight and danger, but

13   then concluded that conditions could be fashioned to address

14   those risks; is that correct?

15        PRETRIAL SERVICES OFFICER FOSTER:  Yes, Your Honor.

16        THE COURT:  And I have seen the Pretrial Services

17   Officers write "there are no known factors that suggest that

18   the defendant poses a risk of" -- and it's either "flight" or

19   "danger."

20        You do that on occasion in reports?

21        PRETRIAL SERVICES OFFICER FOSTER:  Yes, Your Honor.

22        THE COURT:  And if the officer writing this report,

23   in this case that was you, had concluded that there was no

24   risk of danger or flight, would you have stated that in the

25   report?

CR15-00707-PHX-SRB   DETENTION HEARING   6-16-15

1        PRETRIAL SERVICES OFFICER FOSTER:  Yes, Your Honor.

2        THE COURT:  Is there anything that you have heard

3   today that would change your assessment or recommendation?

4        PRETRIAL SERVICES OFFICER FOSTER:  With some of the

5   information that was brought forth today, it does concern

6   Pretrial Services as far as risk of nonappearance and danger,

7   but we would refer to the Judge, to Your Honor, for a decision

8   regarding detention.

9        THE COURT:  All right.  Thank you.

10       The government has the burden of establishing that

11  the defendant poses a risk of flight and must establish this

12  by a preponderance of the evidence.  And they must establish

13  by clear and convincing evidence that the defendant poses a

14  risk of danger to the community.

15       Based on the testimony that was offered and the

16  government's proffer, I agree with Pretrial Services that the

17  government has established both that the defendant poses a

18  risk of flight and a danger.

19       But the Bail Act then requires the Court to consider

20  whether there are conditions that could be fashioned to

21  address those risks.

22       Pretrial Services proposed fairly minimal conditions.

23  It does not appear that any third-party custodian was proposed

24  or evaluated to determine if there is an appropriate

25  third-party custodian, nor was there any assessment of whether

1   the defendant's residence would be suitable for electronic

2   monitoring such as location monitoring through GPS.

3           So we do not have that information to even impose

4   those conditions if they would be deemed appropriate.

5           I'm going to take this in reverse order from the

6   manner in which the parties laid it out.

7           With respect to the issue of flight, that encompasses

8   the Court's concern that the defendant will not abide by court

9   orders.  Now, given what the defense has argued that his prior

10  convictions and probation violations are dated, the Court

11  agrees that that does diminish the significance of those

12  factors.

13          Nonetheless, there are three probation violations.

14  So these are circumstances in which the defendant was placed

15  on a court order, was placed on probation.

16          At the time of being placed on probation, would have

17  been warned and advised that a violation of probation could

18  result in a revocation of probation and being sentenced up to

19  the statutory maximum.

20          So a violation of probation is a serious matter and

21  the defendant would have been advised of that at the time he

22  was placed on probation on three separate occasions but he

23  nonetheless violated probation.

24          It appears from the nature of the offenses which is

25  Driving Under the Influence, that it is probably a substance

1   abuse component or at least that there was at that time that

2   was contributing to these violations of probation, but

3   nonetheless, the defendant has established a pattern of

4   violating court orders.

5         More recently, and more probatively, the defendant

6   was arrested six days ago while in possession of a firearm in

7   his vehicle and possession of a firearm in his home.

8         He is a prohibited possessor because he is a

9   convicted felon.

10        The defense argues that perhaps he wasn't aware of

11  that or suggests that perhaps he wasn't aware that he was a

12  prohibited possessor because he may not have realized a DUI

13  conviction could result in that status and also suggested that

14  he was possessing a bulletproof vest as a matter of

15  self-protection.

16        But nonetheless, he was a prohibited possessor, and

17  as recently as six days ago was violating that statute by

18  being in possession of a firearm in his vehicle and in his

19  home which, again, shows a pattern of violating court orders.

20        So the concern is not the defendant would not abide

21  by conditions that the Court could impose; conditions such as

22  calling into a probation officer on a regular schedule,

23  wearing an ankle monitor to determine his location should that

24  even be feasible given his home.  It requires certain

25  technology.  It requires, for example, a land line which we

1    don't know if he has in his home.

2            Also, it is not impossible, in fact, it is feasible

3    for a defendant to remove an ankle bracelet and flee.

4            So the fact that the Court imposed location

5    monitoring would not provide any assurance that the defendant

6    would not choose to flee and violate court orders.

7            On the issue of dangerousness to the community, the

8    government has a higher burden.  And they have offered

9    testimony and proffered information from a confidential source

10   and a confidential witness.

11           The defense has attacked the reliability and the

12   credibility of the confidential source.  They have made those

13   attacks quite extensively in the courtroom this afternoon and

14   have suggested that this source is not reliable but is,

15   instead, in fact, a snitch, and that the information from that

16   source should not be considered in deciding that the defendant

17   poses a risk of danger.

