# EXHIBIT 1

Case 2:10-cr-00055-SRB    Document 3    Filed 01/13/10    Page 1 of 2

SEALED

```
┌─────────────────────────────────────┐
│  ___ FILED        ___ LODGED          │
│  ___ RECEIVED     ___ COPY            │
│                                       │
│         JAN 1 3 2010                  │
│                                       │
│   CLERK U S DISTRICT COURT            │
│     DISTRICT OF ARIZONA               │
│  BY_____  DEPUTY           │
└─────────────────────────────────────┘
```

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

CR 10    0 55 PHX MHM DKD

INDICTMENT

| United States of America, | VIO:  18 U.S.C. § 1001(a)(2) |
|---|---|
| Plaintiff, | (False Statement) |
| v. | |
| Elton Simpson, | |
| Defendant. | |

THE GRAND JURY CHARGES:

On or about January 7, 2010, in the District of Arizona, defendant ELTON SIMPSON did knowingly and willfully make a materially false, fraudulent and fictitious statement and representation in a matter within the jurisdiction of the executive branch of the Government of the United States, to wit: the Federal Bureau of Investigation ("FBI"), which statement involved international and domestic terrorism, in that defendant falsely stated to Special Agents of the FBI that he had not discussed traveling to Somalia, when in fact defendant had discussed with others, on or about May 29, 2009 and thereafter, traveling to Somalia for the purpose of engaging in violent jihad.

//

//

In violation of Title 18, United States Code, Section 1001(a)(2).

A TRUE BILL

s/
FOREPERSON OF THE GRAND JURY
Date: January 13, 2010

DENNIS K. BURKE
United States Attorney
District of Arizona

s/
Michael T. Morrissey
Assistant United States Attorney

2

**EXHIBIT 2**

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

_____

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) NO. **CR 10-55 PHX-MHM** |
| | ) |
| ELTON SIMPSON, | ) Phoenix, Arizona |
| | ) October 26, 2010 |
| | ) 9:25 a.m. |
| Defendant. | ) |

_____

REPORTER'S TRANSCRIPT OF PROCEEDINGS

(Bench Trial)

BEFORE THE HONORABLE MARY H. MURGUIA

APPEARANCES:

For the Plaintiff:          **Michael T. Morrissey**, Esq.
                            Assistant U.S. Attorney
                            Two Renaissance Square
                            40 N. Central Avenue, Suite 1200
                            Phoenix, Arizona  85004-4408

For the Defendant:          **Gerald A. Williams**, Esq.
                            **Kristina L. Sitton**, Esq.
                            Assistant Federal Public Defenders
                            850 W. Adams Street, Suite 201
                            Phoenix, Arizona  85007

Court Reporter:             Merilyn A. Sanchez, CRR
                            Sandra Day O'Connor U.S. Courthouse
                            401 W. Washington Street SPC-37
                            Phoenix, Arizona  85003-2118
                            (602) 322-7250

Proceedings taken by stenographic court reporter
Transcript prepared by computer-aided transcription  I N D E X

| WITNESS: | DIRECT | CROSS | REDIRECT | RECROSS | VD |
|---|---|---|---|---|---|
| JEFFREY HEBERT | | | | | |
| By Mr. Morrissey | 23 | | | | |
| By Mr. Williams | | 66 | | | |
| By Mr. Morrissey | | | 106 | | |
| LANCE D. TURNER | | | | | |
| By Mr. Morrissey | 129 | | | | |
| By Mr. Williams | | 142 | | | |
| By Mr. Morrissey | | | 157 | | |
| DABLA DENG | | | | | |
| By Mr. Morrissey | 168 | | | | |

E X H I B I T S

| NO. | DESCRIPTION | ID | EVD |
|---|---|---|---|
| 1 | Tape recording 7/31/07 | 47 | 48 |
| 2 | Tape recording 5/29/09 | 47 | 48 |
| 3 | Tape recording 6/17/09 | 47 | 48 |
| 4 | Tape recording 10/23/09 | 47 | 48 |
| 5 | Tape recording 11/7/09 | 47 | 48 |
| 6 | Tape recording | 47 | 48 |
| 101 | Grand jury transcript | 85 | |
| 103 | Form 302 | 98 | |

Is there anything else at this time?

MR. WILLIAMS:  I don't believe so, Your Honor.

MR. MORRISSEY:  No, Your Honor.

THE COURT:  It is Mr. Mitchell, Tyrone Mitchell has been tapped as the lawyer, and he will come over as soon as possible.

MR. MORRISSEY:  Your Honor, I learned of this information, it was either Saturday or Sunday, about the nonfiling of the tax returns.  And then in breaking down the numbers of what Mr. Deng was paid on a yearly basis, I received that information very recently.  And it is clear to me that some of those amounts were substantial.  For some years, they are likely well under any filing threshold.  But for some years, they are substantial.

THE COURT:  Okay.  And how is it you just learned about that?

MR. MORRISSEY:  I knew the numbers.  In meeting with Mr. Deng, he had been, and the testimony would be at best, the FBI told him to pay -- to include these on his tax returns.  Over the course of the weekend, it occurred to me to confirm that that had in fact happened in viewing the trial prep.  And the answer was that had not happened.

THE COURT:  The amount paid you've known for a while?

MR. MORRISSEY:  I knew the aggregate, I didn't know the breakdown for year by year until very recently.

THE COURT:  And what is the aggregate?

MR. MORRISSEY:  100 -- over approximately a five-year period, $132,000 approximately.  And I can break those down by years, Judge, if you would like that.

THE COURT:  Well, if you have that right now, why don't you go ahead.

