UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

_____

| | |
|---|---|
| United States of America, ) | |
| ) | |
| Plaintiff, ) | CR-15-0707-PHX-SRB |
| ) | |
| vs. ) | Phoenix, Arizona |
| ) | November 20, 2015 |
| Abdul Malik Abdul Kareem, ) | 9:32 a.m. |
| ) | |
| Defendant. ) | |
| ) | |

_____)

BEFORE:  THE HONORABLE SUSAN R. BOLTON, JUDGE

REPORTER'S TRANSCRIPT OF PROCEEDINGS

EVIDENTIARY HEARING AND INTERIM PRETRIAL CONFERENCE - DAY 1

(Pages 1 through 153, inclusive.)


APPEARANCES:
For the Government:
          U.S. Attorney's Office
          By: JOSEPH EDWARD KOEHLER, ESQ.
             KRISTEN BROOK, ESQ.
          40 North Central Avenue, Suite 1200
          Phoenix, AZ  85004

For the Defendant Abdul Malik Abdul Kareem:
          Maynard Cronin Erickson Curran & Reiter
          By: DANIEL D. MAYNARD, ESQ.
          3200 North Central Avenue, Suite 1800
          Phoenix, AZ  85012

Official Court Reporter:
Linda Schroeder, RDR, CRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc. 32
Phoenix, Arizona  85003-2151
(602) 322-7249

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

1                              **INDEX**

2

SUMMARY OF COURT PROCEEDINGS                          PAGE:

3
Opening Statements
4          Government                                         11

5

6

7                      INDEX OF WITNESSES

8    WITNESSES FOR THE      Direct     Cross    Redirect
     GOVERNMENT:
9

     TAYLOR, Brian Robert     17        26        44
10   NASH, Jeffrey Davis      48        67        91
     MESHINSKY, Robert J.     98       102       105
11   VAUGHAN, Amy            107       114       128
     CALBONE, Mario          130       133
12

13                      INDEX OF EXHIBITS

14

15   EXHIBIT NO.:          DESCRIPTION:                  RECEIVED:

         3        Equipment Operating Instructions          47
16       4        FBI Reports - Equipment Malfunction       47
         5        SD Card Property and Evidence Form        56
17       14       Report of Analysis of 2012 Lenovo Laptop
                  Image                                    123
18

19

20

21

22

23

24

25

                 **UNITED STATES DISTRICT COURT**

1          THE CLERK:  Criminal case 15-707, United States of

2    America versus Abdul Malik Abdul Kareem, time set for

3    evidentiary hearing and interim pretrial conference.

4          MR. KOEHLER:  Good afternoon, Your Honor.  Joe Koehler

5    and Kristen Brook for the United States.

6          MR. MAYNARD:  Good morning, Your Honor.  Daniel

7    Maynard and Mary Plomin for Abdul Malik Abdul Kareem, who is

8    present and in custody in the courtroom.

9          THE COURT:  Good morning.

10          This is the time set for our interim pretrial

11    conference but also for evidentiary hearing on any motions that

12    require evidentiary hearing.  There are two motions to dismiss

13    that I have before me.  Is it the parties' intention to offer

14    evidence on both motions?

15          MR. MAYNARD:  Yes, Your Honor.

16          THE COURT:  Okay.  And it wasn't clear to me -- I

17    understand that there are some witnesses that are under

18    subpoena from the defense that are not available today and that

19    there also may be a government witness that is not available

20    today.

21          The filing from Mr. Koehler and Ms. Brook indicated a

22    bifurcated hearing, and I didn't know if that meant we were

23    going to hear one motion today and not the other or if it was

24    just that we would be required to have more than one day for

25    evidentiary hearing.

4

1          MR. KOEHLER:  I think the latter, Your Honor.  And we

2     have witnesses available on both of the motions at issue that

3     can testify today.  But there are some threshold issues that

4     would need to be addressed first, such as standing and so

5     forth, before we actually reach the point of putting on

6     evidence, I think.

7          THE COURT:  Well, are you speaking of the issue as to

8     whether or not because this laptop upon which there was -- that

9     was seized several years ago and then returned to the defendant

10    and then allegedly given away, whether he has standing now to

11    challenge the search of that laptop?

12         MR. KOEHLER:  Correct, the later search of the laptop.

13    In other words, we don't intend to rely on the 2012 image that

14    was taken of the laptop in connection with the search warrant

15    that was executed in 2012 in our case in chief in the trial.

16         To the extent it becomes relevant to a claim that

17    evidence was, for instance, planted on the laptop, I suppose it

18    might come in in that fashion.  But in terms of what we intend

19    to present at trial, we intend to present analysis from the

20    2015 image of that laptop, which was delivered -- Mr. Malik --

21    or Mr. Kareem gave that laptop to a third party as payment for

22    a debt.

23         THE COURT:  Let me just interrupt you for a moment,

24    because I know that the government says that, but I don't know

25    whether or not Mr. Maynard also intends or wishes to have

1    evidence on that or whether he accepts what the government has

2    to say with respect to how the 2015 search of the laptop came

3    to be.

4            MR. MAYNARD:  Your Honor, I contend that it's still

5    all fruit of the poison tree, that they illegally searched that

6    laptop in 2012.

7            THE COURT:  Right.  I know that.  But my question is

8    is there a factual dispute about whether or not in 2015 the

9    laptop that had previously belonged to Mr. Kareem was turned

10   over to the government by the new owner of the laptop for a

11   consent search.

12           MR. MAYNARD:  I don't know.  I think he did.  I

13   believe that what happened was Mr. Abdul Kareem gave the laptop

14   to somebody else believing that it had been cleaned, that there

15   was nothing on it, because it was being given to this

16   individual for his children to use and -- as soon as he got it

17   back.  And so it did leave his possession.  We don't know

18   what's on that laptop.  We thought it was clean.  We still

19   haven't gotten a report.  The government has been utilizing

20   information from the 2012 search.

21           THE COURT:  So this is part of what you want to

22   explore in the evidence?

23           MR. MAYNARD:  Yes.

24           THE COURT:  Then I'm not going to decide the issue --

25   the motion to dismiss in pieces, Mr. Koehler.  We're going to

1  have evidence on all of the issues that the government and the

2  defense believe are potentially factually disputed, and the

3  Court will then rule.  I realize that there's an issue as

4  to whether -- that you have raised the standing issue.  But it

5  doesn't seem to me that I can decide that in advance of hearing

6  about -- hearing all the evidence related to the searches of

7  the laptop.

8           So we're going to proceed today with the evidence and

9  then with any other issues that we also need to discuss.  But I

10 thought it would be best to proceed first with the hearing on

11 the motion to suppress.  And then issues related to where we

12 are on our schedule, whether or not we are going to meet the

13 trial date that's presently set we'll take up at the end of the

14 day.

15          MR. MAYNARD:  Can I also raise an issue, Your Honor,

16 that affects the evidentiary hearing today?

17          THE COURT:  Yes.

18          MR. MAYNARD:  We filed -- As the Court is aware,

19 Mr. Abdul Kareem was arrested and indicted back in June, and we

20 filed discovery within less than a week after that, discovery

21 requests.  And we've been getting discovery piecemeal.  In

22 fact, we have turned over three external hard drives to the

23 government, and the Court has allowed us to retain an expert to

24 review that information.

25          When we filed these motions, we had some discovery at

1       the time, and what we had was -- seemed to be very limited

2       about the warrant that was issued in 2012.

3              And we basically had nothing except one 302 that was

4       written in July that told us that an audio or video machine had

5       not worked at the FBI's office when they had interviewed

6       Mr. Abdul Kareem.

7              You ordered that we were to mark our exhibits and have

8       them ready yesterday by noon.  After 1:00, after the time that

9       we were supposed to do that, we got over 600 pages of discovery

10      from the government.  500 -- or 100 pages of this -- 500 pages

11      we already had, so we had to go through it, but we -- 100 pages

12      deal directly with these issues today.  This is the first time

13      we've seen this stuff.  They've listed a witness that we did a

14      Summation search on all the documents that we've been given

15      before.  We can't find anything.  We've not been able to enter

16      into our Summation the documents that we got yesterday because

17      we got them so late.

18             I'm prepared to go forward in part on this hearing,

19      but I'm going to have to do it piecemeal.  There are documents

20      that are clearly going to be marked as exhibits that we got

21      after the time the Court ordered that we were to mark exhibits.

22      And I apologize to the Court for that, but there's nothing that

23      we can do.  We never saw these documents.  These documents --

24             THE COURT:  Let me ask the government what the status

25      is today of your disclosures, because we're supposed to be at

1    the point where more or less all disclosures should be made.

2         I'm looking at our scheduling order, and we're to the

3    point of disclosure of preliminary witness and exhibit lists

4    for trial by a week from Monday, which would contemplate the

5    fact that there wouldn't be anymore disclosure of new material

6    after that.

7         MR. KOEHLER:  Your Honor, when we had the original

8    scheduling conference in this case, Ms. Brook alerted the Court

9    that this was an extremely ambitious trial date.  And as the

10   Court can imagine, in a case of this scope there's evidence in

11   a lot of different places that we're still trying to go through

12   and get analyzed and produce in a form that it makes it usable.

13        One thing interesting that Mr. Maynard mentioned was

14   that 500 pages of what we turned over yesterday we had already

15   given them.

16        That particular part of the discovery produced a mad

17   scramble for me this week because we were unaware that that

18   discovery had actually gone out.  Apparently that had to have

19   gone out on an unBatesed disk or in some other fashion because

20   it wasn't anywhere in our discovery log.  We were getting ready

21   for the hearing this week and looking for documents that

22   related to this hearing.  We couldn't find them in our

23   discovery.

24        THE COURT:  Who other than you and Ms. Brook sends

25   discovery to Mr. Maynard?

1          MR. KOEHLER:  We have a paralegal in our office, and

2     we have two legal assistants that have been working on the

3     case, one of whom is no longer with our office.  And there was

4     a disk that came to our office I want to say it was back in

5     October -- it might have been late September -- that contained

6     that 500 pages of discovery.

7          From what Mr. Maynard said that he already had it, I

8     think that disk might have come in and then just got put out

9     instead of going through the process of being added to our

10    discovery log and Bates stamped and so forth and sent out.

11         And so getting that set of discovery ready and getting

12    it Bates stamped occupied two of my days this week getting that

13    done.  At the same time we were looking for other documents

14    that might relate to this hearing.  And I realized that it

15    would be helpful, for instance, to have the instructions on how

16    to operate, how to start and stop the recording on the device

17    that was used -- intended to be used to record the interview of

18    Mr. Kareem.  And so we went hunting for that.

19         We went hunting for the evidence log where the blank

20    memory card was placed into evidence.  So we found that.  We

21    turned that over.  A lot of the things that they're talking

22    about relate to that.

23         And then when we got a hold of Corporal Herrmann

24    regarding the 2012 search, keeping in mind the 2012 search, all

25    the specifics of that relate to another individual.  They don't

1    relate to Mr. Kareem.  So that wasn't part of our discovery

2    search in the first place.

3         But as we were getting ready for this hearing, we

4    realized that some of those materials would be relevant to this

5    hearing.  And so we obtained those and marked those and

6    disclosed those.  That is the majority of that 100 pages, is

7    that set of documents there.

8         And Mr. Herrmann is not here to testify today.  He's

9    one of the agents who's not available.  Agent Whitson is not

10   here today.  He's another one who is not available to testify.

11   And Mr. Chiappone, who's an agent who is in Paris, France,

12   right now -- and I'm sure the Court can envision why he's there

13   right now -- will be back in the country in a couple of weeks

14   here, another witness that's relevant to the 2012 warrant.

15        THE COURT:  Let's not get off the track.

16        My question more than today's hearing has to do with

17   what is your level of confidence with respect to whether you

18   have now turned over all discovery to the defense?

19        MR. KOEHLER:  I believe that we have turned over all

20   discovery evidence that relates to the Garland attack.  There

21   are things that are still in the process of being analyzed.  I

22   know that CDs were sent off, for instance, to be fingerprinted.

23   I don't know what the status of that is.  But there's little

24   pieces here and there that are still coming in that are still

25   being analyzed by experts.

1      THE COURT:  Those are the kinds of things -- Before

2  the morning gets away from us, I want to start with the

3  evidence, and we can address these issues, the schedule, at the

4  end of the day.  I want to get started with what we have

5  available for evidence this morning on both of these motions.

6  And we will take the testimony of the witnesses that are

7  available.  And then we'll talk about what more needs to be

8  done at the end of the day.

9      MR. KOEHLER:  Okay.

10      THE COURT:  Is that agreeable, Mr. Maynard?

11      MR. MAYNARD:  That's fine, Your Honor.

12      THE COURT:  And since the hearing will be continued,

13  presumably that will alleviate in some small way the problem of

14  having received disclosure late.

15      Do either of you wish to make any preliminary

16  statement with respect to either/or both motions?

17      MR. KOEHLER:  I think it's appropriate to at least

18  foreshadow where we're going with this.

19      THE COURT:  Okay.  You may proceed then, Mr. Koehler.

20      MR. KOEHLER:  With regard to the 2012 search, the

21  agents searched the residence of Abubakar Ahmed -- and that's

22  A-b-u-b-a-k-r, last name A-h-m-e-d -- for evidence relating to

23  an attempted forgery, and that is his attempts to acquire a

24  phony diploma from a company that would be an Arizona State

25  University diploma.  They were there pursuant to Arizona

1  Revised Statute Section 13-2002.  The first subsection of that,

2  Subsection A, says, "A person commits forgery if, with intent

3  to defraud, the person falsely makes, completes, or alters a

4  written instrument" -- and then goes on from there -- "or

5  knowingly possesses a forged instrument."

6          As part of their search, the agents were required to

7  search for evidence of --

8          THE COURT:  I want to just remind you, Mr. Koehler,

9  that I've actually read the motion, so I don't think we need to

10  go through in minute detail what you already said in your

11  motion.

12          If you want to hit some highlights, yes, but I know

13  they went in.  They searched.  And in the course of that search

14  they took Mr. Abdul Kareem's laptop, imaged it, gave the laptop

15  back to him.  And we're going to hear today whether -- from

16  evidence from, I assume, from the government that they didn't

17  actually look at anything on it until a later search warrant

18  was issued this year.

19          MR. KOEHLER:  That's not quite exactly how things

20  happened, but that's kind of where I wanted to go, is the point

21  that they had to search for evidence to defraud as an element

22  of the offense, not merely as 404(b), as I noted in my response

23  to the defense motion.  That was the point I wanted to make

24  there, is the intent to defraud goes hand in hand with this.

25          And the agents knew in advance that Mr. Abubakar Ahmed

1    was suspected of being involved in terrorism-related activity,

2    including his association to Mr. Simpson, who already had a

3    conviction for lying to federal agents about terrorism-related

4    activity.  And although the Court didn't find that it related

5    to violent terrorism at the time of his conviction, he still

6    had that conviction and was still under suspicion for that.

7            After they seized the evidence, agents went through

8    the computer and found evidence related to the forgery,

9    including evidence on the Lenovo laptop that indicated that

10   Mr. Abubakar had made use of that laptop and made inquiries

11   that related to the forgery offense.

12           They also knew that they needed to look more deeply

13   into that laptop for terrorism-related connections because

14   there was evidence in it of intended travel to Saudi Arabia and

15   other things that raised red flags for the agents.

16           That's what we're going to be presenting to show that

17   when the search of that laptop occurred, that the search

18   actually was within the scope of the warrant when intelligence

19   analyst Amy Vaughan specifically went through looking for

20   evidence of jihadi material and so forth.  That's the first

21   point.

22           The second point is that, as you have noted,

23   Mr. Kareem turned that laptop over to a third party, an

24   individual named Sergio Martinez.  And after everything

25   happened in Garland, Texas, in this case, after the attacks,

1    after agents were in touch with Mr. Martinez about going

2    shooting in the desert with Mr. Kareem, Mr. Martinez contacted

3    the case agent, Stewart Whitson, and informed him that he had

4    been contacted by a representative of the defense asking about

5    that laptop.  And Mr. Martinez volunteered the laptop to Agent

6    Whitson and turned it over to Special Agent Mario Calbone, who

7    is available as a witness here.

8         So one other thing that happened obviously is the

9    disclaimer of ownership.  And Agent Nash will testify about

10   that regarding the thumb drive that was in the laptop.

11        So the standing issue is there in terms of his lacking

12   of privacy interest in the thumb drive, his lacking of privacy

13   interest in the laptop.  There's also an independent source

14   issue with regard to Mr. Martinez coming forward with the

15   laptop.  So that's where we're going with that.

16        With respect to the destruction of the recording that

17   is alleged by the defense, they raised a case in their reply, a

18   fairly new case out of the Ninth Circuit.  Vasquez-Moreira, I

19   believe, is the name of the case.  In that case --

20        THE COURT:  Mr. Koehler, I want to limit this to

21   opening statement, which is what the evidence will show, and at

22   closing we can talk about the law and the evidence.

23        MR. KOEHLER:  Okay.  We're going to show that this is

24   very different from that case in that this was an equipment

25   failure, not somebody's failing to attempt to preserve the

1    interview or otherwise preserve the evidence as was set forth

2    in that case, that this was merely an equipment failure and has

3    nothing to do with bad faith or any kind of malice.  If

4    anything, the agents would rather have preserved this.

5              One other thing I wanted to point out is that we have

6    asked the FBI locally here to send the memory card that is

7    still in evidence to Quantico to see if any of the video and

8    audio can in fact be recovered from that.  And once we know

9    back from Quantico, we'll inform the defense of course.

10             THE COURT:  Thank you.  Mr. Maynard, did you wish to

11   make any opening statement?

12             MR. MAYNARD:  No, Your Honor.  I've said in my papers

13   what I plan to prove today.

14             THE COURT:  Then, Mr. Koehler, you may call your first

15   witness.

16             MR. KOEHLER:  The United States calls Brian Taylor.

17             MR. MAYNARD:  Your Honor, I invoke Rule 615.  It's an

18   evidentiary hearing.

19             THE COURT:  Could all of the witnesses that are here

20   in the courthouse please be brought forward to be sworn.

21             MR. KOEHLER:  Your Honor, we have co-case agent

22   Jeffrey Nash in the courtroom.  May he remain in the courtroom

23   as the co-case agent?

24             THE COURT:  Is he the only case agent that you're

25   asking to be present?

1        MR. KOEHLER:  For today, yes.

2        THE COURT:  Okay.  One representative, yes.

3        MR. KOEHLER:  Correct.  Special Agent Stewart Whitson

4   is normally the case agent, but he's outside the country right

5   now, which is why we have Agent Nash here.

6       (The following named witnesses were sworn:)

7        THE CLERK:  Please state your name for the record,

8   spelling your last name.

9        MARIO CALBONE:  Mario James Calbone, last name

10   C-a-l-b-o-n-e.

11        AMY VAUGHAN:  Amy Kathleen Vaughan, V-a-u-g-h-a-n.

12        BRIAN TAYLOR:  Brian Robert Taylor, T-a-y-l-o-r.

13        JEFFREY NASH:  Jeffrey Davis Nash, N-a-s-h.

14        THE CLERK:  Spell your first name.

15        JEFFREY NASH:  J-e-f-f-r-e-y.

16        JEFFREY EVANS:  Jeffrey David Evans.  Excuse me.

17   E-v-a-n-s.  First name is J-e-f-f-r-e-y.

18        ROBERT MESHINSKY:  Robert J. Meshinsky,

19   M-e-s-h-i-n-s-k-y.

20        THE COURT:  Gentlemen and Ms. Vaughan, the rule to

21   exclude witnesses has been invoked in this case.  That means

22   that except when you're being called to testify or with the

23   exception of Officer Nash, who can remain present in the

24   courtroom through the testimony, you will have to remain

25   outside the courtroom while the testimony of other witnesses is

1    being given.

2              Also, you are not to discuss your testimony with any

3    other witness until such time as all of you have been excused

4    as witnesses.  You may of course discuss your testimony with

5    the attorneys so long as no other witnesses are present.  Do

6    you understand what is required?

7         (The witnesses responded in the affirmative.)

8              THE COURT:  Thank you.  So, Officer Nash, you may take

9    a seat at the counsel table.  And who was the first witness

10   again?

11             MR. KOEHLER:  Mr. Taylor, Your Honor.

12             THE COURT:  And Mr. Taylor may take the stand, and

13   I'll excuse the rest of you, and we'll call you in when it's

14   time for your testimony.

15             MR. KOEHLER:  If I can ask the clerk to please place

16   Exhibits 3, 4, and 5 before the witness.

17             THE COURT:  Yes.

18             MR. KOEHLER:  3, 4, and 5.

19             THE COURT:  And you may proceed, Mr. Koehler.

20    BRIAN ROBERT TAYLOR, GOVERNMENT'S WITNESS, PREVIOUSLY SWORN

21                      DIRECT EXAMINATION

22   BY MR. KOEHLER:

23   Q.  Sir, would you please state your full name for the record.

24   A.  Brian Robert Taylor.

25   Q.  Where do you work?

1    A.   Federal Bureau of Investigation.

2    Q.   What is your title there?

3    A.   Special agent.

4    Q.   Are you also a technically trained agent?

5    A.   I am.

6    Q.   Can you explain to the Court what that is.

7              Pull the microphone closer as well.

8    A.   We operate as a special agent with the rules and authority

9    of the position, but more specifically we are tasked with

10   deploying electronic measures to collect and gather evidence,

11   intelligence pursuant to a case or in support of a case.

