# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

_____

| | |
|---|---|
| United States of America, | ) |
| | ) |
| Plaintiff, | ) |
| | ) **CR15-00707-01-PHX-SRB(MHB)** |
| vs. | ) Phoenix, Arizona |
| | ) November 24, 2015 |
| **Abdul Malik Abdul Kareem**, | ) 9:33 a.m. |
| | ) |
| Defendant. | ) |
| | ) |
| _____ | ) |

**BEFORE:  THE HONORABLE SUSAN R. BOLTON, JUDGE**
**REPORTER'S TRANSCRIPT OF PROCEEDINGS**
**EVIDENTIARY HEARING/INTERIM PRETRIAL CONFERENCE-DAY 2**
**(Pages 154 through 318, Inclusive.)**


APPEARANCES:
For the Government:
         U.S. ATTORNEY'S OFFICE
         By:  **Joseph E. Koehler, Esq.**
              **Kristen Brook, Esq**.
         40 North Central Avenue, Suite 1200
         Phoenix, AZ  85004

**For the Defendant Abdul Malik Abdul Kareem:**
         MAYNARD CRONIN ERICKSON CURRAN & REITER
         By: **Daniel D. Maynard, Esq.**
         3200 North Central Avenue, Suite 1800
         Phoenix, AZ  85012

Official Court Reporter:
Elizabeth A. Lemke, RDR, CRR, CPE
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, SPC 34
Phoenix, Arizona  85003-2150
(602) 322-7247


Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription's

1

2                        **INDEX OF WITNESSES**

3

**CORPORAL DANIEL HERRMANN:**

4

Direct Examination by Mr. Koehler                Page 156
5   Cross Examination by Mr. Maynard                  Page 166
    Redirect Examination by Mr. Koehler              Page 201

6

7     **SPECIAL AGENT STEWART WHITSON:**

8     Direct Examination by Ms. Brook                  Page 204
    Cross Examination by Mr. Maynard                  Page 229
9   Redirect Examination by Ms. Brook                Page 252

10

11                       **INDEX OF EXHIBITS**

12    **EXHIBIT NO.:**          **DESCRIPTION:**          **RECEIVED:**

13

14    Exhibit No. 1        Abdul Malik Abdul           Page 259
                         Kareem May 5, 2015
15                       Interview 302 Report
      Exhibit No. 2        TFO Nash and S/A            Page 259
16                       Whitson's notes - May 5,
                         2015 Interview (handwritten
17                       notes from the interview
                         with Abdul Malik Abdul Kareem)
18    Exhibit No. 12       ASU Police Reports and      Page 184
                         associated documents
19                       related to investigation
                         of Abubakar Ahmed in 2012
20    Exhibit No. 94       FD 302 re:  Search          Page 187
                         Warrant on July 20, 2012

21

22

23

24

25

```
 1            P R O C E E D I N G S

 2      (Called to the order of court at 9:33 a.m.)

 3            THE COURT:  Good morning.  Please sit down.

 4            This is the continued evidentiary hearing on the

 5   Motions to Suppress.

 6            We also have some housekeeping matters to take care

 7   of, but I thought we would take the testimony of the witnesses

 8   first and then address whatever other issues we need to

 9   discuss that don't involve any witnesses.  Agreeable?

10            So the government may call its next witness.

11            MS. BROOK:  Thank you, Your Honor.

12            MR. KOEHLER:  The United States calls Daniel

13   Herrmann.

14      (Witness duly sworn.)

15            THE CLERK:  Please state your name for the record,

16   spelling your last name.

17            THE WITNESS:  Daniel Herrmann.  H-E-R-R-M-A-N-N.

18            THE COURT:  You may proceed, Mr. Koehler.

19            MR. KOEHLER:  Thank you, Your Honor.  May I please

20   ask the Clerk to place Exhibit 12 before the witness.

21            DANIEL HERRMANN, WITNESS, SWORN

22                 DIRECT EXAMINATION

23   BY MR. KOEHLER:

24   Q   Sir, would you please state your full name and spell your

25   last name for the record.
```

```
 1    A    Daniel Frederick Herrmann.   H-E-R-R-M-A-N-N.

 2    Q    Where do you work?

 3    A    I work for the Arizona State University Police Department.

 4    Q    What is your title there?

 5    A    I'm a Detective Corporal.

 6    Q    And are you also assigned to the FBI Joint Terrorism Task

 7    Force?

 8    A    Yes, I am.

 9    Q    And in that role, what is your title?

10    A    I'm a Task Force Officer.

11    Q    At some point in the past, did you become a case agent in

12    the investigation of a person by the name of Abubakar Ahmed?

13    A    Yes, I did.

14    Q    Do you recall approximately what date you became the case

15    agent on that case?

16    A    It would be towards the end of July, beginning of August

17    of 2012.

18    Q    And when did you join the FBI Joint Terrorism Task Force?

19    A    January 23rd of 2012.

20    Q    So about six months before you became the case agent on

21    Mr. Ahmed's case?

22    A    Yea, that's about right, minus a month of training which

23    sort of took away from my time at the JTTF, yes.

24    Q    Tell us how Mr. Ahmed came to your attention.

25    A    Mr. Ahmed came to my attention when my -- at the time
```

1    either commander or assistant chief of police -- notified me

2    about an e-mail he got from at attorney at ASU who, in turn,

3    got an e-mail from a publishing company referencing this

4    unusual incident about Mr. Ahmed trying to solicit getting a

5    diploma made for him using his name instead of the subject's

6    name.  He had attached a copy of the diploma he wanted made

7    with his name on it instead of the proper owner.

8    Q    And so this referral came to you through the ASU Police

9    Department; is that correct?

10   A    Yes, it did.

11   Q    And it came to the ASU Police Department through ASU

12   General Counsel's Office, is that what you're saying?

13   A    That's correct.

14   Q    And did you commence an investigation into Mr. Ahmed's

15   activities?

16   A    Yes, I did.

17   Q    Can you tell us what you learned at least from the

18   beginning there?

19   A    I initially learned that Mr. Ahmed had been a subject in

20   the past of other investigations.  I also learned that he was

21   looking into getting a diploma.  Unsure why.  And in the

22   course of that we, you know, we learned he had reached out to

23   certain websites and certain things to, you know, seek, you

24   know, schooling or other education overseas, you know, that --

25   some of which may have required a diploma.

1   Q    As part of your investigation, did you obtain a search

2   warrant to search Mr. Ahmed's residence?

3   A    Yes, I did.

4   Q    And as part of that search warrant, did you seize

5   electronic devices in the residence?

6   A    Yes, I did.

7   Q    And did you seize electronic devices belonging to persons

8   other than Mr. Ahmed?

9   A    Yes.  At the time we were unsure to whom they belonged

10  because no one would claim ownership.  So, you know, the

11  warrant included all electronic devices, so we did take all

12  electronic devices.

13  Q    And was your purpose in seizing those electronic devices

14  related to the fact that the communications occurred over the

15  Internet?

16  A    Yes.

17            MR. MAYNARD:  Objection, Your Honor.  It's leading.

18            THE COURT:  Perhaps, but the objection is overruled.

19  The answer will stand.

20  BY MR. KOEHLER:

21  Q    Once the search warrant was executed, where did the

22  electronic devices go, if you know?

23  A    The electronic devices ultimately went back to the FBI

24  Division here in Phoenix.

25  Q    Okay.  And eventually at some point did you receive a

1    processed image of the devices?

2    A    Yes.

3    Q    From whom did you receive that?

4    A    From the FBI's CART team electronics examiners who were

5    specialized in going through, you know, computers and such.

6    Q    And did that come to you in a form that enabled you to

7    search through it?

8    A    Yes, it did.

9    Q    Did you have assistance from somebody else in performing

10   that search?

11   A    Yes, I did.

12   Q    Who assisted you?

13   A    That would be Intelligence Analyst Amy Vaughan.

14   Q    As part of the search, were you using keyword searches

15   with Intelligence Analyst Vaughan?

16   A    Yes, I was.

17   Q    Okay.  And what were you looking for when you were

18   searching through the electronic device images?

19   A    Some of the keywords we used were things like "diploma,"

20   "degree," "travel," "schooling," things, you know, to help

21   establish the elements of the crime of Forgery.

22   Q    Explain to us for a minute when you talked about the

23   elements of the crime of Forgery, was there a particular

24   element upon which you were focused at this point?

25   A    Yes.  Since we had communication to suggest he was looking

CR15-00707-PHX-SRB     EVIDENTIARY HEARING     11-24-15

 1   into getting a diploma, I needed to establish the intent to

 2   defraud others with a forged instrument.

 3        So my focus was to find some sort of, you know,

 4   purpose or goal or a bit of a time line to find out when he

 5   requested what he would need to go, you know, do what he was

 6   going to do and then fast-forward to maybe seeing if he had,

 7   in fact, accomplished getting a diploma.  So I was pretty much

 8   looking for intent was the main goal.

 9   Q   Okay.  During the course of conducting that search with

10   Intelligence Analyst Vaughan, did you find things that gave

11   you indicators of what his intent was in obtaining that

12   diploma?

13   A   Yes.  We had found correspondence from the Saudi Arabian

14   Cultural Mission within attached to that correspondence was a

15   checklist of what Mr. Ahmed would need to go overseas to Saudi

16   Arabia, one of which included a valid four-year degree -- I'm

17   sorry -- a valid degree from a two- or four-year college.

18   Q   And is ASU a two- or four-year college?

19   A   Yes, it is.  It's a four-year degree.

20   Q   Did the fact that he appeared to be intending to travel to

21   Saudi Arabia raise any red flags for you or others in your

22   Division?

23        MR. MAYNARD:  Objection.  Leading.

24        THE COURT:  Overruled.  He could answer "yes" or

25   "no."

 1                THE WITNESS:  Yes.  It did strike us -- myself and

 2     others -- as a bit of unusual or maybe suspicious or alarming.

 3     BY MR. KOEHLER:

 4     Q   Okay.  And why would that be?

 5     A   Well, I can't speak completely to the others.  I can say

 6     for me I had seen and read enough to know that sometimes

 7     forged documents are used to further other nefarious

 8     activities, especially in that region of the world.

 9                And my colleagues --

10                MR. MAYNARD:  Objection.  If he's going to get into

11     what colleagues have told him, it's hearsay.

12                THE WITNESS:  Well, I'm afraid that's things I've

13     read in the news.  You know, that's --

14                THE COURT:  Well --

15                MR. KOEHLER:  Hold on please.

16                THE COURT:  Detective --

17                THE WITNESS:  Yes?

18                THE COURT:  -- you don't respond to the objection.

19                THE WITNESS:  Okay.

20                THE COURT:  Mr. Koehler does.

21                THE WITNESS:  I'm sorry.

22                THE COURT:  Okay?

23                Do you want to respond to the objection, Mr. Koehler?

24                MR. KOEHLER:  Yes, Your Honor.  I'm seeking to

25     establish Task Force Officer Herrmann's state of mind in how

 1    he was executing the search warrant and why particular things

 2    might be concerning to him, even though he might not have

 3    personal knowledge of those things.

 4            THE COURT:  But what you just asked him about was

 5    after the search warrant.  This was after he executed the

 6    search warrant.  You asked him why things that he saw that

 7    were on the mirrored image of the computer were alarming to

 8    him.

 9            MR. KOEHLER:  I have a little further to go with

10    where I'm going with this, Your Honor.

11            THE COURT:  Okay.

12            MR. KOEHLER:  Which is to talk about that triggering

13    a more detailed look at what he was seeing in the computer.

14            THE COURT:  Okay.  So it was alarming to him.

15            Why don't you just ask why -- what he did after that.

16    BY MR. KOEHLER:

17    Q   Once you saw the information about the intended travel to

18    Saudi Arabia, did you conduct further analysis looking through

19    the image of the different computers that you were looking at;

20    and specifically, the Lenovo laptop, as well as a flash drive

21    that was attached to that laptop?

22    A   I continued my examination strictly for the purposes of

23    establishing the crime of Forgery.  Colleagues kind of had

24    stepped in and examined the other computers for other purposes

25    at that time as of becoming aware.

1    Q    Okay.  So did you relay the information about the intended

2    travel to Saudi Arabia to others within your group?

3    A    Yes, I did.

4    Q    At some point did you pass this on to the Maricopa County

5    Attorney's Office for their review to determine whether to

6    file charges?

7    A    Yes, I did.

8    Q    Approximately, when did that occur?

9    A    I think that was -- if I may look at the report to refresh

10   my memory on that?

11   Q    Certainly.  That's Exhibit 12 in front of you.

12   A    Okay.  It was in approximately the end of December of

13   2012.

14   Q    The end of December of 2012?

15   A    Yes.

16   Q    Okay.  Now, let's circle back here for a moment.  What was

17   the date of execution of the search warrant?

18   A    That was July 20th of 2012.

19   Q    And do you remember approximately when you did your review

20   of the image of the Lenovo laptop computer in this case?

21   A    I believe it was August, but if I may, I can doublecheck

22   my police report real fast.

23          Yes.  It was August 1st.

24   Q    After you submitted the case to the Maricopa County

25   Attorney's Office, did you get an answer from them?

1    A    I did.

2    Q    And what was their answer?

3    A    Pardon me?

4         They declined to go forward with prosecution on the

5    Forgery charge.

6    Q    Approximately, when did you get that answer from the

7    Maricopa County Attorney's Office?

8    A    That was in December.  That was on the same day as

9    paperwork had been submitted to go forward with an arrest

10   warrant.

11   Q    And so did you do anything with the ASU Police Department

12   file at that point?

13   A    At that point I submitted it for closure with a supplement

14   to that report indicating that Maricopa Community --

15   I'm sorry -- Maricopa County Attorney's Office declined to go

16   forward with prosecution.

17   Q    At that point in time were you aware of whether FBI had

18   its own case open on Mr. Ahmed?

19   A    At that time, yes, I was.

20   Q    And did your closure of the ASU Police Department file on

21   the case have anything to do with that?

22   A    It did not.

23        MR. KOEHLER:  May I have a moment, Your Honor?

24        THE COURT:  Yes.

25        MR. KOEHLER:  No further questions.

1        THE COURT:  Mr. Maynard.

2                    **CROSS EXAMINATION**

3    BY MR. MAYNARD:

4    Q   Officer Herrmann, can you tell me briefly your training to

5    become a police officer.

6    A   Yes.  Going back to 1986, I was an immigration officer for

7    four years with at the time the United States Immigration

8    Naturalization Service.  I had been an air marshal for three

9    years from 2000 to 2003.  And then I went to the Arizona Law

10   Enforcement Training Academy down in South Phoenix in April --

11   August of 2005.

12   Q   And when did you go to work for ASU as a police officer?

13   A   That was April of 2005.

14   Q   And at some point you said that in 2012 you became a

15   member of a terrorist task force; is that correct?

16   A   That's correct.

17   Q   Who's involved in that terrorist task force?

18   A   It's multijurisdictional.  You know, it's sort of in the

19   name "joint," it's, you know, Phoenix Police Department,

20   Chandler Police Department, Department of Public Safety.  All

21   send officers or detectives, you know, to work with the FBI

22   to, you know, foster a better relationship and have points of

23   contact to investigate, you know, federal crimes.  So lots of

24   agencies.

25   Q   I think you said you went through an extra week of

1   training for that; is that correct?

2   A   Well, I was gone for a month in 2012.

3   Q   And did you have a particular FBI agent that you reported

4   to on this task force?

5   A   I did not.  I had some I worked with more than others, but

6   I didn't have a particular one that I reported to.

7   Q   All right.  In this particular case, at some point in June

8   of 2012, someone from the General Counsel's Office at ASU

9   contacted you about what they believed may be attempted

10  forgery; is that correct?

11  A   Yes.  Through my chain of command at the Police Department

12  specifically, but, yes.

13  Q   Okay.  And did you learn the name of the individual who

14  they thought was attempting to forge a document?

15  A   Yes, I did.

16  Q   And did you learn it at the very beginning?

17  A   I learned it courtesy of the e-mail, yes.

18  Q   Okay.  How is it that you went to the -- or strike that.

19          Did you go to the FBI with this information?

20  A   At the time I was already at the task force, so the short

21  answer is "yes," because it was a matter of just talking to

22  someone right across the aisle from me because at the time I

23  was at the JTTF.

24  Q   Okay.  When you say you're at the task force, where do you

25  office?

1    A    Oh, up at north Phoenix, Seventh Street and Deer Valley

2    Road up in north Phoenix, that's where I report.

3    Q    As an ASU police officer, do you have an office at ASU?

4    A    I do not.

5    Q    How is it that this happened to come to your attention as

6    a member of a joint task force rather than one of the other

7    officers at ASU?

8    A    I couldn't speculate as to why they chose me, but I feel

9    it was probably because the FBI, with whom I had just started

10   this relationship, probably had a better -- you know,

11   expertise at looking at computers to help establish a forgery.

12          ASU does take forgery of their diplomas rather

13   seriously.  And they thought since I was new there, let's put

14   me to task and get me going and they sent me that e-mail.

15   Q    Had you been involved in any attempted forgeries before?

16   A    I had as a patrolman to the degree that college students

17   would have fake IDs.

18   Q    Had you been involved in any attempted forgery of ASU

19   diplomas?

20   A    No.  I had not.

21   Q    Did you communicate directly with the General Counsel or

22   the Assistant General Counsel at ASU on this issue?

23   A    Yes.

24   Q    Okay.  Were you advised that the lawyers for ASU were

25   looking at it to determine, first, whether they thought it was

1    a crime?

2    A    Yes.

3    Q    And did they advise you that unless there was some intent

4    to use a forged document afterwards, they really didn't think

5    a crime had been committed just in making a copy of a diploma?

6    A    It did say that, you know, intent would be needed to

7    establish a crime.

8    Q    And did they advise you that they determined it really

9    wasn't a crime, all that they were going to do was to send out

10   a cease-and-desist letter to the individual who had attempted

11   to get the diploma?

12   A    Yes.   I know they did that.

13   Q    Did they send out the cease-and-desist letter?

14   A    To my knowledge they did.

15   Q    So even after legal counsel for ASU had determined that

16   this probably wasn't a criminal act at this point and sent out

17   the cease-and-desist letter, you continued on as -- with your

18   investigation?

19   A    Yes.   I was told to not cease in my investigation, so I

20   moved forward with the investigation in consultation with my

21   command staff and with General Counsel.

22   Q    And in consultation with the joint task force on

23   terrorism?

24   A    Yes.   I told them I was going to continue with the Forgery

25   investigation.

1    Q    The focus of your work as of June of 2012 was this

2    terrorist joint task force?

3    A    It was one of my assignments, yea.

4    Q    Wasn't that the primary assignment?

5    A    It could be the primary, yes.

6    Q    Could be --

7         THE COURT:  Could I just interrupt and ask.

8         When -- is being on this task force your full-time

9    job or do you still have responsibilities to the ASU Police

10   Department?

11        THE WITNESS:  Your Honor, I do have responsibilities

12   at ASU.  I have certain training and certain qualifications

13   and certain classes and duties on programs that I deal with at

14   ASU, but the JTTF, it is my primary job and I do have others.

15        THE COURT:  Maybe I should ask it this way.

16        As a detective do you have any responsibilities to

17   continue to do investigative work for ASU as part of the task

18   force?

19        THE WITNESS:  Not typically, but since this had been

20   brought to me, they had assigned that to me, so typically, no.

21        THE COURT:  Please continue, Mr. Maynard.

22   BY MR. MAYNARD:

23   Q    So you're in this task force.  There are FBI agents that

24   are officing near you?

25   A    Yes.

1    Q    You bring it to their attention, correct?

2    A    That's correct.

3    Q    All right.  And one of these FBI agents had dealt with

4    Mr. Ahmed in the past?

5    A    Yes.  That's correct.

6    Q    At that point did you pull down any 302s to see if there

7    had been any interviews of Mr. Ahmed in the past?

8    A    I did not.

9    Q    Did he advise you that he had -- he or someone else at the

10   FBI had interviewed Mr. Ahmed in the past dealing with

11   potential terrorism?

12   A    I'm sorry.  When you say "did he advise me," who?

13   Q    The FBI agent that you were dealing with advise you that

14   he or someone else at the FBI had interviewed Mr. Ahmed in the

15   past?

16   A    Yes.

17   Q    And who was the FBI agent you were dealing with?

18   A    That was Agent John Chiappone.

19   Q    Was he a supervisor of yours at the time?

20   A    He was not.  He was a co-case or colleague or co-agent on

21   the task force.

22   Q    And so you advised Agent Chiappone of the FBI that there

23   appears to be an allegation of attempted forgery by Mr. Ahmed?

24   A    Yes.

25   Q    Do you then work in conjunction with Mr. Chiappone from

1    that point forward to do your investigation?

2    A    Yes.  He helped.  I mean, there are certain things I can

3    do as a state officer that Agent Chiappone couldn't and

4    there's things, you know, that the FBI could bring to the

5    table to assist me in that as well, so.

6    Q    Did you use any other ASU officers to assist you?

7    A    I don't believe so.

8    Q    So it was -- the focus was with the joint task force on

9    terrorism at that point?

10   A    Yes.

11   Q    Okay.  Now, after Mr. Ahmed had been sent the

12   cease-and-desist letter by the ASU General Counsel's Office,

13   did you contact Mr. Ahmed for an interview?

14   A    I'm not entirely sure when the cease-and-desist letter was

15   sent, I'm afraid, but we did contact him for an interview in

16   July.

17   Q    And when you say "we," is that you and Mr. Chiappone?

18   A    Yes.

19   Q    And did Mr. Ahmed come in and have a discussion with you?

20   A    Yes.  He did.

21   Q    And where did that discussion take place?

22   A    That was at the ASU police station.  Arizona State

23   University Police Station.

24   Q    And you didn't routinely have an office there at the ASU

25   Police Station, right?

1    A    Correct.

2    Q    You did not advise him that you -- Mr. Ahmed that you were

3    a member of the joint task force on terrorism at the time, did

4    you?

5    A    No.

6    Q    Okay.  You advised him that you were looking into this

7    attempted forgery of a diploma?

8    A    Yes.

9    Q    Okay.  Did you -- at the time that you met with Mr. Ahmed,

10   did you know who he was living with?

11   A    I did not.

12   Q    Had you been out to his residence?

13   A    I had not.

14   Q    Okay.  Did the FBI tell you who he was living with?

15   A    I don't believe they did.  You know, I'm not sure.  The

16   answer is I don't recall if they told me.

