CR15-00707-PHX-SRB    JURY TRIAL-DAY #11  3-3-16

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

_____

| | |
|---|---|
| United States of America, | ) |
| | ) |
| plaintiff. | ) **APPEAL** |
| | ) **CR15-00707-PHX-SRB** |
| vs. | ) Phoenix, Arizona |
| | ) March 3, 2016 |
| Abdul Malik Abdul Kareem, | ) 1:02 p.m. |
| | ) |
| Defendant. | ) |
| | ) |
| _____ | ) |

BEFORE:  THE HONORABLE SUSAN R. BOLTON, JUDGE
REPORTER'S TRANSCRIPT OF PROCEEDINGS
JURY TRIAL - DAY 11
(Pages 1924 through 2057, Inclusive.)

APPEARANCES:
For the Government:
          U.S. ATTORNEY'S OFFICE
          By:  **Kristen Brook, Esq.**
               **Joseph Edward Koehler, Esq.**
          40 North Central Avenue, Suite 1200
          Phoenix, AZ  85004

For the Defendant Abdul Malik Abdul Kareem:
          MAYNARD CRONIN ERICKSON CURRAN & REITER PLC
          By: **Daniel D. Maynard, Esq.**
               **Mary Kathleen Plomin, Esq.**
          3200 North Central Avenue, Suite 1800
          Phoenix, AZ  85012

Official Court Reporter:
Elizabeth A. Lemke, RDR, CRR, CPE
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, SPC 34
Phoenix, Arizona  85003-2150
(602) 322-7247
Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

CR15-00707-PHX-SRB    JURY TRIAL-DAY #11  3-3-16

INDEX

**SUMMARY OF COURT PROCEEDINGS**                        **PAGE:**

STIPULATIONS                                      Page 2000
GOVERNMENT RESTS                                  Page 1997
DEFENDANT'S ORAL MOTION FOR                       Page 2000
        JUDGMENT OF ACQUITTAL

INDEX OF WITNESSES

**SPECIAL AGENT STEWART WHITSON:**

Cross examination by (cont'd) Mr. Maynard         Page 1927
Redirect examination by Ms. Brook                Page 1965

**DANIEL VAN HOOK:**

Direct examination by Ms. Plomin                 Page 2001
Cross examination by Mr. Koehler                 Page 2013

**DUNSTON REGINALD SIMPSON, II:**

Direct examination by Mr. Maynard                Page 2017
Cross examination by Mr. Koehler                 Page 2023

**DUNSTON FRANCIS SIMPSON, SR.:**

Direct examination by Mr. Maynard                Page 2025
Cross examination by Mr. Koehler                 Page 2030

**STUART SAMPSON:**

Direct examination by Mr. Maynard                Page 2033
Cross examination by Mr. Koehler                 Page 2042

**ANTHONY SAMPSON:**

Direct examination by Mr. Maynard                Page 2044
Cross examination by Mr. Koehler                 Page 2052

CR15-00707-PHX-SRB   JURY TRIAL-DAY #11   3-3-16

## INDEX OF EXHIBITS

| EXHIBIT NO.: | DESCRIPTION: | RECEIVED: |
|---|---|---|
| Exhibit No. 196 | BMO Harris bank records | Page 1936 |
| Exhibit No. 498 | Letter to Elton Simpson from Hassan Abu Jihaad postmarked 9-15-14 | Page 1994 |
| Exhibit No. 545 | Screen shots from LG 480-849-8104 re: AK74 | Page 1952 |
| Exhibit No. 546 | Screen shot from LG 480-849-8104 re: $700 | Page 1961 |
| Exhibit No. 558 | E-mails between Rebecca Magnone and Stewart Whitson dated 12/14/15 | Page 1942 |
| Exhibit No. 565 | Text messages MaxWest Phone 5/1/15 through 5/8/15 | Page 1947 |

UNITED STATES DISTRICT COURT

```
 1                   P R O C E E D I N G S

 2        (Called to the order of court at 1:02 p.m.)

 3             THE COURT:  Good afternoon, ladies and gentlemen.

 4   Please sit down.  The record will show the presence of the

 5   jury, counsel, and the defendant.

 6             Mr. Maynard, you may continue your cross-examination

 7   of Agent Whitson.

 8             MR. MAYNARD:  Thank you, Your Honor.

 9        SPECIAL AGENT STEWART WHITSON, WITNESS, SWORN

10             CROSS EXAMINATION (cont'd)

11   Q   Good afternoon, Agent Whitson.

12   A   Good afternoon, sir.

13   Q   A couple of -- a few followup questions that I have from

14   yesterday.

15             In the course of your investigation, you determined

16   that Mr. Abdul Kareem did not ever have a Twitter account; is

17   that correct?

18   A   Yes.

19   Q   Okay.  And did the FBI do a canvass of the apartment

20   complex that Simpson and Soofi lived in after this incident?

21   In other words, did they go door-to-door and talk to the

22   residents in the area?

23   A   Yes.

24   Q   And in the process of doing that, none of them --

25             Or strike that.
```

1    You also, when that canvass was being done, you had

2  pictures of Simpson and Soofi; Nadir Soofi, Ali Soofi, Abdul

3  Kareem, and others, correct?

4  A   Well, I didn't conduct the canvass, but a number of agents

5  did and I would assume they would have had pictures of all

6  those people.  That's right.

7  Q   The purpose of that canvass was to go there and say, "Can

8  you identified these people as either being here or living

9  here"?

10  A   Yes.  That would be, yes.

11  Q   And is it fair to say that nobody identified Abdul Kareem

12  as ever coming over there?

13  A   I don't recall there being anyone that did that.

14  Q   Okay.  You don't recall anybody who said, "I saw him

15  here"?

16    THE COURT:  Well, he wouldn't recall what anybody

17  said because he didn't do it.  So you can only ask him if

18  there were any positive results of people saying they had seen

19  him.

20  BY MR. MAYNARD:

21  Q   I understand.  From the 302 that you reviewed as part of

22  your investigation, is it fair to say that nobody identified

23  Mr. Abdul Kareem as having been there?

24  A   I do not recall anyone from the apartment complex

25  remembering him.

1   Q   Okay.  Now, we heard Ali Soofi's testimony yesterday and

2   there were a number of times that he had been interviewed by

3   the FBI prior to his coming in to testify, correct?

4   A   Yes.

5   Q   And you had participated in a number of those interviews?

6   A   Yes.

7   Q   I believe the last two?

8   A   Two, yes.

9   Q   One was in September where it was done telephonically --

10  or with a video camera?

11  A   Yes.

12  Q   He was in Kansas with a lawyer.  You were here with

13  somebody from the U.S. Attorney's Office?

14  A   Yes.

15  Q   Okay.  And you prepared a 302 from that interview?

16  A   Yes.

17  Q   But you did not videotape or audiotape that interview?

18  A   Yes.  I did not.

19  Q   And you would have put down everything that you thought

20  was important that he said in that interview in your 302?

21  A   Yes.

22  Q   Okay.  He never mentioned in that interview that he had

23  seen Abdul Kareem assisting or directing his brother and

24  Mr. Simpson in cleaning the weapons, did he?

25  A   I would have to review my report to --

CR15-00707-PHX-SRB    JURY TRIAL-DAY #11  3-3-16

1    Q   You had a notebook.  Do you want to look at September --

2    September 29th?

3    A   I have just reviewed my report from September 25, 2015,

4    and I don't see that he was asked that question or that he

5    provided any information related to cleaning or disassembling

6    or reassembling a weapon.

7    Q   All right.  And I said "September 29."  That was the date

8    that the 302 was finalized and entered up in the top

9    right-hand corner, correct?

10   A   Yes, sir.

11   Q   But the interview actually occurred on September 25th?

12   A   Yes.

13   Q   Okay.  You then flew to Dallas, Texas, and met with him at

14   his mother's house with Ms. Brook?

15   A   In Texas.

16   Q   In Texas.  Somewhere near Dallas?

17   A   Not near Dallas, but, yes, in Texas.

18   Q   And you did not audio or videotape that interview?

19   A   No, I did not.

20   Q   That was the first time that he ever mentioned that he had

21   seen my client directing Mr. Soofi, his brother, and

22   Mr. Simpson in how to clean and disassemble any of these

23   weapons, correct?

24   A   I think that's correct.

25   Q   Okay.  And that interview took place on January 29th of

CR15-00707-PHX-SRB    JURY TRIAL-DAY #11  3-3-16

1   2016?

2   A    I'm not sure if I have a copy of that report with me.  If

3   you have it --

4            THE COURT:  Well, does that date sound about right?

5            THE WITNESS:  That sounds about right, Your Honor.

6            MR. MAYNARD:  Thank you.

7   BY MR. MAYNARD:

8   Q    Now, additionally, as you were preparing for this trial,

9   you went into the jail, Maricopa County Jail, to interview

10  Mr. Verdugo, correct?

11  A    Yes.

12  Q    And that was to get him ready to come over here and

13  testify?

14  A    What do you mean by that?

15  Q    Well, I mean, didn't you want to go, as you had done with

16  Mr. Soofi, and follow up and see what his testimony would be?

17  A    Not to see what his testimony would be, but I did conduct

18  an interview with him, a trial prep interview.

19  Q    I mean, Mr. Soofi had been interviewed by the FBI on five

20  or six occasions.  Yet you and Ms. Brook determined that it

21  was necessary to fly to Texas the end of January prior to this

22  trial.  That was to see what his testimony was going to be,

23  correct?

24  A    Not to see what his testimony was going to be.  To

25  interview him and conduct a pretrial interview.

CR15-00707-PHX-SRB    JURY TRIAL-DAY #11   3-3-16

1    Q    Okay.  You did the same thing with Mr. Verdugo, but you

2    did it in the county jail?

3    A    Yes.  I think -- I believe it was the county jail.

4    Q    And you did not tape that interview either, did you?

5    A    No.  We do not tape interviews in the jail.

6    Q    You can take a computer into the county jail, correct?

7    A    I don't know what the -- what you're allowed to take into

8    the jail.

9    Q    Did you ask anybody if you could bring in a recording

10   device?

11   A    On the first time that I went to interview him, I did ask

12   if I could bring a recording device.

13   Q    And in December of 2015 when you went to the county jail

14   to interview Mr. Verdugo, did you ask them if you could bring

15   in a recording device?

16   A    If that was the first one -- so the first time we

17   interviewed him in the jail, I asked them if I could bring in

18   a recording device, yes.

19   Q    And are you telling me that somebody told you that you

20   could not?

21   A    Yes.  The people in the entry area said they wouldn't

22   allow the recording device to be brought in.

23   Q    Okay.  And it was in that interview when you told

24   Mr. Verdugo that you would make a statement to -- or provide a

25   statement to the County Attorneys to assist him in the

UNITED STATES DISTRICT COURT

1    prosecution that the County was bringing against him?

2    A    No.  I didn't make that statement.

3    Q    Did you tell him you would provide him with a statement?

4    A    No.  I did not tell him I would provide him with a

5    statement.

6    Q    Did you --

7    A    But --

8    Q    Did you prepare a statement?

9    A    Ultimately, I prepared a statement.

10   Q    What was the purpose of the statement?

11   A    Based on my understanding that observations we had made

12   would contain potentially exculpatory material towards his

13   state charges.  So in other words, we had witnessed things

14   that could tend to show his innocence, we had a constitutional

15   mandate to provide that information to the prosecutor to let

16   them know, you know, what we had observed.

17   Q    And did you provide the prosecutors with this

18   constitutionally-mandated information?

19   A    Yes.  I provided it to the prosecutors.

20   Q    And did you prepare it on the day before you went to

21   interview Mr. Verdugo?

22   A    I believe it was prepared after.

23   Q    Your Honor, can --

24        Well, Mr. Verdugo testified that he was -- I believe

25   he said he was shown a copy.

1    A    No.   That's impossible.   He wouldn't have been shown a

2    copy of the statement I prepared.   He was never shown a copy

3    of the statement I prepared by me.

4    Q    Can Mr. Whitson be shown Exhibit 564.

5            Agent Whitson, is this one of the statements that was

6    prepared by you?

7    A    Yes.

8    Q    Okay.   And were you aware that Agent Nash also prepared a

9    statement concerning his observations?

10   A    Yes.

11   Q    And was Mr. Verdugo told that the statements would be

12   prepared?

13   A    Yes.   He was told that.

14   Q    Okay.   And if you -- you knew that Mr. Vergudo had been in

15   custody with the County since June or July, correct?

16   A    I don't recall the exact date of when he was --

17   Q    Sometime in the summer?

18   A    Yes.

19   Q    I mean, you knew that your witness who had prompted you to

20   begin tailing my client 24 hours a day had been taken into

21   custody by the County Attorney's Office here?

22           MS. BROOK:   Objection.   Form of question.

23           THE COURT:   Sustained.

24   BY MR. MAYNARD:

25   Q    You knew that Mr. Verdugo had been taken into custody

1   sometime in the summer of 2015?

2   A   Yes.  I knew, yes.

3   Q   Okay.  And it just so happens that it's either the day of

4   or the day before you meet with him in December is the first

5   time you prepare this 302 concerning your observations that

6   would be exculpatory for him?

7   A   Yes.  I didn't know the details of why he was arrested.

8   Q   Did the FBI --

9           Strike that.

10          Can the witness be shown Exhibit 196?  May I

11  approach, Your Honor?

12          THE COURT:  Yes.

13  BY MR. MAYNARD:

14  Q   Agent Whitson, can you tell the jury what 196 is?

15  A   Yes.  196 is a grand jury return from BMO Harris Bank for

16  bank accounts belonging to Abdul Malik Abdul Kareem.

17  Q   And these are the -- these bank accounts have been

18  reviewed or forensically reviewed by an accountant for the

19  FBI?

20  A   Yes.

21  Q   And these are the bank records that you looked at when you

22  said that there was some unusual activity?

23  A   Yes.

24  Q   And these were the records where he had placed in a

25  $10,000 deposit and then within days after that took on

```
 1    November 13 --
 2            THE COURT:  Excuse me.  I don't think this is in
 3    evidence.
 4            MR. MAYNARD:  Sorry.  I move for the admission of
 5    Exhibit 196.
 6            THE COURT:  Is there any objection?
 7            MS. BROOK:  No objection.
 8            THE COURT:  196 is admitted.
 9        (Exhibit No. 196 admitted in evidence.)
10    BY MR. MAYNARD:
11    Q    Okay.  On what would be about the sixth or seventh page of
12    the document, these are the records that show a $10,000
13    deposit.  And then on November 13th there was a $5,000
14    withdrawal?
15    A    Yes.
16    Q    Correct?
17    A    Yes.
18    Q    And you thought that was unusual?
19    A    Not just because of those two facts, but, yes.
20    Q    Okay.  Can the witness be shown Exhibit 559.
21            Agent Whitson, have you ever seen Exhibit 559 before?
22    A    I don't recognize it, but.
23    Q    Does the yellow marker with the number 22 on it look
24    familiar to you?
25    A    I mean, that looks like a marker that would be used at a
```

CR15-00707-PHX-SRB    JURY TRIAL-DAY #11   3-3-16

1    scene, but.

2    Q    Do you know whether or not this is a copy of a notebook

3    that was taken from Mr. Abdul Kareem's vehicle when he was

4    arrested by the FBI on June 10th of 2015?

5    A    I don't.

6    Q    Okay.  And I take it then, even though the notebook is

7    turned to a particular page and photographed, you don't recall

8    ever seeing this?

9    A    I don't.

10   Q    And so, therefore, you would have not done any

11   investigation concerning the information that is found on

12   Exhibit 559?

13   A    Well, there is -- I did some investigation related to some

14   things that are written there.

15   Q    But how would you have done that without looking at that?

16          Did you do a background on the truck that he had

17   purchased?

18   A    Well, no.  There's information there that looks like

19   information that came from other things and so I did

20   investigative efforts on those other things.

21   Q    Did you do any investigation to determine when Mr. Abdul

22   Kareem had purchased the box truck, the 1998 box truck?

23   A    Yes.

24   Q    And what did you do?

25   A    I checked with records with the Motor Vehicle Department.

UNITED STATES DISTRICT COURT

CR15-00707-PHX-SRB    JURY TRIAL-DAY #11    3-3-16

1    Q    When did you do that?

2    A    I did that yesterday.

3    Q    That was the first time?

4    A    Yeah.  That I did -- that I did it, yes.

5    Q    Are you aware of anybody else having done it?

6    A    No.

7    Q    Did you look -- did you look at Exhibit 559 over the

8    evening?

9    A    No.

10    Q    Okay.  What did you find from the Motor Vehicle

11    Department?

12    A    The records indicated that a GMC truck was purchased by

13    the defendant -- or I should say not purchased, but registered

14    with the State in or about January 20th, I believe, so January

15    20th of 2015.

16    Q    Okay.  Did you go back to look at any of the documents

17    that the FBI had recovered to determine if there was any sort

18    of receipt for the purchase of that truck?

19    A    Yes.  I looked.

20    Q    And you didn't find 559?

21    A    No, I did not.  I did not see anything that looks like

22    this.

23    Q    Okay.  Can I have the witness have Exhibits 242 and 243

24    and may I approach?

25            THE COURT:  The clerk?

CR15-00707-PHX-SRB    JURY TRIAL-DAY #11   3-3-16

1            MR. MAYNARD:  No.  I don't need to.  I'm sorry.

2       Is 242 in evidence?

3            THE COURT:  It is not.  Only 243 is this evidence.

4   BY MR. MAYNARD:

5   Q   Do you have 243 in front of you?

6   A   Yes, I do.

7   Q   Have you seen this photograph before?

8   A   It looks familiar.

9            MR. MAYNARD:  If it's in evidence, can I publish it?

10           THE COURT:  Yes.

11  BY MR. MAYNARD:

12  Q   Do you know where the FBI found this photograph?

13  A   I don't recall for this one.

14  Q   Do you know who this is?

15  A   I think so.  The picture is kind of hard to see.

16  Q   Who do you believe it is?

17  A   But it looks like Nathaniel Soofi, which is Nadir Soofi's

18  son.

19  Q   Okay.  And did the FBI interview Nathaniel Soofi?

20  A   Yes.

21  Q   In this case we've heard from three witnesses so far that

22  said they knew about the Muhammad Drawing Contest before it

23  occurred.  Would you agree with that?

