CR15-00707-PHX-SRB   JURY TRIAL-DAY #12   3-4-16

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

_____

United States of America,          )
                                   )
               plaintiff.          )   **APPEAL**
                                   )   **CR15-00707-PHX-SRB**
          vs.                      )   Phoenix, Arizona
                                   )   March 4, 2016
**Abdul Malik Abdul Kareem,**      )   9:02 a.m.
                                   )
               Defendant.          )
                                   )
_____)

BEFORE:  THE HONORABLE SUSAN R. BOLTON, JUDGE
         REPORTER'S TRANSCRIPT OF PROCEEDINGS
              JURY TRIAL - DAY 12
         (Pages 2058 through 2199, Inclusive.)

APPEARANCES:
For the Government:
              U.S. ATTORNEY'S OFFICE
              By:  **Kristen Brook, Esq.**
                   **Joseph Edward Koehler, Esq.**
              40 North Central Avenue, Suite 1200
              Phoenix, AZ  85004

For the Defendant Abdul Malik Abdul Kareem:
              MAYNARD CRONIN ERICKSON CURRAN & REITER PLC
              By: **Daniel D. Maynard, Esq.**
                  **Mary Kathleen Plomin, Esq.**
              3200 North Central Avenue, Suite 1800
              Phoenix, AZ  85012

Official Court Reporter:
Elizabeth A. Lemke, RDR, CRR, CPE
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, SPC 34
Phoenix, Arizona  85003-2150
(602) 322-7247
Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

CR15-00707-PHX-SRB   JURY TRIAL-DAY #12  3-4-16

```
1                            INDEX

2
     SUMMARY OF COURT PROCEEDINGS                   PAGE:
3
     ORAL ARGUMENT ON RULE 29 MOTION           Page 2191
4    RE:  COUNTS 1, 2, 3, AND 5

5

6                      INDEX OF WITNESSES

7    ALIZABETH TAPIA:

8    Direct examination by Ms. Plomin          Page 2062
     Cross examination by Ms. Brook            Page 2065
9
     SONIA QUINTANA:
10
     Direct examination by Ms. Plomin          Page 2070
11   Cross examination by Ms. Brook            Page 2071

12   LONNIE DWORKIN:

13   Direct examination by Ms. Plomin          Page 2074
     Cross examination by Mr. Koehler          Page 2144
14   Redirect examination by Ms. Plomin        Page 2162

15   JAMES SAMPSON, JR.:

16   Direct examination by Mr. Maynard         Page 2095
     Cross examination by Ms. Brook            Page 2121
17
     NATHANIEL SOOFI:
18
     Direct examination by Mr. Maynard         Page 2168
19   Cross examination by Mr. Koehler          Page 2177

20   ROBERT ABKE:

21   Direct examination by Mr. Maynard         Page 2183
     Cross examination by Mr. Koehler          Page 2187
22

23

24

25
```

1        **INDEX OF EXHIBITS**

2

**EXHIBIT NO.:**          **DESCRIPTION:**                    **RECEIVED:**

3

Exhibit No. 499     Dworkin report Acer              Page 2145

4                    Aspire Laptop

Exhibit No. 523     Chiropractor medical records     Page 2064

5                    (Chiro-Plus 001-081)

Exhibit No. 524     First Plus medical records       Page 2065

6                    (FMP 001-029)

Exhibit No. 600     Dworkin report Nextbook          Page 2155

7                    Tablet

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                  P R O C E E D I N G S

 2        (Called to the order of court at 9:02 a.m.)

 3        (Open court, jury present.)

 4            THE COURT:  Good morning, ladies and gentlemen.

 5   Please sit down.  The record will show the presence of the

 6   jury, counsel, and the defendant.

 7            I wanted to address a question that one of the jurors

 8   submitted yesterday.  The juror was asking about hearsay and

 9   wondering why a particular thing was hearsay.

10            And I can't comment on the particular thing.  All I

11   can say is that generally speaking, hearsay cannot be

12   admitted.  And "hearsay" is defined as an out-of-court

13   statement offered for the truth of what that statement was.

14            But there are approximately 30 exceptions to the

15   hearsay rule, depending on the circumstances, depending on who

16   the speaker is, and it's not just a speaker.  It can be a

17   document, depending on what the document is.

18            And so they have whole courses in law school just on

19   the hearsay rule and the approximately 30 exceptions to it.

20            So we don't have time in the time we have remaining

21   in this trial for me the fully answer this particular juror's

22   question.

23            Mr. Maynard, you may call your next witness -- or

24   Ms. Plomin.

25            MS. PLOMIN:  Your Honor, the people called Alizabeth
```

CR15-00707-PHX-SRB    JURY TRIAL-DAY #12   3-4-16

```
 1   Tapia -- all right -- the defense.
 2       (Witness duly sworn)
 3           THE CLERK:  Please state your name for the record,
 4   spelling your first and last name.
 5           THE WITNESS:  Alizabeth Tapia.  A-L-I-Z-A-B-E-T-H
 6   T-A-P-I-A.
 7           THE COURT:  You may proceed, Ms. Plomin.
 8           MS. PLOMIN:  Thank you.
 9                  ALIZABETH TAPIA, WITNESS, SWORN
10                       DIRECT EXAMINATION
11   BY MS. PLOMIN:
12   Q   Good morning, Ms. Tapia?
13   A   Good morning.
14   Q   Ms. Tapia, who do you work for?
15   A   Chiro-Plus Chiropractic Centers.
16   Q   Are you the custodian of records for that business?
17   A   Yes.
18   Q   And, Madame Clerk, could we please give the witness
19   Exhibits 523 and 524.
20           Ms. Tapia, can you look at the folder marked 523?
21   A   Yes.
22   Q   It should be on the blue page inside the folder.
23           THE COURT:  I just want to tell the jury right now
24   that Ms. Plomin is getting ready to lay foundation for one of
25   the 30 exceptions for the hearsay rule, which is records kept
```

CR15-00707-PHX-SRB    JURY TRIAL-DAY #12    3-4-16

 1    by a business in the ordinary course of their business.

 2            And that's why this young woman described herself as

 3    a "custodian of records," because she's going to tell us how

 4    these records are kept and establish an exception to the

 5    hearsay rule.

 6            MS. PLOMIN:  Thank you, Your Honor.

 7    BY MS. PLOMIN:

 8    Q   So, Ms. Tapia, looking at Exhibit 523, are those records

 9    from Chiro-Plus where you work?

10    A   Yes.

11    Q   And are those records prepared in the ordinary course of

12    business of the people who work at Chiro-Plus?

13    A   Yes.

14    Q   And are those records prepared at or near the time that a

15    patient is treated at Chiro-Plus?

16    A   Yes.

17            MS. PLOMIN:  Your Honor, I move to admit 523.

18            MS. BROOK:  Your Honor, if I may, 523 is an 81-page

19    document.

20            Government has no objection to page 1 through 8 nor

21    13 through 81.  However, pages 9 through 12 are not prepared

22    in the ordinary course of business, but rather there's a

23    letter prepared in anticipation of litigation as a summary for

24    civil litigation.

25            MS. PLOMIN:  Your Honor, subject to those pages, we

1    move to admit the document.

2         THE COURT:  All right.  Because -- well, we will

3    figure out later which are in and which are out.

4         MS. PLOMIN:  Correct.

5         THE COURT:  But those portions that are not objected

6    to are admitted.

7        (Exhibit No. 523 admitted in evidence.)

8         MS. BROOK:  Thank you.

9    BY MS. PLOMIN:

10   Q    And, Ms. Tapia, do you also work for a company named First

11   Medical-Plus?

12   A    Yes.

13   Q    Are you the custodian of records for that company?

14   A    Yes.

15   Q    How does that company relate to -- or is it related to

16   Chiro-Plus?

17   A    It isn't.

18   Q    Okay.

19   A    It's a separate company.

20   Q    Okay.  But you work for both companies?

21   A    I do their medical records for both companies, yes.

22   Q    Okay.  And can you look at 524 in front of you, please?

23   A    Okay.

24   Q    And Exhibit 524 are those medical records from First

25   Medical-Plus?

CR15-00707-PHX-SRB    JURY TRIAL-DAY #12   3-4-16

```
 1   A   Yes.
 2   Q   And are those records prepared in the ordinary course of
 3   business of the people who work at First Medical-Plus?
 4   A   Yes.
 5   Q   And are they prepared at or near the time of the time that
 6   the patient is treated?
 7   A   Yes.
 8           MS. PLOMIN:  Move to admit 524, Your Honor.
 9           MS. BROOK:  No objection.
10           THE COURT:  524 is admitted.
11       (Exhibit No. 524 admitted in evidence.)
12           MS. PLOMIN:  I have nothing further.  Thank you.
13           THE WITNESS:  Okay.  Thank you.
14           THE COURT:  Ms. Brook, you may cross-examine.
15           MR. MAYNARD:  Judge --
16           THE COURT:  Ms. Tapia, the other lawyer has a chance
17   to ask you some questions.
18           THE WITNESS:  Oh, sorry.
19           THE COURT:  You don't get off that easy.
20           THE WITNESS:  Sorry.
21           THE COURT:  That's okay.
22                         CROSS EXAMINATION
23   BY MS. BROOK:
24   Q   Good morning.
25   A   Good morning.
```

```
 1    Q    I just have a couple quick questions for you.
 2              If you turn to the packet that's labeled 523, which
 3    was the first packet that Ms. Plomin talked to you about.
 4    A    Yes.
 5    Q    I want to walk through a couple of pages in it.  If you
 6    can turn to the page that --
 7              And actually, I'm just going to put it on the
 8    overhead for you, so if you can turn to page 34.
 9              So this record is for Abdul Malik Abdul Kareem,
10    correct?
11    A    Correct.
12    Q    And there on page 34 it states that he does not use or
13    consume any alcohol?
14    A    Yes.
15              MS. PLOMIN:  Objection.  Outside the scope.
16              THE COURT:  Overruled.  The answer "yes" will stand.
17    BY MS. BROOK:
18    Q    And these records, obviously, were prepared by the
19    chiropractic office for which you work?
20    A    Yes.
21    Q    Based upon consultation with the client?
22    A    I don't see the patients.  I just have medical records in
23    the chart and I copy them.  That's all I do.  I don't --
24    Q    Let's turn to page 38.
25    A    Okay.
```

1    Q   There does it say:

2            When did your symptoms first appear?

3            And the answer was:  Immediately.

4    A   I'm not the doctor -- I don't --

5    Q   But that's what the records that you certified that the

6    chiropractic office that you work for state; is that correct?

7    A   They state.  Yes.

8    Q   Okay.  Turning next to page 39.

9    A   Okay.

10   Q   Again, indicating that the patient here does not drink

11   alcohol.  Is there an answer?

12   A   Oh, I'm sorry.

13   Q   That's what the records here indicate that you have

14   certified to that the patient here does not drink alcohol?

15   A   That's what they checked off.

16   Q   And now I'm going to turn to page 59 of these records.

17           In particular with this page, if I can scroll to the

18   top of it, this was a record generated from John C. Lincoln

19   North Mountain Hospital, is that correct, on East Dunlap?

20   A   Yes.

21   Q   And that was on April 7th of 2015?

22   A   Yes.

23   Q   And at the bottom is the assessment there from the doctor

24   who was treating?

25   A   No.

```
 1    Q    What is that then?

 2    A    This is -- it appears that it was another record from

 3    another facility but it's kept in the patient's records.

 4            That I wouldn't --

 5            THE COURT:  So could I ask you this question:

 6            If one of the doctors at your clinic orders, for

 7    example, an x-ray that's taken at another location, then is it

 8    customary for you to obtain that report and include that in

 9    the medical records?

10            THE WITNESS:  Well, usually, the doctors keep the

11    chart.  When they get -- when they request anything from

12    another facility, they put it in the patient's record.

13            The only thing that I do is when I -- I keep them.

14    And then when I get a request, I copy them and I send them to

15    whoever requests them.  That's how I do it.

16            THE COURT:  But it's customary that if some test was

17    performed outside of your clinic at one of your doctor's

18    requests, that that doctor puts that in the file too?

19            THE WITNESS:  In the chart.

20    BY MS. BROOK:

21    Q    Okay.  And these are the charts that you have kept and

22    maintained and make sure that they were the same charts that

23    were taken in from the hospital there on April 7th of 2015?

24    A    That I don't -- I don't file the paperwork in the charts.

25    It's the actual doctor that files that in the chart.
```

1  Q    Sure.  You don't put the paperwork itself in the chart,

2  but your job is to make sure that the paperwork that is placed

3  in the chart by somebody else is kept and maintained?

4  A    Yes.

5  Q    Okay.  So let's just turn our attention there to page No.

6  59 which we have on the overhead and the "Assessment and Plan"

7  section talking about the "Clinical Course and Critical

8  Thinking" and what is highlighted there.

9            "Patient had no objective abnormal findings on exam

10  but request x-rays so I will order them.  He walked into the

11  room with no limp, exhibited no difficulty in getting out of

12  his clothes and has full range of motion."

13            Is that what the record states?

14  A    Yes.  Yes.

15            MS. BROOK:  May I have one moment?

16            THE COURT:  Yes.

17            MS. BROOK:  I don't have any other questions.

18            THE COURT:  Any additional questions, Ms. Plomin?

19            MS. PLOMIN:  No, Your Honor.

20            THE COURT:  May Ms. Tapia be excused?

21            MS. PLOMIN:  Yes.

22            THE COURT:  Any objection?

23            MS. BROOK:  No.

24            THE COURT:  Now you may step down, Ms. Tapia, and you

25  are excused as a witness.  Thank you very much.

CR15-00707-PHX-SRB   JURY TRIAL-DAY #12   3-4-16

```
 1              The defense may call its next witness.
 2              MS. PLOMIN:  Thank you.  The defense calls Sonia
 3    Quintana.
 4          (Witness duly sworn)
 5              THE CLERK:  Please state your name for the record,
 6    spelling your first and last name.
 7              THE WITNESS:  Sonia Quintana.  S-O-N-I-A
 8    Q-U-I-N-T-A-N-A.
 9              THE COURT:  You may proceed, Ms. Plomin.
10              MS. PLOMIN:  Thank you.
11                   SONIA QUINTANA, WITNESS, SWORN
12                        DIRECT EXAMINATION
13    BY MS. PLOMIN:
14    Q   Ms. Quintana, can you please introduce yourself to the
15    jury.
16    A   Hi. I'm Sonia Quintana.
17    Q   And, Ms. Quintana, as of May of 2015 last year, who did
18    you work for?
19    A   Mr. Michael Cordova.
20    Q   And what does Mr. Michael Cordova do?
21    A   He's a personal injury attorney.
22    Q   And what was your position with his firm?
23    A   A personal injury paralegal.
24    Q   And did you -- in May of 2015 did you meet the man who is
25    sitting here at the table today, the defendant?
```

```
 1    A    I never met him in person.  We communicated through phone.
 2    When he did come into our office I was not present that day.
 3    Q    Okay.  And did you speak to a man by the name of Abdul
 4    Malik Abdul Kareem by phone?
 5    A    Yes.
 6    Q    Okay.  And were you assigned to Mr. Abdul Kareem's case?
 7    A    Yes.  I was the claim handler.
 8    Q    And how did Mr. Abdul Kareem come to your office?  How
 9    did -- who was he referred by?
10    A    He was referred by First Medical Chiro-Plus.  They're one
11    entity.
12    Q    And do you frequently receive referrals from that
13    business?
14    A    Yes, ma'am.  We do.
15              MS. PLOMIN:  I have nothing more.  Thank you.
16              THE COURT:  Hold on.
17              Ms. Brook, you may cross-examine.
18                          CROSS EXAMINATION
19    BY MS. BROOK:
20    Q    Good morning.
21    A    Good morning.
22    Q    Abdul Malik Abdul Kareem was referred to you.  What date
23    was that?
24    A    I don't know the exact date.
25    Q    Does April 9th sound correct?
```

CR15-00707-PHX-SRB    JURY TRIAL-DAY #12    3-4-16

```
 1    A    I don't recall the exact date at all.  I just know it was

 2    in that time frame because I knew it was in the time frame

 3    because of the situation that had gone on and maybe about a

 4    month, I guess, yeah, maybe.

 5    Q    Approximately, how many cases in your office are referred

 6    to you by chiropractic offices?  You can even just give a

 7    percentage.

 8    A    Sixty percent, maybe.

 9              MS. BROOK:  I don't have any other questions.

10              THE COURT:  Okay.  Any redirect?

11              MS. PLOMIN:  No, Your Honor.

12              THE COURT:  Thank you, Ms. Quintana.  You may step

13    down.  And may Ms. Quintana be excused, Ms. Plomin?

14              MS. PLOMIN:  Yes.

15              THE COURT:  Any objection?

16              MS. BROOK:  No.

17              THE COURT:  And you are excused and released from any

18    subpoena.

19              Defense may call its next witness.

20              MS. PLOMIN:  Defense calls Lonnie Dworkin.

21        (Witness duly sworn)

22              THE CLERK:  Please state your name for the record,

23    spelling your first and last name.

24              THE WITNESS:  Lonnie Dworkin.  Spelling is

25    L-O-N-N-I-E.  Last name Dworkin.  D-W-O-R-K-I-N.
```

CR15-00707-PHX-SRB    JURY TRIAL-DAY #12   3-4-16

```
 1            MR. KOEHLER:  Your Honor?

 2            THE COURT:  Yes, Mr. Koehler.

 3            MR. KOEHLER:  Before we begin with Mr. Dworkin, I

 4   would like to ask to be able to defer my cross of him until a

 5   later time.

 6            We got a report from Mr. Dworkin last night at 8:30

 7   via e-mail.  I wasn't able to open it and print it until eight

 8   o'clock this morning.  It contains search strings that are

 9   approximately --

10            THE COURT:  Wait.  Hold on.

11            MR. KOEHLER:  Yes.

12            THE COURT:  Do you have any objection?

13            MS. PLOMIN:  Well, Your Honor, we have a logistical

14   issue.  Mr. Dworkin will be out of town next week.

15            We received the report at that time as well and it

16   was written yesterday.

17            THE COURT:  Do I have a copy of it?

18            MS. PLOMIN:  No, Your Honor.

19            THE COURT:  May I?

20            MS. PLOMIN:  Yes.

21            THE COURT:  When are you leaving town, Mr. Dworkin.

22            THE WITNESS:  Tomorrow morning.

23            THE COURT:  Okay.

24            MS. PLOMIN:  Your Honor, may I approach?

25            THE COURT:  Yes.
```

1    Under the circumstances, I think the best I'm going

2  to be able to do, Mr. Koehler, is defer it till later today.

3    MR. KOEHLER:  That's what I was going to ask for in

4  light of Mr. Dworkin's circumstances.  Perhaps sometime after

5  lunch to give me time?

6    THE COURT:  Yes.

7    MR. KOEHLER:  Thank you.

8    THE COURT:  You may proceed.

9                **LONNIE DWORKIN, WITNESS, SWORN**

10                     **DIRECT EXAMINATION**

11  BY MS. PLOMIN:

12  Q   Mr. Dworkin, could you please introduce yourself to the

13  jury.

14  A   My name is Lonnie Dworkin.

15  Q   Mr. Dworkin, how are you employed?

16  A   I'm self-employed by a company I own called CompuFor LLC.

17  It's a computer forensics firm located in Scottsdale, Arizona.

18  Q   And what do you do?  What does your business do?

19  A   I'm a computer forensic examiner.  I will examine evidence

20  in both criminal and civil matters.

21    The types of evidence I routinely examine include

22  computer hard drives, cell phones, other mobile devices, cell

23  phone tower dumps, CDR records, which is called "detail

24  records," as well as audio forensics.

25  Q   And what kind of education did you receive in order to do

1  what you do?

2  A   Well, my basic education started with a Bachelor's of

3  Science in Electrical Engineering from Boston University.

4       And then I worked for the U.S. Navy for a number of

5  years and Intel Corporation for a number of years.  And then I

6  received specific training in the area of computer forensics

7  starting back in 2003.

8       And I have been practicing in the field since late

9  2003.

10       I received training from a variety of tool vendors as

11  well as technology vendors.  So in this case, for example, I

12  made use of several tools, one of which is called Cellebrite.

13  This is a cell phone and mobile device forensics tool.  And I

14  received training from Cellebrite, as well as from contract

15  vendors.

16       I also used a tool called EnCase made by Guidance

17  Software out of Pasadena, California.  And I routinely receive

18  training from them as well.

19       And lastly, another tool I use is called Internet

20  Evidence Finder by Magnet Forensics and I have received

21  training from them and vendor as well.

22       That's a very brief summary of the training, but I

23  can go into more detail if you're interested.

24  Q   I think we can move on.  Thank you.

25       Mr. Dworkin, did you receive an imaged copy of a

```
 1    Lenovo laptop that was produced by the government?

