JOHN S. LEONARDO
United States Attorney
District of Arizona

KRISTEN BROOK
Arizona State Bar No. 023121
JOSEPH E. KOEHLER
Arizona State Bar No. 013288
Assistant U.S. Attorneys
Two Renaissance Square
40 N. Central Ave., Suite 1200
Phoenix, Arizona 85004
Telephone:  602-514-7500
Email: kristen.brook@usdoj.gov
Email: joe.koehler@usdoj.gov
Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| United States of America, | No. CR-15-00707-01-PHX-SRB |
|---|---|
| Plaintiff, | |
| v. | **UNITED STATES' SENTENCING MEMORANDUM** |
| Abdul Malik Abdul Kareem, | |
| Defendant. | |

**SENTENCING MEMORADUM**

The United States of America respectfully submits this memorandum to assist the Court at sentencing.  For the reasons set forth below, the Court should accept the recommendation in the presentence report (PSR) and impose a sentence of life imprisonment.

**FACTUAL AND PROCEDURAL BACKGROUND**

On March 17, 2016, the jury found Kareem guilty on 5 counts related to his involvement in an evolving plan to conduct an attack in the United States in support of the

Islamic State in the Levant (ISIL),[1] a designated foreign terrorist organization. The evidence at trial showed that Kareem partnered with Elton Simpson (Simpson) and Nadir Soofi (Soofi) to provide material support to ISIL by conducting attacks in the United States. The Garland attack was the culmination of the conspiracy, although Kareem, Simpson, and Soofi considered other targets along the way – including U.S. military service members, U.S. military bases, U.S. military recruitment centers, and a public mall.

The evidence at trial showed that Kareem's role in the conspiracy included assisting the other two men with firearms training, providing money to purchase weapons and ammunition which were used in the attack, instruction on how to care for and maintain their weapons, taking Simpson and Soofi shooting in the desert, hosting Simpson and Soofi in his home, and providing a meeting location to plan the attack.

The evidence also showed that Kareem supported ISIL and knew Simpson and Soofi supported ISIL. Among other things, he admittedly watched ISIL beheading videos and the video of a Jordanian pilot being burned alive, while in Simpson's company, and also talked to Simpson about ISIL. Multiple witnesses also testified they witnessed Kareem, Simpson and Soofi celebrate and cheer the attackers who murdered 11 people on January 11, 2015, inside the offices of the French satirical magazine Charlie Hebdo, after the magazine published cartoons of the Prophet Muhammad.[2]

On May 3, 2015, at approximately 6:51 p.m., Simpson and Soofi, armed in part with weapons and ammunition purchased with Kareem's assistance, arrived at the American Freedom Defense Initiative's Draw Muhammad Contest in Garland, Texas, with a plan to

---

[1] As noted in the Second Superseding Indictment and the government's trial memorandum, ISIL also is frequently referred to as "ISIS."

[2] Expert testimony at trial from Evan Kohlmann established that "ISIS ha(d) offered monetary rewards and had repeatedly encouraged individuals living in Western countries to assassinate and to murder anyone involved in blaspheming the Prophet Muhammad, including the individuals involved with Charlie Hebdo." (RT 3/1/16 60-61).

commit mass murder to support ISIL.  Simpson and Soofi wore tactical gear and gloves, and Soofi wore a bulletproof vest. At 6:51 p.m. CDT, they sprang from Soofi's black sedan armed with over 1,500 rounds of ammunition and six firearms.  Simpson and Soofi opened fire on a security guard and police officer in the parking lot.  Simpson and Soofi shot Bruce Joiner, a Garland Independent School District security guard, in the lower leg.  Garland Police Department (GPD) officers returned fire and killed Simpson and Soofi in the parking lot before they reached the convention center where the event was underway with approximately 200 people in attendance.

