```
 1                    UNITED STATES DISTRICT COURT

 2                    FOR THE DISTRICT OF ARIZONA

 3                    _____

 4
     United States of America,    )
 5                                 )    No. CR 15-0707-PHX-SRB
                    Plaintiff,     )
 6                                 )
              vs.                  )    Phoenix, Arizona
 7                                 )    October 15, 2019
     Abdul Malik Abdul Kareem,     )    2:18 p.m.
 8                                 )
                    Defendant.     )
 9   _____)

10

11          BEFORE:  THE HONORABLE SUSAN R. BOLTON, JUDGE

12              REPORTER'S TRANSCRIPT OF PROCEEDINGS

13                (Evidentiary Hearing-Day 1-Excerpt)
                    (Testimony of Stewart Whitson)
14

15

16

17

18

19

20
     Official Court Reporter:
21   Laurie A. Adams, RMR, CRR
     Sandra Day O'Connor U.S. Courthouse, Suite 312
22   401 West Washington Street, Spc 43
     Phoenix, Arizona 85003-2151
23   (602) 322-7256

24   Proceedings Reported by Stenographic Court Reporter
     Transcript Prepared by Computer-Aided Transcription
25
```

```
 1   APPEARANCES:

 2   For the Plaintiff:
             U.S. ATTORNEY'S OFFICE
 3           By:  Joseph E. Koehler, Esq.
             By:  Kristen Brook, Esq.
 4           40 North Central Avenue, Suite 1800
             Phoenix, Arizona 85004
 5
     For the Defendant:
 6           MAYNARD CRONIN ERICKSON CURRAN & REITER, P.L.C.
             By: Daniel D. Maynard, Esq.
 7           3200 North Central Avenue
             Suite 1800
 8           Phoenix, Arizona 85012

 9           DRAKE LAW PLC
             By:  Daniel D. Drake, Esq.
10           4340 East Indian School Road
             Suite 21-113
11           Phoenix, Arizona 85012

12

13                        I N D E X

14
     WITNESS:                 DIRECT    CROSS      REDIRECT  RECROSS
15   STEWART WHITSON
     By Mr. Maynard              3                    56
16   By Ms. Brook                         40

17

18

19

20

21                   INDEX OF EXHIBITS

22   EXHIBIT                                 IDENT      RECEIVED

23                     (None admitted.)

24

25
```

```
 1                  E X C E R P T E D   P R O C E E D I N G S

 2              MR. MAYNARD:  I believe the government would like us

 3     to call Agent Whitson at this time.

 4              THE COURT:  Yes.  Please do.

 5              MR. MAYNARD:  So we'll call Agent Whitson.            02:18PM

 6              THE COURT:  You may take the stand.  You have already

 7     been sworn.

 8              THE WITNESS:  Thank you, Your Honor.

 9              THE COURT:  You may proceed, Mr. Maynard.

10              MR. MAYNARD:  Thank you, Your Honor.                  02:18PM

11                          STEWARD WHITSON,

12     a witness herein, having been first duly sworn by the clerk to

13     speak the truth and nothing but the truth, was examined and

14     testified as follows:

15                          DIRECT EXAMINATION

16     BY MR. MAYNARD:

17     Q.  Would you state your name, please.

18     A.  My name is Stewart Whitson.

19     Q.  And how are you employed?

20     A.  I'm a special agent with the FBI.                         02:19PM

21     Q.  In May of 2015, prior to May 8th, were you involved in the

22     FBI's investigation into Mr. Simpson, Elton Simpson?

23     A.  Prior to May 8th?

24     Q.  Yes.

25     A.  I was not involved in an investigation, no.               02:19PM
```

Q.  Did you -- you recall that prior to May 8th you did an

interview of Abdul Kareem at the FBI headquarters here in

Phoenix, Arizona?

A.  Oh, yes.

Q.  Wasn't that part of the investigation of Mr. Simpson?          02:19PM

A.  Yes.

Q.  Okay.

A.  I'm sorry.  I misunderstood your question.

Q.  You have become the case agent on Abdul Kareem's case on

May 8th of 2015?                                                   02:19PM

A.  Yes.

Q.  Prior to that, you were doing some work with the FBI

concerning the attack that had occurred in Garland, Texas?

A.  Yes.

Q.  And that was under the auspices of a case involving Elton     02:20PM

Simpson?

A.  Yes.

Q.  When did you get involved in that investigation involving

Elton Simpson?

A.  Well, my -- so May 5th.  On or about May 5th I guess would    02:20PM

be my first involvement in the investigation of Elton Simpson.

Q.  You became aware of the attack in Garland, Texas on May 3rd

or 4th?

A.  Yes.

Q.  You were aware that on May 4th there was a search done of     02:20PM

1    Mr. Simpson's apartment here in Phoenix, Arizona?

2    A.  Yes.

3    Q.  Did you do anything in the investigation on that attack on

4    May 4th?

5    A.  Not in the investigation of the attack.                    02:21PM

6    Q.  Did you do anything concerning that attack or Mr. Simpson?

7    A.  As a -- yes.

8    Q.  What is it that you were doing on May 4th?

9    A.  I was a member of the FBI Phoenix SWAT team, and I helped

10   execute a search warrant on Elton Simpson's apartment.        02:21PM

11   Q.  Okay.  So on May 4, you actually went to Elton Simpson's

12   apartment?

13   A.  Yes.

14   Q.  Did you have the opportunity to see a search warrant for

15   Elton Simpson's apartment done that day?                      02:21PM

16   A.  No.

17   Q.  Did you ever see a search warrant for Elton Simpson's

18   apartment?

19   A.  Not that I recall.

20   Q.  How many other agents were involved in that execution of  02:21PM

21   that search warrant besides yourself?

22   A.  Approximately 20 to 25.

23   Q.  Do you remember whether or not there was an individual by

24   the name of Andrew Smith that was involved in that execution?

25   A.  Yes.                                                       02:22PM

| | |
|---|---|
| 1 | Q.  Did you know Andrew Smith? |
| 2 | A.  Yes. |
| 3 | Q.  Had you worked with him at the FBI? |
| 4 | A.  Yes. |
| 5 | Q.  And had you worked with him prior to the execution of the |
| 6 | search warrant on May 4th of 2015? |
| 7 | MS. BROOK:  Object to beyond the scope. |
| 8 | THE COURT:  Overruled.  You may answer. |
| 9 | THE WITNESS:  Yes. |
| 10 | BY MR. MAYNARD: |
| 11 | Q.  Who, if anyone, was it that contacted you and asked you to |
| 12 | be involved in the execution of that search warrant on May 4? |
| 13 | A.  I don't recall. |
| 14 | Q.  Who was in charge of the execution of the search warrant on |
| 15 | May 4? |
| 16 | A.  Could you explain the question? |
| 17 | Q.  Yeah.  Was there somebody at the FBI who was in charge of |
| 18 | the execution of that search warrant?  Was there a case agent? |
| 19 | A.  There was a case agent. |
| 20 | Q.  Who was the case agent? |
| 21 | A.  Andrew Smith. |
| 22 | Q.  Were there any other case agents that were involved in the |
| 23 | Simpson investigation that you were aware of at that time? |
| 24 | A.  No. |
| 25 | Q.  Did you know Amy Fryberger? |

Lines 5, 10, 15: 02:22PM
Line 20, 25: 02:23PM

| | |
|---|---|
| 1 | A.  Yes. |
| 2 | Q.  How did you know her as of May 4th of 2015? |
| 3 | A.  She is a special agent in the FBI Phoenix Field Office. |
| 4 | Q.  Did you know whether she was involved in the investigation |
| 5 | of Elton Simpson? |
| 6 | A.  When? |
| 7 | Q.  As of May -- I'm going to focus just on May 4th of 2015. |
| 8 | A.  On May 4th I did not know she was involved in that |
| 9 | investigation. |
| 10 | Q.  Did you know DeEtta Nolen? |
| 11 | A.  Yes. |
| 12 | Q.  How did you know DeEtta Nolen? |
| 13 | A.  She's a special agent with the FBI. |
| 14 | Q.  And was she involved in the execution of the search warrant |
| 15 | on May 4th? |
| 16 | A.  Not that I'm aware of. |
| 17 | Q.  Did you, prior to being involved in the execution of that |
| 18 | search warrant on May 4th, did you have a meeting with Mr. |
| 19 | Smith to talk about what you were going to be looking for, |
| 20 | Special Agent Smith? |
| 21 | A.  No. |
| 22 | Q.  Were there any meetings that were held by the FBI as of May |
| 23 | 4th to discuss the surveillance that had been done on Mr. |
| 24 | Simpson prior to the Garland attack? |
| 25 | A.  Not that I'm aware of. |

02:23PM

02:23PM

02:24PM

02:24PM

02:24PM

```
 1   Q.  At some point somebody asked you to do an interview the

 2   next day on May 5th of Abdul Kareem, correct?

 3   A.  Yes.

 4   Q.  In doing the investigation on the attack in Garland, did

 5   the special agents get together and meet to divide up the tasks   02:25PM

 6   that they were going to do?

 7   A.  Yes.

 8   Q.  When was the first one that you were involved in?

 9   A.  I'm not sure precisely when the first time.

10   Q.  Would it have been around May 4th, before the execution of   02:25PM

11   the search warrant?

12   A.  No.

13   Q.  It was after that?

14   A.  Yes.

15   Q.  Can you tell me, was it that day or the next day?           02:25PM

16           MS. BROOK:  Objection.  Relevance.

17           THE COURT:  Overruled.  You may answer.

18           THE WITNESS:  It would have been -- the earliest it

19   could have been was on the afternoon or evening of the 4th and

20   maybe not until the 5th.                                        02:26PM

21   BY MR. MAYNARD:

22   Q.  Do you recall what was discussed at that meeting?

23   A.  I don't.

24   Q.  Do you recall whether or not the FBI was interested in

25   looking to see when Simpson and Soofi had left Phoenix,         02:26PM
```

| 1 | Arizona, to go to Garland, Texas? |
|---|---|
| 2 | A.  Could you repeat that question, please, sir. |
| 3 | Q.  Sure.  Do you recall whether or not there were discussions |
| 4 | about trying to determine when Simpson and Soofi would have |
| 5 | left Phoenix, Arizona, to go to Garland, Texas? |

02:26PM

6   A.  Yes.  I recall discussions.

7   Q.  So it was important for people to gather, for the FBI to

8   gather all the information that it could about Simpson's and

9   Soofi's activities prior to May 3rd.  Correct?

10  A.  It would depend.  To a certain extent.

02:26PM

11  Q.  Well, I mean, did you know whether they had flown to

12  Garland, Texas or whether they had driven?

13  A.  When?

14  Q.  As of May 4th when you had this meeting with all the

15  agents?

