UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

_____

United States of America,      )
                               )    No. CR 15-0707-PHX-SRB
              Plaintiff,       )
                               )
         vs.                   )    Phoenix, Arizona
                               )    October 15, 2019
Abdul Malik Abdul Kareem,      )    9:34 a.m.
                               )
              Defendant.       )
_____ )


BEFORE:   THE HONORABLE SUSAN R. BOLTON, JUDGE

REPORTER'S TRANSCRIPT OF PROCEEDINGS

(*Evidentiary Hearing-Day 1*)
(*Pages 1 through 202, inclusive.*)


Official Court Reporter:
Laurie A. Adams, RMR, CRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc 43
Phoenix, Arizona 85003-2151
(602) 322-7256

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

APPEARANCES:

For the Plaintiff:
          U.S. ATTORNEY'S OFFICE
          By:  Joseph E. Koehler, Esq.
          By:  Kristen Brook, Esq.
          40 North Central Avenue, Suite 1800
          Phoenix, Arizona 85004

For the Defendant:
          MAYNARD CRONIN ERICKSON CURRAN & REITER, P.L.C.
          By: Daniel D. Maynard, Esq.
          3200 North Central Avenue
          Suite 1800
          Phoenix, Arizona 85012

          DRAKE LAW PLC
          By:  Daniel D. Drake, Esq.
          4340 East Indian School Road
          Suite 21-113
          Phoenix, Arizona 85012


                    I N D E X

| WITNESS: | DIRECT | CROSS | REDIRECT | RECROSS |
|----------|--------|-------|----------|---------|
| AMY FRYBERGER | | | | |
| By Mr. Drake | 6 | | 107 | |
| By Mr. Koehler | | 82 | | |
| STEWART WHITSON | | | | |
| By Mr. Maynard | 120 | | 173 | |
| By Ms. Brook | | 157 | | |
| JON-TODD BAKER | | | | |
| By Mr. Maynard | 179, 185 | | 200 | |
| By Ms. Brook | | 196 | | |
| Voir Dire Examination | | | | |
| By Ms. Brook | 182 | | | |

INDEX OF EXHIBITS

| EXHIBIT | | IDENT | RECEIVED |
|---|---|---|---|
| 1 | Simpson Apartment Complex Aerial w/ Circle | 84 | 84 |
| 2 | Simpson Apartment Map Full w/ Circle | 85 | 84 |
| 3 | Simpson Apartment Map Right Half | 85 | 84 |
| 4 | Simpson Apartment Map w/ Circle | 86 | 84 |
| 5 | Photo Building 30 | 86 | 84 |
| 6 | Photo Building 30 East Approach from Parking Lot | 86 | 84 |
| 7 | Photo Simpson Apartment & Breezeway View from East | 86 | 84 |
| 8 | Photo Building 30 West Approach from Parking Lot | 89 | 84 |
| 9 | Photo Building 30 Breezeway Entrance View from Southwest | 89 | 84 |
| 10 | Photo Simpson Breezeway View | 89 | 84 |
| 11 | Photo Simpson Apartment Door & West Breezeway to Courtyard | 90 | 84 |
| 12 | Surveillance Reports | 29 | 84 |
| 13 | Pole Camera Authorization Documentation | 36 | 84 |
| 14 | Simpson Apartment Complex Aerial-Camera Angle | 95 | 84 |
| 15 | Pole Camera Video Screenshot Samples | 96 | 84 |
| 16 | Simpson Apartment Search Warrant Photos | – | 84 |
| 17 | ELSUR Pole Camera Evidence Collection Log | 56 | 84 |
| 18 | ELSUR Digital Evidence Access Log | 67 | 84 |
| 19 | Pole Camera 302 Log Screenshots | 64 | 84 |
| 20 | Apartment Aerial View | – | 84 |
| 116 | Application for Search Warrant | 70 | 70 |
| 120 | Tweets between Simpson and Junaid Hussain 4/5/15 | 46 | – |
| 121 | Twitter re: Contest 4/23/15 | 45 | 45 |
| 135 | E-mail string #4 Sword and the Tongue | 47 | 47 |

P R O C E E D I N G S

THE COURTROOM DEPUTY:  Criminal Case 15-707 United States of America versus Abdul Malik Abdul Kareem, set for an evidentiary hearing.

Counsel, please note your appearances for the record.

MR. KOEHLER:  Good morning, Your Honor.  Joe Koehler and Kristen Brook for the United States.

MR. DRAKE:  Good morning, Your Honor.  Dan Maynard and Dan Drake on behalf of Mr. Abdul Malik Abdul Kareem, who is present in the courtroom.

THE COURT:  This is the time set for evidentiary hearing concerning the pole camera and its footage.  Have you discussed who is going to present the evidence first since it's not immediately apparent who goes first?

MR. DRAKE:  Yes, Your Honor, we have.  Mr. Koehler and I discussed the fact that this is our burden and hearing and, therefore, we would go first.

THE COURT:  Okay.  Then you may call your first witness.

MR. DRAKE:  Call Amy Fryberger, please.  Also move to invoke the rule.

THE COURT:  Could I ask that all witnesses present in the courtroom please come forward and be sworn.

MR. DRAKE:  Your Honor, while that's taking place would it be permissible for Mr. Abdul Kareem to have his

handcuffs removed so that he can make notes and mark exhibits admitted?

THE COURT:  Yes.  I think that that would be fine. You could remove his handcuffs.

MR. DRAKE:  Thank you, Your Honor.

(Witnesses Glenn Milnor, Jon-Todd Baker, Ryan Mullen, Stewart Whitson, and Amy Fryberger were sworn.)

THE COURTROOM DEPUTY:  Please state your name for the record, spelling first and last name.

WITNESS MILNOR:  Glenn Milnor.  G-L-E-N-N, M-I-L-N-O-R.

WITNESS BAKER:  Jon-Todd Baker.  J-O-N, hyphen, T-O-D-D, B-A-K-E-R.

WITNESS WHITSON:  Stewart Whitson.  S-T-E-W-A-R-T, W-H-I-T-S-O-N.

WITNESS FRYBERGER:  Amy Fryberger.  A-M-Y, F-R-Y-B-E-R-G-E-R.

WITNESS MULLEN:  Ryan Mullen.  R-Y-A-N, M-U-L-L-E-N.

THE COURT:  Gentlemen and Special Agent Fryberger, the rule to exclude witnesses has been invoked in this case.  That means that with certain exceptions, all of you must remain outside the courtroom until you are called in to testify.  You are also prohibited from discussing your testimony with one another until all of you have completed your testimony.  You may, of course, discuss your testimony with counsel.

Is one of these witnesses designated by the government to assist you?

MR. KOEHLER:  Yes, Your Honor.  Special Agent Ryan Mullen.

THE COURT:  So Special Agent Mullen, you may take a seat at counsel table.

Special Agent Fryberger, you may take the stand and I will excuse the other three witnesses.  Thank you.

I'll also ask counsel if there are other witnesses who appear later if you would please advise them that the Rule has been invoked and the requirements of the Rule.

MR. DRAKE:  Will do, Your Honor.

THE COURT:  Thank you.

MR. DRAKE:  May the witness --

THE COURT:  Please sit down.  I'm sorry.

MR. DRAKE:  Will the witness be given the exhibits?

THE COURTROOM DEPUTY:  I have to pull them.

AMY FRYBERGER,

a witness herein, having been first duly sworn by the clerk to speak the truth and nothing but the truth, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. DRAKE:

Q.  Good morning Agent Fryberger.

A.  Good morning.

10-15-19  CR 15-707-USA v Kareem-Evidentiary Hearing-Day 1-Fryberger-Direct

Q.   I wanted to get a quick overview and then ask some more detailed questions.

If I understand correctly, you joined the Simpson investigation that was being conducted by the FBI in Phoenix in approximately April -- about April 6 of 2015?                                    09:37AM

A.   Yes.

Q.   And you were the one who put together the application for the pole camera that's at issue here on or about April 9 of 2015, is that correct.

A.   Yes.                                                                               09:38AM

Q.   And if I understand from a variety of information, the pole camera was not operational until sometime on the day of May 1, 2015, is that correct?

A.   Yes.

Q.   And it was set to stream to your office and to your desk.       09:38AM
Is that also correct?

A.   Yes.

Q.   If I understand as well, you were out of the office and by and large out of cellphone contact from sometime on the 1st of May until sometime on the 3rd of May?                                      09:38AM

A.   Correct.  I was out of cellphone contact on the 3rd.

Q.   And at some point on the 3rd of May you were recalled to the office, were you?

A.   Yes.

Q.   And who called you back?                                          09:39AM

A.   Special Agent Andrew Smith.

Q.   And when you returned to the office on May 3rd -- and about what time was that on May 3rd?

A.   It was later in the evening.  I probably got there somewhere between 9 and 10 p.m.

Q.   Okay.  You then viewed the video of the pole camera that had been available on your desk, is that correct?

A.   Correct, sometime that evening into the early morning.

Q.   Sure.

        THE COURT:  I take it you were called back into the office and did this because of what had happened in Garland, Texas.  Would that be true?

        THE WITNESS:  Yes, ma'am.

        THE COURT:  Thank you.

BY MR. DRAKE:

Q.   And when you viewed the pole camera, went to view the pole camera, whose idea was that that evening?

A.   It would have either been mine or Special Agent Smith's.  We were working together in that endeavor.

Q.   Okay.  And I suspect that you were hoping to find information showing that Elton Simpson and Nadir Soofi were still in Phoenix.  Is that correct?

A.   We were trying to determine if they had left Phoenix.

Q.   Right.  But it would be your hope that they would be in Phoenix?

A.   Correct.

Q.   And then after you had reviewed the pole camera that evening you, or what you described, I believe, in what was described in the government's hearing memorandum, you or a co-case agent requested that an intern create a log of the images or a log of the analysis of the pole camera video.  Is that correct as well?

A.   Yes.

Q.   And that also included a spreadsheet indicating who was seen of note in the pole camera so you could understand what the activity was?

A.   Correct, those that could be identified from the pole camera.

Q.   Right.  And then shortly following that sometime in probably about May 10 or 11, if I understand correctly, the pole camera video was placed into storage?

A.   I'm not sure the exact date, but that would be the process, yes.

Q.   And that was the last you had of contact with the pole camera, or was it?

A.   Yes.

Q.   And was it also the last you had to do with the Simpson case?

A.   It was not the last I had to do with the Simpson case, no.

Q.   Okay.  We'll get to that.

Could you tell us a little bit about your background; basically your employment background as a law enforcement officer with the FBI.

A.   I have been with the FBI as an agent for almost 12 years.

Q.   And you have served on a variety of different squads in different areas?

A.   I have.

Q.   What sort of training have you gone through as an FBI agent?

A.   I went through the 20 weeks of new agent training as well as I have attended maybe not annual training but semi-annual trainings throughout my career depending on different topics and different things I have worked on to better understand those.

Q.   Okay.  Did you -- you said you went to the new agent's training when you were first hired?

A.   Yes.

Q.   And then did you go through the onboarding new employees?

A.   That didn't exist at that time.

Q.   It does now though?

A.   Correct.

Q.   And then there's also something called a virtual academy. Does that exist?

A.   It does.

Q.   What is the virtual academy?

A.   It's online training.

Q.   How do you access it?  Where does it --

A.   It's done through our computers.  It's an internal database doing trainings that are required and -- some that aren't required but some that are required.

Q.   And you take training, I assume, on handling exhibits, sharing information, and a variety of topics?

A.   Yes.

Q.   Were you aware of the Simpson investigation before you joined it in April of 2015?

A.   I was aware that an investigation had existed prior, yes.

Q.   Was there then an -- when you joined it in April, was there then an ongoing investigation, an open investigation, into Elton Simpson?

A.   Yes.

Q.   And when had it opened, if you know?

A.   That investigation had opened, I believe it was March 2nd.  It was early March 2015.

Q.   What were you -- what's your understanding as to why it was opened then?

A.   That investigation was opened because Mr. Simpson was known to be communicating with a U.S. person who was overseas fighting on behalf of a designated terrorist organization.

Q.   Was that individual Junaid Hussain?

        MR. KOEHLER:   Your Honor, we're going to object to any

10-15-19  CR 15-707-USA v Kareem-Evidentiary Hearing-Day 1-Fryberger-Direct

questioning about the identity of the individual that is --

THE COURT:  Could I ask you to speak at the microphone, Mr. Koehler, so the court reporter can hear you and me too.

MR. KOEHLER:  Yes, Your Honor.

The identity of the individual is not relevant.  The general description of the individual is relevant as well as counsel is inquiring about classified information at this point and we would ask that the questioning be limited strictly to the nature of the individual and not the identity.

THE COURT:  Sustained.  And those limitations, unless you have some reason to explain to me why the person's identity is relevant, I think a description is all that we need.

Mr. Drake.

MR. DRAKE:  All right.  Your Honor, there were later that summer text messages or Twitter messages between Elton Simpson and a fellow known as Junaid Hussain, and I wanted to find out if that was part of what prompted this.  But it sounds like it's another individual.  I can't tell.

THE COURT:  You could ask the question that way.

MR. DRAKE:  I will.  But I was sustained.  The objection was sustained.

THE COURT:  You could ask if the person was this whoever this individual is that appears on the Twitter messages.

09:45AM
09:45AM
09:46AM
09:46AM
09:46AM

UNITED STATES DISTRICT COURT

MR. DRAKE:  Mr. Koehler, being helpful, has informed me that it could not have been Mr. Hussein because he's not a U.S. citizen.  So then we'll move on.  And thank you, Mr. Koehler.

BY MR. DRAKE:                                                    09:47AM

Q.  When you joined the investigation in April of 2015, were you brought on board, given any information?  What happened to bring you up to speed about the investigation that apparently had opened in March?

A.  We had team meetings, and those of us working the              09:47AM
investigation worked in very close proximity so we were able to discuss what was going on and where we wanted to try to go with the investigation.

Q.  And how many people were involved in those meetings?

A.  There were three of us kind of the co-case agents of that      09:47AM
investigation.

Q.  Was that Mr. Smith and Mr. -- or Special Agent Hebert and Special Agent Smith?

A.  It was Special Agent Smith, not Special Agent Hebert.

Q.  Oh.  That's how you pronounce it?                              09:48AM

A.  "Hebert," yes.

Q.  Was there a third co-case agent?

A.  There was.

Q.  Who was that?

A.  Special Agent DeEtta Nolen.                                    09:48AM

Q.  Is the official first name DeEtta Nolen?  Am I pronouncing that correctly?

A.  DeEtta is her first name, yes.

Q.  So you, Smith, and DeEtta Nolen, those are the three co-case agents on it.  And you were the ones who were meeting and talking about what you want to do with the investigation. Correct?

A.  Correct.

Q.  Did you have an understanding at that point why the investigation had been closed in November of 2014?

A.  I believe that Mr. Simpson had been convicted of a crime and that the -- at that time, they didn't, no longer, see him as an imminent threat.

Q.  What was your role going to be as you were moving forward in this investigation?

A.  At that time, I was responsible for organizing surveillance.

Q.  And the role of Smith?

A.  He was the lead case agent.

Q.  And the role of Nolen?

A.  She was responsible for some other administrative things on the case.

Q.  So if I understand correctly, you -- from the government's hearing memorandum, the investigation was in the beginning stages of reopening when the attack occurred in May.  Is that

correct?

A.  Yes.

Q.  How long does it take to open an investigation and get it started?

A.  Well, the case was open.  It wasn't a matter of getting it started but it was in the beginning stages of looking at Mr. Simpson.

Q.  Were you aware of Hebert's prior service and handling of the investigation of Elton Simpson?

A.  I knew bits and pieces but not the entirety of it.

Q.  Did you and the other two co-case agents sit down with Special Agent Hebert and talk about the investigation that he had conducted regarding Simpson back in 2006, 7, and 9?

A.  I don't think I was part of the meetings like that.

Q.  Well, did anybody tell you about that?

A.  I knew, like I said, I knew the gist of it.  I wasn't into the details of it.

Q.  All right.  And the gist of it was that Simpson was planning to travel to Somalia?

A.  Yes.

Q.  Right?

Did you review any documents or things of that sort when you first got involved in the Simpson investigation that led you back into the old Simpson investigation?

A.  I had reviewed some but not the entirety of the case.

Q.   Okay.   And if I understand correctly, some of these case files are big, very big?

A.   Correct.

Q.   I understand this one has, perhaps, as many as 35 subfiles?

A.   That's approximate, yes.                                                   09:51AM

Q.   Is there some standard procedure that you were taught or the FBI teaches with respect to organizing its case files that makes it easy to access and retrieve information?

A.   All the case files are electronic now.

Q.   Yes.                                                                       09:51AM

A.   So they are case files specific to certain activities in the case.

Q.   All right.

A.   And then there's also a main case file.

Q.   Okay.   But there would be a file for surveillance?            09:52AM

A.   Yes.

Q.   Would there be a separate subfile for electronic surveillance?

A.   Yes.

Q.   Would there be a separate file for Grand Jury subpoenas?       09:52AM

A.   Yes.

Q.   And another file for search warrants or information obtained via search warrant such as a subscriber information or an internet provider?

A.   There could be, but that's not standard.                       09:52AM

UNITED STATES DISTRICT COURT

10-15-19  CR 15-707-USA v Kareem-Evidentiary Hearing-Day 1-Fryberger-Direct

Q.  But the basic idea is that everybody puts everything in the same place so anybody can find it without getting lost.  Is that a fair assessment?

A.  Everything goes into the case file, yes.

Q.  Well, right.

09:52AM

THE COURT:  I think Mr. Drake was asking more specifically that there's an organization to case files in these subfiles so that any other agent would know where to look to find things.

THE WITNESS:  So some things may go into subfiles and some things may go into the main file and some things may go into both so it could be duplicative.

09:53AM

BY MR. DRAKE:

Q.  Okay.  Let me give you an example and maybe this will help clarify.  Mr. Maynard and I are working on this case together. I happen to keep things in electronic files.  I name them, and I put them in electronic files in a fashion that seems to make sense to me.  And on occasion, Mr. Maynard has told me he can't understand why I put that where I put it and how could he ever possibly find it.

09:53AM

09:53AM

My assumption is that the FBI, organized as it is, has a fairly standardized protocol for what goes in given subfiles.

A.  In certain subfiles, yes, but it doesn't apply to everything.

Q.  All right.  What sort of documents did you look at when you

09:54AM

first became involved in April of 2015 to bring you up to speed about what had been known about Mr. Simpson and the prior investigation and prosecution?

A.  I looked at -- I started with the closing of the previous case to see why it was closed, and then there was source reporting and open source reporting that had been put into the case file.  So I looked at those documents.                    09:54AM

Q.  What is source reporting?

A.  Information provided from outside entities to the FBI.

Q.  That could be Department of Homeland Security, Customs, ICE?                                                          09:54AM

A.  It's more or less like civilians or people in the community that report on individuals.

Q.  All right.  And you mentioned open source.  What is that?

A.  Twitter, social media, anything like that.          09:55AM

Q.  Did you also look at anything that would give you information about his associates?

A.  At that point in time we were trying to identify who his associates were.

Q.  Why were you trying to do that?                      09:55AM

A.  That's a normal, standard practice to identify who people were associating with.

Q.  Would you take a look at one of the exhibits in front of you.  It's Exhibit Number 123.

A.  Can I get my glasses?                                 09:55AM

THE COURT:  Yes.  Go right ahead.

THE WITNESS:  What number was that?

THE COURT:  123.

BY MR. DRAKE:

Q.  123.  And let me note this for the record.  You just got your glasses, and that's fine.  I have hearing aids and I have difficulty hearing so I may have to stop you at times and do some other things, follow up.

What I want to direct you to is Page 8 of that exhibit.  They are numbered -- it's numbered at the top.

A.  Okay.  I have got it.

Q.  And have you seen this before?

A.  It's been a while, but yes.

Q.  That's correct, this was done back in 2015.

This appears to be a Tactical Intel Report.  Is this one of those things that is created upon the opening of a case to track basic information about a subject, their location, and their associates?

A.  Yes; some of their associates, not all.

Q.  Right.  With respect to some of the information that you talked about concerning open source, I see that you got some information here regarding, on this exhibit, on Page 8, vehicle license plates for an Infinity sedan and for a Pontiac.  Correct?

A.  Yes.

Q.  Is that the kind of information that you would pull from public records or readily available records to assemble this?

A.  Yes.

Q.  And this basically is designed to give people who are working on the case a quick overview or quick summary of the subject and pertinent information.  Is that a fair statement?

A.  Yes.

Q.  I see on Page 9 that they also pulled information from the Arizona Department of Economic Security regarding employment. Correct?

A.  Yes.

Q.  And then on Page 10, it begins to show some tactical information and background regarding Mr. Simpson and his prior case that apparently resulted in a Grand Jury indictment on January 13, 2010.  Correct?

A.  Yes.

Q.  It then lists Mr. Simpson's apparent family members and associates slash friends.  Correct?

A.  Yes.

Q.  What information is used to generate the associates and friends portion of Tactical Intel Report in your experience?

A.  So I don't draft these reports, but I believe that the associate would be linked through his vehicle because he had -- she was listed jointly on the registration of the vehicle. There are also other databases that they go into that link

people together, family members and friends together if they have ever stayed at the same address or maybe used the same phone number on a utility bill or something like that.

Q.   What does your experience tell you who would have prepared this portion of the Tactical Intel Report or Tactical Intel Report in its entirety?

A.   Who would have prepared it?

Q.   Yes.

A.   Sorry.  It would have been someone from our Intel branch, either an analyst or what we call an SOS.

Q.   Okay.  When you said the Intel branch, what is that?

A.   They just gather -- they work on the Intel side.  It's like our analysts that go through records and things like that for us.

Q.   Okay.  Are they intelligence analysts?  We have had some testify at a prior hearing in this case that were intelligence analysts.  Am I using the correct term to describe them?

A.   That is one person, yes.  There are different job titles within that branch, but yes, that is one.

Q.   Okay.  And you mentioned something else, was it CHS or SMS?

        THE COURT:  SOS.

        THE WITNESS:  SOS.

        MR. DRAKE:  Thank you.

BY MR. DRAKE:

Q.   What is that?

A.   I actually don't know what it stands for, but it's somebody that produces Intel Tactical Reports, does research for us, things like that.

Q.   All right.  Did you become aware as you and Agents Smith and Nolen were opening up this investigation that Elton Simpson had re-tweeted a post about the drawing contest to be held in Garland, Texas, on May 3, 2015?

A.   I don't know -- I don't recall if I knew that before or after.

THE COURT:  Before or after May 3rd?

THE WITNESS:  Yes, ma'am.

BY MR. DRAKE:

Q.   If it were a tweet that he reposted or re-tweeted, would that be open source?

A.   It could be, yeah.

Q.   That would be something your intelligence analyst could search for and find?

A.   Correct.

Q.   And that's without the benefit of a Grand Jury subpoena or a search warrant?

A.   As long as his profile is accessible, yes.

Q.   Would you take a look, please, at Exhibit 115.

Exhibit 115 is a copy of the first page of the trial exhibit in this case, Trial Exhibit 157, offered and admitted into evidence.  And it was included with the Twitter records

pertaining to Elton Smith.

Is this what you saw at some point?

A.   You mean Elton Simpson?

Q.   I'm sorry.  Thank you.  Elton Simpson.

A.   I can't say for certain if I saw this at some point.  It's been a long time.  I didn't review this information.  But if it came back in the results then I probably saw it, yes.

Q.   All right.  A Muhammad art exhibit and contest scheduled for, does it say -- I don't believe it says on this when it's going to be held.  This is coming how many days, weeks, or months after the attack at the Paris Magazine Charlie Hebdo?

MR. KOEHLER:  I'm going to object to the form of the question.  It's confusing.  And also --

THE COURT:  Once again, Mr. Koehler, I realize it's difficult because you want to be able to see me when you talk to me, but we also need the microphone.

MR. KOEHLER:  Government objects first to form of the question.  It's confusing.  And second, the witness has twice testified she doesn't remember when she saw this the first time and so this is not relevant as well.

THE COURT:  Do you have a recollection as to when the attack on Charlie Hebdo was in Paris?

THE WITNESS:  It was sometime in 2014, but I don't have a recollection, no.

THE COURT:  Thank you.  Mr. Drake.

BY MR. DRAKE:

Q.  Now, you were in charge of the surveillance if I understand correctly, and as part of that, what did you do to assist others on your squad or within the FBI to participate in the surveillance of Elton Simpson?

A.  I had requested a pole cam to be put up and then I participated in one surveillance as well.

Q.  Was it your understanding when you put in the application for the pole camera, which we understand to be April 9, that there had already been some surveillance conducted with respect to Mr. Simpson?

A.  Yes.

Q.  And that was as early as March of 2015?

A.  Yes.

Q.  After you put in the application for the pole camera, did you have occasion to brief any other agents or explain to other agents what it was they might be looking for so that they could participate more effectively in the surveillance of Elton Simpson?

