UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

_____

United States of America,      )
                               )   No. CR 15-0707-PHX-SRB
             Plaintiff,         )
                               )
        vs.                    )   Phoenix, Arizona
                               )   October 16, 2019
Abdul Malik Abdul Kareem,      )   1:03 p.m.
                               )
             Defendant.         )
_____)


BEFORE:   THE HONORABLE SUSAN R. BOLTON, JUDGE

REPORTER'S TRANSCRIPT OF PROCEEDINGS

(*Evidentiary Hearing - Day 2*)
(*Pages 203 through 293, inclusive.*)


Official Court Reporter:
Laurie A. Adams, RMR, CRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc 43
Phoenix, Arizona 85003-2151
(602) 322-7256

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

APPEARANCES:

For the Plaintiff:
          U.S. ATTORNEY'S OFFICE
          By:  Joseph E. Koehler, Esq.
          By:  Kristen Brook, Esq.
          40 North Central Avenue, Suite 1800
          Phoenix, Arizona 85004

For the Defendant:
          MAYNARD CRONIN ERICKSON CURRAN & REITER, P.L.C.
          By:  Daniel D. Maynard, Esq.
          3200 North Central Avenue
          Suite 1800
          Phoenix, Arizona 85012

          DRAKE LAW PLC
          By:  Daniel D. Drake, Esq.
          4340 East Indian School Road
          Suite 21-113
          Phoenix, Arizona 85012


                    I N D E X

| WITNESS: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| RYAN MULLEN | | | | |
| By Mr. Maynard | 205 | | 240 | |
| By Mr. Koehler | | 232 | | |
| | | | | |
| GLENN MILNOR | | | | |
| By Mr. Drake | 244 | | 273 | |
| By Mr. Koehler | | 267 | | |


                    INDEX OF EXHIBITS

| EXHIBIT | | IDENT | RECEIVED |
|---|---|---|---|
| 122 | Mullen's 302 re:  Pole Camera Application | 213 | 231 |

P R O C E E D I N G S

THE COURT:  The record will show the presence of counsel and the defendant.

The defense may call its next witness.

MR. MAYNARD:  We call Ryan Mullen.                    01:03PM

THE COURT:  You may proceed, Mr. Maynard.

RYAN MULLEN,

a witness herein, having been duly sworn by the clerk to speak the truth and nothing but the truth, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. MAYNARD:

Q.  Good afternoon, Mr. Mullen.

A.  Good afternoon, sir.

Q.  Could you state your name and your occupation?          01:04PM

A.  My name is Ryan T. Mullen.  I'm presently employed as affiant and Special Agent.

THE COURT:  I need you closer to the microphone or the microphone closer to you.

THE WITNESS:  Yes, ma'am.                              01:04PM

BY MR. MAYNARD:

Q.  How long have you been employed with the FBI?

A.  My employment started on 4-27-2008.

Q.  At some point you became the case agent on the Abdul Kareem case.  Is that correct?                          01:04PM

A.   Yes.

Q.   And when did that occur?

A.   I believe it was December of 2018.

Q.   Did you have any meetings with Special Agent Baker to discuss the Abdul Kareem case?

A.   Yes.

Q.   Tell me about those.  Tell me what he told you.

A.   They were informal meetings that took place either in my cubicle row or in his cubicle row which was the next one over before he transferred to a different squad.

Q.   Did he advise you that he had been searching for any evidence of a pole camera having been involved in the Abdul Kareem case?

A.   Yes.

Q.   At some point did you begin to look for evidence of this pole camera?

A.   Yes.

Q.   When did you start that?  And let's -- based on your testimony, I think you started around December 11 of 2018 as the case agent.  Correct?

A.   That's correct.

Q.   And did you meet with Agent Baker soon after you became the case agent or right before?

A.   It might not have been that day.  It was probably a week or two after that.

Q.   Okay.  And what did he tell you concerning this pole camera issue?

A.   He told me that he had met with the prosecutors in the case and they had discovered that there was a pole camera in existence and that he was in the process of trying to determine the validity of that.

Q.   Did he provide you with any documentation at that time?

A.   Yes, he did.

Q.   What did he provide you with?

A.   He provided me with a screenshot from our classified computer system that suggested there was evidence of a pole camera down in the ELSUR storage room.

Q.   Was that the only thing he provided you with, that one screenshot?

A.   I believe so.

Q.   Did he provide you with any 302s?

A.   I don't believe so.

Q.   Can the witness be shown Exhibit 19?  Exhibit 19, Exhibit 18 and Exhibit 114, 122.  That would be it for now.

       Okay.  Let's take a look at Exhibit 19 first.  You have been sitting in this hearing the entire time, correct?

A.   Yes, sir.

Q.   So you are aware that Exhibit 19 is a 302 that talks about the pole camera and includes a screenshot and an event log.  Okay.

A.   Yes.

Q.   Are you aware of that?

A.   I am aware of this document.

Q.   When did you first see those documents?

A.   I believe I was provided these documents from the prosecutors in the case, but I can't give you an exact date, sir.                                                                           01:08PM

Q.   You think they came from the prosecutors rather than Agent Baker?

A.   That's correct.                                                                          01:08PM

Q.   And it was sometime after you became the case agent, so sometime after December 11th?

A.   Yes.

Q.   And what did they tell you when they gave you these documents?                                                                       01:08PM

A.   I was provided this document along with, I believe, two additional documents, and I was asked to search the file for additional references of pole camera within documents.

Q.   What were the other documents that were provided to you?

A.   I believe they were two ELSUR-related documents.                                         01:08PM

Q.   Can you look at Exhibit 18?

A.   Yes, I can.  I have that in front of me.

Q.   Okay.  Was this one of the documents they provided to you?

A.   No.

Q.   Can you describe the other documents that they provided to                               01:09PM

—10-16-19-CR 15-707-USA v Kareem-Evidentiary Hearing-Day 2-Mullen-Direct—

you?

A.   They were other documents that were more heavily redacted, sir.

Q.   Okay.  Can you tell me, were they 302s?

THE COURT:  No.  He said they were ELSUR-related documents.

THE WITNESS:  Yes.

BY MR. MAYNARD:

Q.   Can you describe them for me?  What did they show?

A.   Sure.  I believe one was an import form and the other one was an evidence log.

Q.   I'm sorry.  Can the witness be shown Exhibit 17.

While she's getting that, can you describe for me what an import form is?

A.   Sure.  I know that we talked about Sentinel yesterday.

Q.   Yes.

A.   And an import form has -- there's two versions of it. There's a web layout version and an official version.  The documents we're reviewing here are the official version.  The web layout versions look differently within the Sentinel system because you can scroll up and down through the pages.  An import form would be the face page that additional documents would be attached to.  So it would be a way to import documents from other software systems into Sentinel.

Q.   As we have been sitting here yesterday, did you ever see

that document as part of the evidence in this case?

A.   Yes.  I believe so.

Q.   Do you remember what exhibit number it was?

A.   I can look through the exhibits if you like and tell you what those two additional documents were.

THE COURT:  I think you are referring to Exhibit 13 which was called import form.  And it's heavily redacted.

BY MR. MAYNARD:

Q.   Can the witness be shown Exhibit 13?

THE COURT:  It's the pole camera request form.

MR. MAYNARD:  I thought it was a pole camera form not an import form.

THE COURT:  Well, it's called import form but that's what it was used for.

BY MR. MAYNARD:

Q.   Exhibit 13, do you have it in front of you?

A.   I do have Exhibit 13 in front of me.

Q.   Is that one of the documents that you were given by the prosecutors?

A.   Yes.  I believe so.

Q.   And did it have the attachments to it?

A.   No.

Q.   It was just a cover page?

A.   From my memory, yes, sir.

Q.   And the copy that you were provided was not heavily

redacted like this?

A.   I believe it was, sir.

Q.   You believe it was in this form?

A.   Yes, I do.

Q.   And looking at the next four pages of Exhibit 13, when did you first see those pages?

A.   So this document here has some history to it, if you will allow me to explain.

Q.   Sure.

A.   Okay.  So this document is one that I worked to obtain because it was initially classified and unredacted.  And so what you are seeing here is the result of a lot of meetings and hours of work with counsel at FBI headquarters regarding whether or not we would be able to disclose this document in court proceedings.

Q.   So if I understand correctly, at some point the prosecutors gave you the first page of Exhibit 13.  Correct?

A.   Yes.  I believe it was after I acquired this document here.

Q.   And the next four pages of Exhibit 13 you obtained from the FBI, did you obtain it from the FBI in Phoenix or from Washington?

A.   There's an explanation to it if you would like to hear it.

Q.   Sure.  No, I want to.

A.   So I located this document with the assistance of the ELSUR unit.

Q.   This being the last four pages?

A.   Yes, sir, and FBI Phoenix here.  And then I found this document on my own as an attachment to what was likely the web version of this first page here, okay.  And so then I saved that copy to my computer and reviewed it in its unredacted and classified form.

Q.   When did you do that?

A.   That was probably in August and September of 2019.

Q.   Why did it take you from December of 2018 until July and August of 2019 to find the application for the pole camera?

A.   It was less about finding the application for the pole cam and more about getting the approvals to declassify or redact the document to be able to provide it to the prosecutor.

Q.   Can you tell me when you first found the document versus when you got the approval to show the prosecutors?

A.   I can't.  I don't recall the exact date.

Q.   You don't have any 302s or logs or anything that would help refresh your recollection on that?

A.   Obtaining this document and getting the approvals was a very long process, so it took months to acquire, get a form that would be presentable here.

Q.   You have Exhibit 122 in front of you.

A.   Yes, I do, sir.

Q.   Let's take a look at it for a minute.

A.   Sure.  I have it in front of me, sir.

Q.  All right.  Now, this is a 302 that you prepared.  Correct?

A.  Yes, it is.

Q.  Can you tell me when you were doing the investigation that resulted in this 302?

A.  Well, that mark is blacked out.

Q.  I understand that.

A.  It would have been within the month of the date at the bottom which is 5-15-2019, sir.

Q.  Okay.  So as of 5-15 of 2019, you had actually seen the application for the pole camera.  Correct?

A.  Yes, sir.

Q.  And you prepared this 302.  Did you give it to the prosecutors?

A.  Yes, I did, sir.

Q.  Did you give it to them on or about May 15th of 2019?

A.  Probably within two weeks of that date.

Q.  But at that time you had not provided them with the actual application for the pole camera; is that correct?

A.  No, sir.

Q.  I think we have a double negative.

        THE COURT:  I think he said he didn't provide it to them until September.

        MR. MAYNARD:  Okay.  Just want to be sure.

        THE WITNESS:  And I can explain, sir, if you will let me.

BY MR. MAYNARD:

Q.   Sure.

A.   So I was more focused on obtaining a copy of the video and providing that copy to the prosecutors than providing the 794 -- or excuse me -- the 759 which was the request because that had complications to it in that it was classified.

Q.   Okay.  So if I understand correctly, the application was classified, but the video was not?

A.   That's correct.

Q.   Okay.  Can you explain to me why?

A.   Sure.  I will do my best to, sir.

So the video captured from the pole camera is captured in a public setting.  And the collection of that is considered unclassified because it's things that occurred in the public realm.

Q.   Okay.

MR. KOEHLER:  Beyond that we'll object to any further discussion of why something is or is not classified, Your Honor.

THE COURT:  The objection is overruled.  As long as it's -- I think he just gave a very generic logical explanation for why public things aren't classified.  And he can give a generic logical explanation for why an application to do it might be classified.