18           However, as the government correctly notes, there is

19   also a confidential witness.  The defense did not attack the

20   credibility of the confidential witness, nor is any

21   information in the footnotes in the Government's Sentencing

22   Memorandum that would suggest that there was significant

23   issues with credibility with respect to confidential witness.

24           There is no information indicating that the

25   confidential witness received any payment.  And that witness

1    is the one who ties the defendant to the three weapons that

2    were recovered at the scene of the Garland, Texas, attack; and

3    that witness ties the defendant to the shooting, training

4    exercise in the desert, with Simpson and Soofi, who are

5    deceased, of course, as they were killed at the attack in

6    Garland, Texas.

7              So that is damning information that comes from the

8    confidential witness and supports the government's argument

9    that the defendant poses a risk of danger based on ideological

10   reasons and shown motivation to at least facilitate an attack

11   on civilians.

12             Now, the information from the confidential source,

13   even if the Court were to discredit it to some degree based on

14   the defendant's arguments that the source received a one-time

15   payment and that the source had been charged with various

16   offenses recently, indicates that the defendant discussed

17   other attacks, including at the Super Bowl, that he discussed

18   participating in and attending the attack in Texas, and that

19   he wanted to buy various materials such as pipe bombs,

20   silencers, and body armor, all of which is highly suggestive

21   of engaging in very dangerous conduct.

22             The Court will give that less significance and less

23   weight given that there are factors that undermine the

24   confidential source's credibility, although none of that has

25   been resolved, and at this point we are just considering the

1   arguments of counsel with respect to that testimony.

2          There's also direct information about materials in

3   the defendant's possession on the computer which he

4   acknowledges he owned, although he did deny owning the flash

5   drive.

6          And there was material on both the computer and the

7   flash drive and it appears from the arguments and the

8   information that's been presented that perhaps the more

9   inflammatory material was actually on the flash drive that was

10  in the computer, but nonetheless, the computer did maintain

11  files related to various military operations and the

12  government has identified those files as GIMF files.

13         So there is information that the defendant had an

14  interest in this and for a number of years has possessed this

15  information.

16         Now, the defense argues that the defendant knew that

17  he was being followed, as they put it, or perhaps was under

18  surveillance.  He had been called in and voluntarily appeared

19  at an interview.  And therefore, if he was going to flee, he

20  would have done so already.

21         That he would have fled between perhaps May 3rd and

22  the date of the Garland, Texas, attack or if he would have

23  fled after May 6th when he voluntarily appeared at the FBI

24  office for an interview.

25         But the Court finds that there is a significant

1    difference between appearing for an interview and being

2    indicted.

3         And now the defendant has been indicted on serious

4    charges.  The government has provided their guidelines

5    calculation in their memo which may or may not be accurate,

6    but nonetheless, it does reflect a very strong reason to

7    believe that the defendant could face very significant term of

8    imprisonment should he be convicted on these charges.

9         And so that is a factor to consider.  And the

10   difference in his status post-indictment is significant from

11   his status before the indictment.

12        Defense counsel has argued many of the factors that

13   typically weigh in favor of a person's release.  The fact that

14   they are a United States citizen, that they have ties to the

15   community, that they have a residence here, that they are

16   employed, and often they will argue information based on their

17   criminal history or lack of a criminal history.

18        And he suggests -- excuse me -- is suggesting that

19   based on these ties, the Court should conclude that the

20   defendant does not pose a risk of flight or a danger to the

21   community.

22        And those factors do weigh in his favor and the Court

23   has considered all those factors in his favor.  But

24   nonetheless, has concluded that the pattern of disregarding of

25   court orders, including as recently as six days ago when he

1   had firearms, although he was a prohibited possessor, and the

2   other information that's been offered by testimony and proffer

3   establishes ideological motivation for posing a danger to the

4   community.

5           And so for all of those reasons, I find that he does

6   pose a risk of flight and danger and that there are no

7   conditions that can be fashioned to address those risks.  And

8   so I'm going to order that he be detained pending further

9   proceedings as both a flight risk and a danger.

10           Counsel, is there anything else that we need to

11   address this evening?

12           MS. BROOK:  No, Your Honor.

13           MR. MAYNARD:  No, Your Honor.

14           THE COURT:  All right.  Thank you.

15           Then the hearing is adjourned.

16       (Proceedings adjourned at 5:30 p.m.)

17                           * * *

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3         I, ELIZABETH A. LEMKE, court-approved transcriber,

4    certify that the foregoing is a correct transcript from the

5    official electronic sound recording of the proceedings in the

6    above-entitled matter.

7

8         DATED at Phoenix, Arizona, this 17th day of June,

9    2015.

10

11

12

13

14                        s/Elizabeth A. Lemke
                          ELIZABETH A. LEMKE
15

16

17

18

19

20

21

22

23

24

25