MR. MORRISSEY:  I do, Your Honor.  The information would be that in 2005, Mr. Deng was paid approximately $1300 by the FBI.

THE COURT:  1300?

MR. MORRISSEY:  1300.

In 2006, Mr. Deng was paid approximately $6,750.

In 2007, Mr. Deng, the information would be he was paid approximately $46,000.

In 2008, the information would be that Mr. Deng was paid approximately $33,000.

In 2009, the information would be that Mr. Deng was paid approximately $42,000.

In 2010, for which obviously there's not yet an obligation to file, Mr. Deng was paid approximately $3,000.

THE COURT:  Okay.  Thank you.  Let's go ahead and proceed.  You have an opening statement?

MR. MORRISSEY:  Yes, Your Honor.

THE COURT:  Please come forward.

MR. MORRISSEY:  By executive order it is within the

BY MR. WILLIAMS:

Q.   You testified earlier that you only asked him two questions regarding Somalia.

A.   Yes, sir, those questions.

Q.   So you asked him other questions?

A.   Correct.

Q.   Regarding Somalia?

A.   Yes.

Q.   In this case you were asked, at least at the detention hearing, whether he had planned to travel from South Africa to Somalia, and you were asked whether or not he was asked that multiple times.

A.   Correct.

Q.   And you said yes?

A.   He was asked multiple times.

Q.   Mr. Simpson also asked whether or not he had -- excuse me. I withdraw that question.

     Now, you had testified earlier that an investigation of Mr. Simpson dated back to 2006; is that correct?

A.   That's correct.

Q.   And you initiated that conversation -- that investigation with Dabla Deng; is that correct?

A.   No, not with Dabla Deng.

Q.   It had started prior to that?

A.   Yes.

Q.   How did it start?

A.   Mr. Simpson came under investigative interest to us due to his association with Hassan Abu Jihaad.

Q.   And that was one that they had attended mosque together?

A.   That was not the --

THE COURT REPORTER:  I didn't hear that, Your Honor.

THE COURT:  Can you repeat that.

THE WITNESS:  I said that was not the predication for the investigation.

BY MR. WILLIAMS:

Q.   Well, they -- he and Mr. Simpson attended the same mosque, correct?

A.   That's true.

Q.   They worked together?

A.   Yes.

Q.   And may have socialized a couple of times outside of either the workplace or the mosque?

A.   It's my understanding that they socialized more than a couple of times.

Q.   But socialized?

A.   Yes.

Q.   And based upon that, the investigation was initiated against Mr. Simpson?

A.   No, the investigation was initiated against Mr. Simpson because we had reason to believe that Mr. Abu Jihaad was in the

process of attempting to set up a terrorist cell in Arizona. We feared that Mr. Simpson was part of that cell.

Q. And when you say that, based on their association?

A. Yes.

Q. Okay, Mr. -- you had not had any phone calls or information or evidence from Mr. Simpson, correct?

A. I don't understand your question.

Q. Well, you didn't have any evidence that he was posting on sites that he was involved in some type of terrorism activity or associated with some sort of terrorist organization?

A. No.

Q. Certainly no statements by him at that time?

A. Not at that time.

Q. So Mr. Deng was told to ingratiate himself with Mr. Simpson, is that right, or befriend Mr. Simpson?

A. Befriend him.

Q. And you were the handler of Mr. Deng?

A. That's correct.

Q. And as his handler, you are to ensure that -- well, there's something called guidelines in dealing with informants; is that correct?

A. That's correct.

Q. And those guidelines tell you or guide you in how you handle your informant; is that correct?

A. Correct.

Q.   And one of the guidelines is that you advised your informants that if they are paid money, that is their responsibility to pay taxes --

A.   Yes.

Q.   -- on that money.

And Mr. Deng was paid money in this case?

A.   Yes, he was.

Q.   Over $130,000 over a five-year period?

A.   That's correct.

Q.   Could you tell us how that payment worked?  Was he paid by the hour?  Was he paid by the contact?

A.   It -- there's no set standard if you deal with the subject of an investigation five times, you get X amount of dollars. It doesn't work that way.  It would basically come down to approximately every month or so I would review the work that Mr. Deng had done for us and then I would determine, along with my supervisor, what we felt was fair remuneration for him at that time.

Q.   And how would you make that determination?

A.   It would depend on the, essentially the work that he did for us.  If I felt he was doing excellent work, then he generally received additional money.

Q.   Now, when you say "excellent work," do you mean by content or by, for example, the number of meetings he would have had with Mr. Simpson?

A. It's all of the above. Mr. Simpson was an important investigative person for us. Mr. Deng we felt was doing more than we really could expect from him. As such, he was compensated in accordance.

Q. Now, you wrote a 302 regarding your interview with Mr. Simpson, correct?

A. Correct.

Q. And you then also did reports on the summaries of the recordings that Mr. Deng had generated; is that correct?

A. That's correct.

Q. You did not write any reports regarding your review of the recordings, correct?

A. I -- some of them I did. Those that weren't in classified format that we did not declassify for this proceeding.

Q. So what you're saying is you wrote some reports about the recordings, we don't have them because they are classified?

A. Correct.

Q. How many of those records did you write?

A. 15 or 20, possibly.

Q. Do you remember when they were?

A. It varied throughout the investigation.

Q. Mr. Deng produced over 300 recordings; is that right?

A. That's right.

Q. And so of those 300 recordings, you reviewed 15 or 20 recordings?

about and the surveillance that you can't tell us about?
There's no evidence that he reached out or tried to contact
anyone in any of these organizations either, is there?