12   Q.   So in other words do your duties include setting up cameras

13   and recording devices and so forth?

14   A.   They do.

15   Q.   Does that happen both outside the FBI building as well as

16   inside the FBI building?

17   A.   It does.

18   Q.   And as part of your duties do you maintain the recording

19   equipment or set up the recording equipment in interview rooms

20   when agents need that set up?

21   A.   Yes, we do.

22   Q.   Were you on duty on May 5th of 2015?

23   A.   I was.

24   Q.   And as part of your duties that day, did you set up

25   recording equipment in an interview in the FBI building here in

1    Phoenix?

2    A.  I did.

3    Q.  Is that a room that opens to the lobby of the FBI building?

4    A.  It is a room accessible from the lobby of the FBI building.

5    Q.  So it has a door that opens into the lobby; is that

6    correct?

7    A.  The door to the room enters into the interior space of the

8    FBI.  You have to go through another door to get to the

9    unsecured portion of the building.

10   Q.  Okay.  Very good.  When you set up that equipment, did you

11   set that up initially for Agent Stewart Whitson?

12   A.  No, I did not.

13   Q.  Did you set it up for another agent to conduct an

14   interview?

15   A.  I did.

16   Q.  When was the interview for which you set it up set to take

17   place?

18   A.  The day after Special Agent Whitson came to me with his

19   request.

20   Q.  So May 6th of 2015?

21   A.  I believe so.  That was the date.

22   Q.  And did Agent Whitson approach you on May 5th of 2015 to

23   ask you about setting up the room?

24   A.  To the best of my knowledge, he came to the squad area

25   where we work.  A request was made to facilitate the recording

1    of an interview.  And because of my work in preparation of the

2    other request, he was informed that the room was already set up

3    and that the equipment was already in place.

4    Q.  Did you accompany Agent Whitson to the room where the

5    recording equipment was located?

6    A.  I did.

7    Q.  Did you verify at that point in time that the recording

8    equipment was operational?

9    A.  We did a test.  The equipment was powered on.  We went to

10   the monitoring portion of the room.  We could see the video.

11   There was audio that was detectable by the room -- in the

12   monitoring room.  I sat in one of the chairs.  Agent Whitson

13   was in the monitoring room to verify that the camera was in a

14   position of his liking.  So in that respect, yes, we did do a

15   test to that degree.

16   Q.  Now, without disclosing how it was concealed, was the

17   camera in the room concealed in some fashion?

18   A.  It was.

19   Q.  So you mentioned that you could hear audio in the

20   monitoring room as well as see Agent Whitson at the table in

21   the monitoring room; is that right?

22   A.  Correct.

23   Q.  And so from your perspective at this point in time was that

24   equipment functioning correctly?

25   A.  It was.

TAYLOR - DIRECT

1    Q.  Was a recording -- What type of recording media is used

2    with that monitoring equipment?

3             THE COURT:  Let me interrupt just a second.

4             Was the room set up for a video, which includes audio

5    recording, and an audio recording, or was it just the one

6    combined?

7             THE WITNESS:  It was one device that did both.

8             THE COURT:  Okay.  So there wasn't a separate audio

9    back-up --

10            THE WITNESS:  No.

11            THE COURT:  -- recorder?

12            THE WITNESS:  No, there was not.

13            THE COURT:  And the whole thing is done so that it is

14   not apparent to the interviewee that it's being recorded; is

15   that correct?

16            THE WITNESS:  Correct.

17            THE COURT:  Please continue, Mr. Koehler.

18   Q.  (BY MR. KOEHLER)  What type of recording media is used with

19   the equipment?

20   A.  I mean I know there are multiple names.  I called it an SD

21   flash card or an external memory card.

22   Q.  So it's the little square shaped card that has a little,

23   like, little electronic band on the front of it that connects

24   it to the recording device; is that correct?

25   A.  Correct.

1    Q.  And how do you insert that card?

2    A.  There's a slot on the -- what I refer to the front of the

3    device.  It's spring loaded.  So you insert the card.  The

4    device accepts the card.  And in order to eject it, you depress

5    the card again, and the spring slightly ejects it to the point

6    where you can get your fingers on it, and you just pull it out

7    from the device.

8    Q.  Okay.  I'd like to have you take a look at Exhibit No. 3.

9    I also put Exhibit 3 up on your monitor just to make it a

10   little bit easier to follow.  Can you tell us briefly what this

11   Exhibit 3 is.

12   A.  It is the recording device.

13   Q.  With the exception of the redaction of the name of the

14   recording device, is this a fair and accurate depiction of the

15   instructions on how to operate that recording device?

16   A.  It is.

17   Q.  Did you go over those instructions briefly with

18   Agent Whitson?

19   A.  Briefly, yes.

20   Q.  And can you explain to the Court how the device is operated

21   just in layman's terms.

22   A.  The -- This isn't color coded, but the round -- the lower

23   button, which has a circle in the center of it, is the -- it's

24   red.  That is the record button.  The circle above it with the

25   square in the middle is blue.  The square is blue.  And that is

1      the stop button to stop the recording.

2      Q.  So is it as simple as pressing the start button to begin

3      and pressing the stop button to end?

4      A.  It is.

5      Q.  Is there anything more difficulty-wise than that in terms

6      of starting and stopping it?

7      A.  No.

8      Q.  Did you start the recording equipment that day?

9      A.  I did.

10     Q.  Did you produce a test recording first?

11     A.  I conducted a test of the recording device first, yes.

12     Q.  And did the test recording function?

13     A.  It did.

14     Q.  And after you did the test recording, did you again restart

15     the equipment so that it was recording?

16     A.  I did.

17     Q.  Did you have any further involvement with operating the

18     equipment in relation to that interview that day?

19     A.  I did not.

20     Q.  Did a point come at which you learned that the recording on

21     that equipment had failed?

22     A.  At some time later, yes, it did.

23     Q.  Okay.  And from whom did you learn that it had failed?

24     A.  I mean, it was seven months ago.  I don't remember exactly

25     who it was that brought it to my attention.

24

1    Q.  Were there some reports generated in connection with the

2    failure of the recording?

3    A.  I didn't have access to the case file, so I don't know if

4    anything was generated as a result of the failure.

5    Q.  Was there an e-mail chain in which you were included about

6    recording the audio and video of the interview on or about May

7    6 of 2015?

8    A.  I don't recall.

9    Q.  I'd like to place -- have you take a look at Exhibit No. 4.

10   And go in four pages please.  Does that refresh your

11   recollection?

12   A.  I think I received a copy of this approximately one week

13   ago.

14   Q.  I'm asking about -- it's got the number 1424 at the bottom

15   corner of the page, bottom right corner, Page 1424.  It's about

16   four pages in.  Do you recognize that?

17   A.  Yes, I do.

18   Q.  So were you part of the chain of trying to figure out what

19   happened with the recording equipment?

20   A.  Yes.  Based on this e-mail I was.

21   Q.  Now, the following day did you go back in that room to use

22   the recording equipment for the interview that was actually

23   scheduled for that day?

24   A.  I did.

25   Q.  And when you walked back into the room, did you observe

1    anything unusual about the equipment?

2    A.   Not necessarily about the equipment.   There was an image of

3    Agent Whitson on the monitor, which I found not necessarily

4    odd, but my first impression was that the interview was

5    possibly still being conducted.   But I went into the room where

6    the interview was to be conducted.   There was no one in there.

7    So it led me to believe that the image was frozen or static on

8    the monitor.

9    Q.   So at some point would that have had to have happened, the

10   freezing of the image on the monitor, would that have had to

11   have occurred while Agent Whitson was in the room?

12   A.   I don't have enough information to draw that conclusion.

13   Oh, yes.   In order for that image to have been captured,

14   Agent Whitson would have been in the room.

15   Q.   To still be on the monitor?

16   A.   Correct.

17   Q.   With the exception of that, do you have any other knowledge

18   about this recording failing or any knowledge about why this

19   recording failed?

20   A.   I do not.

21           MR. KOEHLER:  No further questions.  Oh, wait.  I have

22   one more.  I'm sorry.

23   Q.   (BY MR. KOEHLER)  Did anything about how Agent Whitson

24   approached you or anyone else that was involved in the

25   interview give you any impression that there was a lack of

1    intention to actually record that interview?

2    A.   None at all.

3              MR. KOEHLER:  No further questions.

4              THE COURT:  Mr. Maynard.

5                        CROSS-EXAMINATION

6    BY MR. MAYNARD:

7    Q.   Mr. Taylor, are you an agent of the FBI?

8    A.   I am.

9    Q.   And how long have you been an agent?

10   A.   Just over 19 years.

11   Q.   And what kind of training do you have in audiovisual

12   equipment?

13   A.   There is a -- During the process of becoming certified as a

14   technically trained agent, there is, I think when I went

15   through, there was a one-week course that went over the various

16   types of recording equipment that the Bureau deploys.  And then

17   through the process of being in the position, there's a

18   continuing introduction of new equipment and I would say an

19   on-the-job training, so-to-speak, or familiarization with new

20   equipment as it gets deployed to the field.

21   Q.   The equipment that was utilized in this room where

22   Mr. Abdul Kareem was being interviewed, was this new equipment?

23   A.   It was not new, no.

24   Q.   How old was it?

25   A.   I would be guessing.  I have no idea when it was first

1  introduced or when we first received it in Phoenix.

2  Q.  Do you -- Is there newer equipment that is being used by

3  the FBI to do audiovisual recordings than was used in this

4  particular interview?

5  A.  There are different types and newer, I guess, versions of

6  recording audio and video.  But based on the circumstances of

7  this scenario, it was my decision that this was going to be the

8  most practical and efficient way of recording the interview.

9  Q.  Well, I'm a little confused.  I thought you said you had

10  set this up not for this interview but for an interview that

11  was to be conducted the next day.

12  A.  That's correct.

13  Q.  And so they didn't come to you and say what type of

14  equipment to use?  That wasn't a decision you made, was it?

15  A.  They came to me with the request to record an interview.

16  Q.  Who?

17  A.  I believe it was Agent Whitson.  Oh, but initially it was

18  another agent in the building that was conducting an interview

19  that was to take place the day after Agent Whitson came to me.

20  Q.  And what kind of interview was going to be conducted the

21  next day?

22  A.  I believe it was -- I know it involved children, but the

23  specifics of the case, I don't recall.

24  Q.  Did you have an understanding that this was to be a covert

25  video and audiotaping in this interview of Mr. Abdul Kareem?

1   A.  I don't recall those words ever being used, no.

2   Q.  Was the camera in the room where somebody could see it?

3   A.  The device was visible, yes.

4   Q.  Okay.  What does the device look like?

5           MR. KOEHLER:  Objection, Your Honor, relevance, and

6   this is a sensitive area that is not relevant to this hearing.

7           THE COURT:  Overruled.  I thought the camera was

8   hidden so that people couldn't tell they were being videoed.

9           THE WITNESS:  It's concealed within a functioning

10  device.

11          THE COURT:  That nobody would know was a camera?

12          THE WITNESS:  Correct.

13          MR. KOEHLER:  That's why I'm objecting, Your Honor.

14          THE COURT:  Gotcha.  So one time I had a case where

15  they had a video in a radio.  That kind of thing?  It's in

16  something else?

17          THE WITNESS:  Correct.

18  Q.  (BY MR. MAYNARD)  Is it in a cell phone?

19  A.  It's in something else.

20  Q.  In this particular case, though, you had set it up for this

21  interview that was going to take place the next day, but you're

22  told that they're wanting to do an interview of an individual,

23  and they want to audio and videotape it; is that correct?

24  A.  Correct.

25  Q.  Did anybody tell you what type of case it was?

1    A.  I don't remember the specific details.  I don't remember

2    the specific details.  They may have mentioned it, but for my

3    purposes, it would not have changed the equipment that was put

4    in place.

5    Q.  And you went in.  You knew that there was going to be an

6    interview done on that particular day.  And so you went in to

7    test this equipment, correct?

8    A.  The interview that the test was conducted for was to take

9    place the following day, not related to Agent Whitson's

10   interview.

11   Q.  Did you do -- After Agent Whitson told you that I'm going

12   to do an interview, did you do another test?

13   A.  I did not.

14   Q.  So the only test you had done was the one to prepare it for

15   the next -- the following day, not the actual interview of

16   Mr. Abdul Kareem?

17   A.  Correct.

18   Q.  And do you -- did you show Agent Whitson how to use the

19   machine?

20   A.  I believe I did.

21   Q.  And did you watch him use it so that he knew how to turn it

22   on, turn it off?

23   A.  I did not.

24   Q.  You assumed he'd know how to press a button and not press a

25   button, right?

1    A.   I thought my directions or instructions were clear that he

2    understood how to stop the recording.

3    Q.   As an FBI agent, you're aware of 302s, correct?

4    A.   I am.

5    Q.   Do you ever prepare 302s?

6    A.   Not in the current position in which I'm in now.

7    Q.   And how long have you been in this position?

8    A.   I think June of 2006.

9    Q.   And was it your experience that 302s are usually done

10   within a few days after either the interview or the event that

11   is being documented?

12   A.   Based on my recollection when I was writing 302s, it was my

13   understanding that the document was supposed to have been

14   started within five days of the interview.

15   Q.   Now, when you're setting up a recording device like we have

16   in this case, do you prepare any documentation that says this

17   is what I did, and I did it at a certain time, something

18   similar to a 302?

19   A.   I do not.

20   Q.   You were asked some questions about the interview room.  If

21   I understand correctly, off the lobby you go into a hallway,

22   and then the interview rooms are off of that hallway; is that

23   correct?

24   A.   There's one room that is accessible directly from the

25   lobby, and I believe there are, at the time, there were three

1    additional rooms that are in what I consider the secure portion

2    of the building.  It requires a badge and an access code in

3    order to access that portion of the building.

4    Q.  This particular interview, was it in the room that was

5    accessible off the lobby?

6    A.  I don't believe it was, but I could be wrong on that.  I

7    thought -- To the best of my knowledge, it was one of the

8    interior rooms.

9    Q.  And had you -- You've set up interview equipment in those

10   rooms numerous times, correct?

11   A.  Multiple times.  It's -- It's not common for those rooms to

12   be used for the recording of interviews, so it doesn't happen

13   with any regularity.  I have done it maybe a handful of

14   times -- not even a handful -- two or three times.

15   Q.  Do you have interview rooms out at the FBI office here that

16   are already wired for video and audio recording?

17   A.  We do.

18   Q.  How many?

19   A.  Two.

20   Q.  I'm sorry?

21   A.  Two.

22   Q.  Do you know whether or not they were being utilized on the

23   day that Mr. Abdul Kareem was being interviewed?

24   A.  I do not.

25   Q.  Are you the person who takes care of that audio-video

1    equipment in those rooms?

2    A.  I am one of five.  So everybody that I work with has the

3    same skill set, the same knowledge, to be able to address and

4    manipulate that equipment.  But I do not have sole oversight

5    over that equipment.

6    Q.  And those particular rooms that are already wired for audio

7    and video recordings, do they have separate recording devices

8    for both audio and separate recording for video?

9    A.  It is one device that records both.

10   Q.  Is there a back-up in case something happens?

11   A.  Not in place, no.

12   Q.  Does the FBI routinely use a back-up when it's doing

13   recordings in a concern that something may malfunction?

14   A.  I am not aware of a routine practice.  It does happen.  But

15   it's not our standard policy to deploy a back-up system when

16   we're asked to set up recording equipment.

17   Q.  But if you considered that the interview was going to be

18   important for a particular investigation such as investigating

19   a terrorist act where people were killed, would you use a

20   back-up video or audio?

21   A.  Personally?

22   Q.  Yes.

23   A.  I would consider it.

24   Q.  Did anybody ask you about using a back-up audio or video in

25   this case?

1    A.   They did not ask me, no.

2    Q.   You told us that you went in at some point, and you saw

3    Agent Whitson's face on the monitor.  When did that happen?

4    A.   The following morning in preparation for the interview that

5    was originally to take place.

6    Q.   Was that the first time you went into the interview room

7    after you had gone in there with Agent Whitson to show him how

8    to operate the equipment?

9    A.   It was.

10   Q.   The camera that was being utilized in that interview room,

11   did you position it so it would be looking at the person who

12   was being interviewed?

13   A.   It was positioned in the general area where the

14   interview -- where I understood the interview to take place.

15   Q.   If I understood you correctly, I thought you said that you

16   and Agent Whitson sort of looked at it together, and he told

17   you how to set it up so that it would be on the face or the

18   body of the person being interviewed.  Did I misunderstand you?

19   A.   You did.

20   Q.   That did not happen?

21   A.   Not with that specificity.

22   Q.   What type of specificity was there?

23   A.   It was my -- There are two chairs on one side of the desk.

24   It was my impression or my understanding that the interview was

25   to take place in those two chairs.  I positioned the device to

1    cover what I thought would accurately cover that area.  In

2    order to obtain Agent Whitson's approval that the camera was

3    placed properly, I sat in one of the two chairs.  Agent Whitson

4    went into the adjoining room or the other room and concurred

5    that the camera was positioned to his satisfaction.

6    Q.  Okay.  So in other words Agent Whitson told you where he

7    was going to put or seat the individual who would be

8    interviewed, and you sat in that chair, and he went to make

9    sure that it was set up properly?

10   A.  He told me the interview was to take place in two

11   particular chairs.  He did not tell me where he would be

12   sitting versus the subject.  I sat in the chair that was

13   closest to the door, and at that point Agent Whitson went into

14   the other room and confirmed that the camera was positioned to

15   his liking.

16   Q.  Well, was it your understanding you were sitting in that

17   chair because he was looking to see if you were on the camera?

18   A.  Correct.

19   Q.  Okay.  I mean, is the camera taking everybody in the room,

20   or is it just taking the person who is being interviewed?

21   A.  The camera did not -- I was not able to see the other

22   chair, but that doesn't mean with someone sitting in that chair

23   they would not have been visible.

24   Q.  The table, though, there are chairs across from each other,

25   correct?

1   A.  I don't know -- There is -- The standard setup is there's

2   one chair on one side and then I think two chairs on the

3   opposite side.  So if this is -- If this is the desk, I would

4   sit here, and there would be two chairs on the opposite side.

5   I don't recall if the chair that was here was brought around,

6   but I do know for certain that there were two chairs on the

7   side of the desk closest to the door.  And it was my

8   understanding that's where the interview was to take place.

9   Q.  And you understood that the person who was being

10  interviewed was going to sit in one of those two chairs?

11  A.  Correct.

12  Q.  And then you understood that the interviewer would be

13  sitting across from him?

14  A.  I did not have that knowledge.

15  Q.  Okay.  You didn't make that assumption?

16  A.  No, I did not.

17  Q.  And if I understood you correctly, what you said was that

18  when you did come in the next day, you found that there was

19  Agent Whitson's face on the monitor?

20  A.  Correct.

21  Q.  And that would have been not in the interview room but in

22  another room where you -- Agent Whitson had gone before to

23  monitor to make sure that the camera was set up properly?

24  A.  Correct.

25  Q.  So the only way that Agent Whitson's face would have gotten

1    on the monitor would have been if he had been sitting in front

2    of that camera?

3    A.   Correct.

4    Q.   After that interview, did Agent Whitson come to you that

5    day and say we have problems?

6    A.   I don't remember which day it was.  Someone brought it to

7    my attention, I guess, after the 6th.  It may have been on the

8    6th, but it was not the day the actual recording took place.

9    It was brought to my attention at some point later that there

10   was a problem with the recording.

11   Q.   Are you the individual who then troubleshoots the recorders

12   to determine what causes a malfunction?

13   A.   No.

14   Q.   Who is that individual?

15   A.   We would take, I guess, steps to verify that the device was

16   recording or operating properly.

17   Q.   Yes.

18   A.   But we would not do any type of forensic analysis or a

19   detailed breaking down of the equipment to determine a point of

20   failure.

21        If that was to be done, it would have been sent back

22   to our laboratories at Quantico.

23   Q.   Was that done with this camera?

24   A.   It would not have been done with the camera.  It would have

25   been done with the recording device.

1   Q.  Was the recording device sent back to Quantico?

2   A.  Not to my knowledge.

3   Q.  Why not?

4   A.  I don't think there was a problem with the device itself.

5   Q.  What do you think happened?

6   A.  I think there was a crash or a failure of the device, but

7   beyond that I can't speak or I can't speculate as to why it

8   failed.

9   Q.  Could it have been error on the part of Agent Whitson?  He

10  didn't press the button?

11  A.  It would be speculation on my part.

12  Q.  Well, do you have an explanation as to how his face gets on

13  it?