17   Q    And without going through everything that Mr. Ahmed said,

18   is it fair to say that Mr. Ahmed denied seeking to get someone

19   to make a diploma for him?

20   A    Yes.  He did.

21   Q    Okay.  Now, you indicated on direct examination that your

22   investigation indicated that Mr. Ahmed may have been seeking

23   the ability to go to school in Saudi Arabia?

24   A    Yes.

25   Q    Do you remember that?

1    A    Yes.

2    Q    Now, did you learn that before or after you executed the

3    search warrant?

4    A    That was after.

5    Q    That was after?

6    A    Yes.

7    Q    Okay.  So at the time you executed the search warrant, all

8    you knew was that Mr. Ahmed allegedly had contacted somebody

9    about making a false ASU diploma, correct?

10   A    Yes.  That's correct.

11   Q    And as far as you knew, it was only one diploma that was

12   going to have his name on it?

13   A    Yes.  That's all I --

14   Q    He wasn't out there trying to make a whole bunch of them

15   to sell to different people?

16   A    At the time I did not believe that.

17   Q    Okay.  You prepared a declaration for a search warrant, a

18   Probable Cause Statement, correct?

19   A    Yes.

20   Q    Well, who prepared the Probable Cause Statement?

21   A    I prepared that.

22   Q    Okay.  Did you have the assistance of the FBI?

23   A    I don't recall.  I don't think I did because it was an ASU

24   document.

25   Q    Had you ever prepared a Probable Cause Statement for a

1    search warrant prior to this?

2    A    Yeah.  It had been some time, but, yes.

3    Q    Had you done it as an ASU police officer?

4    A    Yes.

5    Q    Okay.  How many times?

6    A    Maybe five times.

7    Q    Did you get the assistance of the FBI in asking what the

8    scope of the search warrant would be?

9    A    No.  I did not.

10   Q    You've got Exhibit 12 in front of you?

11   A    I do.

12   Q    If you -- I'm going to look at Bates stamp numbers which

13   are the little numbers on the bottom right-hand side of the

14   page.  Do you see that?

15   A    I do.

16   Q    Okay.  Now, I'm looking at Bates stamp 1457.  Okay?  You

17   have seen this document before?

18   A    I have.

19   Q    Okay.  And this was the affidavit for the search warrant

20   that you prepared; is that correct?

21   A    Yes.

22   Q    Okay.  Now, on the 1458 you're asking for a number of

23   different things.  The first thing is you want indicia of

24   ownership or occupancy.  You want to show that he actually

25   lives in the place; rent, lease.

1    A    Correct.

2    Q    Bills that came there.  Okay.

3         The second thing you were looking for is computers,

4    electronic devices, word processors, things of that nature.

5         Are you the one who prepared that language?

6    A    Yes.

7    Q    And you advised the judge that you're going to -- that the

8    reason that you're doing this is to allow for a systemic

9    search of the files of information therein for evidence of

10   attempted forgery, correct?

11   A    Yes.

12   Q    Now, you're working in a Joint Terrorist Task Force and

13   there are other people that are working with you to coordinate

14   this search warrant, correct?

15   A    Yes.

16   Q    And Agent Chiappone is one of those?

17   A    Yes, he is -- was.

18   Q    And did he advise you that they wanted to look -- the FBI

19   wanted to look at things beyond evidence of Attempted Forgery?

20   A    They offered assistance in the search warrant.  To what

21   ends, I couldn't recall, but they did offer assistance as the

22   Joint Terrorism Task Force is a partnership.

23         THE COURT:  What kind of assistance?

24         THE WITNESS:  SWAT assistance, witness interview

25   assistance, computer examination assistance, ultimately, as

 1    they have the facilities to do it.

 2             THE COURT:  What about in the -- we're back before

 3    it's at -- before it's issued and executed.

 4             Did you have any help or advice or suggestions from

 5    members of the task force about what to include in item 2 on

 6    page 1458 of Exhibit 12?

 7             THE WITNESS:  If I recall No. 2 was a template from

 8    the ASU Police Department because we had a guy at the ASU

 9    Police Department who, you know, executed way more search

10    warrants than myself.

11             And he had a number of templates.  I acquired some of

12    this language from a template that was sent to me from the ASU

13    police.

14             THE COURT:  So you believe that this was a template

15    from ASU Police Department for the appropriate language to

16    include when you want to search an electronic device?

17             THE WITNESS:  Yes.

18    BY MR. MAYNARD:

19    Q    Okay.  And do you have a copy of that template that you

20    used at some point?

21    A    I might have it.  Not with me.  I could probably dig one

22    up.

23    Q    Did you keep it in the file on this particular matter?

24    A    No.  This is a template.  I crafted it accordingly for my

25    purposes and kept it elsewhere.  It has nothing -- it's not in

1   the FBI file.

2   Q   Just so that I understand, you're officing at a joint task

3   force for terrorism that is not on the ASU campus, but you're

4   telling us that you went to ASU and got a template from some

5   officer who had done a search before and you used it but you

6   didn't use stuff from the FBI?

7   A   Well, not for the warrant, no.

8   Q   Is that --

9         THE COURT:  When you say you got it from the ASU

10  Police Department as a template, was it something you had to

11  get in paper or was it some download that you could cut and

12  paste?

13        THE WITNESS:  It was through a forwarded copy.  It

14  was just -- it was e-mailed to me.  You know, "Here is a

15  template I have used for electronics in the past," or

16  something to that effect.

17        THE COURT:  Okay.  Thank you.

18  BY MR. MAYNARD:

19  Q   Okay.  And as you're preparing this warrant, are you

20  coordinating with the FBI about the execution of the warrant?

21  A   Yes, I am.

22  Q   Okay.  Had you already -- or had you done any

23  investigation to determine who lived in the residence?

24  A   I did not, but I was aware at that point upon preparing

25  this who -- I became aware of who else lived there.

1   Q    Okay.  How did that happen?

2   A    I couldn't recall exactly, but I think it was just in the

3   course of conversation it had been -- it had come up that, you

4   know, other people lived there.

5         It wasn't -- I think it was just in the course of

6   execution how many occupants.  Who are they.  Just in the

7   normal course of conversation in preparation for an execution

8   of a search warrant.

9   Q    I'm trying to get to before the course of execution.  As

10  you're preparing the warrant, did you -- or did you go out to

11  physically look at the residence?

12  A    I did not.

13  Q    Are you aware of anybody from the FBI who physically went

14  out and looked at the residence?

15  A    I do recall someone going out or someone, or someone,

16  maybe two people going out to look.  I couldn't recall who

17  exactly.

18  Q    Do you recall if anybody came back and said to you, "Look,

19  there's other people that live there including Mr. Abdul

20  Kareem"?

21  A    Yes.  And they mentioned vehicles as well.  I remember

22  seeing a report indicating that there were other cars parked

23  in front of or near that residence.

24  Q    So before you executed the search warrant, you were aware

25  that there were other people who were living with Mr. Ahmed?

```
1    A    Yes.

2    Q    And did that include Mr. Simpson?

3    A    Yes.

4    Q    Did you participate in the execution of the search

5    warrant?

6    A    In the actual entry of the apartment, I did not.  If

7    that's -- at the risk of being too specific, I did not

8    participate in the entrance into the residence, but I was on

9    scene during the execution.

10           THE COURT:  Did you have a role in the execution of

11   the search warrant?

12           THE WITNESS:  Yes.

13           THE COURT:  What was it?

14           THE WITNESS:  It was to interview the occupants of

15   the residence and to be a witness when devices mentioned in

16   the search warrant were found, I would just observe.

17   BY MR. MAYNARD:

18   Q    So did Agent Chiappone have a role to play in the

19   execution of the warrant?

20   A    He did.

21   Q    Were the individuals who were executing the warrant

22   reporting back to you and Agent Chiappone?

23   A    Yes.

24   Q    So you were off-site, but you were in direct contact with

25   them?
```

1    A    That's correct.

2    Q    Both of you?

3    A    No.  Agent Chiappone was there.  He helped brief the SWAT

4    team and the Phoenix officers who also assisted with that

5    search warrant.

6    Q    And you used that term "SWAT team."  Now, the folks who

7    went in to look to get these computers because somebody had

8    attempted to forge an ASU diploma used a Phoenix Police SWAT

9    team?

10   A    Yes.

11   Q    And do you remember how many officers were involved?

12   A    I couldn't recall specifically; perhaps ten.  I honestly

13   don't know offhand, but it was maybe 10 to 12.

14   Q    Perhaps 20 or more?

15   A    I don't know.

16   Q    Okay.

17   A    I never really saw them.

18   Q    I'm sorry?

19   A    I didn't really see all the numbers there.  They had

20   departed before I got over there.

21   Q    Now, on direct examination I believe you said that you --

22   or the officers in executing the warrant picked up a number of

23   computers but you didn't know whose were whose; is that

24   accurate?

25   A    That's correct.  We were unable to establish, you know,

1    ownership of the computers.

2    Q    Did you ask them?

3    A    Yes.

4    Q    And did they tell you, "This is mine.  This is his."

5    A    I don't recall.  I specifically did not ask them, but I do

6    believe the questions were asked to whom do these computers

7    belong.

8    Q    Where in location to the house that was being entered were

9    you located?

10   A    Out front.

11   Q    Did you actually see them enter?

12   A    I'm sorry.  The SWAT team?

13   Q    Did you see the agents, the SWAT team enter?

14   A    I did not.

15   Q    Okay.  Did you have reason to believe that these

16   individuals were dangerous?

17   A    I did not.  I didn't really know either way.  Other people

18   had, you know, advised that perhaps -- at the risk of making

19   it hearsay, advised that -- there was a history with them that

20   could suggest dangerous behavior.

21        And I think that may have been part of the reason, at

22   the risk of speculating, why they used the SWAT team, but I

23   don't know.

24   Q    Were you aware that Mr. Simpson had been prosecuted

25   earlier by the FBI?

1   A   At that time I did not know.

2   Q   Okay.  And did you have any reason to suggest to the judge

3   who was signing the warrant that this could be dangerous and

4   it should be done at a certain time of day?

5   A   If I recall, I don't remember telling the judge anything

6   to suggest danger.  I did sign the "nighttime exception"

7   that's somewhat standard for ASU at times.

8   Q   Standard for ASU to do -- you mean ASU does this kind of

9   search warrant where they take a Phoenix SWAT team?

10         THE COURT:  Mr. Maynard, that's not what he said.  He

11  said it was somewhat standard for ASU to ask for the nighttime

12  exception.

13  BY MR. MAYNARD:

14  Q   Okay.

15         MR. KOEHLER:  Your Honor, at this point I'm going to

16  object to the line of questioning as being beyond the scope of

17  what is suppressible.

18         The Supreme Court has held that the manner of

19  entering, including knock-and-announce, is not a basis for

20  suppression.  So at this point we're consuming time on an

21  issue that is not relevant to the suppression issue.

22         THE COURT:  There is presently no question before the

23  witness, Mr. Koehler.

24  BY MR. MAYNARD:

25  Q   Okay.  Now, could you turn to page 1487 that is part of

```
 1    Exhibit 12.
 2             Judge, I would move for the admission of Exhibit 12.
 3             THE COURT:  For purposes of this hearing is there any
 4    objection?
 5             MR. KOEHLER:  No objection.  And I thought we
 6    admitted it last week, but just to be clear, no objection.
 7             THE COURT:  Twelve is admitted.
 8        (Exhibit No. 12 admitted in evidence.)
 9    BY MR. MAYNARD:
10    Q    Did you prepare pages 1487 and 1488?
11    A    To the point that I did -- shall we say a cut-and-paste
12    job, this was, in fact, prepared by Phoenix who then e-mailed
13    me this document so I could include it in my ASU report.
14    Q    Okay.  So this is a list of the officers that conducted
15    the entry to execute the search warrant, correct?
16    A    Yes, it is.
17    Q    So there were 20 officers that are listed here, correct?
18             THE COURT:  We don't need to count, Mr. Maynard.  We
19    just admitted it in evidence.
20             MR. MAYNARD:  Okay.
21    BY MR. MAYNARD:
22    Q    And then you and Agent Chiappone are not included in this,
23    but you're part of this execution?
24    A    That's correct.
25    Q    Are there any other agents that were members of this
```

```
 1    terrorist task force that were involved that are not included

 2    on pages 1487 and 1488 besides you and Agent Chiappone?

 3              THE COURT:  Well, this is the Phoenix Police

 4    Department's report of the entry team.  It doesn't have

 5    anything to do with the people that searched; is that right?

 6              THE WITNESS:  That's correct, ma'am.  I'm sorry.

 7              THE COURT:  This is the entry.  And they secure the

 8    residence and then --

 9              THE WITNESS:  That's correct.

10              THE COURT:  -- and then the people to actually

11    execute the search warrant come in.

12              THE WITNESS:  That's correct, ma'am.

13              THE COURT:  And those are not Phoenix Police

14    Department people?

15              THE WITNESS:  That is correct.

16              MR. MAYNARD:  May I approach?

17              THE COURT:  Yes.

18    BY MR. MAYNARD:

19    Q   I'm going to show you what's been marked as Exhibit 94.

20    Have you seen this document before?

21    A   I have.

22    Q   Did you prepare the document?

23    A   I did not.

24    Q   Okay.  It lists you down at the bottom with Agent

25    Chiappone.  Do you see that?
```

```
 1    A    I do.

 2    Q    Did you review it as part of the preparation for this 302?

 3    A    I believe I did.  I don't recall, but --

 4    Q    Okay.  This 302 -- and I just want to clarify things.

 5              This is the one from the execution of the search

 6    warrant on July 20th of 2012 at the residence we have been

 7    talking about, correct?

 8    A    Yes.

 9    Q    All right.  And the date of transcription up in the corner

10    suggests that it was done on May 3rd of 2012.  That would be

11    inaccurate to you?

12    A    Yes.  That would be inaccurate to me.

13    Q    Okay.  And you saw this after it was prepared?

14    A    Yes.

15    Q    Okay.  And does it accurately list the people from the FBI

16    and the Joint Terrorism Task Force that helped in the

17    execution of this warrant?

18    A    Yes.

19    Q    What does TFO stand for?

20    A    TFO stands for Task Force Officer.  Those are nonagents

21    who were at the JTTF.

22    Q    So you are a TFO and Agent Chiappone was an FBI agent?

23    A    Yes.

24    Q    So there were seven FBI agents there and four Task Force

25    Officers?
```

1    A   Yes.

2            MR. MAYNARD:  Okay.  I would move for the admission

3    of Exhibit 94.

4            MR. KOEHLER:  No objection Your Honor.

5            And for the record, that's also the first two pages

6    of Government's Exhibit 13.

7            THE COURT:  But is 13 admitted?

8            MR. KOEHLER:  No, it's not.  We haven't gotten there

9    yet.

10           THE COURT:  Then 94 is admitted.

11           MR. KOEHLER:  Correct.  I just wanted to alert the

12   Court.

13       (Exhibit No. 94 admitted in evidence.)

14   BY MR. MAYNARD:

15   Q   Okay.  Now, turning to the second page of the document, on

16   the second paragraph it indicates that there was a safe

17   opened.  Do you see that?

18   A   I do.

19   Q   And there was a certain amount of money found in that

20   safe?

21   A   Yes.

22   Q   Was that part of this execution of this warrant also?

23   A   I believe it was not.

24   Q   What steps, if any, did you take at that time to see that

25   the people executing the warrant stayed within the bounds of

1    the warrant that you had requested from the judge?

2    A    After I had interviewed the occupants with Special Agent

3    John Chiappone, I entered the residence to, you know, be the

4    observer.

5    Q    Okay.  Did the occupants, when you were interviewing them,

6    tell you which bedrooms they lived in?

7    A    I don't recall that we got to that information.  It was --

8    our interview with Special Agent Chiappone and myself pretty

9    much focused on forgery and the computer correspondence.

10   Q    Well, weren't you primarily, in looking at forgery, want

11   to focus on the computer that belonged to the individual that

12   you thought had committed the forgery?

13   A    Yes.  But the warrant also included just any and all

14   electronic devices.

15   Q    I understand what the warrant said, but was your focus on

16   the forgery?

17   A    Yes.

18   Q    Okay.  Was the FBI looking beyond the forgery to see if

19   there was any terrorist activity here?

20   A    Not to my knowledge.

21   Q    They weren't going in and investigating this because they

22   thought there may be some terrorist activity?

23   A    I couldn't speak to their motives.  They did assist and,

24   you know, because it's a terrorism task force, you know, they

25   helped.

```
 1   Q    Okay.  Now, once the computers are taken into custody, the
 2   FBI obtained them or took them?
 3   A    Yes.
 4   Q    Okay.  Did you participate in the downloading of the
 5   information?
 6   A    I did not.
 7   Q    Once the information was downloaded, did you participate
 8   in searching what had been downloaded?
 9   A    Yes.
10   Q    And did you direct the FBI as to what you were looking for
11   for your investigation on alleged forgery?
12   A    To say "direct" might not be the best, but I did seek the
13   assistance of Intelligence Analyst Amy Vaughan to help me go
14   through those computers to find what I needed to establish
15   intent for the forgery charge.
16   Q    How long did it take you to go through those computers?
17   A    If I recall, I would say maybe four to six hours.
18   Q    Did you do it all in one day?
19   A    I don't believe we did.  It may have been over two days.
20   Q    Did you keep a memo or prepare a memo of what you were
21   doing while you were doing it?
22   A    I had a handwritten sheet of certain numbers and areas
23   where I found things that were pertinent to my investigation.
24   Q    All right.  Turn to a -- in Exhibit 12, the last -- next
25   to last page of Exhibit 12.  Unfortunately, I don't have a
```

CR15-00707-PHX-SRB      EVIDENTIARY HEARING      11-24-15

```
 1    Bates stamp number on it.
 2    A    1489.  Am I right?
 3    Q    Have you seen that document -- or strike that.
 4              Is that your handwriting?
 5    A    Yes, it is.
 6    Q    And when did you prepare that?
 7    A    I would have to go ahead and say that may have been early
 8    August, maybe late July.
 9    Q    Were you preparing it while you were doing or looking at
10    the contents of the computer?
11    A    Yes.
12    Q    Okay.  Can you tell me which computer you were looking at
13    when you did this particular -- made this note?
14    A    I'm afraid I don't recall.  I could look at my notes in my
15    report and see if it mentions it, but I don't recall.
16    Q    Is your report -- do you have a report that is separate
17    and apart from what is Exhibit 12?
18    A    No.  I don't.
19    Q    Well, is there something in Exhibit 12 that you could look
20    at that would tell me what you're looking at?
21    A    I can look and see if it's in there.  I don't recall if
22    it's in my report, so if I may, I'll have to take a look.
23              Okay.  After the report --
24    Q    Can you tell me what page you're looking at?
25    A    Oh, I'm sorry.  1448.
```

1    Q    Yes, sir.

2    A    I'm afraid it does not specify which computer I was

3    looking at.  You know, the computer that's referred to in

4    here, it doesn't identify which computer it was.

5    Q    Okay.  And 1448, this is a report that you prepared after

6    you had completed your search of the computers, correct?

7    A    Yes.

8    Q    This report doesn't indicate that you looked at any

9    computers other than those owned by Mr. Ahmed, correct?

10   A    Correct.

11   Q    Did you look at information on computers or electronic

12   devices owned by others than Mr. Ahmed?

13   A    I believe I looked at other computers.  I couldn't recall

14   who owned them, but I could say it was probably not him.  I

15   did look at other things.

16   Q    Did you look at them or did just the FBI look at them?

17   A    The FBI primarily looked at them, but I may have looked at

18   other computers as well, but after the fact.

19   Q    Was your focus on Mr. Ahmed's computer?

20   A    Yes, it was.

21   Q    Okay.  Is that handwritten page of your notes, are those

22   notes that you took when you looked at Mr. Ahmed's computer?

23   A    I believe so, yes.

24   Q    Did you take any notes when you looked at any of the other

25   computers or electronic devices?

1   A    I don't believe I did.

2   Q    So your focus was strictly on Mr. Ahmed's computer?

3   A    Yes.

4   Q    Okay.  And you prepared your recommendation to the

5   Maricopa County Sheriff's -- or Maricopa County Attorney's

6   Office for prosecution based on what you had reviewed?

7   A    Yes.

8   Q    Okay.  So to prepare that report pursuant to the warrant

9   that had been issued, it was only necessary for you to look at

10  Mr. Ahmed's computer?

11  A    Yes.

12          THE COURT:  How did you know which one was his when

13  you started looking through the electronic information?

14          THE WITNESS:  I believe the analysts who are a little

15  more expert at examining these computers had sort of

16  established through their look-through that some users were

17  more present on these computers than others and that may have

18  been how they did it.  I couldn't speak to exactly how they

19  figured it.

20          THE COURT:  But they figured it out rather than a

21  witness or someone who lived there telling you, "That's mine.

22  That's his"?

23          THE WITNESS:  Yeah.  I'm afraid I don't recall, Your

24  Honor, who had maybe singled out the computers.

25  BY MR. MAYNARD:

1    Q    Turn to page 13 -- or Exhibit 13.

2    A    Exhibit 13?

3              MR. MAYNARD:  Yes, sir.

4              THE COURT:  He doesn't have it.

5              MR. MAYNARD:  I'm sorry.  Can he have Exhibit 13?

6    BY MR. MAYNARD:

7    Q    Have you seen Exhibit 13, the second page -- I'm sorry --

8    the third page of it?

9    A    Yes.  I have seen this before.

10   Q    This is a separate 302 that was done as part of that

11   execution of the search warrant, correct?

12   A    Yes.

13   Q    And somebody at the FBI's office set out which computer

14   was found in which room, correct?

15   A    Yes.

16   Q    Okay.  And there were drawings made of the apartment as

17   they executed the search warrant?

18   A    Yes.

19   Q    Okay.  And they would say room A was a certain person's

20   bedroom or the kitchen, whatever it happened to be?

21             THE COURT:  I don't really think he has to remember

22   what the sketch said.

23             If you have the sketch, we can look at it.  Whether

24   the sketch identified who resided in what room, I don't think

25   is something he needs to have to remember if you have the

 1   sketch.

 2           MR. MAYNARD:  Judge, I've seen it and I don't --

 3           THE COURT:  Well, maybe you can find it after the

 4   break or during the break.