24  A   Could you say that again?

25  Q   Yeah.  We heard -- Mr. Verdugo said he had heard about the

UNITED STATES DISTRICT COURT

1    Muhammad Drawing Contest before it occurred.

2    A    Yes.

3    Q    And the two juveniles, Carlos and Juan, both said they had

4    heard about that drawing contest before it occurred?

5    A    Yes.

6    Q    Okay.  Did anyone else in your investigation, anyone tell

7    you that they had heard of that contest before it occurred

8    other than those two individuals -- those three individuals?

9    A    No, not that I recall.

10    Q    Do you recall whether or not Mr.-- the young boy in the

11    photograph indicated that he knew about the contest before --

12        MS. BROOK:  Objection.  Hearsay as to any content of

13    conversations.

14        THE COURT:  Sustained.

15    BY MR. MAYNARD:

16    Q    Okay.  Did you participate in the preparation of the

17    indictments in this case?

18    A    What do you mean?

19    Q    Did you review them?  Approve them?

20    A    No.  I wouldn't, no.  I would provide information that

21    they may have used in crafting that.

22    Q    Are you aware how many indictments there are in this case?

23    A    Yes.  I believe so.

24    Q    Okay.  The first indictment was when?

25    A    It would have been on June 10th of 2015.

1    Q    So can you explain to the jury what an indictment is?

2    A    Well, an indictment is where the case is presented

3    before -- and in this case it was a grand jury -- and so the

4    case is presented before the grand jury.  And then the grand

5    jury votes on whether they believe there is sufficient cause

6    to justify indicting that individual or charging them with

7    those offenses.

8    Q    And at a later date there was a superseding indictment

9    that was filed; is that correct?

10   A    Yes.

11   Q    And a superseding indictment is one that adds new charges?

12   A    Yes.

13   Q    And then at a later date there was a second superseding

14   indictment that was charged -- filed?

15   A    Yes.

16   Q    And that last one is the one that is here in front of this

17   jury, correct?

18   A    Yes.

19   Q    And that one charged my client for the first time with

20   Conspiracy to Provide Material Support to a Foreign Terrorist

21   Organization; is that correct?

22   A    Yes.

23   Q    And that was done on or about September 22nd of 2015?

24   A    That sounds right.

25   Q    Were you happy when it was -- the government brought that

CR15-00707-PHX-SRB    JURY TRIAL-DAY #11   3-3-16

1  second superseding indictment?

2  A   No.

3  Q   No?

4  A   I don't think "happy" is a right way to describe that.

5  Q   Didn't you think this was a fantastic thing for the

6  government to do?

7  A   To do what?

8  Q   Charge him with Conspiracy to Provide Material Support to

9  a Foreign Terrorist Organization?

10  A   No.  I didn't think that was a happy thing to do.

11  Q   Could you show the witness Exhibit 558.

12       Agent Whitson, have you seen Exhibit 558 before?

13  A   I have not seen this exhibit.

14  Q   You have seen it before, correct?

15  A   I recognize it that it's an e-mail.

16  Q   There was an e-mail that was written to you by somebody at

17  the U.S. Department of Justice, correct?

18  A   Yes.

19  Q   And then you wrote an e-mail back to that person and

20  others, correct?

21  A   Yes.

22       MR. MAYNARD:  Okay.  I would move for the admission

23  of Exhibit 558.

24       MS. BROOK:  No objection.

25       THE COURT:  558 is admitted.

UNITED STATES DISTRICT COURT

```
 1        (Exhibit No. 558 admitted in evidence.)

 2   BY MR. MAYNARD:

 3   Q   Agent Whitson, when you were told that the FBI -- or the

 4   U.S. Attorney's Office here in Phoenix, Arizona, had been

 5   approved for conspiracy to file -- conspiracy to provide

 6   material support as outlined in your e-mail, your response

 7   was:

 8            "Fantastic news.  Thank you or three -- thank you all

 9   three of you for all the hard work.  I know there is going to

10   be a lot of people in our organization who will be very

11   pleased."

12            You thought in was fantastic, didn't you?

13   A   I was thanking them for their hard work, yes.

14   Q   And the people in your organization that you're talking

15   about is the FBI, correct?

16   A   Yes.

17            MR. MAYNARD:  Your Honor, I don't have any more

18   cross-examination, but I believe that Ms. Plomin has some.

19            THE COURT:  Yes.  This will be --

20            That was your last question?

21            MR. MAYNARD:  Yes, ma'am.

22            THE COURT:  Ladies and gentlemen, I made an exception

23   to my rule that only one lawyer could participate for each

24   side in the examination or cross-examination of a single

25   witness because Ms. Plomin has handled all of the
```

1  computer-related evidence in this case and Mr. Maynard has

2  handled other evidence in the case.

3         So there's not going to be any repetition of anything

4  that Agent Whitson has already been asked, but now we're going

5  to focus this part of the cross-examination on the --

6         I said "computer," but more broadly, the electronic

7  communication.

8         MS. PLOMIN:  Thank you, Your Honor.

9                    **CROSS EXAMINATION**

10  BY MS. PLOMIN:

11  Q   Good afternoon, agent.

12  A   Good afternoon, ma'am.

13  Q   Madame Clerk, can we please give Agent Whitson Exhibits

14  544 through 546 and 565.

15         And, Agent, did you also bring Exhibit 48 with you,

16  the physical exhibit?  It has been admitted.

17  A   I don't know if that's here.  What is it, do you know?

18         THE COURT:  It's described as a black LG flip phone.

19         THE WITNESS:  I don't believe that's here in the

20  courtroom right now.

21  BY MS. PLOMIN:

22  Q   Okay.  Okay.

23         Now, Agent Whitson, I want to first direct your

24  attention to Exhibit 565.  Do you have that in front of you?

25  A   Yes.

```
 1    Q    And do you recognize Exhibit 565 or what's depicted in
 2    Exhibit 565?
 3    A    It looks like text messages going back and forth from
 4    users.
 5    Q    And do you recognize those as text messages from Abdul
 6    Malik Abdul Kareem's cell phone, Maxwest cell phone?
 7              MS. BROOK:  Objection.  Hearsay.
 8              THE COURT:  Overruled.  He's being asked if he can
 9    identify that that is what is in this document.
10              THE WITNESS:  I'm trying to see its number.
11              MS. PLOMIN:  And I would also offer it under the rule
12    of completeness, Your Honor.
13              THE WITNESS:  I don't see his number on here, but it
14    looks like these may be text messages from Mr. Kareem.
15    BY MS. PLOMIN:
16    Q    Okay.  You reviewed the text messages from Mr. Kareem's
17    Maxwest cell phone, correct?
18    A    Yes.
19    Q    And those would have been very important to you in your
20    investigation here, correct?
21    A    Yes.
22    Q    And we're looking at the dates of May 1st, 2015, through
23    May 3rd, 2015.  Were those significant dates in this
24    investigation?
25    A    Yes.
```

1    Q    And just -- what date was the Garland attack on?

2    A    The attack occurred on May 3rd.

3    Q    And so May 1st would have been the Friday before the

4    attack, correct?

5    A    Correct.

6    Q    Now, if you could turn to the message on May 1st, 2015, at

7    5:21:07 p.m.

8         MS. BROOK:  Your Honor, if I may, I think our

9    exhibits may be on the witness stand with Special Agent

10   Whitson.

11        Can I just approach to get our copy of these exhibits

12   so we can follow along?

13        THE COURT:  You mean your copy of 565?

14        MS. BROOK:  Right.  Not the ones that the clerk has

15   given him, but some additional copies.

16        THE COURT:  Okay.

17        MS. BROOK:  Thank you.

18        Apparently, they're not up there.

19   BY MS. PLOMIN:

20   Q    It's three lines up from the bottom of the first page.

21   A    Yes.

22   Q    Now, starting with that text message on May 1, 2015, at

23   5:21 p.m. and reading down from that, take a look at those and

24   see if you recognize those.

25   A    Yes.

```
 1   Q    And where do you recognize those came from?

 2   A    I believe these are text messages that came from

 3   Mr. Kareem's phone to various people.

 4   Q    Okay.  And is this a fair and accurate depiction of the

 5   text messages that you reviewed from Mr. Kareem's phone from

 6   May 1st, 2015, through May 3rd, 2015?

 7   A    Yes.  It looks like a portion of those records.

 8            MS. PLOMIN:  Your Honor, I move to admit Exhibit 565

 9   and publish.

10            THE COURT:  Is there any objection?

11            MS. BROOK:  Your Honor, we object to hearsay as well.

12            THE COURT:  Overruled.  565 is admitted.

13      (Exhibit No. 565 admitted in evidence.)

14   BY MS. PLOMIN:

15   Q    I want to direct your attention to the first text message

16   on May 1st at 5:21 p.m.

17   A    Yes.

18   Q    And could you read for us the text messages from May 1st,

19   2015, at 5:21 p.m. through May 2nd, 2015, 8:44:07 a.m. which

20   is on the second page.

21            THE COURT:  Well, first, to the extent that you know

22   who the phone numbers are that they are going out to, can you

23   tell us that too?

24            THE WITNESS:  I don't know that.

25            THE COURT:  Okay.
```

```
 1              THE WITNESS:  So there's other individuals who would

 2     be more qualified to do this, the analyst that was in charge

 3     of this project.

 4              MS. PLOMIN:  Okay.  I'm just interested in what the

 5     content of the messages are for the jury.

 6              THE WITNESS:  Okay.

 7              Should I begin?

 8     Q   Yes.

 9     A   "Salaam walekum."

10              "Salam walaikum brother I'm inviting you to lunch

11     tomorrow I'm marinating the goat the night inshallah lunch

12     start at one."

13     Q   Can I just stop you.

14              If you could read if they are outgoing or ingoing

15     text messages?

16     A   Those two were out.

17     Q   Okay.

18     A   And then in:

19              "Walaikum salaam shukran for the invite but I finish

20     work at 3 and I think I'll have to watch my daughter, if I can

21     I'll try to make it."

22              And then out at 9:37 p.m.:

23              "Salam walaikum brother I'm cooking curry goat

24     tomorrow Jamaican style I invite you tomorrow at 1 o'clock."

25              At 9:41 out:
```

1          "Salaam walaikum I'm marinating the meat for the

2     curry it start at 1."

3          At 9:41:56:

4          "Just let the brothers know."

5          And then keep going?

6     Q    Yes.  Please.

7     A    9:42 p.m. an in-message:

8          "Will be working."

9          9:42 p.m. in says:

10         "In sha allah."

11         9:45 p.m.

12         "Alright excited inshaAllah Ill try and make it.  I

13    work but I'll see if I could leave for like 30 mints.  How

14    early can i come."

15         And then 10:02 P.m. an in:

16         "What happened."

17         And then 5/2 at 8:43 a.m.

18         "You can come early as you want."

19         As an out message.

20    Q    And what's the last message there, the next message?

21    A    At 8:44 a.m. an in-message says:

22         "Koo."

23    Q    Is that slang for "cool"?

24    A    That would be my guess, yes.

25    Q    All right.  So over the course of your investigation

1    through these text messages, was it your understanding that

2    Mr. Abdul Kareem was inviting some people over for lunch the

3    following day after May 1st?

4    A    Based on these text messages alone, yes.

5    Q    Okay.  Now can you please look at Exhibit 544, 545, and

6    546.

7    A    Yes.  I'm set.

8    Q    So you have reviewed Exhibit 544 through 546?

9    A    Yes.

10   Q    Do you recognize what's depicted in those three exhibits?

11   A    Yes.

12   Q    And what is depicted in those exhibits?

13   A    This is the LG 44G cell phone that was recovered from

14   Dallas.  It was a phone that was believed to be utilized by

15   Elton Simpson.  And these are screen captures where the CART

16   folks have gone in and taken pictures of the phone and what

17   they can see on the screen.

18   Q    And you reviewed those screen captures, correct?

19   A    Yes.

20   Q    And let's start with Exhibit 544 --

21            Well, first I want to ask you.  You said that this

22   phone was attributed to Mr. Elton Simpson; is that right?

23   A    Yes.

24   Q    I want to show you a document, Mobile Device Analysis

25   Report.

1          Do you recognize what that is?

2  A   I recognize what that report is.

3  Q   And what is that report?

4  A   That would be a cover sheet for a report that would come

5  from a CART examiner when they're examining a device.

6  Q   And does this indicate what the cover sheet -- what device

7  this cover sheet is for?

8  A   Yes, it does.

9  Q   And which device is that?

10  A   It shows it for the device with the telephone number

11  ending 8104.

12          And could I check my notes for something real quick?

13  Would that be all right?

14  Q   Sure.

15  A   Okay.

16  Q   So isn't it true that this phone was actually attributed

17  to Mr. Nadir Soofi?

18  A   Yes.  I misspoke.  This is actually a phone attributed to

19  Nadir Soofi according to this sheet.

20  Q   Okay.  And it was found in Mr. Soofi's car in Dallas -- or

21  in Garland, Texas?

22  A   I don't recall its exact location, but I understand that

23  this is a phone that was recovered in Garland.

24  Q   I'm going to turn your attention to Exhibit 545.

25          Your Honor, I ask for permission to admit Exhibit

CR15-00707-PHX-SRB    JURY TRIAL-DAY #11    3-3-16

```
 1   545.

 2           THE COURT:  Is there any objection?

 3           MS. BROOK:  No objection.

 4           THE COURT:  545 is admitted.

 5      (Exhibit No. 545 admitted in evidence.)

 6   BY MS. PLOMIN:

 7   Q   Have you seen this text message before?

 8   A   Yes.

 9   Q   When did you first see this text message?

10   A   I don't recall the first date I saw it, but at some point

11   during the investigation I looked through these.

12   Q   All right.  The report date is May 5th, 2015, so did you

13   review this pretty early on in your investigation?

14   A   I don't recall exactly when I reviewed it, but I know I

15   reviewed it at some point in the investigation.

16   Q   Okay.  The phone number on the screen from 6025131626, do

17   you know whose phone number that is?

18   A   I believe and I'm not a hundred percent certain.

19   Q   Okay.  Did you or any other agent interview a man by the

20   name of Christian Leon after viewing this text message?

21   A   Yes.

22   Q   Do you know if that phone number belongs to Mr. Leon?

23   A   I believe that is the case, but I don't know with a

24   hundred percent certainty that that's his phone number, but I

25   believe that.
```

```
 1    Q    All right.  And can you read the content of the text
 2    message, the date and time?
 3    A    Yes.  It says -- there was a message sent from phone
 4    number ending in 1626.  It says:
 5              "Do you still want to get the AK-74?"
 6              It was sent on January 6th of 2015 at 7:01 a.m.
 7    Q    And that was an incoming message to the phone attributed
 8    to Mr. Soofi, correct?
 9    A    Yes.
10    Q    And after that text message at 7:01 a.m., these were --
11              Well, let me actually back up.
12              This report that you are viewing, a portion of the
13    report, is it essentially screenshots of the various text
14    messages and phone calls that occur from a phone?
15    A    Yes.
16    Q    And so after this message came in to Mr. Soofi's phone,
17    "Do you still want to get the AK-74?" there were several calls
18    back and forth between this number ending in 1626, correct?
19    A    I don't know that there were several calls back and forth
20    between the numbers.
21    Q    Why don't you look at the rest of the exhibit to see if it
22    refreshes your recollection.
23    A    Okay.  I have reviewed it.
24    Q    All right.  And were there several calls following this
25    text message that came in to Mr. Soofi's phone?
```

1    A    Yes.  It looks like there were four.

2    Q    Were there actually five?

3    A    I count four.

4    Q    Including page 2?

5    A    No.  I actually do.  See a fifth because there's two lines

6    on the same one, so, yes, there were five.

7    Q    Okay.  I'm putting page 2 of the exhibit on the screen for

8    the jury.

9          What does that indicate to you?

10    A    This is -- this phone received a call from 1626, so from

11    6025131626, on January 6th at 7:41 a.m. and that the call

12    lasted approximately 4 minutes and 10 seconds.

13          It's hard to read a little bit, but I can't see if

14    that's a 4 or a 1 on this screen.  Looks like one minute.  It

15    looks like one minute and 47 seconds.

16    Q    Well, let's go back.

17          The first received call from 1626 about the text

18    message about the AK74 lasted for 4 minutes and 10 seconds; is

19    that right?

20    A    Yes.

21    Q    Okay.  And the second page indicates another dialed call

22    at 8:18 a.m. the same morning, correct?

23    A    Yes.

24    Q    And then there were two more received calls at 8:53 a.m.

25    and 9:08 a.m. the same morning of that text message, correct?

1    A    Yes.

2    Q    And finally, there was a dialed call at 9:14 a.m. on

3    January 6, 2015, to the phone number that texted about the

4    AK74 at 9:14 a.m., correct?

5    A    Yes.

6    Q    And you said after viewing these text messages, you or

7    other agents from the FBI went and interviewed Christian Leon,

8    true?

9    A    Yes.

10   Q    And have you reviewed the 302s relating to that interview?

11   A    I did.

12   Q    All right.  Were those 302s important to you that this

13   person was communicating with Mr. Soofi about buying an AK74?

14   A    Yes.

15   Q    Okay.  So the interviewers were Robert Tobias and Joseph

16   Mulligan.  Do you know who that is?

17   A    Yes.  I know who they are.

18   Q    Who do they work for?

19   A    They are special agents with the FBI.

20   Q    Did you direct them to go and conduct that interview?

21   A    I did not direct them to conduct that interview but

22   someone did.

23   Q    As the case agent investigating Mr. Abdul Kareem at the

24   time, you were not the person who directed them to go

25   interview somebody else who's communicating with them about

1    AK-74s?

2    A    No.  At that time, remember, the Simpson/Soofi

3    investigation had their investigators.

4         And so all the devices that came from the

5    Simpson/Soofi investigation, that would have been a lead

6    generated by those agents.  So it would have been those agents

7    that asked them to go conduct that interview and not me.

8    Q    So you weren't following a lead that pointed in a

9    direction other than to Mr. Abdul Kareem in purchasing or

10   selling the AK-74?

11   A    What do you mean by that?

12   Q    You were the case agent for Mr. Abdul Kareem in May of

13   2015, true?

14   A    Beginning May 8th, yes.

15   Q    Beginning May 8th.

16        And the interview of Mr. Leon was on May 20th of

17   2015.  Does that sound right?