 2    A   Yes.  I received a forensic imaged copy of a Lenovo

 3    laptop.

 4    Q   And I just want to go chronologically with you.

 5            Did you look for evidence of an e-mail address login

 6    of ibrahimibrahim602@gmail.com?

 7    A   On that particular device, yes.  That was known as the

 8    Toshiba 80 gigabyte hard drive.  And, yes, I did search that

 9    for that e-mail address.

10    Q   And did you find evidence that ibrahimibrahim at --

11    ibrahimibrahim602@gmail.com logged into the Lenovo laptop?

12    A   It was logged in from the Lenovo, yes.

13    Q   All right.  And so does that indicate to you that

14    ibrahimibrahim@gmail.com was a user of the Lenovo laptop?

15    A   Yes.

16    Q   All right.  I want to move on to an Acer laptop.

17            Did you receive an imaged copy of the Acer laptop

18    from the government or that the government had produced?

19    A   Yes.  It's my understanding the government produced this

20    forensic copy of the Acer laptop hard drive.

21    Q   And did you specifically look for evidence of a video

22    called "Flames of War"?

23    A   Yes.

24    Q   And were you able to determine if "Flames of War" had been

25    viewed when it was viewed on that Acer laptop?
```

1  A   I found artifacts on that hard drive that indicated that

2  file had been accessed.

3  Q   Okay.  And what do you mean by "artifacts"?

4  A   I would have to refer to my report, if I might.

5  Q   Do you have it up with you?

6  A   I believe I do.  I have a copy here.

7         Okay.  Please ask me again.

8  Q   What do you mean by "artifacts"?

9  A   An artifact will be records that are produced as a result

10  of perhaps user activity or they could be related to system

11  activity.  So in this case for "Flames of War," I found log

12  files that contained information pertaining to the viewing or

13  the accessing of a file titled "Flames of War."

14  Q   And were you able to determine when that artifact was

15  created?

16  A   Yes.  I was able to determine that it was accessed on

17  October 5th, 2014, at approximately 9:00 p.m. -- sorry --

18  October 5th, yes, 2014, at approximately 9:00 p.m.

19  Q   And 9:00 p.m., is that adjusted for Arizona time?

20  A   Yes, it is.

21         In my report it actually says October 6, 2014, at

22  4:48 a.m., so I'm just subtracting 7 hours to adjust for

23  Arizona time.

24         THE COURT:  Well, why?

25         THE WITNESS:  Because --

```
 1              THE COURT:  Tell the jury.

 2              THE WITNESS:  Oh, okay.

 3              The reason for that is many forensic examiners like

 4   myself work on cases that involve evidence from around the

 5   world, and certainly around the country.  And so there's a

 6   worldtime standard.  It's called Zulu or Universal Coordinated

 7   Time.

 8              And so if we use like Greenwich or Universal

 9   Coordinated Time as the time standard of being zero, all other

10   time zones are based off of that.  So, for example, in Arizona

11   we're Mountain Standard Time or minus 7 hours.

12              And so most of the cases that I work on are in

13   Arizona.  However, I also have evidence I receive sometimes

14   from California.  So it's slightly different.  They are off by

15   one hour from us certain times of the year.  So we have to be

16   aware of the time of the year and dates and so forth.

17              And so the forensic tools in their default mode don't

18   make any assumptions around time zones.  The examiner has to

19   go in and maybe adjust the tool for the local time zone.

20              So when I was performing -- when I was trying to

21   address the question about the "Flames of War," I had not

22   determined time zone at that time for this evidence item and

23   so I left it as Zulu or zero time adjustment when I produced

24   this report.

25   Q    And if Phoenix time is 7 hours behind, you'd subtract 7
```

1   hours for Phoenix time from Zulu time?

2   A    Correct.

3   Q    Now, you were unable to determine that a user watched the

4   full video "Flames of War" on that computer, were you?

5   A    No.

6   Q    And how did you determine that this artifact or this maybe

7   search or the artifact was created on October 5th of 2014 at

8   9:00 p.m.?

9   A    What I located on the hard drive was a -- in fact, let me

10  see.

11       What I located on the hard drive using my forensic

12  tools is essentially a series of log files that documented

13  when the file itself was viewed.  So I'm not finding the file

14  itself.  I'm finding an artifact that indicates the file was

15  accessed or viewed.

16       And so the log file from the web browser records the

17  Internet location or the URL.  It records the date the website

18  was visited or last visited, how many times it was visited, as

19  well as the name of the webpage that was accessed for the file

20  that was viewed.

21       It also -- my tool also lets me know what forensic

22  item was -- where the log file came from.  So in this case I

23  know it came from the computer -- the Acer computer.  And it

24  also lets me know where it found it on that evidence item,

25  what path and where it was located.

CR15-00707-PHX-SRB    JURY TRIAL-DAY #12    3-4-16

1         So those are the artifacts that go in to let me know

2    that the file was accessed from this computer.

3    Q   Okay.  And you discussed that your tools might enable you

4    to determine how many times a file was viewed; is that right?

5    A   Potentially.  So, for example, if I look at my report, I

6    see the first entry.  It has the -- the URL where this file

7    was accessed from.  It has the time it was accessed.  And it

8    also has a visit count.  So in this case the visit count was

9    one.

10   Q   Okay.  So what does a "visit count" mean just for us who

11   are not experts?

12   A   Whenever you go back to a website, the web browser log

13   maintains a count, how many times you have been back there.

14   Q   Okay.  So does your -- how many times does your analysis

15   indicate to you that this file was accessed on the Acer

16   computer.

17         What does "visit times once" mean?

18   A   It indicates how many times the webpage was accessed.

19   Q   So is that once?

20   A   Adding up -- I'm looking now.

21         I would say approximately five times.

22         Now, when I say "five times," based on the first

23   occurrence of the event and the last noted occurrence of the

24   visit to that file, it appears that it occurred all within

25   approximately a five-minute duration.

UNITED STATES DISTRICT COURT

1    So I don't want to leave you with the impression

2    someone went back there like five days in a row.  All this

3    happened, according to the log files that I have, the first

4    event occurred at 9:45 and it looks like the last event

5    occurred at 9:49, so approximately four minutes.

6    Q    Okay.  Just one moment.

7         Mr.  Dworkin, when you say -- you used "five

8    times" -- the event five times, what does that mean within

9    those four minutes?

10   A    Uh-huh.  Well, the way I arrived at that number was I

11   looked at the first log entry with the earliest time and I see

12   that the time is 9:45 p.m. on the 5th.

13   Q    Can I just stop you?

14        What do you mean by "log entry"?

15   A    The Internet browsers maintain a log of where people go on

16   the Internet and this is the log file I recovered.  So in that

17   log file it contains an entry for this event.

18   Q    Okay.

19   A    And so the log entry for that event indicates that the

20   last time it was visited was at 9:45 p.m. and the visit count

21   is one.

22        So as of that date and time that I just mentioned, it

23   only has a visit count of one, indicating it had not been

24   visited prior to that according to this log file I was able to

25   recover; and therefore, that's the first event, so that would

1    be a count of one.

2            And then I continued to look at my log entry and I

3    see that there's another log entry at 4:48 -- I'm sorry -- at

4    9:48 p.m. and that has another log entry of one.

5            Now, the log entry that's entered here, it's a

6    different path, so it counted as a separate log entry but

7    still for the same title of the webpage.  It was also for

8    "Flames of War."  So that's the second occurrence.

9    Q    I understand that but I just want to clarify.

10           When you say "five times," does that mean the video

11   "Flames of War" was viewed five times on that computer, the

12   actual hour-long video?

13   A    Yes.  Now, it means the webpage was accessed.  It doesn't

14   mean someone watched the whole video or watched anything.  I

15   can't tell you what actually was shown on the page.

16           All I can tell you is certain pages were accessed a

17   certain number of times.  If I tallied them up, we have

18   approximately five, maybe six times the video -- or that page

19   was accessed that contained a reference to that video.

20           What I'm looking at is when you go to a webpage,

21   webpages have titles, have names.  And what I discovered is

22   the title of the webpage.

23           I don't know what was on that webpage.  I can't tell

24   you if it was this "Flames of War" video or if it was some

25   other movie or some other content.  We know -- I see it's a

```
 1   YouTube location.  And so YouTube contains videos, so it's
 2   obviously some kind of video.
 3          I don't know what was actually viewed.  So I don't
 4   know if there was an issue the user was experiencing trying to
 5   locate the video or playing the video.  I can't tell you what
 6   was going on.  I can just tell you that according to the log
 7   file, there is an attempt of, you know, five times to access a
 8   page that contained references that were titled "Flames of
 9   War."
10   Q   So they could have been accessing other videos on YouTube
11   during those five events you're talking about?
12   A   That.  And I don't know -- I can't tell you when they
13   accessed this page titled "Flames of War."  I can't tell you
14   that's actually what they saw.
15   Q   Okay.  So let me just be clear.  I want -- all this that
16   you're talking about occurred on October 5th, 2014, between
17   9:45 and 9:49 p.m.?
18   A   Correct.
19   Q   All right.  And you cannot tell us whether a user even
20   watched "Flames of War" on that computer?
21   A   I don't know.  I can't tell you that.
22          Now, for example, I have never seen it.  I don't know
23   anything about this video.  I didn't know if it was a
24   30-second video or, as you just told me now, an hour-long
25   video, so that I can't tell you.
```

1          THE COURT:  Can you tell the jury -- give us some

2    example not related to this case about how somebody that's

3    just doing some regular computer searching could end up with a

4    login history like this showing something happening five times

5    in four minutes?

6          THE WITNESS:  Sure.  You might have a family member

7    who had posted a video.  And maybe the family member's name is

8    a very common name like Samantha Jones.  There might be a lot

9    of them out there.

10         So you might perform a search on YouTube looking for

11   Samantha Jones.  And you access a video but it's not your

12   Samantha Jones, so you try again and then you try again.

13         So in a short period of time, in a couple minutes,

14   you may have accessed multiple pages called "Samantha Jones,"

15   but none of them are the ones that you're looking for.

16         Or you may have attempted to access Samantha Jones

17   and you got the right one, but you discover that she put a

18   password on it.  And you got to the page but there's a little

19   banner that pops up and says:  You have to log into your

20   account to view this.

21         So then you log into your account and then you try

22   again and then you can get in.

23         So these are examples of how in a very short period

24   of time a user may frequent this.

25         And a third example might be you might require --

1    your browser might require a special plug-in or it might be

2    out of date, so you may go to view a YouTube video but it may

3    say:

4            Your browser is out of date.  You need an updated

5    browser or you need a plug-in or you have to fix the clock on

6    your computer.

7            And so, again, you may have to make the adjustments

8    and attempt again.  So there's any number of reasons why.

9    BY MS. PLOMIN:

10   Q   Okay.  I want to move on to the Nextbook computer.

11           Did you review an imaged copy of a Nextbook --

12   sorry -- tablet that was provided to you -- that the

13   government provided?

14   A   Yes.

15   Q   And were you able to determine the first date of use of

16   the Nextbook computer?

17   A   Yes.  I need to refer to my report.

18           Yes.  I determined the date for user activity to be

19   May 22nd, 2015.

20   Q   Okay.  And what does that mean?  The "first date of user

21   activity"?

22   A   When I examined the forensic copy of the evidence, I found

23   that in March -- around March 5th, 2015, there were a number

24   of files that had "create" dates associated with them, but

25   they were System create dates, indicating that those were

1    the -- these are the types of files the manufacturer or the

2    vendor would put on the computer.  When they construct the

3    computer, they assemble it and they're ready to ship it to the

4    user.  It has software loaded on it, System files and so

5    forth.  And these System files had a date of March 5th.

6    Q   Okay.  Let me stop you.

7        So just to clarify, the System files dated March 5th,

8    those are created by the manufacturer?

9    A   Correct.

10   Q   Okay.  And then when did you first detect activity by a

11   user of the computer?

12   A   I start to see user activity on May 22nd.  This is when I

13   saw User Folders created, account information created, and so

14   forth.

15   Q   So what does that indicate to you in terms of when that

16   computer was first turned on by the person who bought it?

17   A   Around March -- I'm sorry -- around May 22nd, 2015.

18   Q   Madame Clerk, can we please give the witness Exhibits 451

19   through 457, 459, and 469, please?

20       And while we're waiting, Mr. Dworkin, you saw no

21   Internet activity prior to May 22nd, 2015, on the Nextbook

22   tablet, correct?

23   A   Yes.

24   Q   And did you see any -- any other activity whatsoever prior

25   to May 22nd, 2015, on the Nextbook tablet?

1    A    I did not.

2    Q    Mr. Dworkin, could you please review the exhibits given to

3    you, 451 through 457, 459, and 469.  And the question I'm

4    going to ask you is if you viewed them prior to this.

5    A    I have seen copies of these exhibits previously, yes.

6    Q    Okay.  Where did you see -- well, did you review the

7    imaged copy of the Nextbook tablet?

8    A    Yes, I did.

9    Q    All right.  And is that where you saw those images

10   previously?

11   A    Yes.

12   Q    Okay.  Now, did you actually conduct an analysis as to

13   those exhibits that are in front of you?

14   A    I documented their location in the evidence item on the

15   Nextbook.

16   Q    Okay.  So those images, were you able to determine --

17        Well, tell us the location of the computer they were

18   on.

19   A    They were basically located in two different places

20   because the images are of two different collections, if you

21   will.

22        Some of the images are associated with books,

23   electronic books, and some of the images are located with web

24   browser activity.

25        And if you would like, I can go exhibit-by-exhibit or

```
 1    I can continue to talk in more general terms.

 2    Q    I'm talking about the images that -- the photograph

 3    images.

 4    A    Yes.

 5            MS. PLOMIN:  Can I have a moment, Your Honor?

 6            THE COURT:  Yes.

 7    BY MS. PLOMIN:

 8    Q    Let me show you a black-and-white photograph of

 9    Government's Exhibit 451.

10    A    Okay.

11    Q    All right.  Now, did you view this image on the Nextbook

12    computer that was first turned on on May 22nd, 2015?

13    A    Yes, I did.

14    Q    And were you able to determine the location of this image

15    on the Nextbook computer?

16    A    Yes.  It was located in the cache folder of the Chrome

17    browser on that device.

18    Q    What is a "cache folder"?

19    A    A cache folder is a temporary holding place for Internet

20    information associated with the browser.  If I may give a

21    little bit of a context?

22    Q    Please.

23    A    Years ago when Internet was first coming on the scene, we

24    essentially had dial-up service which was slow, especially if

25    you want to look at images and videos and other information.
```

1    So the engineers realized that if there was a way to

2  track what information is already on the computer from

3  previous access, they could save some time from downloading.

4    So when you would go to a website, and if the images

5  were already on your computer, the computer would -- the

6  browser would be aware that the images were already on the

7  hard drive and not to bother downloading those.  Those images

8  are saved in a temporary location called a "cache" and that

9  continues until today, through today.

10    All of the major browsers, whether it's Chrome,

11  Firefox, Internet Explorer, Safari, they all have these caches

12  where they maintain not just images but videos, text files,

13  other supporting files on the device associated with the

14  particular browser.

15    Of course, today with our mobile devices, we get

16  charged for our data and so it's nice to be able to cache

17  information on our mobile devices so we don't have to pay

18  again to have those images and records downloaded again.

19    So this was located in the Chrome cache.

20  Q  Can I ask you just a hypothetical just to clarify a little

21  bit for us.

22  A  Okay.

23  Q  Let's say that a person was browsing the Internet looking

24  for furniture.  All right?  And without looking at -- say

25  they're looking at a website for Pottery Barn.

1      And without clicking on any of the images of the

2  couches or the beds or anything, would the images on that

3  website that they're looking at, would they show up in the

4  cache portion of the computer?

5  A   Yes.  When you access a website, anything you see on your

6  screen will be saved -- will already be on your computer.  So

7  if you should go back to that webpage, you will see that

8  content again.

9  Q   So if the user of the Nextbook was looking at a website, a

10  news website, and this image that's now on the screen, Exhibit

11  452, was on that news website, it would go into his cache

12  folder or the cache portion of his computer?

13  A   Correct.  I can't tell you if this image was viewed

14  specifically on its own or if there was one of a hundred

15  images on a webpage.

16      I can't tell you what the context of this image was

17  viewed or if it was even viewed for that matter.

18      THE COURT:  Could I ask you a different example?

19      Let's say I click on CNN.com in the morning and

20  there's this big page with all kinds of pictures and headlines

21  for articles.  And then I hit the "X" and it goes away.

22      Does it go in my cache?

23      THE WITNESS:  Well, as soon as -- before you see it,

24  it's already on your cache.  The web browser interprets the

25  images and presents it to you.  But by the time you're looking

1    at it on your screen, the information is already in your

2    cache.

3              THE COURT:  Okay.  But my question goes on.

4              So later in the day I go back to CNN.com and by then

5    they've changed their page because they do it all day long.

6              So that second image of whatever is on the CNN.com

7    page is in my cache before I open -- before it shows on my

8    screen?

9              THE WITNESS:  Well, essentially, effectively, it's at

10   the same time because --

11             THE COURT:  Okay.

12             THE WITNESS:  -- because the computers --

13             THE COURT:  But they're both there now?

14             THE WITNESS:  That is correct.

15             THE COURT:  So can I go back and get them?

16             THE WITNESS:  Potentially, yes.  We can go back and

17   reconstruct webpages.  And oftentimes we do that forensically.

18             We will go back and we'll determine, okay, a

19   particular webpage and address was accessed.  And then when we

20   reconstruct the webpage, we actually have to go back and find

21   the images in the cache to make sure it maps into the webpage

22   correctly.

23             We can't always do that.  It just depends on what's

24   available.

25             THE COURT:  So if I look at CNN.com 50 times in a

1    day, all 50 of those -- but never click-through to anything.

2    I just look at their page, all of those pages are saved in my

3    cache?

4            THE WITNESS:  Yes.

5            THE COURT:  When do they go away?

6            THE WITNESS:  The cache will purge its records

7    periodically based on the hard drive capacity, as well as any

8    settings the user may put in place.  And, of course, your

9    computer -- you can also direct your cache -- you can direct

10   it to clear itself.

11           THE COURT:  Thank you.

12           THE WITNESS:  These files are very small.  These are

13   not large multi-megabite files.

14   BY MS. PLOMIN:

15   Q    Okay.  And you didn't find any -- did you find any

16   evidence on the computer, on the Nextbook computer, that the

17   person had downloaded this image to like their desktop or

18   something like that intentionally?

19   A    I did not.

20   Q    I believe this is Exhibit 452.  Have you seen this image

21   before?

22   A    Yes.

23   Q    And essentially is it the -- was this also found in the

24   cache portion of the Nextbook computer?

25   A    Yes.

1    Q    All right.  So you can't say whether this was -- this

2    could have just been viewed on a website and never

3    intentionally looked at; is that right?

4    A    Correct.  I can't tell you what the intent of the user was

5    or what they actually saw or what the webpage looked like that

6    contained this image.

7    Q    And can you look at Exhibit 453, 454, 455, and 457.

8    A    453, 455, and 457.

9    Q    Why don't we just go through them one by one.

10   A    I have looked at them.  And those, I can tell you from my

11   memory, those also came from the web cache if that would save

12   some time.

13   Q    Okay.  So same thing.  They could have just been on a

14   website somebody was looking at?

15   A    Yes.

16   Q    Showing you 457, it's -- it should be on your screen.  It

17   has been admitted.

18        Looking at 457, was that image also in the cache

19   portion of that computer, of the Nextbook computer?

20   A    Yes.

21   Q    So that could have just been on a news story as well, a

22   news site?

23   A    Yes.

24   Q    Showing you 459, have you seen that before?

25   A    Yes.

1    Q    And where did you see that?

2    A    Also on the web cache.

3    Q    All right.  And could that have just been on a website or

4    on a news site that the user was viewing?

5    A    Potentially.

6         Also, I want to point out, these images are fairly

7    small and bitmapped and grainy and so it's quite possible that

8    these were one of many on a webpage because of the small size

9    and the graininess.

10   Q    Okay.

11   A    So --

12        MS. PLOMIN:  Okay.  No other questions at this time.

13   Thank you.  I believe that your cross is going to be deferred.

14        THE COURT:  So do we want to have Mr. Dworkin return

15   at 1:15?

16        MR. KOEHLER:  Yes, please, Your Honor.

17        THE COURT:  Okay.  Thank you, Mr. Dworkin.  You may

18   be excused until 1:15.

19        THE WITNESS:  Thank you.

20        THE COURT:  And the defense may call its next

21   witness.

22        MR. MAYNARD:  We're going to call James Sampson.

23        Your Honor, Mr. Sampson isn't here yet.  Can we take

24   an early recess?

25        THE COURT:  What time is he expected?

1    MR. MAYNARD:  I thought he would be here sometime

2    between 9:00 and 10:00.

3    THE COURT:  Okay.  Well, ladies and gentlemen, we

4    will take our morning break and we'll reconvene at about

5    10:15.

6    You're reminded of the usual admonitions.

7    Court is in recess and I assume you are going to try

8    to get him on the phone and find out where he is?

9    MR. MAYNARD:  I will.

10    THE COURT:  Thank you.

11    (Recess taken at 10:01 a.m.; resumed at 10:15 a.m.)

12    THE COURT:  Thank you, ladies and gentlemen.  Please

13    sit down.  The record will show the presence of the jury,

14    counsel, and the defendant.

15    Mr. Maynard, you may call your next witness.

16    MR. MAYNARD:  Defense calls James Sampson.

17    (Witness duly sworn.)

18    THE CLERK:  Please state your name for the record and

19    spell your last name.

20    THE WITNESS:  James Sampson, Jr.  Sampson.

21    S-A-M-P-S-O-N.

22    THE COURT:  You may proceed, Mr. Maynard.

23    MR. MAYNARD:  Thank you, Your Honor.

24

25    ////

CR15-00707-PHX-SRB   JURY TRIAL-DAY #12   3-4-16