## A.    KEY EVIDENCE AT TRIAL

### 1.    Stefan Verdugo

Stefan Verdugo, a long-time friend, former employee, and former roommate of Kareem's, testified that Kareem told him about the Garland contest before the attack.  (RT 2/19/16 19, 25, 30).   Additionally, Kareem told Verdugo that he planned to attack the contest with Simpson.  (RT 2/19/16 30).   On at least two occasions prior to the attack in Garland, but after the attack on Paris in January 2015, Verdugo, Kareem, Simpson, and Soofi went shooting together in the desert.  (RT 2/19/16 12, 16).   Kareem told Verdugo "that he was a part of ISIS."  (RT 2/19/16 21).  Verdugo testified that Kareem was "like really intense about how he would speak about it (ISIS)." (RT 2/19/16 21).  Verdugo also witnessed Kareem and Simpson watch 'gorish (*sic*) videos' of terrorist attacks.  *Id*. Verdugo testified that Kareem called people who weren't Muslims "Kaffirs," and talked about "wanting to blow Kaffirs up and he would yell 'Allahu Akbar' while he did it.'  (RT 2/19/16 10).  In January or February of 2015, Kareem attempted to purchase bullet proof vests from Verdugo.  (RT 2/19/16 16).   After New Year's 2015, Kareem also asked Verdugo "several times" if Verdugo knew "where to get pipe bombs or how to make pipe bombs."  (RT 2/19/16 11, 25).  Kareem and Simpson together specifically asked Verdugo how to make a pipe bomb that could blow up University of Phoenix Stadium (home of the

Arizona Cardinals NFL team and the site of the Super Bowl in February 2015).  (RT 2/19/16 16, 61-62).

### 2.    Juan (Juvenile)

Juan, a former neighborhood friend of Kareem's who sometimes slept at Kareem's house, testified that he overheard Kareem discuss the Garland drawing contest, prior to the event, at Kareem's apartment on Cochise.  (RT 2/24/16 8, 15-17).  Juan was in the hallway and heard and saw Kareem, Abdul Khabir "AK" Hyman, and Simpson discuss the contest.  (RT 2/24/16 16).  Juan testified that he heard Kareem getting mad at "whoever was doing the drawing contest or whoever was hosting it. . . . I can hear him saying that he just wanted to go over there and just shoot them."  (RT 2/24/16 17).   Juan testified that Kareem "was angry and kind of like in a very low state . . . not too mad." (RT 2/24/16 17).  Juan further testified that he heard Kareem discuss attacking the contest on two other occasions: Kareem "kind of wanted to go over there and just continue talking about shooting people and just making it seem like it's no big deal and that it's his religion that he should be able to defend it."  (RT 2/24/16 22).  Juan also testified that he heard Kareem say, on more than one occasion - prior to the Garland attack, that "he wanted to literally strap himself to a bomb and go inside a mall with innocent people and just blow everything up."  (RT 2/24/16 13).  Juan testified that Kareem said on another occasion, "he just wanted to strap himself to a bomb and go inside a mall and kill people." (RT 2/24/16 15).

### 3.    Carlos (Juvenile)

Carlos, a former neighborhood friend of Kareem's who often slept at Kareem's house, testified that Kareem spoke to him about the Garland contest before it occurred and that Kareem told him about possibly giving Ibrahim (Simpson) an AK47 for protection when he went to the contest.  (RT 2/24/16 14-15).  This conversation occurred at Uncle Sam's restaurant.  (RT 2/24/16 16).  Carlos testified that he converted to Islam at Kareem's insistence because "it was technically a mandatory thing . . . if I wasn't Muslim, I would be considered a Kaffir, you know." (RT 2/24/16 8).  Kareem told Carlos that he would "shoot a Kaffir" if he had to.  (RT 2/24/16 18).  On one occasion, at Kareem's house,

Kareem woke Carlos up and had him watch the video of a Jordanian pilot burned alive by ISIL. (RT 2/24/16 13, 25). Carlos and Kareem watched the pilot as he "was screaming and he was like – he was just in a cage being burned alive." (RT 2/24/16 13, 25). The whole time Kareem was "laughing because he was like obnoxious and loud … continuously laughing." (RT 2/24/16 13).