02:27PM

16  A.  I didn't know.

17  Q.  Okay.  Was it discussed that the car that had been at the

18  attack in Garland, Texas had been Mr. Soofi's car?

19  A.  Are you at the May 4th or 5th?

20  Q.  Yes.

02:27PM

21  A.  I can't recall what was discussed at that meeting.

22  Q.  You don't recall anything about what was discussed at that

23  meeting?

24  A.  Not with -- no.  I would be -- I could guess, but I don't

25  know.

02:27PM

1    Q.  I don't want you to guess.

2            But wouldn't the FBI have wanted to know when Mr.

3    Simpson and Mr. Soofi had last been in Phoenix, Arizona?

4            MS. BROOK:  Objection, Your Honor.  Asked and

5    answered.                                                    02:28PM

6            THE COURT:  Overruled.  You may answer.

7            THE WITNESS:  I think that's fair that the FBI would

8    want to know that.

9    BY MR. MAYNARD:

10   Q.  And the agent in charge now is Andrew Smith, correct?     02:28PM

11   A.  In charge when?

12   Q.  As of May 4th, 2015, at that meeting.  I'm just focused on

13   that for right now.

14   A.  He is in charge of the Simpson investigation, yes.

15   Q.  Okay.  Do you recall whether or not he asked anybody at    02:28PM

16   that meeting, does anybody have knowledge about when they left?

17           THE COURT:  Well, he already said he doesn't remember

18   anything that was said at the meeting that might have happened

19   on May 4th.

20           MR. MAYNARD:  Okay.                                    02:28PM

21           THE COURT:  But might have been on May 5th.

22   BY MR. MAYNARD:

23   Q.  Do you recall at any time before you got involved in the

24   Kareem investigation on May 8th anyone at the FBI's office in

25   Phoenix trying to do a timeline to show when Simpson and Soofi   02:28PM

| | |
|---|---|
| 1 | would have left Phoenix, Arizona? |
| 2 | A.  Yes.  They would have, yes. |
| 3 | Q.  When was that done, to the best of your recollection? |
| 4 | A.  It was an ongoing process. |
| 5 | Q.  Were you involved in that? |
| 6 | A.  I certainly tried to create my own timelines. |
| 7 | Q.  What would you have reviewed to help you create that |
| 8 | timeline? |
| 9 | A.  Any evidence that was in -- that I had either in the case |
| 10 | file or in other files, I would review that evidence. |
| 11 | Q.  Did anyone ever mention to you that there had been a video |
| 12 | camera at Simpson and Soofi's apartment that showed the last |
| 13 | time they left the apartment? |
| 14 | A.  No. |
| 15 | Q.  Did you ever participate in a meeting where somebody said, |
| 16 | geez, do we have any evidence of when Simpson and Soofi last |
| 17 | left their apartment? |
| 18 | A.  I don't recall that meeting like that. |
| 19 | Q.  When you say you don't recall, does that mean it didn't |
| 20 | happen or you just don't recall whether one happened or not? |
| 21 | A.  I don't remember that ever happening, so I'm saying what |
| 22 | you just said.  Geez, do we have that? |
| 23 | THE COURT:  You know, excuse me.  It just -- the video |
| 24 | camera footage was first reviewed on May 3rd in the middle of |
| 25 | the night.  Just accept that. |

02:29PM
02:29PM
02:29PM
02:30PM
02:30PM

1          THE WITNESS:  Okay.

2          THE COURT:  And within a day or two, you're involved

3    in some kind of a briefing about Simpson.  It just seems odd

4    that no one would talk about the surveillance that was

5    occurring before the video camera and since the video camera          02:30PM

6    was put up since it had just been put up coincidentally on the

7    very day that Simpson and Soofi left.  Doesn't that strike you

8    as odd?

9          THE WITNESS:  Well, if I may, Your Honor, so for these

10   meetings, it's not a meeting led by the case agent but it's a          02:31PM

11   meeting led by the leadership.  And essentially what it is is

12   any new facts that have come out since the last meeting are

13   what was discussed at the meeting.  And so my first involvement

14   as a SWAT operator was I went to the house on the night of the

15   3rd and I stayed all night into the morning of the 4th waiting          02:31PM

16   for the search warrant and helped execute the search warrant on

17   that house.  And having been up for more than 24 hours, I went

18   home briefly and had -- so I was out of pocket for a little

19   bit.  So by the time I came back, that's why I was guessing

20   that maybe the 4th could have been the first time I went to          02:31PM

21   meeting.  But I certainly would have, by the time I came back,

22   tried to attend one.  So it would have made, I guess, that

23   would have made sense so I didn't know that was --

24          THE COURT:  I don't know if it was talked about.  I

25   thought it was odd that it wasn't talked about.          02:32PM

```
 1          THE WITNESS:  So I would say if it was talked about

 2   that would make sense if they had maybe already talked about

 3   they wouldn't talk about what they already talked about before,

 4   they would only talk about new things in the meeting.  And

 5   again, I was there to just assist one of many people inside.      02:32PM

 6          THE COURT:  So when you interviewed Mr. Kareem on the

 7   5th, you really didn't know that much about the investigation.

 8   Who briefed you on Mr. Kareem and who he was and what

 9   information they wanted you to ask him about?

10          THE WITNESS:  I mean, I believe Detective Nash.  So       02:32PM

11   Detective Nash was the lead on that interview, and I was asked

12   to assist Detective Nash in conducting that interview.  So it

13   was Detective Nash's job to compile most of the information but

14   that I obviously looked at whatever he had and formulated our

15   plan before our interview talk.  But it was the case agents      02:33PM

16   who -- it certainly was difficult because of how busy

17   everything was.

18          THE COURT:  So Nash was the one who might have been

19   brought up to speed in who Kareem was in relation to Simpson

20   and you were asked to sit in on the interview because there's    02:33PM

21   always two people in the interview?

22          THE WITNESS:  Yes, Your Honor.

23   BY MR. MAYNARD:

24   Q.  Then as of May 8th, you become the case agent on Kareem,

25   correct?                                                         02:33PM
```

1   A.   Correct.

2   Q.   And at that point, the FBI starts focusing on Mr. Abdul

3   Kareem, correct?

4   A.   I don't know if I would agree with that.  He becomes an

5   important subject.                                              02:33PM

6   Q.   Okay.  In fact, at some point within a very short period of

7   time there was 24/7 surveillance on Mr. Kareem by the FBI?

8   A.   Yes.

9   Q.   So he's a pretty important subject at that point?

10  A.   Yes.                                                        02:34PM

11  Q.   Okay.  So the investigation centers around whether or not

12  there has been a conspiracy between Mr. Abdul Kareem, Mr.

13  Simpson, and Mr. Soofi, correct?

14  A.   That's one of the main.

15  Q.   Well, ultimately, that's what the indictment alleges.       02:34PM

16  A.   Yes.

17  Q.   And as part of that conspiracy, wasn't it important to you

18  as the case agent to know exactly when Mr. Abdul Kareem had had

19  contacts with Mr. Simpson and Mr. Soofi?

20  A.   Yes.                                                        02:34PM

21  Q.   And did you ever go back to the case agents on the Simpson

22  case and say, geez, have you guys done any investigation that

23  would tell me whether or not Mr. Abdul Kareem has had contact

24  with Mr. Simpson and Mr. Soofi?

25  A.   I don't recall asking them that.                            02:35PM

1    Q.  You don't recall asking anybody that?

2           MS. BROOK:  Objection.  Asked and answered.

3           THE COURT:  Overruled.  You may answer.

4           THE WITNESS:  No.

5    BY MR. MAYNARD:                                          02:35PM

6    Q.  Okay.  But that would have been important information for

7    you to have, correct?

8    A.  Yes.

9    Q.  And do you happen to know when the Simpson investigation

10   stops?                                                   02:35PM

11          MS. BROOK:  Objection, Your Honor.  Beyond the scope.

12          THE COURT:  Overruled.  You may answer.

13          THE WITNESS:  Well, so he obviously died in the attack

14   so I think an investigation of him as an individual would have

15   in some ways ended then.  But certainly his investigation would  02:35PM

16   have remained open for longer if there's other matters.

17   BY MR. MAYNARD:

18   Q.  As you are now investigating Mr. Abdul Kareem, the

19   allegation that he is a co-conspirator, did you have access to

20   the Simpson case file?                                   02:36PM

21   A.  Yes.

22   Q.  What steps did you take to investigate Mr. Abdul Kareem's

23   connection with Mr. Simpson by looking at the Simpson case

24   file?