A.  Do you mean other agents that were on surveillance?

Q.  Yes.

A.  Yes, I did.

Q.  What did you tell them?

A.  You would give them the address of where he lived and the address of where he worked as well as vehicles, kind of the

same kind of things that were in the Intel report, vehicles that were registered to him.

Q.  And agents who were on your squad, would they have had access to the Tactical Intel Report?

A.  They would have, yes.

Q.  How would they do that?

A.  They could find it in the case file, or a lot of times when people are going on surveillance we give them that information so that it's handier because you can't take the case file with you when you go to the field.

Q.  All right.  Now, when you say they looked in the case file, what's identified as described as having 35 different subfolders, which subfolder would they look in to find a Tactical Intel Report?

A.  Well, they would either ask me, they could look through it, and if they couldn't find it then they would either ask, but like the majority of the time we would give them pertinent information to be looking for through e-mail or verbally when they were going on surveillance.

THE COURT:  I'm confused right now.  I thought the 35-subfile file was the original investigation that closed and now you had a new investigation of Simpson that opened in March of 2015.  Was that a separate file then?

THE WITNESS:  No, ma'am.  The original case was just reopened and --

THE COURT:  Okay.

THE WITNESS:  -- continued to be added to.

THE COURT:  Oh.  So you just kept adding to the already large file?

THE WITNESS:  Yes, ma'am.                                    10:09AM

THE COURT:  Okay.  Thank you.

BY MR. DRAKE:

Q.  And would they search for it by name?  Would they search for it, that is to say, would they search for it by Tactical Intel Report?                                              10:09AM

A.  They could.

Q.  And how did they do that?  How would they do that?

A.  Similar to a Google search.  If they had access to the case file it operates similar to a Google search.

Q.  All right.  Thank you.  In surveillance, again, coming back   10:09AM
to this, you mentioned you were trying to establish who the associates are.  Correct?

A.  Yes.

Q.  What does that help you know?  How does that advance the case?                                                      10:10AM

A.  This helps us determine if he's associating with potential other subjects or who, you know, who he's spending his time with.

Q.  Have you learned in preparing other agents for briefing that the earlier investigation as to Mr. Simpson listed a       10:10AM

number of associates for him?

A.   I'm sure that he had other associates, but at that time we hadn't identified anybody who he was currently associating with.

Q.   All right.   Did you know that Agent Hebert or -- it's silent H?

A.   Silent.

Q.   Did you know that Agent Hebert had shown Mr. Simpson photographs of a fellow named John Sabari?

A.   No.

Q.   Saabir Nurse?

A.   No.

Q.   Individual known as AK Hyman?

        MR. KOEHLER:   Your Honor, we're going to object.   That this is outside the scope of the hearing.

        THE COURT:   Sustained.

BY MR. DRAKE:

Q.   And if I understand correctly, the first time that you would have been able to associate Abdul Malik Abdul Kareem through surveillance was to see him with Elton Simpson. Correct?

A.   I don't actually recall how he was associated with Mr. Simpson.

Q.   Do you recall ever seeing him in any of the surveillance that was conducted by you?

A.   No.

Q.   Did any other agents tell you about seeing Abdul Kareem in their surveillances?

A.   No.

Q.   There are a variety of different types of surveillance available to the FBI, are there not?                          10:12AM

A.   Yes.

Q.   You can do electronic surveillance?

A.   Yes.

Q.   And that can consist of what?                                    10:12AM

A.   It can be recordings; it could be cameras, camera footage.

Q.   Photographs?

A.   Photographs, yes.

Q.   Would the photographs go in the electronic surveillance?

A.   I don't understand the question.                              10:13AM

Q.   I'm sorry?  Let me see if I can show you another exhibit and it may help.

        THE COURT:  I have a question.  Did Mr. Kareem's name appear in Elton Simpson's file before May 3rd?

        THE WITNESS:  He had not been identified since the          10:13AM
reopening of the investigation.  I'm not sure if he was identified in the previous investigation or not.

        THE COURT:  So at least since the reopening Mr. Kareem had not been identified as an associate in Elton Simpson's reopened file?                                                      10:14AM

THE WITNESS:  Correct.

THE COURT:  Thank you.

BY MR. DRAKE:

Q.  Would you take a look, please, at Exhibit 12, which you will find in the binder in front of you.  It's in the binder.

THE COURT:  I don't think she has a binder.

THE WITNESS:  I have Exhibit 12.

THE COURT:  You have 12?  Okay.

MR. DRAKE:  It's a government exhibit.

BY MR. DRAKE:

Q.  Have you had a chance to review that?

A.  Yes.

Q.  It's a simple question at this point, but partway through this exhibit, there are photographs of vehicles and individuals.  Where would those be stored?

A.  Those particular photos were stored in association with that document.

Q.  And when you say "that document," you mean that surveillance 302?

A.  Yes.

Q.  Thank you.

Is it also important to know during your investigations about an individual's life patterns like where they work, where they bank, things of that matter?

A.  Yes.

Q.   Why?

A.   Well, we want to know where they work because, again, that's associates.

Q.   Okay.  And banking?

A.   Again, it's just places that they visit, people that they potentially interact with.

Q.   All right.  And if you saw them going to a particular bank like a Chase Bank down the street and withdrawing money or accessing the ATM, that might lead to a subpoena to the Chase Bank?

A.   It possibly could.

Q.   You would want to see their bank records, correct?

A.   Yes.

Q.   That might lead you to more associates or other activities, correct?

A.   Correct.

Q.   There's something called FISUR in some of these reports.  I believe that's an acronym standing for physical surveillance?

A.   Correct.

Q.   You also want to find out in your surveillance about individuals so you get a better understanding of who they are, but there are times, are there not, when you want to follow an individual to make sure something untoward does not happen?

A.   Yes.

Q.   All right.  Let's talk briefly about the Pat Tillman run

that was held here in Phoenix in April of 2015.  Were you involved in surveillance of Mr. Simpson in relation to that event?

A.  Yes.

Q.  Do you recall when that event was run?

A.  When the event was run?

Q.  Yes.

A.  April 25, 2015.

Q.  And where was it held?  Don't worry.  I have got an exhibit.

Can you take a look at Exhibit 117, please.  Does that refresh your recollection?

A.  Tempe.

Q.  Tempe, Arizona.  And it finished at Sun Devil Stadium.  Okay.

Now, you had Mr. Simpson under surveillance, your squad did, in conjunction with that event.  Is that correct?

A.  Yes.

Q.  And how many agents and -- well, let me back up.

Is your squad one of those Joint Terrorism Task Force squads at the FBI?

A.  Yes.  It was at that time.

Q.  And there were a number of squads in the JTTF, using that acronym, correct?

A.  Correct.

10-15-19  CR 15-707-USA v Kareem-Evidentiary Hearing-Day 1-Fryberger-Direct

Q.  How many agents or task force officers were on your squad about that time?

A.  On my squad at that time?

Q.  Uh-huh.  We can help you go through this if you don't recall right now.

A.  I would say between six and eight agents were on the squad at that time.

Q.  I have added it up to about 16, and we can confirm that going through.

A.  Special agents?

Q.  No.  Special agents and task force officers.

A.  Yes.  Task force officers would make the number go up, yes.

Q.  That sounds about right?

A.  16?  Yeah.  The task force officers weren't assigned just to our squad.  They were assigned to multiple squads.

Q.  So thank you for clarifying that.

        And did you have an intelligence -- well, strike that.

        The intelligence analysts work sort of as a pool and you could task them from time to time as needed?

A.  We had one analyst assigned to our squad.  If you needed more or they weren't there you could ask for help from somebody else.  But we had one assigned to our squad.

Q.  Okay.  And I take it the task of the intelligence analyst assigned to your squad was to move the investigations on that squad forward?

UNITED STATES DISTRICT COURT

A.  He assisted with doing that.  It wasn't just his responsibility but he assisted.

Q.  Right.  Well, would assist by looking at open source information, trying to analyze the information that was available or being generated by agents and things of that sort, correct?

MR. KOEHLER:  I think we're starting to go outside the scope again.

THE COURT:  I'm not sure yet, but it's possible. Please continue, Mr. Drake.  Remember the limitations of the subject matter of this hearing.

MR. DRAKE:  Right.

BY MR. DRAKE:

Q.  Could you answer the question?

A.  Could you repeat it, please?

Q.  Tell you what.  We'll move on get to something else here and get at it a different way.

With respect to the surveillance that was conducted with regard to the Pat Tillman run, what did you do to brief the agents?

A.  We would have discussed the location of the surveillance. We would have discussed the location of the agents and the task force officers, their positions within the vicinity of the area.

Q.  Would you have discussed Mr. Simpson and his known

associates?

A.   Any that we were aware of at that time, yes.

Q.   Okay.  Now, let's stick with Exhibit 12 for just a minute.

Because that sets the background, more or less, I think, for

the pole cam.  Exhibit 12 is in the binder.  Do you have that?

A.   I do.

Q.   And you have looked through that.  That's a series of 302s

generated by agents and task force officers as well as

photographs taken by them in connection with the surveillance

of Elton Simpson?

A.   Correct.

Q.   But if we start at the very beginning page of Exhibit 12,

we see that Jeffrey Hebert, Special Agent Jeffrey Hebert is

doing surveillance, physical surveillance, on March 10 and

March 11 regarding Mr. Simpson, his address, and his place of

employment.  Correct?

A.   Correct.

Q.   And he writes that up, and then that goes into the case

file.  Correct?

A.   Yes.

Q.   Let's turn to the next page.  They are not numbered, but

they do have dates.  The second item is a 302 prepared by

Andrew Smith, and he started it on April 1 regarding his

investigation on April 1, and he talks about in the second

paragraph, that Elton Simpson is believed to reside in the

apartment at a particular address, Apartment 219, things of

that sort.  Correct?

A.  Yes.

Q.  The next page concerns task force Officer Del Rios'

surveillance on March 3rd.  Correct?

A.  Yes.

Q.  This is the first time Mr. Simpson is seen in the FBI

surveillance, is that correct?

        THE COURT:  Really, you are asking her to go -- is

that important?  I don't know why she needs to go read in

detail of the prior ones to be able to answer your question

that he wasn't seen on the other couple of occasions.  Can we

move on?

        MR. DRAKE:  All right.  I will try to accelerate this,

Your Honor.

BY MR. DRAKE:

Q.  That was the last surveillance that was done prior to your

application for the pole camera; is that correct?

A.  Yes.

Q.  You did find things that surveillance was done on the 11th

of April by five different agents or task force officers.

Correct?

A.  Yes.

Q.  Skipping past the photographs, April 24, this is the start,

I believe, of the round-the-clock surveillance?

10-15-19  CR 15-707-USA v Kareem-Evidentiary Hearing-Day 1-Fryberger-Direct

A.   Yes.

Q.   And that was related to the Pat Tillman run.  Correct?

A.   Correct.

Q.   There are two agents on that first report; second report, eight more agents, and they say, really, nothing noteworthy to them.  Correct?                    10:26AM

A.   Correct.

Q.   And then we've got some more.  I believe there's a report by -- another report by Brown, another one by Brown.

     That is the total of the record of the surveillance           10:27AM
regarding Elton Simpson, correct?

A.   Correct.

Q.   There was other surveillance of him, however, in the sense that, if I understand correctly, agents may have driven by the property, seen things, or looked to see things and not made a     10:27AM
note of it, not made a report?

A.   Yes.

Q.   Let's talk now about the application for the pole camera.

     Please turn to Exhibit 13 in that binder in front of
you.  This is redacted, and we're given to understand that the    10:28AM
redactions were applied by FBI headquarters.  So I don't know
what's behind them.  But this is an FBI import report form.
Correct?

A.   Correct.

Q.   And it contains as well the application or apparent            10:29AM

application that you completed for the pole camera.  Correct?

A.   It's the form we fill out, yes.

Q.   Thank you.

MR. DRAKE:  Your Honor, I'd move to admit Exhibit 13.

THE COURT:  Is there any objection?                    10:29AM

MR. KOEHLER:  No, Your Honor.

THE COURT:  13 is admitted.

BY MR. DRAKE:

Q.   Were there any conditions precedent, as you understood it,

to making application for a pole camera, that is to say, in      10:29AM

some investigations you have to exhaust certain means of

investigation before you can move to the next step.  Were there

any such requirements with regard to the pole camera?

A.   No.

Q.   All you need is a good reason and you are off and running?  10:30AM

A.   Justification and then approval from your supervisor and

the legal department.

Q.   Okay.  If we turn to Page 2, what would typically go in

that area that would be redacted of that big block that's about

a third of the way down the page?  Is that the predicate?       10:30AM

A.   I'm not sure.  I'm on the same Page 2 as you.

THE COURT:  It looks like this.

THE WITNESS:  Okay.

MR. KOEHLER:  Your Honor, may I confer with Mr. Drake

for a moment?  It might save him some trouble.                  10:31AM

THE COURT:  Yes.

(Discussion off the record.)

BY MR. DRAKE:

Q.  In this first -- it's a big block.  It's about five or six lines.  What typically goes -- what did you put in there?

A.  I have no idea.

Q.  Okay.  Let's go down then when it says now, about a third of the way down, there is an area where it refers to a mini case file.  What did you put in there?

A.  The case file number.

Q.  For the Elton Simpson investigation?

A.  Correct.

Q.  Moving to the right, there is a case subfile entry.  What would that reflect?

A.  That's going to be like a subfile, the subfiles we talked about.

Q.  One of those 35 subfolders?

A.  Correct.

THE COURT:  So hold on.  On the first redaction, that six lines, is that where your justification would have been?

THE WITNESS:  No, ma'am.  That's on the next page. That's two pages later.

THE COURT:  I know we don't have the information, but what is the -- what kind of information do you include in that first section?

THE WITNESS:  I'm not even sure it's something I fill out or if it's an automatic thing on the form.

THE COURT:  Oh.  It might be something that the form populates from other information in the computer?

THE WITNESS:  It could be.  I'm not entirely sure.

THE COURT:  But this wouldn't have been something where you wrote your justification?

THE WITNESS:  No, ma'am.  That's two pages later.

THE COURT:  Where the synopsis of the case is?

THE WITNESS:  Correct.

THE COURT:  Thank you.

BY MR. DRAKE:

Q.  So if I understand correctly, if someone wanted to go to the sub case file in the Elton Simpson investigation they would find this pole camera application?

A.  It wouldn't look exactly like this but that's where it would be.

Q.  Okay.  And beneath that there are some form classification markings and I don't mean to get too far into the weeds here.

THE COURT:  I think you are.

BY MR. DRAKE:

Q.  But it talks about dissemination controls.  What does that mean?

A.  Who can see the form and who not to disseminate it to.

Q.  And control markings?

UNITED STATES DISTRICT COURT

A.   Similar.

Q.   Then on the next page you have stated your reason for the pole camera.  That is to collect evidence, correct?

A.   Correct.

Q.   And then we turn to the page that has your predication or justification for the use of the pole camera.  Correct?

A.   Yes.

Q.   Had you gone to the facility, the apartment complex that you were trying to surveil with the pole camera prior to making this application?

A.   I don't think so.

Q.   Did you have any idea when you filled out the application whether there would be one camera, two cameras, three cameras, or more?

A.   No.  We request the application and the people that put the cameras in make that determination as to best place to put them.

Q.   Okay.  Did you -- let me back up.  I understand from the predication or synopsis of the case, that first paragraph, that you were concerned about Simpson because he was in regular contact with a U.S. citizen fighting for a designated terrorist organization.  Correct?

A.   Correct.

Q.   Did you think you were going to catch images of that individual through the use of the pole camera?

10:34AM

10:34AM

10:35AM

10:36AM

10:36AM

A.    No.    I believe that individual was known to be overseas.

Q.    Then I assume there are some provisions here that indicate you were not going to try to violate anybody's rights of privacy through the use of the pole camera.    Correct?

A.    Correct.

Q.    Now, the pole camera application filled out April 9 goes to your supervisor Special Agent Milnor?

A.    Correct.

Q.    And then it goes to two other people.    Correct?

A.    Correct.

Q.    Did others on the squad that you were with, the approximate nine agents, did they know that you were going to fill out this application for a pole camera?

A.    I don't know that they all would have known, but our team of three would have known.

Q.    Okay.    And that might have been shared by others of your team with other people on the squad, not you necessarily.

Now, the pole camera, once it gets approved, what happens to it then?    Where does this process go for paperwork handling or installation?

THE COURT:    Why do I care?    I just -- we know that it didn't go up until May 1.

MR. DRAKE:    Right.

THE COURT:    The intricacies of why it took that long to get somebody to go out there and physically put it up, I'm

10-15-19  CR 15-707-USA v Kareem-Evidentiary Hearing-Day 1-Fryberger-Direct

really not sure why I need to know that.

MR. DRAKE:  I understand, Your Honor.  That's not the point of the query.

THE COURT:  Well, maybe we could get to the point quicker.

10:38AM

MR. DRAKE:  Let me rephrase it and give you a little proffer on it.  What I'm trying to establish is right now we've got at least seven people in the FBI that know about this pole camera application and probably many more on the task force, Joint Terrorism Task Force.

10:38AM

MR. KOEHLER:  I'm going to the object to the characterization.  She said the team of three knew about it. She didn't know if anybody else knew about it.

THE COURT:  The other people are her supervisor Milnor and the two other people that had to approve it.  That's how we get up to the number that Mr. Drake just mentioned.

10:38AM

So the question is what other hands did it go through before it's put up?  So who else would have known about it?

THE WITNESS:  The tech agent supervisor and the agent that would have been responsible for putting it up.

10:39AM

THE COURT:  So you said the agent.  So that's a Special Agent puts it up, or is that some technical employee of the FBI?

THE WITNESS:  It's an agent.

THE COURT:  Okay.

10:39AM

BY MR. DRAKE:

Q.   Are you even the slightest bit aware of what it takes to put a pole camera up?

A.   Globally, yes; but specific details, no idea.

Q.   Do you need power to it?

A.   I don't know.

Q.   Did you become aware after the pole camera video application was prepared that Elton Simpson had tweeted about the cartoon contest, the drawing contest in Garland, Texas, on or about April 15 of 2015?

A.   I'm not sure when I became aware of that.

          THE COURT:   I want to ask you a more global question about the contest.

          Before March -- or I'm sorry -- before May 3, 2015, do you have any recollection that you knew about this Garland, Texas, contest to draw Muhammad?

          THE WITNESS:   I think I had heard about it in the news, but --

          THE COURT:   So your recollection is that you didn't hear about it in connection with your investigation of Mr. Simpson?

          THE WITNESS:   Correct.

          THE COURT:   Subsequently, you may have learned about things that he wrote prior to May 3.

          THE WITNESS:   Correct.

UNITED STATES DISTRICT COURT

BY MR. DRAKE:

Q.   Did you interact with any of the individuals who were involved in putting up the pole camera?

A.   Yes.

Q.   How many?

A.   One or maybe two.

Q.   And can you tell us their names, please?

A.   I actually don't remember who the supervisor was at that time, but I'm sure I had a conversation with that supervisor. And then I remember talking to Special Agent Leroy Hoiland (phonetic) regarding the pole camera.

Q.   Generally speaking, what were the nature of those conversations?

A.   With which one?

Q.   With the supervisor.

A.   It would have just been to check to make sure they got the request and that the request was moving forward.

Q.   And with the agent?

A.   I would have given him the information as far as the location of the residence as well as he was the person I contacted to take the pole camera down.

Q.   Okay.  And was he also the person you spoke with to get the pole camera set up to stream on to your desk when that happened?

A.   No.  I already had that system there.  It was a separate

10-15-19  CR 15-707-USA v Kareem-Evidentiary Hearing-Day 1-Fryberger-Direct

computer and a separate monitor that that system was already at my desk.

Q.   So you didn't have to talk to anybody else about that?

A.   No.  Not specifically for this pole camera.

Q.   Would you take a look, please, at Exhibit 121.

          THE COURT:  She has it, Maureen?

          Go ahead.  She has it.

BY MR. DRAKE:

Q.   Do you recognize this?

A.   I recognize the moniker of the individual.  As far as this specific tweet, not really.

Q.   Okay.  This was from Mr. Simpson's Twitter account, and it was used by the government.  I would offer it at this point, offer Exhibit 121.

          MR. KOEHLER:  I'm going to object on relevance grounds, Your Honor.  The witness has already testified that she doesn't remember seeing this prior to the attack.

          THE COURT:  The objection is overruled.  121 is admitted.

BY MR. DRAKE:

Q.   Take a look, please, at Exhibit 120.

          Do you recognize that?

A.   Again, I recognize Mr. Simpson and his -- the moniker for him.  As far as the actual tweet, I don't recall it.

Q.   All right.  This also is from the government's Twitter

records as to Mr. Simpson, and it involves an individual by the name Junaid Hussein.  Do you recognize the name Junaid Hussein?

A.   Yes.

Q.   What can you tell us about him quickly?

A.   I'm sorry?

Q.   What can you tell us about him quickly?

A.   Very, very little.

Q.   Was he a terrorist recruiter?

A.   Honestly, I would have to go back and review records.  I'm not sure.

Q.   All right.

         MR. DRAKE:  Exhibit 121, I would move for its admission, Your Honor.  I'm sorry.  120.

         MR. KOEHLER:  121 was already admitted.

         THE COURT:  He meant 120.

         MR. KOEHLER:  Your Honor --

         THE COURT:  On what grounds?  She has no recollection of ever seeing it.

         MR. DRAKE:  I understand it's open source information that was available, readily available to the task force squad that she was on.

         THE COURT:  Once again, I don't know if it is open source or not.  It may have been information that the government was able to obtain in connection with their investigation but that -- I don't know that it was open source

or that it required a search warrant.

MR. KOEHLER:  If I may clarify, Your Honor.

THE COURT:  Yes.

MR. KOEHLER:  This was not open source that was gained through a search warrant and this is not a tweet.  It is a direct message.  This is not something Agent Fryberger would have seen.

MR. DRAKE:  I stand corrected.

BY MR. DRAKE:

Q.  Take a look, please, at Exhibit 135.

Take a moment to look at that.  Aside from the first entry, which is apparently a message to an individual named Farley, the next message that appears as part of this string is addressed to DeEtta Nolen, Andrew Smith, and Amy Fryberger. Did you get this message?

A.  I'm sure I received it in my in box.

MR. DRAKE:  Your Honor, offer Exhibit 135.

MR. KOEHLER:  No objection.

THE COURT:  135 is admitted.

BY MR. DRAKE:

Q.  This appears to be from another agent who is reaching directly to three individuals you have identified as being involved in the Simpson investigation, the co-case agents. Where is that information available that would tell somebody within the FBI who was a co-case agent on a given individual?

UNITED STATES DISTRICT COURT

A.   In our electronic case file it lists who the case agents are.

Q.   Okay.  Is that a system called Sentinel?

A.   It is.

Q.   And do you also access it through something called Case Agent Information Review?

A.   No.  It's just through the Sentinel program.

Q.   So somebody could do a Google search, an FBI or authorized user, could do a Google search, like of Sentinel, to find out who the case agents are with respect to a given subject.  Correct?

A.   Correct.

Q.   To your knowledge did Andrew Smith receive this e-mail?

A.   I would assume he did.  He's on it as well.

Q.   And how about DeEtta Nolen?

A.   I would assume she saw it as well but probably not at that time.

Q.   Okay.  This e-mail was sent on April 30 of 2015.  Correct?

A.   Correct.

Q.   And it pertains to a lengthy conversation that an individual had with Elton Simpson.  Correct?

A.   Yes.

Q.   And it says in the near future, you can expect to hear from blank about the possible connection.  I'm informally getting ahead of blank.  I will let the official news -- I will let

them break the official news to you, Andrew, and Amy.

Can you explain what that meant to you?

A.   That someone would be reaching out to us with more information.

Q.   Okay.  So someone has already reached out to you regarding Elton Simpson.  It appears to be an informal reach-out and that there is going to be a follow-up, an official follow-up in the future?

A.   Correct.

Q.   Okay.  And in that the agent asks -- I'm sorry -- the person asks in the e-mail whether you would care to hear that the author's assessment of Surespot Juba1911.  That's the individual believed to be Elton Simpson, correct?

A.   Yes.

Q.   Did you reach out to this individual who sent the message to get the assessment as to their view of -- or assessment of Elton Simpson?

A.   Me personally?

Q.   Yes.

A.   No.

Q.   To your knowledge, did Andrew Smith?

A.   Yes.

Q.   And when did he do that, as you understand it?

A.   My guess would be right away, whenever he got the e-mail. Whenever he read the e-mail.

Q.   And why would you say your guess would be right away?

A.   Well, right away is in regards to when he got the e-mail.
I'm not positive when he got the e-mail.

Q.   Okay.  Well, as you read on in this e-mail, what you found
is that this individual believed to be Elton Simpson is posting
a link to the drawing contest in Garland, Texas.  Is that
correct?

A.   Yes.

Q.   And they have associated Elton Simpson with another
suspected terrorist.  Correct?

A.   Well, it's redacted so I'm not sure.

Q.   Okay.  I understand.  We suffer the same problem.

     Now, how about DeEtta Nolen?  Did she talk to you
about this e-mail message of April 30, 2015?