BY MR. MAYNARD:

10-16-19-CR 15-707-USA v Kareem-Evidentiary Hearing-Day 2-Mullen-Direct

Q.   When were you first requested to obtain a copy of the video?

A.   It was probably sometime in January of 2019.

Q.   What steps did you take to obtain the video?

A.   Well, I first needed to confirm that it existed, and so what I did was I went down to our ELSUR operations unit in the FBI field office, and I spoke with one of the ELSUR technicians there.  And I remember speaking with her and saying, hey, I have got this case number and I'd like to obtain video footage of a pole camera request within this case number.

Q.   And who did you speak with?

A.   Serena Williams -- or excuse me -- Serena Martinez.

Q.   Serena Williams is the tennis player.

A.   Yes.  I apologize.

Q.   What did she tell you?

A.   She told me she would go look for it, and I believe at that time she went back into the room, came back, and said she found it.  And I asked her to make a copy of that for me.

Q.   So to get this pole camera video, all you had to do was go to the person at ELSUR, tell them what you wanted, and within minutes or hours she was able to tell you that she had it and she would make a copy for you?

A.   That's not entirely correct.

Q.   Explain to me why it's not.

A.   She told me within minutes that she found the original

evidence, which would be a hard drive.  But because of the amount of data that was stored on it, I believe she told me it would take overnight for her to make a copy of that and then be able to provide that to me.

Q.  So you asked her for it, and she told you she could have a copy for you the next day?

A.  She said she would work on making a copy.  She didn't tell me exactly when it would be available.

Q.  Did you get it within a couple of days?

A.  Yes.  I believe so.

Q.  What did you do with it once you got it?

A.  I believe I talked to my supervisor about it and we resolved the classification issues.  And then I advised the prosecutors that I had obtained a copy and I would provide that to them.

Q.  And when did you give the prosecutors a copy?

A.  I believe I gave it to them on January 29, 2019.

Q.  Can you look at Exhibit 18 for me, please?

A.  Yes, sir.

Q.  Can you describe for the record what this document is?

A.  Just give me a moment, sir.  I'm just about to open it.

        Sure.  This is a screenshot of the web view of the evidence log for the pole camera recording.

Q.  Do you know who blacked out the -- at the bottom next to "evidence log"?

—10-16-19-CR 15-707-USA v Kareem-Evidentiary Hearing-Day 2-Mullen-Direct—

A.   Yes, I do.

Q.   Who did that?

A.   That was me.

Q.   Why?

A.   Because there are certain portions of documents that have    01:21PM

to be removed due to sensitivity issues within the FBI.

Q.   The documents that we have been looking at, the various

302s where there has been portions that have been redacted, is

that redaction, to the best of your knowledge, done by the FBI?

A.   Yes, an employee at the FBI, whether it's here in the    01:21PM

Phoenix office or headquarters.  There's different procedures

based on the information that's in the document.

Q.   According to this document then, you were provided a copy,

the first copy of this video on January 24th of 2019?

A.   Yes.  That's correct.    01:22PM

Q.   Does that comport to your recollection?

A.   Yes.

Q.   And you would have given it to the prosecution on the 29th,

four or five days later?

A.   If you let me explain.    01:22PM

Q.   Sure.

A.   So the copy was made on the 24th.  I may have picked it up

on the 24th or 25th or 26th.  If you drop something off at

ELSUR or you need to pick something up, they place it in a

particular area and you can stop by when they are open and pick    01:22PM

it up.  So I'm not sure of the exact date.  It would have been within 1-24-2019 to 1-29-2019.

Q.  And it says for discovery.  What was it that you had told ELSUR?  Did you tell them that this was going to be part of a discovery issue or dispute or --

A.  I told them that the prosecutors in the case had requested a copy and I was going to be providing a copy to the prosecutors.

Q.  The next one indicates that you got -- another copy was made on or about May 2nd of 2019.  Why was a second copy made?

A.  For review purposes.

Q.  And then a third copy on August 21st.

A.  Yes.

Q.  And did you give these to anyone?  Were they given to the prosecutor?

A.  I believe I gave one to the prosecution, and I believe one is at my desk, and one may be in the facility with somebody else.  I may have asked somebody else to look at it.

Q.  Now, as part of the process, you looked at the footage from the pole camera, correct?

A.  Parts of the footage; not all of it.

Q.  Did you look at the first part of the footage?

A.  Explain the first part, sir.

THE COURT:  The date, May 1.

THE WITNESS:  I believe I would have started at the

beginning to review what was going on on the screen.

BY MR. MAYNARD:

Q.   At the very beginning, you agree with me that the pole camera seems to be looking in a parking lot and then it moves?

A.   I do recall viewing that, yes, sir.

Q.   And then it moves to a couple of spots and it, ultimately, it settles on looking at the entrance to the apartment?

A.   I believe that's correct, sir.

Q.   Is it your understanding the pole camera can be moved by the person at the FBI office who's watching it?  Is there a mechanism there that allowed it to be moved?

A.   That's my understanding, but I was not in the FBI office at that point so I have no idea of what that device would have looked like.

Q.   Did you have anything to do with the Simpson investigation?

A.   Can I explain?

Q.   Sure.

A.   So I transferred to the FBI office in April of 2017 so it was several years after this all took place.

Q.   Did you ever discuss the pole camera with Agent Fryberger?

A.   Yes.

Q.   And when did you have those discussions?

A.   Approximately a month or so ago, I believe.

Q.   Can you tell us about those?  What was the substance of them?

A.   Sure.  We were in a lengthy process of having the original request declassified, and I wanted to get her knowledge of the information that was contained in the synopsis of the case portion of that request.

Q.   What did she tell you?                                        01:26PM

A.   There's some classified information in there.

        MR. KOEHLER:  Your Honor, I'm going to object to the release of any classified details.

        THE COURT:  Okay.  I'm just going to remind you, Mr. Koehler, to please object into the microphone.           01:26PM

        MR. KOEHLER:  I will go over Mr. Maynard's left shoulder.  Kind of hard to see past him at my height.

        THE COURT:  Yeah, I know, but we need to be sure we're getting you on the record.

        MR. KOEHLER:  I understand the government is objecting   01:26PM
to answers that would relate to any classified information that was in the request form.

        THE COURT:  Sustained.  Can you answer the question without revealing classified information?

        THE WITNESS:  I can try my best, ma'am.                  01:26PM

        THE COURT:  Why don't you answer as best you can without revealing any classified information.

        THE WITNESS:  Sure.  There are three paragraphs in that portion of the request.  The second and third paragraphs contained unclassified information about where the camera would   01:27PM

10-16-19-CR 15-707-USA v Kareem-Evidentiary Hearing-Day 2-Mullen-Direct

be placed and items of that nature.  The first paragraph contained multiple references to classified information.  And the entirety of those sentences in that paragraph explained the nature of why she wanted this request.

So other than that, that's all I feel I'm able to explain to you at this time.

BY MR. MAYNARD:

Q.  Did you have any discussions with Ms. Fryberger about whether she had viewed the camera or the contents of the pole camera?

A.  I don't believe so.

Q.  Did you have any discussions with Andrew Smith about the pole camera?

A.  Yes.

Q.  And when did you have those discussions?

A.  It's likely I would have had those discussions within the next two or three days from initially talking to Amy Fryberger. I have not met her prior to calling her on the telephone so I wasn't familiar with either one of them, either socially or professionally.

Q.  Can you tell us about the discussions that you had with Agents Andrew Smith without revealing any classified information?

A.  I will try.

It was my understanding that Amy and Andrew worked

this case together, and there was another employee at the FBI office named Randy whose last name is difficult to pronounce. I believe we were trying to pronounce it yesterday.  So he had provided some intelligence relating to this document.  And so the three of us had a discussion more individually than all together about the text in that synopsis of the case and whether or not it could be divulged or portions of it could be divulged.

Q.  Did you have any discussions with Andrew Smith about when he had first viewed the video?

A.  No.

Q.  Did you have any discussions about whether or not he had driven on May 3rd to see if Simpson's car was in the parking lot at Simpson's apartment rather than going to look at the video?

A.  I had discussions with him relating to surveillance that occurred in the vicinity of that apartment complex.

Q.  And were these discussions at the time you were telling me about earlier?

A.  Yes.  That's correct.

Q.  Can you tell us about those discussions?

A.  I believe at that time I was searching for other information within the file specific to surveillances that would have taken place on or about the date of the pole camera request up until the pole camera was activated and recording.

And essentially, they were what type of surveillance took place, who was involved in the surveillance, where are the reports, things of that nature.

Q.   And the prosecutors asked you to look for that?

A.   They may have.

MR. MAYNARD:   Can the witness be shown Exhibit 12, please.

BY MR. MAYNARD:

Q.   Exhibit 12 is a multi-page document with a number of 302s from various dates along with some pictures that were taken. Have you seen this document before?

A.   One of the documents in particular or any of them?

THE COURT:   I think this might not be a document except here as an exhibit.   I think it's a series of documents.

MR. MAYNARD:   Right.

BY MR. MAYNARD:

Q.   The Exhibit 12, which the government marked, have you seen that document or that exhibit before?

A.   I believe I have read through and read these individual documents as part of the process I was just discussing with you.

Q.   Were you the one who found these 302s and turned them over to the prosecution?

A.   No.

Q.   Do you know who did turn them over to the prosecution?

A.   I do not.

Q.   Do you know when the prosecution got them?

A.   I do not.

Q.   When did you first see them?

A.   I believe the prosecutors provided me these documents and asked me if I would be able to complete a search to find additional documents similar in nature.

Q.   When was that done?

A.   I would say approximately a month, month and a half ago, sir.

Q.   So August or September?

A.   Potentially.  I don't know exact date, sir.

Q.   Of 2019?

A.   Yes.  That's correct, sir.

Q.   What steps, if any, did you take to see if there were any other documents similar to Exhibit 12?

A.   I searched through the case file, sir.

Q.   Did you also talk to Agent Smith about that?

A.   Yes, I did.

Q.   And what did he tell you?

A.   He suggested I look through the case file.

Q.   Did you find any other documents?

A.   I did not.

Q.   Did Agent Smith tell you where to look?

A.   Not exactly.

01:31PM

01:32PM

01:32PM

01:32PM

01:32PM

Q.   Did you talk to Agent Fryberger about these 302s on surveillance?

A.   No.

Q.   Just Agent Smith?

A.   Yes.

Q.   Did you talk to anyone else at the FBI about looking for documents concerning surveillance of Mr. Simpson in 2015?

A.   I don't believe so.

Q.   And you weren't able to find any other 302s or any other documents?

A.   No, sir.

Q.   We were told that there were times when there was some surveillance done, such as what was called spot surveillance but the 302 would not be generated.  Are you aware of that process?

A.   That's not a process I would be familiar with in my own investigations.

Q.   Why is that?

A.   Well, I worked surveillance for approximately four years as a primary job, so every day we would go out, we would complete a surveillance log regardless of whether or not something actually happened.  But I was assigned to a surveillance specific group, and that was our only function.  So if a log was not completed, what would we say about what we did that day to our supervisor?

Q.   Okay.  Did you ask Agent Smith whether or not he had gone out to Simpson's apartment on May 3rd of 2015?

A.   No.

Q.   Did he discuss whether he had ever gone out there on May 3rd of 2015 prior to the Garland attack?

A.   Not specific to that date.

Q.   Now, in looking at Exhibit 19, I'm going to reference you to the first page that has a picture, which is the third page of that exhibit.

A.   Okay.

Q.   Do you have it?  And that's a picture, looks like somebody in some sort of religious garb or Middle Eastern garb?

A.   It's an individual dressed in clothing.

Q.   I just want to make sure we're on the same page.

A.   We're on the same page.

        THE COURT:  This is Friday, May 1, 2015, at 2:08:18, et cetera, in the afternoon.  Right?

        MR. MAYNARD:  Right.