A.   From what we know from Mr. Deng as well as some of the
other investigation, no.

Q.   Based on the thousands of hours that you recorded of
Mr. Simpson, never once did he indicate or say that he was
going to engage in a violent jihad, did he?

A.   He said he wanted to.

Q.   Violent jihad?

A.   Yes.

Q.   That word, "violent jihad"?

A.   That was my understanding when he referred to fighting the
kaffir or fighting to establish sharia, that's what it means.

Q.   Let me ask you this question again, because we seem to have
this misunderstanding problem.  He never said that he wanted to
engage in a violent jihad, correct?

A.   I can't say that for sure.  And if I were to review all
several thousand hours of conversation, I would find it likely
that at least one time he said that.

Q.   But based on the little investigation that you did --

MR. MORRISSEY:  Objection, argumentative.

THE COURT:  Overruled.

THE WITNESS:  Based on what we've listened to, I don't
recall the words "violent jihad" together.

# EXHIBIT 3

**United States of America, Plaintiff,**

**v.**

**Elton Simpson, Defendant.**

No. CR 10-055-PHX-MHM.

**United States District Court, D. Arizona.**

March 14, 2011.

# ORDER

MARY H. MURGUIA, District Judge.

On January 13, 2010, a grand jury indicted Defendant Elton Simpson for knowingly and willfully making a materially false statement to the Federal Bureau of Investigation ("FBI"). The indictment also charged that the statement involved international and domestic terrorism. The indictment specified that on or about January 7, 2010, the Defendant falsely stated to special agents of the FBI that he had not discussed traveling to Somalia, when in fact he had discussed with others traveling to Somalia for the purpose of engaging in violent jihad. The Government is charging Mr. Simpson with making a false statement in violation of 18 U.S.C. §1001. The Government is also charging that the false statement involves international or domestic terrorism as defined under section 2331, so that he is eligible for a sentence enhancement pursuant to 18 U.S.C. §1001.

The Defendant waived his right to a trial by jury and elected instead to have a bench trial. Trial was held October 26 and 27, 2010 before this Court. At the close of trial the Court permitted the parties to provide any additional briefing on the issue of whether the false statement involves international terrorism under 18 U.S.C. §1001. The Court issues the following Order.

# I. Findings of Fact

According to the testimony presented at trial, the Defendant Elton Simpson is an American Muslim. In 2006, the FBI in Phoenix began a criminal investigation of Mr. Simpson, because of his association with an individual whom the FBI believed was attempting to set up a terrorist cell in Arizona. The FBI was investigating whether the Defendant, and certain of his associates, might travel to foreign countries to engage in violent jihad. The investigation was part of the FBI's mission to deter and disrupt terrorist acts involving American citizens as authorized by executive order.

In May 2005, the FBI engaged an informant, Mr. Daba Deng, who was from Kenya and who knew Mr. Simpson from the mosque he attended. In the fall of 2006, Mr. Deng was asked by the FBI to become friends with Mr. Simpson and get to know him better by presenting himself as an individual who was new to Islam and who sought to learn more from Mr. Simpson. Mr. Deng began to meet with Mr. Simpson three to four times per week and recorded their conversations. Mr. Deng was paid for his work as an informant.

During the trial, the Government played some of the taped conversations between the informant, Dabla Deng, and the Defendant. One of these recordings was from July 31, 2007, more than two years before his indictment. In that recording, Mr. Simpson told Mr. Deng that Allah loves an individual who is "out there fighting [non-Muslims]" and making difficult sacrifices such as living in caves, sleeping on rocks rather than sleeping in comfortable beds and with his wife, children and nice cars. Mr. Simpson said that the reward is high because "If you get shot, or you get killed, it's [heaven] straight away." Mr. Simpson then said "[Heaven] that's what we here for ... so why not take that route?"

At this point Mr. Deng asked:

> Deng: What route though? You mean here in America, we can get the reward too, or do you have to be outside?
>
> Simpson: ... right now, I'm talking about going out, you know what I mean?...Because the brothers in like Palestine, and stuff they need help.

Mr. Simpson then mentioned Palestine, Iraq and Somalia and stated that if "a brother" in Palestine has his house bombed, you should feel like that bomb landed on your house. "You should feel for your Muslim brother no matter where he is." Mr. Simpson then stated that "they trying to bring democracy over there man, they're trying to make them live by man-made laws, not by Allah's laws. That's why they get fought. You try to make us become slaves to man? No we slave to Allah, we going to fight you to the death." Mr. Simpson then mentioned Palestine, Afghanistan and Iraq and stated "Some people they don't believe that they should be over there fighting. That's the problem. That's like a disease in the heart, man. . . [I]t's a small group of brothers who can see and understand why...Some brothers don't have the same understanding."

In another recording from May 29, 2009, Mr. Simpson told Mr. Deng "it's time to go to Somalia, brother ... we know plenty of brothers from Somalia." Mr. Simpson and Mr. Deng then discussed their possible contacts in Africa. Mr. Simpson then said "It's time. I'm tellin' you man. We gonna make it to the battlefield...it's time to roll." Mr. Simpson and Mr. Deng then discussed "jihad". In that conversation, Mr. Simpson explained why Muslims are fighting, the following way: "People fighting and killing your kids, and dropping bombs on people that have nothing to do with nothing. You got to fight back you can't be just sitting down ... smiling at each other ..." The two then discussed a video of a beheading. Then on June 16, 2009, six months before he was indicted, Mr. Simpson mentioned to Mr. Deng "Getting up out of here". Mr. Simpson said he was tired of living under non-Muslims. Mr. Simpson also said that non-Muslims are fighting against Allah and that his money and taxes are going towards their weapons. Later in the same conversation, Mr. Simpson discusses having sent someone a link to a video about the permissibility of doing martyrdom operations. He says that someone in the video talks "about how they gonna use the car with the bombs on it." Mr. Simpson then discussed a lecture, by (presumably former President) Bush about the Caliphate — which Mr. Simpson described as a system based on Shariah law for all Muslims — and Shariah government. According to Mr. Simpson, President Bush said that the Caliphate was evil. Mr. Simpson said that Muslims had the Caliphate over 80 years ago, but that the non-Muslims destroyed that. He also explained "that's what the Muslims are trying to do right now. They're trying to bring that back." Mr. Simpson also said that President Bush said "you're either with us or you're with the terrorists ... Bush is either saying you're with us or you're with the Muslims. That's what that means. The ... true Muslims."