14  A.  I can speculate.

15  Q.  But you don't know how it got on it?

16  A.  I do not know how his image was frozen on the screen.

17  Q.  When one agent is finished with an interview that they are

18  video or audiotaping, what is the protocol that they are to

19  follow to secure that audio or videotape for a chain of

20  custody?

21  A.  It's my understanding that the person assuming custody of

22  the storage media removes it from the recording equipment and

23  takes it to our electronic surveillance evidence technicians.

24  There are forms to fill out to transfer custody from the person

25  who removes it from the equipment into the custody of the

1    evidence technician.  And then once it's in the custody of the

2    evidence technician, they do whatever it is their job requires.

3    Q.  Do you know who did that in this case?

4    A.  I do not know specifically, no.

5    Q.  Do you know an individual by the name of Serena Martinez?

6    A.  I do.

7    Q.  Who is Ms. Martinez?

8    A.  She is one of the evidence control technicians.

9    Q.  Once the tape -- What should I call it?  What was it that

10   would be taken out of the machine?

11   A.  I refer to it as an SD card.

12   Q.  I'm sorry?

13   A.  SD, Sierra David, memory card.

14   Q.  Once the memory card is taken out of the machine and given

15   to this technician who is supposed to secure it, what's the

16   protocol that they are to follow?

17   A.  I don't know specifically.  I know -- I have an

18   understanding of what happens.

19   Q.  Tell me what your understanding is.

20   A.  They accept it into their control system, and based on --

21   or on the request of the agent, a particular number of copies

22   of that information is transferred to typically CDs or DVDs.

23   It's my understanding that the card itself is maintained in the

24   evidence control room and that the copies that are produced are

25   made available to the agent.

1   Q.  While an interview is being -- taking place, and it's being

2   videotaped, can anyone -- well, not anyone -- but can an agent

3   who has authority walk into the room and look at the monitor to

4   see if it's playing or recording?

5   A.  It's my understanding the room was not secured.  It's not

6   locked or it was not locked.  So anyone walking into the room,

7   yes, would be able to have access to it.

8   Q.  Does the FBI have a protocol to follow when a video

9   recording is being made of an interview whether or not somebody

10  is to be watching the video recording to make sure that it's

11  working?

12  A.  I'm not aware of that policy.

13  Q.  Does -- Is it routinely done that way?

14  A.  Routinely I would say no.

15  Q.  Are there times when it's done that way?

16  A.  Absolutely.

17  Q.  Under what circumstances?

18  A.  Various circumstances.

19  Q.  Would it depend upon the -- how important the interview is?

20  A.  Not necessarily.

21  Q.  If there are two agents that are doing the interview, is it

22  typical for one of them to get up and go into the room to see

23  if the recording device is working properly?

24  A.  I can't say if it's typical.

25  Q.  Happens on occasion, but it's not something that's

1    required?

2    A.  I am not aware of that typically happening during the

3    middle of an interview.

4    Q.  Other than what you've told us about today concerning your

5    involvement in this, have you had any other involvement in

6    either looking at the SD card or doing any analysis of it?

7    A.  Other than what's documented in this e-mail or verifying

8    that there is no data, that the interview was not present on

9    the card, no.

10   Q.  Let's take a look for a second at Exhibit No. 5.

11           The first e-mail that we have here is one that's at

12   10:40 in the morning from you to Whitson.

13   A.  5 or 4?

14   Q.  I'm sorry.  It's 4.  And it's Bates stamped Page 1424.

15   A.  Yes.

16   Q.  And you're writing to Agent Whitson saying, "No luck on

17   recovering the audio or video of the interview.  I was able to

18   recover the test videos prior to the actual interview but

19   nothing of investigative value."

20           How did it come to your attention that there was a

21   problem with this?

22   A.  I can't remember who, but someone called me and said that

23   the recording was not on the SD card.

24   Q.  Is there another -- Is there another portion to this

25   e-mail?  In other words, did somebody e-mail you can you go do

1    a test for us or something of that nature?

2    A.  I don't know how the request was made, phone call, person.

3    I don't remember.

4    Q.  And when Agent Whitson writes back to you, says, "I'll

5    touch base with the case agents first, and if they want me to

6    proceed, I'll send the e-mail and get with Rich," what did you

7    understand that to mean?  Who were the case agents?

8    A.  I don't know who they are specifically in this case, but

9    the term refers to a person or persons overseeing an

10   investigation.

11   Q.  That would be somebody who was overseeing this

12   investigation Whitson was under, correct?

13   A.  That's my understanding, yes.

14   Q.  Okay.  Did anybody ever follow up with you about how they

15   wanted you to proceed?

16   A.  No, not to my knowledge, no.

17   Q.  Just a minute, Your Honor.  This is a document I didn't get

18   until yesterday after 1:00.

19          Turn to the first page of Exhibit 4, which is Bates

20   stamped 000298.  This is a 302 that is prepared on July 1st of

21   2015.  Do you see that?

22   A.  I do.

23   Q.  Do you know why it took almost two months before a 302 was

24   prepared about this failure of the equipment?

25   A.  I do not.

1    Q.  Did you have anything to do with the preparation of this

2    302?

3    A.  I did not.

4    Q.  Did anybody contact you after the e-mail that you received

5    on May 6 at 11:35 concerning this matter?

6    A.  I believe it was approximately a week ago when

7    Agent Whitson advised that I was going to be subpoenaed to

8    testify in this matter.

9    Q.  And that was the first time you heard anything about it?

10   A.  Correct.  To my -- Based on my knowledge and recollection,

11   yes.

12   Q.  And what did you do to prepare for your testimony?

13   A.  I met with the prosecutors, reviewed the facts as I

14   recalled them.

15   Q.  Did you review any documents?

16   A.  I don't believe any documents were presented, no.

17   Q.  Are you aware of whether or not this particular recording

18   device has malfunctioned since this particular interview back

19   in May of 2015?

20   A.  It has not been brought to my attention that it has failed,

21   no.

22   Q.  Prior to this particular interview, were you aware of this

23   recording device having malfunctioned?

24   A.  I was not.

25   Q.  So do you believe the recording device had been in use for

1   over a year before this interview?

2   A.  It would be -- I would be guessing as to the time frame.

3   Q.  I don't want you to guess, but what's your best --

4   A.  It was available well prior to the date of this interview.

5   I can't speak with any certainty as to the frequency of its

6   use, the regularity of its use.  It had been available for some

7   time.  I know that equipment is regularly used, but I can't

8   speak to what frequency.

9   Q.  But you're not aware of anybody then taking this equipment

10  and working on it to fix it, to fix a problem with it?

11  A.  I'm not aware of that, no.

12  Q.  And you're not aware of -- Strike that.

13          You don't know how long it's been used, but it wasn't

14  new equipment.  It's been around for some time?

15          THE COURT:  I think he's already said that,

16  Mr. Maynard.

17  Q.  (BY MR. MAYNARD)  And you're not aware of it having

18  malfunctioned any other time other than this one time?

19  A.  I am not aware of that, no.

20  Q.  And you don't know what the malfunction was?

21  A.  Specifically, no.  Other than there was one, I do not know.

22  Q.  And do you know if the malfunction was in the equipment or

23  in the SD?

24  A.  I don't have that knowledge.

25          MR. MAYNARD:  I don't have any further questions.

1          THE COURT:  And, Agent Taylor, has this specific

2    equipment been used regularly and successfully since May 5th?

3          THE WITNESS:  I know specifically it was used the day

4    after this interview, and it has not been brought to my

5    attention that that recording was unsuccessful.

6          THE COURT:  Thank you.  Mr. Koehler, anything else?

7                    REDIRECT EXAMINATION

8    BY MR. KOEHLER:

9    Q.  Do you know who chose the room in which the interview took

10   place?

11   A.  Essentially I did.

12   Q.  And how much time elapsed between the test that you

13   conducted of the equipment and when you went into the room with

14   Agent Whitson?

15   A.  I would say hours.  I set the equipment up that day,

16   conducted my test that day, and it was sometime later in the

17   day, as I recall, that Agent Whitson came to me with the

18   request or the request was made to record his interview.

19   Q.  When you conducted the test, did you use the same memory

20   card that was the memory card that failed to obtain the

21   recording?

22   A.  I did.

23   Q.  So you used a new memory card the following day; is that

24   right?

25   A.  I did.

TAYLOR - REDIRECT

1    Q.  Did you retest the equipment the following day before that

2    interview was conducted?

3    A.  I did not.

4    Q.  How did you get Agent Whitson's image off the screen?

5    A.  Power cycled the equipment.

6    Q.  So you turned it off, turned it back on?

7    A.  Correct.

8    Q.  Is this kind of like what you do with a computer when a

9    computer freezes?

10   A.  It's not uncommon.  It's very similar.

11   Q.  And does this equipment, in the sense that it records onto

12   an SD card, does it record much the same way a computer writes

13   to memory?

14          THE COURT:  Are you asking him a technical question,

15   or just it seems like it does it the same way?

16   Q.  (BY MR. KOEHLER)  Correct.  Just a general question.

17   A.  General question?

18   Q.  Yes.

19   A.  I would say generally they record in very similar manners.

20   Q.  So when you saw Agent Whitson in the room and then he saw

21   you in the room to verify that the camera was on, was the

22   equipment actually recording at that point in time?

23   A.  I don't believe it was.  It doesn't need to be in a

24   recording state in order to see active video and hear active

25   audio.

1    Q.  So what you did essentially then was a test of the camera

2    equipment but not the recording equipment at that point?  Your

3    earlier test of the recording equipment is the only recording

4    test?

5    A.  Yes.

6    Q.  Earlier this week you met with AUSA Kristen Brook and

7    myself; is that right?

8    A.  Correct.

9    Q.  During the course of that did you suggest to us a manner in

10   which one could perhaps test the SD card to see if there was

11   any recording on the SD card despite its failure to finish

12   writing?

13   A.  I know forensically there are tools available to recover

14   corrupt or damaged storage medium.  I can't speak to the

15   results, but I -- I'm fairly certain there are avenues that

16   could be pursued in an attempt to recover any available data.

17   Q.  Where would the card be sent to have that kind of analysis

18   performed?

19   A.  I don't know where policies would come into play.  I know

20   the Phoenix Computer Analysis Response Team has equipment that

21   can recover corrupt or damaged data.  But our laboratory at

22   Quantico has the same if not more equipment.  So absent

23   knowledge of any specific policy, one of those two places, I

24   think, would be able to conduct an examination.

25   Q.  Do you instruct your agents who are conducting an interview

1   to step out of the interview room to check on the recording

2   equipment while that interview is going on?

3   A.  I do not.

4   Q.  And if there's somebody in the monitoring room or the

5   recording room while an interview is taking place, is that

6   person typically there to observe the interview or to monitor

7   the equipment?

8   A.  It's my understanding they're there to monitor the

9   interview.

10            MR. KOEHLER:  No further -- Oh, I would move to admit

11  3 and 4, Your Honor.

12            THE COURT:  Any objection?

13            MR. MAYNARD:  No objection, Judge.

14            THE COURT:  3 and 4 are admitted.

15            Thank you, Agent Taylor.  You may step down.  May

16  Agent Taylor be excused and released from his subpoena?

17            MR. KOEHLER:  He can from the government, Your Honor.

18            MR. MAYNARD:  Yes, Your Honor.

19            THE COURT:  Yes.  Thank you very much, sir.  You may

20  step down.  The government may call its next witness.

21            MR. KOEHLER:  The United States calls Jeffrey Nash.

22            Your Honor, Agent Nash has two things to testify to.

23  One is the failed equipment recording on the interview, and the

24  other is the search issue.  To perhaps confine the issues, I'd

25  like to question him first about the interview subject and then

1   let Mr. Maynard cross about that and redirect, and then I can

2   have AUSA Brook address the other issue with him, if that is

3   okay with the Court.

4           And you're shaking your head no.

5           THE COURT:  It's not.  I mean, I don't mind if you

6   switch questioners, but we're not going to have two crosses and

7   two redirects.  I can keep it straight.

8           MR. KOEHLER:  Okay.  As long as you're okay with us

9   switching questioners, that's fine.

10          THE COURT:  I'm okay in this instance with you

11  switching questioners, but don't try it at trial because it

12  won't work there.

13          MR. KOEHLER:  No, we won't do it there.  Thank you.

14   JEFFREY DAVIS NASH, GOVERNMENT'S WITNESS, PREVIOUSLY SWORN

15                      DIRECT EXAMINATION

16  BY MR. KOEHLER:

17  Q.  Sir, could you please state your name for the record.

18  A.  My name is Jeffrey Davis Nash.

19  Q.  Where do you work?

20  A.  I work at the Department of Public Safety, and I'm assigned

21  to the FBI's Joint Terrorism Task Force.

22  Q.  So you're with the Arizona Department of Public Safety; is

23  that correct?

24  A.  Correct.

25  Q.  What is your title with DPS?

1    A.  Detective.

2    Q.  And you mentioned that you're assigned to the Joint

3    Terrorism Task Force.  Is that part of FBI?

4    A.  Yes.

5    Q.  Do you have a title with the FBI as well?

6    A.  Task Force Officer.

7    Q.  How long have you been with the Department of Public

8    Safety?

9    A.  29 and a half years.

10   Q.  And when were you first assigned to the Joint Terrorism

11   Task Force for the FBI?

12   A.  Just after September 11th, 2001.

13   Q.  And are you the co-case agent in this case United States

14   against Abdul Malik Abdul Kareem?

15   A.  Yes.

16   Q.  Were you working on this case on May 5 of 2015?

17   A.  On this case, no.  The Simpson -- I'm sorry.  The Garland,

18   Texas, shooting case I was --

19   Q.  So was this part of a larger investigation that had kind of

20   an umbrella --

21   A.  Yes.

22   Q.  -- case agent?

23          And were you performing tasks that related to

24   Mr. Kareem in relation to the Garland, Texas, attacks at that

25   point in time?

A.  Yes.

Q.  Did you participate in an interview of Mr. Kareem on May 5
of 2015?

A.  Yes, I did.

Q.  Was Agent Whitson also participating in that interview?

A.  He was.

Q.  Did you witness the setting up of the recording equipment
or the testing of the recording equipment prior to that
interview?

A.  No, I did not.

Q.  What were you doing when the recording equipment was set
up?

A.  As I recall, I was waiting for Mr. Malik -- I'm sorry --
Mr. Kareem to show up.

Q.  How was this interview arranged with Mr. Malik or
Mr. Kareem?

A.  I'm sorry.  I actually made a phone call to Mr. Kareem and
asked him if he would come in to talk about what happened in
Garland.

Q.  When he arrived at the FBI building, did you see his
arrival?

A.  No, I did not.

Q.  How did you learn of his arrival?

A.  I think I went down to the guard shack, and he just
happened to be coming in at the same time.

1    Q.  Did you see a vehicle that he had been in?

2    A.  No, I did not.

3    Q.  Was he on foot at the time that you saw him?

4    A.  Yes.

5    Q.  Did you escort him from the guard shack to the building?

6    A.  I did.

7    Q.  Was he ever in any way ordered to do anything in terms of

8    entering the building or cuffed or restrained in any way?

9    A.  No, he was not.

10   Q.  Did you talk to him on the way into the building?

11   A.  I did.

12   Q.  Did you exchange pleasantries?

13   A.  Yes.

14   Q.  Was there anything substantive discussed while walking into

15   the building?

16   A.  No.

17   Q.  What happened once you got to the front door of the

18   building?

19   A.  We entered and walked him over, and Agent Whitson was

20   standing outside, and then we entered into the secure area.

21   Q.  Did he sign in first?

22   A.  I believe he did.

23   Q.  Present ID to whoever the front desk person is, that kind

24   of thing?

25   A.  Yes.

NASH - DIRECT

1    Q.  Okay.  When you went to the interview room, how did you

2    access the interview room?

3    A.  Through the keypad with our card and a PIN number.

4    Q.  And then you went to the interview room.  How far from the

5    lobby was the interview room?

6    A.  20 feet maybe.

7    Q.  At any point during that time was Mr. Malik's freedom or

8    Mr. Kareem's freedom restrained in any way?

9    A.  No.

10   Q.  When you got to the interview room, how was the room set

11   up?

12   A.  The interview room was set up with a table.  There were

13   three chairs.  And there was a file cabinet in one of the

14   corners.

15   Q.  Where was Mr. Kareem seated in relation to the door?

16   A.  In relation to the door, his back was towards the door, and

17   he was against the wall.

18   Q.  Okay.  And where were you and Agent Whitson sitting?

19   A.  I was seated at the end of the table, and then

20   Agent Whitson was seated across from Mr. Malik -- I'm sorry --

21   Mr. Kareem.

22   Q.  Were either of you between him and the door to the room?

23   A.  No.

24   Q.  Did anything out of the ordinary take place during the

25   interview in terms of any medical issues or anything like that

1  occur?

2  A.  No.  As a matter of fact, we asked him if he had anything,

3  and Agent Whitson had brought some snacks down, some crackers

4  and cookies, and we offered something to drink.

5  Q.  Was that because you were aware that Mr. Kareem was

6  diabetic?

7  A.  Yes.

8          MR. MAYNARD:  Objection.  Leading.

9          THE COURT:  Overruled.  The answer yes will stand.

10          How did you know that?

11          THE WITNESS:  I had had a preliminary investigation on

12  Mr. Kareem prior to, and I knew that he had some medical

13  issues.

14          THE COURT:  Thank you.

15  Q.  (BY MR. KOEHLER)  During the course of the interview, was

16  there any manifestation of any difficulty on Mr. Kareem's part?

17  A.  No, I didn't notice anything unusual.

18  Q.  Did his answers to questions make sense in the context of

19  the questions being asked?

20  A.  Yes.

21  Q.  Did he ever become agitated or excited in any way?

22  A.  No, he did not.

23  Q.  Did either you or Agent Whitson ever become angry toward

24  him or display any sort of intensity, so-to-speak, toward him

25  during the course of the interview?

1    A.  No.

2    Q.  When the interview ended, what happened?

3    A.  The interview ended, and then I walked Mr. Malik out to the

4    gate, and we said good-bye.

5    Q.  Did he express anything to you that gave any indication

6    that he felt his freedom was restrained in any way?

7    A.  No.

8    Q.  What happened after Mr. Kareem walked out the gate?

9    A.  At that point I kind of watched him walk for a few steps,

10   and I turned around and went back into the FBI building.

11   Q.  Okay.  And did you go back to the interview room area?

12   A.  Yes.

13   Q.  What happened when you got back to the interview room area?

14   A.  I met with Agent Whitson, and then we went into the room

15   where the recorder -- recording device was at.

16   Q.  Okay.  And did you see Agent Whitson do anything?

17   A.  We walked over to the actual device itself, and then --

18   this part I don't recall if he -- if he turned it off or if he

19   told me to turn it off.  I can't remember.

20   Q.  Do you recall the recording equipment having a start and a

21   stop button on it?

22   A.  Yes.

23   Q.  Did one of the two of you hit the stop button on the

24   equipment?

25   A.  One of us did.  I wouldn't have done it on my own because I

1    don't know how to operate that equipment.  If Agent Whitson

2    told me to push the stop button, I might have done that, but I

3    don't recall doing it.

4    Q.  Was the stop button on the equipment clearly labeled?

5    A.  Actually, no.  There's two buttons.  One's a blue square

6    and then there's a red circle on the two buttons.

7    Q.  Okay.  And after that, did someone eject the memory card

8    from the device?

9    A.  Yes.

10   Q.  Who did that?

11   A.  I did that.

12   Q.  Okay.  Were there any lights blinking or otherwise

13   displaying on the exterior of the device at the time that you

14   ejected the card?

15   A.  No, I did not see any lights.

16   Q.  What did you do with the card after you ejected it?

17   A.  I took possession of it and took it up to our ELSUR

18   section, which is our electronic surveillance.

19   Q.  Is Exhibit 4 in front of the witness?  No.  Let's go to

20   Exhibit 5 please.

21          I'd like to direct your attention to Exhibit No. 5

22   there.  Do you recognize that?  I know it's not the cleanest

23   copy in the world.

24   A.  It's a bad copy, but, yes, I recognize it.

25   Q.  Looking about a little more than halfway down the form,

1    does your name appear on that form?

2    A.   It does.

3    Q.   What is the form?

4    A.   This is the evidence submittal of electronic evidence.

5    Q.   Is this the sheet that you used to check in that memory

6    card into evidence in this case?

7    A.   Correct.

8            MR. KOEHLER:  Move to admit Exhibit 5.

9            MR. MAYNARD:  No objection.

10           THE COURT:  5 is admitted.

11   Q.   (BY MR. KOEHLER)  Did you do anything to that card in

12   between the time you took it out of the recording device and

13   took it to the ELSUR department?

14   A.   No.

15   Q.   Did you and Agent Whitson ever have any conversations to

16   indicate that you did not want this interview recorded?

17   A.   No.  We wanted it recorded.

18   Q.   Why is that?

19   A.   Just because it's a better -- It's better evidence.  As far

20   as me taking notes, it may not be complete because of trying to

21   write the notes and listen to Mr. Kareem speak at the same

22   time.  I may miss something.  It's more of a better quality.