 5           THE WITNESS:  1453 and 54 in Exhibit 12.

 6           THE COURT:  Oh.  There's the sketch in evidence on

 7   Exhibit 12, Bates number 1453.

 8           MR. KOEHLER:  And 1454.

 9   BY MR. MAYNARD:

10   Q   All right.  Would you turn to page -- Exhibit 12, page

11   1453 and 1454.

12   A   Yes.  I'm already there, sir.

13   Q   Okay.  Is Exhibit 12 your file?

14   A   Exhibit 12?

15   Q   Yes.

16   A   For the most part it is, yes.

17   Q   Are there things that are contained in Exhibit 12 that

18   were not part of your file?

19   A   Not part of the ASU Police case for Forgery, the forgery

20   case, sir?

21           Yes.  There are things in here that are not in that

22   report.

23   Q   Okay.  They may not be in the report, but did you keep a

24   file on this case?

25   A   I did at the JTTF, yea.

1    Q   Did you turn your file over to the U.S. Attorney's Office

2    as part of this case?

3    A   Yes.

4    Q   Okay.  All right.  Let's look at 1453.

5            Do you know as part of your investigation who was

6    staying in the living room which was A?

7    A   I don't recall who stayed in that living room.

8    Q   Do you recall whether or not anybody asked who was living

9    there?

10   A   I believe someone did ask.  I couldn't recall the answer.

11   Q   Do you recall that in this particular place there were

12   bedrooms that were upstairs?

13   A   Yes.  I do recall hearing that there were bedrooms -- that

14   there were bedrooms upstairs.

15   Q   You did not go up to those?

16   A   I did not.

17   Q   And exhibit --

18           Or the second -- I think it's the third page of

19   Exhibit 13 tells us where each one of the electronic devices

20   or computers were found according to these drawings, correct?

21   A   Yes.

22   Q   And as part of your report, you prepared Exhibit 12, pages

23   1440?

24   A   Permit me one moment to get there.

25           1440?  Yes, sir.

1    Q    And would that go all the way through 1450?  Is that your

2    report?

3    A    For the most part, as I said, 1449 and 50 were prepared by

4    Phoenix Police, but for lack of a better term, I did the

5    cut-and-paste job and added it to my report, yes.

6    Q    You just attached it to the report that you had prepared?

7    A    Yes.

8    Q    All right.  And then you also prepared a report to be

9    given to the Maricopa County Attorney's Office for

10   prosecution.  Was it other than this report or was it this

11   report?

12   A    Well, there are some other -- there were additional

13   documents submitted, very similar language used in both.  It's

14   just that they have their own forms and then we have --

15         Again, it's a -- we do it for all of our submissions.

16   There's a release questionnaire.  There's some Probable Cause

17   Statements and some other, you know -- other paperwork that

18   has to be submitted.  And this report may have been part of

19   it, but I think maybe it was just the additional paperwork.

20   Q    And then when they declined prosecution, did you close

21   your file at that point?

22   A    Yes, I did.

23   Q    So that was the end of this?

24   A    For the Forgery charge, yes, that case had come to a

25   close.

1   Q    Now, after this execution of the warrant and you had

2   submitted it for prosecution, did you have other occasions to

3   talk to Mr. Ahmed?

4   A    I was present when he was approached but at another time.

5   But I didn't have cause to talk to him about the Forgery

6   charge but there were other times in the future that I did

7   talk to him.

8   Q    Do you recall any telephone conversations with him?

9   A    Yes.

10   Q    Do you recall him asking you why the FBI was involved in

11   this search warrant and execution?

12   A    I believe the question from -- may have come from him.

13        Again, I couldn't recall because this is three years

14   ago, but I do believe he probably asked me how, you know, an

15   ASU case turned into having an involvement with the FBI.

16   Q    And did you tell him that the FBI had nothing to do with

17   the Forgery because the Forgery was a state charge and not a

18   federal charge?

19   A    Yes.

20   Q    Was that true?

21   A    Yes, that it was a state charge.  It's an Arizona Revised

22   Statute.

23        MR. MAYNARD:  Just a second, Judge.

24   BY MR. MAYNARD:

25   Q    Prior to the search warrant being executed, you had been

1   told by an FBI agent who had -- that he had met with

2   Mr. Ahmed, correct?

3   A   Yes.

4   Q   Hadn't that FBI agent also described for you Mr. Ahmed's

5   computer?

6   A   By "described," I'm not sure what you mean.

7   Q   Told you what kind of computer it was?

8   A   I don't recall that he told me what kind of computer it

9   was.

10          MR. MAYNARD:  Okay.  Judge, can we take a break?

11          THE COURT:  Yes.  Ten minutes.

12          We will reconvene at quarter to eleven.

13          Court is in recess.

14      (Recess taken at 10:35 a.m.; resumed at 10:49 a.m.)

15          THE COURT:  Thank you.  Please sit down.  The record

16   will show the presence of counsel and the defendant.

17          You may continue, Mr. Maynard.

18   BY MR. MAYNARD:

19   Q   Looking at Exhibit 12 and turning to your Probable Cause

20   Statement -- or rather page 1462, this is the Probable Cause

21   Statement that you prepared, correct?

22   A   Yes.

23   Q   All right.  And looking at the second full paragraph, it

24   states:

25          Mr. Ahmed had previously been interviewed back in

1    2011.

2              Do you see that?

3    A   Yes, I do.

4    Q   And that the investigator who did the interview described

5    a laptop computer in Mr. Ahmed's living space and he had

6    acknowledged that that was his.

7              Do you see that?

8    A   Yes.  I do see that.

9    Q   And you were aware of that then at the time that you were

10   preparing this affidavit for the search warrant?

11   A   Yes.  I'm afraid I misspoke earlier.  I needed to refresh

12   my memory and take a look during the break.  And, yea, I do

13   recall that that computer was pointed out.

14   Q   And so at least prior to the execution of it, you had some

15   idea of what his computer looked like, correct?

16   A   Well, I knew it was a laptop, yes.  So to the degree I

17   knew it was a laptop as opposed to a brand, yes.

18   Q   And as the investigation was being conducted, you became

19   aware as the FBI was downloading things and looking at it,

20   which laptop appeared to belong to which individual?

21   A   I don't recall knowing.

22             THE COURT:  No.  After -- he asked you about after

23   they were seized and the FBI looked at them, information the

24   FBI found on the computers caused them to give -- to be fairly

25   confident as to whose -- who belonged to which computer.

1            THE WITNESS:  Yea.  Upon looking at them, I was able

2   to maybe narrow down the more likely owner of the respective

3   computers.

4   BY MR. MAYNARD:

5   Q   And, again, on the next to the last page of Exhibit 12,

6   that's your notes that you took as you were looking at what

7   came out of Mr. Ahmed's computer?

8   A   Yes.

9   Q   And then the last page of Exhibit 12, are those your

10  notes?

11  A   Yes.

12  Q   And these are notes that you took on May 28th?

13  A   Yes.

14  Q   Okay.  Do you recall, had you already finished looking at

15  the contents of the computer --

16            Well, this would be May 28th of 2013, correct?

17  A   Yes.

18  Q   This is after the Maricopa County's -- has turned down

19  prosecution?

20  A   Yes.

21  Q   And you have closed your file?

22  A   Yes.  The forgery case was closed.

23            MR. MAYNARD:  Okay.  I don't have any further

24  questions, Your Honor.

25            THE COURT:  Any questions on redirect, Mr. Koehler?

1    MR. KOEHLER:  Yes, Your Honor.

2                    **REDIRECT EXAMINATION**

3    BY MR. KOEHLER:

4    Q    At the time that you closed the ASU PD file, were you

5    aware of whether the FBI still had an investigation open into

6    Mr. Ahmed?

7    A    Yes.

8    Q    And was there one open or no?

9    A    At the time I closed the case, there had been one that was

10   opened, yes.

11   Q    So at that point in time the FBI did, in fact, have a case

12   already open?

13   A    Yes.

14   Q    Okay.  So on that last page of Exhibit 12 that Mr. Maynard

15   was referring to, you have a to-do list there that's dated

16   May 28, 2013?

17   A    Yes.

18   Q    Would that have related to the ASU PD case or to the FBI

19   case at that point?

20   A    That would have been related to the FBI case.

21   Q    All right.  You mentioned in your search warrant

22   affidavit -- correct me if I'm wrong -- that you wanted to

23   search for electronic devices; is that correct?

24   A    Yes.

25   Q    Was there a purpose in noting the existence of a laptop

1    that had previously been seen in Mr. Abubakar Ahmed's

2    residence?

3    A    Yes.

4    Q    And what was the purpose of mentioning the existence of a

5    laptop there?

6    A    The purpose would have been that maybe that was the

7    more -- that was the one to look for and that there may have

8    been a history or maybe there's going to be at least one

9    laptop to look for.

10   Q    And, again, how was this offense perpetrated in terms of

11   the communications in the case in your view at the time that

12   you were swearing out the warrant?

13   A    The electronic correspondence, through e-mail.

14   Q    To your knowledge is ASU's General Counsel Office involved

15   in any way in criminal investigation and prosecution?

16   A    No.

17   Q    How did you get the language from the template that you

18   received into your affidavit?

19        THE COURT:  He said he got it by e-mail.

20        MR. KOEHLER:  Correct.  I'm asking specifically the

21   mechanism you used to transfer the language from the template

22   to your affidavit.

23        THE COURT:  You mean did he cut-and-paste or did he

24   type?

25        MR. KOEHLER:  Correct.

1              THE WITNESS:  It was a cut-and-paste job and typed as
2    I had to sort of customize it to the particular case.  I
3    couldn't use the warrant that was the -- the language that was
4    sent because it had been a different case.
5              So I just had to, you know, change the names and
6    dates and things like that.
7    Q    So did you copy and paste and then edit it?  Is that what
8    you're saying?
9    A    Yes.  That's exactly right.
10   Q    Did you know what the subject matter was of the open
11   investigation that the FBI had going at that point?
12   A    I'm sorry.  What point?  I did eventually.
13   Q    Okay.  At the time that you closed your file, you stated
14   already that you knew the FBI had an investigation open,
15   correct?
16   A    Yes.
17   Q    Do you know what the subject matters of that investigation
18   was?
19   A    Yea.  Those was terrorism investigations.
20   Q    Okay.  And did it also relate to the forgery charge as
21   well?
22   A    Not that I recall.  I don't think I recall the forgery
23   involved in that.
24              MR. KOEHLER:  Okay.  Very well.  Thank you.  No
25   further questions.

CR15-00707-PHX-SRB     EVIDENTIARY HEARING     11-24-15

```
 1              THE COURT:  May Detective Herrmann be excused,
 2    Mr. Koehler?
 3              MR. KOEHLER:  Yes, Your Honor.
 4              THE COURT:  Is there any objection?
 5              MR. MAYNARD:  No, Your Honor.
 6              THE COURT:  Thank you very much, sir.  You may step
 7    down and you are excused and released from any subpoena.
 8              Please call your next witness.
 9              MS. BROOK:  Thank you, Your Honor.  The government
10    calls Special Agent Stewart Whitson.
11        (Witness duly sworn.)
12              THE CLERK:  Please state your name for the record,
13    spelling your first and last name.
14              THE WITNESS:  Stewart Whitson.  S-T-E-W-A-R-T.  Last
15    name W-H-I-T-S-O-N.
16              THE COURT:  Good morning.  You may proceed,
17    Ms. Brook.
18              MS. BROOK:  Thank you, Your Honor.
19            SPECIAL AGENT STEWART WHITSON, WITNESS, SWORN
20                        DIRECT EXAMINATION
21    BY MS. BROOK:
22    Q   Good morning.
23    A   Good morning.
24    Q   Would you please introduce yourself to the Court.
25    A   I'm Special Agent Stewart Whitson.  I'm a special agent
```

1  with the FBI.

2  Q    And how long have you been a special agent with the FBI?

3  A    For four years.

4  Q    When was it that you became the case agent on the Abdul

5  Malik Abdul Kareem case?

6  A    On or about May 8th of 2015.

7  Q    Prior to May 8th of 2015 and you talked about you have

8  been in the FBI for four years, have you been assigned here in

9  the Phoenix Division?

10  A    Yes.

11  Q    As it relates to Abdul Malik Abdul Kareem, did you know

12  him prior to May 5th of 2015?

13  A    No.

14  Q    And are you aware of a case that the FBI here in Phoenix

15  had against Elton Simpson?

16  A    Yes.

17  Q    Historically, prior to May 5th of 2015, were you involved

18  at all in that case with the investigation?

19  A    No.

20  Q    Were you involved at all in the forgery investigation

21  against Ahmed Hussein Abubakar?

22  A    No.

23  Q    And back in 2012, were you involved at all in the search

24  warrant, the search warrant that was executed at 2419 West

25  Vista Avenue in 2012?

1    A    No.

2    Q    Were you involved at all in processing the results or

3    analyzing the results of that particular search warrant?

4    A    No.

5    Q    So turning our attention to May 5th of 2015, Abdul Kareem,

6    was he suspect in the Garland, Texas, attempted mass murder on

7    May 3rd?

8    A    No.

9    Q    On May 5th of 2015, did you interview Abdul Malik Abdul

10   Kareem at the FBI?

11   A    Yes.

12   Q    How was it that you became involved in that interview?

13   A    I was asked by my supervisor to assist Detective Nash in

14   the interview of Abdul Kareem.

15   Q    And other than you and Detective Nash, were there any

16   other agents involved in that interview that day?

17   A    No.

18   Q    Did you set up the interview in terms of picking the room

19   that it was to occur in?

20   A    Yes.  Yes.

21   Q    How was it that you were involved in the setup of that

22   interview on May 5th?

23   A    It was -- initially, I had requested a booking room to

24   conduct the interview which is located in a different part of

25   the building.

1          I learned that that room was unavailable, so I then

2    found another location which was a separate interview room

3    located towards the front of the building, I guess.

4    Q   Why was it that you requested a booking room to conduct

5    the interview that day?

6    A   Because the booking room is already wired for video and

7    audio and so our intent was to record the interview.

8    Q   So after you learned that the booking room that day was

9    already booked, who did you speak to about arranging to -- a

10   room in which to interview?

11   A   I spoke to Special Agent Brian Taylor.

12   Q   And to your knowledge, is he also a technically-trained

13   special agent?

14   A   Yes.

15   Q   And was he acting in that capacity when you were working

16   with him that day?

17   A   Yes.

18   Q   So you reached out to Special Agent Brian Taylor and did

19   he suggest any rooms --

20          Well, how was it that a room was decided upon that

21   day to interview Kareem?

22   A   When I -- first I contacted Mr. Taylor and asked him for a

23   recording device to use and then I would later figure out the

24   location where to use that device.

25          He informed me that he already had a room that was

1    wired for audio and video for an interview that was scheduled

2    later in the day.

3           I then searched and made sure that room was going to

4    be available at the time when I understood Mr. Kareem was

5    going to arrive at our office.  And when I found out it was,

6    then we coordinated to do our interview there where we already

7    had the equipment set up.

8    Q    Did Special Agent Taylor talk to you at all about the

9    recording device that was going to be used in that room he

10   suggested that day?

11   A    Yes.

12   Q    And do you usually make it a priority to record interviews

13   that you are conducting in your professional capacity?

14   A    It depends.  So -- it depends where the interview is going

15   to take place, with whom, obviously, safety considerations,

16   and things like that.

17          But generally my practice is whenever I can and

18   whether it's safe, I try to record the interview.

19   Q    For this interview on the 5th of Abdul Malik Abdul Kareem

20   was it a priority for you to record the interview?

21   A    Yes.

22   Q    And when you discussed with Special Agent Taylor the

23   recording capacity or the recording equipment, what did you

24   decide about the recording setup that he had suggested?

25   A    I decided that it would work.

1   Q    You had mentioned that it was already set up?

2   A    Yes.

3   Q    So that morning -- or I guess prior in time to the

4   interview that day -- did you work with Special Agent Taylor

5   to check out the equipment in the room?

6   A    Yes.

7   Q    What did you do?

8   A    Approximately 20 minutes before the interview took place,

9   I met with him in the room.  He explained to me a general

10  overview of how the equipment would work.  He then -- we then

11  kind of came up with a plan for how we would operate it.

12       And then he showed me how to turn off the device once

13  we were done and that he would handle turning on the device

14  before it started.

15       The only other thing we did too is we did a couple

16  tests.  So he had me come into the room where we would be

17  conducting the interview.  I sat -- I showed him where I

18  expected Mr. Kareem to sit and where I expected myself and

19  Detective Nash to sit.  And then he had me sit down and looked

20  and viewed to make sure that we weren't going to obstruct the

21  view of Mr. Kareem during the interview.

22       And so we did those tests, he made sure it was

23  working, and then moved on.

24  Q    So the recording device that was set up in the room, was

25  it a covert recording device?

1   A   Yes.

2   Q   And did it, to your knowledge, have both audio and video

3   capability?

4   A   Yes.

5   Q   Did you personally test the equipment before the

6   interview?

7   A   No.

8   Q   Who was it that tested the equipment to your knowledge?

9   A   Special Agent Taylor.

10  Q   And did -- was he there when -- were you there when he did

11  that?

12  A   Yes.

13  Q   Was that at the same time that you talked to Special Agent

14  Taylor about where the angle should be with the camera?

15  A   Yes.

16  Q   And you had mentioned that there was a focus of the angle

17  of the camera.  What was the focus to be?

18  A   The focus would include both Detective Nash and I, kind of

19  our side profiles with Mr. Kareem in the center of the

20  picture.

21  Q   Just for clarification, were you involved at all in the

22  technical setup of the recording device or the receiving

23  device?

24  A   No.

25  Q   On that day did you personally press "Record" to start the

1    recording device?

2    A    No.

3    Q    To your knowledge who did?

4    A    Special Agent Taylor.

5    Q    And how do you know that?

6    A    We -- when I was ready for him to turn the device on, I

7    stood outside the room which was adjacent to the room we were

8    going to interview in and I gave him a thumbs up.

9            And then his signal that we decided before was that

10   he would give me a thumbs up once the audio and video was

11   recording.  And then I would know at that point that I could

12   then go out and get Mr. Kareem.

13   Q    You had mentioned previously that you and Special Agent

14   Taylor had arrived at a plan for how to start the equipment.

15           Was that the plan that you had discussed?

16   A    Yes.

17   Q    And you had also mentioned that you gave him the thumbs up

18   as you were -- was it walking by the room he was in?

19   A    Yes.  I actually stopped briefly in the doorway to the

20   room he was in and then gave him a thumbs up and waited for

21   his reply, I guess.

22   Q    And just for clarification, the room he was in, what room

23   was that?

24   A    It was another interview room nextdoor to the interview

25   room where we interviewed Mr. Kareem.

1    Q    And to your knowledge, what was inside of that particular

2    room?

3    A    That's where the actual -- there was a monitor and the

4    main components of the device were inside that room and that's

5    where -- so someone could observe what was being recorded in

6    the next room were they to sit in that room and watch it.

7    Q    Was that the same room you had previously been in that day

8    with Special Agent Taylor conducting the test that you had

9    spoken about?

10   A    Yes, but we -- our tests -- I was actually in the other

11   room where the interview was going to take place and then he

12   would go into the room where the monitor was and confirm,

13   "Yes, I can hear you.  Yes, I can see you."

14        And kind of he would come to the door and talk to me

15   and say, "Yeah, you look good.  Move your chair this way,"

16   that kind of thing, to get everything lined up.

17   Q    What did you do after you gave him the thumbs up?

18   A    I then opened the door that leads out to the main lobby of

19   the FBI and greeted Detective Nash and Mr. Kareem as they came

20   into the area.

21   Q    And you spoke about Mr. Kareem here with us in the

22   courtroom today.  Do you recognize him?

23   A    Yes.

24   Q    Can you point to him and identify something that he's

25   wearing?

1   A    Yes.  He is the gentleman over there in the middle of the

2   table wearing gray, light gray and dark gray shirt.

3        MS. BROOK:  Your Honor, may the record reflect that

4   the Agent has identified the defendant?

5        THE COURT:  Yes.

6   BY MS. BROOK:

7   Q    To your knowledge, how did the defendant arrive at the FBI

8   that day for the interview?

9   A    He drove himself in his vehicle.

10  Q    And you mentioned he drove himself to the FBI.  Was he

11  ordered to be at the FBI?

12  A    No.

13  Q    How was it that he was brought back from the lobby into

14  the room where you were to do the interview?

15  A    Detective Nash, as I was coordinating with Special Agent

16  Taylor, walked out and kind of greeted him and said hello and

17  then asked him, you know, come back, follow me, that kind of

18  thing and then I was there to greet them as they were coming

19  into that door.

20  Q    And after he was greeted and you were standing in the

21  doorway, what happened next?

22  A    We then brought him into the room and then asked him to

23  have a seat in the chair and then proceeded with the

24  interview.

25  Q    Again, you talked briefly about positioning.

1      So inside the interview there on May 5th, as you have

2    discussed, was it just Detective Nash, yourself, and the

3    defendant?

4    A   Yes.

5    Q   Where was the defendant situated in that room in relation

6    to the door?

7    A   The defendant was closer to the door and then there was a

8    table between Detective Nash and me and the defendant.

9          And so then we were seated with our backs, obviously,

10   to the far wall.

11   Q   And that door itself, is that the door that lead to the

12   hallway to the lobby?

13   A   Yes.

14   Q   Was that door locked or unlocked?

15   A   Unlocked.

16   Q   And during the interview, did you explain to the defendant

17   that the interview itself was voluntary?

18   A   Yes.

19   Q   What exactly did you say?

20   A   I started off with:

21         First of all, I just want to thank you for coming

22   here today, because obviously, this is voluntary.  You are

23   doing us a huge favor by coming to our office, so thank you.

24         And kind of like that.

25   Q   Did you explain at all that he is free to leave?

1   A   Yes.

2   Q   And those statements that you make in regards to a

3   voluntary interview, are you trained on how to say those

4   things at the FBI?

5   A   Yes.

6   Q   Is that regularly part of a colloquy or a statement that

7   you might give an individual who you are interviewing in a

8   voluntary setting?

9   A   Yes.

10  Q   Approximately, to your recollection, how long was the

11  interview?

12  A   Just under two hours.

13  Q   And at any point during the interview did you leave the

14  interview room?

15  A   No.

16  Q   At any point did Detective Nash leave the interview room?

17  A   No.

18  Q   And at any point did the defendant leave the interview

19  room?