18   A    That sound right.

19   Q    And you had already interviewed Mr. Abdul Kareem on

20   May 5th, correct?

21   A    Yes.

22   Q    And on May 12th you spoke to him?

23   A    Yes.

24   Q    And you had already spoken to Mr. Verdugo several times?

25   A    Yes.

1   Q    And the FBI was following Mr. Kareem 24 hours a day?

2   A    Yes.

3   Q    All right.  And you were suspicious of Mr. Kareem for

4   providing the guns that Mr. Soofi and Mr. Simpson took to

5   Garland, Texas, correct?

6   A    I don't know if I knew that yet at that time.

7   Q    Okay.

8   A    I don't know -- I don't think I knew that fact yet.

9   Q    You knew that fact?

10  A    No.  I don't think I knew that fact yet.  When the

11  interviews of Mr. Leon took place, I don't think I knew that

12  yet.

13  Q    Well, you didn't think you believed that yet; is that

14  right?

15  A    No.  I said I didn't know that fact that he provided those

16  weapons until after that date, I believe.  So the first

17  indication came from the interview of Sergio Martinez-Chavez

18  and that occurred on May 20th.

19  Q    Okay.  So you didn't know for sure.  You weren't there.

20         You're saying it's the first time your investigation

21  led you in that direction was at that time?

22         THE COURT:  You're arguing -- that's argumentative.

23         He says it the way he says it.  You say it a

24  different way.

25  BY MS. PLOMIN:

1   Q   Okay.  The interview with Mr. Leon, did you learn in the

2   course of your investigation that Mr. Leon was, in fact,

3   selling an AK-74 in January of 2015?

4   A   I did not learn that.  He claimed he had sold it in

5   October of 2014.

6   Q   Okay.  And then he was interviewed again on May 28th of

7   2015.  Did you review that 302?

8   A   I don't recall a second one.

9   Q   I'm putting a document on the screen to refresh your

10  recollection as to whether or not you reviewed the interview,

11  the May 28th interview of Mr. Leon.

12  A   I don't recall if I have seen this one or not, but it

13  contains some of the same information from the other one.

14  Q   All right.  So you were not aware that Mr. Leon told the

15  FBI that he was selling an AK-74 in January of 2015?

16  A   I don't remember seeing this.

17  Q   I'm just asking.

18          So you're not aware testifying today --

19          THE COURT:  He just answered the question,

20  Ms. Plomin.

21  BY MS. PLOMIN:

22  Q   And during the course of your investigation, did it become

23  clear -- did you learn that Mr. Leon was selling an AK-74 of

24  the same caliber and same make that was found in Garland,

25  Texas?

```
 1    A    I learned that he -- yes, that he had sold -- he claimed

 2    he had sold one that matched those same things, yes.

 3    Q    All right.  And what was the make and the caliber of the

 4    AK-74 that was found in Garland, Texas?

 5    A    It was an AK-74, 5.45x39 millimeter caliber weapon.

 6    Q    And who was it made by?

 7    A    Elk River Tool and Die.

 8    Q    And that was the same weapon Mr. Leon said he was selling

 9    in January?

10    A    That same kind.

11    Q    Now, after learning this information about Mr. Leon, did

12    you investigate his Backpage account to determine who or with

13    whom he communicated about this AK-74?

14    A    There were other, so I did not personally, no.

15    Q    And did the FBI?

16    A    It's my understanding that they did, yes.

17    Q    They reviewed his Backpage account?

18    A    I don't know that they reviewed his Backpage account.

19    Q    Did you do a -- ask for a consent or do a search warrant

20    for his e-mails?

21    A    I did not.

22    Q    Did the FBI do that?

23    A    Not that I know of.

24    Q    Did you obtain a copy of his cell phone records?  Did you

25    ask for consent or write a search warrant for that?
```

CR15-00707-PHX-SRB    JURY TRIAL-DAY #11   3-3-16

1    A    I did not.

2    Q    Did the FBI do that?

3    A    I don't believe -- what's that?

4    Q    Did the FBI do that?

5    A    I don't know if we did.

6    Q    Did you interview anybody that Mr. Leon knew to determine

7    whether he had a connection to Mr. Soofi and Mr. Simpson?

8    A    I personally?

9    Q    Yes.

10   A    I did not personally that I know.

11   Q    Did the FBI do that?

12          MS. BROOK:  Objection.  Speculation.

13          THE COURT:  Overruled.  You may answer if you know.

14          THE WITNESS:  I don't know if the FBI did that.

15   BY MS. PLOMIN:

16   Q    What did you do to follow up with Mr. Leon and the text

17   message you found in Mr. Soofi's phone?

18   A    Me personally?

19   Q    The FBI that you know of?

20   A    Well, from -- so from the two -- it sounds like they did

21   an initial interview and then interviewed him again to see if

22   there was any more to it or any information we could use and

23   determined there was not.

24   Q    All right.  And did you -- did the FBI do anything to

25   follow up on that interview or those interviews?

UNITED STATES DISTRICT COURT

1   A   Not that I know of.

2   Q   All right.  Could you look at Exhibit 546, please.

3   A   Yes.

4   Q   Have you seen Exhibit 546 before?

5   A   Yes.  I recognize it.

6   Q   And that came from Mr. Soofi's phone as well?

7   A   Yes.  I believe so.

8   Q   Your Honor --

9           And is this an accurate depiction of what you saw in

10   the report from Mr. Soofi's phone?

11   A   Yes.

12           MS. PLOMIN:  Permission to admit and publish, Your

13   Honor.

14           THE COURT:  Is there any objection to 546?

15           MS. BROOK:  No objection.

16           THE COURT:  546 is admitted.

17      (Exhibit No. 546 admitted in evidence.)

18   BY MS. PLOMIN:

19   Q   What date was this text message on?

20   A   It's January 5th of 2015.

21   Q   And 10:46 p.m.?

22   A   Yes.

23   Q   And the content says "$700," correct?

24   A   Yes.

25   Q   And the phone number who the message is from ending in

1    7302, did the FBI determine whose phone number that was?

2    A   Yes.

3    Q   And whose phone number was that?

4    A   It was an individual named Baiz, I believe.  B-A-I-Z.

5    Q   Ali Biaz?

6    A   Yes.  That's right.

7    Q   And did the same agents who interviewed Mr. Leon interview

8    Mr. Biaz?

9    A   I'm not sure who conducted the interview.

10   Q   Did you review a 302 from a May 20th interview from

11   Mr. Ali Biaz?

12   A   I don't recall the date, but I did review an interview of

13   him.

14   Q   Would it refresh your recollection to look at the 302 for

15   the date?

16   A   Yes.

17   Q   Does that refresh your recollection?

18   A   Yes.

19   Q   And what date was that interview on?

20   A   It was on or about May 20th of 2015.

21   Q   And in your review of this 302, did you learn in the

22   course of your investigation that Mr. Biaz was selling an

23   AK-47 in January 2015?

24   A   Yes.

25   Q   And can you tell us a little bit about Mr. Biaz?

1        Have you ever interviewed him?

2    A    No.

3    Q    And did you learn how much Mr. Biaz was asking -- how much

4    money Mr. Biaz was asking for the sale of that AK-47 in

5    January of 2015?

6    A    I did.

7    Q    How much was that?

8    A    He was asking $700 for his AK-47.

9    Q    All right.  And Mr. Biaz -- did you learn that he actually

10   had seen Mr. Simpson shopping in his parents' market?

11   A    That he had -- when?

12   Q    He had seen Mr. Simpson before.

13   A    At some point in the past or something?

14   Q    Yes.

15   A    I'm not aware of that, but.

16   Q    Do you know if he was shown pictures of Mr. Simpson and

17   Mr. Soofi to see if he knew them?

18        MS. BROOK:  Your Honor, I object to hearsay and

19   speculation.

20        THE COURT:  Sustained.

21   BY MS. PLOMIN:

22   Q    So with respect to Mr. Biaz, when did you learn about this

23   information in Mr. Biaz's interview on May 20th, 2015?

24   A    This was another one of those that as it was -- the

25   investigation was going on, I believe it came to my attention

1    and I saw it.

2    Q    All right.  Any idea when you learned of it?

3    A    I don't recall the exact date.

4    Q    Do you think it was in 2015?

5    A    Yes.

6    Q    All right.  And once you learned that Mr. Biaz had been

7    communicating with Mr. Soofi about an AK -- well, about $700

8    and he was selling an AK-47, what did you do to investigate

9    him?

10    A    Well, when I reviewed the 302 of his interview, I

11    determined there was no need based on the information in that

12    302.

13    Q    Okay.  So you didn't review any of his accounts or his

14    financial records, anything aside from his word?

15    A    No.  Yeah.  Based on the description of the weapon he was

16    selling, I determined that there was no need.

17    Q    All right.  And that description came from him, correct?

18    A    From the investigators there who were filling out the --

19    who were drafting the report.

20    Q    Right.  But you didn't have any definitive evidence?  You

21    just had what he told them, correct?

22    A    That's what I -- yes.

23    Q    And Mr. Leon and Mr. Biaz both denied selling those

24    weapons to Mr. Soofi, right?

25    A    Yes.  Both denied that.

```
 1   Q   And you decided to take their word for it and not

 2   investigate any further; is that right?

 3           MS. BROOK:  Objection, Your Honor.  Asked and

 4   answered.

 5           THE COURT:  Sustained.

 6           MS. PLOMIN:  I don't have anything further.

 7           THE COURT:  Ms. Brook.

 8           MS. BROOK:  Thank you.

 9                   REDIRECT EXAMINATION

10   BY MS. BROOK:

11   Q   Good afternoon.

12   A   Good afternoon, ma'am.

13   Q   So let's start off right where defense counsel left off in

14   talking about Mr. Leon and Mr. Biaz.

15           Defense counsel has asked you about tracking down

16   prior owners of weapons in order to determine the source or

17   derivative purchase of the weapons found in this particular

18   case.

19   A   Yes.

20   Q   What's a trace report?

21   A   A trace report is an official report produced by the ATF.

22   And, essentially, it's an official report that lists the

23   current registered owner of a firearm.

24   Q   So does it show exactly who the current owner of a firearm

25   may be?
```

CR15-00707-PHX-SRB    JURY TRIAL-DAY #11    3-3-16

1    A    Not necessarily.

2    Q    So can you explain that?

3    A    Yes.  So in some states, Arizona included, if a private

4    owner sells a handgun to another private owner, there's no

5    record that's required to be kept.

6        And so the records that ATF has are records that are

7    given, you know, when this firearm is originally purchased.

8    So typically, for people in Arizona, that would be the person

9    who purchased it from a gun store or from a commercial

10   enterprise of some sort.

11       They would produce that report that ATF would have,

12   but then there would be no record of who they sold it to or

13   who that person had sold it to and on and on.

14   Q    So in those cases where there are not official trace

15   reports because the keep weapon itself wasn't purchased

16   through a federal firearms licensee or something where those

17   reports are generated, how might you determine where a weapon

18   came from?

19   A    Well, there's two ways, I guess.

20       One, is if the person who had the weapon told you who

21   they got it from, obviously, you could determine.

22       But the only other way is to basically just start

23   from the original purchaser or the one you have to go

24   interview them to see if they were the ones that provided it

25   or sold it directly to the person who last it now.

CR15-00707-PHX-SRB    JURY TRIAL-DAY #11    3-3-16

1          If not, maybe they'll give you a description of the

2    person they did sell it to.  Then you need to go find that

3    person and interview them and on and on and on.

4          And so depending how long that chain is, it can

5    obviously get a little convoluted.

6    Q    So how many weapons did ATF do trace reports on in this

7    particular case?

8    A    Eight.

9    Q    And did you review those reports?

10   A    Yes, I did.

11   Q    Did you attempt to trace the path of these weapons to

12   Simpson and Soofi and also the two weapons to the defendant?

13   A    Yes, I did.

14   Q    Did you have any success?

15   A    On two accounts.

16   Q    What were those?

17   A    So, one of the ATF reports listed Nadir Soofi as the

18   original owner, so obviously, we were able to determine that

19   that 9 millimeter high point that was discovered in Garland,

20   that was originally purchased by Nadir Soofi.

21          The other one we had success on was the 38 Special

22   that was found in Mr. Kareem's moving truck that he, you know,

23   admitted that was his.

24          That gun, the original owner, was a man named Sean

25   Raper.  He was an individual that testified here.  And so when

1    we went out and interviewed Mr. Raper, he provided a detailed

2    description of who the person was he had sold it to.  Without

3    us talking to him, he mentioned details about Mr. Kareem that

4    we know he wouldn't have known.

5            MR. MAYNARD:  That's beyond the scope -- it's

6    hearsay.

7            THE COURT:  I think he stopped answering when you

8    started objecting and Ms. Brook is going to ask a new

9    question.

10   BY MS. BROOK:

11   Q   So let's go back to that 9 millimeter high point that you

12   talked about and you said that there was a trace history

13   tracing it back to Nadir Soofi.

14           That was purchased from a gun store, an FFL?

15   A   Yes.

16   Q   In what year?

17   A   It was in or about 2010.

18   Q   And then the other trace report was the 38 Special that

19   Sean Raper had testified about selling it to the defendant.

20   A   Yes.

21   Q   So with the other six weapons, what did you do to take

22   steps to identify if you could find the person that sold those

23   weapons?

24   A   Yes.  So as soon as we received those trace reports, leads

25   were sent out to investigators in the areas where those

1    original owners resided and interviews were conducted to see

2    if they could determine, first of all, whether that original

3    owner had directly supplied the weapon.

4           Or, like I had explained before, whether that

5    original owner had given it to someone else.  And then if that

6    "someone else" was able to be identified, additional leads

7    were sent to go interview that someone else and so on.

8    Q    Were you also able to look at text messages in this

9    particular case and attempt to track down if a sale of a

10   weapon happened based upon some text messages that you saw?

11   A    Yes.

12   Q    Ms. Plomin showed you a couple of different text strings.

13   One was Exhibit No. 545.  Was this the conversation with

14   Mr. Leon?

15   A    Yes.

16   Q    And based upon the 302 that was shown to you in your

17   investigation in this particular case, did the followup with

18   Mr. Leon lead to any useful evidence in this case?

19   A    It did not lead to any useful evidence.

20   Q    Can you explain that?

21   A    Yes.  So Mr. Leon's description of the person he'd sold

22   the weapon to changed.  The type of vehicle that was

23   described, I think -- I believe it was a red Jetta was the

24   person had driven in.  And so based on all that information,

25   there was no conclusive way for us to get any investigative

1    value from the information he was providing us.

2    Q   And in this case are you aware of Elton Simpson, Nadir

3    Soofi, or the defendant driving a red Jetta?

4    A   I am not.

5    Q   Additionally, the visual description of the individual he

6    sold that AK to, did it in any way match any of the suspects

7    in this case?

8    A   It didn't.  And the other thing from the text messages, we

9    couldn't tell that a sell had ever actually taken place.  So

10   if we had, you know, evidence in there where, "hey, thanks for

11   the sale, it was a pleasure doing business," you know, a

12   message of that sort, we could have drawn more conclusions.

13        But based on the text messages we have, we couldn't

14   confirm that a sale had taken place from them either way.

15   Q   These particular text messages that we have seen and that

16   are admitted, were they consistent with evidence that you have

17   seen in this case regarding Nadir Soofi's interest in

18   purchasing an AK-style weapon in January of 2015?

19            MR. MAYNARD:  Objection to the form of the question.

20            THE COURT:  Overruled.  You may answer.

21            THE WITNESS:  They are consistent.

22   BY MS. BROOK:

23   Q   Defense counsel also showed you Exhibit No. 546.

24        Based upon your investigation, were these the

25   communications, the text messages recovered with Mr. Biaz?

1    A    Yes.

2    Q    Additionally, based upon the timing of these particular

3    text messages, what probative value did they have in your

4    investigation based upon the requests or what the individual

5    Mr. Soofi was looking for?

6    A    I'm sorry.  Could you repeat the question?

7    Q    Did they have any value, the text messages, in terms of

8    what Nadir Soofi was looking for in January of 2015?

9    A    Yes.

10   Q    How so?

11   A    Well, as -- I know Ali had testified there's a weapon that

12   was purchased for $700.  So, obviously -- and we had

13   information to believe that weapons were purchased around that

14   date.

15        So clearly, we were interested in anything that would

16   come up that would indicate who that potential seller was.

17   Q    I want to talk about Mr. Biaz and the report that he gave.

18   Based upon the 302 and the information you had about the

19   communications back and forth with Mr. Biaz, was there any

20   indication that a sale was made?

21   A    There was no indication that a sale was made.

22   Q    And, additionally, the AK-style weapon that Mr. Biaz was

23   attempting to sell, what make was that?

24   A    I can't recall the full name but it was Century.

25   Q    I'm going to place on the overhead a report which is not

1    admitted into evidence.  Does that refresh your recollection?

2    A    That does.

3    Q    And, specifically, what was the weapon that Mr. Biaz was

4    attempting to sell back in January of 2015?

5    A    So the AK that he was selling was called a Century Arms,

6    so Century Arms brand AK-47.

7    Q    And is that in any way consistent with any of the weapons

8    involved in this case?

9    A    It is not.  They are not that brand.

10    Q    I want to turn next to Exhibit No. 565 which defense

11    counsel was asking you about.  I'm going to place them on the

12    overhead.

13         Are these the text messages from the defendant's

14    phone, that Maxwest phone, on May 1st and May 2nd?

15    A    Yes.

16    Q    And can you tell us what is -- what was Elton Simpson's

17    phone number during this time period?

18    A    I believe the last four were 8392, I believe.

19    Q    And in cross-referencing those last four digits, do you

20    see any contact with Elton Simpson on May 1st or May 2nd?

21    A    I don't.  Could you please slide it up?

22         MS. BROOK:  May I, Your Honor, just bring him the

23    physical exhibit?

24         THE COURT:  He actually has it.

25         MS. BROOK:  Oh, great.  All right.

CR15-00707-PHX-SRB    JURY TRIAL-DAY #11  3-3-16

1          THE WITNESS:  I do not see any contacts with that

2     number.

3     BY MS. BROOK:

4     Q   Defense counsel asked you about a lunch invitation.

5          Again, I'm just turning to page 2.  So page 2 takes

6     us down to the middle of May 2nd.  Again, do you see that

7     number?

8     A   I do not.

9     Q   And next, I'm going to focus in on that first text message

10    that defense counsel asked you about, the invitation that went

11    out, and you don't see any text messages to Elton Simpson?