```
 1              JAMES SAMPSON, JR., WITNESS, SWORN

 2                    DIRECT EXAMINATION

 3   BY MR. MAYNARD:

 4   Q   Would you introduce yourself to the jury, Mr. Sampson.

 5   A   My name is James Sampson.  I am Decarus's older brother.

 6   Q   And how old are you?

 7   A   Fifty-two.

 8   Q   Where were you born?

 9   A   Philadelphia, Pennsylvania.

10   Q   Were you and the defendant in this case raised together?

11   A   Every since he was a baby when he first came home.

12   Q   Are you guys actually half-brothers?

13   A   We don't call it half-brothers.  He came out of my mother.

14   We were brothers.

15   Q   And so you -- he's been known in this courtroom as Abdul

16   Malik Abdul Kareem.

17   A   Uh-huh.

18   Q   What do you refer to him as?

19   A   Decarus, his given name.

20   Q   Now, are you married?

21   A   Yes, I am.

22   Q   And how long have you been married?

23   A   Eleven years.

24   Q   Do you have any children?

25   A   Yes.
```

```
 1    Q    How many?

 2    A    One boy.

 3    Q    And where do you live?

 4    A    I live outside Surprise in the county area.

 5    Q    Tell the jury what the property is --

 6    A    I live on horse property.  I'm a cowboy.  Been my whole

 7    life.  So has Decarus.

 8              THE COURT:  A Philadelphia cowboy?

 9              THE WITNESS:  Yes, ma'am.  If you goes back there you

10    could thrown a stone and you'll hit somebody.

11              I break horses.  I raise horses.  I shoe.  I rope.

12    Whatever it is, I love being a cowboy.

13    BY MR. MAYNARD:

14    Q    Okay.  When you were raised back in Philadelphia, you and

15    Decarus were raised together?

16    A    Yes.

17    Q    Okay.  And what religion were you raised?

18    A    Baptist.  My mother's father is a Baptist minister -- was

19    a Baptist minister.

20    Q    And how many brothers and sisters do you and Decarus have?

21    A    About 11, 12 -- about 12.

22    Q    Okay.  And do you stay in contact with those other

23    brothers and sisters?

24    A    All of us talk every day, every one of us that's still

25    alive.  You know, I just talked to a couple of brothers today
```

1    and my mom and my sister, so we all talk every day.

2    Q    Your mom is still back in Philadelphia?

3    A    Yes.  Yes.

4    Q    And can you tell us how some of your other brothers are

5    employed?  What do they do?

6    A    I have two brothers who are police officers, Philadelphia

7    police officers.  I have a nephew who is a police officer.

8    Decarus' father, which was my stepfather, but my dad, he was a

9    Philadelphia police department -- officer.  His brother is

10   retired FBI.  Cousins are police.  So the law runs deep in my

11   family.

12   Q    Okay.  When did you move out here to the Phoenix area?

13   A    1994.

14   Q    And why did you move out here?  What was the purpose?

15   A    All the cowboy pictures on TV and no snow.

16   Q    Okay.  What is it you do for a living?

17   A    I have my own business.  I'm called a biotech.  I repair

18   medical equipment; respiratory, cryogenic stuff.

19   Q    Were you still living in Philadelphia when Decarus

20   graduated from high school?

21   A    Yes.

22   Q    And when did Decarus move out to Phoenix?

23   A    I think it was '95.  I think.  I'm not sure.  '93.  '95.

24          Because my mom was here for a year because of my

25   nephew.  His asthma was bad, so my mother and my sister, they

1    moved out here for a year before any of us came out in '93 and

2    then they went back to Philadelphia.

3    Q    Okay.  We've met a couple of witnesses yesterday.  One of

4    them was by the name of Stuart Sampson.  Is he related to you?

5    A    He's my nephew.

6    Q    And the other one was Anthony Sampson.

7    A    Also a nephew.

8    Q    Which one of them had the bad asthma?

9    A    Anthony.

10   Q    Okay.  Now, your two nephews and your brother are now

11   Muslims?

12   A    Uh-huh.

13   Q    Are you a Muslim?

14   A    No.

15   Q    Okay.  Have they ever tried to convert you?

16   A    No.

17   Q    All right.  Now, when you moved out here, did you start

18   raising horses and doing that kind of thing then?

19   A    I brought a couple horses with me from back in Philly.  I

20   have -- me and my -- he wasn't my brother but he's my brother

21   of heart -- we had like 45 horses, so we had a little 25-acre

22   place outside of Philadelphia called Limerick.  So I brought a

23   couple horses with me when I moved here.

24   Q    So you really were a Philadelphia cowboy then?

25   A    Yes.  Yes.

CR15-00707-PHX-SRB    JURY TRIAL-DAY #12    3-4-16

```
1    Q    Okay.  How many horses do you have now?

2    A    Right now I have five.

3    Q    Now, there's been some discussion about shooting.

4    A    Uh-huh.

5    Q    Do you have guns?

6    A    Yes.  I have guns.

7    Q    How many guns do you have?

8    A    A few.

9    Q    Okay.  Tell us what you have?

10   A    I have a .40.  I have a 9 millimeter.  I have a .357.  I

11   have a couple of 16 gauges, a couple 12 gauges, 7 millimeter.

12   Q    Do you shoot out on your property or near your property?

13   A    Not on my property.  Five miles down is the desert, so we

14   go out that way.

15   Q    Okay.  Do you go out there shooting often?

16   A    Yes.

17   Q    Okay.  Has Decarus gone out there shooting often with you?

18   A    I would usually call him and tell him, hey, I'm going out

19   shooting, would you like to come.

20         And he comes to the house, if he's not already there,

21   because he actually almost lives there.  But he comes to the

22   house and we go to the back and go shooting.

23   Q    Do you know whether or not Decarus had any weapons, any

24   guns?

25   A    He had, I think, a 9 millimeter.
```

```
1    Q    Do you know if he had any others?

2    A    And I think he had a .38.  That was it.

3    Q    Okay.  And so did you know that Decarus had a felony

4    conviction?

5    A    Did I know?

6    Q    Yes.

7    A    Yes.

8    Q    And when did you learn that?

9    A    I don't remember when.

10   Q    Okay.  Did you know what the felony conviction was for?

11   A    Yes.

12   Q    And what did you understand?

13   A    Drinking and driving.

14   Q    Okay.  Now, when Decarus would come out to your property

15   and go shooting, did -- did he ever bring anybody with him?

16   A    Not to go shooting.

17   Q    Did he --

18   A    He would bring people and we would go riding.  Sometime he

19   wanted to ride and, you know, I'll let him -- the people he

20   bring in the arena, but never shooting.

21   Q    Okay.  Do you remember -- did you know somebody by the

22   name of Elton Simpson?

23   A    Yes, I do.

24   Q    How did you know Elton Simpson?

25   A    He's been to my house for numerous occasions.
```

CR15-00707-PHX-SRB    JURY TRIAL-DAY #12   3-4-16

```
 1    Thanksgiving -- Thanksgiving I do a big Thanksgiving dinner

 2    for people.  We usually get 45 to 50 to 60 people, whoever

 3    want to bring a friend because a lot of people here are

 4    transplants.

 5            So me and my wife who is Native American, we have

 6    this big Thanksgiving dinner.  Or we'll do a big barbecue, you

 7    know, because -- or various reasons.  So I met him a few times

 8    that way.

 9    Q   Okay.  Do you have an estimate how many times Elton

10    Simpson was actually out to your property?

11    A   I don't have a count.  It was many times.

12    Q   Do you -- did he ever go shooting out on your property?

13    A   No.

14    Q   Did -- I'm going to focus on the last couple of years.

15    A   Okay.

16    Q   Are you and Decarus close?

17    A   Very.

18    Q   How often would you see Decarus?

19    A   At least --

20    Q   In the last two years, let's say.

21    A   Three to four times out of the week.  Most of the weekends

22    he'll come and stay at my house.  And when I go down into

23    Phoenix to do a delivery or pickup, I'll stop and we'll have

24    lunch.

25    Q   Okay.  When you say "make a delivery," is that in
```

UNITED STATES DISTRICT COURT

1  connection with the business that you own?

2  A    Yes.

3  Q    Okay.  So you would end up coming into Phoenix fairly

4  often?

5  A    Yes.

6  Q    Do you recall when he lived on Cochise?

7  A    Yes.

8  Q    Did you ever go to that property?

9  A    Many times.

10  Q    What would the reasons be that you would go to Cochise?

11  A    He is my brother.  Just to go see him.  Have lunch.  Catch

12  up.

13  Q    Okay.  Did you ever eat any meals at his house?

14  A    Yes.

15  Q    Okay.  Did you meet people that lived with him there?

16  A    Yes.

17  Q    And do you remember the names of any of the people that

18  lived with him there?

19  A    You know, really, I really don't.  My brother -- which I

20  don't understand.  Most people bring home puppies and kittens.

21         He helped people.  He would bring people home who

22  don't have.  There was a family across the road of eleven

23  kids.  He fed them every day.  He bought clothes for them.

24         And various time I'll be, like, You can't take care

25  of the world, but he does.  So there's people who I have met

 1    and I'm not good with names.  I'm good with faces.  And names

 2    escape me.

 3              But there are a few people who I have met.  And if

 4    you called the name, I will probably know who they are.

 5    Q    All right.  Did you ever meet anybody who went by the

 6    nickname Black Billy?

 7    A    Yes.  He was a homeless guy.

 8    Q    And how long did he live with your brother?

 9    A    I think a couple -- a few months, maybe five, six months.

10    I'm not sure.  But, yeah, I used to see him on the road

11    because he's homeless.  And next thing I know I go to my

12    brother's and he's living in the house.  So it's like again

13    you can't take care of the world.

14    Q    Okay.  Did you see anybody that was referred to as White

15    Billy?

16    A    Yes.  I met him.

17    Q    Okay.  Do you have an understanding of what they were

18    doing when they were living with your brother?  How they were

19    employed?

20    A    My brother had a little cleaning business and a moving

21    business, so he tried to give everybody jobs.  So that way

22    they'll have a job and then they can get out on their own.

23    Q    When did your brother start the cleaning business?

24    A    Oh, I'm not sure.  But in our household was our father who

25    always said no one is going to give you anything.  If you can

CR15-00707-PHX-SRB    JURY TRIAL-DAY #12   3-4-16

```
 1    give something back to the world, do so.
 2              That means if you have a job, okay.  But if you work
 3    for yourself, you don't get a slice of bread, you get a loaf
 4    of bread and you'll be able to give other people slices.
 5              So that was the whole thing in our house.  You always
 6    go out and you make something of yourself.
 7    Q    When you say your brother had a cleaning business --
 8    A    Yes.
 9    Q    -- tell the jury what kind of cleaning business it was.
10    A    He cleaned banks.  He cleaned office buildings.  He also
11    had a moving business.  He moved private people.  He moved
12    companies.
13              And sometimes I even hired him to deliver when I had
14    an overflow of equipment and I couldn't get out, I had him
15    bring his truck and I would load and he go to different
16    companies for me and deliver equipment.
17    Q    The cleaning business, was it primarily a carpet cleaning
18    business or --
19    A    It was carpet, yes.
20    Q    Okay.  When did he start this moving company?
21    A    Maybe in 2005, 2004.  I'm not really sure.
22    Q    Okay.  Was your brother pretty successful as a
23    businessman?
24    A    If he was, he wasn't always in my pocket.  He always
25    needed something.  You know, he'll call me up and need a bill
```

UNITED STATES DISTRICT COURT

1    paid.  So I would go and I would always send a check to his

2    electric company or whatever he needed.

3            He would call me probably once or twice a month he

4    needed something paid, so I always told him that you moving

5    people doesn't pay the rent.

6    Q    When your brother would borrow money from you, did he pay

7    you back?

8    A    Oh, yeah.

9    Q    And let me focus on the last year of his business.  Did he

10   seem to have a lot of money in the last year?

11   A    No.

12   Q    Did he borrow money from you in the past year?

13   A    Constantly, yes.

14   Q    Okay.  Now, when you -- let me mention a couple other

15   people.

16           We've talked about Elton Simpson.  We've talked about

17   two Billies?

18   A    Uh-huh.

19   Q    Did you know an individual by the name of Stefan Verdugo?

20   A    Stefan Verdugo.

21   Q    Stefan?

22   A    Yes.

23   Q    Did you know him as "Stefan"?

24   A    Yes.  I know him as Stefan.

25   Q    How did you know Stefan?

CR15-00707-PHX-SRB    JURY TRIAL-DAY #12   3-4-16

```
 1    A    Through my brother.

 2    Q    Did he ever come out to your house?

 3    A    Yes.  And him, you know -- they came out -- him and a

 4    couple folks came out one time to go camping.  And they --

 5    something happened but they decided that they couldn't go

 6    camping, so they camped in one of my arenas because I wouldn't

 7    let them in the house.  He's not a person I trust.

 8    Q    Okay.  When you say "arenas" --

 9    A    Horse arena.  I'm sorry.  A horse arena.  They camped out

10    in the horse arena.

11    Q    How many acres do you have?

12    A    I have an acre-and-a-half.

13    Q    Did you know there were some young boys that lived across

14    the street on Cochise?

15    A    Yes.

16    Q    One was named Juan and one was named Carlos?

17    A    Yes.

18    Q    Did you know them?

19    A    Yes.

20    Q    How did you meet them?

21    A    Through my brother, because one day I went down there and

22    he had all these kids feeding them.  And I was, like, so you

23    starting a school program -- just being sarcastic -- and he

24    said well these kids live across the road.

25              MS. BROOK:  Objection.  Hearsay.
```

UNITED STATES DISTRICT COURT

```
 1              THE COURT:  I'm sorry, Ms. Brook?

 2              MS. BROOK:  Hearsay.

 3              THE COURT:  Let's just get the next question.

 4              MR. MAYNARD:  Okay.

 5     BY MR. MAYNARD:

 6     Q    Did either Juan or did -- did either one of those two boys

 7     ever come to your house?

 8     A    Yes.

 9     Q    And for what reason?

10     A    We had, I think, a barbecue or sometime my brother would

11     just bring them up.