### 4. **Sergio Martinez-Chavez**

Sergio Martinez-Chavez testified that in early 2015, a few months prior to the attack in Garland, Kareem repeatedly called him and insisted that Martinez take Kareem and Simpson shooting. (RT 2/24/16 7-8, 11). Martinez testified that Kareem arrived at Martinez's home on a Friday in January 2015 with Simpson and Soofi. (RT 2/24/16 7, 10-11, 25). Kareem, Simpson and Soofi prayed together, then Kareem drove Simpson and Soofi to the desert to shoot. (RT 2/24/16 10). Martinez drove in a separate car with his children to the desert. (RT 2/24/16 10-11). Martinez identified three weapons Kareem, Simpson and Soofi fired that day, including the Keltec 9mm Rifle (Trial Exhibit 5), the Elk River Tool & Die AK-74 Rifle (Trial Exhibit 7) and the Romarm Cugir Draco AK-47 pistol (Trial Exhibit 10). (RT 2/24/16 12-14). Trial testimony showed that those three weapons were used by Simpson and Soofi in the attack in Garland.

Martinez further testified that Simpson was "running sideways, back and forth, while shooting" and he noted those movements made him look like a "terrorist." (RT 2/24/16 14-16). Martinez testified that in May 2015, a week after the Garland attack, Kareem arrived at Martinez's home. (RT 2/24/16 17). Martinez testified he was alone with Kareem and "as I was walking past him (Kareem), he brushed up against my shoulder and whispered, 'If questioned, don't say anything about going shooting.'" (RT 2/24/16 17).

### 5. **Ali Soofi**

Ali Soofi (Ali), the brother of Nadir Soofi, testified that he shared a one-bedroom apartment on 19th Avenue with Soofi and Simpson from February 2014 through March 2015. (RT 3/2/16 2-4). Ali testified that during those 13 months Kareem would sleep over at the apartment, "at the start it was … every once in a while … towards the end it was

more often. I would say maybe three times a week or more."  (RT 3/2/16 8).  Kareem was at the home more than any other visitor.  (RT 3/2/16 8-9).  Kareem would discuss his support of ISIL with Simpson and Soofi, and "everything that was being watched and all the literature that was being read and listened to was -- it was more the militant, more ISIS-side of, you know, Islam." (RT 3/2/16 9-11).  Ali further testified that Kareem would talk about ISIS, "on occasion with Ibrahim, the conversations they had with the Twitter account that he had that he would tweet after watching videos of, you know, ISIS members driving around with their flags and guns, usually Ibrahim would tweet something. And then they would both be sitting on the couch and they would discuss, you know, the general idea of, you know, what was going on in the video and the text that was being sent."  (RT 3/2/16 10).

On a couple of occasions, Kareem told Ali "these people (Kaffirs) should be killed." (RT 3/2/16 16).  Ali testified that Kareem looked pleased as he watched an ISIL execution video.   (RT 3/2/16 15).  Ali also testified that Kareem, alongside Simpson and Soofi, watched the news reports of the Charlie Hebdo attacks in January 2015 at the apartment. (RT 3/2/16 21).  Kareem looked "excited" and "pleased" about the attack, that the attackers had "got their message across."   (RT 3/2/16 21-22).

Ali testified that Kareem and Simpson returned to the apartment during the summer of 2014 with a "snubnose" AK, which Ali identified as Exhibit 10 (the Romarm Cugir Draco AK-47 pistol Simpson carried during the Garland attack).  (RT 3/2/16 25-27). Through conversation with his brother, Kareem and Simpson, Ali learned Kareem had supplied the money for the AK-47 pistol.  (RT 3/2/16 26).  In January 2015, Nadir Soofi returned to the apartment with an AK-style rifle, which Ali identified as Exhibit 7 (the Elk River Took & Die AK-74 Rifle Soofi carried during the Garland attack.)  (RT 3/2/16 29). Ali testified, "my brother had told me he had borrowed the money from [Kareem] to buy the rifle."  (RT 3/2/16 29).  Ali testified that Kareem was present during this conversation. (RT 3/2/16 30).    Ali testified that Kareem, Simpson, and Soofi twice went shooting with these weapons.   (RT 3/2/16 32).  Ali testified that Kareem "was like overseeing, almost,

like . . . like a mentor" and taught Simpson and Soofi to disassemble, clean, and reassemble these weapons. (RT 3/2/16 33).