25   A.  I reviewed, systematically reviewed, all the documents in  02:36PM

| | |
|---|---|
| 1 | the Simpson case file to look for evidence and his connection. |
| 2 | Q.  And that would have started sometime when, at what point? |
| 3 | A.  Very early on in the investigation. |
| 4 | Q.  Sometime after May 8th, though? |
| 5 | A.  On or about May 8, I think it would have started. |
| 6 | Q.  And you would have looked at that through the Sentinel |
| 7 | system? |
| 8 | A.  Yes. |
| 9 | Q.  And would you have done a Google-type of search to look for |
| 10 | information in the Sentinel system? |
| 11 | A.  Yes.  That would -- I would have done both a systematic |
| 12 | search but also used a Google-type Boolean search. |
| 13 | Q.  Did you become aware at some point that the FBI had done |
| 14 | surveillance on Mr. Simpson in March and April of 2015? |
| 15 | A.  I don't recall the dates. |
| 16 | Q.  Did you become aware that sometime in 2015 but prior to May |
| 17 | 3rd the FBI had -- Phoenix office -- had done surveillance on |
| 18 | Elton Simpson? |
| 19 | A.  Yes. |
| 20 | Q.  When did you become knowledgeable of that? |
| 21 | A.  Sometime after the attack, but I'd say on or about May 8. |
| 22 | Around that time. |
| 23 | Q.  How did you learn? |
| 24 | A.  I believe it was from Andrew Smith mentioned it, that they |
| 25 | had done surveillance of his apartment. |

02:36PM
02:37PM
02:37PM
02:37PM
02:37PM
02:38PM

1    Q.   Okay.

2    A.   Of Simpson's apartment.

3    Q.   And did you discuss with him the type of surveillance that

4    had been done?

5    A.   Yes.  Well -- yes.                                                02:38PM

6    Q.   What is it that Andrew Smith told you?

7    A.   He said he conducted drive-by surveillance of his -- of

8    Simpson and Soofi's apartment.

9    Q.   And he never mentioned that they had put a pole camera up

10   there?                                                                02:38PM

11   A.   No.

12   Q.   Do you have any notes of any meetings where you had

13   discussions with Andrew Smith when you asked him historical

14   knowledge about the surveillance that the FBI in Phoenix had

15   been doing on Mr. Simpson?                                            02:38PM

16   A.   No.

17   Q.   Did you get copies of any 302s of the surveillance that the

18   FBI had done on Mr. Simpson from -- in March and April of 2015?

19   A.   I believe I reviewed some documents.  I'm not sure if they

20   were 302s.  They may have been 1054s.                                 02:39PM

21   Q.   Can the witness be shown Exhibit 12?  Take a minute and

22   sort of look through these and then I'm going to ask you a few

23   questions.

24        Mr. Whitson, let me know whenever you are finished.

25   A.   I have reviewed all these documents.                            02:42PM

```
 1   Q.  Have you seen any of those documents before?
 2   A.  I don't -- none of them -- I don't -- I'm not sure if I
 3   have or not.
 4   Q.  You knew Andrew Smith and you knew DeEtta Nolen, correct?
 5   A.  Yes.                                                        02:43PM
 6   Q.  And you knew Amy Fryberger?
 7   A.  Yes.
 8   Q.  Did you work near them?
 9   A.  Yes.
10   Q.  You were on a joint terrorist task force, correct?         02:43PM
11   A.  Yes.
12   Q.  Were they on a joint terrorist task force but it was
13   different teams?
14   A.  They were in a different squad.
15   Q.  Squad.  Okay.  Can you explain to me what a squad is?      02:43PM
16          THE COURT:  Do I really need to know what a squad is?
17          MR. MAYNARD:  I just want to know the size and whether
18   they interrelate with each other, judge.
19          THE COURT:  Why don't you ask.  We already had Special
20   Agent Fryberger talk to us about the squad and the task force  02:43PM
21   and the numbers.
22          MR. MAYNARD:  Okay.
23          THE COURT:  I don't think we need it again.
24   BY MR. MAYNARD:
25   Q.  Did the different squads have different names or           02:44PM
```

1    identifications?

2    A.  Yes.

3    Q.  What was the squad that you were in?

4    A.  So I was on NS-1.

5    Q.  And then there was other squads on the joint terrorist task    02:44PM

6    force?

7    A.  Yes.

8    Q.  How many were there?

9    A.  So there were, at the time, three in Phoenix and then -- in

10   the Phoenix area.    02:44PM

11   Q.  And were the individuals on Smith's task force, were they

12   officed somewhere near your task force?

13   A.  Their squad was located approximately 30 feet from my

14   squad.

15   Q.  30 feet away?    02:44PM

16   A.  Yes.

17   Q.  Did the squads interrelate with each other and do you talk

18   to each other about investigations that are going on?

19   A.  Not unless there's -- you are working together on

20   something, but we're compartmentalized.    02:45PM

21   Q.  At some point when you get involved in the Kareem case do

22   you then work with the people who are involved in Simpson

23   because Simpson is considered to be a co-conspirator with Mr.

24   Kareem?

25   A.  To a certain extent, yes.    02:45PM

```
 1   Q.  Did you go to those individuals and have any formal or

 2   informal meetings to get information from them about what they

 3   had learned when they had been investigating Mr. Simpson?

 4   A.  I don't know that there was any formal meetings to do that.

 5   Q.  Formal or informal?                                    02:45PM

 6   A.  There were informal meetings where -- if we had informal

 7   meetings where new information came to light that we thought

 8   others would appreciate then we would call a meeting and share

 9   that information.

10   Q.  Did you ever come to understand that the task force that  02:46PM

11   Mr. Smith was involved with was concerned that Mr. Simpson may

12   have been a threat at the Pat Tillman run?

13   A.  Could you -- I'm sorry.  I don't understand the question.

14           MS. BROOK:  I'm going to object.  Misstates testimony,

15   beyond the scope.                                          02:46PM

16           THE COURT:  Sustained.

17   BY MR. MAYNARD:

18   Q.  Did you ever ask anybody in Mr. Smith's joint task force

19   whether they considered that Mr. Simpson had been an imminent

20   threat to the public?                                      02:46PM

21           MS. BROOK:  Same objection.

22           THE COURT:  Sustained.

23   BY MR. MAYNARD:

24   Q.  Who was your supervisor when you became the special agent

25   for Mr. Kareem?                                            02:46PM
```

```
1    A.   SSA Michael Caputo.

2    Q.   Did you know Glenn Milnor?

3    A.   Yes.

4    Q.   Did you ever have any discussions with Mr. Milnor about the

5    Simpson investigation?                                          02:47PM

6    A.   I don't recall any specific conversations with them.

7    Q.   I showed you Exhibit 12 which was a series of 302s with

8    some pictures of Mr. Simpson.  Did you ever do any

9    investigations to determine if the FBI had taken pictures of

10   Mr. Simpson in April of 2015?                                   02:47PM

11           MS. BROOK:  Objection.  Beyond the scope.

12           THE COURT:  Sustained.

13   BY MR. MAYNARD:

14   Q.   Just to follow up a little bit, on May 3rd, you were there

15   to execute a search warrant?                                    02:47PM

16           THE COURT:  No.  He was there watching the apartment

17   while the search warrant was being obtained and it was executed

18   the next day.

19   BY MR. MAYNARD:  Okay.  On the 4th.  And you are waiting.  When

20   you go in on the 4th, whatever time it was, did you have to     02:48PM

21   read the search warrant to know what you were looking for?

22   A.   I wasn't conducting the search.

23   Q.   At some point after you became the case agent on Abdul

24   Kareem, did you ask anybody, including Mr. Smith, if they had a

25   timeline on when Mr. Simpson and Mr. Soofi had left Phoenix?    02:48PM
```

| 1 | A.  I asked someone from their team. |
| 2 | Q.  Who did you ask? |
| 3 | A.  I think -- I can't pronounce his name.  Randy. |
| 4 | Q.  You can spell it? |
| 5 | A.  It's K-A-C, maybe Z-I, a W in there.  He is an IA assigned |
| 6 | to the same squad as Andrew Smith. |
| 7 | THE COURT:  IA, intelligence analyst? |
| 8 | THE WITNESS:  Yes, Your Honor. |
| 9 | BY MR. MAYNARD: |
| 10 | Q.  When did you have that conversation? |
| 11 | A.  Fairly early on.  They just asked do you have a timeline |
| 12 | that you are developing. |
| 13 | Q.  And what did he tell you? |
| 14 | A.  He pointed me to a wall where they had one on the wall in |
| 15 | their quad area. |
| 16 | Q.  When you say it's on the wall, can you describe it for me? |
| 17 | A.  Yes.  It was just paper that was printed from one of those |
| 18 | large printers like a map type size, so it was a large document |
| 19 | and it had a developing timeline as facts were getting in. |
| 20 | Q.  Did it show when Simpson and Soofi left Phoenix, Arizona? |
| 21 | A.  Yes.  There were times on there when they -- yes. |
| 22 | Q.  And did it also indicate what the source of the information |
| 23 | was that they had put on the timeline? |
| 24 | A.  Not in all cases, but so in some cases, yes. |
| 25 | Q.  Just focus on when they left Phoenix.  Did it show the |

02:49PM
02:49PM
02:49PM
02:50PM
02:50PM

1    source of the information that the FBI was using to determine

2    when they had left Phoenix?

3    A.  So I can't remember if it was the -- so whatever the phone

4    information had that was the information I remember being there

5    so the phone -- their cellphones indicated a time when they                    02:50PM

6    suspected they left that was up there.  But I don't recall

7    exactly.

8    Q.  Was there ever a photograph made or anything made that

9    memorialized this timeline that was on the wall?

10   A.  The timeline was basically a compilation of all the                        02:51PM

11   documents that were put.

12          THE COURT:  Yeah, but does the timeline itself, is

13   there a visual depiction of it anymore?

14          THE WITNESS:  Not that I'm aware of.

15   BY MR. MAYNARD:                                                                 02:51PM

16   Q.  Was there visual depiction of it made at the time so that

17   you had a hard copy of it that you put somewhere?