A.   No.

Q.   If I understand correctly from your -- from the
government's hearing memorandum, you were out of the office at
some point on May 1 of 2015.  Is that correct?

A.   Yes.

Q.   Were you also out of the office on April 30, 2015?

A.   I wasn't like officially out of the office, but I'm not
sure I was sitting at my desk.

Q.   Okay.  But you had some vacation or some travel or
something else planned elsewhere, an assignment perhaps?

     THE COURT:  On May 1?  I think she's trying to say she

was working on April 30th but that doesn't mean she was sitting at her desk.

THE WITNESS:  Yes, ma'am.

BY MR. DRAKE:

Q.  Let me go back and focus on April 30.  Let's do this one day at a time.  That makes it a little more understandable.

If I understood correctly, you think this went into your mailbox, e-mail box.  Correct?

A.  I'm sure it did, yes.

Q.  Yeah.  And from talking with Andrew Smith you understand he replied at some point or he responded or took some sort of action based on the e-mail.  Correct?

A.  Correct.

Q.  Is it your understanding that he called or sent an e-mail?

A.  I know he at least sent an e-mail.  I'm not sure if he made a phone call.

Q.  You believe he sent an e-mail?

A.  Yes.

Q.  And you -- it's possible he also called?

A.  It's possible, yes.

Q.  Did Mr. -- do you have any understanding where there was further follow-up or communication between Mr. Smith and the author of the exhibit we have been talking about, Exhibit 135?

MR. KOEHLER:  Your Honor, at this point I'm going to object to the continuation of this line of questioning.

Appears to be going far afield from the issue of the pole camera.

THE COURT:  Sustained.

MR. DRAKE:  I'm sorry, Your Honor?

THE COURT:  Sustained is what I said.                10:58AM

MR. DRAKE:  Thank you.  My hearing aids.

THE COURT:  Mr. Drake, I think this would be a good time to take our morning break.  We'll reconvene in 15 minutes. Court is in recess.

(Recess from 10:58 a.m. until 11:15 a.m.)                11:05AM

THE COURT:  The record will show the presence of counsel and the defendant.

Mr. Drake, you may proceed.

MR. DRAKE:  Thank you, Your Honor.

BY MR. DRAKE:                11:15AM

Q.  I would offer Exhibit 12, the government's surveillance records we talked about.

THE COURT:  Is there any objection to 12?

MR. KOEHLER:  No, Your Honor.

THE COURT:  12 is admitted.                11:15AM

MR. DRAKE:  I will also move to -- offer Exhibit 23. That's the communications regarding the Tactical Intel Report.

THE COURT:  Is there any objection to 23?

MR. KOEHLER:  Yes, Your Honor.  It's outside the scope.  And it's not 23.  It has to be 123 because there is no                11:16AM

Exhibit 23.

THE COURT:  I believe it's 123.

MR. DRAKE:  I misspoke.  I'm sorry.

THE COURT:  I know we spoke about the Tactical Intel Report that is several pages of this exhibit and I have no idea what the preceding pages are.

MR. DRAKE:  It was marked -- excuse me.  It was the government's attachment to its filing document 550, which I believe was in response to the motion to suppress or the motion to dismiss.

THE COURT:  You know, this -- if you have attached it as something for me to look at, Mr. Koehler, in connection with a motion or a response then it's part of the evidence.

MR. KOEHLER:  That's correct, Your Honor.  It is already in the record.  It's just in terms of the scope of this hearing and what we're going to cover in this hearing, it's beyond the scope of this hearing.

THE COURT:  I understand.  Sustained.

BY MR. DRAKE:

Q.  Agent Fryberger, when you were recalled to the office on May 3, how were you reached?

A.  By telephone.

Q.  By official government telephone or by private telephone?

A.  My cellphone, my work cellphone.

Q.  Okay.  Who called you?

A.   Special Agent Smith.

Q.   All right.  And had you had any communication with Special Agent Smith between the time that we see this e-mail come in on April 30 to the time that he called you on May 3?

A.   I'm not sure.  I would assume that we had talked, but I don't know that for sure.

Q.   All right.  I want to get a quick view of the understanding of the physical placement of the agents.  Were you and Smith on the same floor?

A.   Yes.

Q.   In the same area or pod?

A.   Yes.

Q.   Is that the way it's structured so that all the agents in a particular squad are closely grouped together?

A.   In the vicinity, yes.  You might not be able to see everybody, but in the same general vicinity.

Q.   Okay.  It facilitates the exchange of information, I take it?

A.   Yes.

Q.   What time was it that you left the office in this sequence of events between April 30 and, let's say, May 2?

A.   I wasn't in the office on May 2nd.  That was a Saturday.

Q.   Correct.

A.   And I don't recall exactly what time I left on April 30.  I was working on April 30 but I might not have been in the

office.

Q.   Okay.  And did you ever see the pole camera in operation before the day of May 3rd?

A.   No.

Q.   Now, when you were done with the pole camera application and you gave that -- and that went into the Sentinel system to be stored, who did that?

A.   Who put it into the system?

Q.   Yeah.

A.   So after I submit the request for it, my supervisor signs it, it goes to our legal department, who then authorizes it as well, and then it goes to our ELSUR department who actually stores the document.

Q.   So if we go back to Exhibit 13, that's the material regarding the pole camera application, is Serena Martinez the person to whom you would have sent the application?

A.   So I don't actually send it to her.  It's an automated system that goes from one person to the next person to the next person.  Ultimately, yes, she was the one that received the document.

Q.   So she should be added to our list of people who knew about the existence of a pole camera?

A.   She would know that it was requested.  She wouldn't know -- she wouldn't really have knowledge of the existence of it until after the fact.

Q.  Okay.  Let's turn then to Exhibit 17.  We're a little out of sequence chronologically, but it pertains to her and the fact that she was the one who apparently entered the pole camera information into Sentinel.  Am I reading that correctly?

A.  Correct.

Q.  And do you recognize this form?

A.  This evidence log?

Q.  Pardon me?

A.  This evidence log?

Q.  Yes.

A.  Yes.

MR. DRAKE:  Offer Exhibit 17, Your Honor.

MR. KOEHLER:  No objection.

THE COURT:  17 is admitted.

BY MR. DRAKE:

Q.  This is different than the previous form we were just looking at.  This is captioned evidence log, not import form. What does evidence log mean in this regard?

A.  When evidence is collected it's logged into the system and it creates an evidence log.

Q.  What is an evidence log?

A.  Tracking purposes, tracks the evidence.

Q.  Okay.  Can you explain a little more?  I don't understand the concept.

THE COURT:  I think I understand the concept so

let's -- it's a log.  Keeps track of where the evidence is.

BY MR. DRAKE:

Q.  I understand the need to keep track of the evidence and to know where things are.  But I'm wondering, does this evidence log go to somebody else?  Is there a person on the other side who receives this?  Because we're now talking about an original hard drive, correct?

A.  Correct.

Q.  A physical object.

A.  It's maintained in ELSUR in the evidence room.

Q.  Yeah.  So that had to be handed from one person to another person.  Were you the one who gave it to Ms. Martinez?

A.  No.

Q.  Do you know who did?

A.  No.

Q.  Does Ms. Martinez, does she keep custody of these or is she simply an intermediary?

A.  She works in ELSUR.  She maintains all the ELSUR evidence.

Q.  So she would have been the one who would have received it; is that correct?

A.  She could have collected it as well.  I don't really know what their policies are.

Q.  Okay.  But clearly at this point now she knows there's a hard copy that's got video surveillance, and the video surveillance covers this pertinent time frame?

A.   Correct.

Q.   What did Agent Smith tell you when he asked for you to come back to the office on May 3rd?

A.   He asked, actually, for an example of a search warrant.

Q.   All right.  And is that what brought you back to the office?

A.   Yes.

Q.   And you gave him that?

A.   I'm sure I did.

Q.   Okay.  Earlier you indicated that you believed it was Agent Smith's idea to look at the pole camera video; is that correct?

A.   It was either he or I, one of us.

Q.   Was anybody else, to your knowledge, tasked to watch the pole camera video from the time that it was operational until the time it was taken down?

A.   One other person was.

Q.   Who?

A.   He was an intern.  He was asked to review the video.

Q.   Okay.  But was he -- he was asked to review them.  We'll get to that in a second.  But was he supposed to be reviewing or viewing the pole camera video on a real time basis?

A.   No.

Q.   Was anybody else in your squad?

A.   No.

Q.   Anybody else in the Phoenix FBI?

A.   No.

Q.   Do you know of anybody who might have looked at this thing, that is to say, the video that was available on your desk between May 1 and May 3?

A.   No.

Q.   Were you aware when you set out to look at the pole camera video on May 3 that the attack had occurred?

A.   Yes.

Q.   That a car bearing license plates registered to Nadir Soofi was at the point of attack?

A.   I don't know if we had that information yet, but we knew that the attack had occurred.

Q.   Okay.  And so when you were looking at this video you were hoping to find that Simpson was still in town, not someplace in Texas?

A.   We were hoping to see that he was there, yes.

Q.   Because if he was there, then he wasn't involved in this, he wasn't part of the threat.  Correct?

A.   We were still trying to -- we didn't have any information from the scene and so we were trying to determine if our guys were in town or not.

Q.   How long did you spend reviewing the pole camera video that evening?

A.   I would say hours, but I don't know a definite time.  There was a lot going on.

Q.  You can fast forward through it?

A.  Correct.

Q.  And pull out images that you want?  Can you print them at your desk?

A.  I could not print them at my desk.

Q.  Could you print them someplace else?

A.  I don't know if the printer was hooked to that computer or not.

Q.  Would it, perhaps, be more technologically correct to say you could make a screen capture of it or do an electronic image of it?

A.  So the system I had was a review system.  There are different types of systems.  You probably could do a screen shot at that point, but I don't believe it was hooked to a printer.

Q.  Okay.  Do you recall when you looked at the pole camera video that you could see in some scenes Simpson and Soofi in what appears to be religious attire?

A.  Yes.

Q.  You have, by that time, I take it, already gotten a photograph of Soofi to be able to identify him, correct?

A.  Correct.

Q.  Was there a Tactical Intel Report prepared with respect to Soofi?

A.  I know one was eventually prepared, but I'm not sure when

it was completed.

Q.   Okay.

THE COURT:   So on May 1 you already knew who Nadir Soofi was and that he was Simpson's roommate?

THE WITNESS:   Yes.  He was identified through surveillance and then identified further through his vehicle.

THE COURT:   Thank you.

BY MR. DRAKE:

Q.   Yes.  In the surveillance they had seen Simpson come out and get into Soofi's vehicle?

A.   Correct.

Q.   And they had seen Simpson and Soofi both arrive at a mosque to attend prayer services?

A.   If that's in surveillance, then yes.

Q.   Yeah, surveillance did.  Correct.  That was, I believe, part of the round-the-clock surveillance on the Tillman?

A.   I can review it if you want me to.

THE COURT:   He might, but I don't want you to.  Let's move on.

BY MR. DRAKE:

Q.   Did you notice, as you went through this video, that there was an image of Nadir Soofi wearing a sidearm?

A.   Yes.

Q.   Were you aware that -- you were aware, I take it, that Simpson was a convicted felon?

A.   Yes.

Q.   Was he still on probation, to your understanding?

A.   I don't know.

Q.   There are restrictions, however, with respect to --

THE COURT:  Okay.  This is going way beyond the pole cameras as to whether or not he could associate with somebody carrying a firearm.  So let's get back to the pole camera.

MR. DRAKE:  I will, Your Honor.  But let me also offer that I believe this is pertinent because it starts to show the significance of the videotape.

THE COURT:  Well, let's get to the videotape, please.

MR. DRAKE:  All right.

BY MR. DRAKE:

Q.   And you also saw on the videotape images of Simpson and Soofi carrying objects out of the apartment on the evening of May 1.  Correct?

A.   I'm not sure about the date, but yes, they were seen carrying things out of the apartment.

Q.   Okay.  And then were they seen at the apartment after that point on May 1?

A.   I'd have to refer to the log.

Q.   Sure.  We'll get to that in a second.

THE COURT:  You were watching this to see if you could see Simpson, in particular, in Phoenix, on May 3rd or soon -- around May 3rd?

THE WITNESS:  Yeah, whether we could see him in the vicinity or if we saw him leave with something that maybe he shouldn't have left with.

THE COURT:  So when you were reviewing it that night, May 3rd, you saw that the last time you saw him was on May 1st. Isn't that right?

THE WITNESS:  I'd have to look at the log, but that's pretty close.  I'm not sure if it was May 1st or May 2nd he was last seen on the video.

BY MR. DRAKE:

Q.  And when you realized that Simpson and Soofi had carried objects out of the apartment, duffles and long objects, on the evening of May 1st and were never seen again until the attack, was that a "gosh darn" moment?

A.  A "gosh darn" moment?

Q.  Yeah.  Was that one of those moments when your reaction was, oh, my God.  It must be these guys?

A.  I don't know if it was one of those moments or not, but it was definitely a potential for them to not be in Phoenix.

Q.  And you didn't see anybody else that you could identify helping them carry out those bundles or duffles that evening on the videotape?

A.  I think Soofi's brother was seen carrying things in and out of the apartment as well.

Q.  Nothing having to do with Mr. Abdul Kareem?

A.  He was not identified through the tape, no.

Q.  Let's turn to Exhibit 19.  Exhibit 19 is the -- well, you tell me what it is.

A.  It's the log that was drafted from viewing the video and the screenshots that were taken from the video.

Q.  And who put that log together?

A.  Michael J. Gallante, II.

Q.  Is he the intern that you talked about?

A.  Yes.

Q.  So he was another person who knew about the pole camera video?

A.  Correct.

Q.  And if we turn to the second page of that, that's the log that you were talking about?

A.  Yes.

Q.  And what follows are a series of screenshots or images taken from that video cam.  Is that correct?

A.  Appears to be, yes.

        MR. DRAKE:  I'd offer 19.

        MR. KOEHLER:  No objection.

        THE COURT:  19 is admitted.

BY MR. DRAKE:

Q.  Let's turn to the second page.

A.  The log page?

Q.  Yes.  Please.  And just so I understand correctly, this log

shows Soofi and Simpson enter the apartment wearing religious clothing, but it doesn't mention Simpson -- sorry -- Soofi with a sidearm, does it?

A.   It does not.

Q.   Somebody would have to view the video to have known that Simpson had a sidearm.  They could not have gotten it from this, correct?

MR. KOEHLER:  Objection.  He was -- there's nothing in there about Simpson having a firearm.

MR. DRAKE:  I misspoke perhaps.

THE COURT:  Go ahead.  Repeat your question then.

MR. DRAKE:  Sure.

BY MR. DRAKE:

Q.   There's nothing in this log about Soofi wearing a sidearm or having a gun on his hip, is there?

A.   No.

Q.   So someone would have had to view the video or talk to somebody who did to know that Simpson was carrying a gun?

A.   Simpson was not carrying a gun.

THE COURT:  He meant Soofi.

MR. DRAKE:  I'm sorry.  Soofi.

THE WITNESS:  Either watch the video or view the screenshots, yes.

BY MR. DRAKE:

Q.   And let me turn you to the particular screenshot in

question.  These pages aren't numbered, but I'm going to go by the time that appears in bold in the lower left-hand corner.  I want to direct you to 2:55:38.

Is that a picture in your mind of Soofi wearing a sidearm?

A.  Yes.

Q.  The log goes on to show that in the evening Soofi and Simpson removed objects and then leave the apartment and do not return.  Right?  That's about the middle of the log.

A.  Yes.

Q.  And then the log continues to reflect that sometime on May 3rd an individual identified as Stewart Soofi enters the apartment area and then leaves the apartment after looking at his cellphone.  That's at about 21:07, 21:08.

Do you see that?

A.  I do.

Q.  From your surveillance, were you aware that Soofi had a relative named Stewart?

A.  Probably not from the surveillance.

Q.  Any other source?

A.  At that point in time, I don't recall.

Q.  Was there an individual related to Elton Simpson by the name of Stewart?

A.  I don't recall.

Q.  Does Stewart Sampson ring a bell?

A.  I'm not sure.

Q.  Okay.  Now, this videotape shows, if we analyze -- have analyzed this correctly, the last moments of Simpson and Soofi at that apartment on May 1 to May 3.  Correct?

A.  Yes.                                                              11:44AM

Q.  And as I understand, you saw nothing on the videotape that relates to Abdul Kareem during that period of time?

A.  He was not identified on the videotape.

Q.  What happens to this log, Exhibit 19?

A.  It's put into the file.                                          11:44AM

Q.  And by "the file," you mean put into Sentinel?

A.  Correct.

Q.  And put into Sentinel in a fashion that can be searched?

A.  In the Simpson case file, yes.

Q.  Yes.  That's a good point.  When we look at Exhibit 18,          11:45AM
which is the evidence log, correct?

A.  Yes.

Q.  That shows that it went in on May 11 of 2005, that is to say, the hard copy of the -- no.  Back up.  Try it again.

        What Exhibit 18 shows is that the hard drive                 11:45AM
containing the images was logged into evidence on May 11, correct?

A.  The hard drive containing the pole camera recording went in on May 11.

Q.  Very good.  That's a fine point and that's a good point.         11:46AM

We're talking about the hard drive which would be in a box or some sort of device, not the images, the screenshots that we saw in Exhibit 19?

A.   Correct.

Q.   But as of November -- I'm sorry.  As of May 11, 2015, there was already an investigation underway at that point with respect to Abdul Kareem.  Correct?    11:46AM

A.   I have no idea what date that investigation was open.

Q.   So the information concerning the hard drive was in the Simpson file; the information concerning the pole camera application was in the Simpson file and then this information from Exhibit 19 went into the Simpson file?    11:47AM

A.   Correct.

Q.   And forgive me.  Does it go in like it is, that is to say, if an agent were to search the Simpson file and could they find this 302 written by Mr. Gallante?    11:47AM

A.   Yes.

Q.   And would they find as well with it the event log, as he describes it?

A.   Yes.    11:48AM

Q.   And would they also find or have access to the resulting screenshots?

A.   Yes.

Q.   All that is in this Sentinel database that can be searched kind of like you do a Google search?    11:48AM

A.  Correct.

Q.  Did it go into any particular subfolder that you know of?

A.  It did not.  This 302 and the pictures, it did not.  It went into the main file.

Q.  It did -- okay.  It did not go into the main file?

THE COURT:  It did.

THE WITNESS:  It did go into the main file.  It did not go into a subfolder.

BY MR. DRAKE:

Q.  Okay.  Thank you.

And the main file is different than the subfolders because?

A.  It's the main file.  Some things get broken off into other sections.

Q.  Okay.  You mentioned a search warrant that you put together or, I'm sorry, a sample for a search warrant that you produced for Agent Smith.  Do you recall that?

A.  Yes.

Q.  And what did you understand he wanted to search?

MR. KOEHLER:  Objection.  Beyond the scope.

THE COURT:  Well, until I hear the answer I won't know whether to overrule or sustain.  So what did you understand he wanted the search warrant form to search?

THE WITNESS:  For Mr. Simpson's residence.

THE COURT:  Okay.

UNITED STATES DISTRICT COURT

BY MR. DRAKE:

Q.   Take a look, please, at Exhibit 116.

     Do you recognize this?

A.   I'm sorry?

Q.   Do you recognize this?                                    11:51AM

A.   Yes.

     MR. DRAKE:   Your Honor, I offer Exhibit 116 as a
search warrant executed at 13850 North 19th Avenue, Phoenix,
Arizona.

     MR. KOEHLER:   Although it's beyond the scope, we don't    11:51AM
object to it.

     THE COURT:   116 is admitted.

BY MR. DRAKE:

Q.   The pages of this exhibit are numbered at the top.  Please
turn to Page 12.  The first paragraph on the page has a         11:51AM
sentence that ends with, "Soofi appeared to be wearing a
handgun on his right hip."  Correct?

A.   Correct.

Q.   Now, what we understand is that you didn't notice that that
night, did you?                                                11:52AM

A.   I don't understand.  I didn't notice that that night?

Q.   I'm sorry.  You didn't notice that Simpson had a handgun on
his hip that night?

     THE COURT:   Soofi?

     MR. DRAKE:   Yeah.                                         11:52AM

THE COURT:  When you reviewed the pole camera footage on May 3rd, did you observe that Soofi had a handgun that he was wearing on his right hip?

THE WITNESS:  Yes.

MR. DRAKE:  Oh.                                                    11:52AM

BY MR. DRAKE:

Q.  And that is a fact that is included in the search warrant application?

THE COURT:  True.  Let's -- I have it right here in front of me.                                                          11:53AM

MR. DRAKE:  Okay.

BY MR. DRAKE:

Q.  It doesn't specify, does it, the manner in which that surveillance was conducted?

A.  It does not.                                                   11:53AM

Q.  So if someone were to search for an image of Soofi wearing a sidearm on the evening of May 1, if you were to search for that, how would you go about searching for that?

A.  How would I try to find that image?

Q.  Yeah.                                                          11:53AM

A.  I think it would depend on when I was searching for it.

THE COURT:  I think what Mr. Drake is getting at, that is, if I were an FBI special agent assigned to the -- to this defendant's investigation, and one of the things that I reviewed was the search warrant affidavit for Simpson and      11:54AM

10-15-19  CR 15-707-USA v Kareem-Evidentiary Hearing-Day 1-Fryberger-Direct

Soofi's apartment and I read, "FBI surveillance observed what appeared to be," et cetera, how would I, as an FBI special agent, find out who it is that made that observation?

THE WITNESS:  You would have to review surveillance 302s to make sure it wasn't seen through that or you would review the pole camera footage or the screenshots that were taken if you are looking at it after the fact.

THE COURT:  Or I could ask Andrew Smith?

THE WITNESS:  Correct.

THE COURT:  I could say, oh, you were the affiant on the search warrant and you said this.  Where did you -- or who made this observation?

THE WITNESS:  Correct.

THE COURT:  And Smith, as you know, because you reviewed this together that night, would have said, oh, it was on the pole camera footage.

THE WITNESS:  Correct.

THE COURT:  Because that was the only way it was observed?

THE WITNESS:  Yes.

BY MR. DRAKE:

Q.  There was no physical surveillance of --

THE COURT:  We know that.  She just said this was the only way it was observed.

MR. DRAKE:  I'm not going to plow that furrow again.

UNITED STATES DISTRICT COURT

THE COURT:  Thank you.

BY MR. DRAKE:

Q.  What happened to the windup of the Simpson case?  Is it now closed that Mr. Simpson is dead?

A.  I'm not sure the status of the investigation.                    11:55AM

Q.  Well, you do know that at some point in time, Agent Stewart Whitson opened up an investigation -- or I'm sorry.

        You do know at some time that an investigation was opened up as to Mr. Abdul Kareem?

A.  Yes.                    11:56AM

Q.  And you do know that Stewart Whitson was one of the case agents on that case?

A.  Yes.

Q.  To your knowledge, was he the only case agent?

A.  I would say he was the main case agent.  I don't know if    11:56AM
there was a co-case agent on there with him or not.

Q.  Was he on your squad?

A.  He was not.

Q.  Was he located in your proximity?

A.  He was not.                    11:56AM

Q.  A different floor?

A.  Same floor.

Q.  So as people are trying to figure, as the FBI is trying to figure out, I should say, what happened here in Phoenix, is there a time when the agents gather together and sit down and    11:57AM

talk about what they have seen and what they have learned in their investigation of Simpson?

A.   There were times after the attack in Garland, Texas, when there were group meetings of the agents involved in the investigations, yes.

Q.   And that investigation that you are referring to, is that the Simpson investigation?

A.   I'm sorry.  I don't understand that question.

Q.   Sure.  It seems that you and the agents on your squad were involved in the Simpson investigation, and then an investigation is opened up on Abdul Kareem on a separate squad with Whitson involved.  And you just made a comment about that there were meetings that involved this investigation.  I'm trying to get clear which investigation.

A.   It would have been in the aftermath about trying to identify who his associates were and the investigations going forward from there.

Q.   With respect to Simpson?

A.   Correct.

Q.   Who is dead.  You were trying to see who his associates were?

A.   Correct.

Q.   You feared there might be someone else out there who could have ill intent?

A.   It's always a possibility.

Q.   That's part of the reason you try to understand who their associates are, so that you can protect against that possibility?

A.   Correct.

Q.   Did you have meetings in the aftermath of the attack with Simpson and others from his squad?

THE COURT:  Whitson.

MR. DRAKE:  Thank you.

BY MR. DRAKE:

Q.   In the aftermath of the Garland attack, did you have meetings with Agent Whitson and agents from your squad to share the information that you had learned in your investigation of Elton Simpson?

A.   Yes.  There were meetings.

Q.   One?  More than one?  How many?

A.   More than one for sure.

Q.   Okay.  Who sat in on those?

A.   Case agents, intel analysts, people from headquarters. Multiple people.

Q.   Were they ad hoc meetings, that is to say, spur of the moment, let's go over here and talk about this?  Or were they set up?