        THE WITNESS:  That is the document I'm looking at, yes.

BY MR. MAYNARD:

Q.   Over the picture it says Camera 2.  Do you see that?

A.   Yes, I do.

Q.   Did you do any investigation to determine whether there was only one or multiple cameras that were involved in this

01:34PM

01:35PM

01:35PM

01:35PM

01:35PM

investigation?

A.   Yes, I did.

Q.   Tell us about that.   Tell us what you did.

A.   Sure.   It was an extensive investigation particular to that notion because I was asked by the prosecutors after I provided them with a document that suggested there was only one camera and it was labeled camera Number 2.

And so I had been provided that document by the ELSUR technician Serena Martinez, and so after providing that document to the prosecutors, they came back to me and asked why did it only have an indication that there was a camera Number 2?   Was there another camera involved, and, you know, where is the recording to that camera?

And so I thought that was a good matter I needed to investigate and I went back to her and I asked her if there was any way that there was another camera assigned to this investigation and the pole camera request that was recording and where that might be.   And she told me that she had got that form from the technical operations unit after she had collected the hard drive from the recording on, I believe it was, May 11, 2015.

And so she said if there were other cameras recording to this hard drive, they would be detailed on this sheet for me.   I said, okay.   Fair enough.   And she said you may want to go to the technical operations unit and confirm that indeed is

UNITED STATES DISTRICT COURT

what took place and what transpired and what was on the pole camera recording.

So I then went and talked to the technical operations unit, and they brought me into the room where the recording systems are located and I said, you know, this occurred back in 2015.  What types of recorders would you have been using?  And they said well, it would have been these recorders off to the right.  And they look like a regular desktop computer but not standing up and down.  They are flat.  So they are approximately, you know, this wide.

Q.   The record will reflect he's showing two feet by two feet.

A.   Exactly.

Q.   Okay.

A.   And I looked over at that recorder, and I remember seeing two slots for hard drives.  And so he said to me, well, each of these recorders can hold two hard drives and there's a different case assigned to each hard drive so this recorder will be able to capture video from two investigations.

And I said okay, and I showed him the piece of paper I had gotten from ELSUR where it said there was only one camera on here.  And I said, could you please explain to me if there's any way that another camera may have been recorded to a different device, and if so, how can I assure that that took place or didn't take place?  And he said, well, all of the cameras assigned to that case number would have streamed to

that hard drive.  And if you inserted the hard drive into a computer to view it you would see evidence there of two camera systems.  And I said, okay, well, can you explain to me why this one is labeled camera Number 2?  Is there a camera Number 1?  Is there a camera Number 3?  And he said, well, it's an arbitrary assignment.  Camera 1 may have been to the different investigation in the other hard drive slot in that recorder, if that makes sense.

So I said, well, I have talked to these two units here.  I'm going to view the video myself to determine if there's any indication on the video or the software that plays the video if there's another camera on there.  So I went to the room across from where those gentlemen sit, and there's a bunch of computers there and you can put the hard drive into a slot and you can view that.  And I did just that, and I attempted to manipulate the camera to see if there was different places I could click on it because I wasn't familiar with that software system.  And there was no indication on that software system or anywhere within the recorded data that there was another camera.

And so at that time, I was satisfied that I did not believe, based on my own investigation and review of the recording, as well as my conversations with the ELSUR unit and the technical operations unit that there was another camera.

Q.  When one checks out a camera to be placed in observation,

is there documentation that shows how many cameras or the number on the camera?  Is there some sort of documentation somebody fills out and says we have given Camera A to this agent to install at a certain location?

A.   So the technical operations unit at the field office here in Phoenix are responsible for installing cameras in various locations wherever they have been approved to be installed. And I have never been a tech agent, so I'm not aware of what happens behind the scenes and what's involved with locating a physical camera, adjusting it, placing it in a spot, activating it, getting approvals.  I have no knowledge of any of that.

Q.   Did you do any investigation to see if there was any documentation from those tech agents who actually installed the camera whether they documented the cameras that they took out and when they installed it, how they installed it, anything like that?

A.   So the technical operations unit is, from my understanding after interacting with them, was that they don't reveal a lot of the methods of how they do business.  In particular, they ask that I not mention their names in court or reference them in documents.  So I can't give you any information on the procedures or policies about what happens in that unit.

Q.   The question I asked, though, was did you ask them for any documents and did they refuse you, or did you not ask them for documents?

A.   I don't believe I remember asking them for documents, because they told me that their unit is sensitive.  So I didn't want to pry or, you know, cause a problem.

Q.   And looking on that same page.

A.   Sure.

Q.   You will look over to the left-hand side of the page.  You will see there's like two boxes:  One says selected camera, and the other one says all cameras in view.  Do you see that?

A.   Yes, I do.

Q.   The box that's marked says all cameras in view.  Do you know why that particular box was marked?

A.   No.

Q.   Did you do any investigation with anybody concerning that aspect of this document?

A.   No.

Q.   Did you ever have any discussions with Agent Milnor about the pole cameras?

A.   I don't believe so.

        MR. MAYNARD:  Your Honor, if it hasn't been admitted I move for the admission of Exhibit 122.

        THE COURT:  Is there any objection?

        MR. KOEHLER:  No, Your Honor.

        THE COURT:  122 is admitted.

        MR. MAYNARD:  May I have just a moment, Your Honor?

        THE COURT:  Yes.

MR. MAYNARD:  Your Honor, since Agent Mullen is the person who is here, I'm having the hard drive that we were provided brought down, and I'm going to admit it into evidence. And I reserve the right to call him back to just put that into evidence if necessary.

THE COURT:  Other than that you have completed your examination?

MR. MAYNARD:  Yes.

THE COURT:  Mr. Koehler.

                    CROSS-EXAMINATION

BY MR. KOEHLER:

Q.  Agent Mullen, you pretty much described everything you did to obtain the video and chase down the issue of more than one camera.  Correct?

A.  I believe so.

Q.  When you obtained the evidence access log that's Exhibit Number 18, did you review that?

A.  Yes.  I actually produced this document.

Q.  Between the time -- when you say "produced it", what do you mean?

A.  Produced it for the prosecutors upon request.

Q.  Did you print it from the system?

A.  Yes.  I believe I did.

Q.  Do you have the ability to alter this document in the system?

A.   Other than redactions, no.

Q.   All right.  And in terms of reviewing that, did you review that to determine whether anybody else had obtained a copy of this video between May 11, 2015, when it was checked into evidence by ELSUR, and January 24 of 2019 when you obtained a copy from ELSUR?

01:46PM

A.   Yes.

Q.   And had anybody either checked out the hard drive itself or had a copy made from ELSUR?

A.   No to both questions, sir.

01:46PM

Q.   When you went to ELSUR to request the hard drive or to request a copy of the video, were you already aware at that point in time that there was potentially a pole camera in existence in this case?

A.   Yes.

01:47PM

Q.   And how were you aware of that?

A.   Because I was told by JT Baker and the prosecutors they had found similar documents suggesting that one existed.

Q.   You were here yesterday for Agent Whitson's testimony, correct?

01:47PM

A.   Yes.  That's correct.

Q.   And you heard him talking about new information coming into the Simpson case file while he was getting underway with his investigation in the case?

A.   Yes.

01:47PM

10-16-19-CR 15-707-USA v Kareem-Evidentiary Hearing-Day 2-Mullen-Cross

Q.  Can you tell the Court what it looks like when you are -- first of all, when you open -- I just dropped the name -- Sentinel.  When you open Sentinel, what do you see?

A.  When you first open Sentinel you will see boxes that you can arrange yourself based on what information you would like to see when you open it.  But essentially on the right-hand side, in my Sentinel view, I have all my cases listed.  And then at the top left corner, I have draft documents that I'm working on.  And in the lower left corner I will have like new documents that have been sent to the file recently.

Q.  All right.  So let's talk about the case listing.  If you click on a case listing, is one of the tabs that you get on your case listing a serials tab?

A.  Yes.

Q.  And will that serials tab take you to the main case file and show you the list of serials in the case?

A.  You are already in the main case file.  When you click on the right-hand side initially, when you open it up there's a list of cases.  If you click on that case then you are within that case file.  Then there's a serials tab at the top of the case file.

THE COURT:  I don't know what a serial is.

THE WITNESS:  Pardon me.  A serial would be a document like a 302, and then there would be attachments to that document.  A serial is what we call the documents within

UNITED STATES DISTRICT COURT

10-16-19-CR 15-707-USA v Kareem-Evidentiary Hearing-Day 2-Mullen-Cross

Sentinel so in a case you will have serial 1 which is essentially the opening of the case.  And then any subsequent documents that are sent to that case will be given a serial number, unique serial number within that case.

THE COURT:  So it's different from a subfile?          01:49PM

THE WITNESS:  Yes.

THE COURT:  Okay.  I'm still not sure I understand what it is, but I don't know if I need to.

MR. KOEHLER:  I want to get to a point here that I think will point to the relevance of this.          01:49PM

BY MR. KOEHLER:

Q.  When new serials are added to a case, are they numbered sequentially?

A.  Yes.

Q.  Yesterday Special Agent Baker testified.  You were here for     01:49PM that as well?

A.  Yes.

Q.  And he identified the 302 that Mr. Gallante, I believe it was Michael Gallante, II, drafted in the case as serial number 1094, is that correct?          01:50PM

A.  I believe so.

Q.  So that would have been the 1094th serial that had been added to the Simpson case file at that point?

A.  I believe that was the serial that was in the main case file.          01:50PM

UNITED STATES DISTRICT COURT

Q.   Okay.  And so are there serials in other parts of the case file that would be numbered differently?

A.   Yes.

Q.   When you are looking at your serials tab and you see these serials, can you give a general description of what that looks like?  Can you compare it to something we're all generally familiar with?

A.   I will try my best.

So when I open up a case and get into it, there's the tabs at the top that I told you about, so commonly the tabs would be like serials, or evidence, or entities.  Entities would be individuals associated with the investigation, and there are several other tabs there as well.  And so if you click on the serials tab, what pops up is similar to what people use when they open Outlook e-mail.  And you will see kind of a small portion of what the title may be and what the classification may be.

And so you can click on that and then you see a bigger version of that like you would in Outlook and so you are able to read it in either web view or an official document view which is what you would see here.  So that's essentially how that process works.

Q.   When you click on a serial and read it and then close it and go back to your main screen, does the main screen show that you previously read that serial?

10-16-19-CR 15-707-USA v Kareem-Evidentiary Hearing-Day 2-Mullen-Cross

A.  No.

Q.  So it doesn't have like a marked unread and read version showing on the screen.  Is that correct?

A.  That's correct.  That's how it's different from Outlook.

Q.  If someone adds new serials to the case while you are reviewing a document and you come back to the home screen on the serials tab, is that going to look exactly the same as it did before you were in that document?

A.  No.

Q.  What will be different?

A.  The serial that you would be looking at would be further down and so you may have to scroll down to look at that serial you were looking at.

        THE COURT:  Are they in reverse chronological order?

        THE WITNESS:  Yes.  It can make it difficult.

BY MR. KOEHLER:

Q.  So if you are looking at a document and somebody adds a bunch of different documents while you are in that document and you close it, will your document necessarily even be on that screen anymore?

A.  No.  Not necessarily.

Q.  How many subfiles are there in the Simpson case?  Do you know?

A.  I do know.

Q.  How many are there?

A.   So I counted them, and there's one main file and 35 subfiles.

Q.   Did you also count the number of serials in the case as of within the last week or so?

A.   Yes, I did.

Q.   What is the number of serials presently in the Simpson case file?

A.   I don't know presently, but when I looked there was 2985 serials.

Q.   2985?

A.   Yes.

MR. KOEHLER:  If I can have a moment.