Then on October 23, 2009, about two months before he was indicted, Mr. Simpson told Mr. Deng:

> Me and Yahya was talking about ... me going to South Africa and then uh, I make my way up to, uh Somalia, and uh he said ... "what if you go to Somalia and you waiting on a brother come pick you up and what if it was me?"

Mr. Simpson then said that Somalia is eight countries away from South Africa and that this was a lot of traveling, suggesting that even if he had the intention to go there, it was far. Then on November 7, 2009 Mr. Simpson, speaking to Mr. Deng and a group of others stated:

> Deng: You never know if one day he's going to be a scholar, ... you never know if he is going to be mujahid[1], ...
>
> Simpson: Yeah, that's the whole point. School is just a front. School is just a front and if I am given the opportunity to bounce ...

Later in the same conversation, another person says "we got to come up with what we gonna say. In case they stop us." Mr. Simpson responds: "I already know. It's so much simpler than what it seems." He goes on to say "You say ... I'm just trying, trying to travel, trying to see the world. 'Cause, you got to be, kind of like, relaxed." Then, later he indicated he would say "How come all you ... asking all these questions and not anybody else in the airport. Why did you all pick me?"

The tapes were played in Court and Mr. Deng, speaking without the assistance of an interpreter, testified and confirmed that the conversations on the tapes were between him and Mr. Simpson and also confirmed that the statements were made. Mr. Deng, however, provided no testimony interpreting the statements, putting them into context or otherwise clarifying what he understood Mr. Simpson to be saying when he made these various statements about making it to the battlefield, expressing support for Muslim brothers all over the world and "going that route" or why he wanted to go to Somalia. Nor did Mr. Deng explain what he understood the Defendant to mean when he said school was a front and he would bounce.

FBI Agent Jeff Hebert, who worked with the informant Dabla Deng and listened to the tapes that were played during the trial, also testified about his interpretation of the Defendant's statements. Agent Hebert testified that when Mr. Simpson expressed his support for the establishment of Shariah law, and stated that fighting non-Muslims in other countries was the way to get to heaven and talked about going on the battlefield in Somalia, Mr. Simpson was making clear that he intended to go to Somalia to engage in violent jihad in order to establish Shariah law. He also testified that the Defendant's statement that school was just a front and that he would "bounce" if given the opportunity meant that Mr. Simpson's plans to attend a madrassa in South Africa was a cover for his true intent — to go to Somalia to engage in violent jihad.

At the trial, Agent Hebert testified about the current political situation in Somalia. Agent Hebert explained that he obtained this knowledge from attending a seminar at West Point, which briefly covered the subject of Somalia. He explained that he had also attended training seminars at the FBI in Phoenix on the political situation in Somalia. Agent Hebert has also done some of his own reading of books and seen news media regarding Somalia. Agent Hebert testified based on his knowledge that in 2004 the United States and United Nations supported the establishment of a transitional federal government in Somalia. He explained that in approximately 2005, a loose coalition of Islamic groups in Somalia established an organization called the Islamic Courts Union, which used armed conflict to fight the transitional federal government and successfully pushed it out of Mogadishu, the capital of Somalia. According to Agent Hebert, the goal of the Islamic Courts Union was to establish Shariah law in Somalia. Shariah law, according to Agent Hebert, is an all encompassing set of rules that includes criminal, civil and day to day living that a true Muslim must live by. The Islamic Courts Union have a faction called Al Shabaab, which Agent Hebert testified means "the youth" in arabic. According to Agent Hebert, from 2006 to the present day, an armed conflict has existed between the transitional federal government and Islamic militants, who have used killings and violence to target the government. Also according to Agent Hebert, militants in Somalia used a suicide bomber to plant a bomb outside the parliament building in Mogadishu and targeted civilian journalists who reported negatively on their activities. Agent Hebert also testified that he watched a video of Osama Bin Laden on the internet website youtube.com urging all true Muslims to support the jihad in Somalia in any way possible by joining the battle themselves or through other means financial and otherwise. According to agent Hebert, at some point before January 7, 2010, the FBI learned that Mr. Simpson was planning to travel to South Africa to study in a madrassa, which is a religious school. The FBI also obtained confirmation of Mr. Simpson's plans through the Customs and Border Protection database, which maintains airline reservations. On January 7, 2010, three FBI agents, Jeff Hebert, Lance Turner and Wyatt Storm went to the house where Defendant was staying to question him in connection with their investigation. Mr. Simpson came out of the home and agreed to speak with the agents.