23   Q.   Was there any point at which either you or Agent Whitson

24   instructed anybody else to tamper with this recording in any

25   fashion?

1    A.  No, absolutely not.

2    Q.  Did you intend to record this interview?

3    A.  Yes.

4         MR. KOEHLER:  No further questions.

5         THE COURT:  Mr. Maynard.

6         MR. KOEHLER:  It's going to go to Ms. Brook now for

7    further direct.

8         THE COURT:  I'm sorry.  Thank you.

9                        DIRECT EXAMINATION

10   BY MS. BROOK:

11   Q.  Good morning.  Can we have TFO Nash have 1 through 10.  I

12   think he has a couple of exhibits but not all of 1 through 10.

13        Continuing back where we left off, we were talking

14   about Exhibit No. 5, which was that property and evidence form.

15   A.  I'm sorry.  What is the --

16   Q.  Exhibit No. 5, the property and evidence form.

17   A.  Yes.

18   Q.  Placing it on the overhead already admitted, there where it

19   says your name is printed, it shows the date that you put it

20   into evidence?  It's hard to read on this gray copy.  Showing

21   there, do you see 5-5-15?

22   A.  Yes.

23   Q.  And again at 1605 hours?

24   A.  I don't see that.  Oh, there it is, yes.

25   Q.  And is that where you accepted custody?

1    A.   Yes.

2    Q.   And then right next to it released custody 5-5-15 at 1611

3    hours?

4    A.   Correct.

5    Q.   You have before you Exhibit No. 1.  What is that?

6    A.   Exhibit No. 1 is the -- what they call the FD302 of the

7    interview of Mr. Malik from 5-5.

8    Q.   And were you the primary author of this particular

9    interview?

10   A.   No, I wasn't.

11   Q.   Your name is on it, so what role did you have in

12   conjunction with producing this 302?

13   A.   Just to make sure that it's factually correct.

14   Q.   And to produce this 302, did you use anything that you had

15   done or created?

16   A.   My notes.

17   Q.   And those notes, let's talk about those for a second.  When

18   did you create the notes?

19   A.   At the same time that the interview took place.

20   Q.   If you can go ahead and look at Exhibit No. 2, do you

21   recognize those?

22   A.   Yes.  They are a copy of my notes.

23   Q.   And are there five pages in total?

24   A.   Correct.

25   Q.   The first four pages, what are those?

1    A.   Those are my handwritten notes.

2    Q.   And the last page, the page with the Bates stamp 1432,

3    whose notes are those?

4    A.   Those are Agent Whitson's.

5    Q.   You spoke about notes and you writing notes.  So throughout

6    the duration of the interview there on May 5th, were you

7    writing notes in realtime?

8    A.   Yes.

9    Q.   And talk to me a little bit about how you generate your

10   notes.  Is this something that you routinely do as part of your

11   duties?

12   A.   Yes, quite often.

13   Q.   Your role -- So you spoke about you and Special

14   Agent Whitson together in that interview room.  Who was the

15   primary note writer?

16   A.   I was the primary note writer, and Agent Whitson was the

17   primary interviewer.

18   Q.   And after notes are generated and created, in this

19   particular case how soon was the report drafted?

20   A.   The next day, I believe.

21   Q.   So it was drafted on the 6th?

22   A.   Within 24 hours.

23   Q.   And can you see there on the bottom of Exhibit No. 1 the

24   date stamp of May 6th?

25   A.   Yes.

1  Q.  As the 302, so Exhibit No. 1, is generated, how do your

2  notes come into play?  When you take notes -- Let me ask a

3  better question.

4        When you take notes, are you taking everything

5  verbatim word for word?

6  A.  If I could, I would, but it's impossible to do that.

7        The interview was flowing along, and I was trying to

8  keep notes as fast as I could to keep up with the interview.

9  Q.  So therefore is it a shorthand?

10  A.  It's not shorthand the way I know shorthand, but it's some

11  of the -- to help me understand so I can remember to help out

12  with the report later on.  There's some things in there I wrote

13  very quickly, so I tend to get sloppy when I write quickly.

14  But, yeah, I tried to keep up as best I could.

15  Q.  And did you use these notes when sitting down with Special

16  Agent Whitson to generate that 302?

17  A.  Yes.

18  Q.  Turning to Exhibit No. 4, which I also believe is before

19  you.

20  A.  Number 4?

21  Q.  Yes.  Do you recognize that 302?

22  A.  Yes.

23  Q.  And was that a 302 that you drafted in conjunction with

24  Special Agent Whitson?

25  A.  Agent Whitson drafted it, yes.

1    Q.  In that 302 did you memorialize additional facts regarding

2    the SD card and the fact that it didn't capture the recording

3    of Abdul Kareem?

4    A.  Yes.

5    Q.  That was done later?

6    A.  Correct.

7    Q.  Why was that?

8    A.  Well, Agent Whitson actually authored it.  I don't know the

9    reason why there was a delay, but that was put in there to

10   verify that there was a malfunction with the recording.

11   Q.  Back on May 6th when you generated Exhibit No. 1, the 302

12   regarding the interview of Abdul Kareem, did you know at that

13   time that the recording equipment didn't work?

14   A.  I don't recall when they actually told us that it didn't

15   work.  It was within the day or the next day, within two days.

16   Q.  Do you recall in conjunction with this case any other

17   situation where recording equipment did not function as it

18   should?

19   A.  Yes.

20   Q.  And specifically was that in relation to an interview on

21   May 19th of CS number one?

22   A.  I know of it, but I don't -- I wasn't present for that.

23   Q.  If you can turn your attention to Exhibit No. 8, which is

24   before you, I'm going to draw your attention to Page 2 of the

25   exhibit, second-to-the-last paragraph.

Case 2:15-cr-00707-SRB   Document 148   Filed 12/08/15   Page 62 of 153

NASH - DIRECT

1    A.  Page 2, second-to-the-last paragraph?

2    Q.  Look up after you've had a chance to review that paragraph.

3    A.  I'm sorry?

4    Q.  Look up after you've had a chance to review that paragraph.

5    A.  Okay.

6    Q.  Is that the time that you were thinking of when the

7    equipment malfunctioned?

8    A.  I'm sorry?  Could you ask that one more time.

9    Q.  Was that the instance that you were thinking of when the

10   equipment malfunctioned?

11   A.  Yes.  On the other malfunction you're talking about, yes.

12   Q.  And it appears there's a notation here regarding due to

13   technical difficulty or lack of memory?

14   A.  I'm sorry?  One more time.  My hearing is not the greatest,

15   being a firearms instructor.

16   Q.  That the equipment did not fully encapsulate the interview

17   because there was a memory shortage or some sort of a technical

18   difficulty related to the equipment?

19   A.  Right, correct.

20   Q.  Are you aware on May 12th of this year, so seven days after

21   Abdul Kareem came to the FBI to engage in the interview with

22   you and Special Agent Whitson that we've been talking about?

23   A.  Yes.

24   Q.  Seven days later on May 12th of this year, did Abdul Malik

25   Abdul Kareem again come back to the FBI?

UNITED STATES DISTRICT COURT

1    A.  He did.

2    Q.  And why -- Well, had you guys reached out to him to ask him

3    to come to the FBI?

4    A.  No.

5    Q.  Were you -- Was it an announced visit?

6    A.  No, it was not.

7    Q.  And as such, when Abdul Malik Abdul Kareem arrived at the

8    FBI, did you all try to talk to him?

9    A.  Yes.

10   Q.  And what happened?

11   A.  He had waited out front.  By the time we got -- Because we

12   were in the midst of other things.  By the time we got down to

13   there, he had left, so Agent Whitson called him on the

14   telephone.

15   Q.  And at that point did Agent Whitson, if you're aware, did

16   he have a conversation with him?

17   A.  He did.

18   Q.  And that information too was memorialized in a report?

19   A.  I believe so, yes.

20   Q.  I believe you have before you Exhibit No. 6.

21          Is that the report that memorializes the unannounced

22   visit of Abdul Malik Abdul Kareem to the FBI on May 12th?

23   A.  I have not had a chance to read this.  I had gone on

24   vacation the following day after that interview, so this is the

25   first time I've seen this.

1    Q.  So taking the documentation aside, you remember the

2    occurrence when he arrived, and then there was a telephonic

3    interview that followed?

4    A.  Yes.

5    Q.  Let's go back to January 23rd of 2014.

6    A.  Of?

7    Q.  Of 2014.  So January 23rd of 2014.

8    A.  Yes.

9    Q.  Were you on duty then?

10   A.  I was.

11   Q.  And on that particular day did you come into contact with

12   Abdul Malik Abdul Kareem?

13   A.  I did.

14   Q.  How did that happen?

15   A.  It was a telephonic interview.

16   Q.  And who reached out to whom in that interview?

17   A.  I called him.

18   Q.  And what was the purpose of you calling him?

19   A.  To do an interview with him and also try and return his

20   computer.

21   Q.  You say try.  What do you mean by that?

22   A.  My understanding is he had been talked to before and did

23   not want the computer.  He talked to Detective Herrmann and

24   said he didn't want the computer back.

25   Q.  So you reached out to him to see if we would take it back?

1    A.   Yes.

2    Q.   And what happened?

3    A.   He originally told me he didn't want it back, and then I

4    told him he could take it and sell it if he wanted to, maybe

5    just make some money off it.

6    Q.   The computer that we're referring to, was this the laptop

7    Lenovo 0768?

8    A.   I don't have anything in front of me.  I can't confirm

9    that.

10   Q.   If you can go ahead and look at Exhibit No. 10, just

11   looking at the first page there, do you recognize that report?

12   A.   Yes.

13   Q.   And was that a report that was generated by you in

14   conjunction with the contact with Abdul Kareem on January 23rd

15   of 2014?

16   A.   It is.

17   Q.   And in that does it refer to the Lenovo 0768 laptop

18   computer?

19   A.   It does.

20   Q.   And that was the laptop computer that was in FBI custody?

21   A.   Correct.

22   Q.   Eventually through the course of you communicating with

23   Abdul Kareem at this particular time, did he take custody of

24   the laptop?

25   A.   He did.

1    Q.   And how did that happen?

2    A.   I took it out of evidence and brought it down to him when

3    he came to pick it up a couple days later.

4    Q.   Did he indicate why it was that he didn't want it back?

5    A.   He thought that the FBI put bugs on it or surveillance

6    software.

7    Q.   And in the end through the course of your discussions with

8    him, did he agree to take it back?

9    A.   I'm sorry.  One more time?

10   Q.   Through talking to him, did he agree eventually that he

11   wanted it back?

12   A.   Yes, he did.

13   Q.   Did he make any statements regarding the thumb drive that

14   was inserted into that Lenovo laptop when it was taken into

15   custody by FBI?

16   A.   He did.

17   Q.   What did he say?

18   A.   He said that he had been on the computer earlier prior to

19   the search warrant being executed and that he did not know how

20   the thumb drive got on the computer or in the -- plugged into

21   the computer.

22   Q.   Did he say it was not his?

23   A.   He did.

24   Q.   Did he indicate knowing who it belonged to?

25   A.   He said he did not know.

```
1    Q.  In this matter did you testify before the Grand Jury?
2    A.  No, I did not.
3            MS. BROOK:  I don't have any other questions, Your
4    Honor.
5            THE COURT:  Thank you.  Mr. Maynard.
6            THE WITNESS:  Your Honor, would it be possible to take
7    a break so I can go to the bathroom?
8            THE COURT:  Sure.  We'll talk a break.  We'll
9    reconvene in ten minutes.  Good idea.
10           THE WITNESS:  Thank you.
11       (Proceedings recessed from 11:07 a.m. until 11:18 a.m.)
12           THE COURT:  The record will show the presence of
13   counsel and the defendant.
14           You may proceed, Mr. Maynard.
15           MR. MAYNARD:  Thank you, Your Honor.
16                       CROSS-EXAMINATION
17   BY MR. MAYNARD:
18   Q.  I believe your testimony was you work for DPS, but you're
19   part of a joint task force; is that correct?
20   A.  Joint Terrorism Task Force, yes.
21   Q.  And how long have you been a part of that Joint Terrorism
22   Task Force?
23   A.  Since just after 9-11, 2001.
24   Q.  And since 2001, you've been working in conjunction with the
25   FBI?
```

1    A.   Correct.

2    Q.   Mr. Simpson went to trial in 2010.  Were you involved in

3    that investigation?

4    A.   No, I was not.

5    Q.   Nothing to do with it whatsoever?

6    A.   Nothing to do with it.

7    Q.   When did you first get involved in investigating Mr. Abdul

8    Kareem?

9    A.   I assisted one of the other case agents on what we call a

10   preliminary investigation, which is basically investigating

11   allegations.  And then later on I became the case agent on one

12   of the preliminary investigations.

13         THE COURT:  I think the question was when did you

14   first begin the preliminary investigation?

15         THE WITNESS:  I don't remember the exact date.  It was

16   2011, I believe, in 2011.

17   Q.   (BY MR. MAYNARD)  How is it that you came to begin

18   investigating him in 2011?

19   A.   Was asked to assist with surveillance and other things.

20   Q.   I'm sorry?

21   A.   Surveillance.

22   Q.   Who -- But who contacted you and said let's start

23   investigating this guy?

24         MS. BROOK:  Your Honor, I'm going to object to beyond

25   the scope as well as irrelevant.

1                THE COURT:  Overruled.  You may answer.

2                THE WITNESS:  I don't recall who actually came to me

3     when -- way back when.

4                MR. MAYNARD:  Can I approach, Judge?

5                THE COURT:  Approach who?

6                MR. MAYNARD:  Approach to give you a copy of a

7     document that I got yesterday.

8                THE COURT:  Yes.

9                MR. MAYNARD:  Then I'll have one of these marked as an

10    exhibit.

11               MR. KOEHLER:  What's the exhibit number going to be?

12    Exhibit number?

13               MR. MAYNARD:  When I know, I'll tell you.

14               What's the number?

15               THE CLERK:  92.

16               MR. MAYNARD:  92.

17    Q.  (BY MR. MAYNARD)  Can the witness be shown Exhibit 92.  I'm

18    showing you what's been marked as Exhibit 92.  Have you seen

19    this document before?

20    A.  Yes.

21    Q.  And when did you first see it?

22    A.  About a week ago.

23    Q.  Did you review it in preparation for your testimony here

24    today?

25    A.  I did.

1    Q.  You'll note that it says that you were the one who

2    collected.  It says collected by.  And that indicates you're

3    the one who collected the card that we've been talking about

4    from the interview --

5    A.  That's correct.

6    Q.  -- correct?

7         It says, "The full investigation was initiated in

8    August 14th of 2006."  Do you see that right above your name?

9    A.  Yes.

10   Q.  Were you involved -- Strike that.

11        Does that refer to an investigation of Abdul Malik

12   Abdul Kareem that began on August 14th of 2006?

13   A.  Actually, no, it does not.  It's Elton Simpson.  The case

14   number's for Elton Simpson.

15   Q.  So the full investigation that is being referenced there is

16   the investigation of Elton Simpson?

17   A.  Correct.

18   Q.  And were you involved in that?

19   A.  Yes, later on.

20   Q.  Okay.  I thought you just told me a moment ago you weren't

21   involved in the investigation of Elton Simpson?

22   A.  During your time frame.  Now I don't remember.

23   Q.  Were you --

24        THE COURT:  You were asking about his trial in 2010.

25        MR. MAYNARD:  Yes.

1          THE COURT:  And Detective Nash said he had no
2    involvement in that.
3    Q.  (BY MR. MAYNARD)  In the trial.
4          Were you involved in the investigation of Elton
5    Simpson leading up to the trial in 2010?
6    A.  Leading up to the trial?  No.
7    Q.  Did you get involved in the trial of Elton Simpson?
8    A.  No.
9    Q.  When did you first get involved in any investigation
10   dealing with Elton Simpson.
11   A.  2012.  Actually 2013.
12   Q.  And would you have gotten involved in the investigation
13   with Abdul Malik Abdul Kareem at the same time?
14   A.  I would say yes, in that same time frame.
15   Q.  What was your initial involvement --
16   A.  Initial involvement was --
17   Q.  -- in this investigation?
18   A.  Simpson or Mr. Kareem?
19   Q.  Mr. Abdul Kareem.
20   A.  My initial was helping out with surveillance.
21   Q.  Did you have anything to do with the execution of the
22   warrant in 2012?
23   A.  No.
24   Q.  Were you aware that the warrant was being executed?
25   A.  I was aware.

NASH - CROSS

1   Q.  How did you become aware of that?

2   A.  I was told by one of the case agents at the time.

3   Q.  Which case agent was it?

4   A.  It would be Special Agent Chiappone.

5   Q.  Was Special Agent Chiappone in charge of the investigation

6   of Mr. Abdul Kareem?

7   A.  At one time, yes.

8   Q.  Do you know the years?

9   A.  I can't give you the exact dates.

10  Q.  Can you give me your best estimate?

11  A.  2010 to 2012.

12  Q.  What did Agent Chiappone tell you about the execution of

13  the warrant on Abubakar's residence?

14  A.  Basically that it was for -- they were looking for

15  fraudulent documents.

16  Q.  The FBI was looking for fraudulent documents?

17  A.  In conjunction with Arizona State University,

18  Detective Herrmann.

19  Q.  Was there any discussion that the warrant was being issued

20  because the FBI knew that Mr. Simpson lived in that residence?

21  A.  Yes.

22  Q.  So Mr. Simpson was a part of that investigation, correct?

23  A.  Correct.

24  Q.  And was there any discussion that Mr. Abdul Kareem also

25  lived in the residence?

NASH - CROSS

1    A.   Yes.

2    Q.   And so Mr. Abdul Kareem was a part of that investigation

3    that resulted in a warrant being issued in 2012 for

4    Mr. Abubakar's residence?

5    A.   Correct, yeah.   They all lived together.

6    Q.   Was it your understanding that part of that investigation

7    was going to be looking through the computers to determine if

8    there were any terrorist activity by those individuals?

9    A.   My understanding was they were looking for the fraudulent

10   documents.   That's the whole reason for the search warrant.

11   Q.   Didn't have anything to do with terrorism?

12        MS. BROOK:   Your Honor, I would object to speculation.

13   This is another agent's investigation.   Best testimony would

14   come from that agent.

15        THE COURT:   Sustained.   You're really asking him to

16   relate hearsay.

17   Q.   (BY MR. MAYNARD)   At some point you became in charge of the

18   computers that were seized in that 2012 investigation, correct?

19   A.   No.

20   Q.   Were you the one who contacted Mr. Simpson about returning

21   the computer to him?

22   A.   Correct.

23   Q.   And you were the one who contacted Mr. Abdul Kareem about

24   returning the computer to him?

25   A.   Correct.

UNITED STATES DISTRICT COURT

1    Q.   And you were doing that as part of your task force

2    activities?

3    A.   Correct.

4    Q.   And you met with Mr. Simpson to return the computer to him?

5    A.   Correct.

6    Q.   And did you do an interview of him at that time?

7    A.   A short interview, yeah.

8    Q.   Whenever you do an interview with an individual, as a

9    member of this task force, do you prepare a 302?

10   A.   Generally, yes.

11   Q.   Are there times when you don't prepare a 302?

12   A.   If there's not an interview.  If we're just talking how

13   about the Chicago Cubs -- "What do you think about how they're

14   playing this year?" -- I wouldn't prepare a 302.

15   Q.   Okay.  When -- You met with Mr. Simpson sometime around

16   January 15th or the first week of January of 2014, correct?

17   A.   Correct.

18   Q.   And it was at that time that you gave him back the computer

19   that had belonged to him?

20   A.   Correct.

21   Q.   So at some point you understood that computers that had

22   been taken out of Mr. Abubakar's residence actually belonged to

23   Mr. Simpson, and one belonged to Mr. Abdul Kareem?

24   A.   Yes.

25   Q.   When did you learn that?

1    A.   I knew that there had been computers taken from the search

2    warrant, so in that time frame.

3    Q.   When you met with Mr. Simpson, did you discuss with him the

4    material that was on his computer?

5    A.   There was some discussion, yeah.   Nothing in specifics, no.

6    Q.   Didn't you discuss with him that you believed that there

7    was terrorist material on his computer?

8    A.   Yes.

9    Q.   And did he tell you that it wasn't against the law to look

10   at certain materials?

11   A.   He did.

12   Q.   And did he tell you that he could have been the one who

13   downloaded a particular magazine called Inspire magazine onto

14   Mr. Abdul Kareem's computer?

15   A.   He did.

16   Q.   And you understood that Inspire magazine was a magazine

17   that had to do with terrorist activity in the Middle East?

18   A.   Correct.

19   Q.   And who puts out Inspire magazine?

20          THE COURT:   We are now getting well beyond the scope

21   of what we're here to discuss today, Mr. Maynard.   I know

22   you're really interested in discovery, but that's not what

23   we're doing today.

24          We're addressing the issue of the 2012 search warrant

25   and the statements that were made during the interview in May

NASH - CROSS

1    of 2015.