20  A   No.

21  Q   I want to talk about the defendant's appearance during the

22  interview itself.

23        Approximately, how far away from him were you?

24  A   Approximately, two-and-a-half feet.

25  Q   And was that during the entire length of the interview?

1    A    Yes.

2    Q    The lighting inside the interview room, was it bright

3    enough to be able to see him clearly?

4    A    Yes.

5    Q    And during the interview, at any point did you see Kareem

6    physically sweating?

7    A    No.

8    Q    Did you see the defendant shaking?

9    A    No.

10   Q    During the interview as you were asking questions and he

11   was responding, did his answers track the questions that you

12   asked?

13   A    Yes.

14   Q    And did he appear lucid?

15   A    Yes.

16   Q    Did he appear at all short of breath?

17   A    No.

18   Q    Did he exhibit any confusion?

19   A    No.

20   Q    I want to take a step away for a moment.

21         In June -- so on June 10th of this year, did you also

22   have occasion to interview the defendant?

23   A    Yes.

24   Q    And you have before you Exhibit 8.  Can you look at that

25   exhibit?

1    A    Thank you.

2    Q    And, you know, I apologize.  It's actually Exhibit 7.

3         This report, is it a report authored by you in

4    conjunction with a few other agents?

5    A    Yes.

6    Q    And was it related to occurrences on the day of June 10th

7    of 2015?

8    A    Yes.

9         Could I have one moment to --

10   Q    Yes.

11   A    Okay.

12   Q    On that day on June 10th of this year, did you interview

13   the defendant for approximately two hours?

14   A    Yes.

15   Q    And was that roughly between 2:30 and 4:30 in the

16   afternoon?

17   A    Yes.

18   Q    And at five o'clock in the evening, did the defendant

19   express that he wasn't feeling well?

20   A    May I look at the notes again?

21   Q    I'm going to turn your attention to page 2 of that report,

22   the second to the last paragraph.

23   A    Yes.

24   Q    And at that point at five o'clock were the medics called?

25   A    Yes.

CR15-00707-PHX-SRB     EVIDENTIARY HEARING     11-24-15

1   Q    Going back in time, back to May 5th of this year, during

2   the interview that you had with Malik at the FBI, at any point

3   did the defendant state to you that he wasn't feeling well?

4   A    No.

5   Q    And at any point did he look to you as if he wasn't

6   feeling well during the interview?

7   A    No.

8   Q    On that day on May 5th of this year, were you aware that

9   Hakeem Sampson, the defendant's nephew, was also being

10  interviewed at the FBI?

11  A    Yes.

12  Q    And was that happening at approximately the same time as

13  the defendant was being interviewed?

14  A    Yes.

15  Q    You yourself, were you conducting the interview of Hakeem

16  Sampson?

17  A    No.

18  Q    Was that happening by other agents in another part of the

19  FBI?

20  A    Yes.

21  Q    Are you aware of whether or not they -- "they" being the

22  defendant and Hakeem Sampson -- arrived together to the FBI?

23  A    I don't know for sure.

24  Q    And are you aware of whether or not they left together

25  from the FBI?

1    A   I don't know.

2    Q   We have talked about how you gave the thumbs up to Special

3    Agent Taylor for the recording equipment to start prior to the

4    interview.

5            After the interview was over, how was the recording

6    equipment, according to the plan you have with Special Agent

7    Taylor, how was it to be stopped?

8    A   Special Agent Taylor had showed me a button that I was to

9    push.  It was one single button.  You push it and everything

10   would stop and then an SD card would come out.

11           So that was the plan is that I was supposed to go in

12   there and push that button when we were done.

13   Q   And I think you have before you Exhibit No. 3.  If you

14   could pull that out and look at it.

15           And, Your Honor, Exhibit No. 3 has been admitted.

16   May I place it on the overhead?

17           THE COURT:  Yes.

18   BY MS. BROOK:

19   Q   And you might also have on the screen next to you as well

20   a blow-up copy of Exhibit No. 3.

21           You had mentioned a "Stop" button that you were to

22   press.  After the interview was completed, did you go in and

23   press that button?

24   A   I can't remember.  I can't remember if I pushed it or if

25   it was Detective Nash, but one of us pushed that button.

1  Q   So after the completion of the interview, was it a

2  priority for you to end the recording and to stop the

3  recording?

4  A   Yes.

5  Q   Why is that?

6  A   Because, obviously, it was continuing to record.  Other

7  people could walk into the area and be recorded.  Things like

8  that.  And so, obviously, I wanted -- would want to get it

9  stopped as soon as the interview was over.

10  Q   So did you and Detective Nash go in to stop the equipment

11  at a time close in time to the end of the interview?

12  A   Yes.

13  Q   By that point had the defendant already been escorted out

14  of that hallway that you had mentioned and out of either the

15  property or out of the lobby?

16  A   Yes.

17  Q   And were you with Detective Nash when the equipment was

18  stopped?

19  A   I don't know.

20  Q   Do you remember pushing a button with Detective Nash near

21  you?

22  A   I don't remember who pushed the button, but I remember

23  Detective Nash being over my shoulder as we were kind of

24  talking together about ending the recording and I remember him

25  taking the card.

1  Q   And before that particular moment when you two were

2  together in front of the equipment, do you remember being near

3  the equipment or stopping or trying to stop the equipment?

4  A   No.

5  Q   So this was the time that you came back in to stop the

6  equipment?

7  A   Yes.

8  Q   And to the best of your recollection, you're not sure who

9  pressed the button?

10  A   Yes.

11  Q   Do you know if the button was pushed?

12  A   Yes.

13  Q   And the button was what button?  What button are we

14  talking about?

15  A   There was, I guess, an "Off" button or an "Off" or an

16  "Eject" button that was pushed because the card eventually

17  came out and we took it.

18  Q   And how is it that you knew to press that button?

19  A   That was the instructions that were given to me by Special

20  Agent Taylor.

21  Q   And were those the instructions that Special Agent Taylor

22  had given you that day in relation to this equipment?

23  A   Yes.

24  Q   Prior to that day with this equipment, have you used

25  covert recording devices that utilize an SD card?

1   A   No.

2   Q   And since that day, have you had occasion to use covert

3   equipment that uses the SD card?

4   A   No.

5   Q   And when the button itself was pushed, you were with

6   Detective Nash?

7   A   Yes.

8   Q   After the button was pushed, did you and Detective Nash --

9        Well, I guess what happened next?

10  A   The card came out and Detective Nash took it.  We had a

11  brief discussion.  I had somewhere I had to go to, so I asked

12  him if he would take it to ELSUR and that I would then head to

13  wherever I had to go.

14  Q   What is ELSUR?

15  A   It's the electronic surveillance group.

16  Q   So was it Detective Nash who had the responsibility in

17  your mind to take the card to ELSUR?

18  A   Yes.

19  Q   After the interview was completed, when was it you learned

20  that there was a problem with the SD card?

21  A   At 4:23 p.m. Detective Nash let me know that the

22  recording -- he thought the recording might have failed.  So

23  it was that same day on 5/5 at 4:23 p.m.

24  Q   So he let you know and how is it that he let you know?

25  A   Via e-mail.

 1   Q   And what happened next in relation to the SD card to your

 2   knowledge?

 3   A   So he brought -- had brought the SD card to ELSUR who took

 4   custody of it, searched it, and whatever.

 5           And then they retained it, held onto it.

 6           Special Agent Taylor was notified by the individual

 7   who runs ELSUR that there had been a failure of the -- on the

 8   recording device or a possible failure and he offered to take

 9   a look at it to confirm that that had happened.

10   Q   And in looking before you at Exhibit 7, if you can turn to

11   page 1425 -- I'm sorry.  Exhibit 4, page 1425.

12           Do you recognize that report?

13   A   Yes.

14   Q   And is that an FBI report an FD 1087 report that's

15   generated from the folks involved with ELSUR, in particular

16   Serena Martinez, in regards to the test of the equipment on

17   May 5th and the fact that the SD card recorded the test but

18   did not download and record the interview?

19   A   Yes.

20   Q   And was that a report that was generated on May 8th?

21   A   Yes.

22   Q   After you learned that the SD card didn't record, did you

23   generate a report in this case?

24   A   Yes.

25   Q   And is it common practice, based upon your training and

1  experience, not only training at Quantico, but experience in

2  the field, to generate reports, 302s, in conjunction with

3  interviews?

4  A    Yes.

5  Q    In this case did you make it a priority to generate that

6  report close in time to the time of the interview?

7  A    Yes.

8  Q    Looking before you at Exhibit No. 1, do you recognize

9  that?

10  A    Yes.

11  Q    And what is it?

12  A    This is the FD 302 that I drafted documenting that

13  interview on May 5th of Mr. Kareem.

14  Q    And your 302 report, is it four pages in length?

15  A    Yes.

16  Q    And was it drafted and produced on May 6th of 2015?

17  A    Yes.

18  Q    So approximately within 24 hours of the time of the

19  interview?

20  A    Yes.

21  Q    And when you did your report, did you rely upon anything

22  in generating it?

23  A    I relied upon handwritten notes and my memory and the

24  memory of Detective Nash.

25  Q    And is that how you're trained to generate reports?

1    A    Yes.

2    Q    Is that part of standard training both at Quantico and

3    practice in the field?

4    A    Yes.

5    Q    And looking at Exhibit 2 which is before you, do you

6    recognize what is Exhibit No. 2?

7    A    Yes.

8    Q    What is it?

9    A    These are the original notes taken during the interview of

10   Mr. Kareem on 5/5/2015 by myself and Detective Nash.

11   Q    And all together, are those five pages of handwritten

12   notes that were taken simultaneously during the interview

13   itself?

14   A    Yes.

15   Q    In this case are you aware of any other situations, any

16   other interviews where recording equipment malfunctioned?

17   A    Yes.

18   Q    What are those situations?

19   A    I know that during recording attempts by Mr. Verdugo there

20   were failures.  I know during an interview of Sergio

21   Martinez-Chavez there was failure of equipment.  And I know --

22   Q    And --

23   A    Sorry.

24        And I know of other ones too where there has been

25   partial failures where the screen has frozen and some data has

 1   been lost and then the recording will resume on two other

 2   interviews of two juveniles.

 3   Q   And those two juveniles where the screen froze and the

 4   recording equipment didn't capture everything, that was

 5   obviously in relation to this case?

 6   A   Yes.

 7   Q   And were those interviews that were conducted at the FBI?

 8   A   Yes.

 9   Q   In looking at -- well, let's go back to Exhibit 1 for a

10   moment.

11        Did you note that the recording equipment in Exhibit

12   1, did you note that it malfunctioned or that it didn't

13   capture the recording?

14   A   No.

15   Q   And do you know why?

16   A   I don't.

17   Q   Typically, if there is a recording that exists that is of

18   the same interview as what you're generating a report, a 302,

19   would that information go into the first paragraph of your

20   report?

21   A   Yes.

22   Q   And in the first paragraph of your report is that here?

23   A   No.

24   Q   On September 9th of 2015, did you talk to Sergio Martinez

25   on the phone?

```
 1    A    Could you repeat that date?

 2    Q    Sure.  On September 9th of 2015?

 3    A    Yes.

 4    Q    And during that call did you learn of a piece of evidence

 5    that you wanted to follow up on?

 6    A    Yes.

 7    Q    What did you learn of?

 8    A    I learned that Mr. Sergio -- or Martinez-Chavez had been

 9    given a Lenovo laptop that had belonged to Mr. Kareem in the

10    past and that he still had that in his possession.

11    Q    And when you learned that Mr. Martinez had that Lenovo

12    laptop given to him by Abdul Malik Abdul Kareem, was that of

13    investigative value to you?

14    A    Yes.

15    Q    Why?

16    A    Because it could contain evidence of the crime we were

17    investigating, as well as others.

18    Q    In this case when there was electronic media that Abdul

19    Malik Abdul Kareem had access to prior to May 3rd prior to the

20    attempted murder in Garland, Texas, were those pieces of media

21    or those devices important in your investigation?

22    A    Yes.

23    Q    Why?

24    A    Because they showed his -- a pattern of his beliefs in

25    support of what was eventually carried out on May 3rd, 2015.
```

1          And so -- and not just the beliefs in favor of that,

2   but also documents that show a tendency toward that.

3   Q    Dovetailing on what we had discussed a moment ago, would

4   you have viewed the Lenovo laptop with the same interest that

5   you had those other media devices?

6   A    I'm sorry.  Could you ask that again?

7   Q    Right.  So did you view the Lenovo laptop that Sergio had

8   reported that he had that he had been given from the

9   defendant -- did you view that with an investigative interest

10  in this particular case?

11  A    Yes.

12  Q    And as such, what did you do?

13  A    So I requested consent from him to be able to search it --

14          Well, first confirmed that it was the same Lenovo

15  based on the serial number, so I had him search on the

16  computer and confirm that that was the same one.

17          And then asked him about the background to make sure,

18  you know, that it really was Mr. Kareem's.  And then asked my

19  partner Special Agent Calbone to go get consent, written

20  consent from Mr. Martinez-Chavez for us to take that laptop

21  and to search it.

22  Q    And, again, why was it that you wanted to search that

23  laptop?

24  A    To see if there was evidence of the crime that we were

25  investigating on that laptop.

1  Q   On the phone when you talked to Sergio Martinez, did he

2  give you verbal consent?

3  A   Yes.

4  Q   And are you aware of whether or not the FBI, in fact, did

5  seize pursuant to a consent search that computer in September

6  of this year from Mr. Martinez?

7  A   Yes.

8  Q   And did they?

9  A   Yes, they did.

10         MS. BROOK:  I don't have any other questions.

11         THE COURT:  Mr. Maynard, you may proceed.

12         MR. MAYNARD:  Thank you, Your Honor.

13                         **CROSS EXAMINATION**

14  BY MR. MAYNARD:

15  Q   So you believe that Agent Taylor is the one who turned on

16  the recording device?

17  A   Yes.

18  Q   Okay.  And is it your testimony that right before you,

19  Mr. Nash, and Mr. Abdul Kareem went into the room, you gave a

20  thumbs up to Agent Taylor and he was in the room and he's the

21  one who turned on the recording device?

22  A   Yes.

23  Q   Okay.  So if he didn't turn it on, then no one turned it

24  on as far as you know?

25  A   Yes.

1   Q    Okay.  And when the interview was completed, you can't

2   remember whether you or agent -- or Detective Nash actually

3   turned off the recording device?

4   A    Yes.

5   Q    Is that correct?

6   A    Yes.

7   Q    Okay.  Do you have any recollection of after the interview

8   walking into the room where the recording device was or --

9   strike that.

10        There was a monitor in that room so that one could

11  view what was going on in the interview room, correct?

12  A    Yes.

13  Q    And prior to the interview, had you viewed the monitor to

14  see what was going on?

15  A    Yes.

16  Q    So you were aware at least during the test period that it

17  was functioning?

18  A    When I viewed the monitor it wasn't during the test period

19  because I was in the interview room.  But before we started

20  the test period, I viewed the monitor; kind of looked around

21  and saw what the screen looked like.

22  Q    I know this may be a little monotonous, but I want to walk

23  you through it briefly.

24        You have a test period where you go into the

25  interview room and you sit and Agent Taylor goes in there to

1    set up the equipment, correct?

2    A    Yes.

3    Q    In fact, the equipment was actually set up for an

4    interview that was going to be done either later that day or

5    the next day by Agent Taylor?

6    A    Yes.

7    Q    Okay.  And part of the reason that you're sitting in the

8    interview room is so that they can focus the device so that it

9    is going to be on the person who is going to be interviewed?

10   A    Yes.

11   Q    Okay.  After that is all done, is that when you go and

12   look into the room to see what's on the monitor?

13   A    Before and after I had gone in and looked in there.

14        Because before we started the testing, I kind of

15   walked in and taken a quick glance.

16        And then after he had done the testing, I walked in

17   there and kind of taken a quick glance.

18   Q    And is it your recollection that it continued to stay on

19   or did he turn it off until someone was going to go into the

20   interview room?

21   A    So view of the monitor, you couldn't tell if it was

22   running but you could see the image even if it wasn't running.

23   So the image I saw was an empty room with empty chairs.  And

24   that's the same image I saw when I came back because I was no

25   longer in the room to view it.

```
1    Q   Did you ever see an image on the monitor of you?

2    A   No.

3    Q   Now, when Mr. -- on this May 5th interview, is it your

4    recollection that Mr. Abdul Kareem arrived at the FBI office

5    with someone else?

6    A   I think he told me that he had but so -- but I don't know

7    if he did.

8    Q   Well, I thought you testified on your direct examination

9    that you were aware that his nephew was being interviewed at

10   the same time that he was?

11   A   I did, yes.

12   Q   How did you come by that knowledge?

13   A   I knew -- I know the other agents that were doing the

14   interview and they had told me in later discussions that they

15   had done that.

16   Q   Do you know whether or not Mr. Abdul Kareem and his nephew

17   came in together?

18   A   I don't know.

19   Q   Is that your understanding?

20   A   That is my understanding though.

21   Q   Okay.  And you were not the one who actually met Mr. Abdul

22   Kareem when he arrived; is that correct?

23   A   Yes.  That is correct.

24   Q   And Agent Nash met him?

25   A   Yes.
```

1   Q   Your testimony, I think, on direct was that Agent Nash met

2   him in the lobby; is that correct?

3   A   Yes.

4   Q   Okay.  One has to go through some security outside of the

5   FBI office before they're able to enter into the lobby,

6   correct?

7   A   Yes.

8   Q   Okay.  Is it your understanding that Mr. Abdul Kareem and

9   his nephew came through that security without an agent?

10  A   Yes.

11  Q   And then when Mr. -- strike that.

12          Was that the first time you had ever met Mr. Abdul

13  Kareem?

14  A   Yes.

15  Q   Had you read any 302s or done anything to prepare for that

16  interview?

17  A   Yes.

18  Q   What had you seen before that?

19  A   Before the interview -- I found out about the interview in

20  the morning and so I looked at -- I'm trying to think of the

21  name -- but there's a basic report that gives a photo of him,

22  his basic biographical info, so I had reviewed all that.

23          So I knew his criminal history and things like that

24  for safety purposes.

25          I had also viewed, as best I could in that short

1    period of time, documents within his case file that were in

2    there and read as many of those as I could to kind of get up

3    to speed and then talked to Detective Nash obviously before

4    the interview and asked him.

5    Q    Were you aware of the warrant that had been executed in

6    2012 where his computer had been taken?

7    A    Not at the moment when I interviewed him on 5/5.

8    Q    You did not then review a report that talked about what

9    was downloaded off that computer in preparation for your

10   interview?

11   A    I did not.

12   Q    Okay.  Do you recall how long after Mr. Abdul Kareem

13   arrived before he was taken into the interview room for the

14   interview?

15   A    I don't know exactly when he arrived.

16   Q    Were you the one who was designated to be the

17   interviewer -- the primary interviewer?

18   A    Yes.

19   Q    So was Detective Nash the individual who was going to be

20   taking notes?

21   A    Yes.

22   Q    Okay.  And your understanding was the interview was going

23   to be videotaped and audiotaped?

24   A    Yes.

25   Q    You testified a few moments ago that Exhibit No. 2

1    contained both your notes and Agent Nash's notes.  Do you

2    recall that?

3    A    Yes.

4    Q    Are your notes the last page of Exhibit 2?

5    A    Yes.

6    Q    So it's fair to say you really didn't take many notes.

7    This is it?

8    A    Yes.

9    Q    Okay.  And your testimony on direct was that he appeared

10   to be calm and wasn't having any physical problems whatsoever?

11   A    Yes.

12   Q    Okay.  What did you do to prepare for your testimony

13   today?

14   A    I reviewed my 302.  I reviewed the 302 regarding the

15   failed recording.  And then reviewed various, you know,

16   communications that we had had as far as, you know, when -- in

17   trying to figure out when I had asked for the room and that

18   kind of thing, so I reviewed all of that.

19          And then I met with the prosecutors yesterday to

20   briefly go over a general idea of what kinds of things we

21   would be talking about today.

22   Q    Did you have any conversations with Agent Taylor?

23   A    No.

24   Q    Did you have any conversations with Agent Nash?

25   A    Yes.

1    Q    When did you talk to Agent Nash?

2    A    I talked to him in the morning yesterday.

3    Q    What did you talk about?

4    A    He got me up -- I had been out of the country, and so

5    Detective Nash got me up to speed on various cases we are

6    working together in other matters.

7              And so we had sat down.  He told me about him

8    testifying.  And I kind of cut him off.  And so -- and then he

9    just told me about other things he was working on, other

10   efforts.

11   Q    What do you mean he told you about him testifying and you

12   cut him off?

13   A    Well, so he said -- he said that he had testified

14   yesterday or whatever and that things had gone well.

15             And I said:  Hey, just -- I know you're not going to

16   say this anyway, but just in case, let's just not even talk

17   about this and then I will talk to you after I testify

18   tomorrow.

19             And then we just kind of switched subjects to the

20   other stuff we're working on, the other issues we have going.

21   Q    How long did that portion of the conversation last?

22             THE COURT:  What portion of the conversation?

23   BY MR. MAYNARD:

24   Q    The portion where Agent Nash started to tell you about

25   what he had testified to here?

```
 1    A    Maybe five seconds.

 2    Q    Anyone else tell you about the testimony that occurred in

 3    this courtroom?

 4    A    No.

 5    Q    During the interview you said that you never left the

 6    room, correct?

 7    A    Yes.

 8    Q    And no one left the room?

 9    A    Yes.

10    Q    Okay.  Did -- and you don't recall Mr. Kareem ever saying

11    anything about he felt bad?

12    A    No.

13    Q    Did he ever ask for anything sweet to eat?

14    A    No.

15    Q    So he wasn't provided with anything?

16    A    No.  Not that I -- no.

17    Q    Okay.  At some point in time did you learn that he was

18    diabetic?

19    A    Yes.

20    Q    And was that after this interview when he was interviewed

21    later on and the Fire Department was actually called?

22    A    Yea.  I actually learned about it sometime before that.

23    Q    But after the interview that took place?

24    A    Yes.

25    Q    Okay.  After -- so because you think that it is being
```

```
1   videotaped and audiotaped, is that one of the reasons you

2   didn't take notes?  You figured you could rely upon those

3   tapes to prepare your 302?

4   A   It's one of the reasons, yes.

5   Q   And is it generally the practice of an FBI agent to

6   prepare the 302 as soon after an incident has occurred as you

7   can?

8   A   For a nonrecorded interview, yes.

9   Q   Okay.  And you prepare a draft and then submit it to

10  somebody to review?

11  A   Yes.

12  Q   Okay.  Do you -- when you're preparing the 302 -- and

13  let's use the one in this case -- you prepare the draft the

14  next day, correct?

15  A   Yes.

16  Q   And then it's not finalized --

17          THE COURT:  Could you refer to the exhibit number for

18  the record, please?

19          MR. MAYNARD:  Exhibit No. 1.

20          Sorry, Judge.

21  BY MR. MAYNARD:

22  Q   And then is it not finalized until May 11th.  I'm looking

23  at the --

24  A   Yes, sir.  Yes, sir.

25  Q   The date of entry on the top right-hand, that's when you
```

1    actually finalized the report?