12    A   I don't see any to Elton Simpson.

13    Q   Was the invitation for dinner or lunch?

14    A   It's for one o'clock.

15    Q   A meal at one o'clock?

16    A   A meal at one o'clock.

17    Q   And just for clarification, that was one o'clock on

18    Saturday, the 2nd?

19    A   Yes.

20    Q   Based upon review of text messages in this case, have you

21    seen text message exchanges in the previous day, earlier, and

22    I guess on April 30th back and forth with Elton Simpson and

23    the defendant?

24    A   Yes.

25    Q   And what was the nature of those communications?

1    A    I recall there being approximately, you know, six calls

2    back and forth, two of which were seven-minute duration calls

3    between the two on the evening of the 30th.

4    Q    And do you recall what the purpose of those messages were,

5    the text messages?

6    A    I don't recall off the top of my head.

7    Q    I'm going to place on the overhead what has already been

8    admitted and published as Government's Exhibit No. 478.

9          In looking at these messages, what have you inferred

10   was the time where dinner with Elton Simpson was set up?

11   A    It would have occurred between 7:12 and 9:12 p.m.

12   Q    On what day?

13   A    On April 30th, which was a Thursday.

14   Q    Okay.  And, additionally, can you read for us the message,

15   the 9:12 message on May 1st of 2015?

16   A    "Wa Alaykim salam wrwb.  Sorry about yesterday for the

17   punches and for today akhi.  I won't be able to make it. I

18   know you hooked it up though.  LOL."

19   Q    Defense counsel has asked you a number of questions about

20   interviewing individuals and witnesses in this particular

21   case.  And is it routine for the FBI to record interviews for

22   people who are not considered to be suspects?

23   A    No.

24   Q    Describe for us what is a noncustodial interview?

25   A    A noncustodial interview is a voluntary interview.  It's

1   one where someone comes in or meets us voluntarily.  They can

2   leave at any time.  They can -- and end the interview at any

3   time.  So just completely voluntary.

4   Q    And what's a consensual interview?

5   A    A consensual is essentially the same thing.  So it

6   would -- we've asked them, "May we interview you."  And the

7   person has said, "Yes you may."  And then an interview takes

8   place.

9   Q    Is there a policy within the FBI about when an interview

10  should be recorded?

11  A    Yes.

12  Q    What's that policy?

13  A    Whenever we're doing what's called a custodial interview,

14  the policy is there is a presumption that it will be recorded.

15          So a custodial interview, obviously, is if someone is

16  under arrest or they're essentially not free to leave, that

17  they're being, you know, brought in in that sense.  That's a

18  custodial interview.  So in that case there is a presumption

19  we will record.

20          However, with the policy, obviously, there are still

21  exceptions to that presumption, various circumstances where it

22  wouldn't.  But the general presumption is that it will be

23  recorded.

24  Q    Is it a mandatory rule that it must be recorded?

25  A    It's a presumption.  Because there's exceptions to it, I

CR15-00707-PHX-SRB    JURY TRIAL-DAY #11   3-3-16

 1    don't know if I would say it's a mandatory rule.

 2            It is the general -- I can't think of any situations

 3    where one of the exceptions has been used, so.

 4    Q    So what is the rule as it relates to consensual

 5    interviews?

 6    A    For consensual or those voluntary interviews, our policy

 7    says you may record.

 8    Q    Okay.  Again, is it a rule that you must record?

 9    A    No.  And it's generally not -- in a noncustodial

10    interview, it would generally not be the practice to record an

11    interview.

12    Q    Can you explain that?

13    A    Yes.  So FBI agents and other employees too at the FBI

14    conduct interviews all the time.  And so most of those

15    interviews, they can range from people just coming into the

16    office to tell us about things they're concerned with.  They

17    may be us going out into the community and meeting with

18    community leaders and having interviews and discussions to a

19    wide range of things.

20            And so most of those interviews are just simply not

21    going to be recorded.

22            Instead, agents are trained at the FBI -- you know,

23    FBI Academy at Quantico on how to conduct interviews, to

24    remember them and take notes and that sort of thing.  And then

25    to memorialize those interviews when needed to on what I

1   described earlier as an FD 302 which is our form.

2   Q   So your interview with the defendant on May 5th of 2015,

3   was -- what type of interview was that?

4   A   That was a noncustodial interview, so voluntary interview.

5   Q   We have heard testimony from you about how you, Special

6   Agent Taylor, and Detective Nash worked together to attempt to

7   record that interview.

8        Before the interview happened, did you tell the

9   defendant that it was going to be recorded?

10  A   I did not.

11  Q   The recording equipment itself, was it -- was it set up in

12  a place where it couldn't easily be seen?

13  A   Yes.  It was concealed.

14  Q   Defense counsel has asked you about --

15       THE COURT:  I just wanted to follow up because I

16  think one of the juror's questions was:  Why would you

17  surreptitiously record a noncustodial interview?

18       THE WITNESS:  Okay.  Well, that -- so again, it's

19  abnormal to do that.

20       But in a case like this, I think, where, you know, an

21  attack had taken place and people were coming in who may be

22  associates and to kind of take an extra step because of the

23  magnitude that there was a lot of people involved, obviously,

24  I wasn't a case agent for that case.  I was just someone

25  assisting them at that point.

 1          And so there was that added benefit of capturing a

 2   recording so then that agent on those cases could actually go

 3   in and listen to that recording again as well and then also

 4   they could read my report.

 5          But for all of those reasons, and again, in this

 6   case, there were case agents on the Simpson/Soofi matters and

 7   that was kind of their call to make that they wanted to have

 8   all their interviews recorded.

 9          And so that's why initially you'll see a lot of the

10   interviews conducted towards the beginning of the

11   investigation are all recorded because that was kind of a

12   general mandate that came down from those case agents.

13          Obviously, then later as the investigation moves,

14   then that judgment call of whether or not a recording is

15   needed would have fallen to me then once it got to the part

16   for my investigation, if that makes sense.

17          THE COURT:  But why surreptitious?

18          THE WITNESS:  Oh, sorry, Your Honor.  That was your

19   question.

20          So the reason to do it surreptitiously, obviously,

21   there's times when a recording will be put on the table and

22   you can record and interview that way.

23          But my experience, just like taking notes in front of

24   someone while you're talking to them, it's extremely

25   distracting.  And I think, again, you know, our job is to get

1    at the truth, whatever that truth is, we want the truth.

2            And so if there's something we can do that can put

3    people at ease and we can just get the truth, whatever that is

4    from them, then I think that's the best policy.

5            And so in these kind of circumstances, obviously, if

6    I told them, you know, in an interview like that that it was

7    being recorded, I think it would be less likely that I would

8    get completely honest answers versus if I told them that it --

9    if I didn't tell them either way whether it was being

10   recorded.

11   BY MS. BROOK:

12   Q    So the interview on May 5th of 2015, Detective Nash took

13   copious notes?

14   A    Yes.

15   Q    And I just want to talk about your practice.  So you

16   mentioned before that oftentimes it's the case that you do

17   interviews and there isn't recording equipment set up

18   simultaneously.

19            Is it routine for you to write and draft reports

20   based upon notes --

21            MR. MAYNARD:  Objection, Your Honor.  This has been

22   asked and answered a number of times.

23            THE COURT:  Sustained.

24   BY MS. BROOK:

25   Q    I want to talk about the security camera.

1        Defense counsel asked you questions about a

2   particular e-mail and communications with an individual within

3   the FBI who said they couldn't recover the information on the

4   SD card.

5   A   Yes.

6   Q   Are you aware of any agent ever requesting security camera

7   footage from your office's security camera in any

8   investigation?

9   A   I have never heard of that ever being done in any

10  investigation.

11  Q   Security camera footage, does it contain audio?

12  A   No.  It's video only.

13  Q   Can you explain for us where exactly was the video camera

14  positioned in the interview room -- the interview room where

15  you conducted the interview with the defendant on May 5th?

16  A   So our interview rooms have a small camera that's located

17  in the ceiling that kind of pans down on the room.  It's a

18  wide-angle shot that's -- its intention is to capture all the

19  movement in the room.

20        Obviously, it's security, so it's primarily for

21  safety consideration.  So to make sure you can see the entire

22  room and know if anyone is in that room and then also to be

23  able to see their behavior.

24        And then obviously, that feed is monitored in what we

25  call an Op Center so they can see what's going on.  So should

1   we be in an interview room and something bad were to happen,

2   there would be people watching that who could then send aid to

3   us.  That's its purpose.

4   Q   The angle itself, is it focused in on anybody's faces?

5   A   No.  No.  So like I said, it's a wide-angle camera that's

6   kind of aiming down from the ceiling.  It's mostly the top of

7   your head.

8           So kind of the way we're sitting, it would have been

9   coming down the back of our heads and kind of the top of

10  Mr. Kareem's head.  And, again, it's not really designed to

11  capture what's going on.  There's no audio, obviously, but

12  it's to see where everyone is moving, where your hands are,

13  that kind of thing, for safety purposes.

14  Q   Defense counsel also asked you about recording pretrial

15  witness interviews with prosecutors.

16  A   Yes.

17  Q   In this case did you record those interviews?

18  A   Pretrial interviews?

19  Q   Correct.

20  A   Never.  No.

21  Q   And in any case have you ever recorded pretrial

22  interviews?

23  A   Never.

24  Q   In your experience what's the general purpose of a

25  pretrial witness interview?

1   A   So a pretrial interview is an opportunity for the

2   prosecutors to speak with a person who is a potential witness

3   to kind of explain what the process is going to be, what they

4   can expect, that kind of thing, just to give them a general

5   overview of the process.

6          And then also to go through the things that -- the

7   information they have provided and then to make sure the

8   prosecutors have a complete understanding of all that

9   information.

10  Q   And during the course of interviewing any witness, have

11  you ever told any of them what any other witness has said?

12  A   Never.

13  Q   In pretrial witness interviews, is there an admonition

14  that's given to every witness?

15  A   Yes.

16  Q   What is it?

17  A   It's just to tell the truth.  So over -- any time you go

18  to pretrial interview, that's going to be something that's

19  repeated over and over to kind of help set them at ease.

20         It's just at the end of the day when you're on the

21  stand, just tell the truth and then you don't have to think.

22  You just tell the truth.

23         So that's the only admonition that's given.

24  Q   And in this case in any interview or every interview that

25  you conducted pretrial or during the investigation itself,

1  when new information came forward, did you generate a report?

2  A    Yes.

3  Q    Defense counsel has asked you about 302s.  Are those the

4  reports that you generate?

5  A    Yes.  Those are the reports.

6  Q    And every time there is new or additional information, do

7  you note it and put it into a report?

8  A    Yes.  Any time new information comes out, obviously, I

9  will put that in a report.

10 Q    From the beginning in this case, approximately how many

11 302 reports have been drafted?

12 A    This is a guess, but I would say probably 300 to 400 or

13 more, maybe even more than 400.

14 Q    And did you author every single report?

15 A    No.

16 Q    Approximately, how many FBI agents were involved in the

17 investigation of this case?

18 A    Between the various field officers throughout the United

19 States, I would say more than 200 special agents for sure.

20 Q    And how many intelligence analysts?

21 A    My estimate, probably minimum of 20 analysts, again, from

22 offices throughout the United States that would have been

23 involved.

24 Q    Defense counsel asked you specifically about Ali Soofi's

25 interviews.  He spoke about the two pretrial interviews; one

 1    in September and another one in January.

 2           He asked you about the September interview and asked

 3    whether or not Ali Soofi talked about disassembling,

 4    lubricating, and reassembling weapons, how he had watched the

 5    defendant teach Simpson and Soofi how to disassemble,

 6    lubricate, and reassemble the weapons.

 7           MR. MAYNARD:  Objection to the form of the question.

 8           THE COURT:  Sustained.

 9    BY MS. BROOK:

10    Q   He asked you about how Ali Soofi reported in January that

11    process.

12    A   Yes.

13    Q   In September during that interview, you were there for it?

14    A   Yes.

15    Q   At any point was Ali Soofi asked whether or not he had

16    seen anybody disassemble, lubricate, or reassemble weapons?

17    A   He was not asked that.

18    Q   In the January interview, was he specifically asked that

19    question?

20    A   I think as he was reliving the moment and talking about --

21           MR. MAYNARD:  Objection.

22           THE COURT:  Yes.  Could you answer Ms. Brook's

23    question.  It was:

24           "In the January interview was he specifically asked

25    that question?"

1           THE WITNESS:  I think, yes, eventually, yes.

2           THE COURT:  Excuse me, Ms. Brook.  We're going to

3    take our afternoon break.

4           Ladies and gentlemen, we will reconvene in 15

5    minutes.  You're reminded of the usual admonitions.

6           Court is in recess for 15 minutes.

7      (Recess taken at 2:32 p.m.; resumed at 2:47 p.m.)

8           THE COURT:  Thank you.  Please sit down.  The record

9    will show the presence of the jury, counsel, and the

10   defendant.

11          Ms. Brook, you may continue.

12          MS. BROOK:  Thank you, Your Honor.

13   BY MS. BROOK:

14   Q    Defense counsel asked you questions about Stefan Verdugo

15   and the process of interviewing him and how everything came

16   forward.

17          When this investigation began, did the FBI seek out

18   Stefan Verdugo?

19   A    No.

20   Q    Can you explain that?

21   A    Yes.  Stefan Verdugo came forward of his own free will, I

22   guess.  After seeing the news reported, he reached out and

23   contacted the FBI.

24   Q    And the information that Stefan Verdugo provided, was that

25   before or after he was arrested and charged in that other

                    UNITED STATES DISTRICT COURT

1  case?

2  A   It was before.

3  Q   After it came to the FBI's attention that Stefan Verdugo

4  had been charged in another case, did the FBI assist in

5  arresting Stefan Verdugo?

6  A   Yeah.  It was actually the FBI that arrested Stefan

7  Verdugo.

8  Q   Defense counsel asked about the $500 payment that Stefan

9  Verdugo received.  Was that before or after he had provided

10  information?

11  A   That was after he had already provided information.

12  Q   Did Stefan Verdugo ever request any money?

13  A   No.  He never asked for a cent.

14  Q   Why did the FBI pay him $500?

15  A   Well, there were a couple reasons.

16      First, meeting with him, we were requiring him to

17  meet us at very late hours and in locations throughout the

18  Phoenix Metro area and we were asking him to provide his own

19  transportation to those areas.  So part of it was just to give

20  him money to pay for the fuel and gas, you know, that kind of

21  thing, so that he would continue to agree to meet with us as

22  the investigation moved forward.

23      The other reason was we learned in our talks with him

24  that he had a fine for a suspended license.  And so there was

25  a worry that in the course of our investigation, he could get

UNITED STATES DISTRICT COURT

CR15-00707-PHX-SRB    JURY TRIAL-DAY #11  3-3-16

1    pulled over for that suspended license and not be able to

2    continue to assist.

3              And so when we found out that amount was around $500,

4    we told him we would give him $500, expecting him to pay that,

5    so that he would not have a suspended license anymore and so

6    then he could continue to go forward.

7    Q    Defense counsel asked you if during suspect interviews you

8    lie to somebody that you're interviewing?

9    A    Yes.

10   Q    Why do you do that?

11   A    Well, it's -- sometimes people are less than forthcoming

12   and so there is a need, occasionally.  But essentially, I mean

13   I'm trying -- I don't think I have ever -- the only lie I have

14   ever given is pretended I know more than I really know.

15             MR. MAYNARD:  Objection.  It's beyond the scope of

16   the question.  He's now going beyond that.

17             THE COURT:  The objection is overruled.  The answer

18   will stand.

19   BY MS. BROOK:

20   Q    Are you trained tactically at the FBI to use that?

21   A    Yes.

22   Q    How so?

23   A    Well, so by -- so basically, how we describe it as

24   whenever you're going to make an accusation, you need to be

25   able to back up that accusation with facts.

1            And so there comes a point when you may need to kind

2    of create those, so to create the appearance that we know more

3    than we really do, and then that encourages the person we're

4    interviewing to tell us the information we don't know.

5            And then as we receive that information we don't

6    know, we use that and piece it together as the interview is

7    going on to then draw other conclusions, again, as a way to

8    motivate them to tell us the truth.

9    Q    Defense counsel yesterday asked you if you are invested in

10   this case.  What did you mean?

11   A    By "invested"?  Well, I mean, like any of my cases,

12   obviously, it's my duty to do the best I can to successfully

13   see the investigations to a conclusion.  So I'm invested in

14   all my cases in that sense.

15   Q    And "cases," do you have more cases than just this case?

16   A    Yes.  Yes.  Actually, I have twelve.

17   Q    Defense counsel also asked you about an e-mail from

18   December.  And I'm going to put it on the overhead.  It's 558,

19   an e-mail where you stated:

20            Fantastic news.  Thank you all three -- or thank you

21   all three of you for all the hard work.

22            Can you explain that?

23   A    Yes.  This was -- so in the process of pursuing the

24   different charges, there was a lot of work being done by

25   individuals.  And so, essentially, I was just trying to send

1    an e-mail to thank people for their hard work and to motivate

2    them to continue to want to work hard.

3          These are the same kind of, you know, e-mails I would

4    send for other members of the team when they, you know, work

5    long hours.

6          I think as we described, the 24/7 surveillance, so

7    obviously, we weren't doing surveillance for 24/7 but we were

8    working 24/7 until we knew this investigation had been done,

9    you know, same like we do all our investigations.

10          And so when I saw this e-mail, again, that was just a

11    way to try to make everyone -- you know, to tell the people I

12    appreciated their hard work.

13    Q    Did you believe that the charged were merited based upon

14    the evidence in this case?

15          MR. MAYNARD:  Objection to the form of the question

16    and also calls for -- well, speculation.

17          THE COURT:  Overruled.  You may answer.

18          THE WITNESS:  Yes.  I mean, obviously that --

19          THE COURT:  "Yes" is sufficient.

20          THE WITNESS:  Yes.  Yes.

21    BY MS. BROOK:

22    Q    And do you have any personal stake in the outcome of this

23    case?

24    A    No.  I mean, other than it's my job to find the truth and

25    to do the best job I can on every case I have.  So as long as

1    that's being accomplished, then that's good.

2    Q    Defense counsel asked you about the timing of drafting a

3    report for -- in conjunction with Stefan Verdugo.

4             And, specifically, he asked about a report that was

5    drafted on December 16th of 2015.  And defense counsel stated

6    that that report was drafted prior to visiting Verdugo in

7    custody.