12     Q    Okay.  So you saw them on a few occasions?

13     A    Yes.

14     Q    And you would see them at his house?

15     A    Yes.

16     Q    Okay.  Did you ever go out to restaurants with them?

17     A    Yes.

18     Q    Okay.  Now, when you would go to your brother's house, did

19     your brother ever have on videos that showed activity in the

20     Middle East?

21     A    No.

22     Q    Did you ever see any radical or terrorist videos?

23     A    No.  I'm going to tell you a secret.

24     Q    It won't be a secret long.

25     A    My wife is Native American.  She makes fry bread, all
```

UNITED STATES DISTRICT COURT

CR15-00707-PHX-SRB    JURY TRIAL-DAY #12    3-4-16

1    kinds of stuff, but she makes -- I raise my own food, you

2    know, beef, pork.

3           So I have my butcher make these big pork steaks.  And

4    my wife puts some kind of seasoning on it and my brother eat

5    pork steaks.

6           So that's the secret that we have that he eats pork.

7    So I don't know -- you know, so whenever she makes it and I'm

8    constantly saying, hey, Pat making steak, the pork steaks and

9    he comes up.

10   Q    All right.  Let me get back to the house.

11   A    Okay.

12          THE COURT:  I take it the secret part is that to your

13   understanding Muslims don't eat pork?

14          THE WITNESS:  Yes.

15   BY MR. MAYNARD:

16   Q    Now, did -- you're messing me up.

17   A    I'm sorry.

18   Q    All right.  Did -- you knew your brother had some guns at

19   his house?

20   A    Yes.

21   Q    Okay.  Did you ever see any terrorist-type videos on his

22   television set?

23   A    No.

24   Q    Did you ever see any type of that activity on his

25   computer?

CR15-00707-PHX-SRB    JURY TRIAL-DAY #12    3-4-16

```
 1    A    No.
 2    Q    Okay.  Now, your two nephews Anthony and Stuart, did they
 3    come out to your place often?
 4    A    Not that often.
 5    Q    Okay.  Do you see Anthony on occasion?
 6    A    I see them both on occasions.
 7    Q    Do you have an understanding of why they don't come out to
 8    your place that often?
 9    A    I'm a little tough.
10    Q    Do you give them a hard time?
11    A    Yes.
12    Q    Okay.  Now, did you know an individual by the name of
13    Nadir Soofi?
14    A    No.
15    Q    Okay.  Do you recall ever meeting him or --
16    A    No.
17    Q    No.  Okay.
18              Do you know an individual by the name of Abdul Khabir
19    Hyman?
20    A    Yes.
21    Q    And how do you know him?
22    A    He is actually my mother's sister's nephew.  So he's a
23    Hyman.  He's related -- he's my mother's sister's nephew on
24    the Hyman side.  She was married to a Hyman.
25    Q    How did you meet him?
```

CR15-00707-PHX-SRB    JURY TRIAL-DAY #12   3-4-16

```
 1   A    They had stuff going on in Philadelphia one time, so I
 2   know his folks.
 3   Q    So you know him from back in Philadelphia?
 4   A    Yes.  Yes.
 5   Q    Do you see him out here in Phoenix?
 6   A    I haven't seen him in a while.  Him and his kids would
 7   come for Thanksgiving or a barbecue, but that's been a while
 8   ago.
 9   Q    Okay.  Did he ever come out shooting at your property?
10   A    No.
11   Q    Do you know an individual by the name of Daniel VanHook?
12   A    Yes.  I know Daniel.
13   Q    And how do you know Daniel VanHook?
14   A    Through my brother.
15   Q    And has he ever been out to your property?
16   A    He's never been out to my property.
17   Q    Okay.  Now, I asked you if your brother had borrowed money
18   from you in the past year.
19            I'm going to -- your brother was arrested in June of
20   2015.
21   A    At my house?
22   Q    Pardon me?
23   A    I'm sorry.  He was a resident where?
24   Q    No.  I said your brother was arrested on June 10, 2015?
25   A    Okay.
```

CR15-00707-PHX-SRB    JURY TRIAL-DAY #12    3-4-16

```
 1   Q    In the six months prior to that, between Christmas and
 2   when he was arrested, did he ever borrow any money from you
 3   then?
 4   A    I believe so.
 5   Q    Okay.  Would he borrow large sums or --
 6   A    No.  Just for bills, you know, or for go put groceries in
 7   the house or something.
 8   Q    Was there ever a time in the last six months that your
 9   brother came and stayed with you for more than a night?
10   A    My brother was always at my house, especially on the
11   weekends.  You know, on the weekends he will come up and he
12   will just stay because, again, my wife cooks.  So he's always
13   there, especially when it's dinner time.
14        But four times out of the week, sometimes five times
15   out of the week we'll see each other.
16   Q    Do you ever remember a time when your brother was having
17   problems with his water at his house?
18   A    Oh, when he couldn't take a shower?  Yes.
19   Q    Do you have any recollection of when that would have been?
20   A    No.  I'm sorry.  I don't.
21   Q    Okay.  Did -- when that happened, did he stay with you?
22   A    Yes.  He stayed at my house for a while.
23   Q    Okay.  Now, did you have any relatives that you actually
24   asked your brother to stay at his house?
25   A    Did I have any relatives?
```

CR15-00707-PHX-SRB    JURY TRIAL-DAY #12    3-4-16

```
 1   Q   Yeah.  Did you have any relatives -- did your wife have
 2   any relatives that actually --
 3   A   Oh, yes, yes.  My --
 4   Q   You've got to let me finish my question or the court
 5   reporter is going to yell at both of us.
 6   A   Oh, yea, I'm sorry.
 7   Q   Did you have -- or did your wife have any relatives that
 8   actually stayed at Decarus's house?
 9   A   Yes.  My nephew.  Her nephew.
10   Q   Who was that?
11   A   Ricky Meechum.
12   Q   And how long did Ricky Meechum stay with Decarus?
13   A   Oh, a year or so.
14   Q   And when was that?
15   A   I think it was 2014.  2014.
16   Q   Okay.  And did you ask Decarus to take him in?
17   A   Yes.
18   Q   Why?
19   A   He needed a job.  So, again, my brother who tries to help
20   everybody, he gave him a job with the moving company.  So
21   instead of him running from my house to his house, which is a
22   long way, he stayed -- I asked my brother if he can stay there
23   until he get hisself together and buy hisself a car and then
24   he will be mobile.
25   Q   Was Ricky having difficulty finding a job?
```

```
 1     A    Yes, he was.

 2     Q    Why was that?

 3     A    Ricky is -- they wrote him off as a lost cause.  He was

 4     into drugs.  And he'll get a job.  Once he get a job, he knows

 5     more than the owners know so they fire him.

 6              So I kind of figure if he was with my brother, he can

 7     keep him balanced and keep him on track.

 8     Q    Now, was Ricky a Muslim?

 9     A    No.  Native American.

10     Q    I asked you questions about when you would go out shooting

11     with Decarus.

12     A    Uh-huh.

13     Q    Would Decarus clean your guns after you guys had shot?

14     A    Decarus is the worst person with guns.  Cleaning.  He

15     leaves too much oil.

16     Q    I'm sorry?

17     A    He leaves too much oil on the gun.  And when he breaks it

18     down, he doesn't put it back together right so I take care of

19     all that.

20     Q    Did he know how to take apart guns?

21     A    He know how to take them apart but he's sloppy taking

22     apart.  He forces it.  You know, if there's a pin that's

23     supposed to come out, he doesn't take the pin out.  So he

24     forces everything and he'll bend something.

25              So, I don't know, forever and a day I been cleaning
```

1    guns.  His guns.  My guns.

2    Q   And have you done that in the last several years?

3    A   Oh, I been doing -- yes.  Yes.

4    Q   So you would actually clean his guns for him?

5    A   Yes.

6    Q   Is Decarus mechanically minded?  Is he pretty good with

7    tools?

8    A   No.  No, he's not.

9    Q   What do you mean by that?

10   A   If you ask him for a crescent wrench, he'll give you a

11   monkey wrench.

12       I don't -- I have all kinds of tools, so I don't let

13   him near my toolbox because there's a tool for every job.  He

14   gets the wrong tool for the wrong job.

15   Q   Do you remember where there was a time when Decarus was

16   living off Bell Road or on Bell Road?

17   A   Yes.

18   Q   Do you remember who he was living with then?

19   A   I think it was White Billy.  I'm not too sure.

20   Q   Do you remember whether or not the fellow who was living

21   with him on Bell Road ever came out to your property to go

22   shooting?

23   A   Oh, to go shooting?  No.

24   Q   No?

25   A   No.  I don't allow it.

1        You know, like I said, my dad was an officer, so he

2   taught us how to shoot.  And when you do that, it's a private

3   time.  So, you know, I don't bring anybody to go shooting,

4   nobody but the family.

5   Q   Did Decarus discuss with you anything about ISIS?  Did you

6   ever hear him talk about ISIS?

7   A   No.

8   Q   Did you ever hear him talk about a Khilafah?

9   A   No.

10  Q   A khalif?

11  A   No.

12  Q   A khalifate?

13  A   No.

14  Q   Did you ever hear him discuss wanting to move to the

15  Middle East?

16  A   Oh, no.  No.  No.  No.

17  Q   You're aware of the incident that occurred in Garland,

18  Texas?

19  A   Yes.

20  Q   And how did you learn about that?

21  A   I saw it on TV.

22  Q   Did you recognize or did you know the name of Elton

23  Simpson when it was --

24  A   Not at first.  I'm not really good with names.  Faces, you

25  know, I saw his face on TV, a younger -- a younger photo of

```
 1    him.
 2              And I was telling my wife I know him from somewhere.
 3    And, of course, she's like you know everybody but -- and then
 4    it hit me and I called my brother.
 5    Q   All right.  So that was the first time --
 6    A   Yes.
 7    Q   -- you learned was watching TV?
 8    A   Yes.
 9    Q   Okay.  Have you been interviewed by the FBI in this
10    matter?
11    A   Yes.
12    Q   On how many occasions?
13    A   Three.
14    Q   Where did those interviews take place?
15    A   The first one was at my house.
16    Q   Do you recall when that was?
17    A   I'm not exactly sure of the date.  I work -- I have a shop
18    on my property.  And the dogs were barking and I came up and
19    there were two gentlemen there and they both said FBI.
20              Okay.  We need to talk.  Okay.  Fine.  So I took them
21    in the house.  Set at the table.  And the first thing they
22    said was that it's about your brother.  And he says your
23    brother bought guns for the Elton guy.  And my response is:
24    My brother is not that dumb and do you gentlemen live in
25    Arizona?
```

CR15-00707-PHX-SRB    JURY TRIAL-DAY #12   3-4-16

```
 1              MS. BROOK:  Objection.  Hearsay.
 2              THE COURT:  Let's ask your next question,
 3    Mr. Maynard.
 4    BY MR. MAYNARD:
 5    Q   Did the FBI interview you about Mr. Simpson?
 6    A   Yes.
 7    Q   Okay.  Did they interview you about your brother's
 8    relationship with Mr. Simpson?
 9    A   Yes.
10    Q   Okay.  And how long did that interview last?
11              THE COURT:  The first one?
12              MR. MAYNARD:  Yes, ma'am.  The first interview.
13              THE WITNESS:  Maybe about 30 minutes.  40 minutes at
14    the most.
15    BY MR. MAYNARD:
16    Q   Okay.  And did you then have a second interview with the
17    FBI?
18    A   Yes.
19    Q   And when was that?
20    A   That was --
21    Q   In relationship to the first?
22    A   A couple week later.
23    Q   And where did it take place?
24    A   At the FBI building.
25    Q   Did they ask you to come down there?
```

UNITED STATES DISTRICT COURT

1    A    Yes.  They did.

2    Q    And you went?

3    A    Yes.

4    Q    Okay.  And you spoke to them openly and honestly?

5    A    Oh, yes.

6    Q    Okay.  And how long did that interview last?

7    A    About 30, 40 minutes.

8    Q    Okay.  And did you have a third interview with the FBI?

9    A    Yes.

10    Q    And when was that interview?

11    A    That was probably a couple weeks after the second one.

12    Q    Okay.  And where did that interview take place?

13    A    At their facility, the FBI.

14    Q    And they asked you to come back out?

15    A    Yes.

16    Q    And you did?

17    A    Yes.

18    Q    And did they ask you a lot of the questions that I have

19    asked you here today?

20    A    Yes.  And they brought out a bunch of weapons, photos, and

21    it was funny because this one thought he would shock me

22    because he says:  Oh, it's gruesome --

23            MS. BROOK:  Objection.  Hearsay.

24            THE COURT:  Sustained.

25    BY MR. MAYNARD:

UNITED STATES DISTRICT COURT

1  Q   You can't tell us what somebody else said?

2  A   Okay.

3         MR. MAYNARD:  We're having lectures today on hearsay.

4         THE WITNESS:  Oh, okay.  I'm sorry.

5         THE COURT:  It's how we're going to spend the

6  afternoon on a short course on hearsay.

7         MR. MAYNARD:  I could learn something.

8  BY MR. MAYNARD:

9  Q   Were you shown weapons?

10  A   Yes.

11  Q   Were you actually shown photographs of weapons?

12  A   Yes.

13  Q   Or did they actually have weapons there for you to look

14  at?

15  A   Photographs.

16  Q   Photographs.  Did you recognize any of those weapons?

17  A   No.

18         MR. MAYNARD:  Just a moment, please.

19         I have no further questions.

20         You can't leave.  You've got to sit there.

21         THE COURT:  Ms. Brook.

22         MS. BROOK:  Thank you.

23                      **CROSS EXAMINATION**

24  BY MS. BROOK:

25  Q   Good morning.

CR15-00707-PHX-SRB    JURY TRIAL-DAY #12   3-4-16

```
 1   A    Good morning.

 2   Q    Sir, I think you mentioned that you're 52?

 3   A    Yes, ma'am.

 4   Q    So you also mentioned that you have 11 -- is it 11 other

 5   siblings?

 6   A    Yes.

 7   Q    And in terms of your order in relation to them, are you

 8   the oldest?  The youngest?

 9   A    I'm the third oldest.

10   Q    You're the third oldest?

11   A    Oldest boy.

12   Q    And you moved out here to Phoenix about 21 year ago?

13   A    Yes.

14   Q    And about the same time your brother Decarus moved out

15   here too?

16   A    Yes.

17   Q    Now, a couple years ago your brother legally changed his

18   name to Abdul Malik Abdul Kareem.

19   A    Okay.

20   Q    And that happened in 2013?

21   A    I'm not sure when it happened.

22   Q    Did he tell you that he had gone down and gone through the

23   effort to legally and formally change his name to Abdul Malik

24   Abdul Kareem?

25   A    Yes, ma'am, but I didn't care.  His name is Decarus.
```

1    Q    So do you call him "Malik" or "Kareem"?

2    A    I just call him Decarus or Carus.

3    Q    And why is it that you won't call him Malik?

4    A    From the time he was born, that's the name my folks gave

5    him, so I don't -- I have a lot of friends that change their

6    names.  I call them by their name that was given to them.

7    Q    So you're Baptist?

8    A    Yes, ma'am.

9    Q    And your brother converted and became Muslim?

10   A    Yes, ma'am.

11   Q    Have you ever gone to the mosque with him?

12   A    No.

13   Q    Have you ever prayed with him?

14   A    No.

15   Q    And is it fair to say that everybody pretty well knows

16   that you're a Baptist and you are the way you are?

17   A    If they ask.  I don't go by religion.  So it doesn't

18   matter, but I feel like if that's the religion you want to be,

19   then you can.

20   Q    But those people that know you know that you're Baptist?

21   A    Some people do, yes.

22   Q    Certainly your family knows that?

23   A    Oh, yes.

24   Q    At some point you told your brother that his religious

25   stuff was going to get him in trouble?

1    A    I did?

2    Q    Do you remember saying that to him?

3    A    No.

4    Q    You remember sitting down with --

5         Well, defense counsel, he asked you a couple of times

6    about the occasions where you sat down with FBI agents and

7    talked to them?

8    A    Yes.

9    Q    And in particular, the first time, which was on June 11,

10   so the day after your brother was arrested, you sat down and

11   you talked to some FBI agents.  You talked to Detective Nash?

12   A    Uh-huh.

13   Q    Okay.  And I'm placing on the overhead your report and

14   there --

15        THE COURT:  Well, let's be clear.  You said "your

16   report."  This is a report that Detective Nash made of the

17   interview?

18        MS. BROOK:  Correct.  Correct.

19   BY MS. BROOK:

20   Q    And in looking at that, does it refresh your memory of

21   what you --

22   A    I never said that.  I wouldn't say that.

23   Q    Okay.  You mentioned that -- you mentioned that you knew

24   your brother had been convicted of a felony, right?

25   A    For drinking and driving?

CR15-00707-PHX-SRB    JURY TRIAL-DAY #12    3-4-16

1    Q    Uh-huh.

2    A    Yes, ma'am.

3    Q    And you found that out in the interview that you had with

4    Detective Nash on June 11th.

5            Before that point you didn't know that your brother

6    had been convicted of a felony?

7    A    No, ma'am, I knew that.  The fourth time he got arrested

8    for DUI, I had already knew that.

9    Q    Now, this is the interview that I'm placing on the

10   overhead.  It's the report --

11   A    Okay.

12   Q    -- from your June 25th, 2015, interview and this, again,

13   was with Detective Nash where you said that if Decarus was a

14   felon --

15           MR. MAYNARD:  Objection.

16           THE COURT:  Excuse me.  You can't -- you can ask him

17   to look at this and ask him if that -- if he said that, but

18   you can't read what -- you can't read this hearsay.

19           MR. MAYNARD:  There we go again.

20   BY MS. BROOK:

21   Q    If you knew that your brother was a felon, would you have

22   let him have a gun?

23   A    It's up to him.  He's grown.

24   Q    In looking at this report, does it refresh your memory

25   about what you told the officer about whether you knew he had

CR15-00707-PHX-SRB    JURY TRIAL-DAY #12    3-4-16

1    a felony and what you would have done if you knew he was a

2    felon?

3    A    No.  There's a few things I said on this, but, no, it's

4    not accurate.

5    Q    Isn't it true that you told Detective Nash that you didn't

6    know your brother had a felony?

7    A    No.  I did.  I've already knew that when his fourth DUI.

8    When he got his fourth DUI, we discussed it and I called my

9    brothers at home and, you know, they told me, they said, yes,

10    he's DUI.  He has four DUIs so he is a felon.  Nash didn't

11    tell me that.  I had already knew.

12    Q    So your statement here today is that you did not tell

13    Detective Nash?

14    A    No.  I did not.

15    Q    Okay.

16    A    Me and my brothers is pretty -- me and my brothers, all of

17    us are pretty close so we talk.  And the fourth time he got

18    arrested, he told me that he was now a felon.

19    Q    Are you aware that your interview with him that day was

20    recorded?

21    A    It didn't matter.  I had nothing to hide.  That's fine.

22    Q    You had mentioned that during the six months before your

23    brother was arrested that there were times that you loaned him

24    money?

25    A    Yes, ma'am.

```
 1   Q    Okay.  Are you aware that periodically your brother would

 2   wire hundreds of dollars to people, including people in

 3   Bangladesh?

 4   A    I don't believe that.

 5   Q    Placing on the overhead Exhibit 197, looking at $699 of

 6   money transfers from the end of March of 2015.

 7   A    Okay.  I don't see his name on there.

 8   Q    Would it surprise you to know that these were found in his

 9   pocket when he was arrested?

10   A    I wasn't -- I wouldn't know.  I wasn't there.  But you

11   showing me receipts and they can come from anywhere.  I don't

12   see a name on there.

13   Q    Additionally, $725 wired on May 4th of 2015?

14   A    Again, I don't see his name.

15        I can bring you a receipt --

16   Q    But it would surprise you to know?

17   A    -- that was wiring something, but there's no name on

18   there.  So what you're telling me --

19   Q    And, sir, hang on one second.

20        So it would surprise you to know that he was wiring

21   hundreds of dollars to people during that period of time where

22   you were loaning him money?

23        MR. MAYNARD:  Objection.  Asked and answered and also

24   a lack of foundation.

25        THE COURT:  Overruled.  You may I answer "yes" or
```

```
 1   "no."

 2            THE WITNESS:  I'm sorry.  What was the question?

 3   BY MS. BROOK:

 4   Q   It would surprise you to know that he was wiring hundreds

 5   of dollars to people during the same period of time where you

 6   were loaning him money?

 7            MR. MAYNARD:  Same objection.

 8            THE WITNESS:  "Surprise" is such a vague word for me.

 9   I don't know how to answer that.

10            THE COURT:  Okay.  Let's move on.

11   BY MS. BROOK:

12   Q   When Elton Simpson died --

13   A   Uh-huh.

14   Q   -- you knew that your brother helped arrange the funeral

15   arrangements?

16   A   Yes.

17   Q   And that he helped to pay in part for the funeral?

18   A   Elton's parents while he was sitting --

19   Q   Just "yes" or "no."  You knew that?

20   A   I can't answer that.

21            THE COURT:  The only question is:  Did you know if

22   your brother helped to pay for it?

23            THE WITNESS:  Not pay for it.  Helped to get him

24   here.  Yes.