### 6.    Abdul Khabir "AK" Wahid

Abdul Khabir "AK" Wahid testified, as a defense witness, that he learned from Kareem before the attack in Garland that Simpson and Soofi planned to attack a military base. (RT 3/8/16 60). AK further testified that he received Ali Soofi's phone number from Kareem and used it to call Ali Soofi after the attack in Garland. (RT 3/8/16 54, 56). AK testified, "I did tell him don't talk to the FBI." (RT 3/8/16 56). AK also testified that Kareem purchased a gun at night in a parking lot with Simpson. (RT 3/8/16 56-57). AK testified that he was in the car when Kareem purchased this weapon. (RT 3/8/16 57).

## B.    The Presentence Report

Kareem's PSR was prepared on July 15, 2016 with an addendum completed on September 7, 2016. The PSR concludes Kareem's total offense level is 60; however, an offense level of greater than 43 is to be treated as offense level 43. (See PSR ¶¶34- 42. *See also* U.S.S.G. Ch. 5, Pt. A cmt. n.2). With one exception, noted below, the government agrees with the PSR's calculations.

The PSR arrived at this calculation starting with a base level of 43, and applying three separate enhancements. First, under U.S.S.G. §2A1.1(a) and U.S.S.G. §2M5.3(c)(1), because the conspiracy resulted in the death of Simpson and Soofi, which was caused intentionally or knowingly, the base offense level is 43. *Id.*

U.S.S.G. § 2M5.3 applies because Kareem was convicted of the conduct alleged in Count 5 in violation of 18 U.S.C. § 2339B, an enumerated crime in § 2M5.3. Under § 2M5.3 the cross-reference in subsection (c)(1) applies because Kareem "intentionally and knowingly" caused the deaths of Simpson and Soofi for purposes of the felony-murder rule by intentionally conspiring to violate the material-support statute in a context where those deaths were entirely foreseeable, and were even to be expected. Shortly after the announcement of the contest, the conspirators began planning to commit an unlawful killing. They amassed the weapons and ammunition with which to carry out the plan, and

they acted deliberately, with malice and willful premeditation.  Defendant Kareem was a participant in the planning process, taking Simpson and Soofi to train in the desert, instructing them on how to disassemble, clean, lubricate, and reassemble their firearms. Because Simpson's and Soofi's deaths were the natural, foreseeable consequence of their planned actions, the cross-reference to § 2A1.1 applies.

Application Note 2B to § 2A1.1 does not alter the result because it considers a downward departure only if the defendant's reduced mens rea and the context warrant such a departure.  Here, nothing in the way Simpson or Soofi died or Kareem's own conduct provides mitigation for Kareem.  Contrary to Kareem's characterization of the issue, Kareem is not being sentenced "pursuant to 18 USC 1111" in violation of his 6th Amendment rights, but rather under an application of U.S.S.G. §§ 2M5.3 and 2A1.1, which is wholly consistent with the substantive law for federal felony-murder (i.e., a defendant need not intend the death of the victims (so long as they were not killed by unforeseeable accidents) and the victim(s) can be a co-conspirator or fellow perpetrator).  *See United States v. Tham*, 118 F.3d 1501 (11th Cir. 1997); *United States v. Martinez*, 16 F.3d 202, 207 (7th Cir. 1994) (Posner, J.); *United States v. El-Zoubi*, 993 F.3d 442, 449 (5th Cir. 1993).