18   A.  Not of that.  It was just a working -- no.

19   Q.  And who was working on the timeline?  Who was putting

20   things on it?                                                                   02:51PM

21   A.  I think just lots of people could come in and add things.

22   Q.  Mr. Smith could come in, Agent Smith?

23          THE COURT:  Okay.  We don't need to know who all the

24   lots of people are.  Anybody on that task force could have done

25   it.                                                                            02:51PM

```
 1            MR. MAYNARD:  All right.
 2    BY MR. MAYNARD:
 3    Q.  Do you know whether or not anybody in the Simpson
 4    investigation prepared a report on what had taken place from
 5    March until May 3rd with Mr. Simpson?                          02:52PM
 6            MS. BROOK:  Objection.  Beyond the scope.
 7            THE COURT:  Overruled.  You may answer.
 8            THE WITNESS:  So can you say that again, a report?
 9    Sorry.
10    BY MR. MAYNARD:                                               02:52PM
11    Q.  The FBI has been monitoring --
12            THE COURT:  Okay.  I think he's asking is there any
13    report that kind of summarized what all the events were that
14    took place between the time they opened their -- or reopened
15    the investigation until they -- until Mr. Simpson was killed?  02:52PM
16            THE WITNESS:  The closest thing would be what I
17    drafted.  That was kind of a cross-memo that would bring all
18    the facts together into a single document.  But that was my
19    notes, I guess, and then it would refer to the original
20    documents.                                                    02:53PM
21    BY MR. MAYNARD:
22    Q.  But you didn't get anything from anybody in the Simpson
23    investigation separate?
24    A.  No.
25    Q.  Do you know an individual by the name of Michael Gallante?  02:53PM
```

```
1   A.  I know two individuals.

2   Q.  Named Michael Gallante?

3   A.  Yes.

4   Q.  This would have been an individual who may have been an

5   intern back in May of 2015.                                        02:53PM

6   A.  Yes.

7   Q.  Did you work with him?

8   A.  No.  I worked with his father, though.

9   Q.  Okay.  Was Mr. Gallante, to the best of your knowledge, II,

10  or Junior, was he working at the FBI as an intern in May of        02:53PM

11  2015?

12  A.  I don't know for sure during that time, but around that

13  time he was.

14  Q.  Okay.  What is an intern at the FBI?

15  A.  Essentially it's just a paid employee that comes in who is      02:54PM

16  generally still in college who doesn't meet all the

17  requirements to be a full time employee that has an opportunity

18  to come in and do some of the work of the FBI, highly

19  supervised generally, and they have security clearance and

20  things like that but they are not a full time employee.  It's      02:54PM

21  an opportunity for them to learn the work the FBI does.

22  Q.  Do you know what, if anything -- strike that.

23          Did Mr. Gallante do any work for you on the Kareem

24  investigation?

25  A.  No.                                                            02:54PM
```

1    Q.  Did you ever have any discussions with him about whether he

2    had done any work on the Simpson investigation?

3    A.  No.

4    Q.  Do you recall him being in the office around May 3rd to May

5    8th of 2015?                                                        02:54PM

6    A.  No.

7    Q.  Is there -- and I may have this wrong.  I understand that

8    there are reports and things that are put into Sentinel.  Is

9    that correct?

10   A.  Yes.                                                            02:55PM

11   Q.  And if you want to research those you do sort of like a

12   Google search of some nature?

13   A.  Yes.

14   Q.  And is there a separate file that's called evidence log in

15   Sentinel, or is that something different?                          02:55PM

16   A.  Yes.  There is a -- I don't know if you would call it a

17   file but --

18   Q.  What would you call it?

19   A.  So an evidence log is a type of document you can create and

20   that's called an evidence log.  And so you can put that inside     02:56PM

21   Sentinel, but you can put that in any kind of file inside

22   Sentinel that you wanted to.  So I guess a better answer to

23   your question is there's not an evidence log file but that's a

24   type of document.

25   Q.  Is there a different type of document that is put in an        02:56PM

| 1 | evidence log versus what's normally put into a Sentinel file? |
| 2 | A.  Well, so an evidence log is just a log of the evidence you |
| 3 | have collected so it's a document that's put into Sentinel. |
| 4 | Q.  When you take over the Kareem investigation, or when you |
| 5 | are the case agent on the Kareem investigation, did you look in |
| 6 | the Simpson investigation to see if there was an evidence log? |
| 7 | A.  Yes.  I looked, yes. |
| 8 | Q.  What do you remember finding in that evidence log? |
| 9 | A.  Well, one of the evidence logs would be the evidence log |
| 10 | for the search of the apartment.  That was done on May 4th so I |
| 11 | don't recall specifically what was in there at that time.  But |
| 12 | I know that I would have looked at that because I know it was |
| 13 | there. |
| 14 | Q.  Would the search warrant have been part of that evidence |
| 15 | log? |
| 16 | A.  It can be included but not always. |
| 17 | Q.  Do you recall whether or not you saw anything in there |
| 18 | about electronic surveillance in the evidence log in the |
| 19 | Simpson case? |
| 20 | A.  No. |
| 21 | Q.  You don't recall or are you certain there wasn't anything? |
| 22 | A.  I wouldn't say I'm certain, but it would be unorthodox to |
| 23 | put something like that in an evidence log. |
| 24 | Q.  Why? |
| 25 | A.  Because it's surveillance so that would go in a separate |

02:56PM

02:57PM

02:57PM

02:57PM

02:57PM

1   document.  An evidence log is just logging what evidence you

2   have seized from a search location.  So it wouldn't make sense

3   to put surveillance stuff in that.  Someone could do that I

4   suppose.

5   Q.  If you had a videotape or disk of surveillance would that          02:57PM

6   be put in the evidence log?

7   A.  No.

8   Q.  And if it was, would that have been unusual?

9   A.  Well, so I'm sorry, so you could have -- if you had an

10  evidence log for some reason in your electronic surveillance           02:58PM

11  subfile, you might house the evidence -- you might, if you had

12  enough electronic evidence come in and you wanted to keep track

13  of it, there's one site that you might fill out an evidence

14  log.

15          THE COURT:  Let's stop being theoretical.  Let's say          02:58PM

16  you have a hard drive of pole camera footage.  That has to be

17  logged into evidence?

18          THE WITNESS:  Yes.

19          THE COURT:  And so there would be an evidence log

20  created.  The hard drive would be physically kept wherever you         02:58PM

21  keep physical evidence and the log would be in the Simpson

22  file?

23          THE WITNESS:  Yes, Your Honor.

24          THE COURT:  Okay.

25  BY MR. MAYNARD:                                                        02:58PM

| | |
|---|---|
| 1 | Q.  Do you recall looking for that or seeing it when you looked |
| 2 | to the Simpson file? |
| 3 | A.  Yes. |
| 4 | Q.  You did see it? |
| 5 | A.  I recall looking at the Simpson log, evidence log. |
| 6 | Q.  Do you recall see that there was, in the evidence log, a |
| 7 | hard drive with a video? |
| 8 | MS. BROOK:  Objection to the form of the question. |
| 9 | THE COURT:  Overruled.  You may answer. |
| 10 | THE WITNESS:  I don't recall. |
| 11 | THE COURT:  Mr. Maynard, we're going to take our |
| 12 | afternoon break.  We'll reconvene at 3:15.  Court is in recess. |
| 13 | (Recess from 2:59 p.m. until 3:17 p.m.) |
| 14 | THE COURT:  The record will show the presence of |
| 15 | counsel and the defendant.  Mr. Maynard, you may continue. |
| 16 | MR. MAYNARD:  Thank you, Your Honor. |
| 17 | BY MR. MAYNARD: |
| 18 | Q.  Agent Whitson, you dealt with Mr. Koehler on this case and |
| 19 | Ms. Brook, correct? |
| 20 | A.  Yes. |
| 21 | Q.  And was your job, at least part of it, to provide them with |
| 22 | the evidence in the case to review? |
| 23 | A.  Yes. |
| 24 | Q.  What were you told to give them? |
| 25 | A.  By them?  I was given a brief and told to give them |

02:58PM

02:59PM

03:17PM

03:17PM

03:18PM

1    anything that might be relevant.  And the memo was much more

2    detailed than that, but that's a quick synopsis.

3    Q.  And did you search the files to determine whether something

4    was relevant and whether to turn it over?

5    A.  Yes.                                                          03:18PM

6    Q.  Was there anyone else other than you on the Kareem case

7    that did that?

8    A.  Not for discovery.  So there were other people searching

9    the files, but I was the one doing it for discovery purposes.

10   Q.  Now, had you known there was a pole camera, would you have   03:18PM

11   turned it over?

12   A.  It depends.

13   Q.  It depends on what?

14   A.  Well, for instance, if there's actual video captured by the

15   pole cam or if it's other things I would have informed the       03:19PM

16   prosecutors.

17   Q.  Let me use the judge's forget the hypotheticals.  Had you

18   known that that pole camera had gone up on May 1st and recorded

19   through May 3rd at Mr. Simpson and Soofi's apartment, would

20   you, first, would you have reviewed that video?                  03:19PM

21   A.  Either I would have reviewed it or I would have had someone

22   on the team review it.

23   Q.  Would you have turned it over to the prosecution?

24   A.  Yes.

25   Q.  And if there were still shots that had been made from the    03:19PM

1    video, would you have turned those over to the prosecution?

2    A.   Probably.

3    Q.   What have you done to prepare for your testimony today?

4    A.   I reviewed prior transcripts from the previous times when I

5    have testified in this matter.                                03:19PM

6    Q.   Have you reviewed any of the documents related to the pole

7    camera that was at Mr. Simpson and Mr. Soofi's apartment on May

8    1st through the 4th of 2015?