A.   Both.

Q.   And can you recall the number of such meetings?

A.   No.  Specific number, no.

UNITED STATES DISTRICT COURT

Q.   Did your application for a pole camera come up?

A.   No.

Q.   Did the video surveillance -- I'm sorry.  Did the surveillance conducted by your agents around the clock in connection with the Pat Tillman run, did that come up?          12:00PM

A.   No.

Q.   Did anything regarding what was seen on the pole camera video, did that come up?

A.   No.

Q.   As to those areas I just touched on that were not          12:01PM discussed, was there any particular reason they were not discussed with Whitson?

A.   They didn't reveal anything of major significance, and Mr. Simpson was deceased.

Q.   But I thought you just said that part of the reason that          12:01PM you were having some of these meetings was to look for other associates that might be out there.

A.   Correct.

Q.   That is to say, other associates of Simpson.

A.   Yes.  Other associates of Simpson.          12:01PM

Q.   Who might have ill intentions?

A.   Yes.

Q.   Did those come up in the discussions with Special Agent Whitson in the aftermath of the Garland attack?

A.   Did what come up?          12:01PM

Q.  The fact that whatever associates you had identified of Mr. Simpson during your surveillance of him?

A.  The only associate I believe we identified through surveillance was Mr. Soofi through the surveillance.  I believe that's the only associate that was identified.  Mr. Soofi would have -- it would have been made aware that Mr. Soofi, he would have come up.  But like Mr. Simpson, he was deceased as well.

THE COURT:  Prior to May 3, through your investigation of Mr. Simpson, had Mr. Kareem been identified as one of his known associates?

THE WITNESS:  No.

THE COURT:  Do you remember just generally anybody other than his roommate, Soofi, and the relatives and the one woman on that report being identified as known associates?

THE WITNESS:  I think Mr. Nurse had been because that's where Mr. Simpson worked.

THE COURT:  Okay.  Thank you.

BY MR. DRAKE:

Q.  And Nurse was, at one point, Mr. Simpson's employer?

A.  Correct.

Q.  And Nurse had been an associate of Simpson's?

MR. KOEHLER:  Objection.  Beyond the scope.

THE COURT:  She just said that he was associated to Simpson because he was -- that's where he worked.

BY MR. DRAKE:

Q.   Is that the extent of the association that you were aware of?

A.   At that time, yes.

Q.   Since that time, have you learned more?

          MR. KOEHLER:   Same objection, Your Honor.          12:03PM

          THE COURT:   Sustained.

BY MR. DRAKE:

Q.   I understand you didn't write a report regarding the pole camera.   Is that correct?

A.   I did not.          12:03PM

Q.   And you didn't do an electronic communication to other people regarding the pole camera.   Correct?

A.   Correct.

Q.   And what is an EC?   Is it like an internal e-mail?

A.   No.          12:04PM

Q.   Okay.   What is it?

A.   It's an internal document.

Q.   That goes in the case file?

A.   Correct.

Q.   Do e-mails go in the case file?          12:04PM

A.   Between agents, no.

Q.   Where are those housed?

A.   In our e-mail system.

Q.   Is that part of Sentinel?

A.   It is not.          12:04PM

Q.   Is it searchable?

A.   You could probably search your own e-mails as long as they haven't been deleted, but you can't search anybody else's.

Q.   If Stewart Whitson wanted to find the e-mail that came in on April 30 to you, Hebert Smith --

12:04PM

MR. KOEHLER:  Objection.  Beyond the scope of this hearing.

THE COURT:  Sustained.

BY MR. DRAKE:

Q.   Did you tell Whitson about that e-mail?

12:05PM

MR. KOEHLER:  Same objection, Your Honor.

THE COURT:  Sustained.

BY MR. DRAKE:

Q.   Did Whitson ask you questions about information that you had discovered that might be helpful to the prosecution of any individuals?

12:05PM

A.   No.

Q.   Did he ask you questions about you and your squad, questions about any information that might be favorable to the defense or help it present, prepare a defense?

12:05PM

A.   I could only speak for myself, but no.

Q.   Okay.  And I take it you weren't involved as a case agent in Kareem?

A.   I was not.

Q.   So you don't know what items were, in fact, turned over to

12:06PM

the prosecutors in that investigation?

A.   I do not.

MR. DRAKE:  May I have just a moment?

THE COURT:  Yes.

BY MR. DRAKE:

Q.   Was it fair to say that you and your squad were more or less separated from the ongoing investigation as -- that Whitson was conducting?

A.   I don't know that we were separated.  We just weren't part of it because he was on a different squad.

Q.   Okay.  And even though you had been investigating Simpson and presumably had knowledge of his earlier case through Sentinel, you didn't participate or share that, if you will, to Whitson?

A.   No.

Q.   Were you aware going forward that charges were brought against Abdul Kareem that involved a conspiracy?

A.   I did know that charges were brought against him.  I don't know what the charges were.

Q.   Did you know that it was an allegation that he and Simpson and Soofi had agreed to do some things?

A.   Again, I know that charges were brought but I don't know the details of them.

THE COURT:  Did you know that the charges that were brought related to the Garland, Texas attack?

THE WITNESS:  Yes.

MR. DRAKE:  Thank you.

BY MR. DRAKE:

Q.   Was anyone in the Phoenix office of the FBI disciplined, reprimanded, or sanctioned in any way over the investigation of Elton Simpson?

A.   Not to my knowledge.

MR. DRAKE:  No further questions.

THE COURT:  We'll take our lunch break.  We'll reconvene at 1:15.

Court is in recess.

(Recess from 12:09 p.m. until 1:18 p.m.)

THE COURT:  The record will show the presence of counsel and the defendant.

Mr. Koehler, you may proceed.

MR. KOEHLER:  Thank you, Your Honor.

There is one housekeeping matter Ms. Brook wanted to address first.

MS. BROOK:  If I may briefly, two housekeeping items that relate to timing this afternoon.  In an effort to be expeditious with our time, the government has offered defense for us to do the initial examination of the remaining witnesses to perhaps speed up the examination process.  Of course it's their burden, but that might make this go a little more quickly.

THE COURT:  Have you asked them about it?

MS. BROOK:  I have.  I wasn't sure.  I think they wanted to talk about it over lunch.

MR. DRAKE:  We prefer to go the way we're going.

THE COURT:  Okay.  Then that's what we'll do.

MS. BROOK:  And then the second is that Special Agent Stewart Whitson is on a flight tonight returning to Washington D.C. at 11.  He needs to be on that flight because he teaches a course in Washington, D.C., a college course tomorrow.  I'm hopeful we can get him on the stand perhaps after Special Agent Fryberger, do his examination then.

THE COURT:  Yes, we will.

MS. BROOK:  Thank you.

MR. DRAKE:  And, Your Honor, we have also been approached by Mr. Koehler.  We have no objection to any of the government exhibits.

THE COURT:  Thank you.

CROSS-EXAMINATION

BY MR. KOEHLER:

Q.  Good afternoon, Agent Fryberger.

Earlier you testified that this was the beginning stages of the reopened investigation into Elton Simpson.  Is that correct?

A.  Yes.

Q.  And you testified that you reviewed some of the case file

UNITED STATES DISTRICT COURT

in that case.  Is that right?

A.  Yes.

Q.  Did you do a deep dive into the historical portions of the Elton Simpson case file?

A.  No.                                                                   01:20PM

Q.  So by the time May 3rd rolled around, based on the surveillance reports you had and your viewing of the pole camera video, did you perceive yourself as being in possession of any unique information about the case that was going to advance the investigation moving forward from that point?        01:20PM

A.  No.

Q.  Let's talk about spot surveillance.  What is that?

A.  Almost like drive-by surveillance, just driving by or staying for a very short period of time to attempt to identify locations, identify addresses, view vehicles.                           01:20PM

Q.  You reviewed Exhibit 12 with Mr. Drake earlier.  Would you describe the majority of the surveillance reports in Exhibit 12 as being spot surveillance reports?

A.  A lot of them were, yes.

Q.  You also mentioned that there were some times when spot       01:21PM
surveillance was performed that didn't result in the generation of a report.  Is that typical when nothing of value is seen during the course of a brief surveillance like that?

A.  Yes.

Q.  If someone had seen Elton Simpson, or seen a person coming    01:21PM

out of Elton Simpson's apartment door, would that cause a report to be generated?

A.  Yes.

Q.  Let's talk about the apartment complex itself.  I have an Exhibit Number 1 on the document camera, and I'm going to go ahead and move to admit 1 through 20 inclusive.  I know a couple of those have already been admitted.  I will move en masse.

01:21PM

THE COURT:  Without objection, 1 through 20 are admitted.

01:21PM

BY MR. KOEHLER:

Q.  So looking through Exhibit 1, what does that depict?

A.  That's the apartment complex that Mr. Simpson resided in.

Q.  Looking at the corner, is that Thunderbird Road?

A.  Yeah, runs across the bottom of the screen.

01:22PM

Q.  That's an east/west road, correct?

A.  Correct.

Q.  And on the right-hand side just to the left, looks like a football field, is that 19th Avenue?

A.  Yes.

01:22PM

Q.  Is it fair to say that this complex was just off the corner of 19th Avenue and Thunderbird, the northwest corner?

A.  Yes.

Q.  Tell us about what kinds of surveillance challenges agents had in terms of conducting physical surveillance at this

01:22PM

apartment complex.

A.   To begin with, there were multiple entrances into the apartment complex.  And then when you got into the actual apartment building that he resided in, the door was inside a breezeway and so it was very challenging to actually see, physically see, the door from a vehicle.

Q.   Does the red circle on that map depict the location of the apartment building Number 30 where Simpson's apartment was located?

A.   Yes.

Q.   Move on to Number 2.  Is that the map of the apartment complex?

A.   Yes.

Q.   And is Building 30 likewise circled on that exhibit?

A.   Yes.

Q.   Same thing with Exhibit Number 3.  Is that likewise a map of the complex?

A.   It is.

Q.   Zoomed in a little closer?

A.   Yes.

Q.   Can you point on that map to where Apartment 219 is for the Court's benefit?

A.   A little above that mark, I guess.

Q.   Very good.  If you could clear your mark by touching the -- I think it's the upper left.  No.  Lower left.  I have got it.

UNITED STATES DISTRICT COURT

10-15-19  CR 15-707-USA v Kareem-Evidentiary Hearing-Day 1-Fryberger-Cross

And Exhibit Number 4, again, a tighter zoom, is that red circle where Simpson's apartment was located?

A.  Yes.

Q.  Now, we have looked at these.  They all show parking areas around the complex.  To your general recollection, what part of the complex did Simpson and Soofi park their cars?          01:24PM

A.  To the north of the building.

THE COURT:  That orientation I'm looking at, north is up.

THE WITNESS:  It is.          01:24PM

THE COURT:  Thank you.

BY MR. KOEHLER:

Q.  This is Exhibit Number 5.  Can you tell the Court what this depicts?

A.  That is a picture of the exterior of the apartment building          01:24PM
that he resided in that's looking -- you are standing north looking south at the building.

Q.  And Exhibit Number 6?

A.  That is the east side entrance of the breezeway into his --
the breezeway that his apartment was in.          01:25PM

Q.  Could you use your finger on the monitor to draw a circle around where Elton Simpson's apartment is located?

Thank you.  Exhibit Number 6, or I'm sorry, Number 7.

A.  That is his apartment building as well standing on the west
side or the east side of the apartment building looking west          01:25PM

10-15-19  CR 15-707-USA v Kareem-Evidentiary Hearing-Day 1-Fryberger-Cross

into the breezeway.

THE COURT:  So am I -- if I look beyond the breezeway, is that where Simpson parked his car?

THE WITNESS:  He would have parked his car like to the right.

THE COURT:  But it's through the --

THE WITNESS:  Not through the breezeway, to the right off screen.

MR. KOEHLER:  Your Honor, if I can have the agent approach the demonstrative exhibit real quick.

THE COURT:  Well, only if you put it in a place where I can see it.

MR. KOEHLER:  I was intending to do that.

THE COURT:  Otherwise it won't do me any good.

BY MR. KOEHLER:

Q.  Just to be consistent, could you circle the area of Elton Simpson's apartment here in red?

A.  It would have been bottom floor.

Q.  Wait until you get back on the stand to talk.

If you mark in blue, mark in blue the areas where Simpson's car would occasionally be observed.

A.  Underneath there and sometimes back in here.

Q.  If you can go resume the stand.

MR. KOEHLER:  Your Honor, would you like me to bring this up so you can see it better?

THE COURT:  That would be great, because I can't really see it very well.  I actually can see on the screen a lot better.

So as I'm looking at Number 20 --

MR. KOEHLER:  I'm going to flash back to Number 1, Your Honor.

THE COURT:  There's a breezeway under this roof that goes --

THE WITNESS:  Yes.

THE COURT:  That the picture that was on the screen, that's what I would have been looking through, is a breezeway that goes right through the middle of this building?

THE WITNESS:  Yes.

THE COURT:  And you can just begin to see the covered parking, but that's not --

THE WITNESS:  That's not where he parked.

THE COURT:  He parked --

THE WITNESS:  North.

THE COURT:  -- north.

THE WITNESS:  That would have been west of the building.

THE COURT:  Thank you.

BY MR. KOEHLER:

Q.  Moving on now to Number 8, can you tell the Court what that photo depicts?

10-15-19  CR 15-707-USA v Kareem-Evidentiary Hearing-Day 1-Fryberger-Cross

A.   So that is a picture of the west side of the building looking from north, looking south, but it's the west side of the building.

Q.   Same building, Number 30?

A.   Yes.                                                                01:29PM

Q.   Now going on to Number 9.

A.   So again, that's the west side of the building but now you are kind of on the south side looking -- north would be that way and that would be east.

Q.   At this point I think this would be a good time to talk          01:29PM
about these stairways here.  Do these stairways lead to the upstairs apartments?

A.   They do.

Q.   How many apartments are in the upstairs of each breezeway?

A.   There are four upstairs.                                          01:30PM

Q.   And how many downstairs?

A.   There are four downstairs.

Q.   So each breezeway a total of eight apartments.  Is that correct?

A.   Yes.                                                              01:30PM

Q.   And this photo from this angle shows those stairs?

A.   Yes.

Q.   Number 10.

A.   That is a photo of the breezeway.  You are on the west side       01:30PM
looking east through the breezeway.

UNITED STATES DISTRICT COURT

Q.   Does that show the courtyard that's on the other side of that breezeway?

A.   Yes.

Q.   Number 11.

A.   So that's from about in the middle of the breezeway looking east into the courtyard.

Q.   Is the door shown on the right-hand side of that photo Elton Simpson and Nadir Soofi's apartment?

A.   It is.

Q.   We talked about surveillance a moment ago.  During the course of all the different surveillances that occurred prior to May 3 of 2015, did any of the agents identify Nadir Soofi's brother, Ali, at the apartment complex?

A.   No.

Q.   How many times was Nadir Soofi seen on surveillance, if you know?

A.   I don't know.

Q.   Did they ever identify any other associates of Elton Simpson other than Nadir Soofi?

A.   No.

         THE COURT:  I'm sorry.  Was the context of the question before May 3?

         MR. KOEHLER:  Correct.

BY MR. KOEHLER:

Q.   Now, we talked about the pole camera.  How did you submit

the request itself to the pole camera?

A.   It's an electronic submission.

Q.   So when it goes from you, where does it go?

A.   To my supervisor.

Q.   And how does your supervisor approve it?                          01:32PM

A.   Electronically.

Q.   And after your supervisor approves it electronically, to whom does it go next?

A.   It goes to the chief division counsel office.

Q.   Can you go back to Exhibit 13 that was already gone over          01:32PM
with you before.

        Do these lines here that I'm pointing to show the approval?

A.   Yes, they do.

Q.   Does anyone other than your supervisor and chief division        01:32PM
counsel review this and approve it?

A.   No.

Q.   So in other words, during Mr. Drake's examination of you, he asked the question of whether there were two or four people above you.  How many people above you exactly reviewed this?     01:33PM

A.   Two.

Q.   And so there was those two, yourself, Agent Smith and Agent Nolen.  Correct?

A.   Correct.

Q.   So that makes five?                                              01:33PM

UNITED STATES DISTRICT COURT

A.   Yes.

Q.   Then it went -- from division counsel, where does it go?

A.   It goes to our ELSUR unit.

Q.   There would be a person in ELSUR who would receive this; is that right?

A.   Correct.

Q.   And then you talked to the technical operations supervisor and the technical operations agent.  Correct?

A.   Correct.

Q.   So that's a total of eight people?

A.   Correct.

Q.   Was there any reason for you to discuss the pole camera with any of the other people on your squad outside of the case manager team that you talked about earlier while this authorization request was pending?

A.   No.

        THE COURT:  Did you tell any of the task force people about the pole camera?

        THE WITNESS:  They would have -- probably not because they -- the camera wasn't up at that time and so if -- they would not have known at that time, no.

        THE COURT:  Did you ever tell any of the members of your task force that they could stop doing surveillance at the apartment because the pole camera was going to be installed?

        THE WITNESS:  No.

BY MR. KOEHLER:

Q.  Who puts the approved 759 form, that's this pole camera authorization form we were just looking at in Exhibit Number 13, who puts that into Sentinel?

A.  The ELSUR people do.

Q.  It's not something you put in.  It's something ELSUR puts in?

A.  Correct.

Q.  Do the technical operations agents have to take certain steps prior to installing a pole camera once they've gotten the instructions essentially to put one up?

A.  They do.

Q.  What kinds of steps do they have to perform?

A.  I know kind of a global view that they go out and they view the scene, they view the site to make their determination as to where they can put one.

Q.  And is the principal criterion for determining placement having an actual view of the place that you want to see?

A.  Yes.

Q.  Are there other criteria as well?

A.  I'm sure there are, but I don't know all of those.

        THE COURT:  For example, if they want to put it on a pole that belongs to someone, do they have to get their permission, like the utility company?

        THE WITNESS:  I'm not sure.

UNITED STATES DISTRICT COURT

THE COURT:  So there may be people outside the FBI that know because they have to give permission?

THE WITNESS:  I would think that even if they had to get permission they wouldn't know what that was for.  But I don't know.

THE COURT:  I mean, I'm assuming nobody could like put a pole camera on a structure on my property without asking me first.

THE WITNESS:  That would be trespassing.

THE COURT:  Wouldn't the same be true on a telephone pole or an electrical pole or a street sign or --

THE WITNESS:  I don't know what their rules are, and I don't know what pre-existing associations or relationships they have to do that.

BY MR. KOEHLER:

Q.  Did you make any requests to expedite the installation of the pole camera?

A.  No.

Q.  Had your perception of Elton Simpson changed in terms of viewing him as an imminent threat to public safety?

A.  No.

Q.  At any point prior the May 3rd of 2015, did anybody on your squad view him as an imminent threat to public safety?

A.  No.

Q.  Let's talk about the camera itself.  This is Exhibit Number

14 if we can zoom out.

Does this fairly and accurately depict the angle of the camera?

A.   The red lines do, yes.

Q.   And so that's the general view that the camera had while it was running on the Simpson apartment?

A.   Yes.

THE COURT:   Then the red circle is the approximate location where the camera was?

THE WITNESS:   It was -- definitely was somewhere in this area or further south.  I don't know.

THE COURT:   So you don't know actually where it was installed?

THE WITNESS:   I don't.  But I know the view that you could see from the camera was between here and about there.

BY MR. KOEHLER:

Q.   Based on what you know about that camera's view, did that camera have any view of the other opening to the breezeway?

A.   It did not.

Q.   So could that camera have definitively told you, or anyone else, who came and went from the Simpson apartment during the time frame the camera was operational?

A.   No.

Q.   Why is that?

A.   It only showed the west entrance of that breezeway.  It

10-15-19  CR 15-707-USA v Kareem-Evidentiary Hearing-Day 1-Fryberger-Cross

didn't show the east entrance.  So anybody that would have come from the east into that breezeway we would not have seen on camera.

Q.  Is this complex gated?

A.  It is not.

Q.  Are there any fences inside of it that would restrict somebody's access to move between apartment buildings?

A.  No.

Q.  Anything that would restrict access from any of the parking areas throughout the entire complex?

A.  No.

        THE COURT:  Was there a designated visitor parking area for the complex?

        THE WITNESS:  Some of the spots were designated for certain apartments, and then throughout the complex there were non-designated areas that visitors could park in.  It wasn't one specific area.  It was multiple places around the apartment complex.

BY MR. KOEHLER:

Q.  I'm just going to show you the first page of Exhibit Number 15.  First page of Exhibit Number 15, does this image give an accurate depiction of the camera angle that the pole camera had?

A.  Yes.

Q.  Is that because this is a screenshot from that same video?

A.   Yes.

Q.   Does the pole camera show that stairway?

A.   It does not.

Q.   Agent Fryberger, do you recognize this photo?

A.   I do.

Q.   Was this taken in connection with the execution of the search warrant on Simpson's car?

A.   It was.

Q.   Does this photo, in combination with the next few I'm going to show you here, help you determine precisely where Simpson's car was located on the morning of May 4, 2015?

A.   Yes.

        THE COURT:  So did he park in a space that was labeled for his apartment number?

        THE WITNESS:  Yeah, he did.

BY MR. KOEHLER:

Q.   Was the space number on that space his apartment number?

A.   It was not his apartment number.

Q.   So there's Page 1 of 15.  Here's Page 2.  Is there something on the ground in that photo that helps orient you on where this location is?

A.   There's screens out of the window on the ground.

Q.   I'm going to skip one and go to the last page.

        Is that those screens on the ground?

A.   Yes.

Q.  Can you tell the building number here?

THE COURT:  Good luck.

THE WITNESS:  No.

BY MR. KOEHLER:

Q.  Next picture, does that help you?                    01:41PM

A.  Yes.

Q.  What's the building number?

A.  30.

Q.  What are the apartments that are covered in Building 30?

A.  209 to 224.                                          01:41PM

Q.  When were you planning to review the footage from the pole camera prior to the events of May 3rd?

A.  Monday morning when I came to work.

Q.  Is there an advantage to reviewing pole camera footage after several days of recording?                      01:42PM

A.  Saves time.

Q.  How so?

A.  You can fast forward to where events are actually taking place instead of watching it minute by minute.

Q.  Is that typical in the early stages of an investigation    01:42PM
when you don't expect any imminent activity in the case?

A.  Yes.

Q.  Was Elton Simpson the only case that you were working at that time?

A.  No.                                                  01:42PM

UNITED STATES DISTRICT COURT

Q.  Mr. Drake showed you an e-mail message earlier that was addressed to you, Andrew Smith, and DeEtta Nolen.  Do you recall whether you saw that message prior to May 3rd, 2015?

A.  I don't recall.

Q.  Was that message sent on an open system?                01:43PM

A.  Open --

Q.  Open e-mail system?  Was it on an unclassified system?

A.  It was not.

Q.  Was it on your classified system?

A.  It was.                                                 01:43PM

Q.  Would you have access to that e-mail when you were not in the office?

A.  No.

Q.  Let's talk about your purpose in reviewing the pole camera footage on the night of May 3rd, 2015.                       01:43PM

Were you hoping to see any particular thing in that video?

A.  No.

Q.  What were you reviewing the footage in order to do?

A.  Just to determine what activities had taken place from   01:43PM that -- from the angle of the video over the last two and-a-half days or so the camera had been up.

Q.  By the time you finished reviewing the video, what level of awareness did you have whether this was actually Simpson and Soofi dead on the ground in Garland, Texas?           01:43PM

A.  By the time we were done with the video we knew that it was them.

Q.  So you didn't hope to see them alive in the video at that point, is that correct?

A.  Correct.

Q.  Can you talk to us about the investigation in the wake of the attack?  What was going on with the investigation after the attack?

A.  There was a lot of things going on.  There was interviews taking place, information being ingested, trying to determine if anybody else was associated with this or going to take action similar to this.  Surveillance was taking place.  There were a lot of things happening at that time.

Q.  Were you also getting tips?

A.  Yes.

Q.  Were agents looking to get more search warrants?

A.  Yes.

Q.  Were they looking to exploit electronic media and so forth?

A.  Yes.

Q.  And so at that point in time, were you participating in some of these events?

A.  Yes.

Q.  At that point in time, looking at the global set of information that you had, was this pole camera something that stood out in your mind as being important to the investigation

in comparison to the other information that was flowing?

A.   No.

Q.   There was a mention about the footage being stored on May 11, 2015.

Do you know who collected that?          01:45PM

A.   I don't.  I know that it was put into evidence by Serena Martinez.

Q.   Is Serena Martinez with the ELSUR unit?

A.   She is.

Q.   Do you know roughly where the hard drives are located when    01:45PM
video is being recorded from a camera live?

A.   In the tech agent area.

Q.   So not at your desk; correct?

A.   Correct.

Q.   And so if Ms. Martinez were to retrieve that, where would    01:45PM
she go to retrieve it?

A.   In the tech agent area.

Q.   Is there a separate evidence log that tracks who has access
to evidence?

A.   There is.          01:46PM

Q.   Is that generally, in agent terminology, a chain of custody
log?

A.   It is.

Q.   Mr. Drake already asked you whether you told Agent Whitson
about the video.  Did you ever hear anybody else tell Agent          01:46PM

Whitson about the pole camera or the video?