BY MR. KOEHLER:

Q.   Does that 2985 serials include the number of attachments to those serials?

A.   No.

Q.   So if one serial has 35 attachments, how many numbers are you going to see in the file?

A.   You would see the same number of serials, but there's no count to how many attachments are within each serial.  You would have to go through manually and count them.

Q.   All right.

MR. KOEHLER:  If I can have one moment, I just want to make sure I have covered everything.

THE COURT:  You may.

UNITED STATES DISTRICT COURT

BY MR. KOEHLER:

Q.   The Gallante 302, was that in the main file or in a subfile?

A.   I believe that was in the main file.

Q.   And then the import form that -- with the 759, the authorization for the pole camera, where was that stored?          01:54PM

A.   I believe that was in the ELSUR subfile.

Q.   And was the 759 itself an independent thing, or was it an attachment?

A.   It was an attachment.          01:54PM

Q.   And it was an attachment to that import form.  Is that correct?

A.   That's correct.

Q.   And what about the evidence access log and the evidence collection log, Exhibits 17 -- or 18 was the access and 17 was          01:54PM the collection?

A.   You are talking about the ELSUR-related evidence log?

Q.   Correct.  Correct.

A.   Those, I believe, were in the ELSUR subfile.

Q.   Do you know where the prosecutors got the import form that          01:55PM was sent to you?

A.   It would have been likely from one of the case agents, but I don't have independent knowledge of that.

Q.   Very good.

        MR. KOEHLER:  No further questions.          01:55PM

THE COURT:  Anything else, Mr. Maynard?

MR. MAYNARD:  Yes.

REDIRECT EXAMINATION

BY MR. MAYNARD:

Q.  Does the serial summary show the date that the information was loaded into the system?

A.  Yes.  You would have to click on the serial, and then you can scroll all the way down to the bottom and you can see who signed it and the date and time and then who approved it and the date and time.

Q.  Okay.  And did you do that for the information involving the pole camera?

A.  No.

Q.  So as we sit here, you don't know when it was put in there and who put it in?

A.  If I can explain, so there are dates on the bottom of the document, so the date that it's signed by the author can differ from the date that it's signed by the supervisor, which can differ from the date that it's serialized to the file.

So I just look at what's on the document.  If I want to know specifically who approved a document, I would need to go down to the bottom to see that because it wouldn't be on the official version of the document.

Q.  But it would be on the computer screen that you are looking at?

10-16-19-CR 15-707-USA v Kareem-Evidentiary Hearing-Day 2-Mullen-Redirect

A.   It would be on the web layout version all the way at the bottom so I would have to scroll all the way down.

Q.   But you could print that page out then?

A.   No.  You have to take a screenshot of that page and then save the screenshot to something.  You can't print like the web version.  It's not easily -- you can't.  You have to download an official version and then print it.

Q.   We were told yesterday by others that in using Sentinel it's basically like doing a Google search.  Do you agree with that?

A.   There are search bars within Sentinel, and essentially it's the same idea of typing in words and then pressing, you know, clicking a button and you will get search results.

Q.   If you were looking in the Simpson file, and you were looking to see if there had been surveillance done of Simpson, if you typed in "surveillance of Simpson in 2015" do you know what would come up?

A.   I don't right now, no.

Q.   Well, as part of your investigations you did look to see if there was additional surveillance done of Simpson in 2015 other than the documents that we have, I think it's in Exhibit 12, correct?  How did you search that?

A.   Well, so you can type in "surveillance" and click the button.  And then any document, ideally how it was designed I imagine any document that references surveillance could be in

there.  So you could see surveillance logs; you could see surveillance requests; you could see information from an intel analyst that said we recommend surveillance be conducted; you could see a document from headquarters saying why wasn't surveillance conducted.

01:58PM

So you then have to look through each one of those documents and read it and it can take time.  You could type in that word and you could have thousands of things come up depending upon what file you are in or if you don't look in the main file you can click "surveillance."

01:59PM

Q.  Did you do that in this case?

A.  When I was tasked by prosecutors to look for other documents, what I did was I went into the main file and then there's a search bar up on the right portion of that main file and you can search within the file.  So you can isolate your search from Sentinel to just a file.

01:59PM

And so when I was tasked to do that, that's the search I completed.  And then I had a list of documents, like you would have in Outlook, and so I cross-referenced the documents that the prosecutors had given me to determine if there were any other documents and I did not see any additional documents in that file that referenced surveillance.

01:59PM

Q.  And when you are looking, can you tell if somebody else has looked at that document before you?

A.  No.

01:59PM

UNITED STATES DISTRICT COURT

MR. MAYNARD:  I don't have any further questions, Your Honor.

THE COURT:  Thank you.

Thank you, Special Agent Mullen.  You may step down.

THE WITNESS:  Thank you.

THE COURT:  Do you have another witness?

MR. DRAKE:  Call Glenn Milnor.

MR. KOEHLER:  Your Honor, we would submit at this point Agent Milnor's testimony would be cumulative to everything that's already been heard according to the summary of what the defense said that they would call Mr. Milnor to testify about.

THE COURT:  I'm not going to prohibit them, the defense, from calling him to the stand.  And if the testimony is cumulative, you may object and I will either sustain or overrule.  But I am not going to prejudge its cumulative nature.

MR. KOEHLER:  Very well.  Thank you.

THE COURT:  Sir, would you please take the witness stand?

You may proceed, Mr. Drake.

MR. DRAKE:  Thank you.

***

***

***

UNITED STATES DISTRICT COURT

GLENN MILNOR,

a witness herein, having been duly sworn by the clerk to speak the truth and nothing but the truth, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. DRAKE:

Q.   Good afternoon, Agent Milnor.  I'm going to go through some of the details, but I also want to do a quick summary with you if I can.

You are the supervisor of the squad that was involved in the Elton Simpson investigation in the early part of 2015?

A.   Yes, I was.

Q.   And in connection with that supervision at one point you approved a pole camera application for Special Agent Amy Fryberger?

A.   Correct.

Q.   And when it came time to make decisions about who was involved in surveillance and how many agents were deployed, was that your decision?

A.   I was part of the team that made that decision, yes, along with the case agents.

Q.   And so in connection with the Pat Tillman run you deployed about 16 Special Agents and task force officers to watch Elton Simpson?

MR. KOEHLER:  Object on cumulativeness and beyond the

10-16-19-CR 15-707-USA v Kareem-Evidentiary Hearing-Day 2-Milnor-Direct

scope.

THE COURT:  Overruled.  You may answer.

THE WITNESS:  The exact number, I can't recall at this time but it would be somewhere around there I would suspect. Yes.

BY MR. DRAKE:

Q.  Okay.  And at that point you were trying to make sure you didn't lose contact with Elton Simpson in relation to the Pat Tillman run.  Is that a fair assessment?

A.  That is one of the reasons we were watching him, yes.

Q.  The last thing you wanted to find was that Mr. Simpson had eluded surveillance and planted a bomb somewhere in relation to the event.  Correct?

A.  Speculation.  There was a threat -- there was a deemed threat not only to the state of Arizona but the United States, and so we were watching all individuals that were associated with that threat, yes.

Q.  All right.  But you were hopeful that you would not have lost contact with Mr. Simpson during that surveillance?

A.  Correct.

Q.  And did you say as well that there were other agents throughout the United States that were interested in that threat related to the Pat Tillman run?

A.  There were numerous offices that were involved in and were given information regarding a potential threat somewhere in the

UNITED STATES DISTRICT COURT

United States, and this was one part of it.

Q.   And that was related to the Tillman run?

A.   Not necessarily just the Tillman run.  There were other -- there was a perceived threat to the United States.  The Tillman run was the -- one threat of the area of responsibility of Arizona and going on at that time that was perceived to be a large a cumulation of the public that would be a risk.  And so, yes, we wanted to -- the Phoenix division of the FBI was paying close attention to the Tillman run and the subjects involved.

Q.   So your assignment or the squad's assignment was basically to keep track of the threat.  In this case the threat would be Elton Simpson.

A.   Correct.

Q.   And the pole camera would have helped you do that?

A.   It was one of the tools we were hoping that were going to help with that endeavor, yes.

Q.   Were you alerted to an e-mail from another office concerning Elton Simpson that came in about April 30 of 2015?

        MR. KOEHLER:  Objection.  Beyond the scope, Your Honor.

        THE COURT:  Sustained.

        MR. DRAKE:  May I be heard?

        THE COURT:  Sure.

        MR. DRAKE:  This has to do with their awareness and alertness in terms of watching Mr. Simpson.

UNITED STATES DISTRICT COURT

10-16-19-CR 15-707-USA v Kareem-Evidentiary Hearing-Day 2-Milnor-Direct

THE COURT:  This has to do with the pole camera and its failure to be disclosed and the circumstances under which it was not disclosed or was ultimately disclosed this year.  And the pole camera didn't go up until May 1st.  So whatever happened on April 30 in connection with surveillance of Mr. Simpson or information about Mr. Simpson is beyond the scope of this hearing.

MR. DRAKE:  My point would be, Your Honor, that the witnesses who were responsible for passing the information regarding the pole camera have previously indicated that they would have done so had they been asked.  And for some reason I'm trying to figure -- I'm trying to share with the Court why that might not have happened.

And my argument would be that were the agents concerned about the thrust of what had happened, that is to say, they missed the pole camera, they missed Mr. Simpson leaving the state, they didn't catch the other items, they would have a greater bias or motive to keep the pole camera existence out of the public domain.

THE COURT:  I understand that.  But I don't see what that has to do with April 30th.

MR. DRAKE:  April 30th was the date that the undercover agent who was dealing with Erick Jamal Hendricks sent an e-mail to Fryberger, Hebert, and Smith regarding his assessment that he was dealing with Elton Simpson and he had

10-16-19-CR 15-707-USA v Kareem-Evidentiary Hearing-Day 2-Milnor-Direct

concerns about Elton Simpson and was willing to share those concerns.

THE COURT:  Okay.  I believe that we discussed that e-mail yesterday.

MR. DRAKE:  And we didn't get very far into it.

THE COURT:  The objection is still sustained.

MR. DRAKE:  Thank you, Your Honor.

BY MR. DRAKE:

Q.  Were others capable of viewing the video stream from the pole camera that ran to Amy Fryberger's desk?

A.  Yes.  Other case officer -- case agents would be able to view that.

Q.  So either Smith or DeEtta Nolen could view it if Fryberger was not there?

A.  Correct.

THE COURT:  Could the people that installed it, the technicians, could they also watch it from someplace within the Phoenix office of the FBI?

THE WITNESS:  That's a very good question.  I don't know for certain.  Yeah.

BY MR. DRAKE:

Q.  You make the case assignments within your squad, do you?

A.  I do.

Q.  And how do you make sure that the agents on your squad do a good job of sharing information, agent to agent, and case

agents to squad members?

A.   You grant access to the case file to all of the participants whether it be another agent or whether it be intelligence staff.  You provide access to the case file for them to review.  You have periodic meetings and reviews.  You discuss it in group meetings, squad meetings.  So there's periodic ways -- there's a whole bunch of ways.  They have access to the case file.  We also discuss the case.

Q.   Are these meetings more or less an ongoing series of meetings as you are working on a particular investigation?

A.   There is -- the frequency depends on what's going on, but it will be an ongoing meeting, sure.

Q.   Sure.  I mean, if there's nothing going on you don't meet; if something happens you might meet?

A.   Correct.

Q.   From other testimony we understand there is this case agent review -- case agent information review application.  And we also understand there is Sentinel.  Can you explain the difference and interrelationship of the two?