The agents asked him about his plans to travel to South Africa and whether he planned to travel anywhere outside of South Africa. The Defendant stated that he did plan to travel to South Africa the following week, but denied having any definitive plans to travel anywhere else from that country. When asked why he was traveling to South Africa, Defendant replied that he was going to attend a madrassa. The agents asked him the name of the school and Defendant declined to answer, telling them that because they were the FBI, they already knew.[2] Agent Turner then asked the Defendant whether he had discussed traveling to Somalia from South Africa with anyone. At this point, the Defendant did not give a direct answer, but only stated that he did not know why they were asking him this. Defendant was asked repeatedly whether he had discussed traveling to Somalia, but continued to refuse to answer directly and continued to question why the agents were asking him this. Agent Hebert finally asked Defendant in a yes or no fashion whether he had discussed with anyone traveling to Somalia from South Africa. The Defendant responded no. Agent Hebert also asked Defendant if he wanted to participate in violent jihad, and Mr. Simpson said no.

Having heard the tapes in which Mr. Simpson discussed traveling to Somalia from South Africa, Agent Hebert knew that Mr. Simpson was not telling the truth when Mr. Simpson said he had not discussed traveling to Somalia with anyone. Agent Hebert testified that until Mr. Simpson made his false statement, the FBI was not sure whether they needed to be concerned about Mr. Simpson's travel plans. Because the Defendant was being deceptive about the possibility of traveling to Somalia, however, the FBI became concerned that Mr. Simpson in fact did intend to go Somalia to engage in violent jihad. As a result, the agents attempted to prevent or disrupt the Defendant's travels. The FBI tried, unsuccessfully, to place Mr. Simpson on the no-fly list. Concerned that Mr. Simpson's associates would be inspired by him and attempt to follow in his footsteps, FBI also prepared to begin interviewing them in the same manner they interviewed Mr. Simpson. The FBI's next step would have been to tell the South African government about Mr. Simpson, but before this happened, the FBI arrested Mr. Simpson and brought him up on charges.

Before the grand jury, and again at Mr. Simpson's detention hearing, Agent Hebert testified that he had asked Mr. Simpson "yes or no" whether he had discussed traveling *or* was planning to travel to Somalia, and that it was to this question that Mr. Simpson had answered "no" and made the false statement. At the trial, Agent Hebert testified that he misspoke before the grand jury and at the detention hearing to the extent he suggested that he had asked a compound question and that the question Agent Hebert asked Mr. Simpson during his interview had simply been "`yes or no" had Mr. Simpson spoken to anyone about traveling to Somalia. Agent Lance Turner, who also participated in questioning Mr. Simpson on January 7, 2010, testified at the trial and confirmed that Agent Hebert had not asked a compound question, but had simply asked Mr. Simpson "yes or no" had he spoken to anyone about traveling to Somalia from South Africa and that Mr. Simpson had answered "no" to that question.

## II. Conclusions of Law

## A. False Statement

To establish that the Defendant has made a false statement in violation of 18 U.S.C. §1001, the Government must prove, beyond a reasonable doubt the following elements: 1) that the Defendant made a statement; 2) that the statement was false; 3) that the Defendant acted willfully and with knowledge that the statement was untrue; 4) that the statement was material; 5) and that the matter is within the jurisdiction of the federal investigative agency. United States v. Jiang, 476 F.3d 1026, 1029 (9th Cir. 2007). That Defendant made a statement to the FBI, while the FBI was investigating him about possible involvement in international terrorism is not in question. Therefore, the first and fifth factor do not warrant discussion here. The Court will rather focus on the elements of falsity, willfulness and materiality.

With regard to falsity, the Government claims that the Defendant made a false statement when he answered "no" when asked whether he had discussed traveling to Somalia. Indeed, Mr. Simpson had previously discussed going to Somalia from South Africa. He told Mr. Deng on October 23, 2009 that he had a conversation with an individual he referred to as "Yahya" about going to South Africa and then making his way up to Somalia. So if Mr. Simpson denied having discussed traveling to Somalia, he made a false statement.

The Defendant has argued that the Government has not proved beyond a reasonable doubt that Mr. Simpson made a false statement, because it is not clear that what question he was asked, so that it is not clear that the Defendant denied having discussed traveling to Somalia. The Defendant points to Agent Hebert's testimony before the grand jury and during Mr. Simpson's detention hearing as evidence that the question Agent Hebert asked may have been an ambiguous compound question about whether Mr. Simpson was planning to travel *or* had discussed traveling to Somalia, so that the denial was not a false statement. Based on the testimony and evidence presented at trial, however, the Court finds that the Government has proved beyond a reasonable doubt that Agent Hebert asked Mr. Simpson "yes or no" whether he had discussed traveling to Somalia and that the Defendant made a false statement when he answered no. Agent Hebert testified credibly during trial that this was the question posed to the Defendant and the testimony of Agent Turner, who was present during the questioning,

confirmed this. The Court, therefore, finds that Mr. Simpson did make a false statement when he denied having discussed traveling to Somalia.

To the extent Agent Hebert's testimony before the grand jury and at the Defendant's detention hearing raises doubts about the actual question that was asked, "the existence of some ambiguity in a falsely answered question will not shield the respondent from a perjury or false statement prosecution." U.S. v. Culliton, 328 F.3d 1074, 1078 (9th Cir. 2003). The trier of fact determines which of the plausible interpretations of an ambiguous question the defendant comprehended and responded to. United States v. Matthews, 589 F.2d 442, 445 (9th Cir. 1978) Even if Agent Hebert had asked Mr. Simpson whether he planned to or had discussed traveling to Somalia, the question in its compound form would still be asking Mr. Simpson in part whether he had discussed travel to Somalia, so that an answer of "no" would still constitute a false statement.

As for wilfulness, the agents repeatedly asked Mr. Simpson whether or not he discussed traveling to Somalia and the Defendant gave evasive answers, apparently not wanting to answer this question. When asked in a "yes or no" fashion, however, whether he discussed traveling to Somalia, the Defendant stopped being evasive and clearly answered "no". The Court, therefore, finds that the Government proved that the Defendant acted willfully in making the false statement.