2    Q.   (BY MR. MAYNARD)   In 2014 when you returned the computer to

3    Mr. Simpson, did you have any discussion with him about the

4    flash drive that had been in Mr. Kareem's -- Abdul Kareem's

5    computer?

6    A.   No, I don't recall I did.

7    Q.   Did you return the flash drive to Mr. Simpson?

8    A.   No.

9    Q.   What did you do with the flash drive?

10   A.   I turned -- I gave it back to Mr. Kareem.

11           THE COURT:  Do I understand correctly that it was

12   plugged, when you returned it, that it was plugged into his

13   laptop?

14           THE WITNESS:  Yes, it was plugged into the USB port in

15   the laptop.

16   Q.   (BY MR. MAYNARD)   And was it your understanding it had been

17   plugged into the USB port when it had been confiscated during

18   the search warrant?

19   A.   Correct, yes.

20   Q.   Okay.   Now, you testified a few moments ago about a meeting

21   that you had with Mr. Abdul Kareem or a conversation that you

22   had with him on January 23rd of 2014 or thereabouts?

23   A.   Yes.

24   Q.   Did you call him or did he call you?

25   A.   I called him.

1    Q.  You had been trying to get the computer back to him?

2    A.  Yes.

3    Q.  He told you that he didn't want it back because he thought

4    that the FBI would have bugged it?

5    A.  Yes.

6    Q.  Did you think that there were things that were on that

7    computer that had been taken in that search in 2012 that were

8    inappropriate?

9    A.  I'm sorry?  One more time?

10          THE COURT:  I think the question is did you know what

11   was on the computer when you gave it back to Mr. Kareem?

12          THE WITNESS:  After the fact, yes.

13          THE COURT:  I'm sorry.  After what fact?

14          THE WITNESS:  After -- Prior to me giving him the

15   computer back but after the fact of the search warrant.

16          THE COURT:  So you knew when you were returning it to

17   him some of the things that had been found on the computer?

18          THE WITNESS:  Yes, ma'am.

19          THE COURT:  Okay.  Continue please.

20   Q.  (BY MR. MAYNARD)  Had you seen a report that sort of

21   outlined what was on that computer?

22   A.  Yes, I did.

23   Q.  And that included Inspire magazine?

24   A.  Yes.

25   Q.  Things that you considered to be terrorist activity?

1    A.  Not terrorist activity but terrorist information.

2    Q.  Terrorist information or possibly promoting terrorist

3    activity?

4    A.  That's correct.

5    Q.  And he told you he didn't want it back, correct?

6    A.  Right.

7    Q.  And you told him, well, jeez, you can come get it, and you

8    can sell it, correct?

9    A.  I did.

10   Q.  You thought it was appropriate for him to take the computer

11   and sell it to somebody with this information on it concerning

12   terrorist activity?

13   A.  Yes.

14   Q.  And then a couple of days later on, did Mr. Abdul Kareem

15   come to you and pick up the computer at that time?

16   A.  He did.

17   Q.  And did you have a discussion with him then?

18   A.  I did.

19   Q.  Just a second, Your Honor.

20          Just a moment, Your Honor.

21          The discussion that you had with Mr. Abdul Kareem when

22   he picks up the computer, did you prepare a 302 on that?

23   A.  I did.

24          MR. MAYNARD:  Just a moment, Your Honor.  I believe we

25   got that 302 yesterday.

UNITED STATES DISTRICT COURT

1              May I approach?

2              THE COURT:  Yes.

3    Q.  (BY MR. MAYNARD)  And could the witness also be shown

4    Exhibit 58.

5              All right.  Agent Nash, the Exhibit 58 is the 302 that

6    you prepared from a telephone conversation that you had with

7    Mr. Abdul Kareem on or about January 23rd of 2014, correct?

8    A.  Yes.  I've got two documents here that appear to be the

9    same documents, both 93 and 58.

10   Q.  93, what's the date on it?

11             THE COURT:  They are the same.  They have different

12   Bates numbers on the bottom, I think.

13             MS. BROOK:  Your Honor, Government's Exhibit No. 10

14   encompasses both 302s I think that Mr. Maynard is referring to,

15   if that helps him.  Exhibit No. 10, Government's Exhibit No.

16   10, has both of these 302s, which I think you're referring to.

17             THE COURT:  It does.  One date of 1-23-14 and the

18   other 1-28-14.  It's Exhibit 10.

19             MR. MAYNARD:  I'll use the Government's

20   Exhibit No. 10.

21             THE COURT:  Maureen, could you get exhibit -- He has

22   10.

23             THE WITNESS:  These are the same documents.

24             THE COURT:  Do you have 10?  It's in a folder.

25             There you go.

UNITED STATES DISTRICT COURT

80

1      THE WITNESS:  Now I'm not sure which one you want me

2  to look at.

3  Q.  (BY MR. MAYNARD)  Look at Exhibit No. 10.  The first two

4  pages of Exhibit 10 are the 302 that you prepared concerning a

5  telephone conversation you had with Mr. Abdul Kareem, correct?

6  A.  On 1-23, yes.

7  Q.  And he confirms that he does not want to pick up the

8  computer from you, correct?

9  A.  Yes.

10 Q.  And you tell him on the second page of the document that he

11 could sell it and make some money, correct?

12 A.  Yes.

13 Q.  All right.  And then he comes and picks up the computer a

14 couple of days later on or about January 28th?

15 A.  Yes.

16 Q.  And you have a conversation with him at that time, correct?

17 A.  I did.

18 Q.  And he told you then that he wasn't associated with

19 Mr. Simpson or Mr. Abubakar at that time?

20 A.  Yes.

21 Q.  And he explained to you why, correct?

22 A.  He did.

23 Q.  He told you he felt they were becoming radicalized, and he

24 wasn't into that?

25 A.  He did.

UNITED STATES DISTRICT COURT

NASH - CROSS

1   Q.  And he also gave you the name of another individual that

2   they were hanging out with that he felt was becoming

3   radicalized?

4   A.  He didn't give me the name, but he couldn't -- it says here

5   he couldn't remember his name.

6   Q.  But you then made the assumption that that individual was

7   Saabir Nurse?

8   A.  Correct, based on what he told me.

9   Q.  And were you investigating Saabir Nurse at the time?

10          MS. BROOK:  Object to relevance.

11          THE COURT:  Sustained.

12  Q.  (BY MR. MAYNARD)  Did you become aware at some point of an

13  interview that was done with Mr. Abubakar and Mr. Abdul Kareem

14  in November of 2011 at Mr. Abubakar's residence?

15  A.  No.

16  Q.  Never seen a 302 on that?

17  A.  I might have seen it, but I don't recall.

18  Q.  You did not participate in that interview that took place?

19          MS. BROOK:  Object to relevance.

20          THE COURT:  Overruled.  You may answer yes or no.

21          THE WITNESS:  No.

22          THE COURT:  Mr. Maynard, we're going to break for

23  lunch.  We'll reconvene at 1:00.  Court is in recess.

24      (Proceedings recessed from 11:43 a.m. until 1:01 p.m.)

25          THE COURT:  The record will show the presence of

NASH - CROSS

1   counsel and the defendant.  Mr. Maynard, you may continue with

2   your cross-examination.

3   Q.  (BY MR. MAYNARD)  A couple of quick questions on the

4   computer again, and then we'll switch topics.

5          When you gave the computer back to Mr. Abdul Kareem,

6   do you know whether or not it was in the same condition that it

7   was when it had been taken?

8   A.  No, I don't.

9   Q.  Who was it that asked you to give it back to him?

10  A.  Detective Herrmann.  Detective Herrmann.

11  Q.  Herrmann.  Okay.  And -- All right.

12         Now, do you happen to know why it took so long to get

13  it back to him?

14  A.  When -- Just because there's such a backlog with all the

15  digital material that comes into the FBI, it takes quite a bit

16  of time to get everything situated.

17  Q.  Have you seen a document that would tell us when the FBI

18  actually downloaded Mr. Abdul Kareem's computer?

19  A.  Have I seen a document?

20  Q.  Yes.

21  A.  I don't recall seeing one, no.

22  Q.  Do you believe that one exists that would tell us that

23  information?

24  A.  I can't say.

25  Q.  Don't know?

1    A.   I don't know.

2    Q.   All right.  You told us earlier today that Mr. Abdul Kareem

3    was contacted to come in for an interview after the Garland

4    incident, correct?

5    A.   Yes.

6    Q.   Were you the one who contacted him?

7    A.   Yes.

8    Q.   And you asked him to come in voluntarily?

9    A.   Yes.

10   Q.   And I believe you said you met him at the gate?

11   A.   Yes, at the security guardhouse gate.

12   Q.   And you walked in with him?

13   A.   Correct.

14   Q.   Anybody with you?

15   A.   No.

16   Q.   Anybody with him?

17   A.   No.  Well, I don't know about his car, but when he was at

18   the gate, he was by himself.

19   Q.   Did he come in a car, or did he come in a truck?

20   A.   A vehicle.  I don't know.

21   Q.   Do you know an individual by the name of Anthony Sampson?

22   A.   I know of him, yes.

23   Q.   You understand that he is Mr. Abdul Kareem's nephew?

24   A.   Yes.

25   Q.   Was he there?

1    A.  I couldn't tell you.  I don't know.

2    Q.  Do you know whether he ever came in and was interviewed on

3    that date?

4    A.  No, I don't believe he was interviewed that day.

5    Q.  Okay.  Did you have anything to do with checking on the

6    recording devices to see if they worked?

7    A.  No.

8    Q.  Had you been told that they were functioning?

9    A.  Yes.

10   Q.  Did you see images on the recording device before you went

11   into the room to participate in the interview?

12   A.  I did a quick peek into the room just to see what was

13   there, but I didn't see any images.

14   Q.  What did you see?

15   A.  I saw the recorder and the monitor.

16   Q.  Okay.  And I think your testimony was you were not the one

17   responsible for turning it on?

18   A.  That's correct.

19   Q.  And do you remember whether or not Agent Whitson ever went

20   in to turn it on?

21   A.  He said he did.

22   Q.  Who went into the interview room first?

23   A.  When we took Mr. Kareem in?

24   Q.  Yes.

25   A.  I don't remember.

1    Q.   When did Agent Whitson get into the interview room?  Was it

2    before or after you did?

3    A.   We all went in basically together.

4    Q.   All three of you went in together?

5    A.   Yes.

6    Q.   Tell me how you sat around the table.

7    A.   If we're sitting at the table here, I'm at the end of the

8    table.  Agent Whitson sat to my left, and Mr. Kareem sat to my

9    right.

10   Q.   Were Mr. Kareem, Abdul Kareem, and Detective or

11   Agent Whitson on the same side of the table?

12   A.   No.  They were opposite.

13   Q.   Opposite sides of the table.

14            And had you been able to determine where the camera

15   was focusing before the interview?

16   A.   No.

17   Q.   Didn't know?

18   A.   I had a general idea which it was focused into the corner,

19   but as far as specifically, I don't know.

20   Q.   It was supposed to be focused at the person who was being

21   interviewed, wasn't it?

22   A.   Yes.

23   Q.   At any time during -- Strike that.

24            How long did the interview last?

25   A.   About an hour, hour and a half.

NASH - CROSS                                              86

1    Q.  And it started about 2:00, 2:15, 2:30, something like that?

2    A.  In that neighborhood, yes.

3    Q.  And you prepared handwritten notes for that interview --

4    A.  Yes.

5    Q.  -- correct?

6    A.  Yes.

7    Q.  And who actually prepared the 302 the next day?

8    A.  I didn't prepare it.  Special Agent Whitson did.  But I

9    reviewed it.

10   Q.  And did you make any changes to it?

11   A.  I don't recall making any changes to it.

12   Q.  Did Agent Whitson take notes while he was in there?

13   A.  He took some short notes, yes.

14   Q.  But you -- were you primarily designated the note taker?

15   A.  Yes.

16   Q.  Was there any time during the interview when you got up and

17   left the room?

18   A.  No.

19   Q.  Was there any time during the interview when Agent Whitson

20   got up and left the room?

21   A.  No.

22   Q.  So you both sat there the whole time together?

23   A.  Correct.

24   Q.  And then when the interview was completed, you walked out

25   and took Mr. Abdul Kareem out of the interview room?

NASH - CROSS

1    A.   Correct.

2    Q.   And did you walk him to his vehicle?

3    A.   No.  I walked him to the security -- the building at the

4    gate.

5    Q.   You walked him to the -- where he'd have to go through to

6    get to the parking lot where his car would be?

7    A.   Yes.

8    Q.   What did he do then?

9    A.   I don't know.  I assume he got in his car and left.

10   Q.   Do you recall him commenting "I don't have my keys.  I left

11   them with my nephew"?

12   A.   No.

13   Q.   Do you remember whether or not anybody went back into the

14   FBI building to get his car keys from his nephew?

15   A.   I don't recall that at all.

16   Q.   And all you do is you remember that he left at that time?

17   A.   Yes.

18   Q.   How is it that you got him candy or cookies if no one left

19   the room when he was diabetic?

20   A.   Agent Whitson brought those in before he arrived.

21   Q.   So he brought them in with him?

22   A.   Before he arrived.

23   Q.   Before he arrived?

24   A.   Yes.

25   Q.   During the interview did Mr. Abdul Kareem tell you that he

1   was having some problems because he is diabetic?

2   A.  No, I don't recall him saying that he had problems.

3   Q.  Don't ever recall --

4   A.  I recall him telling us he was diabetic but that he was not

5   having any issues.

6   Q.  When he told you he was diabetic, was that the first time

7   you knew that?

8   A.  No.

9   Q.  Now, you testified earlier that you wanted to have this

10  interview taped, correct?

11  A.  Yes.

12  Q.  And during the course of this investigation, how many

13  interviews have you participated in?  And I'm going to take it

14  since the Garland incident to now.  How many interviews?

15  A.  From then till now?

16  Q.  Yeah.

17  A.  I would guess in the neighborhood of 15.

18  Q.  How many of those were video or audiotaped?

19  A.  Several were audiotaped.

20  Q.  Pardon me?

21  A.  Several were audiotaped.

22  Q.  Would you audiotape or videotape the interviews that you

23  thought were important?

24  A.  We try to, yes.

25  Q.  In fact, you actually took audio and video equipment with

1    you out into the desert to audio and videotape people during

2    their interviews, didn't you?

3    A.  I did not, no.

4    Q.  Are you aware that Agent Whitson did?

5    A.  I believe, yes, in one case that I know of.

6    Q.  Excuse me, Your Honor.

7            Who's the case agent on this investigation?

8    A.  It would be Special Agent Whitson.

9    Q.  And how long has he been the case agent?

10   A.  Since May 13th, I believe.  Within a couple days of May

11   13th.

12   Q.  You participated in an interview of James Sampson?

13   A.  Yes.

14   Q.  Did you video or audiotape that?

15   A.  Audiotape.

16   Q.  Did you participate in an interview of James Sampson on

17   more than one occasion?

18   A.  Yes.

19   Q.  And did you audiotape him every time you interviewed him?

20   A.  No.  There was one time he was not audiotaped.

21   Q.  And how many times did you interview him?

22   A.  Three times.

23   Q.  What about Billy Ferguson?

24   A.  Yes.

25   Q.  Did you audio -- Did you audiotape him?

NASH - CROSS

1    A.  He was audiotaped.

2    Q.  When you arrested Mr. Abdul Kareem, did you interview him

3    then?

4    A.  Yes.

5    Q.  And did you audiotape him then?

6    A.  Video and audio.

7    Q.  When did you first learn that the video or audiotape of

8    Mr. Abdul Kareem did not have any imagery on it?

9    A.  On the 5-5 interview, within a couple days.  I don't

10   remember the exact day.  It was either the next day or the day

11   after.

12   Q.  What did you do after you learned about that?

13   A.  I went and talked with Special Agent Whitson.

14   Q.  And what did you talk about?

15   A.  That it didn't record.

16   Q.  What steps were taken to try to retrieve that audio and

17   video recording?

18   A.  None at this point.

19   Q.  Did you do anything to go in and check the machine to see

20   if it was working?

21   A.  No.

22   Q.  Did you suggest sending out the chip to see if you could

23   retrieve images from it?

24   A.  No.

25   Q.  Did you participate in any investigation to determine why

1    this audio and videotape failed?

2    A.  No.

3    Q.  Just a moment, Your Honor.

4           Now, the room where the interview took place with

5    Mr. Abdul Kareem, it was an area that was not easily

6    accessible, correct?

7    A.  To the general public, yes.

8    Q.  Right.  One would have to -- It's behind locked doors.  One

9    would have to have some sort of security clearance to get back

10   there?

11   A.  Yes.

12   Q.  He could not get up and leave at any time he wanted to --

13   A.  Sure.

14   Q.  -- without -- without your assistance?

15   A.  No.  He could have.  It's locked coming in.  It's unlocked

16   going out.

17   Q.  Okay.  So he was free to go?

18   A.  He was free to go.

19          MR. MAYNARD:  I don't have any further questions,

20   Judge.

21          THE COURT:  Anything on redirect?

22          MS. BROOK:  Briefly.

23                     REDIRECT EXAMINATION

24   BY MS. BROOK:

25   Q.  Defense counsel asked you about the SD chip and whether or

1    not you have taken any steps to find out if you could retrieve

2    information off of the SD card?

3    A.   Correct.

4    Q.   Presently have you taken any steps?

5    A.   Yes.

6    Q.   What are those?

7    A.   We're going to send it back -- attempt to send it back to

8    Quantico to see if our unit back there can recover anything

9    that's on that SD card -- I'm sorry -- SD card.

10   Q.   So what stage are you at with that?

11   A.   I have to -- I have to get some information to pass to them

12   first before we can send the card back.

13   Q.   Defense counsel asked you back on May 6th, in that period

14   of time when you discovered that the SD card didn't have any

15   recording on it, what you did at that point to take steps to

16   see if something could be uncovered or recovered off of the

17   chip itself.

18        At that particular time, had you ever in a previous

19   case or a previous scenario had a situation where an SD card

20   didn't record or encapsulate what it was supposed to?

21   A.   Not an SD card, but I've had other recording devices fail.

22   Q.   And in those situations, what did you do?

23   A.   There wasn't a whole lot we could do.  I had a tape

24   recorder that ran out of batteries, so basically the power was

25   out.  There wasn't a whole lot you could do.

1   Q.  Are you trained on what to do if the SD card doesn't record

2   or steps to take at that point?

3   A.  No.

4   Q.  And at that stage, so back May 5th, May 6th, May 7th of

5   2015, you obviously were on the JTTF; you were on the Joint

6   Terrorism Task Force assignment?

7   A.  Correct.

8   Q.  How would you characterize your workload at that point in

9   time?

10  A.  It was extremely hectic.  The fact that the two deceased

11  Garland shooters, one from Phoenix, there was a whole lot going

12  on at that time.

13  Q.  And the chip itself, we looked before at Exhibit No. 5.

14  You placed it into evidence?

15  A.  Yes.

16  Q.  And you placed it into evidence on that particular day

17  shortly after the interview on May 5th?

18  A.  Yes.

19  Q.  Defense counsel asked you about whether or not during the

20  May 5th interview defendant expressed or appeared to be

21  suffering from anything related to his diabetes or having some

22  sort of a condition?

23  A.  Correct.

24  Q.  And on that day during that interview did you see him

25  appear to be affected?

NASH - REDIRECT

1    A.   I did not.   And I have had experiences with, when I was in

2    patrol, with people that exhibited the signs and symptoms of

3    being under the influence, and it turned out they were in a

4    diabetic issue.  So I have had a little bit of experience with

5    that.

6    Q.   And during the interview itself, approximately how many

7    feet away from him were you?

8    A.   Three.

9    Q.   And you had spoken with defense counsel about how that was

10   about an hour to an hour and a half long period of time?

11   A.   Right, yes.

12   Q.   The lighting conditions inside the interview room that you

13   were in, were they bright enough for you to be able to see him?

14   A.   Oh, absolutely.

15   Q.   And during the entirety of the interview, did you see him

16   exhibit any of those conditions of being -- of not feeling well

17   or exhibiting some discomfort or health issues?

18   A.   No, I didn't notice anything.

19   Q.   On June 10th of 2015, did you interview Abdul Malik Abdul

20   Kareem?

21   A.   On June 10th, yes.

22   Q.   And on that day did Abdul Malik Abdul Kareem exhibit any

23   symptoms or signs of having some diabetic issues?

24   A.   He didn't exhibit any signs, but he said he was having

25   issues, and we had gotten him some cookies, the same thing, in

1    the previous interview.

2    Q.  And in the June interview was a medic also called?

3    A.  I'm sorry.  Was --

4    Q.  Was a medic called to the facility at all?

5    A.  No.  He didn't -- felt he didn't need one.

6    Q.  Okay.  But did you ask?

7    A.  Yes.

8    Q.  And he said he didn't need one?

9    A.  Yes.

10   Q.  And during the May 5th interview, he never expressed any

11   health problems or concerns?