2    A    That's when it's serialized into the system.

3    Q    Okay.  A draft is done on the 6th, but it's finalized on

4    the 11th?

5    A    Yes.

6    Q    Now, is this 302, Exhibit No. 1, did you prepare it in a

7    chronological fashion based upon the questioning that was done

8    during the interview?

9    A    I don't know.

10   Q    Well, what's your normal practice?

11   A    My normal practice is to do a chronological presentation

12   of an actual chronological.  And so rarely does that happen

13   during the interview.

14           And so I will take the facts as they give them and

15   then group them into chronological order.  So it's not

16   necessarily chronological as far as the interview went because

17   we could go off on tangents.  But then I generally, when I

18   draft my report, I try to do it in a coherent manner.

19           THE COURT:  So if I understand correctly, if you were

20   talking about an incident in May and then you switched to

21   September and then you said, "Let's go back and talk a little

22   bit more about May," when you wrote your report, you would

23   probably try to put all of May together and then all of

24   September together, even though it was not the chronological

25   way in which the interview proceeded?

 1            THE WITNESS:  Yes, Your Honor.

 2            THE COURT:  Thank you.

 3  BY MR. MAYNARD:

 4  Q   When the interview was over, who escorted Mr. Abdul Kareem

 5  out of the interview room and out into the lobby?

 6  A   Detective Nash and myself escorted him into the hallway

 7  area to the door.  And then I remained behind at the door that

 8  lead to the lobby.

 9            And then Detective Nash took him the following feet.

10  He didn't -- I don't think he went way inside.  Kind of said

11  his good-bye at that doorway, if you will, and then

12  released -- or let him go in the lobby.

13  Q   So your recollection is Detective Nash let him go at the

14  entrance to the lobby?

15  A   Yes.

16  Q   And then came back in with you?

17  A   Yes.

18  Q   And then the two of you went into the room to retrieve the

19  SD?

20  A   Yes.

21  Q   Okay.  And when you looked at the monitor, at that point

22  when you both went in together, did it appear that the monitor

23  was on and you could see the room?

24  A   I could not see the monitor, so it was facing away from

25  the doorway which is the side as you come in.  That's where

1    that switch was.

2            So the monitor -- to see the monitor, I would have

3    had to kind of look around.  So I could not see it.

4    Q    Okay.  So -- and who was the one who actually took the SD

5    card?  Was it you or was it Detective Nash?

6    A    Detective Nash took the card.

7    Q    You have a meeting somewhere else?

8    A    I had something that I had to get to and I can't recall

9    what that is.

10   Q    Do you recall how long it lasted, whatever you were going

11   to?

12   A    No.

13   Q    Do you recall how long it was before you were notified

14   that the SD didn't seem to have anything on it?

15   A    Yes.

16   Q    How long was it?

17   A    So at 4:23 p.m. I received an e-mail from Detective Nash

18   saying that he -- that his understanding based on talking with

19   ELSUR was that it had not captured.

20   Q    When would you have seen that though?  Did you see it that

21   day or the next day?

22   A    I didn't go anywhere for months, so I would have seen it

23   that day.  I would have still been in the office doing

24   something or out doing something, but I would have seen it

25   then.

1   Q   What steps, if any, did you take to determine what had

2   malfunctioned?

3   A   Well, my initial reaction was to wait till -- so Special

4   Agent Taylor then sent an e-mail saying he had also received

5   word from ELSUR that it hadn't captured and that he himself

6   was going to go check and see if there was some sort of

7   mistake or see if he could figure it out.

8        And so I kind of just waited for that to develop.

9   That's kind of what probably -- I probably would have drafted

10  that 302 that night, but I wanted to wait to see if the

11  recording was going to get done, so.

12  Q   Did you go back into the room to look at the equipment to

13  see if it was functioning or not functioning?

14  A   No.

15  Q   Is there any other surveillance equipment that's at the

16  FBI office that would have captured Mr. Abdul Kareem coming

17  into the premises?

18  A   Yes.

19  Q   What is that called?

20  A   Well, there's surveillance cameras.

21  Q   So there's surveillance cameras that would actually show

22  one coming through the security and into the lobby?

23  A   I assume so.  I guess I don't know for sure where the -- I

24  can't imagine that it wouldn't show that entryway, but I know

25  there are cameras.

1   Q   Did you ever ask to obtain copies of that surveillance

2   video?

3   A   No.

4   Q   Why not?

5   A   I asked the case agent on the Simpson and Soofi matters

6   whether they thought it was worth it and they said no.  And

7   so -- and I kind of agreed at the time and so I did not seek

8   that information.

9   Q   Do you know whether or not that surveillance video still

10  exists?

11  A   My understanding is it does not.

12  Q   What is the FBI's policy in getting rid of surveillance

13  video for its lobbies and those who enter into the premises?

14  A   I don't know -- I wouldn't know the answer to that.

15  Q   How is it that you believe that it does not exist?

16  A   I contacted an individual that's in charge of that area to

17  see if there was any way for us to obtain a copy of that.  And

18  he told me that there wasn't -- that there wasn't because we

19  wouldn't have that -- it wouldn't still be in memory.

20          THE COURT:  Mr. Maynard, we're going to break for

21  lunch.  We'll reconvene in an hour-and-a-half.

22          Court is in recess.

23      (Recess taken at 11:48 a.m.; reconvened at 1:25 p.m.)

24          THE COURT:  Good afternoon.  Please sit down.  The

25  record will show the presence of counsel and the defendant.

CR15-00707-PHX-SRB    EVIDENTIARY HEARING    11-24-15

1              Mr. Maynard, you may continue your cross-examination.

2              MR. MAYNARD:  Thank you, Your Honor.

3              Good afternoon.

4    BY MR. MAYNARD:

5    Q   Agent Whitson, just to sort of finish up on Exhibit No. 1,

6    you did not note in Exhibit No. 1 there being any malfunction

7    with this recording device, correct?

8    A   Yes.

9    Q   Why not?

10   A   I don't know.

11   Q   Okay.  Turn to Exhibit No. 4.

12             In the records that I've received, this is the 302

13   that talks about there being some alleged malfunction with the

14   recording device.

15             Did you prepare this document?

16   A   I'm sorry, sir.  There's multiple documents.

17   Q   Okay.  Look at the first page of Exhibit 4.

18   A   Yes, sir.

19             THE COURT:  Is that Bates 298?

20             MR. MAYNARD:  298.

21             THE WITNESS:  Thank you, sir.

22   BY MR. MAYNARD:

23   Q   Is this the 302 that you prepared?

24   A   Yes.

25   Q   Is there a reason it took you until July to prepare this

UNITED STATES DISTRICT COURT

1    302?

2    A    Yes.   In consultation with the AUSA, it was deemed that I

3    should draft something to this nature documenting the failure

4    to record and so I drafted that on or about June 30th, 2015.

5    Q    At the bottom of the first page of Exhibit 4 it says:

6              By Stewart Whitson and Jeffrey Nash.

7              Were you the two that prepared this?

8    A    Yes.

9    Q    Did you consult with Agent Taylor in the preparation of

10   this document?

11   A    No.

12   Q    On the second paragraph of Exhibit 4, first page, it says

13   that:

14             Before Abdul Malik Abdul Kareem entered the interview

15   room, the technical agent at the request of S.A. Stewart

16   Whitson began the recording.

17             Do you see that?

18   A    Yes.

19   Q    And the "special agent" that you're referring to is Agent

20   Taylor?

21   A    Yes.

22   Q    Did you consult with Agent Taylor about whether or not he

23   recalled starting this recording device?

24   A    No.

25   Q    And when it says the technical agent confirmed that the

1   recording was on, how did he confirm that with you?

2   A   With the signal of the thumbs up.

3   Q   Okay.  I thought the thumbs up for you to have him turn it

4   on?

5   A   That was my signal to him to turn it on and then he

6   provided a thumbs up in response to let me know he had turned

7   it on.

8   Q   Okay.  Turn to the next page of Exhibit No. 4 which is

9   Bates stamp 1422.

10          Have you seen this document before?

11   A   Yes.

12   Q   And what is this document called?

13   A   This is -- I don't know that it has a name but this is the

14   document that outlines this particular evidence item which is

15   1D288 or the SD card.

16   Q   Under normal circumstances, if the SD card were going to

17   be used because it had information on it, would there be

18   documentation to show a chain of custody?

19   A   I don't know.

20   Q   Well, in your training at Quantico is it important to you

21   to do a chain of custody on evidence?

22   A   Yes.  And so this particular type of evidence, because

23   it's ELSUR evidence, the chain of custody is that person

24   bringing it to ELSUR.

25          And so there isn't quite the same, you know, kind of

1    chain of custody that might occur in other types of evidence.

2    But I would expect there to be some sort of documentation that

3    outlines that; their receipt of it and whoever the provider

4    is.  Actually, that's probably indicated in this form.

5    Q   Well, down near the bottom it says:  Chain of Custody.

6         It says:  No chain of custody for this evidence.

7         Do you see that?

8    A   Yes.

9    Q   Do you know what the chain of custody has been since this

10   SD was shown to not have any information on it?

11   A   Yes.

12   Q   Okay.  What is it?

13   A   So if you move to the top of the form, it was collected by

14   Jeffrey Nash.

15   Q   Yes.

16   A   And so it went from Jeffrey Nash to Serena Martinez is the

17   person who finalized it.

18         And so there being no chain of custody is my reading

19   of that is because it was not passed from anyone else from

20   them.  So I would read that the chain of custody is from

21   Detective Nash to Serena Martinez of ELSUR.

22   Q   And do you belief that she has had that SD ever since?

23   A   Yes.

24   Q   And what do you understand the status of that SD is now?

25   A   So it remains in ELSUR.  So ELSUR has its own evidence

1   area that it holds only to those things so it doesn't even go

2   to the other evidence room.  It stays in this ELSUR evidence

3   room.  And so once it's given to her, it would be filed away

4   in that room.

5   Q   We heard some testimony the other day concerning the

6   status of it now.  Did you ever make a request that it be

7   submitted for analysis -- computer analysis to see if there

8   was any information on it?

9   A   I did not.

10  Q   Do you know who did?

11  A   Detective Nash.

12  Q   And do you know when that was done?

13  A   Not -- no -- not exactly, but my understanding --

14  Q   What's your understanding?

15  A   Is that that was done in the last few days that that

16  request was made.

17  Q   And as we sit here today, do you have an understanding of

18  whether that SD has gone back to Quantico or is it being

19  analyzed at this time?

20  A   No.  It has not gone back to Quantico.  It was analyzed by

21  CART is my understanding as of right now is our CART in our

22  building analyzed it which is the first step in that process.

23          So CART is our forensic examiners.  So they have

24  analyzed it first.  And then if they are unable to find it,

25  then it would be sent on to Quantico.

1              But which I think we may in this case just do anyway.

2    Q    All right.  Turn to the fourth page of Exhibit 4 which is

3    1424, please.

4    A    Yes.

5    Q    This is an e-mail -- or two e-mails, one between you and

6    Brian Taylor.  Do you see that?

7    A    Yes.

8    Q    Okay.  And the one at the bottom is the first e-mail and

9    it's from Mr. Taylor to you; is that correct?

10   A    Yes.

11   Q    Okay.  Had you e-mailed him earlier than this?  Are there

12   earlier e-mails in this string?

13   A    There is an earlier e-mail from him, I know, because I --

14             At or about 7:52 a.m. the morning of the 6th he sent

15   me an e-mail indicating that Serena Martinez had informed him

16   that there was a failure and that he was going to go confirm

17   that that was the case or that there may be a failure.

18             So, yes, there is another communication but I don't

19   know that -- not part of this I don't think.

20   Q    Did you ever have a conversation with Agent Taylor about

21   whether or not he turned on the recording device?

22   A    No.

23   Q    And in the e-mail from Detective Taylor to you he said:

24             I spoke with Jeff Mendez this morning.  He told me

25   they would require video -- that you would require video

1   exported from the security system DVR.

2           Do you see that?

3   A   Yes.

4   Q   What were you referring to there?

5   A   What was he referring to?

6   Q   What was he referring to?

7   A   The -- I'm speculating, but security cameras that are in

8   the room, the ones we talked about earlier.

9   Q   Right.  Were there actually security cameras that were in

10  the room where the interview was taking place?

11  A   Yes.

12  Q   Why have you not gotten any of those videos?

13  A   Well, I think we talked about this earlier, but it was --

14  I asked the case agents if they wanted me to try to take that

15  step to get those.  It's video only.

16          Given that there was no audio that would come with

17  that and given the challenges of extrapolating that data and

18  given the fact that he wasn't a suspect at the time, their

19  answer was no, to not get that, so I did not.

20  Q   So then I understand what I talked to you about earlier

21  was whether or not there was video in the lobby and the

22  entrance in the hallway.

23  A   Uh-huh.

24  Q   Are you telling me now there was actually video in that

25  room?

1    A    Yes.

2    Q    Where is that video?

3    A    That's -- it's deleted or gone.  We don't know.

4    Q    How do you know it's deleted?

5    A    Because I reached out --

6         So I reached out to the people that handle that to

7    see if we could recover that once I had heard about all this.

8    And then -- and so they told me it had already been deleted

9    and so I was trying to get ahold of a copy of it.

10   Q    When did you reach out for it?

11   A    Today.  I e-mailed them today to ask them about that.

12   Q    Well, on the day after the incident occurred Mr. Taylor is

13   writing to you saying that you would require video exported

14   from the security system DVR.  He has said:  No problem.

15   Requested that you send an e-mail to Sherry McAllister.

16        Did you send an e-mail to her asking her for that

17   video?

18   A    No.

19   Q    And it's your understanding there was video but that video

20   has now been destroyed?

21   A    Yes.

22   Q    Was there a case agent who told you not to get that video?

23   A    Yes.

24   Q    Who was the case agent?

25   A    Special Agent Freyberger.

CR15-00707-PHX-SRB     EVIDENTIARY HEARING     11-24-15

1    Q    And even though that -- if I understand correctly, you're

2    telling me it would be video but no audio on it?

3    A    Yes.

4    Q    You're sure of that?  You're sure there's no audio?

5    A    Yes.

6    Q    But the video would show us what Mr. Abdul Malik's

7    condition was at the time of the interviews?

8    A    Yes.

9              MR. MAYNARD:  I don't have any further questions.

10             THE COURT:  Thank you.  Ms. Brook?

11             MS. BROOK:  Thank you.

12                        **REDIRECT EXAMINATION**

13   BY MS. BROOK:

14   Q    Defense counsel asked you questions about the security

15   cameras within the FBI.

16   A    Yes.

17   Q    Those cameras, do they all weave into one feed?

18             Do the cameras report back into one feed?

19   A    That's my understanding, yes.

20   Q    And so, therefore, reflect images of multi pictures with

21   one screen?

22   A    Yes.

23   Q    And, again, for clarification, the security cameras

24   themselves don't record or capture any audio recording?

25   A    Yes.

1   Q   In your time with the FBI, have you ever had occasion to

2   request security footage from that particular security camera

3   device system?

4   A   No.

5   Q   And is it routinely done within the FBI that security

6   camera footage would be requested?

7   A   No.

8   Q   Defense counsel asked you about whether or not you had

9   conversations with Brian Taylor after the recording to confirm

10  whether or not he pressed "Record."

11          You discussed the thumbs up.

12          When you and Special Agent Taylor were discussing the

13  plan for how "Record" would get pressed, was the mutual

14  exchange of the thumbs up your understanding of confirmation?

15  A   Yes.

16  Q   And confirmation of what specifically from Brian Taylor?

17  A   That he had hit "Record" and that it was working and

18  functioning.

19  Q   And when you saw him give the thumbs up, where exactly was

20  he when he gave that to you?

21  A   So he was on the opposite side of the room, so I was

22  standing in the doorway to the room where he was at.  The

23  table was between us and he was seated on the opposite side

24  looking at the monitor that I described earlier and gave me

25  the thumbs up.

```
 1   Q    Defense counsel also asked you about chain of custody

 2   forms and specifically drew your attention to some documents

 3   within Exhibit No. 4.

 4         I believe Exhibit No. 4 has already been admitted.  I

 5   was going to place on the overhead page 2.

 6         So page -- Bates stamp 1422 -- with Your Honor's

 7   permission.

 8         THE COURT:  Go right ahead.

 9   BY MS. BROOK:

10   Q    On this sheet do you see a bar code number relating to

11   this piece of evidence which was the SD card from the

12   interview that day on May 5th?

13   A    Yes.

14   Q    And is there a bar code number there that's highlighted?

15   A    Yes.

16   Q    Can you read for us what that bar code number is?

17   A    E 03438733.

18   Q    You have before you as well Exhibit No. 5 which too has

19   already been admitted.  Can you take a look at that?

20         Do you recognize that?

21   A    Yes.

22   Q    And what is it?

23   A    It's a chain of custody form that's filled out when you

24   turn evidence in to ELSUR.

25   Q    And does that chain of custody form include information
```

1  where Jeffrey Nash indicated that he released custody of the

2  item at 1611 or 4:11 in the afternoon on May 5th of 2015?

3  A   Yes.

4  Q   And at the top does it too have a bar code number?

5  A   Yes.

6        MS. BROOK:  And, Your Honor, this has already been

7  admitted.  May I publish as well?

8        THE COURT:  Yes.

9  BY MS. BROOK:

10 Q   Placing on the overhead Exhibit No. 5, does that bar code

11 number match as the same bar code number for Exhibit 1422?

12 A   Yes.

13 Q   And that's the E 03438733?

14 A   Yes.

15 Q   Defense counsel asked you about the status of the SD card.

16        In your understanding, is it to be sent to Quantico

17 immediately?

18 A   Yes.

19 Q   And is it also your understanding that Quantico required

20 CART here to do tests on it before the transfer to Quantico

21 was made?

22 A   Yes.

23 Q   Defense counsel asked you about the image on the monitor

24 when you and Detective Nash went back into the room after the

25 interview was completed.

1            So the room I'm talking about is the room that had

2    the transmitter, the SD disk.

3            When you and Nash were stopping and ejecting that SD

4    card, do you recall what image was on that monitor?

5    A    No.

6    Q    Defense counsel also asked you about whether or not you

7    saw Kareem in the lobby after the interview was over?

8    A    I don't remember.

9    Q    Did you see Kareem in the lobby after the interview was

10   over?

11   A    At some -- yes.  At -- yes.

12   Q    And you had testified earlier that you had some things to

13   do, some task, but at some point you came back into the lobby

14   after that?

15   A    I think.  I don't know when I saw him.  I just know that

16   some time passed after the interview and I, for some reason,

17   was going through the lobby and saw him and was surprised to

18   see him still there.

19   Q    And how did he appear when you saw him in the lobby?

20   A    He was seated in a chair kind of leaning back against the

21   window near the door, the exit to the lobby area.  He seemed

22   relaxed, just kind of sitting there waiting.

23   Q    Did you move closer to him?

24   A    Yes.

25   Q    And did you get a closer look at him?

1    A    Yes.

2    Q    And how did he appear?

3    A    Well, so I approached him and said -- I think I said

4    something to the effect of, "Oh, why are you still here?"

5    That kind of thing.

6         And then he seemed -- right when he saw me, he seemed

7    to kind of get shocked.  His face kind of -- he looked worried

8    or something but --

9    Q    And at that point did you see any sweating on his face?

10   A    Yes.

11   Q    During the interview at all did you see any sweating on

12   his face?

13   A    No.

14   Q    And the way that he appeared when you said that he looked

15   shocked, was that how he appeared at all during the interview?

16   A    No.

17   Q    Defense counsel asked you about taking notes during the

18   interview.

19        When you are operating as a lead questioner during an

20   interview, generally how many notes do you take in

21   circumstances like that?

22   A    My practice is to take very little notes whenever I'm the

23   lead interviewer.

24   Q    And is that whether or not the interview is being

25   recorded?

CR15-00707-PHX-SRB     EVIDENTIARY HEARING     11-24-15

1   A   Yes.

2   Q   So even if the interview is not being recorded, if you're

3   the lead interviewer, you typically don't take many notes?

4   A   Yes.

5   Q   Why is that?

6   A   I find it distracts the person I'm interviewing.  So if I

7   ask them a question and then as soon as they give me an answer

8   I write that answer down, I find that makes them less inclined

9   to talk.  It disrupts the conversation and the flow.

10       And so my practice is to have whoever my partner is

11  sit out of eyesight, take those notes, and then I maintain eye

12  sight or eye contact and talk so we can just get the

13  information going and then I rely on my partner to take notes.

14       If something comes up during it that's key, then I

15  might -- I still will take some notes occasionally, but I

16  always put them in plain view of the person too so they don't

17  feel stressed by that.

18  Q   So routinely as part of your training and experience, your

19  work with the FBI, are there circumstances that arise when

20  interviews are not recorded and you're called upon to be the

21  lead interviewer and then subsequently draft a report?

22  A   Yes.

23  Q   Is that something that happens routinely in your

24  experience in your work in the field?

25  A   Yes.

1    MS. BROOK:  The government moves to admit Exhibit 1

2   and 2 which weren't admitted previously, the 302 as well as

3   the notes.

4    THE COURT:  Is there any objection?

5    MR. MAYNARD:  No objection.

6    THE COURT:  One and 2 are admitted.

7    (Exhibit No. 1 and 2 admitted in evidence.)

8   BY MS. BROOK:

9   Q   Defense counsel asked you about treats or sweets given to

10   the defendant during that May 5th interview.

11    Do you recall interviewing the defendant on June 10th

12   of 2015?

13   A   Yes.

14   Q   And during that particular interview, were any cookies or

15   candy provided?