8    A    Yes.

9    Q    I want to place on the overhead what has not been

10   admitted.  In looking at that report, does that refresh your

11   recollection on the date that the interview was conducted with

12   Stefan Verdugo at the Lower Buckeye Jail?

13   A    Yes.

14   Q    And what date was it?

15   A    It was on December 15, 2015.

16   Q    So a day before the report was drafted?

17   A    Yes.

18   Q    During the break did you have a chance to refresh your

19   recollection on Elton Simpson's phone number?

20   A    Yes.

21   Q    And what is it?

22   A    Well, it's the last four ending in 6382.

23   Q    So going back and placing on the overhead what's already

24   been admitted as 565 and cross-referencing that number with

25   these text messages, do you see any contact between the

1    defendant and Elton Simpson in terms of inviting him over to

2    dinner or lunch on May 2nd?

3    A    I do not.

4    Q    Defense counsel asked you about whether you subpoenaed

5    medical records for the defendant related to his claim that

6    Karen -- or Karem Gonzalez-Fabian hit him.

7    A    Yes.

8    Q    Don't tell us what was said, but did somebody from the

9    National Insurance Crime Bureau call you?

10   A    Yes.

11   Q    And do you know what the National Insurance Crime Bureau

12   is?

13            MR. MAYNARD:  Objection, Your Honor.  It's beyond the

14   scope.

15            THE COURT:  Overruled.

16            THE WITNESS:  The National Insurance Crime Bureau is

17   a nonprofit organization that teams up with law enforcement

18   and insurance companies, and basically, assists them in

19   identifying and prosecuting those who engage in insurance

20   fraud.

21   BY MS. BROOK:

22   Q    Did you speak to somebody from the National Insurance

23   Crime Bureau?

24   A    Yes, I did.

25   Q    With whom did you speak?

```
 1   A    I spoke with a Special Agent.  His name was Guy Walters.

 2   Q    What did you do after talking to Mr. Walters?

 3   A    After talking to Mr. Walters, I contacted the victim of

 4   the information he had sent, which was Karem Fabian, and asked

 5   her for details surrounding the April 6th, 2015, incident

 6   where she claimed, you know, someone had banged on her trunk

 7   of her car.

 8   Q    Defense counsel asked you if the defendant's fingerprints

 9   were found on any of the guns found at the crime scene in

10   Garland.

11          To your knowledge, were any of Elton Simpson's prints

12   found on any of the weapons at the scene in Garland?

13   A    Not -- his fingerprints were not found, nor his DNA on any

14   of the evidence in Garland, so weapons or the notebooks or the

15   ISIS flags or anything, no Elton Simpson.

16   Q    Yesterday defense counsel asked you about an indented

17   writing.

18   A    Yes.

19   Q    Was the letter itself ever recovered?

20   A    No.

21   Q    And when you received information back from the lab about

22   the contents of that indented writing, that page, was there a

23   date written on that page?

24   A    There was not.

25   Q    Was there a name written about who it was to?
```

```
 1   A    No.  It was addressed to Ismala which is a greeting.

 2             MS. BROOK:  Can I collect Exhibit 555, 556, and 557

 3   for Maureen to use on the overhead?

 4             THE COURT:  Yes.

 5   BY MS. BROOK:

 6   Q    Defense counsel yesterday asked you about some envelopes

 7   that were found at Elton Simpson's and Nadir Soofi's house.

 8   A    Yes.

 9   Q    Specifically, he asked you about three of them.  And I

10   want to walk through them one at a time.

11             The first is Exhibit No. 557, already admitted.  I'll

12   span out and then focus in.

13             In looking at this and having seen the original,

14   what's the postmark date on this?

15   A    It's postmarked August 4th of 2010.

16   Q    I want to turn to the second which is already admitted,

17   Exhibit No. 556, and then I'm going to zoom in.

18             What's the postmark date on this letter?

19   A    This is March 12th, of 2012.

20   Q    I want to turn last to the third letter which is Exhibit

21   557 and then zooming in.

22             I think I transposed that.  Hang on one moment.  We

23   looked at that one.

24             Let's do this one 555.  Zooming out and now all the

25   way into the date.  What was the postmark date on this
```

1    particular letter?

2    A    This letter was postmarked September 15th, 2014.

3    Q    Have you had occasion to review the letter that was

4    contained within this envelope?

5    A    Yes, I have.

6    Q    And the government is going to move to admit Government's

7    Exhibit No. 498.  Let me put it on the overhead so the witness

8    can identify it.

9              Do you recognize this?

10   A    I do.

11   Q    And what is it?

12   A    This is the letter that was inside that envelope that was

13   dated 2014 and addressed to Elton Simpson.

14             MS. BROOK:  The government moves to admit

15   Government's Exhibit No. 498.

16             MR. MAYNARD:  Objection.  Lack of foundation.  Plus

17   it's beyond the scope.

18             THE COURT:  The objection is overruled.  498 is

19   admitted.

20        (Exhibit No. 498 admitted in evidence.)

21             MR. MAYNARD:  Can I have a copy?

22   BY MS. BROOK:

23   Q    I want to take a step back.

24             So Hassan Abu Jihaad who is that?

25   A    Hassan Abu Jihaad was an individual originally from

1  Phoenix who was indicted on terrorism and espionage charges in

2  or about 2008 for information he provided to al-Qa'ida while

3  employed as a member of the U.S. Navy.

4  Q   The letter we looked at just a moment ago which is now

5  admitted, have you had an opportunity to read and review this

6  letter?

7  A   Yes.  I have read this letter before.

8  Q   And does this letter discuss a khalif?

9  A   Yes, it does.

10 Q   What does it say?

11 A   Well, it includes a series of printouts, essentially,

12 arguing against the legitimacy of the Islamic State's

13 declaration of the khalifate.

14 Q   Can you explain that?

15 A   Yes.  So in or about June 29, 2014, the Islamic State

16 declared a khalifate.

17      So they declared that they were going to have this

18 single khalif or leader of you Ummah, which is the community

19 of Muslims throughout the world.

20      They declared that on June 29th.  And obviously, with

21 that declaration, there came those that were in favor of it

22 and those that were adamantly opposed to it.

23      And these particular letters are from someone who is

24 adamantly opposed to the declaration of the khalifate.  This

25 comes from, again, Abu Jihaad who is an al-Qa'ida supporter

```
 1    and al-Qa'ida and the Islamic State as Mr. Kohlmann --
 2            MR. MAYNARD:  Your Honor, this is beyond the scope.
 3    Lack of foundation.
 4            THE COURT:  Sustained.  I think it goes beyond your
 5    question.
 6            MS. BROOK:  And we can move on to the next line of
 7    questioning.
 8    BY MS. BROOK:
 9    Q   Defense counsel asked you about the tracking and
10    monitoring of the defendant starting on May 8th of 2015 and
11    carrying through to June 10th of 2015 when he was arrested in
12    connection with this case.
13    A   Yes.
14    Q   Are you familiar with whether or not there was a tracking
15    device that was placed on his car?
16    A   There was.
17    Q   How did the FBI learn about Sergio Martinez-Chavez?
18    A   From that tracking device.
19            MR. MAYNARD:  Your Honor, that's beyond the scope.
20            THE COURT:  Overruled.  You may answer.
21            THE WITNESS:  So information obtained from that
22    tracking device, as well as surveillance, revealed that
23    Mr. Kareem drove to Sergio Martinez-Chavez's house on the
24    night of May 14th of 2015 and that he arrived there just
25    before midnight still on the 14th on or about.
```

CR15-00707-PHX-SRB    JURY TRIAL-DAY #11    3-3-16

1           MS. BROOK:  May I have a moment?

2           THE COURT:  Yes.

3           MS. BROOK:  I don't have any further questions.

4           THE COURT:  Thank you, Agent Whitson.  You may step

5     down.

6           Does the government have any further evidence to

7     present?

8           MR. KOEHLER:  Your Honor, subject to reading a

9     stipulation or two stipulations and subject to reviewing all

10    of our exhibits with the clerk to make sure everything is in,

11    the government will rest at this time.

12          THE COURT:  Well, why don't you go ahead with your

13    stipulations then.

14          So I just want to review with the jurors.  It was

15    covered in the preliminary instructions, but essentially, a

16    "stipulation" is as to agreed-upon facts.  That is, both sides

17    agree that these facts are true.

18          So Mr. Koehler is going to read a stipulation that

19    the government has proposed.  And then I will ask Mr. Maynard

20    if he agrees to those facts and that will be agreed-upon

21    facts.

22    **STIPULATIONS**

23          MR. KOEHLER:  The United States of America and

24    defendant Abdul Malik Abdul Kareem, through undersigned

25    counsel, stipulate and agree to the following:

CR15-00707-PHX-SRB    JURY TRIAL-DAY #11    3-3-16

1         ISIL As a Designated Foreign Terrorist Organization:

2         The parties agree that at all times material to the

3    Second Superseding Indictment, the Islamic State of Iraq and

4    the Levant, aka ISIL, aka ISIS, was a designated foreign

5    terrorist organization.

6         DNA Analysis:

7         The parties stipulate and agree that the following is

8    an accurate description of DNA testing results on the items

9    described from the crime scene in Garland, Texas:

10        Exhibit 5.  KelTec 9 millimeter Rifle:  DNA was

11   recovered and identified as belonging to Nadir Soofi.

12        Exhibit 7.  Elk River Tool & Die AK-74 Rifle, 5.45 by

13   39 millimeter:  DNA was recovered from the firearm and its

14   strap.  DNA from the firearm was inconclusive for Elton

15   Simpson and Nadir Soofi, and was excluded for Abdul Malik

16   Abdul Kareem.  DNA from the strap was inconclusive for Elton

17   Simpson, Nadir Soofi, and Abdul Malik Abdul Kareem.

18        Exhibit 10.  Romarm Cugir Draco AK-47 Pistol, 7.62 by

19   39 millimeter:  No DNA was recovered from the firearm.

20        Exhibit 12.  Taurus Model 605, .357 Magnum Revolver:

21   DNA was recovered from the firearm and identified as belonging

22   to Elton Simpson.

23        Exhibit 15.  Hi-Point C9 9 millimeter Pistol:  A

24   mixture of male and female DNA was recovered from the firearm

25   magazine; the DNA results were inconclusive for Elton Simpson,

1    Nadir Soofi, and Abdul Malik Abdul Kareem.

2              Exhibit 17.  Jiminez Arms JA9, 9 millimeter Pistol:

3    DNA was recovered and was inconclusive for Abdul Malik Abdul

4    Kareem.

5              Exhibit 36.  Black Tapco double magazine:  DNA was

6    recovered from the tape joining the magazines and was excluded

7    for Abdul Malik Abdul Kareem.

8              Exhibit 72.  Black bulletproof vest (not worn):  DNA

9    was recovered from the tape -- I'm sorry.

10             I read that wrong.  I'm going to withdraw that

11   because I don't have it.

12             Exhibit 109.  Wittman item 6, diabetic test strip:

13   The item did not contain sufficient DNA to perform a

14   comparison.

15             Exhibit 112.  Tanfoglio 9 millimeter Pistol (Kareem

16   Apartment):  DNA was recovered and was inconclusive for Abdul

17   Malik Abdul Kareem.

18             Hair Analysis:

19             Exhibit 68.  White bullet proof vest and carrier

20   Item W (Soofi):  Hairs recovered from the bulletproof vest and

21   carrier were excluded for Abdul Malik Abdul Kareem.

22             No hair sufficient for comparison was recovered from

23   the firearms in this case.

24             That ends the stipulation.

25             THE COURT:  Are those your stipulations, Mr. Maynard?

CR15-00707-PHX-SRB    JURY TRIAL-DAY #11    3-3-16

```
 1              MR. MAYNARD:  They are.
 2              THE COURT:  Okay.  The jury may accept those facts as
 3    agreed upon.
 4              Does the government rest?
 5              MR. KOEHLER:  Yes, Your Honor.
 6    GOVERNMENT RESTS
 7              THE COURT:  And would you like to begin with your
 8    witnesses tomorrow morning?
 9              MR. MAYNARD:  No.  I have got witnesses I would like
10    to start now.
11              THE COURT:  Okay.  So why don't you come see me for
12    one moment at sidebar and then we will have you call your
13    first witness.
14         (At sidebar on the record.)
15    DEFENDANT'S ORAL MOTION FOR JUDGMENT OF ACQUITTAL
16              MR. MAYNARD:  I make a motion for judgment of
17    acquittal.
18              THE COURT:  The motion is taken under advisement.  I
19    will hear argument on it at a later time.
20              MR. MAYNARD:  Thank you.
21         (End of discussion at sidebar.)
22              THE COURT:  Mr. Maynard, you may call your first
23    witness.
24              MS. PLOMIN:  Defense calls Daniel Van Hook.
25         (Witness duly sworn.)
```

UNITED STATES DISTRICT COURT

1    THE CLERK:  Please state your name for the record and

2    spell your last name.

3    THE WITNESS:  Daniel VanHook.  V-A-N-H-O-O-K.

4    THE COURT:  Is that all one word or is it a capital

5    "H."

6    THE WITNESS:  Capital H.

7    THE COURT:  Okay.  Thank you.  You may proceed, Ms.

8    Plomin.

9    MS. PLOMIN:  Thank you.

10    **DANIEL VAN HOOK, WITNESS, SWORN**

11    **DIRECT EXAMINATION**

12    BY MS. PLOMIN:

13    Q   Good afternoon, Mr. Vanhook.

14    A   Hello.

15    Q   Hello.  Mr. Vanhook, do you know the gentleman who is

16    sitting here at defense counsel table to my right?

17    A   Yes.

18    Q   All right.  And who is that?

19    A   Decarus Thomas.

20    Q   So you call him Decarus?

21    A   Yes.

22    Q   All right.  And just for the record, I'm referring to the

23    gentleman sitting in the blue; is that right?

24    A   Yes.

25    Q   Okay.  And when did you meet Decarus?

CR15-00707-PHX-SRB    JURY TRIAL-DAY #11  3-3-16

1   A   I would say back in 1994, 1995.

2   Q   At that time how old were you?

3   A   '95 I graduated from high school, so I guess I was about

4   17.

5   Q   The year you graduated from high school?

6   A   Yeah.

7   Q   And how old was Decarus when you met him?

8   A   Let's see.  I'm 38, so he's probably, what, about five

9   years above me, so 18, 19, 21 -- about 22, 23.

10  Q   How did you meet him?

11  A   He is my best friend's sister's boyfriend.

12  Q   He was back then?

13  A   Yes.

14  Q   And who is your best friend?

15  A   James Newman.

16  Q   And so you met Decarus through Mr. Newman; is that right?

17  A   Yes.

18  Q   Okay.  Now did you become friends with Decarus?

19  A   Yes.

20  Q   And how close of friends were you back then?

21  A   Well, back then we were pretty good friends.  We hung out.

22  Me, him, James, a few other of other buddies.  Like our

23  families are really good friends, yeah.

24  Q   So how often would you see him?

25  A   Back then?

1  Q   Yes.

2  A   Well, I would say maybe once a week, maybe twice a week.

3  We didn't go to their house a lot because he used to stay

4  across the street from James and his family.

5        And Michelle, she was his girlfriend at the time,

6  they stayed directly across.  I was over at James house a lot,

7  so, yeah.

8  Q   And are you still good friends with Decarus today?

9  A   Yes.

10  Q   And as of June of last year, had your relationship with

11  Decarus changed from the time you met him to June of 2015?

12  A   No.  I wouldn't say.

13  Q   And have you ever been to the house on Cochise where

14  Decarus lived?

15  A   Yes.

16  Q   How frequently did you go to that house?

17  A   About once a week, sometimes twice a week, once a week.

18  Q   What did you do when you went over to Decarus's house?

19  A   He cooked, so we ate, drank, had beers, talk.

20  Q   And who else was Decarus -- or did you spend time with at

21  Decarus's house?  Who else did you spend him with at Decarus's

22  house?

23  A   The other people that lived there, the other roommates;

24  Stefan, Billy.  Oh, who is the other guy?  Ricky.  And

25  Stefan's girlfriend.  Those are the other people that lived in

1    the house.

2    Q    And by "Stefan," do you know Stefan's last name?

3    A    I think it's Verdugo or Verzugo, something like that.

4    Q    And do you know his girlfriend's name?

5    A    I know her first name, Janine.

6    Q    And you said "Ricky."  Do you know Ricky's last name?

7    A    No.

8    Q    And do you know Billy's last name?

9    A    No.

10   Q    And did you ever meet a man by the name -- that went by

11   "Ibrahim"?

12   A    Yes.

13   Q    Where did you meet him?

14   A    At Decarus's house.

15   Q    And how frequently would you see Ibrahim at Decarus's

16   house?

17   A    He wasn't there often.  I would see him like, maybe, I

18   spent like maybe once a week over there, so maybe two to three

19   times of the month maybe.

20   Q    So two to three times a month?

21   A    Yeah.

22   Q    And when you would hang out and drink beers at Decarus's

23   house, would Ibrahim be there?

24   A    When we're drinking beer?  No.  Not at the time, no.

25   Q    Did Decarus drink in front of Ibrahim as far as you knew?

1  A    No.

2  Q    So I want to focus on the period of November 2014 through

3  March of 2015 when Decarus --

4           Are you aware that Decarus ultimately moved out of

5  the house on Cochise?

6  A    Yes.

7  Q    Do you know when that was?

8  A    I don't know the exact date, no, but I would say maybe it

9  was the summer of 2015 or somewhere around there.  I don't

10  know the exact date though.

11  Q    Well, let's talk about from November of 2014 to when

12  Decarus moved out of the house on Cochise.

13  A    Uh-huh.

14  Q    Were you still going there -- how often were you going

15  over to the Cochise house during that time period?

16  A    When Decarus had moved out?

17  Q    No.  Before he moved out?

18  A    Oh, before he moved out?  About once, twice a week.

19  Q    Okay.  And you were doing the same thing that you said you

20  were doing, drinking beers over there?

21  A    Yeah.  He would cook, so we would eat.  He would also cut

22  my hair.  He's a barber, so he would cut my hair.  Like Friday

23  I would get off after work, go eat, get my hair cut, maybe

24  have a beer, talk.