25   BY MS. BROOK:
```

CR15-00707-PHX-SRB    JURY TRIAL-DAY #12    3-4-16

```
1   Q   Helped to arrange to transport Elton Simpson's body back
2   from Texas to Phoenix?
3   A   Yes.  No money.  Just told his parents what to do.
4   Q   And you had talked to him and told him that he shouldn't
5   be doing that?
6   A   I told him it wasn't a good idea.
7   Q   On the night Elton Simpson was killed, you called your
8   brother to talk to him on the phone?
9   A   It wasn't that night.  No.
10  Q   Was it the next day?
11  A   I think it was a couple days because I kept seeing his
12  picture.  And I knew who he was, but I didn't know.  I just
13  knew I seen him before.  And maybe the fourth or fifth day it
14  hit me.
15  Q   Do you remember telling Detective Nash that it was that
16  night that your brother -- that you talked to your brother?
17  A   No.
18  Q   That you called him?
19  A   No.
20  Q   And so it's your statement that you didn't say that to
21  Detective Nash?
22  A   No.  I did not.
23  Q   And, additionally, that your brother told you on the phone
24  that he can't talk on the phone with you about Elton Simpson?
25  A   Well, he was little pro -- yes.  He told me.  He says I
```

UNITED STATES DISTRICT COURT

1    can't talk to you on the phone.  He says I'll be up there in a

2    couple hours.

3    Q    You had mentioned that there were times that your brother

4    would stay up at your property, at your horse property in

5    Surprise?

6    A    Yes.

7    Q    And you had mentioned that on weekends, occasionally, he

8    would spend the night with you?

9    A    The whole weekend, yes.

10   Q    How frequently would that happen?

11   A    Like I say, we see each other probably four, sometimes

12   five times out of the week.

13   Q    You had also mentioned that when you were at your

14   brothers's house at Cochise --

15   A    Uh-huh.

16   Q    -- that you never saw any terrorist-type videos being

17   played?

18   A    Correct.

19   Q    What would you have done if you saw a beheading video

20   played there by your brother?

21   A    I didn't, so I can't answer that.

22   Q    Well, what would you have done?

23             MR. MAYNARD:  Objection.  Calls for speculation.

24             THE COURT:  Sustained.

25   BY MS. BROOK:

```
 1   Q   You had mentioned that your dad was a police officer; is
 2   that correct?
 3   A   Yes.
 4   Q   And that he taught you all how to -- how to shoot guns?
 5   A   The older -- the four older ones.
 6   Q   Okay.  And shooting guns was obviously something that's
 7   important to you.  It's something that you would do out at
 8   your property pretty regularly in Surprise?
 9   A   I wouldn't say it's important, but sometimes I like to,
10   yeah.
11   Q   Is it a hobby you enjoy?
12   A   Horses is a hobby.  No.
13   Q   But you had mentioned that you do have about six
14   weapons --
15   A   Yes.
16   Q   -- that you shoot?
17   A   Yes.
18   Q   Okay.  And you know how to take care of those weapons?
19   A   Yes.
20   Q   You know how to disassemble them, lubricate them,
21   reassemble them?
22   A   Yes.
23   Q   And you have also seen your brother disassemble, lubricate
24   and reassemble weapons?
25   A   No.
```

CR15-00707-PHX-SRB    JURY TRIAL-DAY #12    3-4-16

```
1   Q   Well, let me stop you there for a second, sir, because you
2   testified a minute ago that when you watched him do that, that
3   he just -- he didn't do it quite the right way?
4   A   He didn't do it the right way at all, so I would always do
5   it.
6   Q   Okay.  So you have seen him do it?
7   A   No.
8   Q   How do you know he didn't do it the right way if you
9   didn't watch him do it?
10  A   When he started taking it apart, there's a pin you pull
11  out.  That's the very first thing you do.  He wouldn't pull
12  the pin.
13  Q   How long ago was that?
14  A   How long ago?
15  Q   Uh-huh.
16  A   Probably, maybe, the last time he tried to take one apart,
17  maybe about a year ago.
18  Q   And you also mentioned lubricate, that you watched him
19  lubricate those weapons?
20  A   No.  I said I do.
21  Q   Well, hang on a second there, sir, because you had said
22  that when he lubricated, he left too much lubrication,
23  actually, in the weapon.  So in order for you to know that,
24  you would have to have seen that, right?
25  A   When I disassemble --
```

UNITED STATES DISTRICT COURT

1    Q    Just "yes" or "no," sir.

2    A    No.

3    Q    So you never saw him do it, so you don't know if he

4    lubricates and leaves too much or not enough?

5    A    I can't explain to you if it's just a "yes" or "no."

6         I break -- I break the weapon down.  He starts to

7    spray it.  It's too much lubrication.

8    Q    Sir.

9    A    I take it and I wipe it down.

10    Q    You had testified a moment ago that you watched him do it

11    and that he left too much lubrication.

12    A    And that's what I'm trying to explain to you.

13         I break it down.  He sprays it.  But when he sprays

14    too much lubrication, I take it and I --

15    Q    Where exactly did he spray the lubrication that you saw?

16    A    Inside the weapon itself.  You know, it's too much.  When

17    you spraying in the weapon itself.

18    Q    But you saw him spray the lubrication into the weapon?

19    A    Yes.  But I disassembled it.

20    Q    No question.

21         Defense counsel asked you some questions about Stefan

22    Verdugo?

23    A    Yes.

24    Q    Do you remember telling Detective Nash that he was a good

25    kid?

1    A    No.  I did not.

2    Q    Placing on the overhead the report from June 11th, does

3    that refresh your memory?

4    A    No.  Like I told defense counsel, when he came there

5    camping, he was going camping.  Him and some people were going

6    camping so --

7    Q    You don't remember -- just one second.

8    A    I wouldn't let him in my house, so why would I say he's a

9    good kid if I wouldn't let somebody in my house?

10    Q    Do you don't remember telling Detective Nash that he was a

11    good kid?

12    A    No.

13    Q    I want to go back for a moment to the weapons and when you

14    watched your brother spray the lubrication into the weapon to

15    lubricate it.

16          You said that you saw it was too much lubrication?

17    A    Correct.

18    Q    And did you explain that's too much lubrication?

19    A    Yes.  I took it because I broke it down, break it down

20    from the barrel down.  And when you're spraying, he sprays too

21    much.  So I just took it and I said get away because you're

22    putting too much oil in there and I wipe it clean.

23    Q    You had mentioned that Ricky Meechum went to --

24    A    Meechum.

25    Q    Meechum.  I'm sorry.

1          Ricky Meechum went to go live with your brother for a

2   period of time?

3   A   Yes.

4   Q   Do you remember exactly when he moved in and when he moved

5   out?

6   A   He was staying at my house for a while.

7          THE COURT:  Do you remember what year or months?

8          THE WITNESS:  It was in ninety -- I mean 2014.

9   BY MS. BROOK:

10  Q   And how do you know that?

11  A   How I do know that?

12  Q   How do you remember that?

13  A   Because he was at my house in the beginning of 2014.  And

14  I was trying to get him a job, help him get a job.  And then

15  that's when I came up with trying to get him to work for my

16  brother and it was 2014.

17  Q   And your brother gave jobs to a lot of different people?

18  A   Yes, he did.

19  Q   And you know that the neighborhood kids that lived across

20  the street from him at Cochise, he would give them -- buy them

21  clothes?

22  A   Yes.  And he would -- he went and bought a dog just so the

23  little guy Carlos would have a job cleaning the yard.

24  Q   And he would also buy them some gifts?

25  A   What do you mean "gifts"?

1    Q    He would give them things that they didn't have otherwise?

2    A    He would feed them.  He would feed them.  A couple of

3    times I was there somebody had raggedy shoes on and my brother

4    said:  Why are your shoes so bad?

5            Well, mom didn't buy me any.

6    Q    So he went out and bought them shoes?

7    A    Yes.

8            MS. BROOK:  One moment, please.

9    BY MS. BROOK:

10    Q    I just want to go back for a moment and talk about the

11    videos that defense counsel asked you about.

12            He asked you specifically if you had ever seen

13    terrorist videos being played at your brother's house?

14    A    Correct.

15    Q    And you were clear that, no, you have never seen anything

16    like that?

17    A    No.

18    Q    And let's be clear for a second.

19            So if you were to see somebody cutting off another

20    person's head on a video, how would that have made you feel?

21            MR. MAYNARD:  Objection.  Calls for speculation.

22            THE COURT:  Sustained.

23    BY MS. BROOK:

24    Q    What would you have done if you saw that?

25            MR. MAYNARD:  Objection.  Calls for speculation.

```
1              THE WITNESS:  I can't answer that because --
2              THE COURT:  We all agree.  Sustained.
3    BY MS. BROOK:
4    Q    Those types of videos were not things that you ever
5    watched yourself?
6    A    No.
7              MR. MAYNARD:  Been asked and answered.
8              THE COURT:  Please ask your next question.
9              It was asked by you and she gets to ask it again on
10   cross.
11             MS. BROOK:  Nothing further.
12             THE COURT:  Mr. Maynard?
13             MR. MAYNARD:  Your Honor, I have no questions.
14             THE COURT:  May this witness be excused?
15             MR. MAYNARD:  Yes.
16             THE COURT:  Is there any objection?
17             MS. BROOK:  No.
18             THE COURT:  Mr. Sampson, thank you very much, sir.
19   You may step down.  You are excused as a witness.
20             MR. MAYNARD:  Your Honor, can we break for an early
21   lunch?
22             I will tell the Court I have three witnesses lined up
23   for the afternoon.  I didn't realize that it was -- that
24   Mr. Dworkin was not going to go this morning.
25             And the other problem we had is several of our
```

 1   witnesses who will come in on Tuesday are Muslim and this is

 2   their holy day.

 3          THE COURT:  Can we get Mr. Dworkin to come back at

 4   12:30?

 5          MS. PLOMIN:  I think so, Your Honor.

 6          THE COURT:  So we can do that.

 7          Why don't we break now and we will resume at 12:30

 8   and finish up Mr. Dworkin's testimony.

 9          Ladies and gentlemen, you are reminded again of the

10   admonition not to discuss the case or form any conclusions

11   about it until you have heard all the evidence and begun your

12   deliberations.

13          We will reconvene at 12:30.

14          MR. MAYNARD:  Can we have a quick conversation

15   outside the presence of the jury?

16          THE COURT:  Sure.  I will excuse the jury at this

17   time.

18     (Open court, no jury present at 11:13 a.m.)

19          THE COURT:  Mr. Maynard?

20          MR. MAYNARD:  Yes.  Judge, we're planning to bring in

21   Dr. Sageman, our rebuttal expert next week.

22          THE COURT:  What day?

23          MR. MAYNARD:  Pardon me?

24          THE COURT:  What day?

25          MR. MAYNARD:  Tuesday.

CR15-00707-PHX-SRB    JURY TRIAL-DAY #12    3-4-16

```
 1              THE COURT:  Perfect.
 2              MR. MAYNARD:  We're going to have him here.
 3              We invoked the rule.  I invoked the rule.  But I
 4    believe because he's a rebuttal expert, I'm entitled to give
 5    him or tell him what Mr. Kohlmann's testimony was.  And I want
 6    to make sure that I'm not violating the Court's order by doing
 7    that.  I certainly have not done it yet, but.
 8              THE COURT:  Have you provided him with Mr. Kohlmann's
 9    report?
10              MR. MAYNARD:  I have.
11              THE COURT:  Mr. Koehler?
12              MR. KOEHLER:  Your Honor, we would not object to that
13    as long as the government is also permitted to have an expert
14    review Dr. Sageman's testimony either in person or via
15    transcript.
16              THE COURT:  As long as it's somebody who is on the
17    witness list, that would be fine.
18              MR. KOEHLER:  It is, Your Honor.
19              THE COURT:  We know it won't be Mr. Kohlmann, because
20    we can tell when he's -- that he's not going to be here.
21              Okay.  That's fine.
22              MR. MAYNARD:  Okay.
23              THE COURT:  I wanted to address these two jury
24    questions.  The one is really easy.  I don't know why this
25    jury is wondering about being sequestered, but I was going
```

```
 1    to -- I would like to assure them that that is not going to

 2    happen.

 3              MR. MAYNARD:  Judge, do we have a new jury question?

 4              MS. BROOK:  They may be worried about it for

 5    deliberations.

 6              THE COURT:  Right.  And it may be that someone else

 7    has had that experience.  I know that there are some

 8    jurisdictions where jurors are always sequestered during

 9    deliberations and so maybe that's a concern, but I wanted to

10    assure them about that.

11              The second question, however, I think -- well, I'll

12    just tell you my thoughts.

13              I think that it's important that we address it.  It's

14    obviously on their minds, at least one juror's.  I wouldn't be

15    surprised that it wasn't on the minds of several jurors.

16              And it's a very common question and I would ask what

17    you suggest we should do in terms of addressing it.

18              I'll ask Mr. Maynard first.

19              MR. MAYNARD:  I think we should tell them.

20              THE COURT:  Pardon?

21              MR. MAYNARD:  I think you should tell them.

22              THE COURT:  Oh, good.  That was what I was hoping

23    your answer was.

24              MR. KOEHLER:  We have no objection to that.

25              THE COURT:  And so I will tell them that he is, but
```

```
 1    that they can draw absolutely no inferences concerning guilty

 2    or innocence from the fact that the defendant is in custody.

 3              MR. MAYNARD:  Yes.

 4              THE COURT:  Okay.  Thank you.

 5              Anything else before we have lunch, Mr. Koehler or

 6    Ms. Brook?

 7              What's your estimate schedule-wise?  You have some --

 8    three witnesses this afternoon, plus Mr. Dworkin.

 9              Microphone please.

10              And you have got three witnesses and Mr. Sageman on

11    Tuesday?

12              MR. MAYNARD:  I think that's right.  So I think we

13    are going to finish on Tuesday or Wednesday.

14              THE COURT:  And so those four on Tuesday are the last

15    witnesses?

16              MR. MAYNARD:  Unless I determine to call the

17    defendant.

18              THE COURT:  Okay.  But either way, it looks like

19    there's a possibility we may be closing by the -- probability

20    that we will be closing next week?

21              MR. MAYNARD:  Oh, absolutely.

22              THE COURT:  Okay.  Good.

23              MR. MAYNARD:  Really.

24              THE COURT:  Well, no.

25              We still have jury instructions this thick to talk
```

1   about, so we -- we've got to make sure we get some time to do

2   that and that's what I'm trying to plan out.  But my thought

3   would be -- I mean, if you -- just tentatively, if you rested

4   Tuesday, I don't see how we could later in the day -- I don't

5   see how we could settle the instructions and close Wednesday,

6   but we may have some time this afternoon.

7            MR. MAYNARD:  I haven't looked at the instructions.

8   I wouldn't be prepared to talk about them right now.  I mean,

9   I have looked at them, but I haven't in the last two weeks.

10           THE COURT:  Well, I'm just thinking about when we're

11  going to do that, because that's going to take some time to go

12  through them and have them prepared.

13           MR. MAYNARD:  And I don't know that the government is

14  going to put on a rebuttal case, so.

15           THE COURT:  Even if they do, you know, I don't

16  anticipate it would last for more than a couple hours at the

17  most, if that.  I haven't ever seen one that did last more

18  than a couple hours.

19           MR. KOEHLER:  We would agree, Your Honor.  Our

20  rebuttal case, based on what we've seen so far, we think would

21  be fairly short and focused.

22           THE COURT:  So, all right.  Well then if we have some

23  time this afternoon, I'll hear argument on the motion I have

24  under advisement.

25           MR. MAYNARD:  Okay.

1    THE COURT:  Because otherwise, I don't want to leave

2  that and try to be doing it while we're trying to settle

3  instructions and get closing arguments put together.

4    I would like to take care of that argument, whatever

5  it is that everybody wants to say about that, if we can this

6  afternoon if we finish with the witnesses at a reasonable

7  time.

8    MR. MAYNARD:  That will be fine.

9    THE COURT:  Mr. Koehler?

10    MR. KOEHLER:  One more thing, Your Honor, is the

11  exhibit the defense offered.  Was it 555?

12    MS. PLOMIN:  Right.

13    THE COURT:  I don't think there is going -- I don't

14  think there is a disagreement.  I just would like Ms. Brook

15  and Ms. Plomin to get together and see if you can agree on

16  which pages to extract from those medical records and then

17  just tell Maureen and we'll just pull them apart, take those

18  pages out, and staple it back together.  That's --

19    MR. KOEHLER:  550.

20    MS. BROOK:  523.

21    THE COURT:  523?

22    MS. BROOK:  523.

23    THE COURT:  All right.  Thank you.

24    Court is in recess until 12:30.

25    (Recess taken at 11:20; resumed at 12:28 p.m.)

```
 1              THE COURT:  Good afternoon, ladies and gentlemen.
 2    Please sit down.  The record will show the presence of the
 3    jury, counsel, and the defendant.
 4              Before Mr. Koehler begins his cross-examination of
 5    Mr. Dworkin, I wanted to respond to two jury questions that
 6    were submitted this morning.
 7              The first asks more or less under what circumstances
 8    is a jury to be sequestered.
 9              Don't worry about it.  It's not going to happen to
10    you.
11              "Sequestering" means when the jury is not allowed to
12    go home at night and have to stay all together.  That's not a
13    concern here.  Even during your deliberations, if there is an
14    evening over which the deliberations continue, you will be
15    able to go home at night subject to the admonition.
16              The second question asked whether the defendant was
17    in custody.  And the answer is:  Yes.
18              There are many reasons why an individual is in
19    custody pending trial.  Oftentimes, it has to do with an
20    inability to post a bond.
21              The circumstances as to why the defendant is in
22    custody and not released on a bond are something that should
23    not be of any concern to the jury.
24              In addition, you should draw no inferences whatsoever
25    concerning the defendant's guilty or innocence because of the
```

CR15-00707-PHX-SRB    JURY TRIAL-DAY #12   3-4-16

```
 1    fact that he is in custody and not on release.

 2              Mr. Koehler, you may cross-examine.

 3              LONNIE DWORKIN, WITNESS, SWORN

 4                   CROSS EXAMINATION

 5    BY MR. KOEHLER:

 6    Q   Good afternoon, Mr. Dworkin.

 7    A   Good afternoon.

 8    Q   Now, I have looked over your reports in this case and

 9    listened to your testimony.  You testified before about

10    reviewing the Acer laptop, the Lenovo laptop, and the Nextbook

11    images; is that correct?

12    A   Yes.

13    Q   Did you review other devices in this case?

14    A   I don't believe so, no.

15    Q   Those are the only three devices you reviewed?

16    A   Yes.

17    Q   You did not review an RCA android tablet?

18    A   No, I did not.

19    Q   Now, during your testimony you talked about log files that

20    showed that a file had been viewed.  And specifically, that

21    file was a video called "Flames of War"; is that correct?