Next, the PSR applies a 3-level upward adjustment under U.S.S.G. §3A1.1(a), because Kareem, Simpson, and Soofi conspired to select and kill victims based on their religious beliefs, specifically "Kaffirs," non-believers of Islam.  (PSR ¶¶ 38.)  In light of § 280003 of the Violent Crime Control and Law Enforcement Act of 1994, Pub. L. No. 103-322, 108 Stat. 1796 (1994), which requires the finder of fact at trial to determine beyond a reasonable doubt that the defendant had hate crime motivation, the government respectfully submits that application of section U.S.S.G. §3A1.1(a) is not appropriate in this case.

The PSR also applies a 12-level upward adjustment because the offense is a felony that involved providing material support to terrorist organizations, as defined in 18 U.S.C. § 2332b(g)(5), a federal crime of terrorism.  (PSR ¶¶ 39.)   U.S.S.G. § 3A1.4(a) applies because Kareem was convicted of violating 18 U.S.C. § 2339B as alleged in Count 5.

Contrary to Kareem's argument, no impermissible double counting occurs, either in the application of U.S.S.G. § 3A1.4(a) along with § 2M5.3, or in applying both subsections of § 3A1.4. *See United States v. Meskini*, 319 F.3d 88, 92 (2nd Cir. 2003) (finding the language of § 3A1.4 plainly manifests the intent of both Congress and the Sentencing Commission to account for an act of terrorism in calculating both the offense level and the criminal history category); *See also United States v. Hammoud*, 381 F.3d 316, 356 (4th Cir. 2004) (finding no double counting claim when applying both § 2M5.3 and § 3A1.4, as nothing in either § 2M5.3 or in § 3A1.4 prohibits the application of both provisions.) *cert. granted, judgment vacated on other grounds*, 543 U.S. 1097 (2005), *opinion reinstated in part*, 405 F.3d 1034 (4th Cir. 2005).

The trial evidence in this case showed Kareem practiced shooting firearms with Simpson and Soofi; provided money to purchase firearms to Simpson and Soofi; provided ammunition to Simpson and Soofi; taught Simpson and Soofi to clean and maintain their weapons, and hosted Simpson and Soofi at his home where they discussed their multiple potential targets to include the Garland attack. Even apart from Kareem's conviction under § 2339B, such conduct constitutes material support to ISIL, a terrorist organization. U.S.S.G. §3A1.4(a) & cmt. n.1.

Finally, the PSR also applies a 2-level upward adjustment under U.S.S.G. § 3B1.5(1) because Kareem was convicted of a crime of violence and the offense involved the use of body armor. (PSR ¶¶ 40.) Specifically, Soofi used a bulletproof vest during the attack in Garland, Texas. *Id*.

As a result of the foregoing, the government respectfully submits the Total Adjusted Offense Level should be 57, which is reduced to Level 43 pursuant to U.S.S.G. Ch. 5, Pt. A cmt. n.2.

**C.    Sentencing Recommendation**

First, the "nature and circumstances of the offense," the two conspiracies – (1) to provide material support to ISIL by conducting terrorist attacks in the United States; and (2) to transport weapons with intent to commit murder and aggravated assault – were

extremely grave and easily could have resulted in the death of hundreds of civilians and law enforcement officers. Kareem was convicted of facilitating an attempted mass murder. It is difficult to image a more serious offense. The guidelines recommend a life sentence for a defendant like Kareem with an offense level of 43 or above, who falls in Criminal History VI. The PSR recommends a within-guideline sentence of life imprisonment in this case and the United States makes the same recommendation.

Next, the "history and characteristics of the defendant" are also a significant concern and call for a sentence consistent with the guideline calculation – a life sentence. Kareem has five criminal convictions, has repeatedly failed to comply with court orders while on probation, and has a history of disregarding his release conditions. (PSR ¶¶ 57-61.) Kareem also has an acknowledged alcohol problem, mental health issues, carries and possesses weapons despite the fact that he is prohibited from doing so under federal and Arizona law, and was arrested while in possession of a bullet proof vest and two firearms. (PSR ¶¶ 2, 26, 59-60, 84 and 85.)  Kareem's offenses were not a first-time mistake.