9    A.   I have not reviewed any of those.  I have been shown one

10   document once, but briefly.  I didn't really review it.       03:20PM

11   Q.   What was the one document that you were shown?

12   A.   I think it may have been an FD 759 request for the pole

13   cam, but I didn't -- I glanced at it quickly and wanted to

14   preserve my memory so I didn't look at it further.

15        MR. MAYNARD:  Can the witness be shown Exhibit 13, 17,    03:20PM

16   18, and 19, please.

17        Your Honor, I believe you have copies of all of these.

18   I'm not going to put it on the screen unless you want me to.

19        THE COURT:  I have copies of all the exhibits right

20   here.                                                         03:21PM

21   BY MR. MAYNARD:

22   Q.   We looked at Exhibit 12.  I want you to look at Exhibit 13

23   now.  Is this the document that you recently saw?

24   A.   I don't think it was this document, but it's hard to tell

25   because --                                                    03:21PM

Q.  Because of all the black?

A.  Redactions.  But it was something similar to this.  I think
this may have been it, but I'm not sure.

Q.  When was it that you saw the document that was given to
you?

A.  It was sometime after February of 2019.

Q.  Who gave it to you?

A.  Special Agent Mullen showed it to me in response to a
question I asked him.

Q.  What was the question?

A.  Whether the prosecutors might be confused in thinking that
there was a pole cam, because I didn't think there was.  So I
said, are you sure there even is a pole cam, or are they just
confusing this with another case?  And then he sent me an image
of the 759 instead of responding, just sent that as a response
that's saying, well, I don't know.  Just sent me that as a
response.  I kind of looked at it briefly realizing that it was
some sort of a request for a pole cam and kind of glanced at it
briefly.  I closed it out because I wanted to preserve my
memory from what it was at the time of the trial and I didn't
think it made sense for me to do any new digging without the
direction of the prosecutors.  But it was something similar to
this.

Q.  Had you seen Exhibit 13, would you have turned it over to
the prosecution?

03:21PM

03:22PM

03:22PM

03:22PM

03:22PM

1    A.  Well, again, without -- I can't see because of the

2    redactions, but may I look at it a little bit longer?  So

3    maybe.

4    Q.  Maybe.

5         Look at Exhibit 17.  Do you know whether you have seen    03:23PM

6    Exhibit 17 before?

7    A.  I have not seen this before.

8    Q.  Had you seen this during your investigation would you have

9    turned over this document to the prosecution?

10   A.  Yes.    03:23PM

11   Q.  Look at Exhibit 18.  Have you seen this document before?

12   A.  No.

13   Q.  Are you familiar with the format of this document?

14   A.  I think I know what it is.

15   Q.  Turn to Exhibit 19.  The first page is a 302.  Have you    03:24PM

16   seen this before?

17   A.  No, I have not.

18   Q.  And the second page appears to be a timeline of what's on

19   the pole camera.  I take it you have not seen that either?

20   A.  I have not.    03:24PM

21   Q.  And that is followed by multiple pages of images from the

22   pole camera.  I take it you have not seen that?

23   A.  I have not.

24   Q.  But had you seen these documents in Exhibit 19, both the

25   302 the timeline and the images, would you have given it to the    03:25PM

1    prosecution?

2    A.   Yes.

3         THE COURT:  So Special Agent Whitson, you said earlier

4    that you made a systematic review of the Simpson file when you

5    became the case agent for Kareem and you also did a couple of          03:25PM

6    searches.  This 302, Exhibit 19, which includes all of the

7    attachments, would have been part of that file, correct?

8         THE WITNESS:  I can't say that with certainty, Your

9    Honor.  You could presume that it should have been included.

10        THE COURT:  Isn't that where 302s all go, into the          03:26PM

11   file?

12        THE WITNESS:  Well, they go wherever the case agent

13   puts them, Your Honor.  So the case agent decides which case

14   number to send the 302, and furthermore they decide which

15   subfile within that case number, so -- and sometimes if there's          03:26PM

16   a 302 that involves multiple cases it might be sent to multiple

17   case files.  But I don't know if that answers your question.

18        THE COURT:  So the 302s don't all go into one part of

19   the file?

20        THE WITNESS:  No.  So there's different practices.  So          03:26PM

21   some agents have a practice where they will create a 302

22   subfile and they will put all 302s into a single spot.  That's

23   not required.  It's just a practice that's preferred by some.

24   Others will create a criminal subfile if there's criminal

25   charges and they will put their 302s there.  In a case like          03:27PM

1    Simpson, you have so many different multiple AORs, Dallas and

2    everywhere sending stuff to the file that there wasn't -- it

3    wasn't consistent in the way it was sent because it was lots of

4    different agents then.

5           THE COURT:  Well, for reasons unknown to me they          03:27PM

6    blacked out the file number on 19.  But this was prepared by

7    the intern that we spoke about.  And I'm going to presume that

8    the file number really was the Simpson file because it's the

9    only one that makes any sense.  Wouldn't you agree?

10          THE WITNESS:  I agree that that would make sense to        03:27PM

11   send it to the Simpson file.

12          THE COURT:  Even with the redactions we can probably

13   figure out that it says, "Footage obtained from a pole camera

14   located on 19th Avenue."  These should have been in the --

15   discovered in your systematic review of the Simpson file,       03:28PM

16   shouldn't they?

17          THE WITNESS:  If they were entered I should have seen

18   that.

19   BY MR. MAYNARD:

20   Q.  And on the first page of 19 it says, the last sentence that  03:28PM

21   we can see, it says "Included are the resulting screen shots

22   and event logs."  So those were with the 302 according to this

23   302.

24   A.  I'm sorry?

25   Q.  Look at the first page.  Do you see the sentence that says,  03:28PM

1    "Included are the resulting screen shots and event log?"

2    A.  Yes.

3    Q.  So according to this 302, all of these documents together

4    were put together somewhere in the file with the FBI, correct?

5    A.  Yes.                                                            03:28PM

6    Q.  Okay.  Can you look at Exhibit 123.  I'm going to direct

7    your attention to the last four pages of Exhibit 123.

8            THE COURT:  Before you do that, is this the name that

9    you were trying to spell for us before on the first page of

10   123, Special Agent Chris Jancosko?                                 03:29PM

11           THE WITNESS:  No, Your Honor.

12           THE COURT:  Somebody else with a difficult last name.

13           THE WITNESS:  Yes, Your Honor.

14           THE COURT:  Okay.

15           MS. BROOK:  And Your Honor, if I may, I know it's        03:29PM

16   before he's asked the question, but the government is going to

17   object to this line of questioning especially because what's on

18   this thread goes beyond the scope of his testimony and is

19   beyond the scope of what the Court is here to consider.

20           THE COURT:  Okay.  Let me see if I can figure out what  03:30PM

21   this is.

22   BY MR. MAYNARD:

23   Q.  You have Exhibit 123.  You have got the last four pages.

24   At the top it says "Tactical Intel Report"?

25   A.  Yes.                                                           03:30PM

| | |
|---|---|
| 1 | Q.  As part of your investigation, did you ever see this |
| 2 | document? |
| 3 | A.  I don't know. |
| 4 | MR. MAYNARD:  Your Honor, can I have a minute to |
| 5 | confer with Mr. Drake? |
| 6 | THE COURT:  Yes. |
| 7 | MR. MAYNARD:  Your Honor, the only thing -- I'm |
| 8 | finished with this questioning -- we do want to submit the pole |
| 9 | cam video, the entire video.  My understanding was that the |
| 10 | government was going to see whether or not that could be -- |
| 11 | THE COURT:  I can't hear you when you turn and talk to |
| 12 | Mr. Koehler and Ms. Brook. |
| 13 | MR. MAYNARD:  I'm sorry.  I rarely get admonished for |
| 14 | not being heard. |
| 15 | We want to put in the entire video as part of the |
| 16 | record.  And we didn't mark it because we were concerned about |
| 17 | whether or not to make a copy and how to make a copy of it.  I |
| 18 | don't know if we need to -- |
| 19 | THE COURT:  What do you expect me to do about that? |
| 20 | MR. MAYNARD:  Tell me that I can bring in a video, |
| 21 | agree with the government and bring it in. |
| 22 | THE COURT:  I don't know why you can't.  If you want |
| 23 | to mark it as an exhibit and offer it, you are free to do that. |
| 24 | I don't -- I'm not sure I understand what the problem is other |
| 25 | than you are not sure how to make a copy. |

03:30PM

03:31PM

03:31PM

03:31PM

03:32PM

1          MR. MAYNARD:  That's part of the problem.  Okay.

2     Thank you, Your Honor.

3          THE COURT:  I was going to ask whether it had been

4     submitted.  Apparently the answer is not yet.

5          MR. MAYNARD:  Not yet.                                    03:32PM

6          THE COURT:  I, however, I don't -- you don't really

7     expect me to look through like, you know, 24 hours of

8     scintillating pole camera coverage?

9          MR. MAYNARD:  I'm not suggesting to the judge what the

10    judge needs to do.                                             03:32PM

11         THE COURT:  Unless you find a way for me to look at it

12    in a fast forward mode, don't count on it.

13         MR. MAYNARD:  I think the screen shots that are in

14    Exhibit 19 are the more relevant things that are in the video.

15         THE COURT:  And I say this only half facetiously.        03:32PM

16    Obviously we have many, many hours of pole camera footage.  And

17    even the hours from the beginning until the last time you see

18    Simpson and Soofi is a considerable number of hours.  And I

19    think that it's incumbent upon counsel to tell me if there's

20    anything else of significance beyond what is shown in 19.      03:33PM

21    Because Exhibit 19 purports to be all of the people who could

22    be identified that are seen up to the end of May 1.

23         And you can't expect me to find something else of

24    significance on that pole camera footage.  You could certainly

25    point out to me something else of significance and I could look 03:33PM

1    at it myself.  But I'm not the person who is going to determine

2    that Mr. Gallante missed seeing something important.