A.   I didn't hear anybody do that, no.

Q.   Did you ever talk about the pole camera during a meeting or briefing at which Special Agent Whitson was present?

A.   No.

Q.   Do you recall anyone else doing that?

A.   No.

Q.   To your knowledge, was Special Agent Whitson able to access the Simpson electronic case file?

A.   Yes.

Q.   Do you know if he had full access to the case file?

A.   I don't know if he had full access or not.

Q.   What parts of the case file might have been restricted?

A.   The Grand Jury subpoena subfile.

Q.   Is that because of Rule 6(e)?

A.   Yes.

Q.   If you had been the case agent on the Kareem case and known -- knowing the fact that you know, you knew about this video, in fact, you requested it, is this something you would have told the prosecutors about if you were the case agent on that case?

A.   Yes.

Q.   Would you have turned it over to the prosecutors?

A.   Yes.

Q.   There was a reference earlier to Stewart Soofi in the

Gallante timeline of the pole camera video.  Did that name have any meaning to you?  Have you ever heard it before?

A.  Before today or before that time?

Q.  Yes.  Before today.

A.  I don't recall.

Q.  Do you recall what date Mr. Gallante prepared his report?

A.  I think it was May 7th, but I'd have to check it to be sure.

THE COURT:  How would he have been able to identify the individuals when he was reviewing the footage?

THE WITNESS:  So a lot of information was coming in post the Garland attack, and information from everywhere was coming in at that time.  So we knew more after than what we knew before, which is typical, and so he could have gotten information through them.

THE COURT:  So, for example, he was an intern.

THE WITNESS:  Correct.

THE COURT:  Before he started reviewing this footage, before you asked him to review the footage, would he have known by sight Elton Simpson, Nadir Soofi, Ali Soofi, or this person whom he called Stewart Soofi?

THE WITNESS:  Probably not just on his own knowledge. Somebody would have given him the information that, hey, this is a picture of this person and match them up against.

THE COURT:  So when you asked him to review all the

footage and make a log of everything that he saw of people who could be identified, someone obviously gave him -- or maybe it's not obvious.  Did someone have to give him pictures and names of people who had been identified so he would know that?

THE WITNESS:  That would be common, yes.

THE COURT:  Has anybody looked at the pole camera footage since then to see if any of the people not identified on May 7 have since been identified?

THE WITNESS:  I don't know.  I actually don't work that anymore, so. . .

MR. KOEHLER:  You covered my next set of questions. Thank you, Your Honor.

THE COURT:  I hope I did it quicker.

MR. KOEHLER:  My next one was just going to be about did they have information between them and to provide to Mr. Gallante so he could review it.

BY MR. KOEHLER:

Q.  Just a few more here.

After the attack, did anybody at any time suggest that this attack was an embarrassment to the FBI?

A.  No.

Q.  Did anyone suggest someone needed to be made to pay for the attack?

A.  No.

Q.  Did anyone suggest somebody needed to be prosecuted in the

wake of the attack just to hold somebody accountable in any fashion?

A.   No.

Q.   What was your general purpose -- general understanding of the purpose of the investigation in the wake of the attack?

A.   It was just to identify anybody who may have been associated with Simpson and Soofi to ensure that something similar to Garland wasn't going to happen.

Q.   Was there ever any suggestion by anybody, to your knowledge, to pursue somebody just for the sake of pursuing them as opposed to following the evidence?

A.   No.

          MR. KOEHLER:  No further questions.

          THE COURT:  The camera itself, I read in some of the papers that were submitted that you could see not just the breezeway but also where Simpson parked his car.

          THE WITNESS:  From the screenshots I never saw that.

          THE COURT:  Okay.  But did the camera have -- did it move?

          THE WITNESS:  It could move.  You would have to physically move it.  So you would have to be watching it in order to move it.  It's going to record whatever it's viewing at that time, so then if you moved it and allowed it to record there then it would record that.

          THE COURT:  So you never moved it?

THE WITNESS:  Correct.

THE COURT:  So I think I read something about how it started out showing some area, and then it moved to another area.  So the person who installed it was the one who focused it on wherever it was recording?

01:52PM

THE WITNESS:  Correct.  They would have focused it on the entryway, the entry to the breezeway.

THE COURT:  Is that done remotely?

THE WITNESS:  Yes.

THE COURT:  Could you do that from your desk?

01:52PM

THE WITNESS:  If I was watching it live, yeah, you can zoom out and zoom in.

MR. KOEHLER:  That triggered a follow-up if I could, Your Honor.

THE COURT:  You could.  Thank you.

01:52PM

BY MR. KOEHLER:

Q.  Where Simpson's car was parked, would this camera have been able to see that area?

A.  Where his car was parked on that day, no.

Q.  And what about the area further north in the parking lot?  Would it have been able to see whether his car was present?

01:52PM

A.  I think it would have been blocked by the overhangs, but without actually looking at the video I'm not sure.

Q.  And you mentioned earlier that it didn't have a view of the east side of the breezeway.  Is that the side where the

01:52PM

apartment was located?

A.   Yes.

Q.   What was blocking its view from seeing that?

A.   The building.

Q.   Thank you.                                                01:53PM

        THE COURT:  Mr. Drake.

                    REDIRECT EXAMINATION

BY MR. DRAKE:

Q.   Is it your understanding the pole camera requires some sort
of power source to operate it?                                 01:53PM

A.   I don't know that to be true for every camera.

Q.   It would certainly be convenient, just like having a
computer plugged in, you wouldn't have to go back and change a
battery.  Correct?

A.   It would be convenient.  I just don't know if it's true.  01:54PM

Q.   Do you believe that to be the pole on which the pole camera
was located?

A.   I don't know that for sure.  It was definitely in that
direction, but I don't know exactly where the pole camera was
located.                                                       01:55PM

Q.   That is Exhibit 8.

        I'm going to show you Exhibit 5.  This is the general
vicinity, is it not, where Mr. Simpson parked his car?

A.   I believe so, yes.

Q.   Is that what looks like a light down there, a light in the  01:55PM

atrium?

A.   A little bit to the right of your pen?

Q.   Yes.

A.   It looks like a walkway light, yes.

Q.   Yes.  Oh.  Let me put that back up for a second.

01:56PM

If I understand correctly from your testimony, Simpson's apartment was close to where that individual is standing, to the right?

A.   Probably.  Yes.

Q.   And if there had been a pole camera situated on that light pole, it could have been pointed towards the breezeway that led from Simpson and Soofi's apartment.  Is that correct?

01:57PM

A.   That is a light pole that was there in 2015.  It could have been, yes.

Q.   This is the government's exhibit.  I'm not sure when the photograph was taken.

01:57PM

THE COURT:  Just to orient me, am I looking at the courtyard area as I look through the photo?

THE WITNESS:  That's going to be the courtyard on the east side of the building.  So his apartment would be to the right on the west side.

01:57PM

THE COURT:  Facing into the little patio area faced into the courtyard?

THE WITNESS:  Correct.

BY MR. DRAKE:

01:57PM

Q.  And so if the pole camera that you pointed out to us was on the light pole on the west side of the building and had a view of the west side of the breezeway, a camera on this side of the breezeway?

MR. KOEHLER:  A critique of the location of the pole camera is completely outside the scope of this hearing, Your Honor.

THE COURT:  I agree.  Sustained.  This is not about questioning the wisdom of the pole camera's footage.  It's about the disclosure or failure to disclose the pole camera and the value of what it showed or didn't show.

MR. DRAKE:  Well, the argument we have, Judge, is that the government has just gone through and tried to explain how it is they could not have seen anything.

THE COURT:  No, not how they could not have but how they didn't see certain things.  That was the one and only pole camera, and we're here about that pole camera, not whether somebody could have had two pole cameras or found a better place to put the pole camera.

BY MR. DRAKE:

Q.  Was I mistaken in your earlier testimony; I thought you indicated that you had not gone out there before the pole camera application?

A.  I don't recall going there before the pole camera application.

Q.  So your knowledge of which we have seen here, where does this come from?

A.  So I was on surveillance out there after the application was done.

THE COURT:  But before the pole camera was put in?

THE WITNESS:  Correct.

BY MR. DRAKE:

Q.  The government asked if you would need permission to place the pole camera on somebody's property.  Correct?

THE COURT:  I think I asked.

THE WITNESS:  The judge asked.

BY MR. DRAKE:

Q.  And the answer was you thought probably so?

THE COURT:  Well, if it's private property she was pretty clear you had to.  If it was public property she wasn't sure what the procedures were.

MR. DRAKE:  Okay.

BY MR. DRAKE:

Q.  But you got that permission whatever -- if it were required you got that in this case?

A.  I didn't put the pole cam up, so I don't seek those permissions.

Q.  The government asked about whether you viewed Mr. Simpson as a threat to public safety.  Had you seen Exhibit 115, which was the tweet about the Garland contest, had you seen the

UNITED STATES DISTRICT COURT

subsequent tweet of May 23 -- I'm sorry -- April 23, about the Garland contest, would that alter your opinion?

A.   Did you say Exhibit 115?

Q.   The first tweet is Exhibit 115, and that went out February 13 of 2015.

02:01PM

MR. KOEHLER:  Objection.  Relevance.

THE COURT:  Overruled.

MR. KOEHLER:  And outside the scope.

BY MR. DRAKE:

Q.   The second tweet goes out April 23.  That's Exhibit 121, again, about the Garland contest?

02:02PM

A.   So by those tweets would I have assumed he was an imminent threat?  Is that the question?

Q.   No.  My question is:  Had you seen those, would they affect your opinion that Mr. Simpson was not a threat to public safety?

02:02PM

THE COURT:  The question that Mr. Koehler asked was whether he was an imminent threat to public safety.

MR. DRAKE:  Very well.

THE WITNESS:  That does not change my opinion.

02:03PM

BY MR. DRAKE:

Q.   It did not change your opinion?

A.   No.  After reading them now it does not change my opinion.

Q.   Okay.  And had you known that the individual that sent the e-mail to you, Smith and Hebert --

02:03PM

MR. KOEHLER:  Objection.  Beyond the scope.

THE COURT:  Sustained.

BY MR. DRAKE:

Q.  Did you ever find out that the individual who sent that e-mail was the case undercover agent in the investigation of --

MR. KOEHLER:  Objection.  Beyond the scope.

THE COURT:  Let him finish the question, please.

BY MR. DRAKE:

Q.  Was the undercover agent in an investigation regarding Erick Jamal Hendricks?

MR. KOEHLER:  Same objection.

THE COURT:  Overruled.  You may answer.

THE WITNESS:  Did I ever find that out?

BY MR. DRAKE:

Q.  Yes.

A.  Yes.

Q.  And in terms of the imminence of his threat to public safety, if I understand correctly, you ran 24-hour surveillance on him in connection with the Pat Tillman run.  Is that correct?

A.  On Mr. Simpson, yes.

Q.  Yeah.  Is that because you considered him an imminent threat to public safety?

A.  No.

THE COURT:  So why were you surveilling him in

connection with the Pat Tillman run?

THE WITNESS:  There are times in working investigations due to things that are going on in the community that subjects require more surveillance to make sure that nothing happens.  It's not specific to one violation or another.  It's just there are things happening that, you know, that are happening in the community that could incite some sort of violence from particular people.  Then we up our surveillance during those time periods.

THE COURT:  There wasn't anything specific that associated Simpson with the Pat Tillman run, was there?

THE WITNESS:  Not that I recall.

THE COURT:  You just made a decision to do 24-hour surveillance for a day or day and a half because of this public event?

THE WITNESS:  Correct.

BY MR. DRAKE:

Q.  Would it change your opinion about the imminence of his threat to understand or to know that he was communicating on a fairly regular basis with Hassan Abu Jihaad, who was alleged to have tried to start a terrorist cell here in Arizona?

MR. KOEHLER:  Objection.  Beyond the scope.

THE COURT:  Sustained.

BY MR. DRAKE:

Q.  Did you know he was communicating with Abu Jihaad?

MR. KOEHLER:  Same objection.

THE COURT:  Sustained.

BY MR. DRAKE:

Q.   Take a look at Exhibit 119.

MR. KOEHLER:  Your Honor, same objection.  And this is                02:07PM
also beyond the scope.

THE COURT:  I have no idea what this is so I'm not in
a position to yet rule on the objection.

BY MR. DRAKE:

Q.   Agent Fryberger, do you recognize the form we have in front       02:07PM
of us?  Not necessarily the writing that is on it but the
nature of the form?

A.   Yes.

Q.   And what is it?

A.   Grand Jury subpoena request form.                                 02:07PM

Q.   Okay.  And the Grand Jury subpoena request forms are
submitted to whom?

A.   We submit them to the AUSAs.

Q.   The information on here, who provides it?

A.   The agent.                                                        02:08PM

Q.   And in the file that you have access to through Sentinel,
would a record like this be kept?

A.   This specific form?

Q.   Yes.

A.   No.                                                               02:08PM

Q.   Would information leading to support this subpoena request be kept there?

A.   There would be a record of the return of the subpoena and a record of the service of the subpoena.

Q.   Okay.  This form was prepared by a member of your task force.  It looks like a fellow, Andrew Simpson -- or I thought I'd get rid of that at lunch -- Andrew Smith.          02:08PM

A.   It appears to be, yes.

Q.   And it gives his phone number and indicates what he's trying to do, the second page of that exhibit?          02:09PM

          MR. KOEHLER:  Your Honor, I'm going to continue to object.  This whole line of questioning is beyond the scope of the hearing.

          THE COURT:  What does this have to do with the scope of this hearing?          02:09PM

          MR. DRAKE:  The government has tried to make the point that he's not considered an imminent threat.  These are phone call records from the Federal Correctional Institute in Coleman --

          THE COURT:  Florida.          02:09PM

          MR. DRAKE:  -- Florida, between Abu Jihaad and Elton Simpson.  They range generally around a few minutes, but there were, I believe, 13 of them between October of 2014 and March of 2015.  The FBI apparently wanted this information so they could listen to it.          02:10PM

MR. KOEHLER:  Your Honor, the point here is that like the pole camera critique, Mr. Drake is seeking to critique whether the agents should have viewed Mr. Simpson as an imminent threat as opposed to whether they did.

THE COURT:  Sustained.                                  02:10PM

MR. DRAKE:  You sustained the objection?

THE COURT:  Yes, I did.

MR. DRAKE:  Okay.

BY MR. DRAKE:

Q.  Do I understand it was not you who helped the intern       02:11PM
identify the individuals on the pole camera video?

A.  I don't recall who helped him.  I might have given him some pictures, but I'm not sure.

Q.  Did anyone, to your knowledge, edit the log prepared by the intern?                                                  02:12PM

A.  Not to my knowledge.

Q.  And back on Exhibit 113, there's a reference to an SST. Who or what is that person?

A.  What exhibit was that?

Q.  I believe it's 113.  No.  Sorry.  13.                   02:12PM

Thank you, Mr. Koehler.

A.  I'm sorry.  There's reference to what?

Q.  There is a reference at the fourth page in.

A.  The SST, other support?

Q.  Down towards the bottom where it says SST slash other    02:13PM

support for upload.

A.   Yes.

        THE COURT:  What is SST was the question.

        THE WITNESS:  SST is our squad secretaries.

BY MR. DRAKE:

Q.   Say that again?  I'm sorry.

A.   Like a squad secretary.

Q.   Oh.

A.   Other support could be the ELSUR people as well.

Q.   Okay.  So that's another person who would know about the application for the pole camera?

A.   No.  The SST slash other support, so the other support would be the Serena Martinez, the ELSUR person that would upload this into the case file.

        MR. DRAKE:  May I have a moment?

        THE COURT:  Yes.

        MR. DRAKE:  Your Honor, I'd like to make an offer of proof if I may with respect to the testimony and exhibits regarding the Grand Jury subpoena request submitted by Andrew Smith regarding the phone call information for Hasaan Abu Jihaad.

        THE COURT:  Go right ahead.

        MR. DRAKE:  And also the information regarding the Twitter -- not Twitter, I'm sorry -- direct message between Junaid Hussein and Mr. Simpson.  That comes on the 15th of --

THE COURT:  Go.  Yes.  Go.  Go ahead.  Make your offer of proof.

MR. DRAKE:  Okay.  Both those documents go to show the --

THE COURT:  I'm sorry.  An offer of proof is supposed to be what the evidence would be if I hadn't sustained the objection.

02:15PM

MR. DRAKE:  Right.  I understand that.  And I'm trying to explain to you the relevance in my mind.

THE COURT:  No.  I have already sustained the objection.  Now you can put the evidence in as part of the offer of proof without any further explanation of its evidentiary relevance.

02:15PM

MR. DRAKE:  All right.  That's what I have done. Thank you.  I made my offer with respect to that.  And if I understand correctly, I don't need to go further to try and show why it's relevant?

02:15PM

THE COURT:  No.  You just need to put in the evidence for purposes of an appeal where you would suggest that I ruled improperly.

02:16PM

MR. DRAKE:  All right.  I just want to make sure that we had our position on that evidence squared away.

THE COURT:  Well, I'm not sure that you do because you haven't put the evidence in that I sustained.

MR. DRAKE:  Well, all right.  So that means I have to

02:16PM

offer it.

THE COURT:  You have to offer the evidence so the record shows what the evidence is that I did not permit to be part of this hearing.

MR. DRAKE:  Very good.  So I would offer at this time, Your Honor, Exhibit 120 and Exhibit 119.                    02:16PM

THE COURT:  As your offer of proof?

MR. DRAKE:  Yes.

THE COURT:  So noted.

MR. DRAKE:  Thank you.                    02:17PM

THE COURT:  May this witness --

MR. KOEHLER:  May I ask two follow-up questions of the witness very quick?

THE COURT:  No.  I didn't hear anything on redirect that I felt justified recross.                    02:17PM

MR. KOEHLER:  It was only about the --

THE COURT:  Special Agent Fryberger, you may step down.  May this witness be excused?

MR. KOEHLER:  Yes, Your Honor.

THE COURT:  Any objection, Mr. Drake?                    02:17PM

MR. DRAKE:  No.

THE COURT:  You may be excused.  Thank you.

Mr. Drake, Mr. Maynard, please call your next witness.

MR. MAYNARD:  I believe the government would like us to call Agent Whitson at this time.                    02:18PM

THE COURT:  Yes.  Please do.

MR. MAYNARD:  So we'll call Agent Whitson.

THE COURT:  You may take the stand.  You have already been sworn.

THE WITNESS:  Thank you, Your Honor.

THE COURT:  You may proceed, Mr. Maynard.

MR. MAYNARD:  Thank you, Your Honor.

STEWART WHITSON,

a witness herein, having been first duly sworn by the clerk to speak the truth and nothing but the truth, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. MAYNARD:

Q.  Would you state your name, please.

A.  My name is Stewart Whitson.

Q.  And how are you employed?

A.  I'm a special agent with the FBI.

Q.  In May of 2015, prior to May 8th, were you involved in the FBI's investigation into Mr. Simpson, Elton Simpson?

A.  Prior to May 8th?

Q.  Yes.

A.  I was not involved in an investigation, no.

Q.  Did you -- you recall that prior to May 8th you did an interview of Abdul Kareem at the FBI headquarters here in Phoenix, Arizona?

A.   Oh, yes.

Q.   Wasn't that part of the investigation of Mr. Simpson?

A.   Yes.

Q.   Okay.

A.   I'm sorry.  I misunderstood your question.

Q.   You have become the case agent on Abdul Kareem's case on May 8th of 2015?

A.   Yes.

Q.   Prior to that, you were doing some work with the FBI concerning the attack that had occurred in Garland, Texas?

A.   Yes.

Q.   And that was under the auspices of a case involving Elton Simpson?

A.   Yes.

Q.   When did you get involved in that investigation involving Elton Simpson?

A.   Well, my -- so May 5th.  On or about May 5th I guess would be my first involvement in the investigation of Elton Simpson.

Q.   You became aware of the attack in Garland, Texas on May 3rd or 4th?

A.   Yes.

Q.   You were aware that on May 4th there was a search done of Mr. Simpson's apartment here in Phoenix, Arizona?

A.   Yes.

Q.   Did you do anything in the investigation on that attack on

02:19PM

02:20PM

02:20PM

02:20PM

02:20PM

May 4th?

A.   Not in the investigation of the attack.

Q.   Did you do anything concerning that attack or Mr. Simpson?

A.   As a -- yes.

Q.   What is it that you were doing on May 4th?          02:21PM

A.   I was a member of the FBI Phoenix SWAT team, and I helped execute a search warrant on Elton Simpson's apartment.

Q.   Okay.  So on May 4, you actually went to Elton Simpson's apartment?

A.   Yes.          02:21PM

Q.   Did you have the opportunity to see a search warrant for Elton Simpson's apartment done that day?

A.   No.

Q.   Did you ever see a search warrant for Elton Simpson's apartment?          02:21PM

A.   Not that I recall.

Q.   How many other agents were involved in that execution of that search warrant besides yourself?

A.   Approximately 20 to 25.

Q.   Do you remember whether or not there was an individual by          02:22PM
the name of Andrew Smith that was involved in that execution?

A.   Yes.

Q.   Did you know Andrew Smith?

A.   Yes.

Q.   Had you worked with him at the FBI?          02:22PM

UNITED STATES DISTRICT COURT

A.   Yes.

Q.   And had you worked with him prior to the execution of the search warrant on May 4th of 2015?

MS. BROOK:   Object to beyond the scope.

THE COURT:   Overruled.   You may answer.

THE WITNESS:   Yes.

BY MR. MAYNARD:

Q.   Who, if anyone, was it that contacted you and asked you to be involved in the execution of that search warrant on May 4?

A.   I don't recall.

Q.   Who was in charge of the execution of the search warrant on May 4?

A.   Could you explain the question?

Q.   Yeah.   Was there somebody at the FBI who was in charge of the execution of that search warrant?   Was there a case agent?

A.   There was a case agent.

Q.   Who was the case agent?

A.   Andrew Smith.

Q.   Were there any other case agents that were involved in the Simpson investigation that you were aware of at that time?

A.   No.

Q.   Did you know Amy Fryberger?

A.   Yes.

Q.   How did you know her as of May 4th of 2015?

A.   She is a special agent in the FBI Phoenix Field Office.

Q.   Did you know whether she was involved in the investigation of Elton Simpson?

A.   When?

Q.   As of May -- I'm going to focus just on May 4th of 2015.

A.   On May 4th I did not know she was involved in that investigation.

Q.   Did you know DeEtta Nolen?

A.   Yes.

Q.   How did you know DeEtta Nolen?

A.   She's a special agent with the FBI.

Q.   And was she involved in the execution of the search warrant on May 4th?

A.   Not that I'm aware of.

Q.   Did you, prior to being involved in the execution of that search warrant on May 4th, did you have a meeting with Mr. Smith to talk about what you were going to be looking for, Special Agent Smith?

A.   No.

Q.   Were there any meetings that were held by the FBI as of May 4th to discuss the surveillance that had been done on Mr. Simpson prior to the Garland attack?

A.   Not that I'm aware of.

Q.   At some point somebody asked you to do an interview the next day on May 5th of Abdul Kareem, correct?

A.   Yes.

Q.   In doing the investigation on the attack in Garland, did the special agents get together and meet to divide up the tasks that they were going to do?

A.   Yes.

Q.   When was the first one that you were involved in?

A.   I'm not sure precisely when the first time.

Q.   Would it have been around May 4th, before the execution of the search warrant?

A.   No.

Q.   It was after that?

A.   Yes.

Q.   Can you tell me, was it that day or the next day?

          MS. BROOK:  Objection.  Relevance.

          THE COURT:  Overruled.  You may answer.

          THE WITNESS:  It would have been -- the earliest it could have been was on the afternoon or evening of the 4th and maybe not until the 5th.

BY MR. MAYNARD:

Q.   Do you recall what was discussed at that meeting?

A.   I don't.

Q.   Do you recall whether or not the FBI was interested in looking to see when Simpson and Soofi had left Phoenix, Arizona, to go to Garland, Texas?

A.   Could you repeat that question, please, sir.

Q.   Sure.  Do you recall whether or not there were discussions

about trying to determine when Simpson and Soofi would have left Phoenix, Arizona, to go to Garland, Texas?

A.   Yes.  I recall discussions.

Q.   So it was important for people to gather, for the FBI to gather all the information that it could about Simpson's and Soofi's activities prior to May 3rd.  Correct?