A.   When a case agent reviews -- are you talking about a file review?

Q.   No.  We have been told at the trial of this case that some of the files were put into the case agent information report, CAIR, system.  And that is how an agent could access things through Sentinel.  Today -- and yesterday -- it seemed the

02:09PM
02:09PM
02:10PM
02:10PM
02:10PM

primary way to access items in Sentinel was through Sentinel itself and some sort of Google-type word search.  I'm trying to understand what the difference between the two apparatus is.

A.   Sentinel is our case file.  All investigations are in Sentinel based on the classification and you are granted access to it based on the need to know.  You can review -- there are -- there's a main case file and there's a lot of subfiles and there will be subfiles such as surveillance subfiles or physical surveillance and electronic surveillance and there will be the banking subfiles.  And so you can pretty much -- anybody that has access to the case can review all the case files through all the serials through all the documents in there through Sentinel and then just access them logging on.

As far as CAIR goes, I did not have -- I did not necessarily review through CAIR myself.  I was mainly going through Sentinel reviewing all the case files.  So probably I wouldn't want to explain to you CAIR as opposed to Sentinel.  I wouldn't feel comfortable doing that.

Q.   In some instances we have heard from agents at trial about how an agent could bookmark something and have it prepared or then refer it to an intelligence analyst to help generate some sort of analysis or report.

A.   Okay.

Q.   Is that bookmarking done in Sentinel?

A.   Usually in Sentinel you would reference the Sentinel file

and the serial and then you would let whomever you are going to be sending to the analyst know of what serial it is, what document it is that you want them to review.  Bookmarking, I believe, is more referenced in the CAIR.  But once again, I don't -- I wouldn't feel comfortable in discussing CAIR as much.

Q.   I must tell you, most of the people we have heard about CAIR from involve intelligence analysts.  Would that be the people who would have, perhaps, much use of that system?

A.   I think they are more likely to use it, yes.

Q.   And they would be interacting with the case agent?

A.   Correct.

Q.   And you had one intelligence analyst on your squad.  What was that intelligence analyst's duty?

A.   That duty, he's going to be doing -- our intelligence analysts, they do all background checks.  They do file reviews.  They research documents.  They go through intelligence such as any kind of background intelligence, any kind of old case files, any kind of criminal history checks.  They will be checking data coming in from other sources whether it be within the FBI or outside the FBI.  They are going to be doing everything they can to support the investigation.

Q.   And they would be looking, perhaps, at open source information?

A.   Correct.

Q.   And that would include Twitter tweets?

A.   Yes.

Q.   We have heard testimony about serials and what shows up on them.  One question I had was can you sort serials by date?

A.   Yes.  I believe you can, yes.

Q.   So if you wanted to look at all the serials, let's say, from a particular date range, you could pull that up?

A.   Correct.

Q.   There was also some testimony about when items go into Sentinel, and I want to see if you can help clear up this point.

There was something referencing supervisors signing off on the document.  To what extent do supervisors sign off on information that goes into Sentinel?

A.   Pretty much all documents are going to be submitted by the case agent or an analyst or anybody working on the case, and it's going to be reviewed often by his or her supervisor which is often the squad supervisor.  They are going to review it for accuracy.  They are going to review it for any grammatical errors.  They will review and prepare it for the case.

Q.   So if somebody wrote a 302 regarding a surveillance event, that would come through you for your review?

A.   Normally.  Normally.  There are exceptions.  Maybe there's someone else that's been assigned to assist with our case, but they are sitting on a different squad so it may go through not

me but a different supervisor in there.  But normally it would go through me, yes.

Q.  So you get assistance from people sometimes on other squads?

A.  Correct.

Q.  Is there a reason that -- we're dealing with the Simpson case -- that when Simpson and Soofi were killed in Texas this investigation did not stay attached to the Simpson case but then soon became opened up under another individual?

A.  There's multiple reasons.  First of all, the FBI has a policy that you don't do a group -- you don't investigate a group necessarily when it comes to terrorism matters.  Each individual subject must be a predicated subject, must have its own file and have its own case.  So we separate them.  That's FBI policy.  We separate them individually.  So that is why all of a sudden it went from the Simpson case to multiple subjects, accomplices that were associated with both Simpson and Mr. Soofi.

And so -- can you repeat?

Q.  You are doing fine.  So there would be a separate one.  So, for example, there might be a separate file for Mr. Abdul Kareem, a separate file for AK Wahid, a separate file for some other person.  And those might have different case agents on them.

A.  Correct.

Q.   They might be assigned in different squads?

A.   Correct.

Q.   So when it comes time to produce discovery to the prosecutors and, in turn, the defense, who bears the responsibility for that?

A.   It's a culmination of the entire team, the case agents, the analyst who is going to know all the history in the file, the supervisors.  Normally -- and under normal circumstances a particular squad would handle all the associate cases as well.  And this case became so voluminous, so large, so many subjects that were involved in it that we needed help.  Obviously when the terrorist attack happens you are dealing with headquarters, dealing with multiple subjects, multiple divisions of the FBI.  It became very large.  That's when we reached out to the other squads.  That's not necessarily the norm.

       But in this case it was.  So it is a matter of the analyst, the agents, the supervisors, all reviewing that to make sure everything is in place.

Q.   Would it make sense for one person to take all that work on by themselves?

A.   It's a case-by-case basis.

Q.   Assuming it's a big case?

A.   Normally, no.

Q.   The surveillance on Simpson was, in some measure, at least in the early stages, to identify associates, correct?

UNITED STATES DISTRICT COURT

A.    The case on Simpson?

Q.    Yes.

A.    After or -- before or after the --

        MR. KOEHLER:  We're getting cumulative again, Your Honor.

        THE COURT:  Sustained.

BY MR. DRAKE:

Q.    Are tactical information reports or Tactical Intel Reports, once created, ever updated?

A.    They -- as new information comes in, absolutely.

Q.    Would you take a look, please, at Exhibit 123.

        Turn to the last three or four pages, four pages. This is a Tactical Intel Report regarding Elton Simpson.  Can you tell us the date it was created?

        MR. KOEHLER:  Your Honor, we're going to object on the cumulative nature of this, and the document speaks for itself.

        THE COURT:  Sustained on the second basis.

BY MR. DRAKE:

Q.    Is there any information in that Tactical Intel Report that you recall being added based upon surveillance that was conducted by your squad?

        MR. KOEHLER:  Same objection, Your Honor.

        THE COURT:  Well, I think is more -- this, we know, because the document speaks for itself, that this is the Tactical Intel Report that was prepared at the request of

10-16-19-CR 15-707-USA v Kareem-Evidentiary Hearing-Day 2-Milnor-Direct

Special Agent Hebert when the Simpson case was reopened.  And I think the question is, would there have been some updating to this particularly after other associates were identified?  And this basically has all of his known relatives and a woman named Anna Dominguez.

02:22PM

THE WITNESS:  These documents may be updated or may come under a separate document and updated, a new document with new information.  But that file would typically be the way to --

THE COURT:  Thank you.

02:22PM

THE WITNESS:  -- subsequent forms.

BY MR. DRAKE:

Q.  Did it come to your attention as the supervisor of the squad investigating Elton Simpson that Elton Simpson had tweeted regarding the Garland, Texas contest?

02:22PM

MR. KOEHLER:  Objection.  Relevance and cumulative.

THE COURT:  Sustained.

BY MR. DRAKE:

Q.  Was one of the things that you would approve before they left the office Grand Jury subpoena requests?

02:23PM

MR. KOEHLER:  Objection.  Relevance and beyond the scope.

THE COURT:  Overruled.  You may answer.

Was your responsibility to approve Grand Jury requests or were they done without your approval?

02:23PM

THE WITNESS:  Grand Jury requests would usually be with the United States Attorney's Office and the case agent. We would probably discuss it, but I don't need to physically sign off on a Grand Jury.  It would be with the United States Attorney's Office.

BY MR. DRAKE:

Q.  And if I understand correctly, then, if the subpoena were issued, the fact that a subpoena was issued and given to an agent, would that go into Sentinel?

A.  It would go into Sentinel.

Q.  And any results that came as a result of that subpoena, would that go into in Sentinel?

MR. KOEHLER:  Objection.  Cumulative.

THE COURT:  Overruled.  You may answer.

THE WITNESS:  The results should, yes, go into Sentinel.

BY MR. DRAKE:

Q.  Was there any discussion at the meetings that were held in your squad regarding the Elton Simpson investigation regarding Mr. Simpson's association with Hassan Abu Jihad?

MR. KOEHLER:  Objection.  Relevance to this hearing.

THE COURT:  Sustained.

BY MR. DRAKE:

Q.  Was there discussion, as your agents were preparing to conduct surveillance, to your knowledge, discussion about Elton

02:23PM
02:24PM
02:24PM
02:24PM
02:24PM
02:25PM

Simpson's prior case leading to it -- that led to his conviction?

MR. KOEHLER:  Objection.  Beyond the scope.

THE COURT:  Sustained.

BY MR. DRAKE:                                                    02:25PM

Q.  Did you receive any communication from the Dallas office on May 3rd regarding the whereabouts of Elton Simpson?

MR. KOEHLER:  Objection.  Beyond the scope.

THE COURT:  Sustained.

BY MR. DRAKE:                                                    02:26PM

Q.  Did Special Agent Smith discuss with you an e-mail communication he had with the Texas office?

MR. KOEHLER:  Same objection.

THE COURT:  Sustained.

BY MR. DRAKE:                                                    02:26PM

Q.  How did you learn of the attack in Texas?

A.  I first heard it from case Agent Andrew Smith who gave me a phone call.

Q.  So you had not heard it from the news at that time?

A.  No.  Not at first.                                          02:26PM

Q.  And what did Mr. Smith tell you?

MR. KOEHLER:  Objection.  Beyond the scope.

THE COURT:  Sustained.

BY MR. DRAKE:

Q.  What did you do in response to learning about the attack in  02:27PM

10-16-19-CR 15-707-USA v Kareem-Evidentiary Hearing-Day 2-Milnor-Direct

Texas?

MR. KOEHLER:  Same objection.

THE COURT:  Overruled.  You may answer.

THE WITNESS:  Immediately called my supervisors, the assistant special agent in charge, the special agent in charge. I deployed the SWAT teams.  I requested bomb techs.  I requested evidence response.  I reached out to our partners, Phoenix PD, and I accumulated the squad to respond to the apartment of Mr. Simpson and Mr. Soofi.

BY MR. DRAKE:

Q.  You were going to do a search warrant?

A.  Yes.  Working on a search warrant throughout the evening, yes.

Q.  Is it part of your practice and standard practice of the FBI to gather agents together who are going to be involved in the search to discuss the search parameters and search warrant?

A.  Always.

Q.  In other words, everybody knows what is covered under the warrant?

A.  You read through it.  You read through it and what is to be collected and what we are looking for, so absolutely.

Q.  And did you recall your entire squad to assist in this process of preparing for the -- and executing a search warrant?

A.  It's been five years, but it would seem to me my recollection is yes, I called out my entire squad to respond to

UNITED STATES DISTRICT COURT

the scene and/or return to the office to start writing the search warrant.

Q.   And about what time was it that you had agents go to the scene?  Do you recall?

A.   The exact time I did not.  I remember it being late afternoon on that -- late afternoon, early evening.

Q.   Okay.  We have been told in some of the materials at trial that the shooting started in Garland, Texas at about 6:51 p.m. local time Texas.

A.   Uh-huh.

Q.   Does your recollection of when you were contacted comport with that?  It would have been later or earlier?

A.   Earlier.  So, yes, it was late afternoon, early evening, so yes.

Q.   Did you assign anyone to review the pole camera video?

A.   Did I find anyone?

THE COURT:  Assign.