With regard to materiality, a false statement is material if it could have influenced the agency's decisions or activities. See United States v. Gaudin, 515 U.S. 506, 512 (1995) (whether statement is material depends on what decision an agency was trying to make). Here the Government established that because of the Defendant's false statement, they attempted to place him on the "no fly" list and felt compelled to question his friends and associates to ensure they did not have similar plans. That is sufficient to establish materiality.

The Court, therefore, finds that the Government has met its burden in establishing that the Defendant made a false statement in violation of 18 U.S.C. §1001.

## B. Whether the False Statement Involves International Terrorism

The Government also charges that the Defendant's false statement, that he had not discussed with anyone traveling to Somalia, involves international terrorism, so that under the statute, he is eligible for sentence enhancement. 18 U.S.C. § 1001, provides that one who makes a false statement:

> shall be fined under this title, imprisoned not more than 5 years, or if the offense involves international or domestic terrorism (as defined in section 2331), imprisoned not more than 8 years, or both.

(emphasis added.) 18 U.S.C. § 2331(1), in turn, states that the term "international terrorism" means activities that:

> (A) involve violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States or of any State, or that would be a criminal violation if committed within the jurisdiction of the United States or of any State;
>
> (B) appear to be intended—
>
> (i) to intimidate or coerce a civilian population;
>
> (ii) to influence the policy of a government by intimidation or coercion,
>
> (iii) or to affect the conduct of a government by mass destruction, assassination, or kidnaping; and
>
> (C) occur primarily outside the territorial jurisdiction of the United States, or transcend national boundaries in terms of the means by which they are accomplished, the persons they appear intended to intimidate or coerce, or ... [where perpetrators seek asylum]

(emphasis added).

There is no controlling law concerning what the Government must prove to establish that a false statement "involves" international terrorism to trigger the sentence enhancement. The Government argues that the definition of international terrorism under this statute is broad because it was part of a broad effort to combat terrorism, wherever it can be effective. The Government cites Boim v. Holy Land Foundation, 549 F.3d 685 (7th Cir. 2008) in support of its claim that the Defendant's false statement involves international terrorism. In Boim, the Seventh Circuit Court of Appeals held, in an opinion written by Judge Posner, that providing financial assistance to a terrorist group constituted an act of terrorism under 18 U.S.C. § 2331. 549 F.3d at 689. The Court held that giving money to a terrorist organization, "like giving a loaded gun to a child (which also is not a violent act), is an act `dangerous to human life'", under the statute. Id. The Court also found that to be liable under section 2333, the defendant must have known that the money would be used in preparation for or in carrying out the killing of attempted killing of, conspiring to kill or inflicting bodily injury. Id. at 693. Since "merely" giving money to a terrorist organization knowing the money will be used to carry out violence can constitute international terrorism under the statute, the Government argues, lying about having discussed traveling to Somalia, when the reason for the travel and the lie is a plan to engage in international terrorism also qualifies, even if the false statement itself is not a violent act

The problem, however, is that the Government has not established with the requisite level of proof, that the Defendant's potential travel to Somalia (and his false statement about his discussions regarding his travels) was sufficiently "related" to international terrorism. Rather, the Government missed several steps to meeting its burden for establishing this charge. As a result, the Court cannot find the Defendant eligible for the sentence enhancement.

As an initial matter, the only evidence the Government offered regarding the political situation in Somalia came from Agent Hebert, who testified that he learned about the country from attending a few seminars and from media such as news reports and youtube videos. Mr. Hebert's brief testimony on this issue was that an armed conflict has existed between the transitional federal government and Islamic militants who want to establish Shariah law, and that the latter have used killings and violence to target the transitional government. Agent Hebert also testified that militants in Somalia used a suicide bomber to plant a bomb outside the parliament building in Mogadishu and targeted civilian journalists who reported negatively on their activities and struggle in Somalia to establish Shariah.

Even assuming that Agent Hebert's testimony was sufficiently authoritative to establish Somalia as a hotbed of international terrorism, the Government did not prove beyond a reasonable doubt that the Defendant's discussions about traveling to Somalia were related to the political situation Agent Hebert described. It is true that the Defendant had expressed sympathy and admiration for individuals who "fight" non-Muslims as well as his belief in the establishment of Shariah law, all over the world including in Somalia. What precisely was meant by "fighting" whenever he discussed it, however, was not clear. Neither was what the Defendant meant when he stated he wanted to get to the "battlefield" in Somalia. The selected conversations between Defendant and the informant played for the Court — some of which took place two years before his indictment — are individually and together ambiguous on these points. The conversations about school being a "front" and what to say if "they stop us" were similarly without context. The informant, Dabla Deng, who could have provided further clarity on the Defendant's statements through context and interpretation, provided no such clarification, but only confirmed that the statements were made. Agent Hebert's testimony, on the other hand, does attempt to weave the Defendant's various statements into a cogent narrative, explaining that the Defendant sought to go to Somalia to engage in violent jihad to establish Shariah law, that attending the madrassa was a front for this ultimate goal and that the Defendant's discussion about what to say "if they stop us" was a strategy for dealing with questions from authorities when carrying this plan out. But to reach this conclusion, Agent Hebert must make a number of inferential leaps — from Defendant's expressed support of "fighting" of non-Muslims and his support for the establishment of Shariah law, to his sending a video regarding the permissibility of martyrdom operations, to his statement about going to the battlefield in Somalia and his statement that school is a "just a front". It is not uncommon for (and perhaps it is an obligation of) the FBI to make these inferential leaps when conducting their investigations, but the limited evidence presented at trial does not permit the Court to make them to enhance the Defendant's sentence.