12   A.  No.

13   Q.  Defense counsel asked if you had taken him to the outside

14   gate and watched him leave the FBI property?

15   A.  I did.

16   Q.  The gate itself, is it a secure entrance and exit?

17   A.  Yes.

18   Q.  And so when you watched him leave, did he go through that

19   secure exit?

20   A.  He went through -- it's a turnstile, security turnstile,

21   one way.  He went out through there.  At that point I turned

22   around and then walked back into the building.

23   Q.  And so you saw him actually leave the property and be on

24   the outside?

25   A.  Correct, and into the non-secure area.

1  Q.  Defense counsel asked you about returning the Lenovo laptop

2  computer to the defendant in 2014?

3  A.  Yes.

4  Q.  And specifically in regards to the timing of that.

5        The FBI, did the FBI maintain an imaged copy of the

6  Lenovo computer in evidence?

7  A.  It did.

8  Q.  So the computer that was handed back, was that the computer

9  that was the original, not the imaged copy?

10  A.  Correct.

11  Q.  Defense counsel asked you about some of the statements that

12  the defendant made to you on January 23rd of 2014 in that first

13  conversation regarding the computer?

14  A.  Yes.

15  Q.  And in that conversation did he not -- did he admit that he

16  had viewed and looked at Inspire magazine all on his own?

17  A.  Yes.

18  Q.  Why does the FBI return original copies of things like

19  computers after they have created an image?

20  A.  Basically a storage issue, and then also we don't want to

21  hold any property that we don't have to.  There wasn't really

22  any contraband on there as far as, like, child pornography or

23  anything like that.  And it is not illegal to view Inspire

24  magazine.  So we returned it.

25  Q.  Back in 2012, defense counsel asked you about the defendant

1    and living at the residence where the search warrant was

2    executed?

3    A.   Yes.

4    Q.   The defendant himself, was he a target of that particular

5    investigation?

6    A.   No.

7         MS. BROOK:  May I have one moment?

8         THE COURT:  Yes.

9    Q.   (BY MS. BROOK)  And as a follow-up to the question that I

10   just asked, was Elton Simpson a target of the fraud and forgery

11   investigation back in 2012?

12   A.   As part of the forgery investigation?

13   Q.   Right.

14   A.   No.

15        MS. BROOK:  I have no further questions.

16        THE COURT:  Thank you, sir.  You may step down.

17        The government may call its next witness.

18        THE WITNESS:  We have exhibits here.

19        THE COURT:  We'll collect them.  Thank you, detective.

20        MS. BROOK:  The government calls Robert Meshinsky.

21        THE COURT:  Sir, you may take a seat on the witness

22   stand.

23

24

25

1  ROBERT JOSEPH MESHINSKY, GOVERNMENT'S WITNESS, PREVIOUSLY SWORN

2  DIRECT EXAMINATION

3  BY MS. BROOK:

4  Q.  Can we please have Exhibit No. 11.  Sir, would you please

5  introduce yourself to the Court.

6  A.  Good afternoon.  My name is Robert Joseph, J., Meshinsky,

7  M-e-s-h-i-n-s-k-y.

8  Q.  And where do you work?

9  A.  I'm with the FBI here in Phoenix.

10  Q.  How long have you been there?

11  A.  20 years.

12  Q.  What is your job?

13  A.  I'm a special agent, but I do computer forensics.

14  Q.  And as a special agent, have you worked on computer

15  forensics during the entirety of your time with the FBI?

16  A.  19 years.

17  Q.  As one of your tasks as a forensic specialist, do you do

18  imaging?

19  A.  Yes.

20  Q.  What does it mean to image?

21  A.  Imaging is making a bit-for-bit copy of a hard drive, which

22  would be almost like a photocopy of all the data that's on the

23  hard drive.

24  Q.  Are you trained on how to do it?

25  A.  Yes.

99

1    Q.  And is it computer specific in terms of how you create the

2    imaged copy?

3    A.  I don't understand the question.

4    Q.  Sure.  Is it --

5              THE COURT:  Is it the same for an Apple as it is for

6    an IBM?

7              THE WITNESS:  Yes.

8    Q.  (BY MS. BROOK)  And how you're trained to do it, is it how

9    it is standardly done within the field?

10   A.  Yes.

11   Q.  And is it how FBI trains you, how to image?

12   A.  Yes.

13   Q.  Back in 2002, specifically in July, did you have the

14   opportunity to image a Lenovo 0768 laptop computer?

15             MR. MAYNARD:  Objection to the form of the question.

16   Q.  (BY MS. BROOK)  I apologize.  2012.

17   A.  Yes.

18   Q.  Looking at Exhibit No. 11 which is before you, can you open

19   that up and take a look at it.

20   A.  Okay.

21   Q.  What is that?

22   A.  This is a copy of my DelRex, which is a report that we

23   write.

24   Q.  And the report itself has a date of November 19th of 2015;

25   is that correct?

1    A.   No.   It does not.   The date is August 30th, 2012.

2    Q.   And I guess what I'm referring to is the top line, the

3    reproduction date.

4    A.   That is correct.

5    Q.   The actual content and report that you generated, that was

6    back in August of 2012?

7    A.   That is correct.

8    Q.   And it was reproduced in this particular form on November

9    19th of this year?

10   A.   Correct.

11   Q.   The content within it, however, is it still as it was back,

12   as you generated, back in 2012?

13   A.   Correct.

14   Q.   And is this the report that memorializes your imaging of

15   that laptop?

16   A.   Correct.

17   Q.   Turning to Page No. 2 of this exhibit, is that QPX3?

18   A.   Yes.

19   Q.   And did you -- How is it that you came into possession of

20   it?

21   A.   During the search warrant the items were seized.

22   Q.   And when you imaged it, did you take it out of property and

23   evidence to do so?

24   A.   Correct.

25   Q.   Additionally, what -- the line item right below, so QPX3_1,

1    what is that?

2    A.  QPX3_1 means a Toshiba hard drive which was in the laptop.

3    Q.  And that was in the Lenovo?

4    A.  Correct.

5    Q.  So you took the hard drive out and imaged the hard drive as

6    well?

7    A.  Correct.

8    Q.  So does that mean you imaged the laptop itself and then do

9    a separate image of the hard drive?

10   A.  No.  We image the hard drive.

11   Q.  Okay.  And when you image a hard drive, does it copy

12   everything that is on the hard drive itself, the original hard

13   drive?

14   A.  It does.

15   Q.  And there's another line item underneath the Toshiba.  It's

16   QPX4, a Memorex 2 gigabyte flash drive?

17   A.  Correct.

18   Q.  Did you image that?

19   A.  Yes.

20   Q.  Do you recall where that was located when you took it out

21   of property and evidence?

22   A.  I do not.

23   Q.  Those three items that you imaged, what did you do with the

24   imaged copies?

25   A.  The imaged copies were put up onto our review net or

1    examiner net, as we refer to it, so they could be processed.

2    Q.   And were you part of the processing?

3    A.   I processed the images and then put them into what we call

4    CAIR, Case Agent Investigative Review, for the case agent and

5    anybody else on his squad to review the items.

6    Q.   What is processing?

7    A.   Processing we put into a program called AD Lab, and the

8    image sets are massaged, as I like to say, categorizes all your

9    pictures, all your document files, your spreadsheets.  And so

10   it makes it easier for those that are going through it to focus

11   on what they're looking for.

12   Q.   And in this particular search as it related to these three

13   imaged copies, did you do forensic analysis beyond the

14   processing and the copying, duplicating it onto the system?

15   A.   No.

16   Q.   Once you were done with imaging, processing, uploading, did

17   you put the original laptop, hard drive, and flash drive back

18   into property and evidence?

19   A.   Yes.

20           MS. BROOK:  I don't have any other questions.

21           THE COURT:  Mr. Maynard.

22           MR. MAYNARD:  Yes, briefly.

23                      CROSS-EXAMINATION

24   BY MR. MAYNARD:

25   Q.   Let me be sure I understand.  You just basically took the

1    material that was on the hard drive and made a copy of it or

2    imaged it onto another hard drive?

3    A.   Imaged it onto another hard drive, correct.

4    Q.   Did you do anything with it after that?

5    A.   With the original?

6    Q.   No.  The copy.

7    A.   The copy was placed into the -- what we refer to as the

8    examiner net or as review net, and then it was processed in

9    another tool, which was AD Lab.

10   Q.   And did you do that or did somebody else do that?

11   A.   I processed it.

12   Q.   Okay.  And what was the reason for doing that?

13   A.   When you process it, that gives everybody the ability to

14   look at the data that's on there.

15   Q.   And did you do that with all of the computers that were

16   confiscated in the 2012 -- pursuant to the 2012 search warrant?

17   A.   Yes.

18   Q.   Did you do that to any smart phones also?

19   A.   Smart phones were done a different way using a different

20   tool.

21   Q.   But all the computers were done the same way?

22   A.   Correct.

23   Q.   Did you do them all at the same time?

24   A.   There was a gap of a couple days where I did two.  I

25   believe it was one hard drive and a phone.  And then a couple

1    days later I did the other items.

2    Q.  Were you told to do all of them?  In other words, I guess

3    what I'm asking is were you asked to look at and do them

4    piecemeal, to do one first, let's see what's on it, have

5    somebody examine it, and then we'll go to the next one, or were

6    you just told here's some computers that we've gotten through

7    our search warrant; let's download?

8    A.  I can't recall.

9    Q.  Would you have gotten your instructions in writing, or

10   would somebody have given them to you orally?

11   A.  Someone would have put in what we call a CART request,

12   C-A-R-T request, and in the request I'm told what they're

13   looking for, what to do.

14   Q.  And then after the information has been downloaded and

15   you've manipulated it so that -- When I say manipulate, you

16   put --

17            THE COURT:  Processed it.

18   Q.  (BY MR. MAYNARD)  Process.  That's a better word.  You

19   processed it so that somebody could look at it.  Did you have

20   anything else to do with it?

21   A.  I did not.

22   Q.  Do you know who would have been the individual who would

23   have looked at the processed information?

24   A.  There's several people that could have.  Anybody on this

25   squad was given access to look at it.

MESHINSKY - REDIRECT

1    Q.  But you had nothing to do with that?

2    A.  No.

3              MR. MAYNARD:  I don't have any further questions.

4              THE COURT:  Thank you.  Ms. Brook, anything else?

5              MS. BROOK:  Just briefly.

6                       REDIRECT EXAMINATION

7    BY MS. BROOK:

8    Q.  For clarification, the processed information itself is not

9    on the imaged copy or on the original.  It's duplicated and

10   uploaded onto a different server?

11   A.  Correct.

12   Q.  And the imaged copy that you created, was that altered in

13   any way?

14   A.  No.

15   Q.  The original that you took the image off of, was that

16   original, the hard drive, the laptop, or the flash drive,

17   altered in any way?

18   A.  No.

19   Q.  Are steps taken to ensure that the evidence that you are

20   processing are not tampered with?

21   A.  Yes.

22   Q.  What are those steps?

23   A.  For instance, with the hard drive, it's put behind a write

24   blocker so that no data can be written to it while we're

25   imaging it.  Once we're finished with the original evidence, we

MESHINSKY – REDIRECT

1    place it back into the hard drive or -- I'm sorry -- into the

2    laptop in this case, and that's placed back into evidence.

3    Q.  And when you are not processing or working on a particular

4    item, is it placed back into evidence?

5    A.  If we're not finished with a case, it will remain in the

6    lab.  We have evidence lockers.  And also limited access to the

7    lab.  There's only three of us that have access to the lab.

8    Q.  And is the access to that area secured by entry code?

9    A.  Yes.

10   Q.  Additionally the evidence locker within the FBI, is that

11   too a secured facility?

12   A.  Yes.

13          MS. BROOK:  I don't have any other questions.

14          THE COURT:  Thank you.  May this witness be excused

15   and released from the subpoena?

16          MS. BROOK:  Yes, Your Honor.

17          THE COURT:  Mr. Maynard?

18          MR. MAYNARD:  Yes, Your Honor.

19          THE COURT:  Thank you very much, Agent Meshinsky.

20          The government may call its next witness.

21          MR. KOEHLER:  The United States calls Amy Vaughan.

22          If I could have Exhibit 14 placed on the witness stand

23   please.

24          THE COURT:  Ms. Vaughan, please take a seat on the

25   witness stand.

UNITED STATES DISTRICT COURT

1          AMY VAUGHAN, GOVERNMENT'S WITNESS, PREVIOUSLY SWORN

2                          DIRECT EXAMINATION

3     BY MR. KOEHLER:

4     Q.   Could you please state your name and spell the last for the

5     record.

6     A.   Amy Vaughan, V-a-u-g-h-a-n.

7     Q.   Ms. Vaughan, where do you work?

8     A.   The FBI.

9     Q.   What is your title there?

10    A.   Intelligence Analyst.

11    Q.   How long have you been so employed?

12    A.   Five years.

13    Q.   And does the five years encompass your full time with the

14    FBI?

15    A.   Yes.

16    Q.   What kind of work did you do before coming to the FBI?

17    A.   I was a student and a part-time tech support technician.

18    Q.   Can you tell the Court briefly what your duties are as an

19    intelligence analyst.

20    A.   I assist agents in exploiting the information that they

21    collect, and I process that information and disseminate it as

22    well as performing assessments about our -- the effects of our

23    activities, our collection, and other types of research to

24    supplement investigations.

25    Q.   Is a lot of the work that you do classified in nature?

1   A.   Yes.

2   Q.   Are you assigned to the Joint Terrorism Task Force squad

3   here in Phoenix?

4   A.   Yes.

5   Q.   Have you been on that squad the whole time that you've been

6   with the FBI?

7   A.   Yes.

8   Q.   Does part of your training include examination of computers

9   and electronic evidence that is seized from computers?

10   A.   I have received a small amount of training supplemental to

11   my normal analyst training.

12   Q.   Okay.  Can you describe what your normal analyst training

13   involved, an overview.

14   A.   Well, it doesn't include any forensics training, but our

15   normal analyst training focuses on report writing, research

16   techniques, substantive knowledge such as background on

17   terrorism or other criminal violations.

18           Let's see.  That's probably a good summary.

19   Q.   In your five-year history with the FBI, does a large amount

20   of your analytical work involve the former al-Qaeda in Iraq as

21   well as the umbrella al-Qaeda organization?

22   A.   Yes.

23   Q.   And then have you also developed a focus and expertise in

24   following ISIS and ISIS propaganda?

25   A.   Yes.

1   Q.  Were you brought into a case back in 2012 approximately

2   involving an individual by the name of Abubakar Ahmed?

3   A.  Yes.

4   Q.  When did you first become involved in that particular

5   investigation?

6   A.  I believe it was when they seized several computers under

7   search warrant, and I offered to help with that effort to

8   analyze the images that were taken by CART.

9   Q.  And specifically did you have a task in relation to

10  examining those images?

11  A.  They needed to look for evidence of forgery, fraudulent

12  activities, and there was also a concern about

13  terrorism-related activity.

14  Q.  Do you know if they were looking at the terrorism-related

15  activity as having a nexus to the forgery?

16  A.  I believe so.

17  Q.  And specifically were you tasked with a particular part of

18  that search?

19  A.  I was given some free rein to decide how to conduct that

20  analysis.  They didn't have anyone else working on those

21  computers, so -- on our squad.

22  Q.  Were you looking for something in particular, though,

23  during that time?

24  A.  Oh, well, I just had the framework of this is the forgery

25  or fraudulent activity this person is accused of conducting,

1    and I also had my own background knowledge about different

2    types of terrorist propaganda pieces or Web sites and so forth.

3    Q.  As part of your training, are you aware whether people try

4    to engage in foreign travel that relates to terrorist activity?

5    A.  Yes.

6              MR. MAYNARD:  Objection.  Never mind.  Withdraw.

7    Q.  (BY MR. KOEHLER)  As part of your analysis of the computer,

8    would that be something that you would be looking for?

9    A.  Yes.

10   Q.  All right.  Do you know approximately when you looked at

11   and examined and analyzed the Lenovo computer that's been

12   discussed in this case?

13   A.  It was in 2012, but I can't remember the exact month.

14   Q.  And what you were looking at was the image of that

15   computer; is that correct?

16   A.  Yes.

17   Q.  How were you accessing the image in general terms?

18   A.  The FBI has a system specifically for that called CAIR that

19   we use.

20   Q.  Were you using the CAIR system to review it?

21   A.  Yes.

22   Q.  Were you using things like keyword searches and so forth to

23   conduct your examination?

24   A.  Yes.

25   Q.  As part of your examination, did you also need to inspect

1    individual files such as Internet search histories and so

2    forth?

3                MR. MAYNARD:  Objection, Your Honor.  It's leading.

4                THE COURT:  Overruled.  You may answer.

5                THE WITNESS:  Yes.

6    Q.  (BY MR. KOEHLER)  Why would you have to inspect a file on

7    an individual basis?

8    A.  Well, there are many types of files that a determination of

9    what they contain can't be made without opening it and looking

10   at it.

11   Q.  Can you explain more specifically why that is the case when

12   you're looking at such a file.

13   A.  An example of Internet history, when you're looking at it

14   in the CAIR system, it's just a file with a very nondescript

15   name.  It's identifiable as Internet history, but in order to

16   get an idea of the sites that were actually viewed, you must

17   open it and manually review the content of those -- of that

18   particular database.

19   Q.  Can you describe, when you say it's a nondescript file

20   name, how that file name would be expressed.

21   A.  For the particular type of Internet history we're looking

22   at, it's something like the word rose and then a six digit

23   number that indicates how many records are in that file.

24   Q.  Okay.  And then when you're looking at a particular URL,

25   for instance, that somebody has followed in their Internet

1    search history, does that URL necessarily communicate what it

2    was that somebody looked at?

3    A.  Not always.

4    Q.  Explain to the Court what is a URL?

5    A.  It is uniform resource locator.  It's basically the

6    address, the plain English address of a Web site that one would

7    enter into a browser to visit the Web site.

8    Q.  Do you also see files that essentially look like a random

9    string of characters?

10   A.  Sure, sometimes.

11   Q.  And is that -- do you know why a file would have a random

12   string of characters as its name?

13   A.  Not always.

14   Q.  And is there any way to tell what's inside that type of

15   file without clicking on it?

16   A.  No.

17   Q.  Is part of the reason -- Let me go back for a second.  Were

18   you known within your unit to have an expertise in reviewing

19   electronic evidence for jihadist type material and propaganda?

20   A.  Yes.  Because of my duties, I had a significant familiarity

21   with the types -- those types of material.  And I was also

22   known for having more technical proficiency than most of my

23   colleagues, owing to my background.

24   Q.  When you would conduct such a search, if you clicked on a

25   file name, how long would it typically take you to look at

VAUGHAN - DIRECT

1    something and recognize whether it fell within the scope of

2    jihadist propaganda?

3    A.   Not very long, except -- depending on the size of the file.

4    Q.   Can you give an example of things that you've seen, for

5    instance, in the Lenovo that would alert you to the fact that

6    there were propaganda materials that you would need to take

7    note of?

8    A.   Certainly.  There was one file that we found in a recycle

9    bin which I recognized as a manual published by the Global

10   Islamic Media Front, which is a propaganda distribution outlet,

11   the official outlet for some al-Qaeda affiliated groups.  This

12   file was a manual called the Security Intelligence Guide or

13   something along those lines, and it specifically describes how

14   to evade surveillance, detect infiltrators, and conduct

15   encrypted communications explicitly for the furtherance of

16   terrorism.

17   Q.   How quickly did you recognize that file when you clicked on

18   it?

19   A.   Immediately.

20   Q.   If you clicked on something that didn't look like it

21   related to that, what did you do?

22   A.   Typically I would conduct more research, sometimes in FBI

23   holdings, or just on the Internet since many of these are

24   publicly available documents.

25   Q.   If you clicked on something that looked like let's say it

1   was just a recipe or a love letter or some other thing that

2   looked completely unrelated to what you were searching for,

3   what did you do?

4   A.  I would attempt an analysis to detect if there are any kind

5   of hidden pieces to that, because that is a known terrorist

6   technique.

7   Q.  Can you explain that.

8   A.  Some terrorist groups are known to use a technique called

9   steganography, which basically hides a file within a file,

10  often pictures, and that's something that our forensics tools

11  are designed to help us detect if it's there.

12  Q.  During your search of the computer, did you ever go looking

13  for anything outside the scope of either terrorist propaganda

14  or jihadist propaganda or information relating to forgery or

15  fraudulent type activity?

16  A.  No.  I stuck to what I knew about the facts of the case.

17          MR. KOEHLER:  No further questions.

18          THE COURT:  Thank you.  Mr. Maynard.

19                      CROSS-EXAMINATION

20  BY MR. MAYNARD:

21  Q.  Let me go back a little bit through your background.

22          When did you graduate from college?

23  A.  2010.  2010.

24  Q.  2010.

25          Where did you go to school?

VAUGHAN - CROSS

1    A.   Reed College in Portland, Oregon.

2    Q.   What's your degree in?

3    A.   Linguistics.

4    Q.   I'm sorry?

5    A.   Linguistics.

6    Q.   Linguistics.

7             And after you graduated -- You got a degree from Reed,

8    correct?