16   A   Yes.  They were offered.

17   Q   And during that interview on June 10th, did you also

18   discuss with Kareem the fact that he was diabetic?

19   A   Yes.

20   Q   Seven days after May 5th did Kareem, to your knowledge,

21   show back up at the FBI?

22   A   Yes.

23   Q   Was that an announced visit or a planned visit?

24   A   No.

25   Q   What happened?

1    A    He just showed up unexpectedly.  Drove to the office.  And

2    then got out and came to the security gate entry area and

3    demanded to speak to the agents who interviewed him I think

4    was what he had asked.

5    Q    And what happened next?

6    A    I was in the building and was notified that he was there.

7         So I met with our folks because at that point by the

8    12th he was a suspect.  So we discussed our strategy and we

9    sought to obtain a recording device to use before we would go

10   talk to him because we wanted to avoid not having a recorded

11   conversation of him.

12        And so we got there.  Another agent had a recording

13   device, Special Agent Burn, and so he, along with myself and

14   Detective Nash, then went out to go greet Mr. Kareem and

15   basically try to -- he was --

16        The indications we were getting was that he was very

17   upset and kind of had erratic behavior and things like that.

18   So we were just going to go off and de-escalate that and calm

19   him down and have that recorded in the event that an exchange

20   took place.

21   Q    By the time you went out there, was Kareem there?

22   A    No.

23   Q    What happened?

24   A    He had left before we got to the security gate.

25   Q    And did you talk to him on the phone after that?

CR15-00707-PHX-SRB     EVIDENTIARY HEARING    11-24-15

1    A   Yes.

2    Q   And the telephone conversation that you had with him, was

3    that recorded?

4    A   Yes.

5    Q   Is there a policy in your office that relates to having to

6    record voluntary interviews?

7    A   There is a policy, yes.

8    Q   And what does the policy say about when you are required

9    to record interviews?

10   A   So during a custodial interview there is a presumption

11   that a recording will take place.  However, there are

12   exceptions even with the presumption in a custodial setting.

13          In a noncustodial setting it is optional whether to

14   record.

15   Q   And the interview you had on May 5th with the defendant,

16   what was your analysis of whether or not that was custodial?

17   A   It was a noncustodial interview.

18   Q   At the time you and Nash ejected and stopped the video

19   equipment after the interview of Kareem on the 5th, did you

20   believe that that card, that SD card, had video and audio

21   recording of the interview on it?

22   A   Absolutely.

23   Q   What was your reaction after you found out that the SD

24   card didn't capture the recording?

25   A   I was shocked.

1   Q    And why were you shocked?

2   A    Because I felt like we had done everything we could to

3   ensure that very thing wouldn't happen.  We had a technical

4   agent who was an expert help us set up the equipment.  We went

5   through all those steps to avoid just that.  And lo and

6   behold, it happened anyway, so it was shocking and unsetting

7   obviously, because we tried and we wanted the recording so --

8          MS. BROOK:  I don't have any other questions.

9          THE COURT:  Thank you.  Agent Whitson, you may step

10   down.

11          THE WITNESS:  Thank you, Your Honor.

12          THE COURT:  May Agent Whitson be excused?

13          MS. BROOK:  Yes.

14          THE COURT:  Is there any objection?

15          MR. MAYNARD:  No, Your Honor.

16          THE COURT:  You may be excused, sir.

17          THE WITNESS:  Thank you.

18          MS. BROOK:  And, Your Honor, we have no further

19   witnesses today.  We have discussed Special Agent Calbone and

20   when he will testify -- Chiappone, my apologies -- at a time

21   yet to be determined by the Court.

22          But as of today, any additional witnesses, the

23   government doesn't have any more.

24          THE COURT:  I believe that we have concluded -- do

25   you have any other evidence to present today, Mr. Maynard?

```
 1              MR. MAYNARD:  No, Your Honor.

 2              THE COURT:  Do you agree we have concluded all of the

 3    evidence as it relates to the 2012 search?

 4              MR. KOEHLER:  Your Honor, we still have Agent John

 5    Chiappone to present in connection with the 2012 search.

 6              We believe the evidence is closed on the Rule 16

 7    motion to dismiss or suppress regarding the destroyed

 8    recording.

 9              THE COURT:  Okay.  I guess I was confused about who

10    was talking about what.

11              So we're concluded on the recording?

12              MS. BROOK:  Correct.

13              THE COURT:  We still are -- the case -- the evidence

14    is still open on the 2012 search?

15              MR. KOEHLER:  That is correct, Your Honor.

16              THE COURT:  Do you agree, Mr. Maynard?

17              MR. MAYNARD:  I do.

18              THE COURT:  So do either of you want to make any

19    closing argument limited to the issue of the motion related to

20    the failure to have a recording of the May 5th interview?

21              MS. BROOK:  Yes, Your Honor.

22              THE COURT:  Okay.  Are you ready now.

23              MS. BROOK:  Yes.

24              THE COURT:  Go right ahead then, Ms. Brook.

25              MS. BROOK:  And, Your Honor, did you prefer to have
```

```
1    defendant go first since it was his motion?
2            THE COURT:  Well, if you go first, Mr. Maynard, you
3    get the last word.
4            If Ms. Brook goes first, she gets the last word.
5            Do you want to go first?  It is your motion
6    suggesting that the suppression should be made.  And I'm not
7    sure this is one where the government truly has the burden of
8    proof as they might on other types of evidentiary motions.
9            Mr. Maynard wants to go first so he gets the last
10   word.
11           MR. MAYNARD:  Of course this happens in trial too
12   now, right?
13           Your Honor, there's a sort of a new twist that
14   happened, I think, today on this particular motion.
15           Our motion dealt with the interview that was done on
16   May 5th.  And I thought the testimony that occurred from Agent
17   Taylor was that he did the testing on the equipment in a room
18   that he had set up for another interview that was going to be
19   done.
20           I didn't get a transcript of what he said, but my
21   notes indicate to me that Agent Taylor said he did not turn on
22   that equipment.  He tested it but didn't turn it on.
23           So what we have is we have, I believe, a technical
24   agent that said:
25           I didn't turn it on.  I showed them how to turn it
```

1   on.  I showed them how to turn it off.

2          And I thought we spent probably more time on pushing

3   those buttons than we needed to.

4          But the testimony today seems to be that Agent

5   Whitson says that:

6          No, we had hand signals and we were showing each

7   other that it's a go and you've got it turned on and that he

8   actually turned it on.

9          I think that's inconsistent with what Agent Taylor

10  said.

11          THE COURT:  It may be, but what's important to me is

12  what is the significance of the fact that there's no

13  recording?

14          MR. MAYNARD:  Well, I think it's significant because

15  I believe it's exculpatory.  We believe that my client was

16  having -- had a condition.  He's diabetic.  There's no

17  question about that.

18          If he were to testify, he would tell you that --

19          THE COURT:  No.  If he were to testify, Mr. Maynard,

20  he either testifies or he doesn't.  But you don't get to

21  proffer what we he would say about how he was feeling on May

22  5th.  That's not evidence.

23          MR. MAYNARD:  It's not, but there's case law, Judge,

24  that it wouldn't be fair to make him have to testify.

25          THE COURT:  True, but that doesn't allow you to

1     testify in his stead.

2            MR. MAYNARD:  But it would be excul--

3            You asked me why it's important.  It would be

4     exculpatory.  And what we have learned today is not only were

5     they audio and videotaping it surreptitiously -- and there

6     seems to be all kinds of confusion by the government on how

7     this was done.  And it starts from Detective Nash saying where

8     he picks him up and where he brings him in.

9            Their testimony is completely inconsistent as to what

10    was actually done.

11           Judge, I understand.  It is difficult to try to find

12    a smoking gun that says that the government acted in bad faith

13    and that they intentionally destroyed that tape.

14           But I think you can draw that inference if you show

15    that the government's testimony in recollection of what

16    happened is inconsistent with each other with the agents that

17    are there.

18           Taylor is inconsistent with what Whitson says as to

19    who was to push the button.

20           Whitson says it's Taylor.  Taylor says he wasn't

21    going to do it.  He didn't do it.  He doesn't say he's there

22    getting hand signals from Whitson on the -- as to who comes in

23    and who doesn't.  That's inconsistent.

24           Agent Nash tells us that they knew ahead of time that

25    my client was diabetic and that Whitson had cookies for him on

```
 1   that day and he gave them the cookies on that day.

 2           Whitson says:  I had no idea that he was diabetic.

 3   Nobody left the room.  Nobody gave him candy.  Nobody gave him

 4   cookies.

 5           I think this shows complete inconsistency by the

 6   government and I believe it shows bad faith.  I don't know

 7   whether or not they intended to record this interview or not.

 8   But what I do know is that once they didn't, they realized it

 9   hadn't been recorded, the steps that you would have expected

10   them to take to retrieve it were not taken.

11           They have taken no steps up until today.  We're on

12   November 24th and we're learning that they're just now going

13   to try to examine this to see if there is any information on

14   it and they have known that this has been an issue for a long

15   time.

16           They didn't put in the 302 that was prepared for that

17   particular interview that they had attempted to recording and

18   that it hadn't malfunctioned.

19           Now, why?  Was it because they didn't care because

20   they were going to allege that he had committed crimes by

21   giving them false information, which is what they have done?

22           He doesn't prepare the 302 that says why -- or that

23   they believed that this thing has malfunctioned until into

24   July.

25           And then what we have learned today is --
```

CR15-00707-PHX-SRB    EVIDENTIARY HEARING    11-24-15

1          THE COURT:  Well, Agent Whitson was very clear that

2     he prepared the 302 because the prosecutors told him that he

3     should memorialize what he learned about the recording failing

4     in a 302 so it would be available in a report presumably to

5     give to you.

6          There's clearly other contemporaneous information

7     within the FBI that shows that it was -- that the recording

8     failed.  There's the e-mails that you pointed out.

9          MR. MAYNARD:  And the e-mails also show that there's

10    an alternative that they could look to, and that was the video

11    camera that was in there that didn't have audio.  And he's

12    instructed by the case agent on it not to obtain it.

13         Now, this is a terrorist -- alleged terrorist

14    investigation that involves two individuals who have been

15    killed in another state.  This was all over the news.  They

16    are out there gathering evidence for this and he's becoming --

17    if he wasn't already a suspect, he's clearly becoming a

18    suspect.

19         It is disingenuous to think that you would not get a

20    video to see what the condition was of this person when he's

21    in that room.

22         THE COURT:  I really don't know when the defendant

23    became a suspect.

24         MR. MAYNARD:  Well, we know he became --

25         THE COURT:  What I know is that the testimony is that

1   on May 5th he was not a suspect and came in and gave this

2   voluntary statement.  He clearly showed up on his own and left

3   on his own and gave a statement.  Nobody from law enforcement

4   compelled him to be there.

5           They said he wasn't a suspect.  I don't know when he

6   became a suspect.  Maybe there's something in the evidence

7   that's been admitted that reflects that, but I don't know that

8   right now.

9           MR. MAYNARD:  Well, the evidence, I believe, at a

10  minimum shows that as of May 12th he's a suspect because

11  that's the date that he shows up and that would be Exhibit 6,

12  Your Honor.

13          THE COURT:  Well, that's the day he showed up and he

14  was upset and they went to talk to him but by the time they

15  got there he had left.

16          MR. MAYNARD:  Yes.

17          THE COURT:  What causes me to know that that means he

18  was a suspect by the 12th?

19          MR. MAYNARD:  He just testified to it.

20          THE COURT:  That he was a suspect?

21          MR. MAYNARD:  Yes.  Agent Whitson just testified that

22  by the time he showed up, he was a suspect, and that's why he

23  went out to get a recording device.

24          THE COURT:  You are correct.

25          MR. MAYNARD:  Every now and then.

1          And, Judge, going back to 2012, the search that was

2     done in the residence that Mr. Abdul Kareem was living in,

3     again, the FBI had him on some sort of a watch list.

4          I mean, they're out there -- and I guess we will deal

5     with this at a different date -- but I do believe that you can

6     go back to that and see that he was at least a suspect or they

7     suspected him of some sort of inappropriate activity as early

8     as that.  And --

9          THE COURT:  Well, they clearly knew he was associated

10    with people that they were investigating.

11         MR. MAYNARD:  That's true.

12         And they wanted to look through his computers and

13    they executed a search warrant which allowed them to do that,

14    whether that was legal or not, and we'll probably deal with

15    that later.

16         But at least a week after they have interviewed him,

17    the testimony today was he's a suspect.  And some of the

18    charges that have been brought against him was that in that

19    particular interview that he had done back on the 5th, he made

20    false statements to the government.

21         Well, Judge, you know, to try to determine whether

22    somebody makes false statements or not, you would like to know

23    what the statements are.  And we don't have it.  There's

24    nothing in the reports.  There's nothing in the notes.

25    There's nothing in the 302.

1          THE COURT:  But my question is:  Is there anything in

2    the law that requires that in order to charge somebody with

3    false statements to the FBI, you have to have an audio

4    recording of their exact statement?

5          And we know the answer to that is "no."  There's

6    nothing that requires that.

7          We can all agree that it would be ideal to have when

8    you're charging somebody with a false statement their own

9    voice making the statement that is alleged to be false.

10         But the law doesn't require that.

11         And so before -- and we know -- we're pretty

12   confident, unless they are real magicians in Quantico, that

13   we're never going to have that.  We're never going to have

14   your client's voice to hear the statements that he made on May

15   5th.

16         MR. MAYNARD:  You know, I tend to agree with you.

17         THE COURT:  Yes.  But unless the government did

18   something that's in violation of the law, the testimony of the

19   witnesses about what was said doesn't -- is allowed to be

20   given.  That's what we're here about.

21         What can you point to that shows that there was some

22   violation of a statute, a rule, or the constitution with

23   respect to the failure of the recording that would require

24   that the contents of that interview be suppressed?

25         MR. MAYNARD:  I believe that if the government

1    intentionally destroys evidence that would be exculpatory,

2    which I believe they did when they destroyed the videotape --

3              THE COURT:  Okay.  Let's talk -- I'm still on the --

4    we can talk about what you just learned today in a minute.

5              MR. MAYNARD:  Okay.

6              THE COURT:  I'm talking about his voice.

7              MR. MAYNARD:  I hear you.

8              THE COURT:  We know that the security camera -- I'm

9    going to call them "security cameras."

10             MR. MAYNARD:  Yes.

11             THE COURT:  Don't record audio.

12             MR. MAYNARD:  Absolutely, that's the testimony.

13             THE COURT:  We're talking about -- well, most of us

14   are very familiar with security cameras.  They're everywhere.

15   And they don't record audio.  And I have no reason to doubt

16   that the FBI's security video is just video.

17             But now we're talking about what I started out by

18   saying.

19             We are confident that we are never going to hear

20   defendant's voice on May 12th and hear exactly what he said.

21             And the government didn't destroy any evidence.  They

22   failed to record it.

23             And does it matter whether the failure was an

24   equipment failure?  The failure was a mix-up by the agents as

25   to who was supposed to turn it on?  Or the failure was just

1    never turning it on?

2         It's not -- they don't have the obligation to record

3    it.  If they don't have the obligation to record it, can the

4    failure to record it result in its suppression as opposed to

5    they did record it and then they destroyed it because they

6    didn't want us to hear it?  Or they did record it and then

7    they negligently failed to preserve it?

8         Those cases are -- I mean, there's lots of cases that

9    deal with the consequences of a failure to preserve evidence

10   that exists or the destruction of evidence.

11        But this is neither of those.  This is a failure to

12   make a recording of an interview.

13        And so where does the law tell me that I can suppress

14   that because it's not what we would -- it's not the best kind

15   of evidence we could have had.

16        MR. MAYNARD:  No.  It clearly is not.  And it should

17   be.

18        I mean, if you are going to accuse somebody of making

19   a false statement to the FBI on the FBI's facility, there

20   really ought to be a recording of it.

21        THE COURT:  Well, you know, you and I both know that

22   if we were talking about this five years ago, there wouldn't

23   even have been recording devices for the FBI to record

24   interviews because they had a completely different policy

25   which was:  Do not record.

1              And the case law was legion that they don't have to

2    if they don't want to and they never wanted to.

3              Now, at least, they're trying.

4              MR. MAYNARD:  Well, they still don't want to and they

5    do on occasion, so civilization is stepping forward slowly but

6    surely.

7              THE COURT:  But the case law hasn't changed the

8    standard.

9              MR. MAYNARD:  Make new case law, Judge.

10             THE COURT:  Do you know that this is the trial court?

11             MR. MAYNARD:  I do, but this is where they all start.

12             THE COURT:  And the Appellate Court is the one that

13   sets the standard.  They have a standard that I have to apply.

14             And if they want to change the standard, the

15   Appellate Court can overrule themselves but I can't overrule

16   them.

17             MR. MAYNARD:  I understand that.

18             THE COURT:  Do you want to talk about the other

19   surveillance?  We'll call it the "security cameras."

20             MR. MAYNARD:  I believe that they destroyed that

21   based on the testimony that I heard today.

22             THE COURT:  They failed to preserve it.  They have

23   allowed it to be recorded over.

24             MR. MAYNARD:  Well, that's a nicety.  I mean --

25             THE COURT:  Well, the case law distinguishes between

1    "failure to preserve" and "intentional destruction."

2         MR. MAYNARD:  Well, the day after --

3         THE COURT:  Well, I know what the evidence is, but

4    the question is --

5         MR. MAYNARD:  They were told not to preserve it.

6    They were told -- if somebody has indicated as in Exhibit 4 --

7         THE COURT:  An agent who was apparently the case

8    agent on the Garland shooting investigation said:

9         We don't need that.

10        And so in the ordinary course of things, it went away

11   when recordings happened over it.  That's my understanding of

12   how all of the security video works.

13        MR. MAYNARD:  And I don't know what the FBI's policy

14   is on this.  This is the first time I heard that there was

15   actually a video camera in that room.  I was under the

16   impression there was only a video and audio, that there was

17   not a security camera in there.

18        I mean nobody ever mentioned that until Agent Whitson

19   mentioned it this afternoon.

20        THE COURT:  And that's true.

21        MR. MAYNARD:  And it may be my fault for not having

22   asked the proper questions.

23        THE COURT:  But as it relates to false statements, it

24   doesn't -- it clearly doesn't affect what the statement was.

25        MR. MAYNARD:  It doesn't affect what the statement

1    was, but it does affect the atmosphere and the attitudes and

2    what was going on and what the condition of my client was,

3    what his physical condition was at the time.

4         THE COURT:  But there is absolutely no evidence that

5    there was anything about his condition --

6         MR. MAYNARD:  Sure there is.

7         THE COURT:  -- that was concerning, other than the

8    fact that we know he's a diabetic.

9         MR. MAYNARD:  And they gave him cookies, at least

10   according to Nash.  They gave him cookies because he seemed to

11   have some sort of problem with his diabetes.

12        THE COURT:  That's not what Nash said.

13        MR. MAYNARD:  It is what Nash said.

14        THE COURT:  What Nash said -- and I could be wrong

15   again, Mr. Maynard, but I don't think I am.

16        I think they had them.  Nash testified that they were

17   available because they knew he was diabetic, not because he

18   was in any distress.

19        MR. MAYNARD:  I think what Nash said was that they

20   knew he was diabetic and that Whitson brought cookies and gave

21   him cookies during the interview, because I asked him did they

22   leave to get them and he said no.

23        THE COURT:  But I don't believe there's any testimony

24   it was because he was in any distress.

25        MR. MAYNARD:  Well, I don't think they were giving

1   him cookies because -- I mean, Nash said he knew he was

2   diabetic.  I don't think he brought him cookies because he

3   thought he likes Chips Ahoy.

4          THE COURT:  I don't know.  I think a lot of times law

5   enforcement gives people, you know, whether it's cookies or a

6   soda or something to try to make them feel like they are all

7   friendly and they get more out of the person if they seem like

8   they're friends rather than adversaries.

9          So I'm not sure that the fact that they offered him

10  and he either did or did not accept cookies or candy or a

11  beverage allows me to infer that it was because he was in some

12  type of physical distress as opposed to they were just trying

13  to look -- make for a friendly atmosphere to try to develop

14  some rapport and to make it clear to the interviewee that if,

15  you know, he was feeling a little lethargic or like he needed

16  a boost in his blood sugar, there was something right there

17  for him.

18         MR. MAYNARD:  And had Agent Nash not said that they

19  knew he was diabetic, I would probably agree with you.  But I

20  believe that's what he said.

21         So I think we have a different recollection of what

22  Agent Nash said and we're clearly drawing different inferences

23  off of it.

24         That's really all I have.

25         THE COURT:  Okay.  Ms. Brook?

1          MS. BROOK:  Thank you, Your Honor.

2          THE COURT:  So are we going to talk about snacks or

3     do you want to talk about something else?

4          MS. BROOK:  We will, indeed, talk about snacks.

5          Your Honor, in this case Whitson and Nash diligently

6     acted to record and preserve the defendant's statements in his

7     interview on May 5th.  They liaisoned with the technical agent

8     who was Brian Taylor to ensure that the room was wired, it was

9     equipped, and that Brian Taylor had gone in, tested the

10    equipment, and it's the government's position that the

11    evidence showed that he, in fact, pressed "Record" prior to

12    the interview beginning.

13         At the conclusion, Nash and Whitson went in to stop

14    the interview, obtain the evidence, the SD disk, and place it

15    into evidence.

16         It was Whitson's understanding as well as Nash when

17    he testified that the recording of the interview was, in fact,

18    on that SD card.  And it wasn't but until after the interview

19    that they learned through exploiting it and through talking

20    with ELSUR people that the interview was not captured on the

21    recording.

22         Special Agent Whitson testified today here that he

23    was shocked.  That they made painstaking efforts to make sure

24    that the interview was captured and recorded.

25         Defense counsel suggested when he stood up before

1     that the government didn't want to have it recorded.  And all

2     evidence was to the contrary in this case, that special effort

3     was taken to ensure a recording happened.

4           But when the recording didn't, Special Agent Whitson

5     performed just as he does typically in these scenarios.  He

6     drafted a report within 24 hours, a four-page report that Your

7     Honor has.  One that was -- he relied upon notes that were

8     generated contemporaneously.

9           Defendant in this case alleges that the government

10    acted in bad faith and destroyed and failed to preserve

11    potentially exculpatory evidence.