25  Q    And during that time period did you notice any changes in

```
 1    Decarus from how you had known him before?

 2    A    No.

 3    Q    And are you Muslim?

 4    A    No.

 5    Q    What religion are you?

 6    A    I'm Christian.

 7    Q    And how did Decarus treat you as a Christian person?

 8    A    Good.  The same.  Like he treated me when I first met him.

 9    I don't think it really mattered my religion.  He didn't treat

10    me bad or anything.  He knows that I'm Christian and my family

11    is Christian.

12    Q    And you say "your family."  Is your mom here watching

13    today?

14    A    Yes.

15    Q    All right.  And how long has Decarus known her?

16    A    Same amount of time, so 1994/'95.  Our families know each

17    other just like James family.  All of our moms know each

18    other.  We know his siblings.  He knows my siblings.  Kind of

19    like that.  We moved out here from California.  They are from

20    Philadelphia.  So our families kind of became family, you

21    know, because we're all out of state.

22    Q    And how did Decarus treat your mom as a Christian?

23    A    Very respectful.  Good.

24    Q    You're smiling.  Why?

25    A    Because he treats my mother with the utmost respect, you
```

1  know, kind of calls her Miss Rhonda.  And her first name is

2  Rhonda, so he treated her very respectful.

3  Q   Up until when he was arrested, did he still treat her

4  respectfully up to June of 2015?

5  A   Yes.

6  Q   Did you ever hear Decarus use the term "kafir"?

7  A   Yes.

8  Q   And in what context did you hear him use that term?

9  A   To me, like in a joking context.

10  Q   All right.  In a joking context.

11        Can you explain that a little more?

12  A   Yeah.  Like if we're talking about something, he would

13  say, oh, you don't understand, you kafir, oh, ha, ha, ha, and

14  start laughing.  Like, man, be quiet, you know, you don't even

15  know what "kafir" means.

16  Q   Did you ever feel threatened when Decarus called you a

17  kafir?

18  A   No.

19  Q   Now, I want to talk about your relationship with Stefan

20  Verdugo.  How do you know Stefan Verdugo?

21  A   Through Decarus.  He was one of Decarus's movers.

22  Q   Do you know when you met him?

23  A   We've known Stefan for a long time, so I would say -- I

24  don't know when he met him, but I know that he has known him

25  for a very long time.

1    Q    When did you meet him?

2    A    Oh, I met Stefan about ten years ago, maybe.

3    Q    And did you become friends with Stefan Verdugo?

4    A    Yes.

5    Q    And you said that you and Stefan Verdugo would be at the

6    Cochise house together?

7    A    Yes.

8    Q    And during that time -- and I want to focus on from

9    November 2014 to when Decarus moved out of the Cochise house.

10          During that time were you ever with Stefan when

11    Decarus told you he was a part of ISIS?

12    A    No.

13    Q    Did Decarus ever tell you he was a part of ISIS?

14    A    No.

15    Q    Were you ever with Stefan when any kind of videos were

16    played depicting ISIS or execution-style videos?

17    A    No.

18    Q    Did you ever see any of those types of videos being played

19    at Decarus's house?

20    A    No.

21    Q    Did Decarus ever show you any of those types of videos?

22    A    No.

23    Q    Did you ever see Decarus pull a gun on Mr. Verdugo?

24    A    No.

25    Q    Did you ever see a gun at Decarus's house at all?

```
 1    A    No.

 2    Q    Now, you said you have been in the Cochise house at the

 3    same time as a man named Ibrahim?

 4    A    Yes.

 5    Q    And during that time, did you have conversations with

 6    Ibrahim and Decarus?

 7    A    Yes.

 8    Q    Did you ever hear anything during a conversation about --

 9    with Ibrahim and Decarus about ISIS?

10    A    No.

11    Q    Did you ever hear anything about -- within those

12    conversations about a contest in Texas of drawing the Prophet

13    Muhammad?

14    A    No.

15    Q    And did you ever hear anything about any mention of an

16    attack in Paris, a Charlie Hebdo attack, between Ibrahim and

17    Decarus Thomas?

18    A    No.

19    Q    Do you own a gun?

20    A    No.

21    Q    Have you ever shot a gun?

22    A    Have I ever shot a gun?  Yes.

23    Q    And how many times have you shot a gun?  How many

24    occasions have you shot a gun?

25    A    Maybe twice.
```

CR15-00707-PHX-SRB    JURY TRIAL-DAY #11   3-3-16

```
 1    Q    Okay.  And on either of those occasions did you go shoot
 2    the gun or a gun with Decarus?
 3    A    Yes.
 4    Q    And who were you with when you went to go do that?
 5    A    It was me, Decarus, a friend of ours Sergio, Sergio's
 6    brothers.  We went to Sergio's parents' house.  They have a
 7    ranch.  And his father and his mother was also there.  They
 8    cook dinner or made us lunch and they kind of have like a
 9    shooting range and we went shooting, yes.
10    Q    And when you went to Sergio's parents' house, did you --
11    were you planning on going shooting or did it just happen?
12    A    It just happened.
13    Q    And how long ago was that?
14    A    It was so long ago, I would say six years ago, seven years
15    ago.
16    Q    Now, moving to May of 2015, did there come a time when you
17    learned that Ibrahim -- Ibrahim had gone to attack a contest
18    in Texas?
19    A    I found out about that after it happened.
20    Q    And when you found out about that --
21         I want to talk about the period after you found out
22    about that.  How did you find out about it?
23    A    Through Decarus.
24    Q    Okay.  And after that -- well, let me back up.
25         Do you know when Stefan Verdugo moved out of the
```

1    Cochise house for the last time?

2    A   I don't recall the exact date, but I would say it was

3    summer of 2015, somewhere around that time.

4    Q   Okay.  And do you know where he moved after he moved out?

5    A   I don't think he really had a steady place to go, so I

6    don't know exactly where he moved.  I know that he was staying

7    like with friends, another good friends of his.  I forgot the

8    guy's name.  And I know he was staying like at a Budget

9    Suites, so kind of place to place.

10   Q   So after he moved out of Decarus's house, did Verdugo --

11   was Verdugo essentially homeless?

12   A   Yes.

13   Q   And did you talk to Verdugo in the time after he moved out

14   of Decarus's house?

15   A   Yes.

16   Q   And during that time how was Verdugo doing financially?

17   A   He was struggling.  Wasn't doing so well.  He was having a

18   hard time.  He was from home to home, so I would say he was

19   struggling, low on money.

20   Q   All right.  And at some point did you have a conversation

21   with Verdugo about moving into Decarus's -- back in with

22   Decarus?

23   A   Yes.

24   Q   And did Verdugo express to you that he wanted to move back

25   in with Decarus?

 1              MR. KOEHLER:  Objection.  Hearsay.

 2              THE COURT:  Sustained.

 3              MS. PLOMIN:  It's offered for impeachment, Your

 4    Honor.

 5              THE COURT:  Sustained.

 6    BY MS. PLOMIN:

 7    Q   And did you -- after you spoke to Verdugo, did you make a

 8    phone call to Decarus asking if Verdugo could move back in

 9    with him?

10              MR. KOEHLER:  Objection.  Leading.

11              THE COURT:  Overruled.  You may answer "yes" or "no."

12              THE WITNESS:  Yes.

13    BY MS. PLOMIN:

14    Q   And did Decarus, after that, allow Verdugo to move back in

15    with him?

16    A   No.

17    Q   Did you testify that Verdugo moved out of the Cochise

18    house in December 2015?

19              MR. KOEHLER:  Objection.

20              THE COURT:  I don't think he said at all when he

21    moved out, only that he remembered that he did.

22    BY MS. PLOMIN:

23    Q   Okay.  Do you have a clear memory of when Verdugo moved

24    out of the house on Cochise?

25    A   No.

CR15-00707-PHX-SRB    JURY TRIAL-DAY #11    3-3-16

```
 1              MS. PLOMIN:  I don't have any more questions.

 2         Thank you.

 3              THE COURT:  Mr. Koehler.

 4                    CROSS EXAMINATION

 5    BY MR. KOEHLER:

 6    Q    Good afternoon, sir.

 7    A    Good afternoon.

 8    Q    You haven't met me before; is that correct?

 9    A    That's correct.

10    Q    Nor have you met Agent Whitson?

11    A    I have not met him before, no.

12    Q    Nor Ms. Brook; is that correct?

13    A    That's correct.

14    Q    Now, you did submit to an interview with a couple of FBI

15    agents on two different occasions in connection with this

16    case; is that right?

17    A    Yes.

18    Q    One in May of 2015 and another in January of 2016; is that

19    right?

20    A    That sounds about right, yes.

21    Q    And am I right from your interviews that you didn't think

22    that Elton Simpson was capable of the kind of violence that we

23    saw in the attack in May of 2015?

24              MS. PLOMIN:  Objection.  Hearsay.

25              THE WITNESS:  That's not correct.
```

1          THE COURT:  He was asked whether he thought Elton

2    Simpson was capable and he said "that's not correct," so the

3    objection is overruled.  The answer will stand.

4          MR. KOEHLER:  If I can have one moment.

5    BY MR. KOEHLER:

6    Q    Did you say to agents on May 17 of 2015 that you were

7    surprised that Simpson had engaged in such an attack because

8    you had always seen Simpson as a quiet and sensible

9    individual?

10   A    I said I was surprised, yes, but I did not say that it was

11   unbelievable or what you stated earlier.  I said that it was

12   surprising, yes.

13   Q    Did you also say that you never overheard Simpson talking

14   about guns?

15   A    Yes.

16   Q    Did you also say that you never heard any indications from

17   Mr. Thomas, as you knew him, that Simpson was planning or

18   capable of this type of attack?

19   A    Yes.

20   Q    You also stated that Thomas did not own any guns; is that

21   right?

22   A    From what I'm aware --

23          MS. PLOMIN:  Objection.  Hearsay.

24          THE COURT:  Sustained.  Form of the question, Mr.

25   Koehler.

```
1    BY MR. KOEHLER:

2    Q    To your knowledge, at that time Decarus Thomas as you knew

3    him did not own any guns; is that correct?

4    A    That's correct.

5    Q    You went over to that house every other weekend roughly;

6    is that correct?

7    A    Yes.

8    Q    And at the time that you went over there, you had beers

9    with him?

10   A    Yes.

11   Q    Did Mr. Simpson or Mr. Soofi ever stay at the house during

12   the time that you were having beers with him?

13   A    I don't know Mr. Soofi, but I know a Mr. Simpson, and, no,

14   he did not.

15   Q    So you don't know Mr. Soofi.  You never ever saw him at

16   the house?

17   A    I saw him coming and going once.  But other than that, I

18   did not know at the time that that was Mr. Soofi.  I only

19   found out the guy's name "Mr. Soofi" on the news.  So at that

20   time, no, I did not know that that was Mr. Soofi.

21   Q    You mentioned on direct somebody named "Billy"; is that

22   right?

23   A    Yes.

24   Q    Was there more than one Billy at the house?

25   A    Yes.
```

1  Q    How did the people at that house differentiate between the

2  two Billies?

3  A    One Billy is black and the other Billy is white.

4  Q    Okay.  So did they have nicknames?

5  A    Yes.

6  Q    Who gave them those nicknames, if you know?

7  A    I'm not sure who gave them the nicknames, but they did

8  have nicknames.

9  Q    And did Decarus Thomas use those nicknames with them?

10  A    Yes.

11  Q    What were their nicknames?

12  A    White Billy and Black Billy.

13  Q    Did you spend any time at the 21st Drive apartment after

14  Decarus Thomas moved out of the house on Cochise?

15  A    Yes.

16  Q    How often would you visit there?

17  A    Oh, not as often, but I would say maybe once every two

18  weeks maybe.

19  Q    And when you went there was Elton Simpson there?

20  A    No.

21        MR. KOEHLER:  If I can have a moment?

22        No further questions.

23        THE COURT:  Any questions on redirect, Ms. Plomin?

24        MS. PLOMIN:  Just one moment, Your Honor.

25        No, Your Honor.  Thank you.

CR15-00707-PHX-SRB    JURY TRIAL-DAY #11  3-3-16

```
 1              THE COURT:  May this witness be excused and released
 2    from his subpoena?
 3              MS. PLOMIN:  Yes.
 4              THE COURT:  Thank you.  You may be excused.
 5              THE WITNESS:  I have a question.
 6              After you are a witness, because I've never been
 7    through anything like this before, are you allowed to stay and
 8    hear the rest of the trial?
 9              THE COURT:  Yes.
10              THE WITNESS:  Okay.
11              All right.  That's it.  Thank you.
12              MR. MAYNARD:  Defense will call Dunston Simpson, Jr.
13         (Witness duly sworn.)
14              THE CLERK:  Please state your name for the record,
15    spelling your first and last name.
16              THE WITNESS:  Dunston.  D-U-N-S-T-O-N.  Reginald.
17    R-E-G-I-N-A-L-D.  Simpson.  S-I-M-P-S-O-N.  Second, not a,
18    Junior.
19              THE COURT:  You may proceed Mr. Maynard.
20              MR. MAYNARD:  Thank you, Your Honor.
21          DUNSTON REGINALD SIMPSON, II, WITNESS, SWORN
22                     DIRECT EXAMINATION
23    BY MR. MAYNARD:
24    Q   Good afternoon, Mr. Simpson.
25    A   Good afternoon.
```

UNITED STATES DISTRICT COURT

CR15-00707-PHX-SRB   JURY TRIAL-DAY #11  3-3-16

```
1    Q    Would you introduce yourself to the jury.  What is your

2    name?

3    A    My name is Dunston R. Simpson.

4    Q    And do you live in the Phoenix metropolitan area?

5    A    Yes, specifically Glendale, Arizona.

6    Q    And how long have you lived here?

7    A    Approximately, 20 years.

8    Q    And are you employed here in Phoenix?

9    A    I am.

10   Q    Okay.  Are you the brother --

11             Well, strike that.

12             Who was your brother?

13   A    Elton Francis Simpson.

14   Q    And the year prior to your brother's death, how often

15   would you see him?

16   A    A few times.  You know, toward the latter part, often.

17   Q    And what do you mean "towards the latter part, often"?

18   Can you explain that for us?

19   A    Probably the last three or four months of his life, I

20   would spend a lot of time with him traveling to San Diego.  He

21   would come to the home often to spend time with my children,

22   yeah.

23   Q    Okay.  You're married?

24   A    I am.  Fourteen years.

25   Q    And how many kids do you have?
```

1    A    Two.

2    Q    And your brother was a Muslim, correct?

3    A    Correct.

4    Q    And do you recall when he converted?

5    A    Sometime in his collegiate time, so I don't know.  He was

6    32.  Fifteen years --

7    Q    Sometime after he started college?

8    A    Freshman year college, second year of college.

9    Q    Are you a Muslim?

10   A    No, I'm not.

11   Q    Okay.  Now, you said your brother and you spent more time.

12   Was that unusual the last couple of months before his death?

13   A    It was.  It was.  I mean, I was not attracted by, you

14   know, always getting -- always talking about, you know, the

15   religion and things like that because I'm just not that

16   person.  I tend to focus on other interests other than

17   religion.

18            So there was dissention for quite some time because,

19   you know, there was no interest in that space.  But again,

20   this last four or five months of his life, he spent a lot of

21   time with me.

22   Q    Okay.  Did he seem to spend a lot of time with other

23   members of your family also?

24   A    Indeed, yes.

25   Q    And that was different than he had been the prior several

1    years?

2    A    Correct.

3    Q    Okay.  Now, did you know an individual by the name of

4    Nadir Soofi?

5    A    No.

6    Q    Did you know Ali Soofi?

7    A    No.

8    Q    Had you been to your brother's apartment?

9    A    No.

10   Q    In the -- in the year before he died?

11   A    No.

12   Q    All right.  Did -- prior to May 3rd of 2015, had you ever

13   heard of a Muhammad Drawing Contest prior to your brother's

14   death?

15   A    Are you specifically stating Garland, Texas, Muhammad

16   Drawing?

17   Q    Yes.  Yes.  Yes, sir.

18   A    No.

19   Q    Now, were you aware that your brother was going out of

20   state in May of 2015?

21   A    No.

22   Q    Okay.  How did you learn that your brother was out of

23   Arizona on May 3rd of 2015?

24   A    I received a phone call from a reporter.  I don't know

25   exactly who she was, but she claimed to be a reporter stating

1    that my brother was potentially involved in an incident in the

2    State of Texas and was I aware of it.  And I said absolutely

3    not.

4    Q   And what did you do after you received that phone call?

5    A   I immediately called anyone who would figure out whether

6    or not Elton was in the state, out of state, what have you.  I

7    contacted Saleem.

8    Q   Did you refer to your brother as "Elton" or did you call

9    him "Ibrahim"?

10   A   I don't recall.

11   Q   Do you remember approximately what time you received that

12   phone call on the evening of May 3rd?

13   A   Sure.  It was sometime around 9:30, ten o'clock.

14   Q   Sort of late in the evening?

15   A   Correct.

16   Q   And did you eventually get in contact with anybody that

17   you knew that knew Elton?

18   A   Yes.

19   Q   And who was that individual?

20   A   It was Saleem.

21   Q   I'm sorry?

22   A   Saleem.

23   Q   Do you know what Saleem's last name is?

24   A   I do not.

25   Q   Did you -- can you tell us what you asked Saleem to do if

1    anything?

2    A    Sure.  I asked Saleem if he could go by Elton's apartment,

3    because I had no idea where he lived.  And he said sure,

4    because I guess Saleem was at the mosque and the mosque was

5    right down the street from Elton's residence.

6         And so he said yes, I have no problem with going to

7    his residence to see if he's there or not.

8    Q    And what do you understand that happened next?

9    A    So he goes on to Elton's apartment, realizes that the

10   apartment was dark, realized that no one was in there after

11   knocking on the door.

12        He also noticed two possible agents who were there at

13   Elton's residence.  He immediately turned around, got in his

14   car.  Mind you, I'm on the phone with him this entire time.

15        He gets in his car and says, listen, I think I might

16   be getting pulled over.  I need to call my wife.  And that was

17   the last time I heard from him.

18   Q    All right.  When did you next here anything about your

19   brother?

20   A    It was all media-related.

21   Q    So from that point on after you had spoken to Saleem, the

22   rest you heard -- or at least the next reports you heard on

23   the media?

24   A    Correct.

25        MR. MAYNARD:  I don't have any further questions,

1    Your Honor.

2    　　　　　THE COURT:  Mr. Koehler, you may cross-examine.

3    　　　　　　　　　　**CROSS EXAMINATION**

4    BY MR. KOEHLER:

5    Q    Good afternoon, Mr. Simpson.

6    A    Good afternoon.

7    Q    You have not met with me or anybody at counsel table over

8    here before today; is that correct?