22    A   Yes.

23    Q   And the full name of that file was:  ISIS Video "Flames of

24    War" (Full Film) YouTube; is that correct?

25    A   Can I check my report?
```

UNITED STATES DISTRICT COURT

1    Q    Yes.  Please.

2    A    Thank you.

3            Yes.  That is correct.

4    Q    Just to make it easier so everyone can follow along, I'm

5    going to place on the document camera what's been marked for

6    identification as Exhibit 499.  Do you recognize that?

7    A    Yes.

8    Q    That's your report, correct?

9    A    Yes, it is.

10   Q    And that's a true and accurate copy of your report?

11   A    Yes.

12           MR. KOEHLER:  Move to admit 499.

13           MS. PLOMIN:  No objection.

14           THE COURT:  499 is admitted.

15       (Exhibit No. 499 admitted in evidence.)

16   BY MR. KOEHLER:

17   Q    So this first page here, I'm going to zoom in -- I'll just

18   go to the left side here where the actual items are.

19           This first one, numbered 381, shows going to a

20   YouTube account -- or YouTube page and looking at a particular

21   video; is that right?

22   A    Yes.

23   Q    And then let's go to the next one.  Same thing?

24   A    Yes.

25   Q    Okay.  Now, let's go to this third one here and tell us

1    what this particular one is.

2    A    This is logging in of a YouTube account.  Someone is

3    logging into a YouTube user account.

4    Q    But you can't see which account was logged in; is that

5    right?

6    A    Correct.  I can't decode that text.

7    Q    Now, let's go to this next page.  Right here it has

8    "continue"; is that correct?

9    A    Yes.

10   Q    And then it required another login in order to continue?

11        Where it says "sign in" right there?

12   A    It says "signin."  It says "CheckCookie." I'm not sure

13   what it's doing at this point.  I couldn't tell you without

14   testing it.

15   Q    Right here does it say "verify_age"?

16   A    Yes.  But I don't know if that's associated with the

17   previous login activity, because it still says

18   "accounts.google/login."

19   Q    Are you familiar with YouTube age-restricting videos based

20   on their content?

21   A    Yes.

22   Q    And are you familiar that someone has to verify that they

23   are of age in order to watch certain types of videos on

24   YouTube?

25   A    Yes.

1    Q    And would this be consistent with that fact?

2    A    That could be, yes.  I just don't know if it's separate

3    from the previous login on the other page.

4    Q    And, again, are you seeing repeats of the "signin" as you

5    go forward here?

6    A    Yes.  In fact, some of these are duplicates of each other.

7    Q    And so would you agree that these entries are consistent

8    with somebody clicking through the age verification screens on

9    YouTube before watching this video?

10   A    This would be the indication, yes.

11        But keep in mind, some of these are duplicate

12   records.  I wouldn't count each one as a unique event.  Some

13   of these are duplicate records.

14   Q    Understood.  Okay.

15        And we see the same thing on this third page here; is

16   that right?

17   A    Yes.

18   Q    Same here where it says "verify_controversy"?

19   A    Yes.

20   Q    And then we have the same thing here where it says

21   "verify_controversy" and it says "action=confirm 1"; is that

22   right?

23   A    Yes.

24   Q    And where you see the "1" there, that's a binary digit,

25   right?

1    A    That's right.  That's a confirmation.

2    Q    And so "one" is yes; "zero" is no, correct?

3    A    In this application, yes.

4    Q    And then finally down here we see somebody finally

5    click-through and actually watch the video?

6    A    Yes.  That's what it would indicate.

7    Q    Now, I'm going back to the first page of the actual

8    history report.  I want you to read right here (indicating)

9    the machine name.  What's the machine name?

10   A    Where are you.  Oh, "git-PC."

11   Q    "Git-PC," correct?

12   A    Yes.

13   Q    You mentioned that you found this in the unallocated

14   space; is that right?

15   A    Which records are you referring to?

16   Q    The one that we just looked at.

17        MS. PLOMIN:  Objection.  Misstates the testimony.

18   BY MR. KOEHLER:

19   Q    The Opera Carved Web History, did you find that web

20   history in the unallocated space?

21   A    Some of the web history that's in this report is from the

22   unallocated space, some is not.

23   Q    Okay.  The part that is not, from where did it come?

24   A    The parts that are not --

25        Let me look because I have not been asked that.

1   Q    If you could guide us to a particular page in your report?

2   A    Okay.  So let's go to the very first entry.  381 and --

3            THE COURT:  What page?

4            THE WITNESS:  I'm sorry.  On the second page of the

5   report, the first page that you have up.  You have the correct

6   page up.

7   BY MR. KOEHLER:

8   Q    So right here?

9   A    Yes.  And if we go over to the right-hand side of the

10  report under the column labeled "source," if we look at the

11  text in there, we see it says "Acer (Volume Shadow Copy)."

12           This log, this entry was recovered from the Volume

13  Shadow Copy.

14  Q    Okay.  And that has a date of April 21, 2015; is that

15  right?

16  A    The Volume Shadow Copy does, but you would have to minus 7

17  hours from that because that says UTC.

18  Q    In preparing to conduct your analysis, did you review the

19  FBI reports on the analysis of this device?

20  A    No, I did not.

21  Q    Okay.  Would it be consistent that April 21 date be

22  consistent with the finding of the Restore Point for that

23  date?

24  A    Yes.

25  Q    And is that how you managed to mine that particular thing

1    was from a Windows Restore Point?

2    A    Yes.  The Volume Shadow Copy is part of the Restore Point

3    process.

4              THE COURT:  What is a Restore Point process?

5              THE WITNESS:  On the Windows computers, starting

6    pretty much with Vista, Windows or Microsoft wanted a way to

7    enable users to backup errant installations that caused

8    problems in the computer.

9              So it implemented a way to preserve and protect

10   deleted records, modified records, so that when updates to the

11   Operating System are installed, it takes a snapshot of the

12   records that are there.

13             And it does it at a very low level so as not to be

14   affected by things such as a record locking or file locking.

15   So it makes backups at what's called the "block level."

16             This is all part of the Restore Point process.  There

17   are several things that go on.

18             Another activity that goes on is a copy of the

19   registry is made.  So that if at some point in the future the

20   user wanted to go back to a time with the computer before this

21   errant program was installed and caused them problems, they

22   can go into the Control Panel, select one of these Restore

23   Points in time, and reconstitute what was on the hard drive.

24             Part of that process not only restores the registry,

25   but also deleted files.  And so in this case there was a log

CR15-00707-PHX-SRB    JURY TRIAL-DAY #12  3-4-16

1    file that was recovered and that had been preserved at the

2    time a Restore Point was set.  And this is a portion -- the

3    portion of the Restore Point that I recovered it from was the

4    Volume Shadow portion of that process.

5              THE COURT:  Thank you.

6    BY MR. KOEHLER:

7    Q   Are you familiar with tool kit CDs?

8    A   Generally, yes.

9    Q   And specifically, are you familiar with a data shredding

10   programs?

11   A   Yes.

12   Q   If a person uses a data shredding program on a computer

13   using a tool kit CD that allows the user to actually boot

14   straight to the CD, can that person delete files from the

15   computer and remove any trace of them?

16   A   Potentially, yes.

17   Q   If a person were to do that, would that type of thing

18   remove this type of entry from the Windows System Restore

19   Point?

20   A   Potentially.

21   Q   But not necessarily; is that correct?

22   A   Correct.

23   Q   Would the person have to delete the Restore Point in order

24   to remove the data that was contained inside the Restore

25   Point?

```
 1    A    Yes.

 2          Well, it depends on what level.  You could certainly

 3    delete the Restore Point or you can go in at a lower level and

 4    selectively delete sectors.  It depends on the tool that we're

 5    talking about.

 6    Q    It would take somebody really sophisticated to do that

 7    though, wouldn't it?

 8    A    Yes and no.  Many of these tool kits are intended for

 9    different levels of skill, so we would have to be more

10    specific.

11    Q    Are you familiar with Hiren's Boot CD?

12    A    Yes.  I have heard of this one, yes.

13    Q    Is that a particularly sophisticated tool kit CD?

14    A    That one has a mix of tools, if memory serves.  I don't

15    actually use that particular one, but I have seen it in the

16    past.  And so that one has a mix of -- I think it had like

17    maybe 40 or 50 varieties of different types of utilities.  So

18    I would say that's more like a hybrid or a mix.

19    Q    Were you asked to look at that in connection with this

20    case by chance?

21    A    I don't recall.  I don't think so.

22    Q    Okay.  On direct examination you testified that this log

23    file that we just looked at potentially shows the number of

24    times that this particular video was used; is that right?

25    A    Yes.
```

1    Q    Why would you say it "potentially" shows that?

2    A    Well, I didn't want there to be confusion regarding

3    redundant entries.  So, for example, in the display you have

4    up here, we have two entries.  They have the exact same last

5    visited times.  We have the exact same URLs.

6         But they were found in two different places.  One was

7    found via the VSS, Volume Shadow file, and the other one was

8    found in an unallocated space, but it wasn't two separate

9    events.  It was one single event.  So I would count this as

10   one.

11   Q    I understand.  Is it possible, in fact, that this was

12   viewed more than just this one time?

13   A    Well, there were other records as we move through this

14   report where we will see the visit count increase.

15   Q    Is it also possible that this could have been viewed on

16   other dates and times aside from this but those dates and

17   times have been removed from the computer?

18   A    It's possible.

19   Q    You also testified on direct that you found logins for

20   ibrahimibrahim602@gmail.com account on the Acer?

21   A    Yes.

22   Q    Is that correct?

23   A    Yes.

24   Q    You didn't produce a report that showed those logins; is

25   that right?

1     MS. PLOMIN:  Your Honor, I'm going to object.  It

2  misstates the testimony.

3     THE COURT:  I was just looking back on my notes.  I

4  thought he said that was on the Lenovo.

5  BY MR. KOEHLER:

6  Q   Was it on the Acer or on the Lenovo?

7  A   It was -- let me check my report and I will tell you.

8     I was answering the question in my mind.  Yes, I

9  found some logins.  I'm not tying it to a particular platform.

10  So I found logins for the ibrahimibrahim602@gmail on the

11  Toshiba 80 gig drive.

12  Q   And from what did that come?

13  A   And that came from the Lenovo laptop.

14  Q   Did you produce a report showing the dates and times or

15  any other information about those logins?

16  A   Yes.  It's here.

17  Q   And when you say "here," to what are you referring?

18  A   I'm referring to the Nextbook report.  I actually

19  incorporated those results in this report and I can direct you

20  to that section.

21  Q   So the report on the Nextbook includes results from the

22  Lenovo?

23  A   Yes.

24  Q   Okay.  I'm going to place what's been marked for

25  identification as Exhibit 600 on the document camera.

```
 1              Is that your report on the Nextbook, Mr. Dworkin?

 2    A    Yes.

 3    Q    Is it a true and correct copy of that report?

 4    A    Yes, it is.

 5              MR. KOEHLER:  Move to admit 600.

 6              MS. PLOMIN:  No objection.

 7              THE COURT:  600 is admitted.

 8         (Exhibit No. 600 admitted in evidence.)

 9    BY MR. KOEHLER:

10    Q    Can you please guide us to the page of the report that

11    reflects results from the Lenovo computer?

12    A    Yes.  Can you turn to page 10?

13              Oh, I'm sorry.  Page 3.  Sorry.  Page 3.

14              Yes.  And if you could scoot down a little bit.

15              Section 5 says:  Located e-mail address:

16    ibrahimibrahim602@gmail.

17              I found this e-mail address -- I searched through the

18    Nextbook and I also had searched through the Toshiba at the

19    same time and I reported all the results.  I didn't filter any

20    of the results.

21              And so I included both the results from the Toshiba,

22    the Lenovo laptop, along with the Nextbook, just to show

23    completeness of the search that I performed, because

24    originally I was asked can I find this e-mail address.

25    Q    So what you're telling us is that this entry No. 5 here
```

1    came from the Lenovo; is that right?

2    A    We have to go one level down and look at each entry.

3    Q    Okay.  Could you please do that?

4    A    Yes.  So if you move your finger down slightly to item

5    No. 1, it says "contacts2.db."  Underneath there it says "Item

6    Path".  And if you slide over to the right it says "Disk

7    Image."  The Disk Image is the name of the forensic copy from

8    the Nextbook.

9    Q    Okay.

10    A    All right.  If we move down to item No. 2 just below that,

11    it says "Unallocated Clusters."  It says "Toshiba 80 gig."

12    And then if you slide down a little bit further, there should

13    be some -- well, actually, if you go to the next page, sorry,

14    we actually have -- I have highlighted --

15          Go to the top of the page.  This is the continuation

16    of that same Unallocated Cluster No. 2.  We see, if we look

17    across, we will find "ibrahimibrahim" in this text.

18          Yes, thank you.  If you move the red mark.  Oh, I

19    didn't realize I was doing that.  Sorry.  I thought you were

20    marking it.  Okay.

21          So here we have a match.  If we now move down to Item

22    No. 3 Unallocated Clusters.  Okay, can we erase it?  No?

23          We see the Toshiba again, so it's telling us it's

24    coming from the Lenovo.  And we see, if we look in the text,

25    we see it again.  And so on.

1           So as we go through, you'll see that I had hits on

2    the Lenovo for this address.  For the Nextbook, the hits I did

3    find were in a contact database.  So, for example, a user

4    would have names, addresses, things of that nature.  This

5    e-mail address was in the contacts database on the Nextbook

6    but I didn't find any instances of the e-mail actually being

7    used in terms of correspondence on the Nextbook.

8           Using the same search techniques and tools and

9    everything, I did find occurrences of it appearing to have

10   been used on the Lenovo Toshiba.  So I included those results

11   with the Nextbook Report to show that I was able to find the

12   occurrence or the usage of this e-mail address on an evidence

13   item, just not on the Nextbook, but I was successful in

14   finding it on the Lenovo.

15   Q   Did you happen to write a separate report on other things

16   that you found on the Lenovo?

17           MS. PLOMIN:  Objection.  Relevance.

18           THE COURT:  Sustained.

19           THE WITNESS:  Not that I --

20           THE COURT:  "Sustained" means you don't answer.

21           THE WITNESS:  Oh, okay.  Thank you.

22   BY MR. KOEHLER:

23   Q   So is this another example of that right here?

24   A   Correct.

25           And so what I found was any time it said "Unallocated

UNITED STATES DISTRICT COURT

1    Clusters," it was found in -- on the Toshiba 80 gig drive.

2    Q    Okay.

3    A    Which is the Lenovo.

4    Q    Did you also find the "gitrdonemoving" e-mail account on

5    the Lenovo?

6    A    I do not know.  I wasn't asked to specifically look for

7    that, so I couldn't tell you if it was there or not

8    specifically.

9    Q    Okay.  On each of these in the Unallocated Clusters were

10   you able to determine a date and time of these different

11   accesses of these different accounts?

12   A    No, I was not.

13   Q    You mentioned earlier that you found these items on the

14   Nextbook tablet.  And from your study of the tablet, it

15   indicated that the earliest date of use of that tablet was

16   May 21 of 2015; is that correct?

17   A    I think it was the 22nd.  May 22nd.  If you go to

18   section --

19   Q    Go ahead.

20   A    Sorry.

21   Q    Is this an example of that?  The eBook there?

22   A    This is an artifact recovered from the eBook because it

23   says "disk image," so I know what I'm looking at.

24   Q    Okay.  Were you asked to also find the file creation dates

25   on those items?

1    A    I was asked to be able to explain these dates and I was

2    asked about the creation date.

3    Q    You don't have a file creation date for this publication

4    "Origins of the Islamic State" on there, on the eBook, do you?

5    A    Not in this report, that is correct.

6    Q    Did you actually discover a file creation date?

7    A    Well, I know from using this particular forensic tool,

8    when it interprets the Android Operating System which is a

9    different Operating System than Windows, it has -- it doesn't

10    parse out the "create date."  It's just how this particular

11    forensic tool works.

12        So my experience has been the last written and last

13    access date, when I see it here, if I was to use a different

14    forensic tool, I would find the create date would usually

15    match these.

16        Also, another artifact here is with this particular

17    forensic tool, sometimes the create date -- I'm sorry -- the

18    last written date and access date are off by a second.  And

19    that's just an oddity of this forensic tool.  But if I was to

20    use a different tool, the seconds would align.

21    Q    What would it mean to you if a separate program analyzing

22    that same file revealed a file creation date of February 26 of

23    2015?

24    A    It would have that date?  I don't know.  If there's

25    another report or something that I should look at, I have not

1    seen any additional information.

2    Q    Would that contradict your finding that May 21 of 2015 was

3    the earliest usage date of that device?

4              MS. PLOMIN:  Objection.  Lacks foundation.

5              THE COURT:  Overruled.  You may answer if you can.

6              THE WITNESS:  Potentially, but I would have to see

7    that report and I would want to verify and test those results.

8    BY MR. KOEHLER:

9    Q    Were you not given the results to verify and test in

10   connection with your testimony?

11   A    Another report?

12   Q    Yes.

13   A    No.

14   Q    Mr. Dworkin, am I correct that in Windows Operating

15   Systems that Windows also creates thumbnails of images in

16   order to speed the browsing through a directory full of

17   images?

18   A    Yes.

19   Q    It creates a file called "thumbs.db" for that, right?

20   A    In earlier versions of Windows, yes, like Windows XP, yes.

21   Q    And so a computer would have both the original image and a

22   thumbnail image?

23   A    Potentially.

24   Q    And if you delete the original, does the thumbnail

25   automatically go away?

1   A   No.

2   Q   Let's talk for a minute about tablet computers and so

3   forth.  Can someone wipe the memory of a tablet computer and

4   reinstall the Operating System and all of the client files and

5   so on that go with that?

6   A   Potentially, yes.

7   Q   If someone were to do that, would those Operating System

8   files and so on show the original creation date when the

9   manufacturer created them?

10   A   Potentially.

11   Q   And you have no way of knowing whether this Nextbook had

12   been wiped and then had that reinstalled, do you?

13   A   I have not examined it for that purpose, no.

14        MR. KOEHLER:  May I have a moment, Your Honor?

15        THE COURT:  Yes.

16   BY MR. KOEHLER:

17   Q   There was one more thing.  I want to take you back to page

18   11 of your report that's marked as Exhibit 600 in evidence.

19   A   Yes.

20   Q   You have the two eBooks there.  One is "Origins of the

21   Islamic State," correct, this top one here?

22   A   Thank you.  It was too small for me to actually read, so.

23   Q   Let's see if I can zoom it in.

24   A   No.  I mean on my copy when I had a good copy, I could

25   hardly read it.  So I didn't know what it actually said.  It

1    was too bitmapped for me.

2    Q    And then the second book is "The British Government in

3    Jihad," correct?

4    A    Yes.  That I can see.

5    Q    What is the e-mail address associated with both of those

6    eBooks?

7    A    It's gitrdonemoving@gmail.com.

8              MR. KOEHLER:  I have no further questions.

9              Oh, one second.

10   BY MR. KOEHLER:

11   Q    I want to direct you to page 17 of your report.  Can you

12   read that version there?

13   A    Yes.  Now that I have a hint of what it should say, I can

14   make out it says -- it looks like it says something like "The

15   Origins Of The Islamic State."

16             But without the coaching, I probably would not have.

17             MR. KOEHLER:  Fair enough.  No further questions.

18             THE COURT:  Ms. Plomin?

19             MS. PLOMIN:  Thank you.

20                        **REDIRECT EXAMINATION**

21   BY MS. PLOMIN:

22   Q    Good afternoon, Mr. Dworkin.

23   A    Good afternoon.

24   Q    Mr. Dworkin, let's just go back to the Acer computer.  And

25   assuming that the video "Flames of War" is an hour long, based