Under section 3553(a)(2), the Court also must consider whether the sentence will "reflect the seriousness of the offense," "promote respect for the law," "provide just punishment for the offense," "afford adequate deterrence to criminal conduct," and "protect the public from further crimes of the defendant." In this case, all of these factors weigh heavily in favor of the defendant receiving a life sentence for his crimes. Indeed, this crime was motivated by Kareem's ideological belief system – his purposeful allegiance and commitment to ISIL. Kareem sought to answer ISIL's call to kill non-believers. Kareem, Simpson, and Soofi's plans to launch attacks on other potential targets highlight the risk Kareem poses to the United States if ever released from custody.

Further, § 3553(a)(4)(A)(i) – which requires sentencing courts to consider "the sentencing range . . . set forth in the guidelines" – also supports the recommended approach. Although the guidelines no longer are binding, the Supreme Court has emphasized they still should be utilized as the "starting point and initial benchmark" for sentencing decisions, *Gall v. United States*, 552 U.S. 38, 49 (2007), and deserve "respectful

consideration." *Kimbrough v. United States*, 552 U.S. 85, 101 (2007). Here, because a sentence of life falls "within" the advisory guidelines range – in fact, at a level 43 the defendant is at the maximum end of the guidelines – even though his true guideline calculation is 14 levels higher at a 57, it complies with section 3553(a)(4).

Finally, the court must consider the need to avoid unwarranted sentencing disparities. *See* 18 U.S.C. § 3553(a)(6). The sentence requested by the defendant would constitute a variance well below the bottom of the advisory guideline range. The PSR and the Government are requesting a life sentence for Kareem, as no sentence short of life imprisonment is appropriate.  There are other similar cases in which defendants received sentences of life for similar conduct. In the Eastern District of New York, Russell Defreitas and coconspirator Abdul Kadir were both sentenced to life in prison for conspiring to commit a terrorist attack at John F. Kennedy International Airport in Queens, New York, for plotting to blow up fuel tanks and the fuel pipeline under the airport.  *United States v. Defreitas*, Eastern District of New York, Case No. 07-CR-543 DLI SMG. The Second Circuit upheld both Defreitas' and Kadir's convictions and stated that the "gravity of the crimes for which they were convicted easily justifies the life sentences that were imposed." *United States v. Kadir*, 718 F.3d 115, 126 (2d Cir. 2013).  Kareem Ibrahim, a third defendant, also was convicted of aiding the conspiracy. Ibrahim operated from the country of Trinidad and provided spiritual instruction and operational support to other conspirators. Ibrahim likewise was sentenced to life in prison, which was affirmed on appeal. *United States v. Ibrahim,* 529 F. App'x 59, 65 (2d Cir. 2013).  Similarly, in the District of New Jersey, Eljvir Duka, Mohamad Ibrahim Shnewer, Dritan Duka and Shain Duka were each sentenced to life imprisonment for conspiring to use assault rifles and grenades to attack and kill U.S. soldiers at the United States Army Base at Fort Dix.  *United States v. Duka,* 671 F.3d 329, 333, 335 (3d Cir. 2011).

**D.      Conclusion**

Based on the foregoing, the United States respectfully recommends the Court impose a sentence of life imprisonment on Count 5.  Further, the United States respectfully recommends the Court impose the statutory maximum sentences of five years of imprisonment on Count 1, ten years of imprisonment on Count 2, eight years of imprisonment on Count 3, and ten years of imprisonment on Count 4, to run consecutive to each other and concurrent to the life sentence in Count 5.

Respectfully submitted this 22nd day of September, 2016.

JOHN S. LEONARDO
United States Attorney
District of Arizona

 *s/Kristen Brook*
KRISTEN BROOK
JOSEPH E. KOEHLER
Assistant U.S. Attorneys

CERTIFICATE OF SERVICE

I hereby certify that on the 22nd day of September, 2016, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, and that true and accurate copies have been transmitted electronically to counsel for the defendant via the ECF system.

Daniel Maynard, Attorney for Defendant

By*:  /s Kristen Brook*