3             MR. MAYNARD:  Okay.  Well, I will take that up, Your

4    Honor.  I mean, obviously Mr. Gallante didn't put in Mr. Soofi

5    walking with a handgun.  That's not in the -- it's in the        03:34PM

6    pictures but it's not in --

7             THE COURT:  Well, no, it's in the pictures.  I'm

8    talking about what I would see if I were looking at the pole

9    camera footage.  And if you think there's something that I will

10   see that's not part of Exhibit 19, then it's incumbent upon      03:34PM

11   defense counsel or the prosecutor, if they think there's

12   something I should see, to tell me where it is so that I can

13   see it or, even more importantly, to get a screen shot of it

14   and show it to me.

15            MR. MAYNARD:  Yes, Your Honor.  Thank you.               03:34PM

16            MR. KOEHLER:  Your Honor, I just wanted to make a

17   point of clarification with respect to 19.  The first screen

18   shot is May 1 of 2015 at 2:08 p.m. and 18 seconds.  The last

19   image on there is Sunday, May 3rd, 2015 at 10:27 p.m. and 15

20   seconds, meaning this is actually three full days worth of       03:35PM

21   screen shots from the pole camera not just May 1st.

22            THE COURT:  Yeah, I understand that.  I was just

23   thinking that the significance is through -- what's most -- if

24   there's anything of significance it's going to be on May 1.

25            MR. KOEHLER:  We agree with that.  We are just          03:35PM

1    clarifying for the record that 19 encompasses the full span of

2    the camera.

3            THE COURT:  Right.  The camera I believe was recording

4    for something in the neighborhood of three days.

5            MS. BROOK:  May I?                                    03:35PM

6            THE COURT:  You may, Ms. Brook.

7                        CROSS-EXAMINATION

8    BY MS. BROOK:

9    Q.  Special Agent Whitson, you testified that you took over the

10   Kareem case, the investigation as the lead case agent, on May 8  03:35PM

11   of 2015?

12   A.  Yes.

13   Q.  And at that point going forward, did you have access to the

14   Simpson electronic case file?

15   A.  Yes.                                                      03:36PM

16   Q.  We're going to come back in a second and talk in more

17   detail about what that looked like.  But before we get there,

18   in your role as the lead case agent on Kareem, you mentioned in

19   talking with Mr. Maynard that you were given a directive by the

20   prosecutors to produce anything that might be relevant in      03:36PM

21   discovery in the Kareem case for the prosecutors?

22   A.  Yes.

23   Q.  Explain for us what anything that might be relevant meant

24   to you?

25   A.  Well, as I indicated that there was much more detail than   03:36PM

UNITED STATES DISTRICT COURT

1    just that, but essentially anything that might have a bearing

2    on the case that might be material to the case, anything that

3    could be exculpatory, inculpatory, anything that tended -- any

4    of those kind of things.  So if it was even remotely relevant,

5    then that would be something I would give to the prosecutors to          03:37PM

6    let them make a determination whether it should be whether it's

7    discoverable or not.

8    Q.   Mr. Maynard asked you a bunch of questions about certain

9    exhibits and asked whether or not you would provide an exhibit

10   over to the government if you saw that.  Once or twice you          03:37PM

11   answered that you weren't sure.  In those situations, at a

12   minimum, would you have talked to the prosecutors about what

13   you saw?

14   A.   Yes.

15   Q.   Explain that.          03:37PM

16   A.   So in a situation like this, communication with the

17   prosecutors is ongoing, whether it's formal meetings or over

18   the phone calls.  And so if I came to something that I thought

19   was even remotely possible should we hand it over and it wasn't

20   glaringly obvious that it should be, I would bring that up to          03:37PM

21   the prosecutors in a conversation and explain it to them and

22   ask them what their guidance was and proceed forward.

23   Q.   I think before you you still have the book of exhibits.

24   And in particular, I want to turn to Number 16.  Actually, I'm

25   sorry, can you turn to Exhibit 13.          03:38PM

1          In looking back at this exhibit, which was that 759

2    document that you said might have been the one that Special

3    Agent Mullen had e-mailed you, you said that you might have

4    sent it over to the prosecutors.  At a minimum, would you have

5    talked to the prosecutors about this document if you saw it in          03:38PM

6    reviewing the Simpson file?

7    A.  So the problem with this document is I can't -- all I see

8    is date 4-9-2015 and the name of the case agent.  So presuming

9    this is related to this case, I would reach out to the

10   prosecutors and tell them at a minimum about it.          03:39PM

11   Q.  So understood.  So if you flip a couple pages in to Page

12   Number 4 where there's a little more text and information, does

13   that help clarify your answer on whether or not you would talk

14   to the prosecutors about this information?

15   A.  Yes.          03:39PM

16   Q.  And what is it?  Would you have talked to the prosecutors

17   about that?

18   A.  Yes.

19   Q.  Defense counsel also asked you about government's Exhibit

20   Number 18.  If you could turn to that for a moment.          03:39PM

21   A.  Yes.

22   Q.  You had mentioned in looking at it that you thought it

23   looked familiar?

24   A.  Yes.

25   Q.  Is that just the form of it that looked familiar or the          03:39PM

1  actual content?

2  A.   The form of it looks familiar, so it looks like a screen

3  capture out of Sentinel.   But other than that, the content I

4  don't know.

5  Q.   So that looks familiar as something that would be                    03:40PM

6  consistent with a screen shot out of the Sentinel case file?

7  A.   Yes.

8  Q.   And same question as to that.   If you had seen that or the

9  information contained therein, would you have spoken to the

10  prosecutors about what you saw?                                          03:40PM

11  A.   Yes.

12  Q.   Let's talk about Sentinel for a moment.

13         You testified that during the time you were the lead

14  case agent on the Kareem investigation you reviewed and you

15  worked through the Simpson electronic case file?                         03:40PM

16  A.   Yes.

17  Q.   In doing so, you mentioned that you had a systematic

18  approach to reviewing that file?

19  A.   Yes.

20  Q.   Talk to us about what that file looks like when you open            03:41PM

21  it.

22  A.   So I guess comparing it to other files, it's a very large

23  file containing thousands of documents.   There's, when you

24  first open it, the default page is the main case file.   So that

25  has lots and lots of documents but then there's hyperlinks to           03:41PM

1    all the subfiles.  And each one of those that you go into

2    there's lots of other documents in there as well.

3         THE COURT:  Let me ask you a question about the

4    Simpson file.  We have heard testimony that the Simpson file

5    was opened around 2006 to 2007, and then it was closed for              03:41PM

6    several years and then reopened in or about March 2015.

7         Was it possible in the review through Sentinel to just

8    start the new part of the file?

9         THE WITNESS:  You could, but, Your Honor, but I

10   didn't.  But I reviewed everything because I thought just in           03:42PM

11   case there might be something from the earlier part of the

12   investigation that could still be relevant, I didn't want to

13   miss that.

14        So and then also even when the case is closed, the

15   case can still be populated with documents.  So it's closed, so       03:42PM

16   it's not under review by FBI supervisors and it's not being

17   watched in that sense, but documents can still load into a

18   closed file even after it's closed.

19        THE COURT:  Would you say, though, that you may have

20   paid more attention to why it was reopened and what happened in       03:42PM

21   that last two months?

22        THE WITNESS:  Yes.  Especially initially, that was

23   much my focus initially in the investigation part would have

24   been just on the newer stuff when it was newly opened.  And as

25   I had more time and I had handled immediate leads and theories        03:43PM

| | |
|---|---|
| 1 | of a threat, ongoing threat was resolved it was more |
| 2 | painstaking looking through item by item. |
| 3 | BY MS. BROOK: |
| 4 | Q.  So describe what the newer stuff entailed.  Was that the |
| 5 | surveillance that happened before May 3rd of 2015, or was the |
| 6 | new stuff other information that was populating the Simpson |
| 7 | account starting on May 3rd of 2015? |
| 8 | A.  It was new stuff coming from the Garland event was flooding |
| 9 | the file with discoveries of things because the search was |
| 10 | being conducted in another AOR.  So I was fully dependent |
| 11 | initially on the documents they were writing and the synopsis |
| 12 | they were writing to understand that part of it until the |
| 13 | evidence arrived and I could look at it for myself. |
| 14 | Q.  So you mentioned the word "flooding."  What do you mean by |
| 15 | that? |
| 16 | A.  Means every time you would go in to look at any of these |
| 17 | cases there would be many more new documents that had come in |
| 18 | since the last time you had been viewing it.  And so again, |
| 19 | this was during the initial part. |
| 20 | THE COURT:  So were things being added to the Simpson |
| 21 | file by all of the people that were investigating back in |
| 22 | Garland, Texas? |
| 23 | THE WITNESS:  Yes, among others. |
| 24 | THE COURT:  Among others.  But so the file was being |
| 25 | flooded not just because of the Phoenix task force that was |

03:43PM
03:43PM
03:44PM
03:44PM
03:44PM

| 1 | investigating Simpson but all of the other FBI information that |
|---|---|
| 2 | was being developed in Garland and in connection with Garland, |
| 3 | they were putting things in the file as well? |
| 4 | THE WITNESS:  Yes, Your Honor. |
| 5 | BY MS. BROOK: |
| 6 | Q.  Describe for us what the organization system inside |
| 7 | Sentinel looks like.  We have talked about how individual |
| 8 | agents take maybe their own personal approach to organization. |
| 9 | Is that your experience in what you have seen? |
| 10 | A.  Yes.  I mean, there's some things that need -- that are |
| 11 | prescribed by policy and then there's others that -- where |
| 12 | agents are given latitude of how they organize the case file. |
| 13 | Q.  And, in fact, was that also the case for the Simpson file? |
| 14 | A.  Could you repeat that? |
| 15 | Q.  Sure, that the Simpson file, too, had its unique |
| 16 | organizational system? |
| 17 | A.  Yes. |
| 18 | Q.  Was that compounded by the fact that the investigation had |
| 19 | been run at different times by different lead agents? |
| 20 | A.  Yes. |
| 21 | Q.  I think you have before you still Exhibit Number 19 which |
| 22 | defense counsel was asking you about, that May 7 of 2015 intern |
| 23 | Gallante 302. |
| 24 | A.  Yes. |
| 25 | Q.  Obviously, if that was in the Simpson file and you didn't |

03:44PM

03:45PM

03:45PM

03:45PM

03:46PM

1    see it, was that a mistake?