A.   It would depend.  To a certain extent.

Q.   Well, I mean, did you know whether they had flown to Garland, Texas or whether they had driven?

A.   When?

Q.   As of May 4th when you had this meeting with all the agents?

A.   I didn't know.

Q.   Okay.  Was it discussed that the car that had been at the attack in Garland, Texas had been Mr. Soofi's car?

A.   Are you at the May 4th or 5th?

Q.   Yes.

A.   I can't recall what was discussed at that meeting.

Q.   You don't recall anything about what was discussed at that meeting?

A.   Not with -- no.  I would be -- I could guess, but I don't know.

Q.   I don't want you to guess.

But wouldn't the FBI have wanted to know when Mr. Simpson and Mr. Soofi had last been in Phoenix, Arizona?

MS. BROOK:  Objection, Your Honor.  Asked and answered.

THE COURT:  Overruled.  You may answer.

THE WITNESS:  I think that's fair that the FBI would want to know that.

BY MR. MAYNARD:

Q.  And the agent in charge now is Andrew Smith, correct?

A.  In charge when?

Q.  As of May 4th, 2015, at that meeting.  I'm just focused on that for right now.

A.  He is in charge of the Simpson investigation, yes.

Q.  Okay.  Do you recall whether or not he asked anybody at that meeting, does anybody have knowledge about when they left?

THE COURT:  Well, he already said he doesn't remember anything that was said at the meeting that might have happened on May 4th.

MR. MAYNARD:  Okay.

THE COURT:  But might have been on May 5th.

BY MR. MAYNARD:

Q.  Do you recall at any time before you got involved in the Kareem investigation on May 8th anyone at the FBI's office in Phoenix trying to do a timeline to show when Simpson and Soofi would have left Phoenix, Arizona?

A.  Yes.  They would have, yes.

Q.  When was that done, to the best of your recollection?

A.  It was an ongoing process.

Q.  Were you involved in that?

A.  I certainly tried to create my own timelines.

Q.  What would you have reviewed to help you create that timeline?

A.  Any evidence that was in -- that I had either in the case file or in other files, I would review that evidence.

Q.  Did anyone ever mention to you that there had been a video camera at Simpson and Soofi's apartment that showed the last time they left the apartment?

A.  No.

Q.  Did you ever participate in a meeting where somebody said, jeez, do we have any evidence of when Simpson and Soofi last left their apartment?

A.  I don't recall that meeting like that.

Q.  When you say you don't recall, does that mean it didn't happen or you just don't recall whether one happened or not?

A.  I don't remember that ever happening, so I'm saying what you just said.  Jeez, do we have that?

THE COURT:  You know, excuse me.  It just -- the video camera footage was first reviewed on May 3rd in the middle of the night.  Just accept that.

THE WITNESS:  Okay.

THE COURT:  And within a day or two, you're involved in some kind of a briefing about Simpson.  It just seems odd

that no one would talk about the surveillance that was occurring before the video camera and since the video camera was put up since it had just been put up coincidentally on the very day that Simpson and Soofi left.  Doesn't that strike you as odd?

THE WITNESS:  Well, if I may, Your Honor, so for these meetings, it's not a meeting led by the case agent but it's a meeting led by the leadership.  And essentially what it is is any new facts that have come out since the last meeting are what was discussed at the meeting.  And so my first involvement as a SWAT operator was I went to the house on the night of the 3rd and I stayed all night into the morning of the 4th waiting for the search warrant and helped execute the search warrant on that house.  And having been up for more than 24 hours, I went home briefly and had -- so I was out of pocket for a little bit.  So by the time I came back, that's why I was guessing that maybe the 4th could have been the first time I went to meeting.  But I certainly would have, by the time I came back, tried to attend one.  So it would have made, I guess, that would have made sense so I didn't know that was --

THE COURT:  I don't know if it was talked about.  I thought it was odd that it wasn't talked about.

THE WITNESS:  So I would say if it was talked about that would make sense if they had maybe already talked about they wouldn't talk about what they already talked about before,

they would only talk about new things in the meeting.  And again, I was there to just assist one of many people inside.

THE COURT:  So when you interviewed Mr. Kareem on the 5th, you really didn't know that much about the investigation.  Who briefed you on Mr. Kareem and who he was and what information they wanted you to ask him about?

THE WITNESS:  I mean, I believe Detective Nash.  So Detective Nash was the lead on that interview, and I was asked to assist Detective Nash in conducting that interview.  So it was Detective Nash's job to compile most of the information but that I obviously looked at whatever he had and formulated our plan before our interview talk.  But it was the case agents who -- it certainly was difficult because of how busy everything was.

THE COURT:  So Nash was the one who might have been brought up to speed in who Kareem was in relation to Simpson and you were asked to sit in on the interview because there's always two people in the interview?

THE WITNESS:  Yes, Your Honor.

BY MR. MAYNARD:

Q.  Then as of May 8th, you become the case agent on Kareem, correct?

A.  Correct.

Q.  And at that point, the FBI starts focusing on Mr. Abdul Kareem, correct?

A.   I don't know if I would agree with that.  He becomes an important subject.

Q.   Okay.  In fact, at some point within a very short period of time there was 24/7 surveillance on Mr. Kareem by the FBI?

A.   Yes.

02:34PM

Q.   So he's a pretty important subject at that point?

A.   Yes.

Q.   Okay.  So the investigation centers around whether or not there has been a conspiracy between Mr. Abdul Kareem, Mr. Simpson, and Mr. Soofi, correct?

02:34PM

A.   That's one of the main.

Q.   Well, ultimately, that's what the indictment alleges.

A.   Yes.

Q.   And as part of that conspiracy, wasn't it important to you as the case agent to know exactly when Mr. Abdul Kareem had had contacts with Mr. Simpson and Mr. Soofi?

02:34PM

A.   Yes.

Q.   And did you ever go back to the case agents on the Simpson case and say, jeez, have you guys done any investigation that would tell me whether or not Mr. Abdul Kareem has had contact with Mr. Simpson and Mr. Soofi?

02:34PM

A.   I don't recall asking them that.

Q.   You don't recall asking anybody that?

        MS. BROOK:  Objection.  Asked and answered.

        THE COURT:  Overruled.  You may answer.

02:35PM

THE WITNESS:  No.

BY MR. MAYNARD:

Q.  Okay.  But that would have been important information for you to have, correct?

A.  Yes.

Q.  And do you happen to know when the Simpson investigation stops?

MS. BROOK:  Objection, Your Honor.  Beyond the scope.

THE COURT:  Overruled.  You may answer.

THE WITNESS:  Well, so he obviously died in the attack so I think an investigation of him as an individual would have in some ways ended then.  But certainly his investigation would have remained open for longer if there's other matters.

BY MR. MAYNARD:

Q.  As you are now investigating Mr. Abdul Kareem, the allegation that he is a co-conspirator, did you have access to the Simpson case file?

A.  Yes.

Q.  What steps did you take to investigate Mr. Abdul Kareem's connection with Mr. Simpson by looking at the Simpson case file?

A.  I reviewed, systematically reviewed, all the documents in the Simpson case file to look for evidence and his connection.

Q.  And that would have started sometime when, at what point?

A.  Very early on in the investigation.

Q.   Sometime after May 8th, though?

A.   On or about May 8, I think it would have started.

Q.   And you would have looked at that through the Sentinel system?

A.   Yes.                                                                    02:36PM

Q.   And would you have done a Google-type of search to look for information in the Sentinel system?

A.   Yes.  That would -- I would have done both a systematic search but also used a Google-type Boolean search.

Q.   Did you become aware at some point that the FBI had done        02:37PM surveillance on Mr. Simpson in March and April of 2015?

A.   I don't recall the dates.

Q.   Did you become aware that sometime in 2015 but prior to May 3rd the FBI had -- Phoenix office -- had done surveillance on Elton Simpson?                                                         02:37PM

A.   Yes.

Q.   When did you become knowledgeable of that?

A.   Sometime after the attack, but I'd say on or about May 8. Around that time.

Q.   How did you learn?                                              02:38PM

A.   I believe it was from Andrew Smith mentioned it, that they had done surveillance of his apartment.

Q.   Okay.

A.   Of Simpson's apartment.

Q.   And did you discuss with him the type of surveillance that     02:38PM

had been done?

A.   Yes.  Well -- yes.

Q.   What is it that Andrew Smith told you?

A.   He said he conducted drive-by surveillance of his -- of Simpson and Soofi's apartment.

Q.   And he never mentioned that they had put a pole camera up there?

A.   No.

Q.   Do you have any notes of any meetings where you had discussions with Andrew Smith when you asked him historical knowledge about the surveillance that the FBI in Phoenix had been doing on Mr. Simpson?

A.   No.

Q.   Did you get copies of any 302s of the surveillance that the FBI had done on Mr. Simpson from -- in March and April of 2015?

A.   I believe I reviewed some documents.  I'm not sure if they were 302s.  They may have been 1054s.

Q.   Can the witness be shown Exhibit 12?  Take a minute and sort of look through these and then I'm going to ask you a few questions.

       Mr. Whitson, let me know whenever you are finished.

A.   I have reviewed all these documents.

Q.   Have you seen any of those documents before?

A.   I don't -- none of them -- I don't -- I'm not sure if I have or not.

Q.   You knew Andrew Smith and you knew DeEtta Nolen, correct?

A.   Yes.

Q.   And you knew Amy Fryberger?

A.   Yes.

Q.   Did you work near them?                                    02:43PM

A.   Yes.

Q.   You were on a joint terrorist task force, correct?

A.   Yes.

Q.   Were they on a joint terrorist task force but it was
different teams?                                               02:43PM

A.   They were in a different squad.

Q.   Squad.  Okay.  Can you explain to me what a squad is?

THE COURT:  Do I really need to know what a squad is?

MR. MAYNARD:  I just want to know the size and whether
they interrelate with each other, judge.                       02:43PM

THE COURT:  Why don't you ask.  We already had Special
Agent Fryberger talk to us about the squad and the task force
and the numbers.

MR. MAYNARD:  Okay.

THE COURT:  I don't think we need it again.                    02:44PM

BY MR. MAYNARD:

Q.   Did the different squads have different names or
identifications?

A.   Yes.

Q.   What was the squad that you were in?                       02:44PM

A.   So I was on NS-1.

Q.   And then there was other squads on the joint terrorist task force?

A.   Yes.

Q.   How many were there?

02:44PM

A.   So there were, at the time, three in Phoenix and then -- in the Phoenix area.

Q.   And were the individuals on Smith's task force, were they officed somewhere near your task force?

A.   Their squad was located approximately 30 feet from my squad.

02:44PM

Q.   30 feet away?

A.   Yes.

Q.   Did the squads interrelate with each other and do you talk to each other about investigations that are going on?

02:45PM

A.   Not unless there's -- you are working together on something, but we're compartmentalized.

Q.   At some point when you get involved in the Kareem case do you then work with the people who are involved in Simpson because Simpson is considered to be a co-conspirator with Mr. Kareem?

02:45PM

A.   To a certain extent, yes.

Q.   Did you go to those individuals and have any formal or informal meetings to get information from them about what they had learned when they had been investigating Mr. Simpson?

02:45PM

A.   I don't know that there was any formal meetings to do that.

Q.   Formal or informal?

A.   There were informal meetings where -- if we had informal meetings where new information came to light that we thought others would appreciate then we would call a meeting and share that information.

02:45PM

Q.   Did you ever come to understand that the task force that Mr. Smith was involved with was concerned that Mr. Simpson may have been a threat at the Pat Tillman run?

A.   Could you -- I'm sorry.  I don't understand the question.

02:46PM

        MS. BROOK:  I'm going to object.  Misstates testimony, beyond the scope.

        THE COURT:  Sustained.

BY MR. MAYNARD:

Q.   Did you ever ask anybody in Mr. Smith's joint task force whether they considered that Mr. Simpson had been an imminent threat to the public?

02:46PM

        MS. BROOK:  Same objection.

        THE COURT:  Sustained.

BY MR. MAYNARD:

02:46PM

Q.   Who was your supervisor when you became the special agent for Mr. Kareem?

A.   SSA Michael Caputo.

Q.   Did you know Glenn Milnor?

A.   Yes.

02:47PM

Q.  Did you ever have any discussions with Mr. Milnor about the Simpson investigation?

A.  I don't recall any specific conversations with them.

Q.  I showed you Exhibit 12 which was a series of 302s with some pictures of Mr. Simpson.  Did you ever do any investigations to determine if the FBI had taken pictures of Mr. Simpson in April of 2015?

MS. BROOK:  Objection.  Beyond the scope.

THE COURT:  Sustained.

BY MR. MAYNARD:

Q.  Just to follow up a little bit, on May 3rd, you were there to execute a search warrant?

THE COURT:  No.  He was there watching the apartment while the search warrant was being obtained and it was executed the next day.

BY MR. MAYNARD:  Okay.  On the 4th.  And you are waiting.  When you go in on the 4th, whatever time it was, did you have to read the search warrant to know what you were looking for?

A.  I wasn't conducting the search.

Q.  At some point after you became the case agent on Abdul Kareem, did you ask anybody, including Mr. Smith, if they had a timeline on when Mr. Simpson and Mr. Soofi had left Phoenix?

A.  I asked someone from their team.

Q.  Who did you ask?

A.  I think -- I can't pronounce his name.  Randy.

Q.   You can spell it?

A.   It's K-A-C, maybe Z-I, a W in there.  He is an IA assigned to the same squad as Andrew Smith.

THE COURT:  IA, intelligence analyst?

THE WITNESS:  Yes, Your Honor.

BY MR. MAYNARD:

Q.   When did you have that conversation?

A.   Fairly early on.  They just asked do you have a timeline that you are developing.

Q.   And what did he tell you?

A.   He pointed me to a wall where they had one on the wall in their quad area.

Q.   When you say it's on the wall, can you describe it for me?

A.   Yes.  It was just paper that was printed from one of those large printers like a map type size, so it was a large document and it had a developing timeline as facts were getting in.

Q.   Did it show when Simpson and Soofi left Phoenix, Arizona?

A.   Yes.  There were times on there when they -- yes.

Q.   And did it also indicate what the source of the information was that they had put on the timeline?

A.   Not in all cases, but so in some cases, yes.

Q.   Just focus on when they left Phoenix.  Did it show the source of the information that the FBI was using to determine when they had left Phoenix?

A.   So I can't remember if it was the -- so whatever the phone

information had that was the information I remember being there so the phone -- their cellphones indicated a time when they suspected they left that was up there.  But I don't recall exactly.

Q.  Was there ever a photograph made or anything made that memorialized this timeline that was on the wall?

A.  The timeline was basically a compilation of all the documents that were put.

THE COURT:  Yeah, but does the timeline itself, is there a visual depiction of it anymore?

THE WITNESS:  Not that I'm aware of.

BY MR. MAYNARD:

Q.  Was there visual depiction of it made at the time so that you had a hard copy of it that you put somewhere?

A.  Not of that.  It was just a working -- no.

Q.  And who was working on the timeline?  Who was putting things on it?

A.  I think just lots of people could come in and add things.

Q.  Mr. Smith could come in, Agent Smith?

THE COURT:  Okay.  We don't need to know who all the lots of people are.  Anybody on that task force could have done it.

MR. MAYNARD:  All right.

BY MR. MAYNARD:

Q.  Do you know whether or not anybody in the Simpson

02:50PM
02:51PM
02:51PM
02:51PM
02:52PM

investigation prepared a report on what had taken place from March until May 3rd with Mr. Simpson?

MS. BROOK:  Objection.  Beyond the scope.

THE COURT:  Overruled.  You may answer.

THE WITNESS:  So can you say that again, a report?  Sorry.

BY MR. MAYNARD:

Q.  The FBI has been monitoring --

THE COURT:  Okay.  I think he's asking is there any report that kind of summarized what all the events were that took place between the time they opened their -- or reopened the investigation until they -- until Mr. Simpson was killed?

THE WITNESS:  The closest thing would be what I drafted.  That was kind of a cross-memo that would bring all the facts together into a single document.  But that was my notes, I guess, and then it would refer to the original documents.

BY MR. MAYNARD:

Q.  But you didn't get anything from anybody in the Simpson investigation separate?

A.  No.

Q.  Do you know an individual by the name of Michael Gallante?

A.  I know two individuals.

Q.  Named Michael Gallante?

A.  Yes.

02:52PM

02:52PM

02:53PM

02:53PM

02:53PM

Q.   This would have been an individual who may have been an intern back in May of 2015.

A.   Yes.

Q.   Did you work with him?

A.   No.  I worked with his father, though.

Q.   Okay.  Was Mr. Gallante, to the best of your knowledge, II, or Junior, was he working at the FBI as an intern in May of 2015?

A.   I don't know for sure during that time, but around that time he was.

Q.   Okay.  What is an intern at the FBI?

A.   Essentially it's just a paid employee that comes in who is generally still in college who doesn't meet all the requirements to be a full time employee that has an opportunity to come in and do some of the work of the FBI, highly supervised generally, and they have security clearance and things like that but they are not a full time employee.  It's an opportunity for them to learn the work the FBI does.

Q.   Do you know what, if anything -- strike that.

     Did Mr. Gallante do any work for you on the Kareem investigation?

A.   No.

Q.   Did you ever have any discussions with him about whether he had done any work on the Simpson investigation?

A.   No.

Q.  Do you recall him being in the office around May 3rd to May 8th of 2015?

A.  No.

Q.  Is there -- and I may have this wrong.  I understand that there are reports and things that are put into Sentinel.  Is that correct?                                                                02:55PM

A.  Yes.

Q.  And if you want to research those you do sort of like a Google search of some nature?

A.  Yes.                                                                  02:55PM

Q.  And is there a separate file that's called evidence log in Sentinel, or is that something different?

A.  Yes.  There is a -- I don't know if you would call it a file but --

Q.  What would you call it?                                               02:55PM

A.  So an evidence log is a type of document you can create and that's called an evidence log.  And so you can put that inside Sentinel, but you can put that in any kind of file inside Sentinel that you wanted to.  So I guess a better answer to your question is there's not an evidence log file but that's a       02:56PM type of document.

Q.  Is there a different type of document that is put in an evidence log versus what's normally put into a Sentinel file?

A.  Well, so an evidence log is just a log of the evidence you have collected so it's a document that's put into Sentinel.       02:56PM

Q.  When you take over the Kareem investigation, or when you are the case agent on the Kareem investigation, did you look in the Simpson investigation to see if there was an evidence log?

A.  Yes.  I looked, yes.

Q.  What do you remember finding in that evidence log?

A.  Well, one of the evidence logs would be the evidence log for the search of the apartment.  That was done on May 4th so I don't recall specifically what was in there at that time.  But I know that I would have looked at that because I know it was there.

Q.  Would the search warrant have been part of that evidence log?

A.  It can be included but not always.

Q.  Do you recall whether or not you saw anything in there about electronic surveillance in the evidence log in the Simpson case?

A.  No.

Q.  You don't recall or are you certain there wasn't anything?

A.  I wouldn't say I'm certain, but it would be unorthodox to put something like that in an evidence log.

Q.  Why?

A.  Because it's surveillance so that would go in a separate document.  An evidence log is just logging what evidence you have seized from a search location.  So it wouldn't make sense to put surveillance stuff in that.  Someone could do that I

suppose.

Q.   If you had a videotape or disk of surveillance would that be put in the evidence log?

A.   No.

Q.   And if it was, would that have been unusual?                    02:58PM

A.   Well, so I'm sorry, so you could have -- if you had an evidence log for some reason in your electronic surveillance subfile, you might house the evidence -- you might, if you had enough electronic evidence come in and you wanted to keep track of it, there's one site that you might fill out an evidence    02:58PM log.

THE COURT:  Let's stop being theoretical.  Let's say you have a hard drive of pole camera footage.  That has to be logged into evidence?

THE WITNESS:  Yes.                    02:58PM

THE COURT:  And so there would be an evidence log created.  The hard drive would be physically kept wherever you keep physical evidence and the log would be in the Simpson file?

THE WITNESS:  Yes, Your Honor.                    02:58PM

THE COURT:  Okay.

BY MR. MAYNARD:

Q.   Do you recall looking for that or seeing it when you looked to the Simpson file?

A.   Yes.                    02:58PM

Q.  You did see it?

A.  I recall looking at the Simpson log, evidence log.

Q.  Do you recall see that there was, in the evidence log, a hard drive with a video?

MS. BROOK:  Objection to the form of the question.

THE COURT:  Overruled.  You may answer.

THE WITNESS:  I don't recall.

THE COURT:  Mr. Maynard, we're going to take our afternoon break.  We'll reconvene at 3:15.  Court is in recess.

(Recess from 2:59 p.m. until 3:17 p.m.)

THE COURT:  The record will show the presence of counsel and the defendant.  Mr. Maynard, you may continue.

MR. MAYNARD:  Thank you, Your Honor.

BY MR. MAYNARD:

Q.  Agent Whitson, you dealt with Mr. Koehler on this case and Ms. Brook, correct?

A.  Yes.

Q.  And was your job, at least part of it, to provide them with the evidence in the case to review?

A.  Yes.

Q.  What were you told to give them?

A.  By them?  I was given a brief and told to give them anything that might be relevant.  And the memo was much more detailed than that, but that's a quick synopsis.

Q.  And did you search the files to determine whether something

was relevant and whether to turn it over?

A.   Yes.

Q.   Was there anyone else other than you on the Kareem case that did that?

A.   Not for discovery.  So there were other people searching the files, but I was the one doing it for discovery purposes.

Q.   Now, had you known there was a pole camera, would you have turned it over?

A.   It depends.

Q.   It depends on what?

A.   Well, for instance, if there's actual video captured by the pole cam or if it's other things I would have informed the prosecutors.

Q.   Let me use the judge's forget the hypotheticals.  Had you known that that pole camera had gone up on May 1st and recorded through May 3rd at Mr. Simpson and Soofi's apartment, would you, first, would you have reviewed that video?

A.   Either I would have reviewed it or I would have had someone on the team review it.

Q.   Would you have turned it over to the prosecution?

A.   Yes.

Q.   And if there were still shots that had been made from the video, would you have turned those over to the prosecution?

A.   Probably.

Q.   What have you done to prepare for your testimony today?

A.   I reviewed prior transcripts from the previous times when I have testified in this matter.

Q.   Have you reviewed any of the documents related to the pole camera that was at Mr. Simpson and Mr. Soofi's apartment on May 1st through the 4th of 2015?

A.   I have not reviewed any of those.  I have been shown one document once, but briefly.  I didn't really review it.

Q.   What was the one document that you were shown?

A.   I think it may have been an FD 759 request for the pole cam, but I didn't -- I glanced at it quickly and wanted to preserve my memory so I didn't look at it further.

        MR. MAYNARD:  Can the witness be shown Exhibit 13, 17, 18, and 19, please.

        Your Honor, I believe you have copies of all of these. I'm not going to put it on the screen unless you want me to.

        THE COURT:  I have copies of all the exhibits right here.

BY MR. MAYNARD:

Q.   We looked at Exhibit 12.  I want you to look at Exhibit 13 now.  Is this the document that you recently saw?

A.   I don't think it was this document, but it's hard to tell because --

Q.   Because of all the black?

A.   Redactions.  But it was something similar to this.  I think this may have been it, but I'm not sure.

03:20PM

03:20PM

03:20PM

03:21PM

03:21PM

Q.  When was it that you saw the document that was given to you?

A.  It was sometime after February of 2019.

Q.  Who gave it to you?

A.  Special Agent Mullen showed it to me in response to a question I asked him.                                                                    03:21PM

Q.  What was the question?

A.  Whether the prosecutors might be confused in thinking that there was a pole cam, because I didn't think there was.  So I said, are you sure there even is a pole cam, or are they just   03:22PM confusing this with another case?  And then he sent me an image of the 759 instead of responding, just sent that as a response that's saying, well, I don't know.  Just sent me that as a response.  I kind of looked at it briefly realizing that it was some sort of a request for a pole cam and kind of glanced at it   03:22PM briefly.  I closed it out because I wanted to preserve my memory from what it was at the time of the trial and I didn't think it made sense for me to do any new digging without the direction of the prosecutors.  But it was something similar to this.                                                                          03:22PM

Q.  Had you seen Exhibit 13, would you have turned it over to the prosecution?

A.  Well, again, without -- I can't see because of the redactions, but may I look at it a little bit longer?  So maybe.                                                                         03:23PM

Q.   Maybe.

Look at Exhibit 17.  Do you know whether you have seen Exhibit 17 before?

A.   I have not seen this before.

Q.   Had you seen this during your investigation would you have turned over this document to the prosecution?

A.   Yes.

Q.   Look at Exhibit 18.  Have you seen this document before?

A.   No.

Q.   Are you familiar with the format of this document?

A.   I think I know what it is.

Q.   Turn to Exhibit 19.  The first page is a 302.  Have you seen this before?

A.   No, I have not.

Q.   And the second page appears to be a timeline of what's on the pole camera.  I take it you have not seen that either?

A.   I have not.

Q.   And that is followed by multiple pages of images from the pole camera.  I take it you have not seen that?

A.   I have not.

Q.   But had you seen these documents in Exhibit 19, both the 302 the timeline and the images, would you have given it to the prosecution?

A.   Yes.

THE COURT:  So Special Agent Whitson, you said earlier

that you made a systematic review of the Simpson file when you became the case agent for Kareem and you also did a couple of searches.  This 302, Exhibit 19, which includes all of the attachments, would have been part of that file, correct?