THE WITNESS:  Did I assign anyone.  I remember talking to case Agents Fryberger and Smith about the need to review it. And so I don't specifically remember if I assigned them or if we assigned somebody else.  I cannot recall that.  But I remember talking to Smith and Fryberger wanting to confirm that Mr. Simpson and Mr. Soofi left their apartment and what information and evidence we would get from anything that was captured.

BY MR. DRAKE:

Q.   Okay.   You were kind of scurrying to catch up.   Would that be fair at this point?

A.   We were trying to ascertain what happened.

Q.   Yeah.   Did you come to learn what Agent Fryberger or Agent Smith saw on the video?

A.   Yes.   We had -- we came -- I remember we had a relative time that the two left and that information was captured.

Q.   When was this information shared in relation to the execution -- strike that.

When was this information shared in relation to the application for the search warrant?

A.   I cannot recall the exact timeline on that.

Q.   Would you take a look, please, at Exhibit 125.   Excuse me. I'd like you to look at Exhibit 116.

Do you have that?

A.   I do, sir.

Q.   Does it appear familiar to you?

A.   If you don't mind giving me a second.

Initial review it seems to be the affidavit in support of the search warrant for the day of the shooting, or actually probably would have been early the next morning by the time we got it signed by the judge.

Q.   Right.   And was this presented physically to the judge, that is to say, did an agent go to meet with the judge and

present them to them?

A.   Yes.  I believe Mr. Smith did.  Yes, sir.

Q.   In other words, you didn't take -- you didn't use the telephonic warrant provision?

A.   No.

Q.   And in this affidavit in support of the application for a search warrant, begins at Page 9, there is a brief summary of the investigation.

A.   Uh-huh.

Q.   That's provided, is it not, to help the judge or the reviewing magistrate come up to speed on the investigation?

A.   Correct.

Q.   It's a more or less a summary of what you have done so far that is pertinent to the search?

A.   It's to provide probable cause to give us a justification to enter the premises under a search warrant.

Q.   Okay.  And if you were going to review, or begin the review of a massive file with lots of information in it, would this be a good place to start, perhaps, because it would give you an easy summary?

        MR. KOEHLER:  Objection, Your Honor.  This is beyond the scope of what this is about, and he's now critiquing the review of the file rather than the sharing.

        THE COURT:  I think that's maybe your argument, Mr. Drake, not something for this witness to give his opinion

about.

THE WITNESS:  So, Your Honor, would you like me to answer?

THE COURT:  No.  Sorry.

THE WITNESS:  Okay.                                    02:34PM

BY MR. DRAKE:

Q.  Did you discuss this search warrant, Exhibit 125, I'm sorry, 116, with Agent Smith prior to his making the application?

A.  Yes.  I was with Mr. Smith in the office that evening as he   02:35PM
was drafting it.

Q.  Who -- what was that second name?

A.  I said Mr. Smith, Andrew Smith.

Q.  Yes.  So the two of you more or less put this together?

A.  Mr. Smith was the author.  Special Agent Smith was the   02:35PM
author of this.

Q.  And there's a reference in here on Page 12 at the end of
the first paragraph on that page that Mr. Soofi was observed to
walk towards the apartment and Mr. Soofi to appear to be
wearing a handgun.  Was there any physical surveillance out   02:35PM
there that day?

A.  On the day of the attack?

Q.  This is on May 1, I'm sorry.

A.  I'm sorry.  Can you repeat which page you are on, sir?

Q.  Sure.  I'm trying to find out the source of this   02:36PM

information, whether it came from the pole camera or whether it came from an agent on line?

THE COURT: I think it's pretty obvious that it came from a pole camera. I don't think there's any evidence in the record that there was any surveillance other than the pole camera surveillance on May 1.

MR. DRAKE: All right. I will move on.

BY MR. DRAKE:

Q. Would you take a look, please, at Exhibit 19.

This is the 302 prepared by Michael Gallante, an intern. And I want to direct you to the second page of this document.

It contains a number of entries on this second page about what was seen and the times at which they were seen. The last two entries are one dated May 3 at 22 hours and 56 minutes, and the next one is May 3 at 10:19 a.m., or sorry, 10:19, and that last entry shows the camera being disconnected.

Do you know if that's accurate?

A. I personally cannot recollect the exact time that camera was taken down. I would have to reflect back on documents such as this to verify. So I have no reason to question this.

Q. Would it have been your practice if you were going to go out and execute a search warrant to have disabled or turned off a pole camera of the scene?

A. Under the circumstances, we -- it was a necessity to get

into the apartment as quickly as possible.  Would be normal protocol to turn down normally, in a normal case, we would have had all the evidence collected, gone to a Grand Jury before getting a search warrant, and then everything would have been taken down, wrapped up our case, presented it to Grand Jury, get a search warrant for whatever else, and go forward.  These were not normal circumstances.

MR. DRAKE:  May I have a moment?

THE COURT:  Yes.

BY MR. DRAKE:

Q.  When you made the -- excuse me.

When Amy Fryberger submitted the application for the pole camera and when it was subsequently approved, was that fact ever discussed in one of these squad meetings that you recall?

A.  That a pole camera was approved?

Q.  Yes.

A.  We did talk about a pole camera and then, yes, and working with our tech agents to get it mounted.  Yes.

Q.  So this would have been something you discussed within the squad?

A.  Definitely with the case agents.

Q.  All right.  But would it be of assistance to the others who were conducting surveillance to know that perhaps there was a pole camera they need not spend as much time on surveillance?

A.   Actually, yes.  Yes.  Part of the tool -- one of the tools, one of the benefits of a pole camera is that it has 24 hours a day ability to stay on a fixed location, so yes.

Q.   Was there any surveillance of your squad at the Simpson apartment, to your knowledge, on May 3rd before the attack?

A.   Is May 3rd on that Saturday?

Q.   It's it's a Sunday, I believe.  It's the day the attack occurred.

A.   No, sir.  Nothing else that I was aware of.

Q.   In the Sentinel file, is there generally a subfile for electronic surveillance?

A.   Normally, yes.

Q.   And normally another one for physical surveillance, field surveillance?

A.   Physical surveillance, yes.  Correct.

Q.   And so if one wanted to see what sort of surveillance had been conducted, would you go to those subfiles?

A.   Normally, yes.

Q.   And that's where you would find electronic surveillance records in the electronic surveillance subcategory?

A.   Normally, yes.

Q.   You might also, if you were looking for evidence of surveillance, would you do a -- well, let me strike that.

        What sort of contact did you have after the attack in Garland, Texas, with Special Agent Stewart Whitson and his

squad regarding the activities you had conducted concerning Elton Simpson, including the application for the pole camera?

A.   Specifically to the pole camera, I can't answer that.  But I would say that all the information, of course, was made available to Special Agent Whitson and his supervisor.  We would always have -- we would have almost daily meetings there for the first few weeks after the attack, talking about associates that we had come across and what progress had been made and what needed to be done and new files to be opened and who are we talking to.  So there would be daily interaction with most people but probably a few times a week for a number of weeks.

MR. DRAKE:  All right.  I believe I have nothing further at this time, Your Honor.

THE COURT:  Thank you.  Mr. Koehler.

CROSS-EXAMINATION

BY MR. KOEHLER:

Q.   Good afternoon, Agent Milnor.

A.   Good afternoon.

Q.   I want to pick up where Mr. Drake left off with these briefings.  Were these briefings prospective or retrospective in terms of what they were covering?

A.   Both.

Q.   When you say "both," how far back were you looking at each one of these briefings?  Were you covering things that had

already been covered in previous briefings?

A.   Only if it pertained to future taskings.

Q.   And to your knowledge, was the pole camera discussed at any briefing at which Special Agent Whitson was present?

A.   Not that I can recall.

Q.   Did you ever tell Special Agent Whitson yourself about this pole camera?

A.   Not that I can recall.

Q.   Now, I'm going to walk back a little bit.

THE COURT:   How much time do you think you have with Special Agent Milnor?

MR. KOEHLER:   No more than five minutes.

THE COURT:   Okay.  Go ahead.

BY MR. KOEHLER:

Q.   Special Agent Milnor, on the weekend of April 24th/25th of 2015, the Pat Tillman weekend, were other individuals in the Phoenix metropolitan area also under FBI surveillance to make sure that they weren't planning on doing anything around that event?

A.   Not to my knowledge.

Q.   When there was a mention of subfiles in Sentinel being restricted, are Grand Jury subfiles one of the types of subfile that would get restricted?

A.   Yes.

Q.   If somebody otherwise has a need to know, would they have

full access to the Sentinel file on an individual?

A.   On the Grand Jury file you would have to be on the Grand Jury list to have access to that.

Q.   With the exception of the Grand Jury list, would one be able to access the full file?

A.   If they were not a case participant or a case manager?

Q.   Correct.

A.   If the case was not restricted, it would be likely they would have access to it.

Q.   And to your knowledge --

        THE COURT:   That really doesn't matter generically. Did Agent Whitson have full access to the Simpson file?

        THE WITNESS:   He did.

BY MR. KOEHLER:

Q.   That's where I was going.   Thank you.

        Mr. Drake brought up the CAIR system.   Is the CAIR system used to review forensic computer images and similar electronic evidence?

A.   That is my understanding.

Q.   Are items bookmarked by either a Special Agent or intelligence analyst so that the FBI computer analysis response team can export those items for the agents to use as evidence?

A.   That is my understanding.

Q.   So is CAIR anything like Sentinel?

A.   I have -- since I'm not -- I personally have not used CAIR.

10-16-19-CR 15-707-USA v Kareem-Evidentiary Hearing-Day 2-Milnor-Cross

Q.   Okay.

A.   So I would hate to answer that.

Q.   I will stop with that then.

Assignment of agents to individuals rather than groups, is that at least in part related to the First Amendment guarantees of freedom of speech and freedom of association?

MR. DRAKE:  Objection, Your Honor.

THE COURT:  Sustained.

BY MR. KOEHLER:

Q.   You mentioned earlier that in order to conduct an investigation of individuals they had to be predicated.  Is that correct?

A.   Correct.

Q.   And does that relate back to FBI policies that are a result of protecting those rights?

A.   Correct.  FBI and DOJ policy, sure.

Q.   The date and time of the camera deactivation, Mr. Drake went over that with you a minute ago.  Would that indicate that the camera was still active at the time the search warrant, A, the SWAT team went in to breach the apartment; and B, the search team went in to collect evidence?

THE COURT:  Well, the search warrant was not signed until May 4th.

MR. KOEHLER:  Correct.

BY MR. KOEHLER:

Q.  Do you know what time the search warrant was signed on May 4th, approximately?

A.  We notified the judge early in the morning.  It was 3, 4, 5 in the morning.

Q.  Had the team already breached the apartment before daylight the next day?

A.  No.  Sun was breaking.  It was early in the morning.

Q.  What time does the pole camera -- take a look at Exhibit 17, please.

A.  The pole camera is disconnected the 3rd of May at 10:19.

THE COURT:  See and I think that's wrong.  I think it has to be the 4th of May.

BY MR. KOEHLER:

Q.  Take a look at where it says item type and type of description, third line down.

THE COURT:  I'm sorry.  We're looking at the log?

MR. KOEHLER:  Exhibit 17.

THE COURT:  Oh.

MR. KOEHLER:  Oh.  I'm sorry.

THE WITNESS:  I was looking at Exhibit 19.

MR. KOEHLER:  Can I just put this on the document camera, show it to the witness?  This is in evidence.

THE COURT:  That's what I'm saying.  The log is wrong that says May 3rd at 10:19.  The camera was taken down on May 4th at 10:19.

MR. KOEHLER:  Yes, it says right here May 4th, 10:19.