Because the charge that the Defendant's false statement "involved" international terrorism serves to enhance his sentence, the Government has the same burden for establishing that element as any other element of the crime with which Defendant is charged. "[A]ny fact that increases the penalty for a crime beyond the prescribed statutory minimum must be. . . proved beyond a reasonable doubt." Apprendi v. New Jersey, 530 U.S. 466, 489 (2000). As stated, the Government has not established beyond a reasonable doubt that the Defendant's false statement "involved" international terrorism with the portions of conversations played for the Court, which it had recorded during a period spanning over a year. The Government has not established that the selected statements of the Defendant, presented without further context or explanation, establish beyond a reasonable doubt that the Defendant was or planned to be involved in violent acts dangerous to human life, appeared to be intended to intimidate or coerce a civilian population, influence the policy of a government by intimidation or coercion, or affect the conduct of a government by mass destruction, assassination or kidnapping

The Government has, at best, established that the Defendant, who harbors sympathy and admiration for "fighting" non-Muslims abroad and establishing Shariah law, made a false statement about discussing traveling to Somalia. "[A] defendant's abstract beliefs, however obnoxious to most people, may not be taken into consideration by a sentencing judge." Wisconsin v. Mitchell, 508 U.S. 476 (1993) (citing Dawson v. Delaware, 503 U.S. 159 (1992)). That the Government has not established that Defendant's false statement "involved" international terrorism is confirmed by the fact that even the FBI agents who heard the conversations with the informant that were played for the Court, were unsure of the dangerousness of Defendant's expressed desire to go to Somalia until he denied having discussed traveling there. While the denial suggests a nefarious purpose, it does not serve as sufficient proof for this Court that the Defendant's false statement involved international terrorism.

Had the Government proved beyond a reasonable doubt that the reason Mr. Simpson lied about discussing travel to Somalia was because he intended to engage in violent jihad there, even if he had no definite or concrete plan to do so, the Court would have had a more solid basis for finding that Mr. Simpson's false statement involved international terrorism. The possibility that the Defendant did in fact intend to go to Somalia to engage in violent jihad exists, as the Defendant never presented any alternative reason for going there. However, that is not the Defendant's burden and as stated, the Government has not established beyond a reasonable doubt that the Defendant had such intentions. As it is, the Government only established that Mr. Simpson discussed traveling to Somalia and later lied about discussing traveling to Somalia. The Government also established that Mr. Simpson expressed sympathy and admiration for individuals who fight non Muslims — possibly even those who engage in violent jihad in other countries including Somalia — that he would like to see Shariah law established, and that he believed that fighting non-Muslims would lead to heaven. However obnoxious, troubling or repugnant these beliefs and statements may be, this Court cannot find that sufficient evidence exists to enhance the Defendant's sentence.

Accordingly,

IT IS HEREBY ORDERED, finding the Defendant guilty of making a false statement in violation of 18 U.S.C. §1001.

IT IS FURTHER ORDERED, finding that there is insufficient evidence to support that the false statement "involved" international terrorism.

IT IS FURTHER ORDERED directing the Clerk to reassign this case for sentencing purposes.

[1] The informant Dabla Deng testified that a mujahid is a person who fights.

[2] He later left a message for Agent Storm, telling him the name of the school.

Save trees - read court opinions online on Google Scholar.

**EXHIBIT 4**

### *UNITED STATES DISTRICT COURT*
### DISTRICT OF ARIZONA

**United States of America**

**v.**

**Elton  Simpson**

USM#: 81472-208

## JUDGMENT IN A CRIMINAL CASE
(For Offenses Committed on or After November 1, 1987)

### No.  CR 10-00055-001-PHX-SRB

Kristina Sitton (AFPD)
Attorney for Defendant

**THERE WAS A** finding of guilty on 3/14/11 as to the one Count Indictment.

**ACCORDINGLY, THE COURT HAS ADJUDICATED THAT THE DEFENDANT IS GUILTY OF THE FOLLOWING OFFENSE(S):** violating Title 18, U.S.C. §1001, False Statement, a Class D Felony offense, as charged in the one Count Indictment.

**IT IS THE JUDGMENT OF THIS COURT THAT** the defendant is hereby placed on probation for a term of **THREE (3) YEARS** on Count 1.

### CRIMINAL MONETARY PENALTIES

The defendant shall pay to the Clerk the following total criminal monetary penalties:

**SPECIAL ASSESSMENT:** $100.00     **FINE:** $500.00     **RESTITUTION:** $0.00

If incarcerated, payment of criminal monetary penalties are due during imprisonment at a rate of not less than $25 per quarter and payment shall be made through the Bureau of Prisons' Inmate Financial Responsibility  Program.  Criminal monetary payments shall be made to the Clerk of U.S. District Court, Attention: Finance, Suite 130, 401 West Washington Street, SPC 1, Phoenix, Arizona 85003-2118.  Payments should be credited to the various monetary penalties imposed by the Court in the priority established under 18 U.S.C. § 3612(c).   The total special assessment of $100.00 shall be paid pursuant to Title 18, United States Code, Section 3013 for the one Count Indictment. **Payment of criminal monetary penalties is due in equal monthly installments of $50.00 over a period of 12 months to commence 60 days after the date of entry of judgment.**

Any unpaid balance shall become a condition of supervision and shall be paid within 90 days prior to the expiration of supervision.  Until all restitutions, fines, special assessments and costs are fully paid, the defendant shall immediately notify the Clerk, U.S. District Court, of any change in name and address.  The Court hereby waives the imposition of interest and penalties on any unpaid balances.