9    A.   Yes.

10   Q.   After you finished at Reed, what did you do then?

11   A.   I joined the FBI.

12   Q.   Immediately after graduation?

13   A.   Yes.

14   Q.   When did you complete your initial training with the FBI?

15   A.   August, 2010.

16   Q.   You would have graduated in May or June of 2010?

17   A.   Correct.

18   Q.   And so you had a couple of months of training with the FBI?

19   A.   Yes.

20   Q.   And according to you, as of 2012, did the FBI look at you

21   as some sort of expert on jihadist information?

22   A.   I don't think I would have been considered an expert, but I

23   had received training supplemental to my academy training.

24   Q.   Okay.  Tell me what the training was that you had that

25   specifically dealt with terrorist organizations.

1    A.  I attended a -- I am trying to remember if it was one week

2    or two weeks course specifically designed to educate FBI

3    employees on terrorist history, organizations, techniques,

4    ideology, things of that nature.

5    Q.  When did you attend that?

6    A.  I believe that was 2011.

7    Q.  So we've got a one- or two-week course.  Anything else?

8    A.  Every day in my job at the FBI I was exposed to terrorist

9    material.  And so by 2012 I had become very familiar with the

10   ideology and rhetoric I suppose.

11   Q.  Any specific training other than what you got on the job?

12   A.  I can't think of anything off the top of my head.

13   Q.  Where were you first assigned after you finished your

14   initial training?

15   A.  Phoenix.

16   Q.  And what were you considered?  How were you categorized?

17   A.  I don't understand the question.

18         THE COURT:  Her job title?

19   Q.  (BY MR. MAYNARD)  What was your job title or job

20   description?

21   A.  Intelligence analyst.

22   Q.  Now, were you aware that this warrant was being served at

23   Abubakar Ahmed's residence before it was served?

24   A.  I don't recall.

25   Q.  When do you recall you first learned about the warrant

1   being served and these computers being obtained?

2   A.  I don't remember exactly.  I just remember learning that

3   there was a great deal of digital evidence that they needed

4   help processing.

5   Q.  And who was the case agent that you were dealing with?

6   A.  I believe that it was Dan Herrmann was the main case agent

7   I dealt with.

8   Q.  Dan Herrmann was a corporal in the ASU Police Department,

9   correct?

10  A.  Yes.

11  Q.  Were you on site when they did the -- when they executed

12  the warrant?

13  A.  No.

14  Q.  We've had some testimony that tells us that after the

15  computers were obtained, the information on them is then

16  downloaded or imaged onto a hard drive, and then it's -- I'm

17  not sure -- manipulated.  I forgot.  What was the word, Judge?

18          THE COURT:  Processed.

19  Q.  (BY MR. MAYNARD)  Processed.  I'm going to write that down.

20          Processed.  And then someone looks at it.  You looked

21  at the processed information; is that correct?

22  A.  That's correct.

23  Q.  Were you given directions as to which computer you should

24  look at first?

25  A.  No.

1    Q.  Did anybody -- And you've told us today that you were

2    looking for information concerning forgery; is that correct?

3    A.  Yes.

4    Q.  Okay.  Who gave you the information as to what you were

5    supposed to do?

6    A.  It was probably through conversations with Dan that I

7    understood what they were looking for.

8    Q.  Did you have an understanding that they were -- that

9    somebody had made a photocopy of an ASU diploma and was wanting

10   their name put on it?

11   A.  No.  That doesn't --

12   Q.  What did you understand you were looking for?  What was

13   this forgery?

14   A.  I believe it was that he had attempted to purchase a

15   fraudulent diploma over the Internet.

16   Q.  Do you know how that was being done?

17   A.  That was part of the objective of the search, was to figure

18   out how that was being done.

19   Q.  Were you given any background as to how this case came to

20   the ASU Police or the FBI?

21   A.  Not really, no.

22   Q.  Do you know why the FBI was involved in it?

23   A.  Until that point, I hadn't been involved in the case, so I

24   didn't know very much about it other than the general facts.

25   Q.  Did you have any understanding of how many diplomas had

1    been attempted to be forged?

2    A.  No.

3    Q.  Were you looking for forged information dealing with forged

4    college diplomas from ASU?

5    A.  Yes.

6    Q.  And did you find such information?

7    A.  Yes.

8    Q.  And when in your investigation did you do that?

9    A.  I don't recall the specific order.

10   Q.  Did you keep a report or a log of what you were doing as

11   you were doing it?

12   A.  I took notes, which I used to compile my ultimate report.

13   Q.  What happened to those notes?

14   A.  I'm not sure since it was three years ago.

15   Q.  When did you compile your report?

16   A.  I can't remember the exact date.

17   Q.  Does the report have a name?

18   A.  I think it was analysis of CART obtained materials.

19   Q.  How many pages is it?

20   A.  I don't recall.

21   Q.  Approximately?  Is it 100?  Is it ten?

22   A.  Two to three.

23   Q.  Two or three pages?

24   A.  Yes.

25   Q.  Does it go through what you did on each computer?

1    A.   It was a summary of the items that I had found on each

2    computer, yes.

3    Q.   Do you have an understanding who was the target that was

4    being investigated?

5    A.   Yes.

6    Q.   Who?

7    A.   Abubakar Ahmed.

8    Q.   Did you look at his computer first?

9    A.   I think I probably started with the computer that was

10   labeled computer one just because it was labeled number one.

11   Q.   How long would it take you to go through each one of these

12   computers?

13   A.   It depended on the size of the computer, the size of the

14   hard drive, and the amount of material that was in there.  But

15   I think it took me several days to finish my search there.

16   Q.   Did you make any efforts to discriminate what you were

17   looking at once you determined it didn't have anything to do

18   with your investigation?

19   A.   I'm not sure what you mean by discriminate.

20   Q.   You told us that if you saw something that looked like a

21   love letter or an e-mail, you'd look at it; is that correct?

22   A.   Yes.

23   Q.   Is it fair to say you basically looked at everything in

24   each one of these computers?

25   A.   That is required for a thorough analysis, yes.

VAUGHAN - CROSS

1    Q.  So the answer is yes, you looked at --

2    A.  Yes.

3    Q.  -- everything, correct?

4    A.  Yes.

5    Q.  You didn't make any effort to try to, after you had looked

6    at some portion of it, shut it down?  You felt you had to look

7    at everything to do a thorough analysis, correct?

8    A.  Yes.

9    Q.  Now, one of the tasks that you were told was to be looking

10   for information dealing with terrorist activities?

11   A.  Yes.

12   Q.  Was that your primary focus?

13   A.  No.  Because it was a forgery issue that was item number

14   one.

15   Q.  How much time did you spend looking for files that dealt

16   with forgery versus looking for files that dealt with terrorist

17   activities?

18   A.  I couldn't give an estimate since --

19   Q.  Sure, you can.

20   A.  I couldn't give you a percentage.  Good guess.

21   Q.  What did you find dealing with forgery?

22   A.  I found the diploma.  I found communications between Ahmed

23   and the individuals that he was trying to buy diplomas from.  I

24   found some documents that suggested that he was considering

25   defrauding the federal student aid program.  I found

UNITED STATES DISTRICT COURT

VAUGHAN - CROSS

1    correspondence that suggested to me the reasons why he might

2    be -- some of the reasons why he might be trying to forge a

3    diploma.  Lots of searches that I thought were probably fraud

4    related.

5           I found a document which comes from the Inspire

6    magazine published by al-Qaeda in the Arabian Peninsula, which

7    provides religious justification for committing fraud in

8    furtherance of terrorism.  I can't remember anything else.

9    Q.  Did you find any information that dealt with forgery on

10   anyone's computer other than Abubakar -- Abubakar Ahmed?

11   A.  I don't recall exactly.

12   Q.  If you had, it would be in your report?

13   A.  Yes.

14   Q.  Once you completed your report, what did you do with it?

15   A.  I uploaded it to the case file.

16   Q.  Could the witness be shown Exhibit 14 please.

17          Have you seen Exhibit 14 before?

18   A.  Yes.

19   Q.  What is Exhibit 14?

20   A.  This is the report that I wrote.

21   Q.  Is this the entire report?

22   A.  Portions of it are redacted.

23   Q.  But --

24   A.  But other than that, yes.

25   Q.  Other than the redacted portions.

1         You wrote everything that was on here, correct?

2    A.  Yes.

3    Q.  Can you tell me when you wrote this report?

4    A.  I don't remember the exact month, but it was 2012.

5         MR. MAYNARD:  Your Honor, I move for the admission of

6    Exhibit 14.

7         THE COURT:  Is there any objection?

8         MR. KOEHLER:  No, Your Honor.

9         THE COURT:  14 is admitted.

10   Q.  (BY MR. MAYNARD)  When's the last time you've seen an

11   unredacted copy?

12   A.  Today.

13   Q.  Do you know who redacted this?

14   A.  No.

15   Q.  Did you have anything to do with the redaction?

16   A.  No.

17   Q.  Is -- Is it typical when the FBI prepares a report of this

18   nature it's not dated so that we don't know when it was done?

19   A.  I don't know the answer to that question.

20   Q.  Well, is it your practice that you would normally date a

21   report when you prepare it?

22   A.  Yes.  Now that I'm looking at it, the header information is

23   not in there.

24   Q.  So are there portions of this report that are not included

25   in this four pages?

VAUGHAN - CROSS

1    A.   I believe it's only the administrative header that's

2    missing.

3    Q.   Could I tell -- If I wanted to determine which computer you

4    looked at first and then what you did, would that be in this

5    redacted portion?

6    A.   No.  I mean, not the order that I did it.  It's ordered in

7    the order that it was numbered in the -- I forget exactly how.

8    But it proceeds computer one, computer two, computer three,

9    computer four.

10   Q.   Can you tell me which one was computer one, which one was

11   computer two?

12   A.   I can't remember the exact serial numbers or model numbers.

13   Q.   What would you need to look at to make that determination?

14   A.   Well, I'm not sure what it is that you're asking for.

15   Q.   I want to know what computers you were analyzing.

16        THE COURT:  I assume -- maybe I'm wrong -- that what's

17   redacted is a description of some of the other items that you

18   looked at.

19        THE WITNESS:  Yes.

20        THE COURT:  Right in the redaction on the page that's

21   Bates stamped 1503, after the first redaction it says a Lenovo

22   laptop and then computer four with a certain number XPX3 and

23   XPX3_1.  Presumably what's redacted before that describes the

24   other computers?

25        THE WITNESS:  Yes.

1    Q.  (BY MR. MAYNARD)  Can the witness be shown Exhibit 13.

2           Have you seen Exhibit 13 before?

3    A.  I can't recall.

4    Q.  Is it your belief that when it says in Exhibit 13 on the

5    third page, which is Bates stamped 1444 as computer one, is

6    that the first computer that you would have looked at do you

7    think?

8    A.  Yes.  I believe I took the numbering scheme from the CART

9    report, the initial report that they wrote.  So, yes, that

10   would tell you which computer was which.

11   Q.  So computer four would be the Lenovo?

12   A.  Yes.

13          MR. MAYNARD:  Your Honor, I would ask for an

14   unredacted copy of this report.

15          THE COURT:  My consideration of whether you should get

16   one or not is beyond the scope of this hearing.

17          MR. MAYNARD:  Well --

18          THE COURT:  I don't have one either, Mr. Maynard.  I'm

19   not going to take the time in the limited time we have

20   available today to ask Mr. Koehler to give me an unredacted

21   one, review it, and then hear argument as to whether or not it

22   has information in it that shouldn't be redacted.  We're going

23   to proceed with our witnesses today.

24          MR. MAYNARD:  Okay.  Just to make my record, Your

25   Honor, the reason I need an unredacted copy is the purpose of

1    this supposed investigation was to determine if there were --

2    if there was fraud or forgeries being done.  And I suggest to

3    the Court I will -- I will suggest to the Court that, as I've

4    said, I think that the focus was not on that, but it was

5    focused on terrorism, that I think I'm entitled to look at the

6    report in full so that I can see how much of it dealt with

7    fraud or fraudulent activity.

8             THE COURT:  And you may be correct, Mr. Maynard, but

9    we're not going to take the time to figure that out this

10   afternoon.

11   Q.  (BY MR. MAYNARD)  All right.  Now, you also analyzed a

12   Memorex flash drive; is that correct?

13   A.  Yes.

14   Q.  When your report says paren U/FOUO, what does that stand

15   for?

16   A.  Unclassified/For Official Use Only.

17   Q.  So all of that information was Unclassified/For Official

18   Use Only; is that correct?

19   A.  I believe so.

20   Q.  Do you know whether or not the stuff that's redacted is

21   Unclassified/For Official Use Only?

22   A.  I believe my entire report is Classified/For Official Use

23   Only.

24   Q.  It's Unclassified/For Official Use Only?

25   A.  Yes.

1    Q.  Do you know why -- Strike that.

2          Is there any document that you're aware of that you

3    could look at that would tell you when you prepared this

4    report?

5    A.  The administrative header portion would tell you the date

6    that it was serialized.

7    Q.  And is that contained in the first part of the redaction?

8    A.  No.

9          THE COURT:  She said that would have been some kind of

10   cover page that's not here.

11   Q.  (BY MR. MAYNARD)  Oh, it's another -- Okay.

12          And do you prepare a 302 when you make a report like

13   this as to what you've done?

14   A.  Not typically.

15   Q.  Did you in this case?

16   A.  No.

17   Q.  Did you prepare any other documentation other than this

18   four-page report?

19   A.  For what?

20   Q.  From looking at these computers.

21   A.  In this 2012 analysis you mean?

22   Q.  Yes.

23   A.  I don't believe so, no.

24   Q.  Is there any documentation that would show the manner in

25   which the search or your analysis was done?

1    Q.  And that's the part that has the date?

2    A.  Yes.

3    Q.  Getting to the subject, can you tell us what reasons that

4    you detected?  You mentioned that you detected reasons for

5    Mr. Abubakar Armand of trying to obtain this fraudulent

6    diploma.  Can you describe what those reasons were at least

7    briefly?

8    A.  I theorized based on what I saw in the computers that he

9    was trying to go to Saudi Arabia and Sudan.  I did not know why

10   exactly.  But based on the research that I saw him doing, he

11   needed to have a college diploma in order to qualify for many

12   of the programs that he was considering.

13   Q.  And are Saudi Arabia and Sudan areas that are of concern to

14   the FBI when it comes to terrorist travel?

15   A.  Yes.

16   Q.  Would that make your search for other jihadist material on

17   the computer more important to defining that intent?

18   A.  Yes.

19           MR. MAYNARD:  Objection.  Leading.

20           THE COURT:  Overruled.  The answer will stand.

21           MR. KOEHLER:  No further questions.

22           THE COURT:  May this witness be excused and released

23   from her subpoena, Mr. Koehler?

24           MR. KOEHLER:  From the government's perspective, yes.

25           THE COURT:  Is there any objection?

1          MR. MAYNARD:  Yes.

2          THE COURT:  Because you think you might want to bring

3    her back when we reconvene the hearing?

4          MR. MAYNARD:  Yes.

5          THE COURT:  All right.  Ms. Vaughan, at the present

6    time you may be excused.  You're not released from your

7    subpoena.  And either Mr. Koehler or Ms. Brook will let you

8    know if you're needed when we reconvene the hearing.  Thank

9    you.

10          THE WITNESS:  Thank you.

11          THE COURT:  Mr. Koehler, you may call your next

12   witness.

13          MS. BROOK:  The government calls Mario Calbone.

14      MARIO CALBONE, GOVERNMENT'S WITNESS, PREVIOUSLY SWORN

15                     DIRECT EXAMINATION

16   BY MS. BROOK:

17   Q.  He'll be looking at Exhibit 15 and 16.  Thank you.

18          Good afternoon.

19   A.  Good afternoon.

20   Q.  Would you please introduce yourself to the Court.

21   A.  Mario Calbone.

22   Q.  And, sir, where do you work?

23   A.  Special agent with the FBI.

24   Q.  What's your title?

25   A.  I'm a special agent.

1   Q.  And are you also at times an acting supervisor?

2   A.  Yes, I am currently.

3   Q.  And how long have you been with the FBI?

4   A.  I joined April, 2009.

5   Q.  Are you currently assigned to the JTTF?

6   A.  That's correct.

7   Q.  In September of this year, were you also so employed and

8   assigned?

9   A.  Yes.

10  Q.  On September 9th of this year, did you have contact with

11  Sergio Martinez Chavez?

12  A.  Yes, I did.

13  Q.  And why was it you reached out to him?

14  A.  Well, I reached out to him to pick up the computer, the

15  laptop, the Lenovo.

16  Q.  And at whose direction did you do that?

17  A.  Special Agent Stewart Whitson.

18  Q.  How did you reach out to him?

19  A.  Sergio?

20  Q.  Uh-hmm?

21  A.  I called him on his cell phone.

22  Q.  And what computer were you talking to him about?

23  A.  The Lenovo laptop.

24  Q.  So you called him, and did he indicate that he had that

25  computer?

1    A.  Uh-hmm.

2            THE COURT:  Is that yes?

3            THE WITNESS:  Yes, that's correct.

4    Q.  (BY MS. BROOK)  And so did you go on out and go to his home

5    to pick it up?

6    A.  Yes, I did.

7    Q.  Did he say that he was willing for the FBI to image it and

8    to look at it?

9    A.  Yes, he did.

10   Q.  And in looking at documentation before you, you have

11   Exhibit No. 16.  Can you open that up please.

12   A.  16?

13   Q.  Turning to the last page, the third page in, is there a

14   consent to search computers?

15   A.  Yes, an FD941.

16   Q.  And does it have your signature?

17   A.  Yes, it does.

18   Q.  And was that dated and signed by you on September 9th of

19   this year?

20   A.  That's correct.

21   Q.  And was it also signed by Mr. Martinez when you went out to

22   speak to him?

23   A.  Yes.

24   Q.  And the Lenovo laptop that we've referred to, serial number

25   L3HK07107-03, is that the one that's marked there on the form?

1    A.  Yes, it is.

2    Q.  And did you take possession of it?

3    A.  Yes, I did.

4    Q.  What did you do with it?

5    A.  I took possession.  It was later in the evening when I

6    actually took possession.  Our evidence control room is closed.

7    I took it to my house.  I secured it in my safe.  Next morning

8    I brought it to the -- our office, and I entered it into our

9    evidence control room.

10             MS. BROOK:  I don't have any other questions.

11             THE COURT:  Mr. Maynard.

12                       CROSS-EXAMINATION

13   BY MR. MAYNARD:

14   Q.  Had you met Mr. Martinez prior to this?

15   A.  Yes, I had.

16   Q.  Had you been involved in interviewing him prior to this?

17   A.  Yes, I had.

18   Q.  Had you asked him whether or not he had a computer that had

19   belonged to Mr. Abdul Kareem?

20   A.  No.

21   Q.  You said you ended up calling him; is that correct?

22   A.  That's correct.

23   Q.  Why was it you called him?

24   A.  Well, I got his phone number from Special Agent Whitson, so

25   I called him en route to make sure he was going to be at the

1    house.

2    Q.  Did you call him and ask him if he had a computer?

3    A.  Yes, that's correct.  I also, while I was talking with him,

4    I also got verbal consent from him.

5    Q.  I'm sorry?

6          THE COURT:  Verbal consent.

7          THE WITNESS:  Verbal consent.

8    Q.  (BY MR. MAYNARD)  I'm having a hard time hearing.

9          How did you know he had a computer that had belonged

10   to Mr. Abdul Kareem?

11   A.  I received the information from Agent Whitson.

12   Q.  So all the information that you had concerning that issue

13   came from Agent Whitson.  You did not get it from Mr. Martinez?

14   A.  That's correct.

15   Q.  Agent Whitson was the one who asked you to call him?

16   A.  Well, I called him on my own to make sure that he's going

17   to be there at the house just to coordinate the time.  But

18   while I was talking with him, I went ahead and got verbal

19   consent on my own, and I documented that.

20   Q.  But Agent Whitson was the one who told you that he had the

21   computer?