12          However, the facts don't show or support any of these

13    allegations.  Quite to the contrary.

14          For the Court to find there to be bad faith, there

15    has to be -- well, the presence or absence of bad faith, it

16    turns on the government's knowledge of the apparent

17    exculpatory value of the evidence at the time that it was lost

18    or destroyed.  And that's because without knowing the value of

19    the evidence at the time, there could be no bad faith in the

20    first place.

21          In this case as it applies to the recording on the SD

22    card, there was no question of it being lost or destroyed.

23    The card is in Property and Evidence and effort was taken and

24    made for it to be recorded.  It just didn't end up recording

25    on the device.

1    Defense counsel has brought up the security footage

2    and has talked about that in terms of evidence not preserved.

3    In order for there to be an issue with the government

4    needing to preserve evidence or acting in bad faith to not

5    preserve something at the time that it occurred, there needs

6    to be some sort of showing of relevant value, that it would be

7    useful to the defense.

8    And in this case we've had multiple agents testify

9    about that interview on May 5th.  And there's been no facts to

10   suggest anything that would be illuminated or probative based

11   upon a video that's just that.  It's just a video.  Has no

12   audio.

13   There is no question from the testimony of the two

14   agents that testified here, Whitson and Detective Nash, that

15   throughout the course of the interview over the

16   hour-and-a-half or so length that Kareem, the defendant, did

17   not exhibit any signs of being in distress.  He didn't have

18   any sudden mood changes.  He wasn't sweating.  He wasn't

19   shaking.  His question and answers were linear.  So his

20   answers that he produced were linear to the questions that

21   were asked of him.  And at no point did he express the fact

22   that he felt ill.

23   Defense counsel has raised questions about

24   inconsistencies and how they play out in this case.  And the

25   reality is that the inconsistencies, if any, in the testimony

1    that have come out have come out over small factors, not

2    substantive issues that you would expect to be in reports.

3           Whether or not cookies were provided, we know cookies

4    were provided at the June 10th interview or cookies were

5    provided at the May 5th interview.

6           What we know based upon the testimony is that there

7    is no contradiction in terms of the fact that both agents

8    testified he felt fine, he appeared fine, and he didn't

9    express being ill.  He also was told that the interview was

10   voluntary.  He engaged in the interview in an unlocked room

11   and at the end he left.  And, in fact, he didn't even leave

12   the property.  He stayed within the lobby of the FBI and then

13   left subsequently.

14          We also know that he returned seven days later to

15   come back to the FBI to talk to agents freely and then again

16   left freely.

17          I want to briefly, Your Honor, just distinguish the

18   *Zaragoza-Moreira* case which defense has cited.  And factually,

19   that case is opposite from the facts of this particular case.

20   So *Zaragoza-Moreira* was a Ninth Circuit case that just

21   recently came out 2015.  And in that case what it talked about

22   was the failure to retain or preserve video footage after the

23   defense had made a timely request.  So it was December 22nd

24   and the charge was that the individual was bringing in

25   methamphetamine on her body.

1          She had said during interviews with the officers that

2     day when she was apprehended that she was doing it only

3     because she was forced to do it.  That she was showing signs

4     at the time to try to alert agents there so that they would

5     come to her and talk to her.  Throwing her passport.  Trying

6     to wiggle out of the drugs that were strapped on her.  And the

7     agents didn't even look at the recording.  They didn't

8     preserve it and they didn't look at it.

9          In addition, the defense attorney six days later had

10     requested that footage to be preserved and nobody acted to

11     have it preserved and then eventually it was taped over, some

12     30 to 45 days later.

13          So the nature of this particular instance being

14     dissimilar from anything in this case is that there was some

15     sort of potential usefulness of that video.  Potential

16     usefulness in terms of corroborating statements made at the

17     time.

18          In this case there has been no showing of potential

19     usefulness of any of the footage.  And again, it's showing at

20     the time, not allegations made by defense counsel some six

21     months after the fact, that don't marry up with the facts of

22     the case or the facts that were presented.

23          And as Your Honor has already highlighted, the Ninth

24     Circuit has consistently held that the government does not

25     have a duty to record custodial interviews.  There is no

1   federal mandate that custodial interviews being recorded.

2          We understand that this too is below that.  This is a

3   voluntary interview.  So even something as this, too, is not

4   required to be recorded.

5          I wanted to lastly, Your Honor, draw the Court's

6   attention to the *Fries* case.  And the *Fries* case is another

7   Ninth Circuit case cited by the government.  It is a 2015 case

8   and it's on point especially as it relates to allegations and

9   charges of false statements, because in that case they had

10  just that.

11         Part of the charges were false statements.  And the

12  agent chose not to record the interview that was conducted

13  over the telephone.

14         Judge Jorgenson had the case down in Tucson and

15  denied permitting to the jury a jury instruction about lost

16  evidence or not preserved evidence.

17         Defendant argued it but there was no jury instruction

18  that was given.  And the Ninth Circuit held that that was not

19  error, that that was appropriate to restrict and not have a

20  jury instruction on that issue.

21         Similarly, and just taken by analogy in this case,

22  there's been no showing of bad faith.  There has been no

23  showing that the agents did anything other than attempt to

24  diligently record and the equipment didn't capture the

25  recording.

1       So based upon the evidence that has come out from the

2  witness stand, we ask that the Court deny defense's motion.

3       THE COURT:  Thank you, Ms. Brook.

4       Mr. Maynard, anything else?

5       MR. MAYNARD:  Judge, I think Ms. Brook is correct in

6  stating that the primary case that the Court ought to look at

7  is the *Zaragoza* case.  And in that case, the individual was

8  attempting to cross the border with methamphetamines on her.

9  And she contended that she was under duress when she was

10  crossing and that the videotape that was there would have

11  shown what she was doing and that she was in duress.

12       Judge, in this case after Mr. Abdul Kareem was

13  indicted, we sent out discovery requests to the government,

14  the routine ones that we all send out, not knowing what was

15  out there at the time, not knowing when he had been

16  interviewed and how many times he had been interviewed.

17       They knew as of a day after his interview on May 5th

18  that there was a recording, a video recording at least, of

19  that interview.  The thought that they wouldn't have preserved

20  that, I think, shows bad faith.  I mean, we don't know as I

21  sit here today, because I don't know when they recorded over

22  it, if they destroyed it.  But they certainly were considering

23  using --

24       THE COURT:  But don't you have to also show it would

25  have had exculpatory evidentiary value?

1          MR. MAYNARD:  The only way I can do that is to put

2     him on the stand to testify.  And --

3          THE COURT:  But don't you have to show it -- I

4     realize that if the only way to show it is to put the

5     defendant on the stand, that places the defense in an

6     untenable position.

7          But I'm asking about what the law requires and

8     doesn't there have to be some evidence that this was

9     potentially exculpatory?

10          MR. MAYNARD:  Judge, the only thing I can tell you is

11     that in the *Zaragoza* case, she indicated that she was under

12     duress.

13          THE COURT:  Apparently, that was well-known.

14          MR. MAYNARD:  Well --

15          THE COURT:  I mean, I don't know exactly -- I don't

16     recall -- I have read the case, not in connection with this

17     motion, but previously.

18          I don't recall, but I think there was something like

19     she told them -- it was in the reports, I think.  I'm not

20     sure.  It was in the police reports that she claimed she was

21     under duress.

22          And so there was already evidence that what she was

23     telling them at the time of her arrest could have been

24     confirmed or at least supported by the video.  And that was

25     where the defense had the evidence because it was recorded in

1    the police reports that there was potentially exculpatory

2    video to support her defense of duress.  And that's why the

3    Court of Appeals ruled the way it did.

4         But here we don't have any -- I mean, we don't have a

5    hospital record that later that day he was in diabetic shock.

6    I don't have a doctor's report that he has uncontrollable

7    diabetes and he has to eat every hour-and-a-half.

8         I don't have anything that would suggest to me that

9    the bare video of that room during the short period of time,

10   less than two hours that he was in there, would be potentially

11   exculpatory.  That's what I think the law requires.

12         MR. MAYNARD:  Well, and I guess that's where we

13   differ then, and I would ask the Court to go back and look at

14   the *Zaragoza* case one more time, because I think the Ninth

15   Circuit makes it pretty clear that it would be untenable for

16   her to have to get on and testify about duress.

17         And I think she's -- she raises that defense and the

18   Court says this evidence could have -- could have -- doesn't

19   say it would have.  I mean, I think that's where it becomes

20   important, Judge, is that it's not an absolute in the *Zaragoza*

21   case.  She raises it.  This could have been exculpatory but it

22   was destroyed.  And I think that's what we have got here.

23         I mean, you've got people who are looking at a

24   videotape that -- I mean, the FBI has internal e-mails that we

25   have looked at saying:  Should we get this particular

1     videotape?

2          And the case agent decides no, we, don't need it.

3          Well, we know at least within a week after that --

4     and I don't know how long it takes.  Maybe they record over it

5     every day and that would make a difference.  And, you know,

6     shame on me because I haven't developed the evidence.  I don't

7     know if they erase it every week, every 30 days, because I

8     just heard it today for the first time.

9          But we know that within a week after that interview

10    took place and six days after the agent was asking about

11    obtaining a copy of it, that he's a suspect.  Now, I don't

12    know if he became a suspect that day or he became one two days

13    later.  I'm not aware of anything that happens in between

14    them, but he becomes a suspect very soon thereafter.

15         And there's a videotape of his interview.  And, yes,

16    it sounds like there is not audio recording because I agree

17    with the Court that most video -- security videotapes do not

18    have audio.

19         THE COURT:  There was nothing that would cause me to

20    disbelieve the testimony that there is no audio.

21         MR. MAYNARD:  Yeah.  I think he said he didn't know.

22    I mean, I would not have assumed there was videotape within an

23    interview room in the FBI office.

24         I really thought it was going to be in the hallway

25    and in the lobby, so I was a little surprised when I heard

1   that.  That's why I thought they put the other one in there.

2   And I assume the only reason they put the other one in there

3   was because there wasn't audio on it.  But I don't know.

4         But my point is is that I think even if it's just

5   video, it's potentially exculpatory and we seem to differ.

6         THE COURT:  Anything else on that, Mr. Maynard?

7         MR. MAYNARD:  No.

8         THE COURT:  Thank you.

9         It's ordered taking under advisement Defendant's

10  Motion to Dismiss the Indictment or In the Alternative

11  Suppress Evidence Due to Violations of Federal Rule of Civil

12  Procedure 16.

13        So we need to talk about several other things.

14        The first one is, Mr. Koehler, have you been able to

15  make contact with Agent Chiappone; and if so, what potential

16  options do we have for taking his testimony?

17        MR. KOEHLER:  We have been able to make contact with

18  Agent Chiappone.  He is still in Paris.  He was not able to

19  give us a firm date when he would be back in the United States

20  and be available.

21        He said next week he should be in a position to

22  communicate to us when he would be in the United States and

23  available to testify via VTC or telephonically.  And, of

24  course, if we want him to come here, we would have to refine

25  that a little bit further, but he would not know until next

1    week.

2          THE COURT:  I think that -- I don't think that we

3    need him to come here in person if it's only for that reason.

4    I think that we can take his testimony ideally on video, but I

5    also think that if we cannot find a location with compatible

6    equipment to what we have here that we could do it

7    telephonically.

8          What I'm going to do then, since I will be

9    unavailable when you hear back, that you and Mr. Maynard and

10   Maureen can figure it out.  And then we can also put you in

11   touch with the person who can give you the specifications for

12   what you have to have on the other side to be compatible with

13   our video system.

14         So that -- and that will be the last witness on the

15   evidence related to the motion to suppress the 2012 search.

16         MR. KOEHLER:  We believe that to be the case, Your

17   Honor.  However, Mr. Maynard did not want to release

18   Ms. Vaughan from her subpoena.  We are still in the process of

19   resolving --

20         THE COURT:  I forgot about that.

21         MR. KOEHLER:  -- whether to release the full

22   unredacted report of her analysis of the various computers

23   seized from the home of Abubakar Ahmed and also working on

24   getting a declassified version of the cover page of the report

25   that reveals the day of preparation.

```
 1            THE COURT:  Well, let me say this about Ms. Vaughan.
 2            If, when we schedule Agent Chiappone for his video or
 3    telephonic testimony, if Mr. Maynard wants to recall her, he
 4    will let you know of it and we will do it on the same day.
 5    We're not going to have more than one more day to complete the
 6    evidence on that motion.
 7            The other thing that we need, I want to review with
 8    you in a little bit of detail are the dates on the Scheduling
 9    Order.
10            MR. KOEHLER:  May I resume the counsel table for that
11    purpose, Your Honor?
12            THE COURT:  Yes, please.  That would be fine.
13            So right now, the first date that hasn't passed is
14    next Monday, November 30, for the government to disclose
15    Preliminary Witness and Exhibit List.  And is that on schedule
16    to be done by Monday, the 30th?
17            MR. KOEHLER:  We are not on schedule for that, Your
18    Honor, no.
19            THE COURT:  Okay.  How are you doing on summary
20    charts?
21            MR. KOEHLER:  We are --
22            THE COURT:  Are there going to be any?
23            MR. KOEHLER:  Yes, there will be.  And specifically,
24    one of the things that is still underway, Your Honor, there is
25    a team at FBI that's called the CAST team.
```

1        THE COURT:  There's CART.  There's CAST.  How do you

2   keep them straight?  Do you have a glossary of terms?

3        MR. KOEHLER:  To be honest, I need one, and I think

4   I'm going to work on creating one, especially specifically for

5   this case.  That might be one of our summary charts for the

6   jury is one that explains the acronyms.

7        But the CAST team is a team that analyzes the

8   historical cellular telephone location data.

9        We obtained court orders under Section 2703 for

10  historical cellular location data for a significant number of

11  cellular telephones in this case belonging to Elton Simpson,

12  Nadir Soofi, Mr. Abdul Kareem and others involved or

13  potentially involved in the investigation to try to ascertain

14  common times that those phones were near each other for a for

15  instance.

16        That analysis is not quite complete yet.  We're

17  hoping that it will be complete in the fairly near future.

18  But we anticipate preparing summary charts of the location

19  data to present to the jury through the CAST analytical team.

20        THE COURT:  And have you disclosed the raw data to

21  Mr. Maynard?

22        MR. KOEHLER:  I believe that -- yes.  The raw data

23  was on one of the terabyte drives or on CDs, one or the other,

24  the returns from the 2703 that came from the providers.

25        THE COURT:  If you are not part of this FBI unit, can

1   you look at any of that and have any idea what it says?

2          MR. KOEHLER:  I don't --

3          THE COURT:  Is it just numbers?  Or does it actually

4   have -- or is it just like longitude and latitude?

5          I have seen some of it before.

6          MR. KOEHLER:  That's exactly what it is.

7          THE COURT:  Without somebody actually interpreting

8   it, it's almost impossible for any lay person to just look at

9   it and say, Oh, I know where on earth these places are.

10         MR. KOEHLER:  I believe you're correct that it does

11  come in as, for instance, cellular tower locations.

12         THE COURT:  By longitude and latitude?

13         MR. KOEHLER:  Correct.

14         THE COURT:  Not "it's in northwest Scottsdale."

15         MR. KOEHLER:  I think it might have tower numbers as

16  well, but the same problem, yes.

17         THE COURT:  So their analysis is going to locate it

18  in language where we understand where that place is?

19         MR. KOEHLER:  That's correct.  Our --

20         THE COURT:  Plus a summary chart that would show a

21  summary of who called who when in relationship to important

22  times?

23         MR. KOEHLER:  Correct.  And it would plot it on a map

24  showing cell tower faces, the sector faces, and so on of the

25  cell tower, and with the little pie chart around the tower

1    that shows which way that sector is facing and that kind of

2    information; that's correct.

3              THE COURT:  But at the present time, the summary

4    chart disclosure is supposed to be by December 11th.

5              Is that a date that is close to when they're going to

6    have at least a draft of the chart?

7              MR. KOEHLER:  We think that that may be close, but we

8    think that it's more likely that that would be forthcoming and

9    fully complete by sometime in January.

10             THE COURT:  Any problem with *Jencks* and witness

11   impeachment material by January?

12             MR. KOEHLER:  We think that we have turned over the

13   vast majority of the *Jencks* in the case already.

14             And talking to co-counsel, we think that the witness

15   impeachment material, a lot of that has already been turned

16   over.  There may be more to turn over, but --

17             THE COURT:  But you should be able to do that by

18   January 7th?

19             MR. KOEHLER:  Yes.

20             THE COURT:  Okay.  I'm going to skip over Final

21   Witness and Exhibit List right now and talk about one deadline

22   that has passed which is a motion in limine deadline.

23             And no motions in limine were filed, which I take is

24   good news, as opposed to somebody saying:  But we do have them

25   and we couldn't get them in on time.

 1          So nobody is saying the latter?  That's good news.

 2          MR. KOEHLER:  Correct.  No.  We anticipate preparing

 3  a trial memorandum for the Court identifying potential

 4  evidentiary objections that might come up at trial, but we do

 5  not have a specific motion in limine to present to the Court.

 6          THE COURT:  Nor does the defense, correct?

 7          MR. MAYNARD:  Until I know who the witnesses are,

 8  Judge, I understand what you're saying.  I'm not aware of any

 9  motions in limine at this time.

10          THE COURT:  Okay.  At the present time we have a

11  trial date of January 14th.  And while I don't anticipate

12  there being any difficulty and the Court ruling on the motion

13  that was taken under advisement today in advance of January

14  14th, as we sit here today, I don't know when we're going to

15  take Agent Chiappone's testimony.

16          We know for certain the earliest that his testimony

17  could be taken is on December 23rd.  That's the earliest.  I

18  say that because at the present time we are fully booked on

19  the 21st and the 22nd of December.  So it's either the 23rd of

20  December, a date where I'm sure all of you want to be here

21  having testimony and argument, or potentially, the following

22  week.  But the point is that that places us within two weeks

23  of trial with my not being confident that I will be able to

24  rule on the motion within that short period of time.

25          I really think that we need to push the trial date a

1    month.  And my suggestion is that we reset the trial today to

2    Tuesday, February 16th.

3         I see Ms. Brook and Mr. Koehler nodding as if they

4    don't have any conflicting problems with that trial date that

5    would take priority over this one.

6         MR. KOEHLER:  While we would certainly feel more

7    comfortable with a little bit more time given the amount of

8    data that we're still trying to go through and make sure that

9    we're organizing it properly, the one thing we don't want to

10   do is walk into court with our evidence half-baked, so to

11   speak.

12        THE COURT:  I know, but I have to be sensitive to the

13   speedy trial issue.

14        MR. KOEHLER:  Well, we are --

15        THE COURT:  And I'm also very sensitive to

16   Mr. Kareem's conditions of confinement and his interest in

17   having his case tried as soon as possible.  And I don't think

18   that I can -- that I hear of any basis that I could exclude

19   time on the government's request.

20        MR. KOEHLER:  Well, we're under a complex case

21   designation, so I don't think we are as worried in terms of

22   that as being an appellate issue, but I understand more

23   importantly the issue of just getting the case over with.

24        THE COURT:  But clearly, the existence of these

25   unresolved motions to suppress exempts that period of time

CR15-00707-PHX-SRB     EVIDENTIARY HEARING     11-24-15

```
 1    from any speedy trial clock.

 2              MR. KOEHLER:  Correct.

 3              We are going to do our best to work with that.  I

 4    need to doublecheck my calendar and I believe Ms. Brook has

 5    already doublechecked hers, but I believe that we are both

 6    going to be available during that time frame.

 7              THE COURT:  This does bring up the issue of this SD

 8    card, Mr. Maynard.  I have no confidence that the FBI will

 9    complete an analysis of that card between now and the trial

10    date.  And I think that I spoke about that last week.  You

11    suggested, well, let me have it and I will have my own

12    forensic expert take a look at it.

13              I said you and Mr. Koehler had to talk about that

14    because I don't think that's something I could just order them

15    to do since it's not like they can make a copy of it to give

16    to you to have forensically analyzed to see why it failed.

17              But I did ask you to give some thought to whether or

18    not you wished to proceed to trial knowing that you likely

19    would not have that forensic analysis.

20              MR. MAYNARD:  I don't have any confidence in the FBI

21    at all on this issue, so, yeah, I think all I would do if I'm

22    sitting there waiting for them to do an analysis on it is

23    giving the government more time to build a case against my

24    client, so.

25              THE COURT:  Okay.  So you are comfortable with the
```

UNITED STATES DISTRICT COURT

1    idea because I deduced from the evidence last week that the

2    reason this SD card is now going to be sent to Quantico is

3    because of you raising the concerns.

4             But as long as we all know that if I -- if we go to

5    trial on February 16th, in all likelihood there will be no

6    forensic analysis complete on this SD card.

7             You're ready to proceed to trial with knowing that's

8    the likelihood?

9             MR. MAYNARD:  Yes.  I'm ready to proceed to trial --

10            THE COURT:  Good.

11            MR. MAYNARD:  -- because I don't have any confidence

12   that the FBI is going to find anything on the SD card and they

13   should have done it five months ago.

14            THE COURT:  Well, there is that too.  I mean, I think

15   the result of their analysis when it's finally completed is

16   that the only thing on the card is the test as the local

17   people have found.  But I don't know that we will have

18   anything but the local people to tell us that, if that's

19   important at trial.

20            Do you have any difficulties with the February

21   16th -- scheduling-wise with the February 16th trial date?

22            MR. MAYNARD:  I'm not agreeing to the movement.

23   That's up to the Court.

24            THE COURT:  I know that.

25            MR. MAYNARD:  I will make myself available on those

1    days.

2            THE COURT:  Well, as a result of the pendency of the

3    two motions to suppress and the fact that the Court is

4    unlikely to be able to rule by January 14th, the present trial

5    date, in light of the fact that the evidence has not closed,

6    and as of this date we are not aware of when precisely we will

7    be able to complete the evidence, let alone have the Court

8    review all the evidence, the law, and make a decision, the

9    trial date is continued from January 14th to February 16th and

10   the time is excluded.

11           What I want to then talk to you about, because even

12   though you didn't agree to that trial date, you might agree to

13   some moving of a few little deadlines that were all designed

14   to be in accord with the January 14th date.

15           Mr. Koehler?

16           MR. KOEHLER:  Your Honor, before we reach those

17   issues, two things.