9    A    No, sir.

10   Q    You have spoken to the FBI after what happened in Garland,

11   Texas, about your brother?

12   A    Yes, sir.

13   Q    So after your brother realized that he couldn't convert

14   you, he still continued to spend time with you; is that

15   correct?

16   A    Correct.

17   Q    How frequently did he try to convert you to Islam?

18   A    He never tried to convert me.  Let's just make that a

19   record.  He never tried to convert me.  He tried to just share

20   the religion with me.  He never asked me to convert.

21   Q    Did you make it clear to him that you were not interested

22   in any way?

23   A    Yeah.  It was due to body language and the fact of a lack

24   of engagement through communication.

25   Q    Okay.  Can you explain the "body language" part?

1  A    Well, you know, just kind of like just not interested.  If

2  you're not interested in something, you just kind of shrug it

3  off or you maybe move to another room while he's talking to

4  the kids or having fun with the kids.  You know, you just kind

5  of dissociate yourself with the situation.

6  Q    But despite that, he continued to spend time with you; is

7  that correct?

8  A    Correct.

9  Q    Was that true with the rest of your family?

10  A    I believe so.

11  Q    Were you surprised at what happened in Garland with your

12  brother?

13  A    Of course, I was.

14  Q    Can you explain that a little bit.  Why?

15  A    Because my brother is not a violent person.  He's a very

16  peaceful person.  He was a happy person.  He -- I just would

17  never think that it would get to that point.

18  Q    Am I correct that you did not think that using weapons was

19  something that your brother was into?

20  A    Correct.

21  Q    Am I also correct your brother didn't have a lot of money

22  to spare?

23  A    Not that I was aware of, no.

24        MR. KOEHLER:  I have no further questions.

25        THE COURT:  Mr. Maynard, anything else?

CR15-00707-PHX-SRB    JURY TRIAL-DAY #11    3-3-16

```
 1              MR. MAYNARD:  No.

 2              THE COURT:  May Mr. Simpson be excused and released

 3    from his subpoena?  Is there any objection?

 4              MR. KOEHLER:  No, Your Honor.

 5              THE COURT:  Thank you very much, Mr. Simpson.  You

 6    may step down and you are excused as a witness.

 7              Do you have someone else you want to call today?

 8              MR. MAYNARD:  Yes.  Dunston Simpson, Sr.

 9         (Witness duly sworn)

10              THE CLERK:  Please state your name for the record.

11              THE WITNESS:  Dunston Francis Simpson.

12              THE COURT:  You may proceed, Mr. Maynard.

13              MR. MAYNARD:  Thank you, Your Honor.

14         DUNSTON FRANCIS SIMPSON, SR., WITNESS, SWORN

15                        DIRECT EXAMINATION

16    BY MR. MAYNARD:

17    Q   Good afternoon, Mr. Simpson.

18         Could you introduce yourself to the jury, please.

19    A   Again, I am Dunston Simpson, Elton Simpson's dad.

20    Q   And do you live in the Phoenix metropolitan area?

21    A   I do.

22    Q   Okay.  And without telling me who your employer is, how

23    are you employed?

24    A   I do accounting work.

25    Q   Okay.  Now, you are aware that at some point your son
```

UNITED STATES DISTRICT COURT

1    Elton converted to Islam; is that correct?

2    A    I am.

3    Q    Did you ever convert to Islam?

4    A    I did not.

5    Q    Now, had you ever met Decarus Thomas, also known as Abdul

6    Malik Abdul Kareem?

7    A    I did.

8    Q    Do you recognize him in this courtroom today?

9    A    I do.

10    Q    Okay.  On how many occasions did you meet Mr. Abdul

11    Kareem?

12    A    Once.

13    Q    When was that?

14    A    At my home to clean the carpets.  He had a carpet cleaning

15    service.

16    Q    Okay.  And I want to direct your attention to May 3rd of

17    2015.  Did you know that Elton was going out of town that

18    weekend?

19    A    I did not.

20    Q    And how is it that you learned that Elton had gone out of

21    town?

22    A    I was visited earlier that morning, May 3rd, by the

23    defendant; came to my house.

24    Q    Okay.  When you say early the morning of May 3rd, was it

25    either late at night on May 3rd or early the morning of May

```
 1    4th?

 2    A    I'm not really sure.  I'm thinking it was 1:00 or

 3    2:00 a.m.

 4    Q    Okay.  If I were to tell you that the incident in Garland,

 5    Texas, occurred about seven or eight o'clock Texas time -- or

 6    six o'clock Texas time on May 3rd, does that help you refresh

 7    your recollection as to when?

 8    A    No, it does not, because my wife and I were asleep.

 9    Q    Okay.

10    A    We got a knock at the door and I went to the door and --

11    Q    Tell us what happened that evening.

12    A    Well, again, we were asleep.  There was a knock at the

13    door.  I came to the door and it was the defendant.  And he

14    indicated that he had heard something disturbing and that

15    maybe we should turn the television on and take a look at what

16    might be broadcast as the news, to take a look because it's

17    possible that my son had gone to Garland, Texas, and something

18    terrible happened.

19    Q    Was there anybody that was with Mr. Abdul Kareem?

20    A    There were two other gentlemen.  I'm not real familiar

21    with them, so I can't give you their names, but there were two

22    other gentlemen.  I just don't have their names.

23    Q    All right.  Did the three of them walk into your house?

24    Did you invite them in that evening?

25    A    Absolutely.
```

```
 1    Q    Okay.  And it was very late at night, whatever time it
 2    was?
 3    A    Absolutely.
 4    Q    And did you turn on the television?
 5    A    Yes, I did.
 6    Q    How is it that you were able to get news that late at
 7    night?  Did you have a DVR?
 8    A    It was broadcasting.  I surfed the channels.  I found some
 9    news and watched it and because it was a fantastic story that
10    was there.
11    Q    Did you realize from watching that news that your son was
12    involved in this?
13    A    I did not.
14    Q    Did anyone of the three indicate that they recognized
15    anything from the newscast?
16    A    Not actually.  There was a conversation that the
17    automobile --
18         MR. KOEHLER:  Your Honor, I'm going to object on
19    hearsay grounds at this point.
20         THE COURT:  Overruled.  You may complete your answer.
21         THE WITNESS:  There was some talk that the automobile
22    looked like the automobile that belonged to one of the guys.
23    BY MR. MAYNARD:
24    Q    Okay.  Did you know Nadir Soofi?
25    A    I had never met him.
```

UNITED STATES DISTRICT COURT

```
 1    Q    Had you ever been to your son's apartment?

 2    A    No.

 3    Q    Okay.  Now, when did you finally learn that your son had

 4    died in Texas?

 5    A    I was in disbelief, so I still went to work.  I had to be

 6    at work at 4:00 a.m.  And I get a call -- I can't even

 7    remember who called me at work and told me that, yes, it was

 8    him.

 9    Q    Okay.  Now, before your son passed away, did your son own

10    a car?

11    A    He did own a car.

12    Q    And what kind of car did your son own?

13    A    It was an Infinity 300 or something like that.

14    Q    At some point in time did somebody give you the car

15    registration to that car?

16    A    Yes, they did.

17    Q    Who was that individual?

18    A    The gentleman's name was Saabir.  I don't know his last

19    name but he gave me the title.

20    Q    Did he tell you how he came to have the title?

21    A    He did not.  He just says I think you should have it and

22    he gave it to me.

23              MR. MAYNARD:  I have no further questions, Your

24    Honor.

25              THE COURT:  You may proceed, Mr. Koehler.
```

1                     **CROSS EXAMINATION**

2    BY MR. KOEHLER:

3    Q    Thank you, Your Honor.

4         And good afternoon, Mr. Simpson.

5    A    Hello, sir.

6    Q    You've not met me or the two people at the counsel table

7    with me before today; is that correct?

8    A    No.  I'm a little older.  I don't remember quite well,

9    but, no, I haven't met you.

10   Q    A couple quick questions for you.

11        First of all, this person Saabir that came to your

12   house?

13   A    Yeah.

14   Q    Did you know him?

15   A    Yeah, I did.

16   Q    Okay.  And when he brought you the car -- title to the

17   car, did he bring you a letter or anything?

18   A    He did not.

19   Q    Just the title itself?

20   A    Just the title itself.

21   Q    Now, I think you were already asked, but I want to make

22   clear.  You're not Muslim; is that right?

23   A    No.  I am not.

24   Q    And your wife is not Muslim?

25   A    No.  She is not.

1   Q   At the time that your son Elton converted to Islam, did he

2   attempt to share Islam with you and your wife?

3   A   He did.

4   Q   And what was your response to that?

5   A   I have a little difficulty with religion, so my response

6   was that's really good, son, I'm glad you found something that

7   you could believe in.

8   Q   Okay.  But you, yourself, were not interested; is that

9   correct?

10   A   No.  I wasn't.

11   Q   You didn't convert?

12   A   I did not.

13   Q   Your wife didn't convert either?

14   A   She did not.

15   Q   Yet your son still came over to visit you; is that

16   correct?

17   A   Not as often as we would like, but once in a while, he did

18   come over.

19   Q   Was he still loving toward you?

20   A   Yes.

21   Q   Was he still loving toward your wife?

22   A   Yes, he was.

23   Q   Would you see him hug his mother?

24   A   Yes, I did.

25   Q   Did he tell her that he loved her?

```
 1    A    Well, I don't know.

 2    Q    Okay.  But you already said that he was loving toward her.

 3    A    Yes.

 4    Q    You already stated on direct that you were in disbelief

 5    about the attack happening in Garland?

 6    A    Correct.

 7    Q    Why were you in disbelief about it?

 8    A    That wasn't my son's nature.  He was caring, loving,

 9    gentle.

10    Q    Did you ever see him with a firearm?

11    A    Never.

12    Q    Had you ever heard of him ever having a firearm or using

13    one?

14    A    Never.  He told me that they weren't allowed.

15    Q    Were you ever aware of your son having any large sums of

16    money?

17    A    No.  Please.

18    Q    Okay.  We got a little bit of what sounded like a chuckle

19    out of you in response to that?

20    A    Yeah.

21    Q    Explain that, please.

22    A    Well, he just never had large sums of money.  When I think

23    of large sums of money, I think of you guys.

24    Q    Fair enough.

25         So my question here is:  Did he seem to you like
```

1  somebody who had the kind of money that could spend, say, 500

2  or $700 on a firearm?

3  A  No.

4          MR. KOEHLER:  I have no further questions.  Thank

5  you.

6          THE COURT:  Mr. Maynard, do you have any questions on

7  redirect?

8          MR. MAYNARD:  I do not.

9          THE COURT:  May this witness be excused and released

10 from his subpoena?

11         MR. MAYNARD:  Yes.

12         THE COURT:  Is there any objection?

13         MR. KOEHLER:  No objection.

14         THE COURT:  Thank you very much, Mr. Simpson.  You

15 may step down and you are excused as a witness.

16         MR. MAYNARD:  Defense calls Stuart Sampson.

17     (Witness duly sworn)

18         THE CLERK:  Please state your name for the record,

19 spelling your first and last name.

20         THE WITNESS:  Stuart Sampson.  S-T-U-A-R-T

21 S-A-M-P-S-O-N.

22         THE COURT:  You may proceed, Mr. Maynard.

23              **STUART SAMPSON, WITNESS, SWORN**

24                   **DIRECT EXAMINATION**

25 BY MR. MAYNARD:

```
1    Q    Good afternoon, Mr. Sampson.

2    A    Good afternoon.

3    Q    Could you introduce yourself to the jury.

4    A    My name is Stuart Sampson.  I go by Saleem as well.

5    Q    Mr. Sampson, you are a Muslim; is that correct?

6    A    I am.

7    Q    And when is it that you converted to Islam?

8    A    Twenty-one years ago.

9    Q    Okay.  You are also -- strike that.

10        You know the defendant in this case Abdul Kareem,

11   correct?

12   A    I do.

13   Q    And are you related to him?

14   A    I am.

15   Q    And how are you related?

16   A    He's my uncle.

17   Q    Were you born in Philadelphia?

18   A    I am.

19   Q    And your mother was his sister; is that correct?

20   A    Correct.

21   Q    Now, are you married?

22   A    I am.

23   Q    And how many children, if any, do you have?

24   A    Three.

25   Q    And how long have you been married?
```

```
 1    A    Six years.  I been with my wife eleven years.
 2    Q    Okay.  And without telling me who your employer is, how is
 3    it that you are employed?
 4    A    How is it that I'm employed?
 5              THE COURT:  What do you do for a living?
 6              MR. MAYNARD:  What do you do for a living?
 7              THE WITNESS:  Floors.  I do floors.
 8    BY MR. MAYNARD:
 9    Q    Okay.  Now, you also have a brother that lives out here in
10    Phoenix at this time, correct?
11    A    I do.
12    Q    And what is his name, please.
13    A    Anthony Sampson.  And he goes by Hakeem as well.
14    Q    Did you know an individual by the name of Elton Simpson?
15    A    I do.
16    Q    And how did you know him?
17    A    We pray together.
18    Q    When did you first meet him?
19    A    I believe 2012 or 2013.
20    Q    And when you say you pray together, did you go to the same
21    mosque?
22    A    We do -- well, it's a lot of mosques in the same area, so
23    people go wherever they at at the time.  And basically, we
24    would meet at the masjid.  He plays basketball.  Everything.
25    Q    Okay.  Did you play basketball with him at times?
```

1    A    I did.

2    Q    Did he ever work for you at any time?

3    A    He did.

4    Q    And how long did he work for you?

5    A    A couple of months.

6    Q    Okay.  Now, did you know Nadir Soofi?

7    A    I do.

8    Q    And how did you know him?

9    A    Prayer.

10   Q    Same way as you knew Elton or Ibrahim?

11   A    Yep.

12   Q    I'm going to direct your attention to the day of May 1st

13   of 2015.  Did you pick your brother up at the airport that

14   day?

15   A    I did.

16   Q    He was coming in from Philadelphia?

17   A    Yep.

18   Q    Was he coming back here to live?

19   A    He's coming -- yeah.  To live in Arizona.

20   Q    Okay.  Who was he going to live with?

21   A    My uncle.

22   Q    And who was he going to be employed by?

23   A    My uncle and me.  Well, he can work with him and he can

24   work with me.

25   Q    Okay.  And, approximately, what time did you pick your

1    brother up at the airport that day?

2    A    It was in the afternoon sometime.  I don't remember the

3    exact time.

4    Q    Do you recall where you went after you picked your brother

5    up?

6    A    To my house.

7    Q    Okay.  At some point did you go to the mosque that day?

8    A    It had to be later in the afternoon.

9    Q    Okay.  Did you see Elton Simpson or Ibrahim at the mosque

10    that day?

11    A    That was a Friday.  Yeah.  We did see him.  You have to go

12    to the mosque on Friday.  It's Jumu'ah.  It's always

13    obligatory for Muslim men to attend prayer on Friday.  So we

14    did see Elton and seen Nadir.  Nadir was sitting behind me and

15    Elton was sitting to the right of me.

16    Q    Was that the last time that you saw Elton Simpson?

17    A    The last time.

18    Q    Was that the last time you had seen Nadir Soofi?

19    A    Yep.

20    Q    Okay.  After the Jumu'ah prayers that day, can you tell us

21    what happened, if anything?

22    A    I know my uncle, he arranged to have a barbecue at his

23    house and he offered everybody to come over to his house for a

24    barbecue.  Other than that, I didn't -- I'm usually home or

25    I'm working, so I don't know.

1              My brother, he was with my uncle, because -- in

2    Islam, if I'm married and I have a wife in my house, then

3    another male is not allowed to live in my household.  So he

4    was with my uncle.

5    Q   Okay.  So did your brother leave that day to go to your

6    uncle's house from the mosque?

7    A   He did.

8    Q   Did you participate in that -- did you go to the barbecue

9    that your uncle had talked about?

10   A   I didn't.

11   Q   Okay.  I'm going to direct your attention now to May 3rd

12   of 2015.  At some point did you get a call from anyone

13   concerning Ibrahim?

14   A   I did.

15   Q   And who was that call from?

16   A   Ibrahim's brother Dunston.

17   Q   Had you met him before you received that call?

18   A   Personally, no.

19   Q   Okay.  And do you remember approximately what time at

20   night it was -- or what time of day it was that you --

21   A   It was at night time.  Because you share prayers the last

22   prayer of the day.  And what the events that took place is I

23   got a phone call because I was praying.  I didn't answer the

24   phone.  And then I got a text message.  After that I got the

25   text message.  That's when I talked to him.

UNITED STATES DISTRICT COURT

1    Q    Okay.  And so you got the text message from Dunston and

2    you returned his call?

3    A    I did.

4    Q    And what did he ask you, if anything, to do?

5    A    Well, he told me that he had some communications with some

6    kind of reporters or something like that and reference to

7    Ibrahim, that he did something over in Texas or something like

8    that.

9         And I was on the phone with him.  And I told him:

10    What do you mean Texas?

11         And I told him this is unusual for you not to talk to

12    Ibrahim with something like this to take place for a reporter

13    to call you.  I can go check on him because the masjid is on

14    23rd Avenue and Ibrahim and them live on 19th Avenue.

15         So I left the masjid and I went to knock on his door.

16    As soon as I knocked on his door, his door is facing, I

17    believe, south.  And to the right of me I see two SUVs parked

18    directly looking at his apartment on the other side of the

19    wall.

20         So as I'm leaving the apartment complex, I see the --

21    a car come around this way.  I'm driving here.  They stopped

22    right here.  So I come out of the complex and I'm headed to

23    the masjid.

24         I was still on the phone with his brother.  I told

25    him I'm going to let you go because somebody is following me.

1  I called my wife and I told my wife to meet me at the masjid

2  because somebody is following me and I don't have a clue

3  what's going on.

4        A police car came out of Chase Bank or Bank of

5  America and got in front of them and they turned on their

6  lights.  And so I proceeded to the masjid.  I made a left.

7  They turned on the lights and I pulled over in the masjid.

8        And that's when they drew their guns and everything

9  and made me get out of the car and whatever and just basically

10  put me on my knees and everything like that and started asking

11  me questions.

12        And they asked me what I'm in Arizona for and all

13  this other stuff.  I told him:  What are you in Arizona for?