```
 1    on what you've seen in that four-minute period where you
 2    saw --
 3              MR. KOEHLER:  Objection.  Beyond the scope.
 4              THE COURT:  She hasn't even asked her question yet,
 5    so I can't tell.
 6    BY MS. PLOMIN:
 7    Q   In the four-minute period where you saw activity relating
 8    to the "Flames of War", would it have been possible for
 9    somebody to watch "Flames of War" five times?
10    A   Correct.
11    Q   Do you know whether "Flames of War" was actually
12    watched -- actually watched -- on the Acer computer?
13              MR. KOEHLER:  Objection.  Asked and answered.
14              THE COURT:  Overruled.  You may answer.
15              THE WITNESS:  I can't tell.
16    BY MS. PLOMIN:
17    Q   And if it was watched, can you tell for how long?
18    A   No.
19    Q   All right.  I just want to move to the Nextbook.
20              I'm not sure how to zoom out on this.  Okay.
21              Now, I'm showing you page 19 of your report for the
22    Nextbook.  In looking at under 7.1, what is that?
23    A   Can you zoom in just a little bit.
24    Q   Sure, now that I know how.
25    A   That's good.
```

1    Q    Okay.

2    A    So the forensic tool that I use has the ability to present

3    a time line of files with respect to create dates, last

4    access, and last written.

5         And so what I'm showing here is essentially we have

6    like 2014.  We have the years across the top; 2015, 2016.  And

7    then we have the months right under -- oh, I can draw.

8         So we have 2015 and then we have the months right

9    underneath.  And then on the side we have the days of the

10   month.

11        So this gives us a bird's-eye view, a 50,000 foot

12   view of where files are located and so forth.  So we have

13   these files back here, these are the System Files I described

14   earlier as having come from the manufacturer installation.

15        And then over here I have drawn a box -- I can draw

16   one -- that aligns with May 22nd of when I detected what

17   appeared to me to be more user-type activity, setting up user

18   accounts and things of that nature.

19   Q    Okay.

20   A    And so this is just -- because there's so much minutia and

21   so much technical detail, it's easy to kind of get lost in the

22   weeds, so to speak, so this is kind of a step back to see

23   globally the period of use.

24   Q    Okay.  So let's focus on the March time period.

25        What did you see in terms of what was happening on

1    the Nextbook in March?

2    A    Can you scroll down on my display?

3    Q    Scroll down?

4    A    Oh, I'm sorry.  Slide down.  No.  The other way.

5         I'm sorry.  I use a max that's reversed.

6         Can you lift up -- I want to look at 7.2.

7    Q    Oh, I see.

8    A    7.2.  Yes.  Thank you.  You can even go a little higher.

9         Oh, no, the other way.

10        THE COURT:  He wants to see the bottom of the page.

11        THE WITNESS:  Thank you.  That's already the bottom.

12   Okay.  I see this on a long screen when I look at it, so I

13   didn't realize where the bottom was.

14        So 7.2 I say Selected Files and Associated Metadata.

15        So what I was doing here is I want to give a sense of

16   what I'm looking at.  So now we're going into the weeds.

17        Okay.  So the previous section, big picture, here I

18   want to show you some examples.

19        So 7.2.1 it says the selected files show some

20   standard System files I found.

21        So if we look here, we see it came from the hard

22   drive from the Nextbook and we see that, for example, this is

23   the LiveWallpaper app class file for android.

24        MR. KOEHLER:  Your Honor, this is a repeat of what

25   the witness said on direct.

CR15-00707-PHX-SRB    JURY TRIAL-DAY #12    3-4-16

```
 1              THE COURT:  If that's an objection --
 2              MR. KOEHLER:  It is.
 3              THE COURT:  It's overruled.  You may continue with
 4    explaining the difference between 7.1 and 7.2.
 5              THE WITNESS:  Okay.  And so what I'm showing here
 6    now -- so this is a System file, it's a standard System file
 7    you'll find on any of these types of devices.
 8              And this is the date that I circled up here.  This is
 9    the March 5th date.
10    BY MS. PLOMIN:
11    Q   Okay.  So during this period in March of 2015 -- do you
12    actually have your report in front of you as well?
13    A   Yes.
14    Q   Now, during this period of March of 2015, does it indicate
15    to you that that's when the device was at the manufacturer?
16    A   No.
17    Q   Okay.  What does it indicate to you?
18    A   It just tells me the date of the System files that were
19    installed on the system.
20    Q   And those are the basic System files that are installed on
21    a computer when it's first kind of formatted?
22    A   Yes.  These systems oftentimes have a built-in restore
23    capability.  So if there is a problem and the user wants to
24    get it back to restore, there's a technical support issue, you
25    can hold in a pin or perform some procedure and reset the
```

```
1    device and it usually copies back over the original System
2    files.
3              So at this point I don't know the history of the
4    device, so.
5    Q   Okay.  So the first time -- let's move down to the next
6    activity you saw on the computer was in May; May 22nd?
7    A   Correct.
8    Q   So you saw no other activity between March and May?
9    A   Correct.
10   Q   All right.  And starting May 22nd, are you confident that
11   that's the first activity that you saw on the Nextbook
12   computer?
13   A   Well, this is it.  This is what I was relying on.  These
14   and then those -- the detailed files when I inspected them.
15   And I showed you one and we have some others.
16             MS. PLOMIN:  I don't have any further questions.
17   Thank you.
18             THE COURT:  May this witness be excused?
19             MS. PLOMIN:  Yes.
20             THE COURT:  Is there any objection?
21             MR. KOEHLER:  No, Your Honor.
22             THE COURT:  Thank you, Mr. Dworkin.  You may step
23   down and you are excused as a witness.
24             Take your papers and make sure you don't take any of
25   ours.
```

```
 1              THE WITNESS:  I have no exhibits.

 2              THE COURT:  Okay.  Thank you.

 3         The defendant may call his next witness.

 4              MR. MAYNARD:  Defense calls Nathaniel Soofi.

 5              THE COURT:  Nathaniel, see this lady standing up?  If

 6    you would come up and stand right in front of her and she is

 7    going to ask you to swear to tell the truth.

 8              THE CLERK:  Can you please raise your right hand.

 9         (Witness duly sworn)

10              THE CLERK:  Please state your name for the record.

11              THE WITNESS:  My name is Nathaniel Soofi.

12              THE COURT:  If you would walk over here and go around

13    the side and up the steps and sit in this chair.

14         You may proceed, Mr. Maynard.

15              MR. MAYNARD:  Thank you, Your Honor.

16                   NATHANIEL SOOFI, WITNESS, SWORN

17                        DIRECT EXAMINATION

18    BY MR. MAYNARD:

19    Q    Nathaniel, you're going to need to talk into the

20    microphone when I ask you questions.  Okay?

21    A    Okay.

22    Q    Do you want to pull it a little closer to you or is that

23    pretty good?  All right.

24         Would you tell the jury what your name is.

25    A    Where is the jury?
```

1    THE COURT:  That's the jury right there.  Those

2    ladies and gentlemen that are waving at you.

3    THE WITNESS:  Oh.  Okay.

4    BY MR. MAYNARD:

5    Q   Can you tell them your name?

6    A   All right.  My name is Nathaniel Soofi.

7    Q   And how old are you?

8    A   I'm nine years old.

9    Q   And where do you go to school?

10   A   Canyon Ridge.

11   Q   And what grade are you in?

12   A   Fourth.

13   Q   Okay.  Do you have any particular subjects that are your

14   favorites?

15   A   My favorite subject is math.

16   Q   Do you play any sports?

17   A   I play basketball and soccer.

18   Q   Which one is your favorite?

19   A   Soccer.

20   Q   Are you pretty good?

21   A   Yeah.

22   Q   Okay.  Now, I'm going to ask you a few questions and I'm

23   going to show you a couple of pictures.

24       Your Honor, can I approach the Clerk and get some

25   exhibits to put on the overhead?

```
 1                THE COURT:  Yes.
 2                MR. MAYNARD:  Can I have 393, 394?
 3   BY MR. MAYNARD:
 4   Q    Nathaniel, I'm going to put a picture up here.  Have you
 5   ever seen that apartment before?
 6   A    Yes.
 7   Q    And can you tell the jury who lived in that apartment?
 8   A    Me, my dad, he had a roommate named Ibrahim, and then my
 9   uncle.
10   Q    And what was your uncle's name?
11   A    Ali.
12   Q    Okay.  And how often would you come over and stay with
13   your dad in this apartment?
14   A    I think like two days a week.
15   Q    Was it normally on the weekends, like Saturday and Sunday?
16   A    Yeah.
17   Q    Okay.  And when you stayed there, how many bedrooms were
18   in this apartment?
19   A    There was one bedroom.
20   Q    And who stayed in the bedroom?
21   A    Me and my dad.
22   Q    Okay.  Well, where would your uncle Ali sleep?
23   A    He would sleep on the couch.
24   Q    And do you see the couch in this picture?
25   A    Yes.
```

1    Q    Okay.  And was the couch sort of an L-shaped couch?

2    A    Yeah.  It was an L-shaped.

3    Q    Okay.  And you said that there was another man, a

4    roommate, his name was Ibrahim?

5    A    Yes.

6    Q    Okay.  Would he -- where would he sleep?

7    A    He would sleep on the other part of the L-section couch.

8    Q    Okay.  Okay.  So your uncle would sleep on one part and

9    Ibrahim would sleep on the other?

10   A    Yes.

11   Q    Do you know this man that's sitting over here in the blue

12   shirt?

13        Stand up.

14   A    Yes, but I forgot his name.

15   Q    Okay.  Did he ever come over and spend the night with you

16   and your dad and your uncle and Mr. Simpson or Ibrahim?

17   A    No, not that I remember of.

18   Q    You don't ever remember seeing him spend the night there.

19        No?

20   A    No.

21   Q    Did he ever come over to the house?

22   A    Yeah.

23   Q    Okay.  How often do you remember him coming?

24   A    Not that often.

25   Q    Okay.  Did you ever go to his house?

UNITED STATES DISTRICT COURT

1    A    No.

2    Q    Do you remember whether or not he ever cut your hair?

3    A    No.

4    Q    No?  Don't remember?  Okay.

5         THE COURT:  Well, let me ask.

6         Do you remember?  Or are you sure he never did?

7         THE WITNESS:  Yeah.

8         THE COURT:  Did he ever cut your hair?

9         THE WITNESS:  No.

10        MR. MAYNARD:  No.  Okay.

11   BY MR. MAYNARD:

12   Q    And you don't think you ever went to his house then?

13   A    No.

14   Q    Okay.  Now, your -- you would go sometimes on the week or

15   you would go -- was it almost every weekend to your dad's

16   house?

17   A    Yeah.

18   Q    Did you and your dad ever go out shooting guns?

19   A    Yeah.

20   Q    How often would you do that?

21   A    I only did it twice.

22   Q    Okay.  Did this man over here, do you know him as Abdul

23   Kareem or Malik?  Does that ring a bell?

24   A    Yeah, sort of.

25   Q    You just didn't see him very often, huh?

1    A    Yeah.

2    Q    Okay.  Did he ever go shooting with you and your dad?

3    A    No.

4    Q    Who, if anybody, went shooting with you and your dad?

5    A    Ali.  And then once was with my grandpa.

6    Q    Your grandpa.  Did you go shooting with your grandpa in

7    Kansas?

8    A    Yeah.

9    Q    Did you go see your grandpa sometime around the new year

10   this past year?

11   A    Yeah.

12   Q    About a year ago?

13   A    Yeah.

14   Q    Okay.  Did you ever -- did your dad ever tell you that --

15   about a contest where they were going to draw pictures of the

16   Prophet Muhammad?

17   A    Yes.

18   Q    And what did he tell you about that?

19   A    That they were going to draw pictures of the Prophet

20   Muhammad and like they were doing it to like make fun of his

21   religion.

22   Q    Okay.  Do you remember anything else your dad told you

23   about that?

24   A    Well, I remember he said like it was in Texas.

25   Q    Did he tell you if he thought that that was a bad thing or

CR15-00707-PHX-SRB    JURY TRIAL-DAY #12    3-4-16

1    a good thing?

2    A    Yeah.  He said it was a bad thing.

3    Q    Did he tell you whether or not he was going to try to do

4    something about it?

5    A    Yeah.  He told me that he was going to do something.

6    Q    What did your dad tell you he was going to do about this

7    drawing contest?

8    A    He said he was going to go there.  He was going to go to

9    Texas and go there and then he was going to go in the building

10   and start shooting.

11   Q    And was anybody around when he told you this?

12   A    No.

13   Q    Did he ever discuss going to Texas when Ibrahim was

14   around?

15   A    No.

16   Q    Okay.  Did your dad have some guns?

17   A    Yes.

18   Q    And do you know how many guns your dad had?

19   A    He had two guns.

20   Q    What kind of guns do you remember your dad had?

21   A    He had an assault rifle and a pistol.

22   Q    Do you remember whether or not he had a gun that had a

23   collapsable stock that sort of folded under?

24   A    Yeah.

25   Q    So did he have three guns or two?

1    A    Actually, yeah, he had three.

2    Q    Okay.  Do you know where your dad bought his assault

3    rifle?

4    A    No.

5    Q    Do you have any remembrance of when he bought the assault

6    rifle?

7    A    No.  I don't remember when he bought it.

8    Q    Other than your Uncle Ali and Ibrahim and you and your

9    dad, did anyone else ever spend the night in that apartment?

10   A    No.

11   Q    So just the four of you?

12   A    Yeah.

13   Q    Okay.  Did -- excuse me.

14        Did your dad ever show you any videos of people

15   getting killed?

16   A    Yes.

17   Q    How many times did he do that?

18   A    About like five, six times.

19   Q    Okay.  Well, was there ever anybody else there when he

20   showed you those?

21   A    No.

22   Q    Okay.  When you were there on the weekends, were those

23   videos playing all the time or did your dad just show them to

24   you, just the two of you?

25   A    Just with the two of us.

1   Q    Okay.  What did you -- I mean on the weekends when you

2   would go see your dad, what else did you do?  Did you ever

3   play soccer with him?

4   A    Yeah.  I played soccer with him.

5   Q    Did you guys just hang out?

6   A    Yeah.

7            MR. MAYNARD:  Okay.  Just a second, Judge.

8   BY MR. MAYNARD:

9   Q    You told me just a minute ago your dad told you about what

10  he was planning to do in Texas.  Okay?

11  A    Yes.

12  Q    Did Ibrahim ever tell you that he was planning to go also?

13  A    Yeah.

14  Q    Okay.  Can you tell us what Ibrahim told you?

15  A    Well, my dad told me that he was going to go and, yeah.

16  Q    Okay.  Did your dad tell you anybody else was going to go

17  or was it just the two of them?

18           MR. KOEHLER:  I'm going to object to the form of the

19  question.

20           THE COURT:  What's wrong with the form?

21           MR. KOEHLER:  It's compound, number one; number two,

22  it should be limited to the first part of that question.

23           THE COURT:  Okay.  It was compound.

24           Rephrase the question, Mr. Maynard.

25  BY MR. MAYNARD:

1   Q    Did your dad tell you Ibrahim was going too?

2            MR. KOEHLER:  Objection.  Asked and answered.

3            THE COURT:  Overruled.  You may answer.

4            THE WITNESS:  Yeah.

5   BY MR. MAYNARD:

6   Q    Did Ibrahim ever tell you he was going?

7   A    No.

8   Q    Okay.  Do you see the people that are sitting at this

9   table?

10  A    Yes.

11  Q    Okay.  Have you ever seen them before?

12  A    Yeah.

13  Q    Did you go to their office two or three weeks ago and talk

14  to them?

15  A    Yeah.

16  Q    Did you tell them the same thing that you've told us

17  today?

18  A    Yes.

19           MR. MAYNARD:  Okay.  I don't have any further

20  questions.

21           THE COURT:  Thank you.

22           Ms. Brook or Mr. Koehler?

23                      **CROSS EXAMINATION**

24  BY MR. KOEHLER:

25  Q    Good afternoon.

```
 1    A    Good afternoon.

 2    Q    You mentioned a few minutes ago that you stayed with your

 3    dad on weekends; is that right?

 4    A    Yeah.

 5    Q    Saturday and Sunday?

 6    A    Yeah.

 7    Q    So you stayed overnight on Saturday?

 8    A    Yeah.

 9    Q    And that was the only night you stayed over?

10    A    Uh-huh.

11    Q    When you said that --

12             THE COURT:  Is that "yes"?  You said "uh-huh."  Did

13    you mean "yes"?

14             THE WITNESS:  Uh-huh.

15             THE COURT:  It's a "yes."

16    BY MR. KOEHLER:

17    Q    Just a few minutes ago you mentioned that your dad told

18    you about this contest in February.

19             Do you remember the approximate timing of when your

20    dad told you about the contest?

21             THE COURT:  I'm confused because there was no

22    discussion of February.

23    BY MR. KOEHLER:

24    Q    You mentioned that your dad told you about the contest

25    coming up in May in Texas.
```

1            Do you remember approximately what month it was when

2    your dad told you about that contest coming up?

3    A   Like, yeah, it was like late February.

4    Q   And how did you know that it was late February?

5    A   Because it was like kind of like warming up from the

6    winter.

7    Q   Was it still cold out?

8    A   A little bit.

9    Q   Before he talked to you about this contest in Texas, did

10   your dad tell you about another plan to do something to people

11   who were not of his religion?

12   A   Yeah.

13   Q   And was one of those things he told you about going to

14   shoot up a military recruiting station?

15   A   Yeah.

16   Q   Did your dad also talk to you about driving past an Air

17   Force base?

18   A   Yeah.

19   Q   And wanting to run over people there with his car?

20   A   Yeah.

21   Q   Did your dad tell you that he learned about that Texas

22   contest on the Internet?

23   A   Yes.

24   Q   Did he tell you not to tell anything about -- did he tell

25   you not to tell anyone else about this contest?

```
 1    A    Yes.

 2    Q    So was it a secret?

 3    A    Yes.

 4    Q    You didn't tell your mom; is that right?

 5    A    Yes.

 6    Q    Did you overhear your dad and Ibrahim talk about it on

 7    those Saturday nights or Saturday and Sunday days when you

 8    were at the apartment?

 9    A    Yeah.

10    Q    Was one of the videos that your dad showed you a video

11    showing people being walked along a beach next to the ocean?

12    A    Yes.

13    Q    Were there people in orange jumpsuits in the video?

14    A    I'm pretty sure, yeah.

15    Q    And did you see those people have their throats cut?

16    A    Yes.

17    Q    Did your dad ever tell you why he was showing you these

18    kinds of videos?

19    A    Yeah.

20    Q    What did he tell you was the reason for showing those to

21    you?