2    A.   Yes.

3    Q.   Let's talk for a moment about the briefings.  So there was

4    testimony earlier about these briefings that you were part of,

5    starting on or about May 5th of 2015.  And the question was,          03:46PM

6    how would it be that pole camera footage would not be talked

7    about in these types of briefings?  Does that -- well, let me

8    start.

9            Do you recall pole camera footage from Simpson and

10   Soofi's apartment being discussed at any of the briefings of          03:47PM

11   the FBI or other locations that you had attended?

12   A.   No, not of Simpson's apartment.

13   Q.   And based upon the nature of the briefings, does it make

14   sense to you that the pole camera footage would not be

15   discussed?                                                            03:47PM

16   A.   Yes.

17   Q.   Can you explain that?

18   A.   Yeah.  So the primary purpose of these briefings was to

19   bring the entire division together and provide an update of

20   what had happened since the previous briefing.  So this was a        03:47PM

21   briefing where there's probably 60 or so people in the room

22   surrounding a big room and they are going around the group and

23   basically asking does somebody have something new that's

24   happened since the last meeting to share with the group to help

25   drive everyone's investigation.  So at that time if some new         03:48PM

1    development had happened you would raise your hand and you

2    would brief that to the group what that new development was.

3    And so it would be if that -- if this happened before or if

4    there was something pertinent and so the other component was a

5    lot of how they focus on threat.  So if there was a future          03:48PM

6    threat that follows this attack, that's the primary focus of

7    the meeting, stopping the next attack.  If the individuals who

8    carried out the attack were already dead, they weren't worried

9    about them but they were worried about the other folks, was

10   there a follow-up attack planned.                                   03:48PM

11          So that was what was driving these briefings.  It

12   wasn't the historical stuff or necessarily understanding why

13   but it was understanding is there a threat now, what are the

14   folks who are connected to them doing right now.

15   Q.  Let's rewind back to the late evening hours of May 3rd of       03:49PM

16   2015, the early morning hours of May 4th of 2015.  You had

17   mentioned that you were part of the SWAT execution team?

18   A.  Yes.

19   Q.  And that was for the search warrant at Simpson and Soofi's

20   apartment on 19th Avenue?                                           03:49PM

21   A.  Yes.

22   Q.  Did you, at any point, when you were preparing for entry

23   into that apartment, or entering that apartment, learn that

24   there had been a pole camera?

25   A.  No.                                                             03:49PM

| | |
|---|---|
| 1 | Q.  How do you know that you did not learn that on May 3rd or |
| 2 | May 4th of 2015? |
| 3 | A.  Because obviously, when I carried out that operation, I |
| 4 | carried out many before that, many SWAT operations before, and |
| 5 | a routine part of what we do is to brief whether there is a |
| 6 | pole cam on the site or not.  And if there is, then we're |
| 7 | notified of that and there's usually a plan put in place to |
| 8 | make the pole cam go down before we execute the search and |
| 9 | basically so our appearance isn't videotaped. |
| 10 | Q.  Explain that. |
| 11 | A.  So SWAT is a collateral duty, so FBI investigators like me |
| 12 | who I work terrorism cases undercover, things like that, they |
| 13 | make up the SWAT team.  So if we are videotaped people will see |
| 14 | our face and a lot of people we conduct operations against are |
| 15 | drug dealers.  Some of them are suspected terrorists, things |
| 16 | like that.  So we don't want them to see our image.  It could |
| 17 | put our family in jeopardy.  Eventually it could be released |
| 18 | and we don't know who is going to get that so they could have a |
| 19 | picture of us, it could put us in harm's way or our family in |
| 20 | harm's way.  So there's a lot of efforts to not have us be |
| 21 | videotaped. |
| 22 | Q.  So during the process of you executing the SWAT component |
| 23 | of the search warrant, at any point did you learn information |
| 24 | that would suggest to you that there was a pole camera at that |
| 25 | location of the apartment? |

03:49PM

03:50PM

03:50PM

03:50PM

03:51PM

1    A.   No.

2            THE COURT:  So if I hear what you are saying, that the

3    people at the FBI that knew there was a pole camera, for

4    example, Special Agent Smith, who was the one who also did the

5    search warrant affidavit, he should have told everybody that it    03:51PM

6    existed so it could have been taken -- turned off before you

7    went in?

8            THE WITNESS:  Yes, or so we would at least know about

9    it and if it could be turned off it would be turned off.  Yes,

10   Your Honor.                                                        03:51PM

11   BY MS. BROOK:

12   Q.  At any point did Special Agent Smith tell you there was a

13   pole camera placed outside Simpson and Soofi's apartment?

14   A.   No.

15   Q.  Before we move on, what is the SWAT component of a search?     03:51PM

16   Did you do the actual search execution?

17   A.   No.  So the SWAT component is just to get initial entry

18   into the apartment and make sure it's safe to allow the people

19   that are going to conduct the search to conduct the search.  So

20   we don't do any searches, just kind of come in and secure the     03:52PM

21   area, make sure it's safe.

22   Q.  So you aren't perusing or reading or finding out what

23   should be searched for?

24   A.   No.

25   Q.  Defense counsel asked you about whether or not you reviewed    03:52PM

1    the affidavit for the search at Simpson and Soofi's apartment?

2    A.  Yes.

3    Q.  And as part of your duties as the lead case agent, did you

4    focus on reviewing affidavits to the numerous searches that had

5    been conducted in this investigation?                          03:52PM

6    A.  No.

7    Q.  Can you explain that to us?

8    A.  Yes.  So the search warrant affidavit is just the affiants

9    restating the facts from the case file.  So I would prefer to

10   go to the original source and find those facts myself.  So I   03:53PM

11   wouldn't normally review an affidavit.  That's part of my

12   investigation to try to look at the facts or documents that

13   could arise from those facts.

14   Q.  So as part of systematically reviewing the Simpson case

15   file to look for any possible discovery or relevant            03:53PM

16   information, how was it that you worked through the file?

17   A.  Well, I started with the main case file and then just went

18   from the oldest document to the newest document and just

19   essentially opened each document, did a quick read of the

20   document to see what the substance of it, what it was, and if  03:53PM

21   it met the parameters of what I had been told by the

22   prosecutors then I printed that.  And then I took those

23   documents that were printed and I had an Excel spreadsheet that

24   labeled where I found them at so we could go back to them if we

25   needed to look at them.                                        03:54PM

1          And then I took all those documents once I had them

2    and I scanned them into a single document that had all the

3    discoverable materials in one bat, or electronic file.

4    Q.  Were there times in your review you were uncertain whether

5    or not something was relevant?                                    03:54PM

6    A.  Yes.  There were times when -- yes.

7    Q.  And what would you do?

8    A.  When in doubt I would just include it, and if it was

9    something -- I can't think of a particular example where I had

10   to ask, but I would have talked to the prosecutors if there was  03:54PM

11   something I needed their guidance on.  But when in doubt I

12   would just include it with the understanding that the

13   prosecutors would look it over and make sure.  They would be

14   the ones that would actually decide what went on after that.

15   Q.  How is it that you first came to learn that there was        03:54PM

16   potentially a pole camera placed outside of Simpson and Soofi's

17   apartment?

18   A.  The prosecutors in this case called me and told me that --

19   asked me if I knew about it.

20          THE COURT:  That was this year, right?                     03:55PM

21          THE WITNESS:  Yes, Your Honor, in or about February of

22   2019.

23   BY MS. BROOK:

24   Q.  So in or about February 2019, the prosecutors on the Kareem

25   case called you to ask about potential pole camera footage       03:55PM

1    outside of Simpson and Soofi's apartment?

2    A.   Yes.

3    Q.   When we called you to ask you about it, what was your

4    response?  What did you think?

5    A.   Well, my initial response was that the prosecutors were          03:55PM

6    probably confused, were confusing this with another matter.

7    But I wanted to make sure that was the case because I didn't

8    believe there was one, honestly.  So that's when I reached out

9    as I mentioned earlier to Special Agent Mullen.

10   Q.   So let's take a step back in time to May 3rd of 2015 and         03:56PM

11   the weeks that followed and throughout the pendency of the

12   investigation in the Kareem case.

13           At any point did -- prior to February of 2019, did you

14   talk to Amy Fryberger and learn about the existence of pole

15   camera footage?                                                       03:56PM

16   A.   No.

17   Q.   Did Special Agent Fryberger suggest to you anything that

18   would indicate there may be pole camera footage?