THE WITNESS:  I can't say that with certainty, Your Honor.  You could presume that it should have been included.

THE COURT:  Isn't that where 302s all go, into the file?

THE WITNESS:  Well, they go wherever the case agent puts them, Your Honor.  So the case agent decides which case number to send the 302, and furthermore they decide which subfile within that case number, so -- and sometimes if there's a 302 that involves multiple cases it might be sent to multiple case files.  But I don't know if that answers your question.

THE COURT:  So the 302s don't all go into one part of the file?

THE WITNESS:  No.  So there's different practices.  So some agents have a practice where they will create a 302 subfile and they will put all 302s into a single spot.  That's not required.  It's just a practice that's preferred by some.  Others will create a criminal subfile if there's criminal charges and they will put their 302s there.  In a case like Simpson, you have so many different multiple ALRs, Dallas and everywhere sending stuff to the file that there wasn't -- it wasn't consistent in the way it was sent because it was lots of

different agents then.

THE COURT:  Well, for reasons unknown to me they blacked out the file number on 19.  But this was prepared by the intern that we spoke about.  And I'm going to presume that the file number really was the Simpson file because it's the only one that makes any sense.  Wouldn't you agree?

THE WITNESS:  I agree that that would make sense to send it to the Simpson file.

THE COURT:  Even with the redactions we can probably figure out that it says, "Footage obtained from a pole camera located on 19th Avenue."  These should have been in the -- discovered in your systematic review of the Simpson file, shouldn't they?

THE WITNESS:  If they were entered I should have seen that.

BY MR. MAYNARD:

Q.  And on the first page of 19 it says, the last sentence that we can see, it says "Included are the resulting screen shots and event logs."  So those were with the 302 according to this 302.

A.  I'm sorry?

Q.  Look at the first page.  Do you see the sentence that says, "Included are the resulting screenshots and event log?"

A.  Yes.

Q.  So according to this 302, all of these documents together

were put together somewhere in the file with the FBI, correct?

A.  Yes.

Q.  Okay.  Can you look at Exhibit 123.  I'm going to direct your attention to the last four pages of Exhibit 123.

THE COURT:  Before you do that, is this the name that you were trying to spell for us before on the first page of 123, Special Agent Chris Jancosko?

THE WITNESS:  No, Your Honor.

THE COURT:  Somebody else with a difficult last name.

THE WITNESS:  Yes, Your Honor.

THE COURT:  Okay.

MS. BROOK:  And Your Honor, if I may, I know it's before he's asked the question, but the government is going to object to this line of questioning especially because what's on this thread goes beyond the scope of his testimony and is beyond the scope of what the Court is here to consider.

THE COURT:  Okay.  Let me see if I can figure out what this is.

BY MR. MAYNARD:

Q.  You have Exhibit 123.  You have got the last four pages. At the top it says "Tactical Intel Report"?

A.  Yes.

Q.  As part of your investigation, did you ever see this document?

A.  I don't know.

MR. MAYNARD:  Your Honor, can I have a minute to confer with Mr. Drake?

THE COURT:  Yes.

MR. MAYNARD:  Your Honor, the only thing -- I'm finished with this questioning -- we do want to submit the pole cam video, the entire video.  My understanding was that the government was going to see whether or not that could be --

THE COURT:  I can't hear you when you turn and talk to Mr. Koehler and Ms. Brook.

MR. MAYNARD:  I'm sorry.  I rarely get admonished for not being heard.

We want to put in the entire video as part of the record.  And we didn't mark it because we were concerned about whether or not to make a copy and how to make a copy of it.  I don't know if we need to --

THE COURT:  What do you expect me to do about that?

MR. MAYNARD:  Tell me that I can bring in a video, agree with the government and bring it in.

THE COURT:  I don't know why you can't.  If you want to mark it as an exhibit and offer it, you are free to do that. I don't -- I'm not sure I understand what the problem is other than you are not sure how to make a copy.

MR. MAYNARD:  That's part of the problem.  Okay. Thank you, Your Honor.

THE COURT:  I was going to ask whether it had been

submitted.  Apparently the answer is not yet.

MR. MAYNARD:  Not yet.

THE COURT:  I, however, I don't -- you don't really expect me to look through like, you know, 24 hours of scintillating pole camera coverage?

03:32PM

MR. MAYNARD:  I'm not suggesting to the judge what the judge needs to do.

THE COURT:  Unless you find a way for me to look at it in a fast forward mode, don't count on it.

MR. MAYNARD:  I think the screenshots that are in Exhibit 19 are the more relevant things that are in the video.

03:32PM

THE COURT:  And I say this only half facetiously. Obviously we have many, many hours of pole camera footage.  And even the hours from the beginning until the last time you see Simpson and Soofi is a considerable number of hours.  And I think that it's incumbent upon counsel to tell me if there's anything else of significance beyond what is shown in 19. Because Exhibit 19 purports to be all of the people who could be identified that are seen up to the end of May 1.

03:32PM

And you can't expect me to find something else of significance on that pole camera footage.  You could certainly point out to me something else of significance and I could look at it myself.  But I'm not the person who is going to determine that Mr. Gallante missed seeing something important.

03:33PM

MR. MAYNARD:  Okay.  Well, I will take that up, Your

03:33PM

Honor.  I mean, obviously Mr. Gallante didn't put in Mr. Soofi walking with a handgun.  That's not in the -- it's in the pictures but it's not in --

THE COURT:  Well, no, it's in the pictures.  I'm talking about what I would see if I were looking at the pole camera footage.  And if you think there's something that I will see that's not part of Exhibit 19, then it's incumbent upon defense counsel or the prosecutor, if they think there's something I should see, to tell me where it is so that I can see it or, even more importantly, to get a screen shot of it and show it to me.

MR. MAYNARD:  Yes, Your Honor.  Thank you.

MR. KOEHLER:  Your Honor, I just wanted to make a point of clarification with respect to 19.  The first screen shot is May 1 of 2015 at 2:08 p.m. and 18 seconds.  The last image on there is Sunday, May 3rd, 2015 at 10:27 p.m. and 15 seconds, meaning this is actually three full days worth of screenshots from the pole camera not just May 1st.

THE COURT:  Yeah, I understand that.  I was just thinking that the significance is through -- what's most -- if there's anything of significance it's going to be on May 1.

MR. KOEHLER:  We agree with that.  We are just clarifying for the record that 19 encompasses the full span of the camera.

THE COURT:  Right.  The camera I believe was recording

for something in the neighborhood of three days.

MS. BROOK:  May I?

THE COURT:  You may, Ms. Brook.

CROSS-EXAMINATION

BY MS. BROOK:                                          03:35PM

Q.  Special Agent Whitson, you testified that you took over the Kareem case, the investigation as the lead case agent, on May 8 of 2015?

A.  Yes.

Q.  And at that point going forward, did you have access to the    03:35PM
Simpson electronic case file?

A.  Yes.

Q.  We're going to come back in a second and talk in more detail about what that looked like.  But before we get there, in your role as the lead case agent on Kareem, you mentioned in    03:36PM
talking with Mr. Maynard that you were given a directive by the prosecutors to produce anything that might be relevant in discovery in the Kareem case for the prosecutors?

A.  Yes.

Q.  Explain for us what anything that might be relevant meant    03:36PM
to you?

A.  Well, as I indicated that there was much more detail than just that, but essentially anything that might have a bearing on the case that might be material to the case, anything that could be exculpatory, inculpatory, anything that tended -- any    03:36PM

of those kind of things.  So if it was even remotely relevant, then that would be something I would give to the prosecutors to let them make a determination whether it should be whether it's discoverable or not.

Q.   Mr. Maynard asked you a bunch of questions about certain exhibits and asked whether or not you would provide an exhibit over to the government if you saw that.  Once or twice you answered that you weren't sure.  In those situations, at a minimum, would you have talked to the prosecutors about what you saw?

A.   Yes.

Q.   Explain that.

A.   So in a situation like this, communication with the prosecutors is ongoing, whether it's formal meetings or over the phone calls.  And so if I came to something that I thought was even remotely possible should we hand it over and it wasn't glaringly obvious that it should be, I would bring that up to the prosecutors in a conversation and explain it to them and ask them what their guidance was and proceed forward.

Q.   I think before you you still have the book of exhibits.  And in particular, I want to turn to Number 16.  Actually, I'm sorry, can you turn to Exhibit 13.

In looking back at this exhibit, which was that 759 document that you said might have been the one that Special Agent Mullen had e-mailed you, you said that you might have

sent it over to the prosecutors.  At a minimum, would you have talked to the prosecutors about this document if you saw it in reviewing the Simpson file?

A.   So the problem with this document is I can't -- all I see is date 4-9-2015 and the name of the case agent.  So presuming this is related to this case, I would reach out to the prosecutors and tell them at a minimum about it.

Q.   So understood.  So if you flip a couple pages in to Page Number 4 where there's a little more text and information, does that help clarify your answer on whether or not you would talk to the prosecutors about this information?

A.   Yes.

Q.   And what is it?  Would you have talked to the prosecutors about that?

A.   Yes.

Q.   Defense counsel also asked you about government's Exhibit Number 18.  If you could turn to that for a moment.

A.   Yes.

Q.   You had mentioned in looking at it that you thought it looked familiar?

A.   Yes.

Q.   Is that just the form of it that looked familiar or the actual content?

A.   The form of it looks familiar, so it looks like a screen capture out of Sentinel.  But other than that, the content I

UNITED STATES DISTRICT COURT

don't know.

Q.   So that looks familiar as something that would be consistent with a screen shot out of the Sentinel case file?

A.   Yes.

Q.   And same question as to that.  If you had seen that or the information contained therein, would you have spoken to the prosecutors about what you saw?

A.   Yes.

Q.   Let's talk about Sentinel for a moment.

You testified that during the time you were the lead case agent on the Kareem investigation you reviewed and you worked through the Simpson electronic case file?

A.   Yes.

Q.   In doing so, you mentioned that you had a systematic approach to reviewing that file?

A.   Yes.

Q.   Talk to us about what that file looks like when you open it.

A.   So I guess comparing it to other files, it's a very large file containing thousands of documents.  There's, when you first open it, the default page is the main case file.  So that has lots and lots of documents but then there's hyperlinks to all the subfiles.  And each one of those that you go into there's lots of other documents in there as well.

THE COURT:  Let me ask you a question about the

Simpson file.  We have heard testimony that the Simpson file was opened around 2006 to 2007, and then it was closed for several years and then reopened in or about March 2015.

Was it possible in the review through Sentinel to just start the new part of the file?

THE WITNESS:  You could, but, Your Honor, but I didn't.  But I reviewed everything because I thought just in case there might be something from the earlier part of the investigation that could still be relevant, I didn't want to miss that.

So and then also even when the case is closed, the case can still be populated with documents.  So it's closed, so it's not under review by FBI supervisors and it's not being watched in that sense, but documents can still load into a closed file even after it's closed.

THE COURT:  Would you say, though, that you may have paid more attention to why it was reopened and what happened in that last two months?

THE WITNESS:  Yes.  Especially initially, that was much my focus initially in the investigation part would have been just on the newer stuff when it was newly opened.  And as I had more time and I had handled immediate leads and theories of a threat, ongoing threat was resolved it was more painstaking looking through item by item.

BY MS. BROOK:

Q.  So describe what the newer stuff entailed.  Was that the surveillance that happened before May 3rd of 2015, or was the new stuff other information that was populating the Simpson account starting on May 3rd of 2015?

A.  It was new stuff coming from the Garland event was flooding the file with discoveries of things because the search was being conducted in another AOR.  So I was fully dependent initially on the documents they were writing and the synopsis they were writing to understand that part of it until the evidence arrived and I could look at it for myself.

Q.  So you mentioned the word "flooding."  What do you mean by that?

A.  Means every time you would go in to look at any of these cases there would be many more new documents that had come in since the last time you had been viewing it.  And so again, this was during the initial part.

THE COURT:  So were things being added to the Simpson file by all of the people that were investigating back in Garland, Texas?

THE WITNESS:  Yes, among others.

THE COURT:  Among others.  But so the file was being flooded not just because of the Phoenix task force that was investigating Simpson but all of the other FBI information that was being developed in Garland and in connection with Garland, they were putting things in the file as well?

03:43PM
03:43PM
03:44PM
03:44PM
03:44PM

THE WITNESS:  Yes, Your Honor.

BY MS. BROOK:

Q.  Describe for us what the organization system inside Sentinel looks like.  We have talked about how individual agents take maybe their own personal approach to organization.  Is that your experience in what you have seen?

A.  Yes.  I mean, there's some things that need -- that are prescribed by policy and then there's others that -- where agents are given latitude of how they organize the case file.

Q.  And, in fact, was that also the case for the Simpson file?

A.  Could you repeat that?

Q.  Sure, that the Simpson file, too, had its unique organizational system?

A.  Yes.

Q.  Was that compounded by the fact that the investigation had been run at different times by different lead agents?

A.  Yes.

Q.  I think you have before you still Exhibit Number 19 which defense counsel was asking you about, that May 7 of 2015 intern Gallante 302.

A.  Yes.

Q.  Obviously, if that was in the Simpson file and you didn't see it, was that a mistake?

A.  Yes.

Q.  Let's talk for a moment about the briefings.  So there was

testimony earlier about these briefings that you were part of, starting on or about May 5th of 2015.  And the question was, how would it be that pole camera footage would not be talked about in these types of briefings?  Does that -- well, let me start.

Do you recall pole camera footage from Simpson and Soofi's apartment being discussed at any of the briefings of the FBI or other locations that you had attended?

A.   No, not of Simpson's apartment.

Q.   And based upon the nature of the briefings, does it make sense to you that the pole camera footage would not be discussed?

A.   Yes.

Q.   Can you explain that?

A.   Yeah.  So the primary purpose of these briefings was to bring the entire division together and provide an update of what had happened since the previous briefing.  So this was a briefing where there's probably 60 or so people in the room surrounding a big room and they are going around the group and basically asking does somebody have something new that's happened since the last meeting to share with the group to help drive everyone's investigation.  So at that time if some new development had happened you would raise your hand and you would brief that to the group what that new development was. And so it would be if that -- if this happened before or if

there was something pertinent and so the other component was a lot of how they focus on threat.  So if there was a future threat that follows this attack, that's the primary focus of the meeting, stopping the next attack.  If the individuals who carried out the attack were already dead, they weren't worried about them but they were worried about the other folks, was there a follow-up attack planned.

So that was what was driving these briefings.  It wasn't the historical stuff or necessarily understanding why but it was understanding is there a threat now, what are the folks who are connected to them doing right now.

Q.   Let's rewind back to the late evening hours of May 3rd of 2015, the early morning hours of May 4th of 2015.  You had mentioned that you were part of the SWAT execution team?

A.   Yes.

Q.   And that was for the search warrant at Simpson and Soofi's apartment on 19th Avenue?

A.   Yes.

Q.   Did you, at any point, when you were preparing for entry into that apartment, or entering that apartment, learn that there had been a pole camera?

A.   No.

Q.   How do you know that you did not learn that on May 3rd or May 4th of 2015?

A.   Because obviously, when I carried out that operation, I

carried out many before that, many SWAT operations before, and a routine part of what we do is to brief whether there is a pole cam on the site or not.  And if there is, then we're notified of that and there's usually a plan put in place to make the pole cam go down before we execute the search and basically so our appearance isn't videotaped.

Q.   Explain that.

A.   So SWAT is a collateral duty, so FBI investigators like me who I work terrorism cases undercover, things like that, they make up the SWAT team.  So if we are videotaped people will see our face and a lot of people we conduct operations against are drug dealers.  Some of them are suspected terrorists, things like that.  So we don't want them to see our image.  It could put our family in jeopardy.  Eventually it could be released and we don't know who is going to get that so they could have a picture of us, it could put us in harm's way or our family in harm's way.  So there's a lot of efforts to not have us be videotaped.

Q.   So during the process of you executing the SWAT component of the search warrant, at any point did you learn information that would suggest to you that there was a pole camera at that location of the apartment?

A.   No.

          THE COURT:   So if I hear what you are saying, that the people at the FBI that knew there was a pole camera, for

UNITED STATES DISTRICT COURT

example, Special Agent Smith, who was the one who also did the search warrant affidavit, he should have told everybody that it existed so it could have been taken -- turned off before you went in?

THE WITNESS:  Yes, or so we would at least know about it and if it could be turned off it would be turned off.  Yes, Your Honor.

BY MS. BROOK:

Q.   At any point did Special Agent Smith tell you there was a pole camera placed outside Simpson and Soofi's apartment?

A.   No.

Q.   Before we move on, what is the SWAT component of a search? Did you do the actual search execution?

A.   No.  So the SWAT component is just to get initial entry into the apartment and make sure it's safe to allow the people that are going to conduct the search to conduct the search.  So we don't do any searches, just kind of come in and secure the area, make sure it's safe.

Q.   So you aren't perusing or reading or finding out what should be searched for?

A.   No.

Q.   Defense counsel asked you about whether or not you reviewed the affidavit for the search at Simpson and Soofi's apartment?

A.   Yes.

Q.   And as part of your duties as the lead case agent, did you

10-15-19   CR 15-707-USA v Kareem-Evidentiary Hearing-Day 1-Whitson-Cross

focus on reviewing affidavits to the numerous searches that had been conducted in this investigation?

A.   No.

Q.   Can you explain that to us?

A.   Yes.  So the search warrant affidavit is just the affiants restating the facts from the case file.  So I would prefer to go to the original source and find those facts myself.  So I wouldn't normally review an affidavit.  That's part of my investigation to try to look at the facts or documents that could arise from those facts.

Q.   So as part of systematically reviewing the Simpson case file to look for any possible discovery or relevant information, how was it that you worked through the file?

A.   Well, I started with the main case file and then just went from the oldest document to the newest document and just essentially opened each document, did a quick read of the document to see what the substance of it, what it was, and if it met the parameters of what I had been told by the prosecutors then I printed that.  And then I took those documents that were printed and I had an Excel spreadsheet that labeled where I found them at so we could go back to them if we needed to look at them.

        And then I took all those documents once I had them and I scanned them into a single document that had all the discoverable materials in one bat, or electronic file.

10-15-19  CR 15-707-USA v Kareem-Evidentiary Hearing-Day 1-Whitson-Cross

Q.   Were there times in your review you were uncertain whether or not something was relevant?

A.   Yes.  There were times when -- yes.

Q.   And what would you do?

A.   When in doubt I would just include it, and if it was something -- I can't think of a particular example where I had to ask, but I would have talked to the prosecutors if there was something I needed their guidance on.  But when in doubt I would just include it with the understanding that the prosecutors would look it over and make sure.  They would be the ones that would actually decide what went on after that.

Q.   How is it that you first came to learn that there was potentially a pole camera placed outside of Simpson and Soofi's apartment?

A.   The prosecutors in this case called me and told me that -- asked me if I knew about it.

         THE COURT:  That was this year, right?

         THE WITNESS:  Yes, Your Honor, in or about February of 2019.

BY MS. BROOK:

Q.   So in or about February 2019, the prosecutors on the Kareem case called you to ask about potential pole camera footage outside of Simpson and Soofi's apartment?

A.   Yes.

Q.   When we called you to ask you about it, what was your

UNITED STATES DISTRICT COURT

response?  What did you think?

A.  Well, my initial response was that the prosecutors were probably confused, were confusing this with another matter. But I wanted to make sure that was the case because I didn't believe there was one, honestly.  So that's when I reached out as I mentioned earlier to Special Agent Mullen.

Q.  So let's take a step back in time to May 3rd of 2015 and the weeks that followed and throughout the pendency of the investigation in the Kareem case.

At any point did -- prior to February of 2019, did you talk to Amy Fryberger and learn about the existence of pole camera footage?

A.  No.

Q.  Did Special Agent Fryberger suggest to you anything that would indicate there may be pole camera footage?

A.  No.

Q.  How about Special Agent Andrew Smith?

A.  No.

Q.  And specifically, did you learn any information in any conversation from Andrew Smith that would have suggested to you that there was pole camera footage on Simpson and Soofi's apartment?

A.  No, and the opposite.

Q.  What do you mean the opposite?

A.  At one point he mentioned that he had done a drive-by spot

surveillance and so to me, if he had a pole cam there would be no reason for you to drive by and do a surveillance.  You would -- that's why you would just look at the pole cam.  So that was my understanding is they didn't have one.

Q.   At any point prior to February of 2019 and any conversations you may have had with Special Agent Nolen, did you learn that there may be pole camera footage from Simpson and Soofi's apartment?

A.   No.

Q.   How about supervisory Special Agent Glenn Milnor?

A.   No.

Q.   Any conversations with the intern Gallante that would lead you to believe that there could potentially be pole camera footage outside of Simpson and Soofi's apartment?

A.   No.

Q.   Assistant Chief Division Counsel Matthew Greenberg?

A.   No.

Q.   Any text from within ELSUR?

A.   No.

Q.   Special Agent Leroy Holland?

A.   I'm sorry, could you repeat that?

Q.   Special Agent LeRoy Holland.

A.   No.

Q.   Any conversations with him or information obtained from him that would lead you to believe there was a pole camera placed

outside of Simpson and Soofi's apartment complex?

A.   No.

Q.   Special Agent Andrea Theobald?

A.   No.

Q.   And any conversations before February of 2019 with Serena Martinez of ELSUR that would have suggested to you that there could potentially be pole camera footage outside of Simpson and Soofi's apartment?

A.   No.

Q.   In preparing for your testimony here, did you review your e-mail to find out whether or not anybody e-mailed you about there being pole camera footage of Simpson and Soofi's apartment?

A.   Yes.

Q.   And did anybody?

A.   No.

Q.   You didn't find any e-mails or information in your e-mail system that would have led you to believe there could have been pole camera footage?

A.   No.

Q.   When you were reviewing the Simpson Sentinel file did you ever do a word search for the term pole camera?

A.   I did after February of 2019.

Q.   I will ask a better question.  Prior February 2019 did you ever do a word search inside the Simpson Sentinel file to find

out whether or not there was a pole camera?

A.   No.

Q.   During the time that you were working the Kareem case, did anybody at the FBI suggest to you that the FBI must act to cover up embarrassment for Simpson committing an attack despite FBI surveillance?

A.   No.

Q.   At any point when you were working the Kareem case did anybody at the FBI suggest to you that somebody needed to pay for the attack?

A.   No.

Q.   During the time that you were working the Kareem case did anybody ever suggest to you at the FBI that someone needed to be prosecuted because there was an attack?

A.   No.

        MS. BROOK:   May I have one moment?

        THE COURT:   Yes.

        MS. BROOK:   I don't have any other questions.

        THE COURT:   Thank you.   Mr. Maynard.

                    REDIRECT EXAMINATION

BY MR. MAYNARD:

Q.   Agent Whitson, when you did the search in Sentinel in February or thereafter of 2019 for pole camera, did you find it?

A.   I didn't.

Q.  Do you have an explanation as to why?

A.  I had just started that as I was reaching out to Ryan Mullen, and so before I had done any kind of full exhaustive search in Sentinel he gave that response that led me to believe perhaps there was.  And as I indicated before, I wanted to preserve my memory of what it was at trial.  I thought doing any kind of further look would not be appropriate so I stopped and didn't look or do anything.

Q.  But you have told us you did a systematic search in the various documents that I showed you which included a pretty thick sheet of single pages of photographs that were taken from the pole camera.  You never saw any of those before February of 2019, is that correct?

A.  That's correct.

Q.  And if those things were in the file, the documents that I showed you, Exhibit 12, 13, 16, 17, 19, do you have an explanation as to how you would have missed them if they were there?

A.  I don't.  I mean, I could guess.

Q.  I don't want you to guess.

A.  So I don't.

Q.  Okay.  And you had some briefings with Andrew Smith about the Simpson file, correct?

A.  He was in the room while I had briefings about the Simpson case.

Q.  Did you ever sit down with him individually one-on-one and talk about the Simpson case?

A.  No.

Q.  Did anyone ever tell you that on May 1st that Nadir Soofi was carrying a sidearm?

MS. BROOK:  Objection.  Beyond the scope.

THE COURT:  Overruled.  You may answer.

THE WITNESS:  I don't recall hearing that he was carrying a sidearm on that day.

BY MR. MAYNARD:

Q.  Did you task anyone else at the FBI to look at these files for you?

A.  I don't understand your question.

Q.  The Simpson -- in going through the Simpson file that was in Sentinel, you have told us that you did a fairly systematic review.  Did you task any other people to go look for things for you?

A.  Not for the purposes of discovery.

Q.  Did you ever hear after the attack in Garland, Texas, anybody in the Phoenix office of the FBI talk about having been advised by FBI agents in Dallas or undercover agents that Simpson had been communicating with the FBI about attacking Dallas?

MS. BROOK:  Objection.  Beyond the scope.

THE COURT:  Sustained.

MR. MAYNARD:  Your Honor, may I be heard?