THE COURT:  Well, the document that we previously were looking at when everybody said it was May 3rd is the log. That's wrong when it said May 3rd.

MR. KOEHLER:  That is the Gallante log that is Exhibit 19.

THE COURT:  That's wrong.

MR. KOEHLER:  Yes.  The evidence log which is 17 shows May 4th, 10:19.  Had the search warrant been executed by May 4 at 10 a.m.?

THE WITNESS:  Yes.

MR. KOEHLER:  So I think it would be a good idea to take a break at this point, Your Honor.

THE COURT:  We'll reconvene at five minutes after 3. Court is in recess.

(Recess from 2:52 p.m. until 3:07 p.m.)

THE COURT:  The record will show the presence of counsel and the defendant.

Mr. Koehler, you may continue your cross-examination.

BY MR. KOEHLER:

Q.  Special Agent Milnor, was this pole camera, in your view, placed in an ideal location?

A.  No.  We had very limited visual access to the entire area. It was not good clarity.

Q.  And to your knowledge, was there another way that people

could go to and from the apartment without ever being seen by the pole camera?

A.   Yes.   The pole camera did not capture the entire area.   So absolutely.

Q.   Was that a concern?

A.   Absolutely.

Q.   Did you personally tell any surveillance agents to stand down as a result of the pole camera being activated?

A.   No.

Q.   Do you know personally whether the agents would have done that?

A.   I do not know personally.   I would doubt that because at most they would be on standby because the pole camera cannot do everything that a surveillance team can do.

Q.   To your knowledge, when the surveillance, the physical surveillance was active, were agents trying to follow Simpson away from the complex?

A.   Yes.

        MR. KOEHLER:   No further questions.

        THE COURT:   Anything else, Mr. Drake?

                    REDIRECT EXAMINATION

BY MR. DRAKE:

Q.   We were looking at the FBI report, the 302, the log of the pole camera and the screenshots, Exhibit 19.   That's electronic surveillance, is it not, evidence of electronic surveillance?

A.   Let me take a look, please.

THE COURT:  I think the question is:  Is the pole camera's footage electronic surveillance?

THE WITNESS:  Yes.

BY MR. DRAKE:

Q.   And that would logically go in the electronic surveillance subfolder?

MR. KOEHLER:  Asked and answered, Your Honor.

THE COURT:  Sustained.

MR. DRAKE:  Nothing further.

THE COURT:  May this witness be excused, Mr. Drake?

MR. DRAKE:  No objection.

THE COURT:  Mr. Koehler?

MR. KOEHLER:  No objection, Your Honor.

THE COURT:  Special Agent Milnor, thank you.  You may step down and you are excused as a witness.

Does the defense have any other witnesses?

MR. MAYNARD:  Mr. Koehler.

THE COURT:  I had previously said that you would have to show good cause before you could call Mr. Koehler.  So tell me what it is that you need from Mr. Koehler that you have not been able to elicit from other witnesses.

MR. MAYNARD:  Exhibit Number --

THE COURT:  Please do it at a microphone.

MR. MAYNARD:  Exhibit Number 12, which is the 302s,

it's a compilation of 302s dealing with the --

THE COURT:  Physical surveillance.

MR. MAYNARD:  Pardon me?

THE COURT:  Physical surveillance.

MR. MAYNARD:  Yes, Your Honor.  We have not been able to establish when the prosecution got that and where they got it from.  I asked several agents, where did this come from?

THE COURT:  What difference does it make?

MR. MAYNARD:  Well, I believe that this came out of somebody doing the investigation of the pole camera, and then they went back and found these documents.  We never got these documents during discovery.  And they become important to us because it shows that there were numerous individuals who testified in the Kareem case, that Kareem spent lots of time over at Simpson's apartment.  These documents show us that from March through April, or through the 1st of May, that there was surveillance by the FBI.

THE COURT:  But what difference does it make when Mr. Koehler got these when he didn't get them until long after this trial was over?

MR. MAYNARD:  Well, I'm not sure exactly when he got them and I'm not sure where he got them from.  They certainly weren't produced to us.  That's the only reason to ask him.

THE COURT:  I think didn't you just get it recently?

MR. MAYNARD:  Yes.

THE COURT:  Right.  And I think we had testimony about how it came about that these were located and when they were located.  And the answer was long after this trial was over.

MR. MAYNARD:  That's all I know.

THE COURT:  So I don't really see what you are going to get from -- if Mr. Koehler says, yes, I believe what Special Agent Mullen said is exactly what happened.  He did a search and he gave us this stuff within the past few months.  Where does that add anything that I don't already know?

MR. MAYNARD:  I just don't know when he got them, who he got them from.

THE COURT:  What difference does it make when the answer is long after the trial was over?

MR. MAYNARD:  Fine, Your Honor.

THE COURT:  Okay.  Thank you.  So do you have any other evidence to present?

MR. MAYNARD:  Yes.  We have a copy of the external drive.  This has the footage that was provided to us by the government for the observation from the pole cameras from May 1st through May 4th of 2015.  Mr. Koehler and I have talked about this.  He has some concern about us putting it into evidence because he believes that it may show the SWAT team or certain FBI agents.

THE COURT:  Does it?

MR. MAYNARD:  I don't think so, Judge.  I have looked

10-16-19-CR 15-707-USA v Kareem-Evidentiary Hearing-Day 2

at it several times.

THE COURT:  What we now know for sure, that the camera was not turned off until after the search warrant was executed. Whether it shows anyone that can be identified would be something known to you and Mr. Koehler and not to me.

MR. MAYNARD:  Yes.  I have looked at it.  I don't believe it does.  But if Mr. Koehler wants us or wants to give us a redacted version that knocks out sometime in May 4th all of May 4th --

THE COURT:  What about all of May 2nd and 3rd?  I don't -- isn't the only thing that's significant May 1?

MR. MAYNARD:  May 3rd is also significant.  There is the observation of Stewart.  They have it down as Stewart Soofi.

THE COURT:  I don't know anyone by that name.

MR. MAYNARD:  They testified it is Stewart Sampson that actually came in.  But other than that --

THE COURT:  But --

MR. MAYNARD:  It confirms his testimony that he did go over there that day.

THE COURT:  But what difference does that make to this motion for new trial?

MR. MAYNARD:  It doesn't.

THE COURT:  That's right.  It doesn't make any difference.

UNITED STATES DISTRICT COURT

10-16-19-CR 15-707-USA v Kareem-Evidentiary Hearing-Day 2

So I -- if there is a concern about the possible identification of individuals who work for the FBI why can't I just admit May 1?  I mean, I don't know how you get it to just be May 1.  So is that an actual hard drive as opposed to some kind of a disk that I can plug into my computer?  How do you watch it?

MR. MAYNARD:  We transferred it to something else to watch.  I couldn't watch this either.

THE COURT:  Then I don't see why you are putting it in evidence if it can't be viewed, seriously.  The value of the evidence is that it can be viewed.  And if it can't be viewed by me or by a reviewing court, then it's not -- it shouldn't be admitted unless it's admitted in a form in which it can be viewed.

MR. MAYNARD:  I can't do that, but I could give it to the Court in the manner that the government gave it to me.

THE COURT:  That's not what's important.  If you want to admit something in evidence it has to be able to be seen.  And the way the government produces things, doesn't always translate into being able to be viewed as admitted exhibits.  And you transform them into a different format all the time, like these screenshots which are the thing that I consider to be the evidence that I am most likely to look at.

So seriously --

MR. MAYNARD:  We do have another form.

UNITED STATES DISTRICT COURT

MR. DRAKE:  What happened, Your Honor, we got it in an actual physical hard drive that you would have to plug into a tower computer or some sort of desktop configuration but with slots and all those things in the back.  We couldn't access that.  So I went out and bought a hard drive, commercially available, gave it to the government.  They copied everything onto this hard drive.  It connects to a computer by USB and is readily viewable through a computer by clicking on the USB and then opening it up.

THE COURT:  Great.  But it's May 1 through 4?

MR. DRAKE:  It is.

THE COURT:  And is there anything relevant beyond May 1 to the motion for new trial?

MR. DRAKE:  I guess not.

THE COURT:  Then I will be happy to admit a viewable copy of the footage from May 1.  But there's just no reason to potentially jeopardize the identity of anyone who is not connected with the case or who is employed by the FBI that might be seen on the video beginning on May 3rd.  And nobody said there's anything significant on May 2, so I don't know why the record should be burdened by that.

MR. DRAKE:  Well, presumably, we could take this back, alter it in some fashion by deleting some of these files, I believe, or doing a clip of it in some fashion to create something that pertains only to the May 1's portion.

THE COURT:  And I think that's perfectly admissible in evidence, but I wanted to remind you again of what I said yesterday, which is, it is not up to me to discern what is important or not important on approximately, I don't know, 18 hours of a camera, almost the whole time fixed on one place. It is up to the parties to direct the Court to anything that is significant on that footage.  And as of this moment, the only thing that I have been pointed to that is of any significance is Exhibit 19.

MR. MAYNARD:  Your Honor, I would request then that we have -- you give us a couple of days to create a disk or something that is watchable from the beginning of the camera through May 1st and a log that shows what we think is important besides the log that you already have.  And I can deal with the U.S. Attorney's Office and see -- show it to them so that we can try to get a stipulation or agreement on it.

THE COURT:  That sounds like a good solution.

MR. MAYNARD:  Okay.  Then can I have until next week to do that?

THE COURT:  Sure.

MR. MAYNARD:  Thank you.

THE COURT:  Is that all the evidence, then, that you wish to present?

MR. MAYNARD:  Yes.

THE COURT:  Does the government have any additional

UNITED STATES DISTRICT COURT

evidence?

MR. KOEHLER:  No, Your Honor.

THE COURT:  So are you going to be agreeable to this admission of just May 1 and then you can look at this log, and if you don't like the log or you think things should be added or deleted, you can file something that says that whatever they think they saw isn't really there, something they didn't see is there.  I strongly suspect that Exhibit 19 is going to be the best thing that we have.  But you may see something else.

MR. MAYNARD:  Judge, candidly, I have looked at this video a number of times, fast forwarded.  You are right.  Those pictures that are on Exhibit 19 are about as good as you are going to get of anything.  But I do think in abundance of caution I need to put the video or some portion of it into the record.  So that's why I'm asking.

I would like --

THE COURT:  So I didn't get an answer from Mr. Koehler.

MR. MAYNARD:  I'm sorry.

MR. KOEHLER:  Your Honor, yes, we will work with the defense to figure out a way to export a portion of the video covering May 1 so that the Court has a video available to review and a reviewing court would have video available to review.

THE COURT:  And you agree to the admission of that

portion?

MR. KOEHLER:  Yes.

THE COURT:  Thank you.

MR. MAYNARD:  Your Honor, one more thing.  Because of the testimony that's come up, we think we need to call agent Andrew Smith, and I will explain why.

Agent Smith was aware of the video camera being put in.  It's our belief, and we got testimony for the first time yesterday from Agent Fryberger that there was the undercover agent that was disclosed sometime after the trial who was involved in the Hendricks investigation apparently sent an e-mail to Ms. Fryberger, Agent Smith, and Agent Nolen on April 30th, saying I have had -- I'm involved in two investigations and we have come to the conclusion that Juba is Simpson.

THE COURT:  I think we have already come to that conclusion, too.

MR. MAYNARD:  Pardon me?

THE COURT:  We all have all come to that conclusion ourselves.

MR. MAYNARD:  Yes.  But apparently Agent Smith then responded, according to Agent Fryberger yesterday, she said she had no reason to doubt that she got the e-mail and she thought that Agent Smith was the one who responded back.