**IT IS ORDERED** the bond in this matter shall be exonerated.

### CONDITIONS OF SUPERVISION
The drug testing condition is suspended based on the Court's determination that the defendant poses a low risk of future substance abuse.

Case 2:10-cr-00055-SRB    Document 67    Filed 09/01/11    Page 2 of 3

CR 10-00055-001-PHX-SRB                                          Page 2 of 3
USA vs. Elton Simpson

It is the order of the Court that, pursuant to General Order 05-36, which incorporates the requirements of USSG §§5B1.3 and 5D1.2, you shall comply with the following conditions:

1)  You shall not commit another federal, state, or local crime during the term of supervision.
2)  You shall not leave the judicial district or other specified geographic area without the permission of the Court or probation officer.
3)  You shall report to the Probation Office as directed by the Court or probation officer, and shall submit a truthful and complete written report within the first five days of each month.
4)  You shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer.
5)  You shall support your dependents and meet other family responsibilities.
6)  You shall work regularly at a lawful occupation unless excused by the probation officer for schooling, training, or other acceptable reasons.
7)  You shall notify the probation officer at least ten days prior to any change of residence or employment.
8)  You shall refrain from excessive use of alcohol and are subject to being prohibited from the use of alcohol if ordered by the Court in a special condition of supervision.
9)  You shall not purchase, possess, use, distribute or administer any narcotic or other controlled substance as defined in section 102 of the Controlled Substances Act (21 U.S.C. § 801) or any paraphernalia related to such substances, without a prescription by a licensed medical practitioner. Possession of controlled substances will result in mandatory revocation of your term of supervision.
10) You shall not frequent places where controlled substances are illegally sold, used, distributed or administered, or other places specified by the Court.
11) You shall not associate with any persons engaged in criminal activity, and shall not associate with any person convicted of a felony unless granted permission to do so by the probation officer.
12) You shall permit a probation officer to visit at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view by the probation officer.
13) You shall immediately notify the probation officer (within forty-eight (48) hours if during a weekend or on a holiday) of being arrested or questioned by a law enforcement officer.
14) You shall not enter into any agreement to act as an informer or a special agent of a law enforcement agency without the permission of the Court.
15) As directed by the probation officer, you shall notify third parties of risks that may be occasioned by your criminal record or personal history or characteristics, and shall permit the probation officer to make such notification and to confirm your compliance with such notification requirement.
16) If you have ever been convicted of a felony, you shall refrain from possessing a firearm, ammunition, destructive device, or other dangerous weapon. If you have ever been convicted of a misdemeanor involving domestic violence, you shall refrain from possession of any firearm or ammunition. Possession of a firearm will result in mandatory revocation of your term of supervision. This prohibition does not apply to misdemeanor cases that did not entail domestic violence, unless a special condition is imposed by the Court.
17) Unless suspended by the Court, you shall submit to one substance abuse test within the first 15 days of supervision and thereafter at least two, but no more than two periodic substance abuse tests per year of supervision, pursuant to 18 U.S.C. §§ 3563(a)(5) and 3583(d);
18) If supervision follows a term of imprisonment, you shall report in person to the Probation Office in the district to which you are released within seventy-two (72) hours of release.
19) You shall pay any monetary penalties as ordered by the Court. You will notify the probation officer of any material change in your economic circumstances that might affect your ability to pay restitution, fines, or special assessments.
20) If you have ever been convicted of any qualifying federal or military offense (including any federal felony) listed under 42 U.S.C. § 14135a(d)(1) or 10 U.S.C. § 1565(d), you shall cooperate in the collection of DNA as directed by the probation officer pursuant to 42 U.S.C. § 14135a(a)(2).

The following special conditions are in addition to the conditions of supervised release or supersede any related standard condition:

CR 10-00055-001-PHX-SRB                                                    Page 3 of 3
USA vs. Elton Simpson

1.   You shall submit your person, property (including but not limited to computer, electronic devices, and storage media), residence, office, or vehicle to a search conducted by a probation officer, at a reasonable time and in a reasonable manner.
2.   You shall provide the probation officer access to any requested financial information.
3.   You are prohibited from making major purchases, incurring new financial obligations, or entering into any financial contracts without the prior approval of the probation officer.
4.   The defendant shall comply with the standard condition of supervision requiring full-time employment at a lawful occupation. This may include participation in training, counseling, and/or daily job searching as directed by the probation officer. If not in compliance with the condition of supervision, the defendant may be required to perform up to 20 hours of community service per week until employed as approved or directed by the probation officer.

**THE DEFENDANT IS ADVISED OF DEFENDANT'S RIGHT TO APPEAL WITHIN 14 DAYS OF ENTRY OF JUDGMENT.**

The Court may change the conditions of probation or supervised release or extend the term of supervision, if less than the authorized maximum, at any time during the period of probation or supervised release.  The Court may issue a warrant and revoke the original or any subsequent sentence for a violation occurring during the period of probation or supervised release.

**IT IS FURTHER ORDERED** that the Clerk of the Court deliver two certified copies of this judgment to the United States Marshal of this district.


Date of Imposition of Sentence: **Monday, August 29, 2011**


_____
Susan R. Bolton
United States District Judge

DATE: <u>August 31, 2011</u>


**RETURN**

I have executed this Judgment as follows:_____

Defendant delivered on _____ to _____ at _____, the institution designated by the Bureau of Prisons, with a certified copy of this judgment in a Criminal case.


_____                 By:_____
United States Marshal                                              Deputy Marshal

CR 10-00055-001-PHX-SRB - Simpson                                          8/30/11 3:01pm