22   A.  That's correct, before I left the office.

23          MR. MAYNARD:  Okay.  I have no further questions.

24          THE COURT:  Anything on redirect?

25          MS. BROOK:  No, Your Honor.

```
 1              THE COURT:  May Agent Calbone be excused?

 2              MS. BROOK:  Yes.

 3              THE COURT:  And released, if he's under subpoena,

 4   released?

 5              MS. BROOK:  Yes.

 6              THE COURT:  Any objection, Mr. Maynard?

 7              MR. MAYNARD:  No.

 8              THE COURT:  Thank you, sir.  You may step down, and

 9   you are excused.

10              Mr. Koehler, your next witness.

11              MR. KOEHLER:  We have no more witnesses for today,

12   Your Honor.  I have confirmed with Mr. Maynard that he was

13   willing to excuse Special Agent Evans, who is also a CART

14   examiner, who would have given essentially the same testimony

15   as Agent Meshinsky but relating to the 2015 imaging of the

16   Lenovo computer after it came from Sergio Martinez.

17              THE COURT:  Mr. Maynard, do you have any witnesses you

18   wish to call today?

19              MR. MAYNARD:  No, none that are available.

20              THE COURT:  For the continued evidentiary hearing, are

21   the only witnesses to be called Agent Chiappone and

22   Agent Whitson?

23              MR. KOEHLER:  And Task Force Officer Herrmann.

24              MR. MAYNARD:  Your Honor, I also have a subpoena out

25   for Abubakar Ahmed.
```

1          THE COURT:  A subpoena out.  That implies unserved?

2          MR. MAYNARD:  Yes.  We gave it to the Marshal's Office

3    to serve.  The address that we had for him, the Marshal's

4    Office went out there, came back and told us that he wasn't

5    living there anymore.  I sent a private investigator out to

6    serve it.  It ended up being a post office box.  So I'm in the

7    process of trying to contact him.  I understand he's a truck

8    driver, and he drives out of state.

9          THE COURT:  So he may or may not be testifying --

10         MR. MAYNARD:  That's correct.

11         THE COURT:  -- at the next hearing.  But we have under

12   subpoena or the government is bringing voluntarily three

13   witnesses?

14         MR. MAYNARD:  Yes.

15         MR. KOEHLER:  Correct.

16         THE COURT:  Okay.  Then let's speak about when we

17   could reconvene the hearing.  And I also want to speak to you

18   about whether we are on schedule based on the scheduling order

19   that was agreed to and signed by me on August 13th, 2015.

20         The dates that are still upcoming include the

21   disclosure of preliminary -- I'll go government first --

22   government's disclosure of preliminary witness and exhibit

23   list, summary charts, Jencks material, and final witness and

24   exhibit list.

25         Is that all?  At the present time is the government

UNITED STATES DISTRICT COURT

1  going to be able to meet those deadlines, Mr. Koehler?

2          MR. KOEHLER:  I think at this point it's becoming

3  extremely difficult to do that, Your Honor.

4          The crush of information in this case is overwhelming,

5  to say the least.  We are doing our best to comply, but as

6  evidenced this week, snafus happen that makes it very difficult

7  to prepare for one thing while you're having to go back and

8  reverify everything else that's been done along the way.

9          Marking things and getting them in order and making

10 sure that we have everything in place for an exhibit list for

11 this case is a very daunting task.  And I'm not sure that we're

12 going to be able to continue on this pace at this point.

13         THE COURT:  Well, and there's another item of evidence

14 that we have had some extensive discussion and testimony about

15 today, which is this SD card from the camera, which apparently

16 the process is underway to send it to Quantico.  It has not

17 been sent to Quantico.

18         MR. KOEHLER:  That's correct.  If you'd like, Your

19 Honor, I can illuminate a little bit on that.

20         THE COURT:  Go right ahead.

21         MR. KOEHLER:  As we were getting ready for this

22 hearing, we realized, looking at some of the other items, that

23 the recording of that particular item had been placed into

24 evidence.  And it dawned on us that we should be looking to see

25 if this particular memory card had been placed into evidence

1      and was in fact still around and available.

2             And so that's part of what we were running down this

3      week while also figuring out that a CD that we had given out

4      that just had a Bates label on the CD instead of the documents

5      inside of it being Batesed and not realizing that that had even

6      gone out in that fashion, we were very worried that it hadn't

7      gone out at all.

8             Tracking down that SD card to discover that, yes, it

9      is in fact still in evidence, it's there, and it's available,

10     and making arrangements to have that sent to Quantico so that

11     it can be analyzed to see if there's anything on it and then go

12     through the recovery process to get it off of it.

13            THE COURT:  And before it gets to Quantico, could

14     anyone give any reasonable estimate as to when -- how long it

15     will take them before they do whatever they're going to do to

16     it?

17            MR. KOEHLER:  We haven't asked yet.  I have to imagine

18     that in light of events that have happened in the past week or

19     so, Quantico is spun up on a number of other things as well,

20     and it's going to be really hard to get something priority in

21     front of them and get a guarantee from them in light of that.

22     But we are going to endeavor to find that information out and

23     present it to the defense.

24            THE COURT:  I wouldn't want to take a wager that it

25     will be done quickly.  But let me go back then to another

1    issue, which is when are these three witnesses going to be

2    available?

3              MR. KOEHLER:  Your Honor, my understanding is

4    Agent Chiappone will be back in the United States at the end of

5    the first week of December.  I don't know how long he will be

6    here for.  I know he's going to be here at least by the 4th.

7    He might be available a day earlier, and we can check to find

8    that out.

9              THE COURT:  Let me let you know something about my

10   unavailability.

11             MR. KOEHLER:  Yes.

12             THE COURT:  I am unavailable from December 1 through

13   December 18th, unavailable.

14             I have -- I have availability next week, which, as you

15   know, is a short week.

16             MR. KOEHLER:  Yes.

17             THE COURT:  And I have availability during the next

18   three-day week, which is the week of December 21.  And I have

19   limited availability during the next short week, which is the

20   week of December 28th.

21             And where we're getting to here -- it should be

22   obvious to both the government and the defense -- is that we

23   have a trial date on January 14th.  And I just don't see how

24   it's going to be possible with this hearing not being able to

25   be concluded until, at the earliest, the fourth week in

1    December.  And I don't even know what counsel's availability is

2    in the fourth week of December to expect that the matter will

3    be ruled on before the 14th of January.

4           So I think that we need to seriously look at that

5    trial date today, because it just doesn't make sense to expect

6    you to be preparing for a January 24th trial only for me to

7    take this matter under advisement and be unable to rule on it

8    by January 14th.

9           So I don't know if you or Mr. Maynard have compared

10   calendars on your availability compared to my availability and

11   the witnesses' availability to conclude this evidentiary

12   hearing.

13          Mr. Maynard, obviously the -- whether or not the

14   contents of the SD card are recoverable or not is a matter of

15   more importance to you and your client than it is to the

16   government.

17          The government obviously has been ready to proceed

18   without that analysis.  If the defense wants the result of that

19   analysis, you know it's not going to be available by January --

20   January 14th.

21          MR. MAYNARD:  Judge, you can give me the card, and I

22   can see if I can get it done a little faster.  I mean, you know

23   the problem I've got is I have a client who's been in solitary

24   confinement since the first week of June.

25          THE COURT:  I agree.

UNITED STATES DISTRICT COURT

1          MR. MAYNARD:  Every time I go over there to see him, I

2     get claustrophobic.  I get locked up with him.

3          THE COURT:  And I want this case to be ready to go to

4     trial as soon as it possibly can.  But it didn't -- until two

5     days ago, I didn't know that we weren't going to be able to

6     meet this date, which is the date to have the evidentiary

7     hearing on these motions.

8          I thought we would conclude it by today.  And if we

9     did, it would be no difficulty for the Court to rule on the

10    pending motions before, you know, well in advance of the trial

11    date.

12         But I obviously can't rule before we hear the

13    evidence.  And we're not going to hear the evidence until, at

14    the earliest, at the end of December.

15         MR. MAYNARD:  I hear you, but all I can tell the Court

16    is that I followed the scheduling order.  I filed the motions

17    in a timely fashion.  And I would have thought that the

18    government would have realized that we had a schedule -- we had

19    an evidentiary hearing set on motions that needed to be

20    resolved.  And both motions, ironically the two most important

21    witnesses, Agent Whitson, who seems to be the case agent on

22    this, and Colonel Herrmann, who's the one who signs the

23    affidavit that supports --

24         THE COURT:  I don't know where he is.

25         MR. MAYNARD:  I don't either.  And I didn't know that

1    they weren't going to be here until after I had subpoenaed them

2    and I was told by counsel that they had prepaid tickets to go

3    out of the state.  I think Agent Whitson, I was told, was

4    actually out of the country, and I don't know where Colonel

5    Herrmann is.

6            So I thought until four or five days ago, you know, we

7    would be ready.

8            I also didn't know I was going to get 100 documents I

9    had never seen that dealt specifically with this issue dropped

10   on me after the time for filing exhibits yesterday.

11           So --

12           THE COURT:  Well, I mean really what do you want me to

13   do, Mr. Maynard?

14           MR. MAYNARD:  I don't know.

15           THE COURT:  You agreed with Mr. Koehler that we could

16   have these witnesses testify at a later date.

17           MR. MAYNARD:  I did.  I did.  I mean, because I, you

18   know -- My point to him was that I'm not going to oppose the

19   motion that he files.  People have preexisting paid vacations,

20   you know.  I didn't tell them to do it.  They're not my

21   witnesses.  I mean, they're my witnesses because I subpoenaed

22   them.  I didn't tell them they could go off there and do it,

23   and I didn't let them out of the subpoenas.

24           So, I mean, I'm not trying to be a pain, and I'm sure

25   I am being a little bit of a pain.  But, Judge, these are

1    unusual circumstances.  This is the first time I've ever had a

2    client that's been in solitary like this.  The living

3    conditions are just deplorable over there at the county jail.

4            THE COURT:  I have no doubt.

5            But, I mean, the point is we're past that now.  You

6    have subpoena -- I assume that you've served -- you served

7    subpoenas on Whitson and Herrmann, and you might be upset about

8    the fact that they're not here today, but you agreed with

9    Mr. Koehler that they didn't have to be here today.

10           MR. MAYNARD:  I agreed that I would not oppose his

11   motion.  That's exactly right.

12           THE COURT:  Which means we have to hear from them at a

13   later time.

14           MR. MAYNARD:  And if the Court says we need to move

15   this case off a couple of weeks, I just don't know what the

16   Court is thinking.

17           THE COURT:  Oh, in terms of the date?  You mean when

18   we would move it?

19           MR. MAYNARD:  For the trial.

20           THE COURT:  It all depends on when we can reconvene

21   this hearing.

22           MR. MAYNARD:  Oh, Judge, I'm ready -- You tell me I've

23   got to be back in next week, I'll be in next week.

24           THE COURT:  When are our witnesses -- I just heard

25   that Whitson -- I'm sorry -- that Chiappone won't be available

 1     until December.

 2             MR. KOEHLER:  That's correct.  December 3rd or 4th at

 3     the earliest.

 4             THE COURT:  What about Herrmann and Whitson?

 5             MR. KOEHLER:  Herrmann and Whitson will both be here

 6     commencing next week.

 7             THE COURT:  So they'll be here Monday, Tuesday,

 8     Wednesday?

 9             MR. KOEHLER:  I believe Herrmann is gone Monday, but

10     Whitson is here.

11             THE COURT:  Well, we could, I think -- Let me see if

12     my calendar is here.

13             We could hear their testimony, if you wanted to, next

14     week on Tuesday or Wednesday.  But we still have to wait to

15     hear from -- I don't really know exactly who Agent Chiappone is

16     or what his testimony is, the scope.  I have a good idea about

17     Whitson and Herrmann because I heard enough about them today to

18     know where they're involved.

19             MR. KOEHLER:  Agent Chiappone, Your Honor, is an FBI

20     agent who was in Phoenix, is now assigned to New York City.  He

21     was the co-case agent on the Abubakar Ahmed investigation back

22     in 2015 or -- excuse me -- 2012.

23             He is part of the direction in terms of the scope of

24     the warrant, in terms of what they were looking for and why

25     they would have been looking for particular things.  So he's

```
1    relevant to that.  As I mentioned before, he's assigned to New
2    York City, but he's in Paris presently, and he'll be back in
3    the states the week after Thanksgiving, arriving and coming to
4    Arizona on I believe it's the 4th that he's scheduled to be
5    here.
6              THE COURT:  It doesn't matter because I am not
7    available.
8              MR. KOEHLER:  So I'll need to confer with him to find
9    out when we can get him back after that period of time.  I know
10   he's scheduled to be here for something else that following
11   week.  But then if he's going to be in New York or Paris after
12   that, I need to find that out and inform the Court and defense
13   counsel.  We will also make an inquiry of Quantico of course.
14             MR. MAYNARD:  Your Honor, if Agent --
15             THE COURT:  Microphone please.
16             MR. MAYNARD:  I was just told that Agent Chiappone --
17   he's the government's witness, a government witness in this
18   case -- they only plan to have him on the stand for 15 minutes.
19             THE COURT:  So you don't care about him that much?
20             MR. MAYNARD:  Ten minutes.  What I was going to
21   suggest:  Is it possible to do it through some sort of a Skype?
22             THE COURT:  Well, some sort of but not a Skype.
23             MR. MAYNARD:  Some sort of.
24             THE COURT:  Yes, it is.  I mean, we certainly could
25   try to do it by some type of video conference.  We have
```

1    equipment here.  And the only problem with the setup is making

2    sure that the person is in a location that has compatible

3    equipment.

4           We cannot do it by Skype because apparently Skype is

5    some insecure, open thing that we can't use.  But, yes, there

6    are ways to do it that we have done many times in the past and

7    particularly -- If we're talking about doing this in particular

8    during the week of December 21 or the week of December 28th, I

9    would certainly suggest that we try to do it by video

10   conference rather than having him try to get on an airplane and

11   fly round trip to Phoenix, Arizona, during that period, which

12   is quite difficult both personally and logistically.

13          MR. MAYNARD:  Well, I mean, if he's going to be only

14   30 minutes --

15          THE COURT:  Microphone.

16          MR. MAYNARD:  If he's only going to be 30 minutes, I

17   don't have a problem with it.

18          THE COURT:  But we still have the problem that we

19   aren't closing the evidence on the --

20          MR. KOEHLER:  May I recommend --

21          THE COURT:  I suppose we'll close the evidence after

22   Whitson on the motion to suppress the statements that were made

23   during the interview on May 5th, so that can be ruled on after

24   we hear from Whitson.  But with respect to the other motion, we

25   would not be closing the evidence until after we hear from

1    Agent Chiappone.

2          MR. MAYNARD:  Well, what I was suggesting was if

3    Agent Chiappone is available next week.

4          THE COURT:  From France?

5          MR. MAYNARD:  From France.

6          THE COURT:  Well, Mr. Koehler can certainly try to

7    find that out, but I suspect he's pretty busy.  And there's a

8    significant time change, as in maybe nine hours, which means

9    that almost any time that we would try to do it during business

10   hours, which we have to do because we can't do it without staff

11   and the people that know how to set up the video equipment, the

12   likelihood is that the same is true on their end.  And I don't

13   believe there's any overlapping business hours between here and

14   Paris.

15          So, I mean, that sounds easy, but I don't think it is

16   because of the fact that it's not like he can just pick up the

17   phone.

18          MR. MAYNARD:  I think it's an eight-hour time change.

19          THE COURT:  We could -- I just said pick up the phone.

20   That is another possibility.  I mean, we certainly have in the

21   past taken testimony over the phone if you don't think I need

22   to see the demeanor of the witness.

23          But, again, it's, you know, 10:00 in the morning here,

24   it's going to be -- I don't know.  Mr. Koehler can certainly

25   inquire.

1          MR. KOEHLER:  Your Honor, I would be very hesitant to

2     try to schedule anything with Agent Chiappone while he's in

3     France.  The situation there is very fluid and dynamic.  There

4     are raids going on fairly regularly in relation to the attacks

5     there last Friday.  That's not going away anytime soon.  And so

6     trying to schedule something with somebody who may be reacting

7     in an instant to some change on the ground I don't think is a

8     wise use of the Court's time as well as anybody else's.

9          THE COURT:  I think it's -- If he were just in France

10    because that happened to be where he was detailed to for some

11    regular, ordinary assignment, maybe.  I agree with Mr. Koehler

12    this is not a moment in time when we could probably carve out

13    an hour of his time.

14          And, again, it would have to be done during business

15    hours here.  Even if it was by phone, we'd have to do it by

16    business hours here, which would certainly be post-business

17    hours there.  Anyway, I think that's unrealistic to think we

18    could do that.

19          MR. KOEHLER:  I will speak to Agent Chiappone, and the

20    soonest I'll be able to do that will be Monday, have a

21    conversation with him and find out where things stand.  I'll

22    probably send him an e-mail first just to set up the

23    conversation.  Reach out to Mr. Maynard and see if we can find

24    an agreeable time that's also something that we can set on the

25    Court's calendar and have him testify either --

1          THE COURT:  So what do you want to do about Herrmann

2    and Whitson specifically?

3          MR. KOEHLER:  Next Tuesday or Wednesday, or we can set

4    a firm --

5          MR. MAYNARD:  Either day is fine with me.

6          MR. KOEHLER:  Or we could seek to do it on December

7    28th and have everybody taken care of on that date.

8          MR. MAYNARD:  Your Honor --

9          THE COURT:  I didn't offer the 28th.  I said it was

10   the week of the 28th because I think, I think -- let me just

11   check -- that we might have law and motion day already

12   scheduled.  Let me just check.

13          Well, the advantage to doing something earlier is that

14   it does close the evidence on one of the two motions.

15          MR. KOEHLER:  True.

16          THE COURT:  So I think I would prefer that.  And I do

17   want to have this case ready as soon as possible, even if it's

18   not possible by January 14th.  And putting off all of the

19   evidence till December 28th, 29th, or 30th, or 31st pushes

20   everything else out.

21          MR. KOEHLER:  Understood.

22          THE COURT:  So I think we should try for next week.

23   And, you know, we're, as I said, we can be available Tuesday

24   morning or -- and afternoon and Wednesday morning and at least

25   part of the afternoon.  I would prefer Tuesday, but --

1          MR. KOEHLER:  Tuesday would work fine for us, Your

2     Honor.

3          THE COURT:  Are you confident it's going to work for

4     your witnesses?

5          MR. KOEHLER:  Yes.

6          MR. MAYNARD:  Works for the defense.

7          THE COURT:  Shall we say 9:00 a.m. on Tuesday to take

8     the testimony of those two witnesses?

9          MR. KOEHLER:  Could we do 9:30 again, Your Honor?

10         THE COURT:  Yes.

11         MR. MAYNARD:  That works.

12         THE COURT:  And perhaps you can also have some

13    estimate of how -- when the lab in Quantico might have an

14    answer, depending on when they get the SD card, because -- I

15    mean, I think I'm correct that you're ready to go forward

16    without the answer on the SD card?

17         MR. KOEHLER:  That is correct, Your Honor.

18         THE COURT:  And then Mr. Maynard and his client can

19    decide how important that information is to them if Quantico

20    says, well, we've got a lot of stuff here; we can't get you the

21    answer till May, which wouldn't surprise me that they would say

22    that unless Mr. Koehler's got a lot of pull with Quantico that

23    we don't know about.

24         MR. MAYNARD:  Then you could release it to me.

25         THE COURT:  That's up to you and Mr. Koehler to try to

1    resolve.

2            And so with that information on Tuesday, I guess what

3    I'm going to ask you and Mr. Maynard to do is to take a close

4    look at the remaining things on this schedule, and we'll have a

5    serious conversation about whether and which dates may need to

6    be extended.

7            MR. KOEHLER:  We will do so, Your Honor.

8            THE COURT:  And it will also be based on when we can

9    take the testimony of Agent Chiappone.

10           MR. KOEHLER:  We will do so.

11           THE COURT:  Okay?  Are there any other things we need

12   to talk about this afternoon?

13           MR. KOEHLER:  There's the grand jury transcript

14   motion, Your Honor.

15           THE COURT:  Check your e-mail.

16           MR. KOEHLER:  It's moot at this point?

17           THE COURT:  Pardon?

18           MR. KOEHLER:  I said the subject of addressing it is

19   moot at this point?

20           THE COURT:  It has been addressed, and your e-mail

21   will reveal how it's been addressed.  An order was docketed

22   this morning on that.  It didn't require evidence, and it

23   didn't require argument.

24           MR. KOEHLER:  Very well.  Thank you.  Is there

25   anything else we need to do?

152

1          MS. BROOK:  No.

2          THE COURT:  Mr. Maynard, any other matters you want to

3    bring up today?

4          MR. MAYNARD:  Not at this time.

5          THE COURT:  So everything else you want to talk to me

6    about before the end of the year we're going to have to talk

7    about on Tuesday.

8          MR. KOEHLER:  All right.

9          THE COURT:  Okay?

10         MR. KOEHLER:  Thank you, Your Honor.

11         THE COURT:  Court is in recess.

12      (Proceedings recessed at 2:47 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1                       **C E R T I F I C A T E**

2


3            I, LINDA SCHROEDER, do hereby certify that I am duly

4    appointed and qualified to act as Official Court Reporter for

5    the United States District Court for the District of Arizona.

6            I FURTHER CERTIFY that the foregoing pages constitute

7    a full, true, and accurate transcript of all of that portion of

8    the proceedings contained herein, had in the above-entitled

9    cause on the date specified therein, and that said transcript

10   was prepared under my direction and control.

11           DATED at Phoenix, Arizona, this 25th day of November,

12   2015.

13

14                                    s/Linda Schroeder
                                 Linda Schroeder, RDR, CRR
15

16

17

18

19

20

21

22

23

24

25

                       **UNITED STATES DISTRICT COURT**