18           One thing that came to mind when talking about the SD

19   card is we wouldn't want to be put in the unfortunate position

20   of facing an argument, "Well, you could have sent that card to

21   Quantico and had it analyzed and had the analysis here for

22   this trial date," if we push forward with a trial date that

23   doesn't allow that to be completed.  I would not want to hear

24   that argument.

25           THE COURT:  I think the argument that you are going

 1    to hear which Mr. Maynard just expressed was why did you wait

 2    until November -- the end of November when you knew on May 5th

 3    that it had failed?

 4            That's the argument that you can't avoid.

 5            MR. KOEHLER:  I understand that and that's something

 6    that I guess he's free to try.

 7            But in terms of just the notion of not having that

 8    done and pushing forward with a trial date knowing that it

 9    might not be done kind of puts us in the untenable position

10    dealing with that at argument.

11            The other issue is:  Are we going to go forward on

12    the same type of schedule where we do jury selection a week

13    ahead of the commencement of evidence?  That was how we

14    originally set up the trial dates for January was starting

15    with the 14th and then starting the evidence --

16            THE COURT:  Well, we did that -- we did that for a

17    different reason and I can't remember why.  I think it had to

18    do with everybody's availability that we decided to try -- we

19    were looking at how far out the case was going to go and then

20    pushing the date back so that it could be complete by whatever

21    that date was.  And that's why we were going to do a jury

22    selection on Thursday, the 14th, and not begin the evidence

23    until Tuesday, the 19th of January.

24            I don't know.  Unless you and Mr. Maynard agree to do

25    something differently, I just set this case on a Tuesday for

1   jury selection.

2        MR. KOEHLER:  That should work fine.

3        THE COURT:  With my anticipation that we would begin

4   the evidence as soon as the jury was sworn.

5        MR. MAYNARD:  Judge, do you have a practice or do you

6   ever use jury questionnaires ahead of time?

7        THE COURT:  No.

8        MR. MAYNARD:  Okay.

9        THE COURT:  Let me say this.  Well, a couple of

10  issues that arise today.

11        I would not necessarily rule out a short, targeted

12  questionnaire in a case like this.  I am not one of the

13  judges -- there are several here that use a written

14  questionnaire for every single case.

15        In my practice I would only use a jury questionnaire

16  because there are certain questions that are pertinent to the

17  case that need to be asked that likely would not be answered

18  at all; or if answered, wouldn't be answered fully and

19  forthrightly in public.

20        And I used to use the example of if you have a case

21  that involves potentially like child sexual abuse, that's one

22  that I feel oftentimes a written questionnaire is appropriate

23  because people are more revealing of things that they would

24  never want to talk about in a room full of people.

25        I would not exclude the possibility that there may be

1     some kinds of voir dire questions in this case that either the

2     government or the defense would want to ask that a written

3     questionnaire might be helpful.

4          But once you talk about a written questionnaire, you

5     have to talk about how it's going to be administered.  And

6     there are two different ways to administer it and both of them

7     have their advantages and their disadvantages.

8          And the first one is to send it to the prospective

9     jury panel in the mail.  It has the advantage of you get it

10    back and you have lots of time to look at it.  It has the

11    disadvantage of you have no idea how many people went into

12    answering the questions.

13         Whatever you put on the questionnaire to tell them

14    how to do it and not to discuss it with anybody, et cetera, et

15    cetera, there's no confidence that it was, in fact, completed

16    by that individual without sharing the information with others

17    or obtaining or supplementing the information with other

18    people.  But at least the lawyers have it and they have it to

19    look at before the first day they see the prospective jurors.

20         The second one is that you administer the written

21    questionnaire the day that the jurors arrive at the

22    courthouse.  And that one does have the advantage of them

23    filling it out in the jury room and there's people there to

24    make sure they're doing it.  You know, they're taking --

25    they're like the test proctor and make sure that they're not

1    consulting other people about the answers.

2         The disadvantage, however, is then when -- how much

3    time do the lawyers have to look at the answers to the

4    questionnaire.  Because you run the risk if you say, well,

5    here is this questionnaire and it's only going to take an hour

6    for them to fill out, because I think the questionnaire, as I

7    said, should be targeted to the questions that are really

8    important and not the ones that you -- you know, we don't want

9    to be in a situation where we don't have a chance to talk to

10   the jury in court.

11        How much time do you give the lawyers to review the

12   answers?

13        Because if you bring the jury in at 8:30, have them

14   fill out the questionnaire, and then cool their heels in the

15   jury room for four hours, do you send them home and hope they

16   come back the next day?

17        So there's problems with both ways of doing it and

18   advantages and disadvantages, but I would not rule out doing

19   it in this case if you and Mr. Koehler could come up with a

20   reasonable, relatively short questionnaire, not, you know,

21   like 20 pages or something.

22        However, if you do come up with one and we agree that

23   it's a good one, I do insist that the witness list be an

24   attachment or included within the questionnaire because then I

25   don't have to read a witness list to the jury and mispronounce

1    everybody's name and it allows the jurors to really look and

2    think about it rather than in a situation where, hopefully,

3    they're able to absorb the information a little better.

4            So if you want to talk about that and consider it and

5    then we could meet again in January and look at it and also

6    talk about how you would like to have it administered, I don't

7    know off the top of my head if you --

8            If you decided that you wanted it mailed out in

9    advance and mailed back, Maureen can find out from the Jury

10   Administrator how many weeks in advance of the trial we needed

11   to do that.

12           And then didn't -- I can't remember.  Did we talk

13   about a prescreen for time?

14           MR. MAYNARD:  I don't think so, Judge.

15           THE COURT:  We need to do that too.

16           MR. KOEHLER:  Would that be part of the questionnaire

17   or a separate thing?

18           THE COURT:  Well, the prescreen always goes out in

19   advance in writing, so I don't see any good reason why you

20   would want to -- I mean, I did it one time, but it was a very

21   extraordinary situation where the trial, which luckily never

22   happened, was going to take six months and we sent out the

23   jury questionnaire and the six-month thing all together.

24           But this trial, I don't remember from our prior

25   discussion what the anticipated length was.  What are you

```
 1    thinking right now?
 2            MR. KOEHLER:  We discussed it actually this morning,
 3    Your Honor, and we think two-and-a-half weeks, approximately.
 4    We're hoping to go shorter than that obviously, but.
 5            THE COURT:  Are you counting on four-day weeks?
 6            MR. KOEHLER:  Yes.  So ten, maybe eleven total trial
 7    days.
 8            THE COURT:  Ten or eleven days?
 9            MR. KOEHLER:  And that's hoping for everything to go
10    smoothly and so forth and giving a rough estimate for how long
11    cross would take.
12            MR. MAYNARD:  Is that the estimate just on the
13    government's case?
14            MR. KOEHLER:  Correct, for government's
15    case-in-chief.
16            THE COURT:  And an estimate of cross time?
17            MR. MAYNARD:  It could be pretty long for several of
18    them, Judge.  Again, until I see the witness list, I can't
19    tell you.  But I can assure you that I intend to put on a fair
20    number of witnesses on my own, so.
21            THE COURT:  Well, just in the defense case, how many
22    days would you anticipate today?
23            MR. MAYNARD:  Three or four.
24            THE COURT:  Three or four.
25            So basically, what I look at is how many different
```

1    weeks will the jury have to be here?  And now we're talking at

2    least over four weeks.  Even eleven days, that's

3    two-and-a-half -- that's three different weeks that they are

4    here.  So we're talking at least four weeks, and hopefully,

5    only four weeks.  That would be a total, including jury

6    selection and deliberations, 16 days.

7         A prescreen for time to me would be an essential

8    thing to do or else voir dire will take forever because it

9    will all be about spring break and who's got prepaid tickets

10   to go wherever they're going on spring break.

11        Maureen just told me that if we use a written

12   substantive questionnaire -- are you talking about a

13   questionnaire-questionnaire or prescreen?

14        THE CLERK:  Both.

15        THE COURT:  Four weeks.  Four weeks before trial.

16        And I definitely think we need to do a written

17   prescreen.  And I'm not going to sit here and count the days

18   for you, but if we counted out 16 days, I don't think there is

19   any holidays there, but anyway, then at least we would have a

20   voir dire panel that didn't have good and sufficient reasons

21   why they can't be here for four weeks.

22        MR. KOEHLER:  Your Honor, I don't know what day

23   President's Day is in February, but it's probably --

24        THE COURT:  It's the day before the first day of

25   trial.

1              MR. KOEHLER:  Aha.  So we would start on the Tuesday

2    right after President's Day.

3              THE COURT:  It's the 15th.

4              MR. KOEHLER:  There we go.  Thank you.

5              THE COURT:  So we are agreeable that we need a

6    prescreen, is that right, for time?

7              MR. MAYNARD:  Yes, from the defense.

8              THE COURT:  Yes?

9              MR. KOEHLER:  Agreed.

10             THE COURT:  Okay.  So we'll plan on that.

11             Whether or not we use a written questionnaire, you

12   two need to discuss that and also discuss the methodology by

13   which it would be administered.

14             MR. MAYNARD:  Okay.

15             THE COURT:  And if you submit a 50-page questionnaire

16   to me, we won't have one.

17             MR. MAYNARD:  That was pretty loud and clear.

18             THE COURT:  It never hurts to, like, say it

19   explicitly.

20             So let's talk about the dates that have not passed

21   and make a few slight changes to the upcoming dates.  So I'm

22   going to start with the disclosure of summary charts.

23             Previously -- well, let's look at it this way.  We'll

24   start with the November 30th date.  When the trial date was

25   January 14th, we were suggesting Preliminary Witness and

1    Exhibit List six weeks in advance.

2              Is it agreeable, Mr. Maynard, to get the government's

3    Preliminary Witness and Exhibit List on or about the last day

4    of this year or the first day of next year?

5              MR. MAYNARD:  Yes, Your Honor.

6              THE COURT:  So what date, Mr. Koehler?  The last day

7    of the year is pretty obvious, the first day of the year

8    business-wise, is the 4th of January.

9              MR. KOEHLER:  I was going to suggest the first

10   business day of the new year, Your Honor.

11             THE COURT:  January 4th?

12             MR. KOEHLER:  Yes.

13             THE COURT:  Okay.  So we're modifying that to January

14   4th, 2016.

15             Disclosure of summary charts.  Previously, December

16   11th.  Can we change that to January 11th, which is a week --

17   the next Monday?

18             MR. KOEHLER:  Your Honor, can we get to the Friday of

19   that week?

20             THE COURT:  The 15th?  Agreeable, Mr. Maynard?  This

21   is your cell phone data.

22             MR. MAYNARD:  That's fine.

23             THE COURT:  January 15, 2016.

24             Final date for Disclosure of Jencks Act and Witness

25   Impeachment Material, do we need to move that from January 7th

1    to February 5th?

2          MR. KOEHLER:  Your Honor, given the summary charts,

3    we think that it would make sense to back that up a little

4    bit.

5          THE COURT:  To February 1st?

6          MR. KOEHLER:  That should work.

7          THE COURT:  Your Final Witness and Exhibit List,

8    February 5th, Friday of that week, with, of course, the

9    anticipation that the preliminary list is bigger than the

10   final list because the final list is culling down from

11   preliminary.

12         MR. KOEHLER:  Your Honor, the previous date was

13   about -- was the Friday before the commencement of trial on a

14   Thursday, I believe.

15         THE COURT:  Well, but the commencement -- that was

16   commencement of jury selection.

17         MR. KOEHLER:  Correct.  We would propose like the

18   10th or the 11th of February.

19         THE COURT:  How about the 8th?

20         MR. KOEHLER:  Okay.

21         THE COURT:  Same date for you then on your disclosure

22   of Final Witness and Exhibit List, Mr. Maynard?  February 8th?

23         MR. MAYNARD:  Sure.

24         THE COURT:  The next item for dates that have not yet

25   passed is the filing of the Joint Statement of the Case, the

 1    Joint Proposed Voir Dire and Supplemental Voir Dire To Which

 2    There is No Agreement.

 3           And I think that the Joint Statement of The Case can

 4    be put off.  Joint Proposed and Supplemental Oral Voir Dire

 5    can be put off.  But I need to set a good date for you that --

 6    and maybe December 28th is it -- by which time you submit, if

 7    there's going to be one, a proposed written questionnaire if

 8    the methodology by which you want it completed is to mail it

 9    out.

10           If the methodology by which you want it completed is

11    to be administered to the jury on the day they arrive, then we

12    can push this date into January.

13           But what I think I should do today is that the Joint

14    Statement of The Case and the Oral Proposed Voir Dire we

15    can -- we previously had that about three weeks before the

16    commencement of trial.  We can do it again three weeks --

17    well, no, I guess it was only two weeks before the

18    commencement of trial.  So we can put that back to February

19    1st, 2016.

20           But I'm going to add that any written questionnaire

21    to be mailed to prospective jurors be by December 28th; or if

22    administered on February 16th, we'll put that date on February

23    1st also.

24           Okay?  Then filing of Trial Briefs, Joint Proposed

25    Jury Instructions, Supplemental Jury Instructions To Which

1   There is No Agreement, and any Joint Proposed Verdict Forms we

2   can move that to February 9th.

3          Anything else that we need date-wise, Mr. Koehler?

4          MR. KOEHLER:  No, Your Honor.  We wanted to inquire

5   about the size of the venire panel the Court was considering

6   for this case.

7          THE COURT:  Well, since we're doing a prescreen, it

8   won't be as big, but I don't know.  Do you have a suggestion?

9          Have you tried any cases -- do you have any

10  experience in your office with any of these issues and how

11  many jurors were used or anything like that?  I mean, I was

12  not --

13         MR. KOEHLER:  Ms. Brook is informing me that she's

14  talked to others in our office and it's typically three to

15  four times the normal venire panel that is necessary to get a

16  qualified jury in a case like this.

17         THE COURT:  Who thinks --

18         MR. KOEHLER:  In other districts.

19         THE COURT:  In other districts?  Okay.  Because we

20  don't have any experience here.

21         MR. KOEHLER:  I believe that's correct.

22         THE COURT:  And do we know if those are because of

23  the length of -- you know, we have this difference between all

24  the people that have to be excused for long trials and then

25  all the people that have to be excused for -- because they

1    can't be fair and impartial.

2              MR. KOEHLER:  Correct.

3              THE COURT:  And I'm not sure.  I don't know if they

4    have distinguished that.  But typically, you know, for a

5    regular jury we usually get 50 and I wouldn't have considered

6    more than a hundred, but I could be persuaded otherwise.

7              MR. KOEHLER:  When you're talking about a hundred,

8    are you talking about the number that you actually bring in

9    after they have answered the questionnaires?

10             THE COURT:  Yes, after they have been prescreened for

11   time.

12             MR. KOEHLER:  If you prescreen --

13             THE COURT:  For time only.

14             MR. KOEHLER:  For time regardless via mail, we have

15   been talking about the notion of doing the questionnaire in

16   the morning and wanted to confer with defense counsel about

17   the notion of having the day to go through all those

18   questionnaires and calling them back the next morning to go

19   through the actual substantive voir dire.  But obviously, we

20   haven't talked yet and crossed that bridge.

21             THE COURT:  You need to discuss that and decide and

22   then I have to agree on the questionnaire.

23             MR. KOEHLER:  That's correct.

24             THE COURT:  And if it is the day of trial, exactly

25   what the logistics will be.

1          MR. KOEHLER:  So the big question will be how many

2    people to bring in to answer the questionnaire?

3          THE COURT:  Correct.  And that --

4          MR. KOEHLER:  We think that will be a substantial

5    number.

6          THE COURT:  And then it's an even bigger substantial

7    number that have to get prescreened.

8          MR. KOEHLER:  Right.

9          THE COURT:  Because they know how to do it in the

10   jury room, but they send out some huge number of prescreen

11   slips to yield an available number of people just to start

12   talking to about the substantive voir dire.

13         MS. BROOK:  Your Honor, my inclination -- and I have

14   discussed this with folks who have tried similar type cases in

15   other districts, but I think we are in kind of a different

16   ballpark presently, and I think probably in February we will

17   be in that same ballpark still, just because of the heightened

18   sensitivities nationally and worldwide with the issue at hand,

19   that I don't know if there is a way --

20         If we did go with perhaps 150 jurors, to then provide

21   some sort of other avenue where they could be

22   telephonically -- not telephonically -- but electronically

23   present because I would assume the courtroom itself doesn't

24   seat 150.

25         THE COURT:  We have another courtroom that's bigger.

1          MS. BROOK:  Very good.  Very good.

2          But I think that the real interest at hand is not

3   only just how these cases have been tried in other districts

4   historically, but also the current context in which we're

5   trying the case now which has an added layer.

6          And I would be concerned about breaking the panel or

7   busting the panel, but that concern might be alleviated

8   through our questionnaire.

9          THE COURT:  Well, the problem is is that if we didn't

10  have enough prescreened jurors, then we could call in another

11  hundred and find that there is only 12 that could serve for

12  four weeks before they know anything else.

13         MS. BROOK:  Right.

14         THE COURT:  So you think 150?  Because in order to

15  exercise the strikes, I'm just assuming a jury of 14.  That

16  means 32 qualified jurors.

17         MS. BROOK:  That would be -- yea.  That absolutely

18  would be my thought with two alternates and especially

19  prescreening them as to time, I think we would be safe with

20  two alternates.

21         My only concern, and it is at this stage just a

22  guess, but I know that given the heightened sensitivities at

23  issue in this case, we just want to make sure that we can,

24  indeed, sit a panel after we begin questioning.

25         THE COURT:  Okay.

1          MR. MAYNARD:  Judge, the longest trial I have ever

2     had was three months and we had four alternates and we lost

3     two during the beginning of the case.

4          THE COURT:  We're not going to talk about the number

5     of alternates today.  I was just trying to do the math in my

6     head about the number that we needed, and do we really need

7     more than four times that many people to come in?

8          MR. MAYNARD:  Well, I don't disagree with the

9     government.  I would rather have too many.

10         THE COURT:  All right.  We will ask for 150 and we

11    will prescreen for 150 unless you want to administer a

12    questionnaire by mail and then we will send a questionnaire to

13    heaven knows how many people.  I don't know.  That would be up

14    to --

15         If I say to the Jury Administrator, "I need 150

16    prescreened jurors," they know how many people that is they

17    have to send out to and it's at least three or four times that

18    many.

19         MR. KOEHLER:  Your Honor, do you know how many the

20    Court typically requests for a venire panel in a child

21    pornography case?

22         THE COURT:  No, I don't.  I am fortunate to have

23    never tried one.

24         MR. KOEHLER:  I think that in terms of sensitivity

25    and getting juror reaction just to the subject matter alone,

```
 1    that that's probably the closest thing that we are going to

 2    find in terms of something that's that visceral.

 3              THE COURT:  I don't have the answer to that.  I guess

 4    I could inquire.

 5              Anything else you want to raise, Mr. Maynard?

 6              MR. MAYNARD:  Judge, I don't think so.  The only

 7    issue, and again, we just haven't had a chance to talk, the

 8    government's initial expert disclosures were supposed to be on

 9    October 19th.  I think they were a little bit late.  And then

10    they have been supplemented since then.

11              I'm in the process -- and so I think technically my

12    rebuttal expert date has passed -- but I think it was last

13    week that I got -- it could have been ten days ago that I got

14    the disclosure from the government.

15              THE COURT:  So have you made any expert disclosure?

16              MR. MAYNARD:  No.

17              THE COURT:  So you want a new date for that?

18              MR. MAYNARD:  I do.

19              THE COURT:  Because your date was November 2nd?

20              MR. MAYNARD:  Yes.

21              THE COURT:  What new date do you want?

22              MR. MAYNARD:  We are looking -- so I would like at

23    least two weeks because of the holidays.

24              THE COURT:  Two weeks from now?

25              MR. MAYNARD:  Yes.
```

1              THE COURT:  I already moved to 2016 while I was

2    talking to you.  Now I have to go back to today.

3              MR. MAYNARD:  Well, I'll take 2016.

4              THE COURT:  So two weeks from today, I believe, is

5    the 8th of December.

6              MR. MAYNARD:  How about the 11th?

7              THE COURT:  The 11th?

8              MR. MAYNARD:  Yes.

9              THE COURT:  Agreeable, Mr. Koehler?

10             MR. KOEHLER:  Yes, Your Honor.

11             THE COURT:  Okay.  December 11th.

12             Okay.  Communicate with Maureen about Agent

13   Chiappone.  When right around the same time that we hear from

14   him, we will also know -- it doesn't sound like you are going

15   to want to administer a written questionnaire by mail.  At

16   least the government clearly doesn't want to do that.  You are

17   going to talk about that.

18             We will revisit the questionnaire issue and find out

19   what you have agreed upon whenever it is that we reconvene

20   with Agent Chiappone.  And then we will also probably set at

21   that time a Final Pretrial Conference just to go over all of

22   the last minute details.  Okay?

23             MR. KOEHLER:  That sounds good, Your Honor.

24             MR. MAYNARD:  Okay.

25             MR. KOEHLER:  One quick question.

1            Given the extension for the defense experts, that

2    would trigger a possible need for rebuttal experts and we

3    would request that we have the same distance between, which is

4    eleven days, so December 22nd.

5            THE COURT:  Okay.

6            MR. KOEHLER:  Does that work in terms of Friday to

7    Monday?

8            MS. BROOK:  Yes.

9            MR. KOEHLER:  That is December 22nd, a Tuesday?

10           THE COURT:  Yes.

11           MR. KOEHLER:  Okay.  Perfect.

12           THE COURT:  Okay.

13           MR. KOEHLER:  Thank you.

14           THE COURT:  I think that does it.

15           Thank you very much.  Court is in recess.

16        (Proceedings adjourned at 3:18 p.m.)

17                              * * *

18

19

20

21

22

23

24

25

1

2                       C E R T I F I C A T E

3

4            I, ELIZABETH A. LEMKE, do hereby certify that I am

5    duly appointed and qualified to act as Official Court Reporter

6    for the United States District Court for the District of

7    Arizona.

8            I FURTHER CERTIFY that the foregoing pages constitute

9    a full, true, and accurate transcript of all of that portion

10   of the proceedings contained herein, had in the above-entitled

11   cause on the date specified therein, and that said transcript

12   was prepared under my direction and control.

13           DATED at Phoenix, Arizona, this 8th day of December,

14   2015.

15

16

17

18

19                       s/Elizabeth A. Lemke
                         ELIZABETH A. LEMKE, RDR, CRR, CPE
20

21

22

23

24

25