14  I mean, I came here because I live here.

15  Q   And what happened next after they stopped you?

16  A   After about -- they got my identification.  My wife pulled

17  up on this side.  They went and got her identification and

18  they asked her some questions.

19        And then she had to go back around the corner.  They

20  left me on the car with the handcuffs.  And then after that

21  they let me go about 25, 30 minutes.

22        When I get back to my house I start calling around to

23  tell people what's going on.  The first people I contacted, I

24  tried to contact my brother, but nobody answered the phone.

25  So I contacted my uncle and I told him:  Did you hear anything

1  that's going on with Ibrahim and them because his brother

2  called me and the cops and the FBI already grabbed me and

3  everything.  He said no, he didn't hear nothing about that.

4  Q    Okay.  Did you do anything else after that evening, after

5  you had talked to your uncle?

6  A    I was calling multiple people to let them know what's

7  going on.

8  Q    And when you say you were letting them know what was going

9  on, you were telling them about the call you had gotten from

10  Dunston and having been stopped by the police?

11  A    Exactly.

12  Q    Okay.  Now, when did you learn that Ibrahim had been

13  killed in Texas?

14  A    When did I learn?

15  Q    Yes.

16  A    It had to be that night.

17  Q    Did you see it from the news or did you hear it from

18  somebody or --

19  A    It was on the -- it was everywhere.  It was all over the

20  place.

21  Q    Okay.  Had you ever heard of the Muhammad Drawing Contest

22  prior to learning that Ibrahim had been killed in Garland,

23  Texas?

24  A    No.

25  Q    Had there ever been any discussion in the Muslim Community

```
 1    that you participate in in this Muhammad Drawing Contest in

 2    Garland, Texas?

 3    A    No.  Nobody at the masjid talk about no drawings.

 4    Q    And you've used the term "masjid" a few times.  Is that

 5    what --

 6    A    "Masjid" is another word for "mosque."

 7              MR. MAYNARD:  Mosque.  Okay.

 8              I don't have any further questions.

 9              THE COURT:  Mr. Koehler?

10                        CROSS EXAMINATION

11    BY MR. KOEHLER:

12    Q    Good afternoon, Mr. Sampson.

13    A    Good afternoon.

14    Q    Before I ask you other questions about the case, you

15    haven't met me before; is that correct?

16    A    No.

17    Q    And you haven't met the two people seated at counsel table

18    with me?

19    A    No.  I seen them before.  I didn't know them.  I never met

20    them.

21    Q    You have seen us here in the courthouse?

22    A    I have.

23    Q    Okay.  You mentioned that Elton Simpson worked with you

24    for a couple of months?

25    A    That's correct.
```

1   Q   Whereabouts was that?

2   A   I can't recall.  It was years ago.

3   Q   Years ago.  That's fine.

4       Did you ever see him with large sums of money?

5   A   No.

6   Q   Were you surprised about his involvement in this event in

7   Garland, Texas?

8   A   Of course.

9   Q   Why were you surprised?

10  A   Because Ibrahim to me -- everybody knowed him is all he do

11  is smile, is quiet, and play basketball.

12  Q   And was that attitude of his consistent all the way up

13  until May 3rd of 2015?

14  A   It was.

15  Q   What about Nadir Soofi?

16  A   Same thing.  Quiet.

17      MR. KOEHLER:  Thank you.  No further questions.

18      THE COURT:  Any other questions?

19      MR. MAYNARD:  No, ma'am.

20      THE COURT:  May Mr. Sampson be excused and released

21  from his subpoena?

22      MR. MAYNARD:  Yes.

23      THE COURT:  Is there any objection?

24      MR. KOEHLER:  No, Your Honor.

25      THE COURT:  Thank you, Mr. Sampson.  You may step

```
 1    down, sir, and you are excused as a witness.

 2             MR. MAYNARD:  Defense calls Anthony Sampson.

 3         (Witness duly sworn.)

 4             THE CLERK:  Please state your name for the record and

 5    spell your last name.

 6             THE WITNESS:  Anthony Sampson.  You said spell it?

 7             THE CLERK:  Spell your last name.

 8             THE WITNESS:  S-A-M-P-S-O-N.

 9             THE COURT:  You may proceed, Mr. Maynard.

10             MR. MAYNARD:  Thank you, Your Honor.
```

**ANTHONY SAMPSON, WITNESS, SWORN**

**DIRECT EXAMINATION**

```
13    BY MR. MAYNARD:

14    Q    Would you introduce yourself to the jury, please.

15    A    Anthony Sampson.

16    Q    Do you also go by the name Hakeem?

17    A    Yes.

18    Q    And you are a Muslim?

19    A    Absolutely.

20    Q    And when is it that you converted?

21    A    I don't remember exactly.

22    Q    Okay.  You know the defendant in this case Mr. Abdul

23    Kareem?

24    A    That's my uncle.

25    Q    Where were you born?
```

```
 1    A    Philadelphia.
 2    Q    And how long did you live in Philadelphia before you moved
 3    to Phoenix?
 4    A    It was on and off.
 5    Q    Did you actually live in Phoenix at some time with your
 6    grandmother?
 7    A    Yes.
 8    Q    And do you recall when that was?
 9    A    No.
10    Q    Okay.  Now, you moved back to Philadelphia sometime around
11    2012 or thereabouts?
12    A    Yes.
13    Q    Okay.  And then you came back out here on May 1st of 2015?
14    A    Yeah.
15    Q    Is that right?  You need to say "yes" or "no."
16    A    Oh.  Yes.
17    Q    That's okay.
18         Do you recall who picked you up at the airport that
19    day?
20    A    My brother.
21    Q    And after your brother picked you up at the airport, what
22    did you two do?
23    A    I think we went to the masjid.  It's kind of blurry, but I
24    think we did go to the masjid.
25    Q    And if I were to tell you that May 1st of 2015 was a
```

1    Friday, does that help you recall what you would have done?

2    A    I know I went to the masjid but --

3    Q    You don't know whether you went there directly or --

4    A    Yeah.  I don't remember exactly.

5    Q    Okay.  Did you know Elton Simpson, also known as Ibrahim?

6    A    I might have seen him one time before I left.

7    Q    And when you say "before you left," you're talking about

8    when you left in 2012?

9    A    Yes.

10   Q    Okay.  Did you see him again at the masjid on May 1st of

11   2015?

12   A    Yes.

13   Q    Was he praying there that day?

14   A    Yes.

15   Q    Okay.  Did you know Nadir Soofi?

16   A    No.

17   Q    Okay.  Do you know whether or not he was there that day?

18   A    I think I seen him sitting next to Ibrahim.

19   Q    After the service, the prayer service, was finished --

20   A    Uh-huh.

21   Q    -- on May 1st of 2015, what did you do next?

22   A    Said "salaam walaikum," shook a bunch of people hand and

23   then left.

24   Q    Did you leave with your uncle that day?

25   A    No.

1    Q    Who do you think you left with?

2    A    I left with my brother.

3    Q    At some point -- when you were moving out here, were you

4    coming to live with your uncle or were you coming to live with

5    your brother?

6    A    I was coming to live with my uncle.

7    Q    Did you eventually go over to your uncle's house on

8    May 1st?

9    A    Yes, I did.

10    Q    What did you and your uncle do that afternoon after the

11    prayer service was over?

12    A    Well, I was hungry.  Went to the house and ate.  And

13    that's it, basically.

14    Q    Was there any discussions about your uncle having people

15    to come to his house for a barbecue?

16    A    Yeah, but they didn't show up.

17    Q    Did he buy meat and stuff that day?

18    A    No.  The food was already cooked.  It wasn't like no big

19    barbecue.  All we gonna have was a barbecue.  It was left-over

20    food that he already cooked.

21        And he had a problem with Ibrahim, you know, so they

22    wasn't talking for a while.  So he basically say, okay, come

23    over.  I guess he was trying to solve the problem or whatever

24    and he never showed up.

25    Q    Ibrahim never showed up?

```
 1    A    Yeah.

 2    Q    Okay.  Now, let me jump ahead or next to May 3rd of 2015.

 3    A    Uh-huh.

 4    Q    What were you doing in the evening of May 3rd, 2015?

 5    A    I think we did a little bit of work and then we went to

 6    eat.

 7    Q    Okay.  And when you say you did a little bit of work, were

 8    you working with your uncle?

 9    A    I think we was moving, yes.

10    Q    And do you recall where you and your uncle went to eat

11    that evening?

12    A    Red Lobster.

13    Q    And did you receive any phone calls or did your uncle

14    receive any phone calls that evening?

15    A    Yeah.  My uncle received a phone call.

16    Q    And do you know who he received a phone call from?

17    A    I think my brother.

18    Q    Okay.  Did you come to learn what the phone call was

19    about?

20    A    I think he was told that he just went to go check to make

21    sure Ibrahim was all right because I think Ibrahim's brother

22    called my brother and --

23         My uncle was shocked.  He was like -- I don't know

24    exactly the words that he saying to everybody but he said

25    Saleem just got pulled over and grabbed by the cops.  And he
```

1    was like --

2    Q    Prior to your uncle getting the phone call and you two are

3    sitting there eating at Red Lobster, what was your uncle's

4    disposition?

5    A    How was he acting?

6    Q    Yeah.  Yeah.  How was he acting?

7    A    Yeah.  He was happy.  He's a happy person.  Sit down and

8    laugh.  Everybody arguing and stuff but he just sitting there

9    and laughing, eating because he was hungry because he been out

10   all day.

11         But after he got a phone call, he just like -- to the

12   point where he didn't want to eat no more.

13   Q    In fact, did you guys finish eating or did you pack up the

14   food or what did you do?

15   A    No.  We packed up the food.

16   Q    And then what did you do?

17   A    We went back to his house.

18   Q    To your uncle's house?

19   A    Yes.

20   Q    Did you go by Ibrahim's house that evening?

21   A    I don't think we went by Ibrahim's house that evening.

22   Q    Okay.  Do you recall going and picking your uncle -- your

23   uncle picking anyone else up?

24   A    I believe that we went back to the house and then we

25   went -- because he got the phone call, we went to Abdul

1    Khabir.  He asked Abdul Khabir because I guess he was worried

2    had he talked to Ibrahim.  And Abdul Khabir was like no, I

3    haven't talked to Ibrahim.

4    Q    And when you say "Abdul Khabir," is that Abdul Khabir

5    Hyman?

6    A    Absolutely, yeah.

7    Q    And is he related to you by marriage, do you know?

8    A    I don't know him like that, to be honest with you.

9    Q    Okay.  And how do you know Abdul Khabir?

10   A    Because I found out he was my cousin when I came out here.

11   But I don't know he is exactly related to me.

12   Q    Do you also know of him as being referred to as "AK"?

13   A    I guess that's his nickname or whatever.

14   Q    Okay.  Have you ever heard anybody called him "AK"?

15   A    Oh, yeah, it's his nickname.

16   Q    Okay.  Now, that evening did Abdul Khabir come with you

17   and your uncle in your uncle's car?

18   A    Yes.

19   Q    And where did you three go?

20   A    I guess he wanted to go see if Ibrahim was all right

21   because I guess he didn't know the situation that was going

22   on.  So he was going to basically check on.  Because when we

23   was riding there he basically said I hope everything is all

24   right.

25   Q    Did you go to Ibrahim's apartment at that time?

UNITED STATES DISTRICT COURT

1    A    Yes, we did.

2    Q    And what was the -- what was it like at Ibrahim's

3    apartment?

4    A    Well, it was a whole bunch of cop cars everywhere.

5    Q    Did you guys get out of the car?

6    A    No.

7    Q    Did your uncle and AK get out of the car?

8    A    I don't remember.

9    Q    Okay.  Where did you go after you had been to Ibrahim's

10   apartment complex?

11   A    Dropped AK off and then I went home and went to sleep.

12   Q    Do you remember whether or not you and your uncle and AK

13   went to Ibrahim's father's house?

14   A    I don't remember.

15   Q    Okay.  You don't remember whether you went there or not?

16   A    I'm trying to -- it's kind of blurry to me, that's what

17   I'm saying.  I forget a lot so.

18   Q    Okay.  Do you -- Did you see Mr. Simpson sitting outside?

19   A    Mr. Simpson?

20   Q    Yes.  Ibrahim's father.  Before you came in to testify did

21   you see him sitting out in the hallway?

22   A    Yeah.  I did.

23   Q    Do you remember whether or not you went to his house that

24   evening?

25   A    It wasn't that evening that we went to his house.

 1    Q    Did you go to the funeral for Ibrahim?

 2    A    The funeral?

 3    Q    Yes.

 4    A    Yes, I did.

 5    Q    You don't remember going to Mr. --

 6    A    No.  I remember him at the funeral.

 7    Q    Okay.  You don't remember whether you went to his house or

 8    not that evening?

 9    A    No.  Not -- no.

10    Q    Oh.  Before you learned that Ibrahim had been killed --

11    A    Uh-huh.

12    Q    -- had you ever heard of this Muhammad Drawing Contest

13    that was going on in Garland, Texas?

14    A    Absolutely, not.

15             MR. MAYNARD:  I have no further questions, Your

16    Honor.

17             THE COURT:  Any questions, Mr. Koehler?

18             MR. KOEHLER:  May I have a moment, Your Honor?

19             THE COURT:  Well, it's 4:27, so, no.  I was hoping

20    that Mr. Sampson could have his testimony completed by 4:30.

21             MR. KOEHLER:  I would like to do that and I'm just

22    reviewing a couple of things to be focused.

23                         **CROSS EXAMINATION**

24    BY MR. KOEHLER:

25    Q    Good afternoon, Mr. Sampson.

1    A    Hi.  How you doing?

2    Q    I'm well.  How are you?

3    A    I'm good.

4    Q    Okay.  So you've seen me around the courthouse here last

5    week; is that right?

6    A    I really wasn't paying attention to all that, so I

7    don't --

8    Q    With the exception of being here at the courthouse, have

9    you met me before?

10   A    I don't think so.

11   Q    Okay.  Have you met anybody here at counsel table with me

12   before?

13   A    Yes.

14   Q    Who?

15   A    I don't know if it's her, but I met a lady, but I don't

16   know exactly if it was her or not.

17   Q    Ms. Brook?

18   A    I don't know if it's Ms. Brook or not.

19   Q    Have you had a conversation with her before today?

20   A    No.

21   Q    All right.  So you returned to Phoenix May 1st, 2015,

22   correct?

23   A    Yes.

24   Q    How long had it been since the last time you had

25   physically been present in Phoenix?

1    A    Since 2008 -- no -- 2012, I mean.  Yeah.  2012.

2    Q    So about three years?

3    A    Yeah.

4    Q    Give or take?

5         When you went to the masjid on May 1 of 2015, you

6    mentioned that you saw Mr. Simpson there.  Did you see your

7    uncle and Mr. Simpson talk that day?

8    A    I think right after I shook hands I left.

9    Q    Okay.

10   A    I don't think I remember -- that's kind of blurry to me.

11   I might have, I might -- my memory is not too good.

12   Q    Do you remember giving an interview to FBI agents on May 5

13   of 2015?

14   A    Yes.

15   Q    You met with Agent Dina McCarthy and Agent Mario Calbone?

16   A    Yes.

17   Q    And during that interview, do you remember telling them

18   that your uncle Abdul Malik and Simpson briefly talked after

19   masjid?

20   A    That's why I said I might have because my memory is

21   blurry.

22   Q    So is that something that you did tell the agents that

23   day?

24   A    I might have.  My memory is blurry.  I box, so I just want

25   everybody to know that.  So sometimes I forgot.  Sometimes I

 1    forget.

 2    Q    The dinner at your uncle's house that Friday, can you go

 3    into a little bit more detail?

 4    A    It wasn't a dinner.  Right after Jumu'ah I was hungry.  I

 5    was going to go get something to eat.  Pay for it.  But he

 6    said, no, I got food here.  So I went to his house and I ate

 7    there.

 8    Q    But you mentioned something about other people being

 9    invited; is that correct?

10    A    Yes.

11    Q    Do you know how many people were invited?

12    A    I don't know exactly how many people was invited.

13    Q    You mentioned there was some kind of problems between him

14    and Mr. Simpson?

15    A    Yes, before that.  At least that's what I heard.

16    Q    Okay.  What did you hear?

17    A    Basically, they got in an argument or whatever and they

18    wasn't talking to each other.

19    Q    Your uncle and Mr. Simpson?

20    A    Yes.

21    Q    Do you know when the argument had occurred?

22    A    No.  I just came that day.

23    Q    But did your uncle tell you when the argument occurred?

24    A    No.  He did not say when it occurred.

25    Q    Did he say how long it had been since he had spoken to

1    Mr. Simpson?

2    A    No.  He did not.

3              MR. KOEHLER:  If I can have a moment?

4              You get off easy and we will leave at 4:30.

5              No further questions.

6              THE COURT:  Thank you.  Any on redirect?

7              MR. MAYNARD:    No.  We're done.

8              THE COURT:  May Mr. Sampson be excused and released

9    from his subpoena?

10             MR. MAYNARD:  Yes, ma'am.

11             THE COURT:  Any objection?

12             MR. KOEHLER:  No, Your Honor.

13             THE COURT:  Mr. Sampson, you may step down.  You are

14   excused.  We are at recess.

15             I'll remind the jury of the admonition not to discuss

16   the case or form any conclusions about it until you have heard

17   all the evidence and begun your deliberations.

18             We will reconvene at nine o'clock tomorrow morning.

19             Court is in recess.

20        (Proceedings adjourned at 4:30 p.m.)

21                            *  *  *

22

23

24

25

CR15-00707-PHX-SRB    JURY TRIAL-DAY #11   3-3-16

1

2                     C E R T I F I C A T E

3

4          I, ELIZABETH A. LEMKE, do hereby certify that I am

5     duly appointed and qualified to act as Official Court Reporter

6     for the United States District Court for the District of

7     Arizona.

8          I FURTHER CERTIFY that the foregoing pages constitute

9     a full, true, and accurate transcript of all of that portion

10    of the proceedings contained herein, had in the above-entitled

11    cause on the date specified therein, and that said transcript

12    was prepared under my direction and control.

13         DATED at Phoenix, Arizona, this 1st day of August,

14    2016.

15

16

17

18

19                         s/Elizabeth A. Lemke
                           ELIZABETH A. LEMKE, RDR, CRR, CPE
20

21

22

23

24

25

UNITED STATES DISTRICT COURT