22    A    Like he said, like he -- like another one of his plans was

23    like traveling by plane, like -- and going to join like the

24    Muslim Army and like that might be one of the things he would

25    do -- or I mean he does.
```

1   Q   So he told you he wanted to travel by air to go back to

2   the Middle East?

3   A   Yeah.

4   Q   Did he tell you what country he was going to go to?

5   A   No.

6   Q   But he told you he was going to join the Muslim Army?

7   A   Yes.

8   Q   And do the same kinds of things you were seeing in that

9   video?

10  A   Yeah.

11  Q   Did your dad use gloves when he handled the guns inside

12  the house?

13  A   Yes.

14  Q   Did he use them not to leave fingerprints on the guns and

15  on the bullets?

16  A   Yes.

17  Q   When your dad talked about things like this, would he

18  leave his phone in the other room?

19  A   Yes.

20  Q   Did he tell you why he would leave his phone in the other

21  room?

22  A   Yeah.

23  Q   Why?

24  A   He says because like there's like this new technology or

25  something like that put in the phone.  And like they could --

 1    these people could listen to you, like in what you're saying.

 2              MR. KOEHLER:  May I have a moment, Your Honor.

 3              THE COURT:  Yes.

 4    BY MR. KOEHLER:

 5    Q    I'm not sure your answer to the last question about

 6    leaving the phone in the other room was audible.  Could you

 7    please repeat your answer about that?

 8              THE COURT:  I'll read what he said.

 9              MR. KOEHLER:  Okay.  That would be fine.

10              THE COURT:  "He says because like there's like this

11    new technology or something like that put in the phone.  And

12    like they could -- these people could listen to you, like in

13    what you're saying."

14    BY MR. KOEHLER:

15    Q    So from that was your dad worried about people overhearing

16    him talk about this kind of thing?

17    A    Yeah.

18              MR. KOEHLER:  No further questions.

19              THE COURT:  Mr. Maynard, any further questions?

20              MR. MAYNARD:  No, ma'am.

21              THE COURT:  Nathaniel, thank you very much.  You may

22    step down and you may be excused.

23              THE WITNESS:  Can I go sit with my mom?

24              THE COURT:  You can go sit with your mom and you can

25    stay if you want, but you and your mom can leave if she wants

```
1    you to do that.
2              Please call your next witness.
3              MR. MAYNARD:  Defense will call Robert Abke.
4         (Witness duly sworn.)
5              THE CLERK:  Please state your name for the record and
6    spell your last name.
7              THE WITNESS:  Robert Abke.  A-B-K-E.
8              THE COURT:  You may proceed, Mr. Maynard.
9                    ROBERT ABKE, WITNESS, SWORN
10                       DIRECT EXAMINATION
11   BY MR. MAYNARD:
12   Q    Hello, Mr. Abke.
13   A    Hello.
14   Q    Could you tell the jury your name, please.
15   A    Robert Abke.
16   Q    And what do you do?
17   A    UPS driver.
18   Q    Mr. Abke, was there a time -- strike that.
19              Did you -- at one point in your life -- sell
20   ammunition on the Internet?
21   A    Yes.  I do have a small business doing that.
22              THE COURT:  Can I ask you to speak a little closer to
23   the microphone?  Thank you.
24              THE WITNESS:  Yes.
25   BY MR. MAYNARD:
```

1    Q    And when was that?

2    A    There's been many times I have sold.

3    Q    Okay.  What was the time period?

4    A    Oh, when I started?

5    Q    Let me ask it this way.

6         Were you selling ammunition at the end of 2014 and

7    the first couple of months of 2015?

8    A    Yes.

9    Q    And was that being done here in Phoenix, Arizona?

10   A    Yes.

11   Q    Okay.  And what kind of ammunition did you sell?

12   A    I sell all kinds.  But I think the one you're talking

13   about was 7.62 by 39.

14   Q    Okay.  Can you explain to the jury what that is?

15   A    It's a rifle round.

16   Q    Okay.  And did you sell to any individuals those rifle

17   rounds of ammunition in January of 2015?

18   A    Yes.  I have sold ammo then.

19   Q    Okay.  I'm going to show you what's been marked as Exhibit

20   431.  Can I place this on the overhead?

21         THE COURT:  Is it in evidence?

22         MR. MAYNARD:  Yes, ma'am.

23         THE COURT:  Yes.

24   BY MR. MAYNARD:

25   Q    Do you recognize this individual?

1    A    It's a possibility, but I can't swear if that was the guy

2    or not.

3    Q    Okay.  At some point did you sell rifle rounds to an

4    individual who looked like this?

5    A    Yes.

6    Q    On how many occasions?

7    A    Once.

8    Q    Okay.  Can you tell us where this took place?

9    A    It took place about I-17 and either Olive or Northern at

10   the O'Connor's Bar.

11   Q    And explain to us what happened.

12          How did you get in contact or how did he get in

13   contact?

14   A    He either texted me or called me.  I think it was a text.

15   And I told him I would meet him after work.  And it was after

16   work and I picked that place because I was probably going to

17   have a beer after work and told him what time I would be

18   there.

19   Q    And did he show up there?

20   A    Yes.

21   Q    Okay.  And what was it that he purchased from you?

22   A    400 rounds of the ammo we were talking about, 7.62 by 39.

23   Q    And for the sake of the jury, what kind of gun would shoot

24   those rounds?

25   A    Usually, SKS, AK.

1  Q    And do you recall that there were three transactions that

2  were involved where this same type of round was sold?

3  A    No.  Two transactions.

4  Q    Do you recall two?

5  A    Yes.

6  Q    Okay.  When was the second one that you recall?

7  A    The second one was I met with -- he had one of his friends

8  meet me.

9  Q    Okay.  Did -- when --

10 A    The third time.

11 Q    -- the person that looked like this showed up, was he by

12 himself?

13 A    The first time, no.  He was in the passenger car in the

14 front seat.

15 Q    And did you get a look at the other person that was in the

16 car?

17 A    No.

18 Q    Okay.  I'm going to show you what's been marked as Exhibit

19 432.  Have you ever seen this individual before?

20 A    He could have been the third time I met -- the second time

21 I sold ammo, the third time I met with this group.

22 Q    Okay.  And when you say the third time you met, was this

23 fellow by himself?

24 A    Yes.

25 Q    And did -- did you sell him anything at that time?

CR15-00707-PHX-SRB    JURY TRIAL-DAY #12    3-4-16

```
 1   A    Just the 400 rounds of 7.62 by 39.

 2   Q    Okay.  So did you sell 400 rounds the first time and then

 3   400 rounds the third time?

 4   A    Yes.

 5   Q    Okay.  How many rounds of ammunition did these two

 6   individuals end up buying from you?

 7   A    That would be 800.

 8   Q    Okay.  And do you believe those were the only two times

 9   you sold them ammunition?

10   A    Yes.

11   Q    Do you see my client?

12   A    Yes.

13   Q    Was he there at either one of these two transactions?

14   A    No.

15        MR. MAYNARD:  I don't have any further questions,

16   Your Honor.

17        THE COURT:  Mr. Koehler, you may cross-examine.

18                      CROSS EXAMINATION

19   BY MR. KOEHLER:

20   Q    Good afternoon, Mr. Abke.

21   A    Hello.  How you doing?

22   Q    What was the price of the 400 rounds of ammunition each

23   time?

24   A    125.

25   Q    And how were you paid each time?
```

UNITED STATES DISTRICT COURT

1    A    Cash.

2    Q    The third occasion, you looked at the picture there and

3    said that could have been the person.  Did you give a physical

4    description of the person that you saw on the third occasion

5    to the FBI?

6    A    Yes.

7    Q    What was the physical description you gave?

8    A    He was kind of a hefty guy and kind of walked with like

9    a -- I don't know, just kind of a stomp, I guess.

10    Q    Okay.  Did you give a description of his ethnicity?

11    A    Yes.  I said Mexican.

12    Q    Okay.  And what kind of vehicle was he driving?

13    A    A white, I think, Chevy truck, single cab.

14    Q    On the second occasion, what kind of car showed up?

15    A    The second occasion wasn't -- it was -- it wasn't that

16    guy.  It was, I think, the first guy.  That was like a

17    brownish Cadillac, four-door Cadillac.

18    Q    Okay.  And then the first time, what kind of car did they

19    show up in?

20    A    That was, I would say, kind of mid 80s, white Monte

21    Carlo-ish, you know, Buick Regal, that kind of style.

22    Q    The two-door coupe kind of car made by Chevy and Buick?

23    A    Yes.

24    Q    And on that middle occasion what did you sell?

25    A    I sold some magazines.

```
1    Q    Do you remember what that purchase price of that was?

2    A    Fifteen for the one brand and I think ten for the other

3    brand.

4    Q    So how much total, do you recall?

5    A    Oh, I don't remember.  Three or four mags --

6    Q    I'm sorry?

7    A    I don't remember.

8    Q    Okay.  These were all cash transactions; is that correct?

9    A    Yes.

10             MR. KOEHLER:  No further questions.

11             THE COURT:  Anything on redirect?

12             MR. MAYNARD:  No questions, Your Honor.

13             THE COURT:  May Mr. Abke be excused?

14             MR. MAYNARD:  Yes, ma'am.

15             THE COURT:  Any objection?

16             MR. KOEHLER:  No, Your Honor.

17             THE COURT:  Thank you, Mr. Abke.  You may step down

18    and you are excused as a witness.

19             THE WITNESS:  So I can just go out?

20             THE COURT:  Pardon?  Yes.  Go right back out and

21    you're released from your subpoena.

22             THE WITNESS:  Thank you.

23             MR. MAYNARD:  Judge, we are out of witnesses for the

24    day.

25             THE COURT:  Oh, I thought you had three.
```

1          MR. MAYNARD:  I released one.  It wasn't necessary.

2          THE COURT:  Oh, okay.  Once again, unless a juror

3    objects, we can excuse you until next Tuesday.

4          I did want to give you an update on where we are in

5    the case.  It looks like we will finish all of the testimony

6    probably next Wednesday, and hopefully, we will be ready to

7    have closing arguments before the end of next week and at

8    least the beginning of your deliberations.

9          So I will excuse you until Tuesday morning at

10   9:00 a.m.

11         I want to remind you, again, of the admonition not to

12   discuss the case among yourselves or with anyone else.

13         Please do not form any conclusions about the case

14   until you have heard all the evidence and begun your

15   deliberations.

16         Please remember the limitations on what you can tell

17   people.  You are hitting the home stretch.  The case is

18   scheduled to last for two more weeks and you can't tell them

19   anything else about the case until the trial is over.

20         Also, when you're on your computers and you're

21   getting ready to do a Google search, make sure it has nothing

22   to do with anything you have heard about this case.  Don't

23   visit any websites that you may have seen in this case.  Don't

24   do any research or investigation about the case on your own or

25   any terms, words, phrases, pictures, anything.  Don't go out

CR15-00707-PHX-SRB    JURY TRIAL-DAY #12  3-4-16

1   and try to look at guns at a gun shop that might be like the

2   guns in this case.  Don't do anything.

3        You have been very good about asking me questions

4   about anything you wanted to know.  Please continue to do that

5   rather than try to find out answers outside of this courtroom.

6        So I'm going to excuse the jury.  We're going to take

7   a break for 15 minutes.  And then I'm going to come back and

8   talk to the lawyers about some other things that we need to

9   discuss.

10        Court is in recess.

11      (Recess taken at 1:47 p.m.; resumed at 2:05 p.m.)

12      (Open court, no jury present.)

13   **ORAL ARGUMENT ON DEFENSE RULE 29 MOTION**

14        THE COURT:  Thank you.  Please sit down.

15        The record will show the presence of counsel and the

16   defendant.  The jury is not present.

17        Mr. Maynard, yesterday at sidebar after the

18   government rested, you made a Motion for Judgment of

19   Acquittal.  I took it under advisement.  And at this time I'm

20   giving you the opportunity to make an argument.

21        And while you didn't specify, do you really have a

22   good-faith basis to make an argument as to Count 4, Felon in

23   Possession of a Firearm?

24        MR. MAYNARD:  No.

25        THE COURT:  Okay.  So I will assume that you're only

UNITED STATES DISTRICT COURT

1    moving on Counts, 1, 2, 3, and 5.

2            MR. MAYNARD:  And, Judge, the only argument I'm --

3    can I approach?  I'm sorry.

4            At this stage, I mean, on Count 3 the evidence -- the

5    only evidence that my client knew anything about this Muhammad

6    Art Contest that was going on in Garland, Texas, on or about

7    May 3rd, or that he knew that they were going to Garland,

8    Texas, comes from, I guess, three individuals; Mr. Verdugo,

9    the -- and the two boys that lived across the street.

10           They certainly testified about something.  One of

11   them thought it was an Osama bin Laden Drawing Contest.  The

12   other one, he didn't specifically say Muhammad Drawing

13   Contest, but they clearly said that the time that they learned

14   about these things is completely inconsistent with when the

15   contest was announced.  They both said that it occurred before

16   Christmas is when they heard these conversations take place.

17           I don't believe that the jury -- or that you could

18   allow a jury --

19           THE COURT:  Well, hold on.  I just want to clarify.

20           With respect to Count 3, you are only asking --

21   you're not asking for a verdict of acquittal as to Count 3.

22           At the moment you're just asking that I eliminate

23   from the jury's consideration certain of the five alleged

24   false statements.  Is that what you're saying?

25           MR. MAYNARD:  That's what I'm debating.

UNITED STATES DISTRICT COURT

1    THE COURT:  Mr. Koehler?

2    MR. KOEHLER:  Your Honor, I do want to inform you

3  that before you came into the courtroom I alerted Mr. Maynard

4  to the fact that the government will withdraw one of the five

5  alleged false statements; and it is the one about Simpson and

6  Soofi asking the defendant to participate in an attack.

7    THE COURT:  Okay.

8    MR. KOEHLER:  We did not present any evidence of that

9  particular statement.

10    THE COURT:  Okay.  That's No. 3.

11    MR. KOEHLER:  Correct.

12    I should say we didn't present any evidence to

13  contradict that statement.  Certainly, he made the statement

14  during the interview, but we didn't present any evidence

15  showing somebody saying that he was asked.

16    THE COURT:  Okay.  But am I accurate then that you're

17  only -- you're not suggesting that there isn't sufficient

18  evidence with respect to 1 and 2, the alleged false

19  statements?

20    MR. MAYNARD:  Not for the sake of a Rule 29 motion.

21    THE COURT:  Okay.  But only with respect to 4 and 5?

22    MR. MAYNARD:  Yes.  And I will stand on my argument

23  at this point.

24    THE COURT:  So this is just asking me to eliminate 4

25  and 5, so I'm not going to ask the government to address 1 and

1   2 because it's conceded that there is sufficient evidence that

2   he made the statements and there is sufficient evidence that

3   the statements were false for submission to the jury.

4         So we don't need to talk about 1 and 2, only 4 and 5,

5   that Mr. Kareem did not know in advance that Simpson and Soofi

6   planned to conduct the attack in Garland and that he did not

7   know about the event that was to take place on May 3rd until

8   after Simpson and Soofi were killed.

9         MR. KOEHLER:  Your Honor, the defense is asking you

10  to make a credibility determination with respect to the three

11  witnesses who testified about the fact that the defendant knew

12  about this contest and knew that Simpson and Soofi were going

13  to attack this contest.

14        In fact, they also testified -- at least Verdugo

15  did -- that at some points he was planning on being part of

16  that.

17        The fact that Mr. Maynard was able to get them

18  confused about timing of events does not mean that there's --

19  that their testimony is insufficient to support the charge

20  when viewed in the light most favorable to the government.

21        We know from the other evidence in the case that the

22  contest was announced on February 11 of 2015.  We know simply

23  from common sense that kids aren't particularly great with

24  time.  So that's not that surprising that these two juveniles

25  would have some confusion about what was going to be drawn,

1    when they heard about it, and that kind of information.

2         It couldn't have happened earlier than that.  But you

3    have witnesses who come from completely different angles who

4    don't spend time together talking about the same kinds of

5    things; that there was going to be this contest, that there

6    was anger about this contest, that there was going to be --

7    that they wanted to do something about this contest.  The

8    witnesses were completely unequivocal about those things.

9         Because of that, under Rule 29, viewing the evidence

10   in the light most favorable to the government, at this time

11   ruling those two portions of Count 3 out is inappropriate.

12        THE COURT:  Thank you.

13        Mr. Maynard, did you want to say anything else on

14   Count 3 or about Counts 1, 2, and 5?

15        MR. MAYNARD:  No.

16        THE COURT:  It's ordered denying the Motion for

17   Judgment of Acquittal.

18        The defense has failed to point out why there is not

19   sufficient evidence to justify the submission to the jury of

20   Counts 1, 2 and 5.  The defense concedes that there is

21   sufficient evidence to submit Count 4 to the jury and that

22   there is sufficient evidence to submit at least statements 1

23   and 2 in Count 3 to the jury.

24        The Court finds that the discrepancies in the

25   witnesses' testimony with respect to the fourth and fifth

1    alleged false statement is a matter to be decided by the jury

2    but it is certainly sufficient evidence to submit those

3    statements as well.

4         Is there anything else that we need to talk about

5    before I see you at nine o'clock on Tuesday?

6         MR. MAYNARD:  I think the only -- Judge, from my

7    standpoint, the only question that I have, assuming -- we are,

8    I believe, going to wrap this up on either Tuesday or

9    Wednesday.

10        THE COURT:  Yes.

11        MR. MAYNARD:  I guess I would sort of like to get a

12   sense.  Will the Court, depending on when we wrap up, how long

13   are you anticipating letting us have for closing argument?

14        I'm not looking for half a day.  I'm just --

15        THE COURT:  How much time do you think you want to

16   spend in closing argument?

17        MR. MAYNARD:  An hour.

18        THE COURT:  That's fine.

19        MR. MAYNARD:  Something of that nature.  Yes.

20        THE COURT:  Is the government anticipating something

21   substantially in excess of that?

22        MR. KOEHLER:  I don't think so, Your Honor.  It might

23   take an hour-and-a-half to walk through everything that we

24   have.  This is a case that has lasted three weeks now and 550

25   some exhibits.

 1          So it will take some time to walk through everything
 2  and tie it all together.  But I don't see it going past an
 3  hour-and-a-half.  If it does, it won't be by much.
 4          THE COURT:  Okay.  What I need for you to do is the
 5  next time we have time, to be prepared to discuss the
 6  instructions.  So if we have a gap like this on Tuesday, we
 7  will pull out the instructions and talk about them then.
 8          MR. MAYNARD:  I clearly don't anticipate any more
 9  gaps.  I apologize.  We have two witnesses that are Muslim and
10  today was -- we just couldn't bring them in.  And then
11  Dr. Sageman comes in -- he will be in on Sunday night, so I
12  don't anticipate a gap.
13          THE COURT:  What I am hoping our timing is is that
14  the entire case is -- all of the evidence closes sometime
15  relatively early on Wednesday and that we can then resolve the
16  instructions -- have the jury come back for instructions and
17  closing argument on Thursday.
18          But if we finish early on Tuesday, we will start
19  talking about the instructions, because it will take a little
20  bit of time to get them in a final form.
21          MR. KOEHLER:  Would that mean closings on Wednesday
22  or still closings on Thursday?
23          THE COURT:  Let's just plan on Thursday.
24          MR. KOEHLER:  Okay.
25          THE COURT:  I don't want to, you know, be rushing to

1  get things collated and put together because somehow everybody

2  rested on Tuesday and we haven't talked about the instructions

3  yet.  So let's just plan on Thursday.

4         MR. KOEHLER:  Thank you.  And, of course, we have to

5  work in rebuttal as well, but that will be short.

6         THE COURT:  Right.  So the last thing that I want you

7  to do is I'm leaving and I want you and -- I want both the

8  government and defense to spend a few minutes with Maureen so

9  that she's got a better comfort level that we've got the

10  exhibits that are not the physical exhibits in good shape to

11  be ready to provide to the jury on our computer.

12         I think it's absolutely essential in this case for

13  ease of the jury reviewing all of those photographs to have it

14  that way and not have to pass dozens and dozens of things

15  around the room so that it's impossible for them to be talking

16  about something that's important to them without having the

17  chance to all see it at the same time.  Okay.

18         I will see you on Tuesday morning at 9:00 a.m.

19         Court is in recess.

20      (Proceedings adjourned at 2:17 p.m.)

21                          * * *

22

23

24

25

```
 1
 2                   C E R T I F I C A T E
 3
 4         I, ELIZABETH A. LEMKE, do hereby certify that I am
 5   duly appointed and qualified to act as Official Court Reporter
 6   for the United States District Court for the District of
 7   Arizona.
 8         I FURTHER CERTIFY that the foregoing pages constitute
 9   a full, true, and accurate transcript of all of that portion
10   of the proceedings contained herein, had in the above-entitled
11   cause on the date specified therein, and that said transcript
12   was prepared under my direction and control.
13         DATED at Phoenix, Arizona, this 1st day of August,
14   2016.
15
16
17
18
19                         s/Elizabeth A. Lemke
                           ELIZABETH A. LEMKE, RDR, CRR, CPE
20
21
22
23
24
25
```

UNITED STATES DISTRICT COURT