19   A.   No.

20   Q.   How about Special Agent Andrew Smith?                            03:56PM

21   A.   No.

22   Q.   And specifically, did you learn any information in any

23   conversation from Andrew Smith that would have suggested to you

24   that there was pole camera footage on Simpson and Soofi's

25   apartment?                                                            03:56PM

| | |
|---|---|
| 1 | A.  No, and the opposite. |
| 2 | Q.  What do you mean the opposite? |
| 3 | A.  At one point he mentioned that he had done a drive-by spot |
| 4 | surveillance and so to me, if he had a pole cam there would be |
| 5 | no reason for you to drive by and do a surveillance.  You |
| 6 | would -- that's why you would just look at the pole cam.  So |
| 7 | that was my understanding is they didn't have one. |
| 8 | Q.  At any point prior to February of 2019 and any |
| 9 | conversations you may have had with Special Agent Nolen, did |
| 10 | you learn that there may be pole camera footage from Simpson |
| 11 | and Soofi's apartment? |
| 12 | A.  No. |
| 13 | Q.  How about Supervisory Special Agent Glenn Milnor? |
| 14 | A.  No. |
| 15 | Q.  Any conversations with the intern Gallante that would lead |
| 16 | you to believe that there could potentially be pole camera |
| 17 | footage outside of Simpson and Soofi's apartment? |
| 18 | A.  No. |
| 19 | Q.  Assistant Chief Division Counsel Matthew Greenberg? |
| 20 | A.  No. |
| 21 | Q.  Any text from within ELSUR? |
| 22 | A.  No. |
| 23 | Q.  Special Agent Leroy Holland (phonetic)? |
| 24 | A.  I'm sorry, could you repeat that? |
| 25 | Q.  Special Agent Leroy Holland. |

03:57PM

03:57PM

03:57PM

03:57PM

03:58PM

1    A.   No.

2    Q.   Any conversations with him or information obtained from him

3    that would lead you to believe there was a pole camera placed

4    outside of Simpson and Soofi's apartment complex?

5    A.   No.                                                              03:58PM

6    Q.   Special Agent Andrea Theobald?

7    A.   No.

8    Q.   And any conversations before February of 2019 with Serena

9    Martinez of ELSUR that would have suggested to you that there

10   could potentially be pole camera footage outside of Simpson and   03:58PM

11   Soofi's apartment?

12   A.   No.

13   Q.   In preparing for your testimony here, did you review your

14   e-mail to find out whether or not anybody e-mailed you about

15   there being pole camera footage of Simpson and Soofi's           03:58PM

16   apartment?

17   A.   Yes.

18   Q.   And did anybody?

19   A.   No.

20   Q.   You didn't find any e-mails or information in your e-mail    03:58PM

21   system that would have led you to believe there could have been

22   pole camera footage?

23   A.   No.

24   Q.   When you were reviewing the Simpson Sentinel file did you

25   ever do a word search for the term pole camera?                  03:59PM

| | |
|---|---|
| 1 | A.  I did after February of 2019. |
| 2 | Q.  I will ask a better question.  Prior February 2019 did you |
| 3 | ever do a word search inside the Simpson Sentinel file to find |
| 4 | out whether or not there was a pole camera? |
| 5 | A.  No. |
| 6 | Q.  During the time that you were working the Kareem case, did |
| 7 | anybody at the FBI suggest to you that the FBI must act to |
| 8 | cover up embarrassment for Simpson committing an attack despite |
| 9 | FBI surveillance? |
| 10 | A.  No. |
| 11 | Q.  At any point when you were working the Kareem case did |
| 12 | anybody at the FBI suggest to you that somebody needed to pay |
| 13 | for the attack? |
| 14 | A.  No. |
| 15 | Q.  During the time that you were working the Kareem case did |
| 16 | anybody ever suggest to you at the FBI that someone needed to |
| 17 | be prosecuted because there was an attack? |
| 18 | A.  No. |
| 19 | MS. BROOK:  May I have one moment? |
| 20 | THE COURT:  Yes. |
| 21 | MS. BROOK:  I don't have any other questions. |
| 22 | THE COURT:  Thank you.  Mr. Maynard. |
| 23 | REDIRECT EXAMINATION |
| 24 | BY MR. MAYNARD: |
| 25 | Q.  Agent Whitson, when you did the search in Sentinel in |

03:59PM

03:59PM

04:00PM

04:00PM

04:00PM

| | |
|---|---|
| 1 | February or thereafter of 2019 for pole camera, did you find |
| 2 | it? |
| 3 | A.  I didn't. |
| 4 | Q.  Do you have an explanation as to why? |
| 5 | A.  I had just started that as I was reaching out to Ryan |
| 6 | Mullen, and so before I had done any kind of full exhaustive |
| 7 | search in Sentinel he gave that response that led me to believe |
| 8 | perhaps there was.  And as I indicated before, I wanted to |
| 9 | preserve my memory of what it was at trial.  I thought doing |
| 10 | any kind of further look would not be appropriate so I stopped |
| 11 | and didn't look or do anything. |
| 12 | Q.  But you have told us you did a systematic search in the |
| 13 | various documents that I showed you which included a pretty |
| 14 | thick sheet of single pages of photographs that were taken from |
| 15 | the pole camera.  You never saw any of those before February of |
| 16 | 2019, is that correct? |
| 17 | A.  That's correct. |
| 18 | Q.  And if those things were in the file, the documents that I |
| 19 | showed you, Exhibit 12, 13, 16, 17, 19, do you have an |
| 20 | explanation as to how you would have missed them if they were |
| 21 | there? |
| 22 | A.  I don't.  I mean, I could guess. |
| 23 | Q.  I don't want you to guess. |
| 24 | A.  So I don't. |
| 25 | Q.  Okay.  And you had some briefings with Andrew Smith about |

04:01PM

04:01PM

04:01PM

04:02PM

04:02PM

| | |
|---|---|
| 1 | the Simpson file, correct? |
| 2 | A.  He was in the room while I had briefings about the Simpson |
| 3 | case. |
| 4 | Q.  Did you ever sit down with him individually one-on-one and |
| 5 | talk about the Simpson case? |
| 6 | A.  No. |
| 7 | Q.  Did anyone ever tell you that on May 1st that Nadir Soofi |
| 8 | was carrying a sidearm? |
| 9 | MS. BROOK:  Objection.  Beyond the scope. |
| 10 | THE COURT:  Overruled.  You may answer. |
| 11 | THE WITNESS:  I don't recall hearing that he was |
| 12 | carrying a sidearm on that day. |
| 13 | BY MR. MAYNARD: |
| 14 | Q.  Did you task anyone else at the FBI to look at these files |
| 15 | for you? |
| 16 | A.  I don't understand your question. |
| 17 | Q.  The Simpson -- in going through the Simpson file that was |
| 18 | in Sentinel, you have told us that you did a fairly systematic |
| 19 | review.  Did you task any other people to go look for things |
| 20 | for you? |
| 21 | A.  Not for the purposes of discovery. |
| 22 | Q.  Did you ever hear after the attack in Garland, Texas, |
| 23 | anybody in the Phoenix office of the FBI talk about having been |
| 24 | advised by FBI agents in Dallas or undercover agents that |
| 25 | Simpson had been communicating with the FBI about attacking |

04:03PM

04:03PM

04:03PM

04:04PM

04:04PM

1   Dallas?

2          MS. BROOK:  Objection.  Beyond the scope.

3          THE COURT:  Sustained.

4          MR. MAYNARD:  Your Honor, may I be heard?

5          THE COURT:  No.  It's beyond the scope of cross.          04:04PM

6   BY MR. MAYNARD:

7   Q.  You testified on cross-examination that Smith told you at

8   some point that he had done spot surveillance.  Do you recall

9   that testimony?

10  A.  Yes.                                                         04:05PM

11  Q.  Did he tell you when he had done the spot surveillance?

12  A.  He had said it was the day or the day before he thought

13  they had left, and he was remarking that he had done the spot

14  surveillance and saw their vehicle there so he didn't think

15  that meant they had left.  He thought they were still there.    04:05PM

16  Q.  Do you recall whether or not he told you that the spot

17  surveillance actually occurred on May 3rd?

18  A.  No.  I don't recall.

19  Q.  What was the context of the conversation where Smith talked

20  to you about spot surveillance?                                 04:05PM

21  A.  He was -- we were in our squad area, so I was in mine and

22  he was walking into the edge of his, and he kind of almost

23  bemoaned the fact that he had just gone.  I don't want to

24  speculate what his thoughts were, but he basically was saying I

25  just looked for the vehicle there and it was still there.  So I 04:06PM

1    thought that meant they were -- they hadn't gone.  And he like

2    walked into their squad area which is where I lose view of

3    them.  That was the moment where I thought my understanding was

4    he had done a spot check, saw the vehicle, or Simpson's vehicle

5    in the parking lot.                                    04:06PM

6    Q.  He saw Simpson's vehicle.  Didn't see Soofi's vehicle?

7    A.  He didn't comment on that.  He said he had seen Simpson's

8    vehicle.

9    Q.  And there was no conversation or no discussion with him

10   about gee, if I had looked at the streaming I would have seen   04:06PM

11   they left on May 1st?

12   A.  That was not part of this discussion.

13   Q.  Did you ever hear anybody at the FBI in Phoenix talk about

14   that had we ever looked at the video we would have known they

15   had left on May 1st?                                   04:06PM

16   A.  No.

17           MR. MAYNARD:  I don't have any further questions, Your

18   Honor.

19           THE COURT:  May this witness be excused?

20           MR. MAYNARD:  Yes, ma'am.                      04:07PM

21           THE COURT:  Thank you very much, Special Agent

22   Whitson.  You may step down and you are excused.

23           THE WITNESS:  Thank you, Your Honor.

24           (Excerpted proceedings concluded at 4:07 p.m.)

25

1

2

3

4

5                        C E R T I F I C A T E

6

7            I, LAURIE A. ADAMS, do hereby certify that I am duly

8    appointed and qualified to act as Official Court Reporter for

9    the United States District Court for the District of Arizona.

10           I FURTHER CERTIFY that the foregoing pages constitute

11   a full, true, and accurate transcript of all of that portion of

12   the proceedings contained herein, had in the above-entitled

13   cause on the date specified therein, and that said transcript

14   was prepared under my direction and control.

15           DATED at Phoenix, Arizona, this 29th day of October,

16   2019.

17

18                              s/Laurie A. Adams

19                              _____
                                Laurie A. Adams, RMR, CRR

20

21

22

23

24

25