THE COURT:  No.  It's beyond the scope of cross.

BY MR. MAYNARD:

Q.  You testified on cross-examination that Smith told you at some point that he had done spot surveillance.  Do you recall that testimony?

A.  Yes.

Q.  Did he tell you when he had done the spot surveillance?

A.  He had said it was the day or the day before he thought they had left, and he was remarking that he had done the spot surveillance and saw their vehicle there so he didn't think that meant they had left.  He thought they were still there.

Q.  Do you recall whether or not he told you that the spot surveillance actually occurred on May 3rd?

A.  No.  I don't recall.

Q.  What was the context of the conversation where Smith talked to you about spot surveillance?

A.  He was -- we were in our squad area, so I was in mine and he was walking into the edge of his, and he kind of almost bemoaned the fact that he had just gone.  I don't want to speculate what his thoughts were, but he basically was saying I just looked for the vehicle there and it was still there.  So I thought that meant they were -- they hadn't gone.  And he like walked into their squad area which is where I lose view of them.  That was the moment where I thought my understanding was

he had done a spot check, saw the vehicle, or Simpson's vehicle in the parking lot.

Q.   He saw Simpson's vehicle.  Didn't see Soofi's vehicle?

A.   He didn't comment on that.  He said he had seen Simpson's vehicle.

Q.   And there was no conversation or no discussion with him about gee, if I had looked at the streaming I would have seen they left on May 1st?

A.   That was not part of this discussion.

Q.   Did you ever hear anybody at the FBI in Phoenix talk about that had we ever looked at the video we would have known they had left on May 1st?

A.   No.

     MR. MAYNARD:  I don't have any further questions, Your Honor.

     THE COURT:  May this witness be excused?

     MR. MAYNARD:  Yes, ma'am.

     THE COURT:  Thank you very much, Special Agent Whitson.  You may step down and you are excused.

     THE WITNESS:  Thank you, Your Honor.

     THE COURT:  Please call your next witness, Mr. Maynard.

     MR. MAYNARD:  If the government has a preference, I don't know if there's people from out of state.  We've got three more witnesses if they -- do you have a preference?

MR. KOEHLER:  All three are local, Your Honor.  We think it would make sense to call Special Agent Baker next then Special Agent Mullen.  And if there is still a need after those two have been called perhaps Supervisory Special Agent Milnor.

THE COURT:  I thought you were referring to yourself, Mr. Koehler.                                                       04:07PM

MR. KOEHLER:  Oh, no.

MR. MAYNARD:  Be happy to call Special Agent Baker then.

THE COURT:  Whoever else is still waiting I think can leave and come back -- actually, we don't know when we're coming back.                                                          04:07PM

MS. BROOK:  Tomorrow morning are we coming back?  What works for Your Honor.

THE COURT:  Why don't we talk about that right now.  I am not available in the morning tomorrow, but we could resume at 1:00.                                                              04:08PM

MS. BROOK:  I have a sentencing at 2:00 in front of Judge Lanza.  I could get coverage.  May I have a moment for my conversation with my covering attorney?                             04:08PM

That works.

THE COURT:  Okay.

MR. KOEHLER:  We think Special Agent Baker would be 10 to 15 minutes according to Mr. Maynard.

THE COURT:  I don't have a lot of confidence in Mr.          04:08PM

Maynard's estimates of brevity.  Sorry.

MR. MAYNARD:  That hurts.

THE COURT:  But we have experience, Mr. Maynard.

So in any event, Special Agent Baker, if you would please retake the stand, or take the stand.  You have already been sworn in this matter.

JON-TODD BAKER,

a witness herein, having been first duly sworn by the clerk to speak the truth and nothing but the truth, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. MAYNARD:

Q.  Good afternoon.

A.  Good afternoon.

Q.  Would you state your name, please?

A.  It's Jon-Todd Baker.

Q.  And you are currently employed with the FBI?

A.  Yes, I am.

Q.  And how long have you been with the FBI?

A.  Since September of 2008.

Q.  At some point did you become the case agent on the Kareem case?

A.  Yes.

Q.  When was that?

A.  That was approximately November of 2017.

Q.  And what, if anything, were your duties at that time as the case agent on the Kareem case?

A.  The substantive investigation had pretty much concluded by the time I had the case so I had administrative custodial duties of it.

Q.  When you say "administrative custodial," were you in charge of the evidence on the case?

A.  I was the case agent on the case.

THE COURT:  I know, but we don't know what that means.

THE WITNESS:  So I had the overall case management of the case.  So when, say, the U.S. Attorney's Office had questions related to the case they would contact me and I would search the case and provide them with documents or answers to the questions they had.

BY MR. MAYNARD:

Q.  Okay.  At some point in September of 2018, defense counsel for Mr. Kareem sent a discovery request to the U.S. Attorney's Office about the Kareem case.  Are you familiar with that?

A.  Yes.

Q.  Were you asked to assist in looking for certain information or documents?

A.  Yes.

Q.  And what was it you were looking for?

A.  They had asked about an alert or a BOLO, to be on the lookout, and I looked for that.

Q.   And how did you go about doing that?

A.   Our --

Q.   What you would look at?

A.   So our case file system is computerized in a system called Sentinel, so I ran some searches in Sentinel looking for documents related to that.

Q.   And was the documents you were looking for, was it a multi-page document that was sort of a tactical intel alert involving Mr. Simpson?

A.   They were looking for an alert or lead out to Texas for Mr. Simpson.

Q.   When were you doing this?

A.   It was approximately October of 2018.

Q.   Now, at some point in October/November of 2018, did you come across some documents that led you to believe there may have been a pole camera that was at the Simpson and Soofi apartment, or the video at the Simpson/Soofi apartment?

A.   At some point there were documents that I turned over to the prosecutors.  And upon their review they found reference to a pole camera and asked me about that.

Q.   What were the documents that you turned over to the prosecutor?

A.   They were internal FBI documents from FBI headquarters.

Q.   How about describing them for me.  What were they?  302s or --

MS. BROOK:  Your Honor, I'm going to object to the relevance.  They have been described as internal documents from D.C., and any further explanation is unnecessary.

THE COURT:  Okay.  You are making an objection and I didn't understand.  He said internal documents from FBI headquarters.  That's -- how did you get those?

THE WITNESS:  We had to request those documents.

THE COURT:  Okay.  I'm now really confused.  I thought you were looking in the Simpson file for this alert.

THE WITNESS:  Yes.

THE COURT:  And was it there?

THE WITNESS:  I did not find that alert.

THE COURT:  Okay.  And so then did you make a further inquiry to FBI headquarters for it?

THE WITNESS:  So I made an inquiry as to FBI headquarters about a document at the request of prosecutors in reference to the defense motion for information.

MS. BROOK:  Your Honor, may I voir dire the witness on this particular subject?

THE COURT:  Yes.  Because it's not getting any clearer.

VOIR DIRE EXAMINATION

BY MS. BROOK:

Q.  So when you were tasked with being the manager of the Simpson case file, you have mentioned that the prosecutors --

THE COURT:  The Kareem case file.

MS. BROOK:  Sorry I misspoke I'm sorry.  The Kareem case file.

BY MS. BROOK:

Q.  You mentioned that the prosecutors had asked you to search for a BOLO?

A.  Yes.

Q.  And in your review of the case file did you find the BOLO?

A.  No, I did not.

Q.  In an effort to continue to request and look for the BOLO, did you look at and request internal FBI documents from D.C.?

A.  Yes.

Q.  Those documents, were they prepared by case agents here in Phoenix?

A.  No, they were not.

Q.  And did you produce those documents to the prosecutors in this case?

A.  Yes.

Q.  When you produced those documents to the prosecutors in this case, did that happen at the FBI?

A.  Yes, it did.

Q.  And did the prosecutors discover a reference to a pole camera at Simpson and Soofi's apartment?

A.  Yes, they did.

Q.  Can you describe for us the reaction of the prosecutors at

discovering --

THE COURT:  I think we're beyond the voir dire about these documents.

So did you search the Simpson file, too, for this alert relating to Simpson?

THE WITNESS:  Yes.

THE COURT:  Wasn't there either?

THE WITNESS:  I did not find it.

THE COURT:  But something led you to believe that there was other places that could be searched?

THE WITNESS:  So I did reach out to headquarters about documents concerning the Simpson case file that wouldn't be maintained in the case file.

THE COURT:  Okay.

MS. BROOK:  Your Honor, if I may, we're just asking to cut off questioning about the documents based upon relevance and the fact that we would be getting into classified information.

THE COURT:  So was the information that they responded with classified?

THE WITNESS:  Yes.

THE COURT:  So you turned it over to the government because they are able to look at that type of information?

THE WITNESS:  Yeah, within the FBI facility.  If you are cleared for national security information you are able to

view that information.

THE COURT:  Okay.  And so this classified information is their review is when they responded that they saw something that indicated there might have been pole camera footage.

THE WITNESS:  Yes.

THE COURT:  And then I take it you went back and searched the Simpson file and lo and behold found that information.  Is that right?

THE WITNESS:  Then I went back and searched the Simpson file for documents related to a pole camera, and I found serial 1090 which was FD 302 of a review of a pole camera, and it had two attachments to it.

THE COURT:  A log and a whole bunch of screenshots?

THE WITNESS:  Yes.

THE COURT:  We call that Exhibit 19.

THE WITNESS:  Okay.

THE COURT:  Please continue, Mr. Maynard.

MR. MAYNARD:  Judge, you were doing great.  Doing better than I am.

DIRECT EXAMINATION (Resumed)

BY MR. MAYNARD:

Q.  All right.  When did you send the documents to the government or when did you send the documents, whatever they were, to the prosecutors that caused them to say, jeez, maybe there was a pole camera?

A.   When I received the documents I sent them to the prosecutor.  That was November of 2017 -- or 2018.

THE COURT:  2018.

THE WITNESS:  Sorry.

BY MR. MAYNARD:

Q.   Did you do a 302 on that, or is there something that we could look at to tell us when in November you sent those to the government?

A.   Let me see here.  I have --

Q.   If you can also tell me what you are looking at.

A.   I have notes here if I may refresh my memory as to the exact date.

THE COURT:  Go ahead.

THE WITNESS:  So it was late November, I don't have the date written down, of 2018.

BY MR. MAYNARD:

Q.   Did you meet with the prosecutors when you gave them the documents or did you send it to them?

A.   I met with them at the FBI building here in Phoenix.

Q.   Without telling me what the document was because it's classified, was there some reference in that document that talked about a pole camera outside of Simpson's apartment that was placed there in May of 2015?

A.   Yes.

Q.   And did you show that reference to Mr. Koehler and Ms.

Brook?

THE COURT:  Apparently they saw it.

THE WITNESS:  They found that reference and asked me about it, showed it to me.

BY MR. MAYNARD:                                          04:20PM

Q.  So you gave them the documents, they found the reference, and then they asked you about --

A.  About -- yes.

Q.  -- whether there was a pole camera or not?

A.  They asked me about what information in the case file there   04:20PM is about a pole camera.

Q.  Okay.  When you showed them the documents you were present in -- you were in their presence?

A.  Yes.

Q.  What was their response?                              04:20PM

A.  They were surprised.  It was apparent from their response and the questions that they asked that they had not previously known about a pole camera.

Q.  Can you recall for us, tell the Court exactly what their response was to the best of your ability?                 04:21PM

A.  Yeah.  It was, I mean, they asked several questions about, you know, about is there more information about this pole camera?  It was clear that they didn't know about it before and were trying to gather information about what there was about this pole camera and what --                          04:21PM

UNITED STATES DISTRICT COURT

Q.   Were they calm or were there any expletives that came out of either one of their mouths?

A.   No.  I would describe as kind of maybe excited or maybe alarmed at not knowing sooner.

Q.   Alarmed at not knowing sooner?                            04:21PM

A.   That would be --

Q.   What steps did you take at that point to then see if there had been a pole camera that had been surveilling Simpson's apartment in May of 2015?

A.   I searched the case file for other references of a pole       04:21PM
camera.

Q.   And can you tell us how you did that?  We have heard that you can do something similar to a Google search of Sentinel?

A.   That's a decent description of it.  It's a search bar that -- keyword search.                                          04:22PM

Q.   What did you do to uncover -- I mean, did you write in "pole camera" and it popped up or --

A.   I don't recall exactly the key words that I used to search it.

Q.   When did you do this?                                      04:22PM

A.   This was November of 2018.

Q.   And did you find documentation that indicated that there had been a pole camera?

A.   Yes, I did.

Q.   Do you have Exhibit 19 in front of you?                   04:22PM

A.   I do not.

Q.   Can the witness be shown Exhibit 19, please.

Have you seen Exhibit 19 before?

A.   Yes, I have.

Q.   When did you see Exhibit 19 for the first time?

A.   In my search for the pole camera references, the serial in the case file it's serial 1090 is this FD 302 with the attachments.  That's Exhibit 19.

Q.   So they were all there.

Can you tell us, was it in a subfile, or can you describe for us how it was kept in the Simpson Sentinel file?

A.   It was in the main file for the Simpson case.

Q.   Were there any other documents with it?  Do you recall?

A.   Well, because I got to it through a key word search, I mean, do you mean attachments?  Because there were the attachments, the Word document and the image files and zip file.

Q.   Can the witness be shown Exhibit 17 and Exhibit 13.

While she's getting those, what did you do after you found this file?

A.   I showed this particular serial to the prosecutor.

Q.   Did you make a copy of it in November of 2018 and give it to the prosecutors?

A.   The prosecutor was present at the office and was able to view it on my computer screen.

Q.  Did you make a copy for them?

A.  I don't recall.

Q.  Could you look at Exhibit 13, please.  Have you seen Exhibit 13 before?  And granted it's redacted quite -- I will avow to you this seems to be the application for the electronic monitoring we're talking about.

A.  I don't specifically recall this.

Q.  You don't recall whether you saw that or not?

A.  That is what this is, is an application for electronic monitoring.

Q.  I know what it is.  The question is:  Did you find it when you did your original search and you found Exhibit 19?

A.  I don't remember this one specifically.

Q.  Could you look at Exhibit 17 for me.  Have you seen Exhibit 17 before?

A.  No.  I know what it is, but. . .

Q.  Have you seen Exhibit 17 before?

A.  Yes.

Q.  When did you see it?

A.  Just this past week.  I went through the case file as I was looking to refresh my memory on documents.

Q.  Did you see it back in November of 2018 when you did your search?

A.  No.

Q.  After you found Exhibit 19, which is the 302 with the log

and the photographs, did you find any other documents that made reference to a pole camera?

A.   This was the main reference that I remember finding.

Q.   It's the main reference.  The question is:  Did you find any other references?

A.   I don't recall the search results, like how many things came up when I entered the search.  I do remember seeing this and this drew the attention at that point in time.  Right.  So this is what I focused on once I found Exhibit 19.

Q.   Did you take any steps to see if the camera and/or the recording that the camera had made was still logged into electronic surveillance storage?

A.   At the time in which this all happened I was getting ready to transition to a different squad, so my basis as the case agent was coming to an end.  So I did not take further steps.

Q.   You stopped being the case agent on December 11th, correct?

A.   Of the December --

Q.   2018?

A.   For the Simpson case, yes.

Q.   So you find Exhibit 19 sometime in the latter part of November.  Do you do anything else to search for information concerning a pole camera that may have been out there?

A.   I did not.

Q.   Did the prosecutors give you any instructions to look for more documents concerning the pole camera?

A.   At a later date when I was no longer the case agent, I had been asked about searching, performing some searches on the case file.

Q.   When did that occur?

A.   That was just about maybe three weeks or a month ago.

Q.   And who asked you to do some additional searching three weeks ago or a month ago?

A.   The prosecution, prosecutors.

Q.   What did they ask you to do?

A.   Just to search for the -- trying to think of the specific requests.

Q.   Did they send you an e-mail or was this oral?

A.   No, this was in person.

Q.   Well, what is it that -- did you do anything after they made this request to you three or four weeks ago?

A.   I made a couple of searches and relocated the pole cam information, the Exhibit 19.

Q.   Okay.  Can you tell us what you did?

A.   What I did specifically?

Q.   Yeah.  Prosecutor contacts you three or four weeks ago, asks you to do something.  You can't seem to remember exactly what it was, but it dealt with a pole camera and you did some searches and you found Exhibit 19.  Again, is that the best you can tell us?

A.   I'm sorry.  Is that the question, is that the best you --

can you clarify, please?

Q.   Yeah.   Can you remember anything else that you did concerning this request that was made by the prosecutors three or four weeks ago for you to look for additional information concerning the pole camera?

A.   Beyond running Sentinel searches, that's what I did.

Q.   Did you just do the same search that you had done before, or did you do something different?

A.   I looked in the ELSUR file, the electronic surveillance file, for documentation there.

Q.   And you had not looked in the ELSUR file -- what is the ELSUR file?

A.   Electronic surveillance.

Q.   You had not looked at that back in November or December of 2018.   Is that correct?

A.   No, I did not.

Q.   Did you find anything in the ELSUR file three or four weeks ago when you did this additional search?

A.   That's where it maintained the documentation of the existence that there's the footage, where it's kept in custody, in ELSUR.

Q.   Can the witness be shown Exhibit 18.

Have you seen Exhibit 18 before?

A.   Yes, I have.

Q.   When did you first see it?

A.   That's when I made the additional searches.

Q.   Is this a document that you found?

A.   Yes.

Q.   And it indicates at the bottom right hand, it was October 3rd of 2019.  Is that the date that you found it?

A.   I believe so.

Q.   Did you find any other documents besides this in the ELSUR file?

A.   None that I recall.

Q.   Did you speak to anybody such as Serena Martinez?

A.   No, I did not.

Q.   Is there anything else that you have done in trying to locate information concerning the pole camera that was near Simpson's apartment in May of 2015 other than what you have told us so far today?

A.   No.

        MR. MAYNARD:  Can I just have a moment?

        THE COURT:  Yes.

BY MR. MAYNARD:

Q.   In the Sentinel file, is there an ELSUR subfolder or file in it?

A.   Yes, there is.

Q.   Did you search that file to see if there was any information about the pole camera in that subfile?

A.   At what point?  When?

—10-15-19  CR 15-707-USA v Kareem-Evidentiary Hearing-Day 1-Baker-Direct—

Q.   At any point.

A.   In the subsequent follow-up, that's what I described I did.

Q.   But you didn't do that back in 2018?

A.   No.  I had searched the main file in 2018.

Q.   Can you tell us how long it took you to search the Sentinel file to look for the pole camera?

THE COURT:  You mean when he did it the first time?

MR. MAYNARD:  When he did it --

THE COURT:  October?

MR. MAYNARD:  November of 2018.

THE WITNESS:  It's kind of a Google-type search.

THE COURT:  Question is:  Do you remember how long it took until you found Exhibit 19 in the file?

THE WITNESS:  Exhibit 19 was one of the first things I came across in the search returns.

THE COURT:  I mean so --

THE WITNESS:  It was relatively quickly.

THE COURT:  So you put in whatever your search terms were, and the number one thing that came up was Exhibit 19?

THE WITNESS:  It was the -- one of the first documents I had looked at.

THE COURT:  Just took a few minutes to find it?

THE WITNESS:  Yeah.

BY MR. MAYNARD:

Q.   And were the prosecutors present when you did that search?

A.   Yes.

Q.   And can you tell us what their response was when they saw the results of your search?

A.   They were definitely interested in the 302 with the screenshot images.

Q.   Anything other than they were just interested?  I mean. . .

A.   They wanted to go through the screenshot images.  That's what we did.

Q.   Did they seem pleased or unhappy?

A.   I think it was wanting to know what was in there.

Q.   You can't describe their reaction any more than that?

A.   I would say interested.  That's wanting to see what the images were.

        MR. MAYNARD:  I don't have any further questions.

        THE COURT:  Ms. Brook.

        MS. BROOK:  Thank you, Your Honor.

                    CROSS-EXAMINATION

BY MS. BROOK:

Q.   Good afternoon.

A.   Good afternoon.

Q.   You testified in regards to Exhibit Number 19 that back in 2018 you searched through the Simpson case file and you found that particular document.  Is that correct?

A.   Yes.

Q.   Let's turn to it for just a moment.  When you opened that

04:36PM
04:37PM
04:37PM
04:37PM
04:38PM

document inside of Sentinel, the documents that follow it, were those there present on the screen, or were they attachments?

A.   No. They were attachments.

Q.   Can you describe for us how you navigated to them?

A.   So at the first page that you see here is the 302, and that's the main thing that when you click into the document that's displayed.  Down below there were -- there's a section in the file that has a place for attachments.  So the first attachment was a zip file that ended up containing the screenshot images.  And the second attachment was a Word document, and they were both like small icons down at the bottom that designated there was an attachment there to be downloaded and viewed.

Q.   In the Sentinel system how do you open a zip file?

A.   I would double click on the icon down there, and it would pop up the popup that asks if you want to open it and it would open into the Microsoft Windows Explorer area there and just like a regular file structure that you would open.  And whatever files are contained in the zip would be in there or subfolders, whatever is contained in the zip file.

Q.   You also testified that when you did that original search back in 2018, to look for any information in the Simpson file related to the Simpson and Soofi pole camera that you just saw this one document.  Correct?

A.   What was the question again?

10-15-19  CR 15-707-USA v Kareem-Evidentiary Hearing-Day 1-Baker-Cross

Q.   That when you did your first search back in 2018 and you searched through the file, the only thing that you saw during that first search was this particular document which has been labeled Exhibit Number 19.

A.   Yeah.  I opened that right away off of the search results.

Q.   And it wasn't until you did a second additional search a few weeks ago that you noticed that there were additional documents or entries related to the pole camera?

A.   That's correct.

Q.   And those two we have talked about is Exhibit Number 17 and Exhibit Number 13?

A.   Yes.

          MS. BROOK:  May I have one moment?

          THE COURT:  Yes.

BY MS. BROOK:

Q.   So just to be clear, when you opened Sentinel and you are in that main file, how many entries are there for what was 19? Was there just one main entry and then sub attachments for the other two entries, or were there three entries for the three things that are Exhibit Number 19?

A.   So Exhibit Number 19 was one serial in Sentinel, and the attachments were attached to that same serial.  So you would not see the pictures and the log document without opening up that FD 302 serial and seeing the attachments.  There's a little icon of a paper clip that will show up next to it in the

search results indicating there are attachments.  But without opening it -- so you have to open it to get to the attachments.

Q.  At any point when you were searching and researching the existence of this pole camera footage from Simpson and Soofi's apartment complex, did anybody in the FBI suggest to you that you shouldn't be looking for that?

A.  No.

Q.  Did anybody suggest to you that you need not be looking there?

A.  No.

Q.  What case assignment do you have now?

A.  I'm assigned to cyber -- CY-1 is the squad.

Q.  You testified, I believe, in talking to Mr. Maynard that you transferred to that squad, the cyber squad, in December of 2018?

A.  Yes, I did.

Q.  Who was it that took over these cases for you at that point?

A.  Ryan Mullen took over the Kareem case at that point.

Q.  I think we covered it, but originally you were tasked to look for a BOLO for Simpson sent to Garland, Texas in May of 2015?

A.  Yes.

Q.  Throughout your search, did you find that?

A.  I did not.

MS. BROOK:  May I have one more moment?

THE COURT:  Yes.

MS. BROOK:  I don't have any other questions.

THE COURT:  Do you have any questions on redirect, Mr. Maynard?

MR. MAYNARD:  Yes, ma'am.

REDIRECT EXAMINATION

BY MR. MAYNARD:

Q.  What is a BOLO?

A.  Be on the lookout.

Q.  At the end of November of 2018 when you found Exhibit 19, did you make copies of it?

A.  I showed it to them on the screen.  I don't recall making copies of it.

Q.  Were you in their office or were they --

A.  No, it was at the FBI office, field office.

Q.  Field office.  They didn't ask you to make copies of that document?

A.  I don't recall them asking me to make copies of that document.

Q.  And you didn't take any steps to see if the actual video still existed at the time.  Is that correct?

A.  I did not.

Q.  I have no further questions.

THE COURT:  May this witness be excused?

MS. BROOK:  Your Honor, may I just ask one question related to what Mr. Maynard was saying to put it into context?

THE COURT:  No.

MR. MAYNARD:  Yes.  He may be excused.

THE COURT:  Thank you.                                    04:44PM

Thank you, sir.  You may step down and you are excused as a witness.

And we will recess and reconvene tomorrow afternoon at 1 p.m.

(Proceeding recessed at 4:45 p.m.)                       04:45PM

C E R T I F I C A T E

I, LAURIE A. ADAMS, do hereby certify that I am duly appointed and qualified to act as Official Court Reporter for the United States District Court for the District of Arizona.

I FURTHER CERTIFY that the foregoing pages constitute a full, true, and accurate transcript of all of that portion of the proceedings contained herein, had in the above-entitled cause on the date specified therein, and that said transcript was prepared under my direction and control.

DATED at Phoenix, Arizona, this 12th day of December, 2019.

s/Laurie A. Adams
_____
Laurie A. Adams, RMR, CRR