That becomes important because it would appear to us that at that point they were concerned about Simpson a week

earlier and surveilled him for 24 hours straight about the Pat Tillman run.  Now, on the 30th of April, there is reason to think that Simpson may have some interest in Garland, Texas, or may be involved.  We don't know exactly what the undercover agent said to Smith other than we think that Juba is Simpson. We don't know what Smith sent back to him because we haven't ever seen those e-mails.

What then happens is the camera goes into operation on May 1st.  Nobody seems to be looking at it on May 1st, May 2nd, or on May 3rd.

THE COURT:  Well, they start looking at it on the night of May 3rd.

MR. MAYNARD:  On the night of May 3rd, after the incident occurs.

Then what happens, according to an affidavit or a declaration that the government gave you in their response to defendant's supplemental motion for new trial, they have provided an affidavit from Weldon Harrison Hegwood, which is Exhibit 5 to that response that they filed.  The declaration says that approximately --

THE COURT:  You will have to remind me who that person is, because his name doesn't ring a bell.

MR. MAYNARD:  He is an FBI agent that was in Dallas, Texas, on May 3rd and was monitoring the Garland or the Muhammad drawing contest.  And according to the declaration, at

03:23PM

03:23PM

03:23PM

03:24PM

03:24PM

12:00 on May 3rd, he received information from the Dallas FBI that an undercover FBI Special Agent, which we believe is the UCE that we have talked about, was traveling to the event in support of the investigation of Hendricks.  My understanding from my conversation with the Dallas Special Agent was that Hendricks informed the UCI he may encounter a brother from Arizona at the event.  So the UCI had no further information.

Upon learning of the brother from Arizona, I asked FBI and Dallas intelligence analyst, also present at the command center, to contact the FBI in Phoenix division to attempt to ascertain the likely identity of the brother from Arizona who we now believe and know is Simpson.

According to the Dallas FBI division, this may have referenced the FBI Phoenix subject Elton Simpson.  FBI Phoenix further advised that Elton Simpson's vehicle remained parked at the apartment complex and they did not think Simpson would travel to the event.  Now, this was all done on May 3rd.

THE COURT:  After -- so this relates to the questions about whether there was surveillance by a person --

MR. MAYNARD:  Yes.

THE COURT:  -- on May 3rd.

MR. MAYNARD:  The reason we were asking that is obviously somebody drove out there on May 3rd and looked to see if Simpson was there or his car was there.

THE COURT:  Because we can't see his car from the pole

UNITED STATES DISTRICT COURT

camera.

MR. MAYNARD:  That's right.  But if you had looked at the pole camera you would have seen that Simpson and Soofi had left on May 1st.

THE COURT:  Right.

MR. MAYNARD:  But what they did --

THE COURT:  But Simpson's car is still there.

MR. MAYNARD:  That's right.  But Soofi's is gone, and the observations that have taken place over the prior six or eight weeks indicated Soofi and Simpson drive together all the time.

Now, what happens is Dallas is asking Phoenix FBI, can you confirm or do you think it's possible that Simpson is the brother from Arizona that the undercover agent is.  If somebody had gone to the FBI office and had looked at the computer screen they would have seen that Simpson and Soofi left the evening of October 1st.  But what they did --

THE COURT:  You said October 1st.  Let me correct the record.  May 1st.

MR. MAYNARD:  May.  I'm sorry.  May 1st.

What they did was they went out to the apartment complex and looked and somebody saw Simpson's car.  We believe that that's Smith based upon the testimony of Whitson yesterday because Whitson said at some point, either on May 3rd, May 4th, or May 5th, he heard Smith say as he was walking by that he had

done a spot check and had seen Simpson's car and had not thought that Simpson would have gone to Dallas.

THE COURT:  Okay.  So what does that have to do with the disclosure or lack of disclosure of the pole camera?

MR. MAYNARD:  Goes to motivation as to why they didn't disclose.  I mean, if I'm Smith and I'm in charge, I'm the case agent following Simpson.  And Simpson has been perceived as a threat in the public that has caused all of us to spend 16 agents watching him a week earlier.  And I have been asked now, is he in Phoenix.  And I could have determined it by going and looking at the pole camera video, or he hops in his car and just drives over because he doesn't want to drive all the way up to north Phoenix to look and he sees the car.  So he contacts him back and says, no, his car is still here.  We don't think he's going to be a problem.  That's sort of an uh-oh moment.

And I think it gave Smith motivation to sort of hide that issue.  He's not going to -- I mean, it's just strange that Whitson wouldn't know about it.  It's just the motivation is I screwed up.

THE COURT:  Nobody -- how is it hidden?  It's all in the file if somebody looked in the right place.

MR. MAYNARD:  I'm sorry, Judge?

THE COURT:  The existence of the pole camera is in the Simpson file.  If you looked at -- I mean, the 302 that is

Exhibit 19 is in the file.  The ELSUR documents are in the file.  The import form apparently is in a classified part of the file.  It's all in the file so I don't -- you are talking about Smith not mentioning it?

MR. MAYNARD:  Yeah.  And again, this goes to motive.  I mean, do I think Whitson should have found it?  Of course.  It should have been found.

THE COURT:  Motive.  What motive?  There was no case against Mr. Kareem at that time.

MR. MAYNARD:  Motive to hide the observation that he had missed, that this terrorist was traveling and that people from FBI had contacted him from Dallas and said jeez, do you think it could be him?  Had he gone to the office and looked at the computers he could have said, yeah.  Jeez.  They might send them the information on Soofi's car because Soofi's car is not there.

THE COURT:  I guess I just don't relate this to our case and the alleged deliberate failure to disclose *Brady* material.  Smith not mentioning at the time that he's inquiring about this Dallas information, Smith not mentioning it before the search warrant was executed, I don't see how that relates to this case.  This case.  I mean, Mr. Kareem doesn't even come in to the picture until, is it, May 5th?  May 7th?

MR. MAYNARD:  May 8th.

THE COURT:  May 9th?

10-16-19-CR 15-707-USA v Kareem-Evidentiary Hearing-Day 2

MR. MAYNARD:  7th, 8th.

THE COURT:  One of those dates.

And nobody -- I mean, there's no evidence that someone changed the file, suppressed information in the file, didn't put something in the file.  It's all in the file.

MR. MAYNARD:  Well, maybe I have missed something.  I don't know how clear it is where it was in the file.  I mean, it's certainly clear that if you Google searched it you should have found it.  It's certainly clear in the testimony of Agent Whitson if he had reviewed the files as he told us he did methodically going through it he should have found it.  But my point being is I think Agent Smith could have deep-sixed it somewhere in the file.  He sticks it in there but I'm not sure if it's under the electronic surveillance.

THE COURT:  But you questioned Special Agent Mullen and Baker, and they both explained how they found it once they knew to look for it.  Apparently wasn't that hard once they knew to look for it.

MR. MAYNARD:  Well, that's the reason --

THE COURT:  They didn't say, gosh, somebody filed this in the Grand Jury subpoena section that nobody gets access to.  There's nothing in this record that would suggest any irregularity in how these records were kept and maintained.  And once somebody knew to look, there it was.

MR. MAYNARD:  But I don't think either Agent Baker or

10-16-19-CR 15-707-USA v Kareem-Evidentiary Hearing-Day 2

Agent Mullen said I found it in the electronic surveillance section.  I thought they said they found it in the main file.

THE COURT:  Well, they found Michael Gallante's 302 there.

MR. MAYNARD:  In the main file.

THE COURT:  Right.

MR. MAYNARD:  But I don't know where they found the other stuff.

THE COURT:  Well, that's not something to ask Smith. He's not the one that went looking.  He didn't have anything to do with the prosecution of this case.

MR. MAYNARD:  But we don't know.

THE COURT:  So the answer is no.  We're not going to continue the hearing for some speculation about Smith's motivations in not mentioning the pole camera in the presence of Special Agent Whitson at the time they are planning the search warrant.

MR. MAYNARD:  Well, and also his boss today testified --

THE COURT:  That was my decision.  We're not going to delay, continue the hearing to question Special Agent Smith.

MR. MAYNARD:  Thank you.

THE COURT:  Does anyone have anything else to present?

MR. MAYNARD:  No, Your Honor.  Not from the defense at this time other than the video we talked about.

THE COURT:  Did you want to make a closing argument with respect to this evidence?

MR. MAYNARD:  I would prefer to have a day to put my thoughts together about what's been presented.

THE COURT:  Okay.

MR. MAYNARD:  If that's okay.

THE COURT:  Well, that's always preferable to me rather than people doing it off the cuff.  But I'm also cognizant, I mean, we would have to do it soon because Mr. Kareem is in a -- I'm assuming that the current circumstances under which he's being held is one that he would like to have ended as soon as possible.

MR. MAYNARD:  Be happy to do it tomorrow if the Court has time, later this week, either tomorrow or the next day.

MR. DRAKE:  Your Honor.

THE COURT:  Yes, Mr. Drake.

MR. DRAKE:  I just asked Mr. Kareem if he would be willing to, given weight and the circumstances he's under, to give adequate time to present this to the Court, in other words, longer than a day.

THE COURT:  And he said yes?

THE DEFENDANT:  Yes.

THE COURT:  Okay.

MR. KOEHLER:  Your Honor, we're ready now.  I will tell the Court tomorrow I have a medical appointment in the

afternoon and Friday I have one in the morning.  And in addition to that, I have some matters with my son tomorrow afternoon after the medical appointment that would keep me away from work.

THE COURT:  What did you say about Friday morning?

MR. KOEHLER:  I have a medical appointment Friday morning as well.

THE COURT:  So I think -- am I open -- I know I had an appointment but it's gone.  What about Friday morning?

MR. KOEHLER:  That's when I have the medical.

THE COURT:  I'm sorry.  You just said that.

What about tomorrow morning, 10-ish, 10:30?

MR. KOEHLER:  As long as we're done before 1.

THE COURT:  Don't worry about that.  Is that enough time for you, Mr. Maynard?

MR. MAYNARD:  Yes, Your Honor.

THE COURT:  Because Friday afternoon just is not usually when lawyers are at their best when it comes to argument.  We could do it Friday afternoon.  But, I mean, that would be the other alternatives because you said you have an appointment Friday morning.

MR. KOEHLER:  Correct.

THE COURT:  So your two choices would be tomorrow at 10:30 or Friday afternoon.

MR. KOEHLER:  Tomorrow at 10:30 should be fine, Your

—————10-16-19-CR 15-707-USA v Kareem-Evidentiary Hearing-Day 2—————

Honor.

MR. MAYNARD:  We would like Friday afternoon.

THE COURT:  Does that work for you, Mr. Koehler, Friday afternoon, 1:30-ish?  2?

MR. KOEHLER:  That is just fine, Your Honor.

THE COURT:  Preference?  Earlier?  Later?  I know -- I mean because you have -- you are the one that has the appointment.

MR. KOEHLER:  The appointment is at 9:15.  I don't anticipate it would go past 11.  So 1:30 is just fine.

THE COURT:  Let's do Friday at 1:30.

MR. MAYNARD:  Thank you, Your Honor.

THE COURT:  Okay.

All right.  I will see you Friday at 1:30.

Court is in recess.

(Proceeding concluded at 3:38 p.m.)

C E R T I F I C A T E

I, LAURIE A. ADAMS, do hereby certify that I am duly appointed and qualified to act as Official Court Reporter for the United States District Court for the District of Arizona.

I FURTHER CERTIFY that the foregoing pages constitute a full, true, and accurate transcript of all of that portion of the proceedings contained herein, had in the above-entitled cause on the date specified therein, and that said transcript was prepared under my direction and control.

DATED at Phoenix, Arizona, this 16th day of December, 2019.

s/Laurie A. Adams
_____
Laurie A. Adams, RMR, CRR