UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

_____

| | | |
|---|---|---|
| United States of America, | ) | |
| | ) | No. CR 15-0707-PHX-SRB |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Phoenix, Arizona |
| | ) | October 18, 2019 |
| Abdul Malik Abdul Kareem, | ) | 1:32 p.m. |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

BEFORE:   THE HONORABLE SUSAN R. BOLTON, JUDGE

REPORTER'S TRANSCRIPT OF PROCEEDINGS

*(Evidentiary Hearing-Day 3)*
*(Pages 294 through 344, inclusive.)*

Official Court Reporter:
Laurie A. Adams, RMR, CRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc 43
Phoenix, Arizona 85003-2151
(602) 322-7256

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

APPEARANCES:

For the Plaintiff:
          U.S. ATTORNEY'S OFFICE
          By:  Joseph E. Koehler, Esq.
          By:  Kristen Brook, Esq.
          40 North Central Avenue, Suite 1800
          Phoenix, Arizona 85004

For the Defendant:
          MAYNARD CRONIN ERICKSON CURRAN & REITER, P.L.C.
          By: Daniel D. Maynard, Esq.
          3200 North Central Avenue
          Suite 1800
          Phoenix, Arizona 85012

          DRAKE LAW PLC
          By:  Daniel D. Drake, Esq.
          4340 East Indian School Road
          Suite 21-113
          Phoenix, Arizona 85012

I N D E X

| WITNESS: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| GLENN MILNOR | | | | |
| By Mr. Drake | 297 | | | |
| By Mr. Koehler | | 307 | | |

| CLOSING ARGUMENT | PAGE |
|---|---|
| By Mr. Maynard | 308 |
| By Mr. Koehler | 325 |
| By Mr. Maynard | 337 |

INDEX OF EXHIBITS

| EXHIBIT | | IDENT | RECEIVED |
|---|---|---|---|
| 187 | Supplemental Discovery | 296 | 297 |

UNITED STATES DISTRICT COURT

P R O C E E D I N G S

THE COURT:  The record will show the presence of counsel and the defendant.

Mr. Maynard you may proceed.

MR. MAYNARD:  Oh, no.                                          01:32PM

THE COURT:  You are not making the closing argument?

MR. MAYNARD:  Yes, I am, but I thought the government had something they wanted to --

THE COURT:  Oh.

MR. KOEHLER:  Your Honor, this morning we disclosed     01:33PM
three reports to the defense.  One of them was written by Special Agent Mullen and serialized this morning.  The other two are reports that Special Agent Milnor had uploaded to Sentinel on May 8 of 2015.  One of the reports detailed surveillance on May 2nd, 2015; the other one detailed, at least    01:33PM
purportedly detailed, surveillance on the 3rd.  Agent Mullen interviewed Agent Milnor who said the May 3rd report was not accurate; that he did not perform any surveillance on May 3rd.

So we disclosed that information to the defense.  They have it marked as an exhibit.  I'm happy to proffer their     01:33PM
exhibit to the Court and have the Court view it and determine whether you wish to hear additional testimony from Mr. Milnor.

THE COURT:  What number is it?

MR. KOEHLER:  Exhibit 187.

MR. DRAKE:  That's correct, Your Honor.                  01:34PM

MR. KOEHLER:  And we'll stipulate to the admission of 187 for the Court to review, and then if you want to hear further from Agent Milnor we have him here in the courtroom and available.

THE COURT:  All right.  I have read through 187 and without objection it is admitted.

MR. DRAKE:  I'd like to recall Agent Milnor for a few brief questions regarding Exhibit 187, Your Honor.

THE COURT:  That would be fine.

You may proceed, Mr. Drake.

MR. DRAKE:  Thank you.

GLENN MILNOR,

a witness herein, having been previously duly sworn by the clerk to speak the truth and nothing but the truth, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. DRAKE:

Q.  Supervisor Agent Milnor, let's turn to the 302 that you generated on or about May 2 of 2015.  I believe that's towards the back.  It is the next to the last document in this packet, Exhibit 187.

THE COURT:  Could we rephrase the question to -- you said he generated it on that date.  But it appears that the report itself was generated on 5/8, so even though the activity that's documented may have occurred on May 2.

UNITED STATES DISTRICT COURT

MR. DRAKE:  Well, and that's what I want to talk to Agent Milnor about.

BY MR. DRAKE:

Q.  We have heard, or read in this document elsewhere, there is something called a created date?

A.  Correct.

Q.  Where is that on this form?

A.  It's on the bottom.  It will list the day that you actually wrote the document.

THE COURT:  Are you referring to date drafted?

THE WITNESS:  Date drafted.  So it would be the 7th of May.

THE COURT:  Is that what --

THE WITNESS:  That would be the date that it was drafted, it was written, yes.  Correct.

BY MR. DRAKE:

Q.  Okay.  And the other date is the investigation.  That's the one that the investigation is on?

A.  That's correct, at the top of the page.  May 2nd.  Yes.

Q.  Okay.  And then there is a third date on here called date of entry in the upper right-hand corner.

A.  Correct.

Q.  What does that reflect?

A.  That's when it was uploaded.  That was serialized to the case in Sentinel.

01:41PM
01:41PM
01:41PM
01:41PM
01:42PM

UNITED STATES DISTRICT COURT

Q.   And there's also something about a date when the document was signed.  There's a reference in the preceding text to that. Is there any place on here you can tell when the document was signed?

A.   No.                                                          01:42PM

Q.   With respect to this document, that is to say, the one that pertains to investigation on May 2, it shows you out there at the ungodly hour of 11:16 p.m.?

A.   Correct.

Q.   That's accurate?                                             01:42PM

A.   That is accurate.

Q.   And I understand from the earlier proceedings, that is to say, the earlier materials in this exhibit, that this 302 went into the main case file.  Is that correct?

A.   That is correct.                                            01:43PM

Q.   And is that because there was no reference down here on the bottom under file number to FISUR?

A.   Can you repeat the question?

Q.   Sure.  Let me go at it this way.

A.   Uh-huh.                                                     01:43PM

Q.   What I have got on the screen now is a page that shows investigation on 3-10-2015.  It is the first page of Exhibit 12 and shows it was prepared by Jeffrey Hebert.

A.   Uh-huh.

Q.   Following the file numbers, there is a FISUR.            01:44PM

A.   Yes.

Q.   Correct?

A.   Correct.

Q.   Is that -- would that -- what would show that this particular matter was placed into the FISUR subfolder with respect to the Simpson case?                                    01:44PM

A.   Yes.  And in your particular exhibit it shows that it was placed both in the main file and then in the physical surveillance subfolder.

Q.   Okay.  And that happened several more times with some of    01:44PM the documents we may have looked at yesterday with respect to the surveillance conducted between March 10 and April 27.  Is that correct?

A.   I can't speak for each of the documents that you are referring to, but it would make sense it was both put into the    01:45PM main file and then the FISUR subfile.

Q.   What I have on the screen now is the page from Exhibit 12 regarding the investigation on April 25 by Special Agent Hebert.  It's got the FISUR on it?

A.   Uh-huh.                                                      01:45PM

Q.   So this went only into the FISUR file?

A.   Correct.

Q.   FISUR means physical surveillance?

A.   Yes.

     THE COURT:  Even though it's F instead of PH?               01:45PM

UNITED STATES DISTRICT COURT

THE WITNESS:  Yes, ma'am.

BY MR. DRAKE:

Q.   And if I understand correctly, let's turn to the second page which is the -- I say the second page of Exhibit -- sorry. Let's turn to the last page of Exhibit 187.

A.   Uh-huh.

Q.   Which is the investigation on May 3?

A.   Yes.

Q.   2015?

A.   Yes.

Q.   That's the one that you believed to be inaccurate?

A.   Yes.

Q.   And that's -- can you explain why you believe it could be inaccurate?

A.   Looking at this document, this is an incomplete document. The times are wrong.  The data is incorrect.  There's a lot of information that seems to be copied.  Basically what happened is that my conclusion, after reading this report, is that it was user error on my part.  You can -- I was drafting a document, the document that I was out on the scene of the apartment after the shooting.  I was going to document that we went out there, and I drafted a document.  And you can, in Sentinel, you can do a save as, a save as draft mode.  And I believe in this instance I didn't hit the save as draft.  I hit the save button and it got uploaded.

This document is not complete.  I did not conduct surveillance on the apartment complex of Mr. Simpson and Mr. Soofi on that day.  The first time I went out to that apartment complex on this date is after the shooting.  We went there to secure the scene waiting for the search warrant to be signed.

THE COURT:  Do you remember about what time you went out there?  Because I believe the evidence is that the shooting occurred on or about 5 p.m. Arizona time.

THE WITNESS:  It was -- I remember talking on the phone around 6:00 that evening, so it was after 6:00 p.m. when I went out to the apartment complex.  Once again, this was a draft form that should have never been uploaded.  It was not completed and I assumed it was in the save as.  We determined later on this kind of a document was not needed because we did receive the search warrant.  So we were just going to document that we secured the facility, and all the documentation on our actions at the scene would have been done when we were talking about the search warrant and serving the search warrant.  So this was not needed.

THE COURT:  You say this was not needed, but what do you, based on your best recollection and your experience, what were you documenting in what you had planned to have as a draft?

THE WITNESS:  What my recollection of this draft is that we were going to document that we were -- we were going

out on scene, that the team showed up on scene.  We were just going to document our actions, investigative actions leading up to everything.  It was not deemed necessary so I thought this was in the draft folder.  I never went back to fix it but somehow it did get uploaded into the file.  It should never have.  It was a not-needed document.  I was just trying to make sure we were covering everything and being thorough.

THE COURT:  When I read it, it follows the exact same format as the preceding page, and it made me wonder whether you might have done -- have driven by twice on May 2nd.

THE WITNESS:  No.

THE COURT:  Do you have present recollection of going out there at 11:16 p.m. on May 2nd and observing the vehicle?

THE WITNESS:  I do.

THE COURT:  Do you have any recollection of ever, before you learned of the attack at the contest in Garland, ever doing any other of the surveillance at the apartment complex?

THE WITNESS:  Yes, I do.  We did it the evening -- the weekend the evening before the Pat Tillman run.

THE COURT:  And you were part of the surveillance?

THE WITNESS:  I was part.  I was on the midnight shift that night, so yes.

THE COURT:  Please continue, Mr. Drake.

BY MR. DRAKE:

Q.  And what was it that prompted you to go out there on May 2nd?

A.  That evening I received a telephone call from a supervisor in the Los Angeles field office of the FBI, and they had received some information.  They weren't sure what they had, but they received some information that they wanted to pass on to us and that could have indicated that Mr. Simpson was discussing his thoughts and was -- they weren't sure if he was going to participate in something or if he was going to -- what exactly he was doing.

So they could not tell me specifically that he was going to be involved in anything, so I decided that evening after receiving the phone call, I talked to the case agent, Special Agent Andrew Smith, and then I decided to do a spot check to see if I could see Mr. Simpson's vehicle.

Q.  All right.  Can you give me the name of the agent that contacted you?

A.  Los Angeles agent.  I do not recall at this time but I can get that for you.  I don't know his name.

Q.  Let me show you -- may you be shown Exhibits 131 and 132.

MR. KOEHLER:  Your Honor, before we go to those exhibits, the government objects to this as being beyond the scope of the hearing.

THE COURT:  Well, I haven't turned my book back to find out what these two exhibits are.  Why don't you go ahead

and ask your question, and I will rule on the objection.

BY MR. DRAKE:

Q.   On Exhibit 131, do you recognize any of the names there as the individual that called you from the Los Angeles field office that day of the 2nd of May?

THE COURT:   I will allow this question and answer.

THE WITNESS:   I recognize some of the names.  I could not tell you specifically if it was one of them that called me.

BY MR. DRAKE:

Q.   Okay.  Take a look please at Exhibit 132.  I direct you to the second -- what appears to be a second message on here, part of a message string that includes as a to, Thomas M. Ford and 25 other people.

A.   Yes.

Q.   Was one of those individuals, does that refresh your recollection if one of those individuals was the agent that called you from Los Angeles on May 2nd?

A.   I don't want to guess, so I'm not going to answer yes at this time.

MR. DRAKE:   Fair enough.  We don't want you to guess.

BY MR. DRAKE:

Q.   When you went out on May 2nd at 11:16 p.m. and saw Simpson's car but not Soofi's, did you relay that information then back to the agent that had contacted you in Los Angeles?

A.   I did not, no.  And the reason being is that we were

UNITED STATES DISTRICT COURT

basically spotting for Mr. Simpson's vehicle, and it was not, according to other surveillance, it was not uncommon for Mr. Soofi's vehicle not to be there.  So it did not seem out of the ordinary.  We were mainly spotting for Mr. Simpson's vehicle.

Q.  Did you communicate that information that Mr. Soofi's vehicle was not there on May 2nd?  Did you communicate that to anyone else?

A.  Not at that time of night.  Not that evening, no.

Q.  The next day, May 3rd?

A.  Well, when I talked to Special Agent Andrew Smith, I did relay to him that I had been out there the night before and I relayed what I saw.

        THE COURT:  Was that after the attack?

        THE WITNESS:  Yes.

BY MR. DRAKE:

Q.  Was there a reason you didn't look at the pole camera instead of going out to the scene to see if the vehicle was there?

A.  I didn't have access to the pole camera at my home, and it was just as quick and easy to just do a drive-by.

        THE COURT:  I thought the pole camera didn't show the vehicles.

        MR. DRAKE:  It may not have.  I believe it did not show the parking facility.

BY MR. DRAKE:

Q.   But you were aware that Mr. Simpson was known to ride in Mr. Soofi's vehicle?

A.   Did I know at the time?

MR. KOEHLER:  Objection.  This is beyond the scope, Your Honor.

THE COURT:  Sustained.

MR. DRAKE:  May I have a moment?

THE COURT:  Yes.

MR. DRAKE:  I have nothing further, Your Honor.

THE COURT:  Did you wish to ask any additional questions, Mr. Koehler?

MR. KOEHLER:  Just briefly, Your Honor.

CROSS-EXAMINATION

BY MR. KOEHLER:

Q.   Is the FISUR subfolder in the Simpson file available to anybody with access to that file?

A.   Yes.

Q.   Is the main case file likewise available to anyone with access to that file?

A.   Yes.

Q.   Since the time of the attack, has anybody at the FBI, to your knowledge, ever suggested that the FBI needed to act to cover up the fact that there was surveillance prior to Simpson's attack in Garland, Texas?

A.   No.

UNITED STATES DISTRICT COURT

Q.  Has anybody ever suggested that somebody else needed to pay for that attack?

A.  No.

MR. KOEHLER:  Nothing further.

THE COURT:  Mr. Drake, anything else?                    01:57PM

MR. DRAKE:  No, Your Honor.

THE COURT:  Thank you, Special Agent Milnor.  You may step down and you may be excused as a witness.

THE WITNESS:  Thank you.

MR. MAYNARD:  Good afternoon, Your Honor.  The purpose    01:58PM
of the hearing was to learn the circumstances surrounding the application for the pole camera and the placement of the pole camera and to determine why the existence of the pole camera was not disclosed for at least three years after Mr. Kareem's trial.                                                         01:58PM

I'd like to just briefly go through a little bit of the background of what happened here.  We had filed, the defense had filed a motion for a new trial back in June of 2018.  And as part of that process, we had stayed the appeal that was going on.  And we had sent a letter to the government  01:58PM
on September 6th of 2018 seeking certain discovery.  One of the things that we were looking for was the information, the intel report that we had heard -- and there was reference to it in the Hendricks case that we had been looking at that was in Cleveland.                                                      01:59PM

The government, we know from the --

THE COURT:  This is the intel report you thought might have been the BOLO for Simpson in Texas?

MR. MAYNARD:  Yes, Your Honor.

THE COURT:  Although we haven't seen any evidence that there was any such Be on the Lookout bulletin.

MR. MAYNARD:  Right.  We still haven't seen it, don't know whether it existed.  But we do know there was an intel report that eventually was sent to the Dallas FBI on May 3rd. We do know from the evidence that we got at the hearing that on late November of 2018, the prosecutors in the case were sitting with Agent Baker and they are looking, I believe, at some sort of classified information.  And there's something in that classified information to lead them to believe that there was a pole camera out at Simpson's apartment.

We got a letter back from the government on January 24th of 2019 dealing or responding to our request for documents.  There's no mention in that letter anything about the pole camera even though the government obviously had known about it, or the prosecutors knew about it for at least two months at that point.

The first time that we learned that there is a pole camera at Simpson's is a communication Mr. Koehler has with Mr. Drake.  It's oral.  It's sometime in the middle of February of 2019.  And on March 15th we actually get a copy of the video

10-18-19 - CR 15-707 - USA v Kareem - Evidentiary Hearing - Day 3

from that pole camera.  The letter that accompanies that is Exhibit 2 of Docket Number 541.  We received some other information in that concerning Saabir Nurse and some other things.  We then, after reviewing the pole camera video a number of times, file a supplement to our motion for new trial on April 26, 2019.  And on May 15th the government files a response to that supplement.

And at that time, as part of the response to the supplement is attachments.  We get a number of new documents and information that we had never had before.  That's docket 550.  Exhibit Number 4 is some e-mails that went from Garland, Texas, to the FBI concerning what happened on May 3rd.  There's a declaration which is Exhibit Number 5, which is from a Special Agent Hegwood from Dallas who tells us that on May 3rd of 2015, the undercover agent contacted the FBI office in Dallas, told them that he may be encountering a brother from Arizona.

Dallas FBI office then contacts Arizona FBI office and advises them that there's some information that would lead them to believe that Mr. Simpson may be out in Garland.  Although we haven't seen any e-mails back from Phoenix, according to Agent Hegwood's declaration which is Exhibit 5 to Docket 550, the Phoenix FBI advises that Simpson's vehicle is still in the parking garage and they don't think that he will be traveling to Garland, Texas.  It's at that point that it appears that the

Phoenix office of the FBI sends the intel report which has Mr. Simpson's photograph and the license plate number on his car.

We also got at that time Exhibit Number 6 which was the 302 by Agent Mullen, who testified.  And that 302 talks about his reviewing of the application of the pole camera so that we knew at that point that they had applied for the pole camera on April 9th of 2015.

After receiving that information on June 4 of 2019, we filed and asked for an evidentiary hearing.  This Court then had a telephonic conference with us, advised us that the hearing would be limited to the circumstances surrounding the pole camera.

On August 14th we then sent a letter to the U.S. Attorney's Office telling them here's the witnesses we think we would like to call and here's some documents that we think should be out there, including we want information about when they put the pole camera up, why they put the pole camera up, how long it stayed up, things of that nature.  We had a number of -- couple of -- we had one conference personally, Mr. Drake and I did, with the prosecutors in the case and we had some telephonic communication with them concerning producing documents and witnesses for us.

The government then files a motion for clarification on August 29th.  Again, there's no mention at that time of surveillance that preceded the pole camera.  We didn't know

that the FBI had been surveilling Mr. Simpson from sometime in March up through apparently March 2nd.

THE COURT:  May.

MR. MAYNARD:  May 2nd, rather.

And the government filed a response to our motion to compel on October 2nd of 2019 which is Docket Number 604, which, again, doesn't mention any surveillance.  We had a telephone conference with you on October 3rd.  You advised us that we were not going to be able to expand this hearing and that it would be strictly limited to the pole camera as you had indicated earlier in August.

On that same day, and I think we got it right before the hearing but had not looked at it, there was a hearing memoranda that had been filed by the government.  And the hearing memoranda mentions for the very first time that there was surveillance that had been done on Mr. Simpson and that that there will be testimony about that from an Agent Fryberger and she'll discuss sporadic surveillance.  That hearing memoranda is 607.  First time we knew about it.  And it actually outlines that the surveillance had started, I believe, on March 10 and had gone through April 27th or 28th, according to that memo.

Four days later on October 7th, the government produced a letter to us that provided us with the prior surveillance information, the 302s.  We got the 302 that had

UNITED STATES DISTRICT COURT

10-18-19 - CR 15-707 - USA v Kareem - Evidentiary Hearing - Day 3

been done by the intern.  We got the log sheet.  We got the photos that had been taken down.  And we got a copy of the ELSUR document about the application for the pole camera and the logs from ELSUR.  So we got those eight days before this hearing.

Now, what did we learn at the hearing.  We learned that the pole camera, references to the pole camera is all over the Simpson file.  According to the testimony from the various agents, it's in the general file.  It's in a subfile that you would have found it in on electronic surveillance.  It should have been in the subfile, or there should be references at least to surveillance of Simpson and his apartment and his work that would have been in the subfile on FISUR which dealt with the personal surveillance -- or physical surveillance even though it begins with an F.

And the information involving the pole camera is numerous.  There's a memo from the intern.  There's a log sheet.  The government, I believe, brought out evidence that the log sheet and the photos were attached to that memo.  There's information involving the starting of the new investigation on Simpson on March 2nd of 2015, none of these things that we know about but we learned about them at the hearing.

Special Agent Fryberger testified at the hearing that she applied for the pole camera on the 9th and that it had to

be approved by Supervisor Agent Milnor and had to be approved by a field assistant chief division counsel, Matt Greenberg. There's another individual who worked at the FBI office, Serena Martinez, who would have known about it.  She testified, if I'm not mistaken, she had discussed this with Special Agent Smith who was in charge of the case agent, and the other case agent who was on it was Agent Nolen.

She also testified that she had conversations with two other special agents; one being the installer who would have been a special agent and the other one being the installer's supervisor.  That tells us that at least at the time that the pole camera went up there were at least eight people at the FBI's office who was aware of it.

Now, Agent Milnor testified on Wednesday that he believes that he discussed the pole camera with members of his squad.  If that were the case, that would give us five more agents.  And from looking at Exhibit 12, which is the surveillance 302s, that would have been Agents Hebert, Brown, Tobias, Jacobs, and Byrne.  We now have 13 agents, or 13 employees of the FBI that are working in the Phoenix office that know about this pole camera.

There were also seven officers who were working on the Joint Terrorist Task Force with that squad.  If those individuals knew about the pole camera, that takes our number up to 20.  And additionally, when the pole camera is taken down

we know that there's an intern, Michael Gallante, who reviews and makes a log of the pole camera.  And somebody enters it into the system, whether it's the intern, Mr. Gallante, or somebody else.

So there's at least 14 people who are working on it at that office, possibly 21, at a minimum who seem to know about this pole camera.  Agent Whitson was working on the Simpson case and is there the night of May 3rd.  And Agent Simpson did the first interview of Abdul Kareem on May 5th.  He wasn't a part of that particular squad, but there were only three squads and he officed near all of these people and he dealt with them and he talked to them.

It seems not only odd but just disingenuous that at some point, at some time in this investigation, that somebody didn't mention that pole camera being out there.  But what we do know is that Agent Whitson becomes in charge of the Kareem investigation on May 8th of 2015.  And what he tells us, and what he testified to, was that he thoroughly and methodically went through the Simpson file preparing to identify items for production in discovery.

Now, he testified that he did this himself and that he didn't have any help.  That, in itself, seems odd because the government wants to talk about how large this file is.  And he had access to other special agents that were out there.  He had access to other investigative agents that were out there.  And

10-18-19 - CR 15-707 - USA v Kareem - Evidentiary Hearing - Day 3

yet he testified that in going through it thoroughly and methodically, he never saw any reference to the pole camera, nor did he see any reference to the prior surveillance that had been done of Mr. Simpson from March of 2015 through May of 2015.  The Exhibit 12 to this hearing were the 302s on all of the surveillance that was done on Mr. Simpson from March until May.

Your Honor, the government, Mr. Baker, Special Agent Baker, testified that when the prosecutor saw something on the classified information that led them to believe that there may have been a pole camera out there, he did what he described as something similar to a Google search, and he was able to find within minutes the intern's 302 which then led him to the log which then led him to all of the photographs that had been put in there.  Either Agent Whitson didn't do what he said he did, or he did and he failed to disclose it.  I don't know which one it is.

What happens is Agent Baker makes a copy of the 302 activity log and the pictures, and I believe his testimony was that he gave that to the U.S. Attorney, the prosecutors, the end of November of 2018.  He then leaves, and I think it's December 11 of 2018 and takes another assignment, never does any further investigation, never looks for the actual pole camera.

At that point Agent Mullen comes into the case.  For

02:12PM
02:12PM
02:13PM
02:13PM
02:14PM

some reason, it seems to take until the end of January.  And I believe the testimony was that it was January 24th of 2019 that Agent Mullen then goes to the ELSUR department and requests a copy of the footage of the pole camera.  And I believe his testimony was that he can't recall if he got it that day or within a day or two of that but they did then turn it over to him.  Keeping in mind that Mr. Koehler is now sending us a letter on January 25th of 2019, the response to our discovery request, but he never mentions the pole camera and on January 24 is when I believe that Agent Mullen already knew that the pole camera tape actually existed.  Now, they had the pictures from it and they had the log in November.

The disclosure of the pole camera is important for a number of reasons, but it also led us to the surveillance information that we didn't know anything about until less than two weeks ago.  Judge, I'm not going to go through the requirements under *Brady* because I went back and looked at all the briefs and we have briefed that over and over again as to what is required.  And I will tell the Court that I believe that the standard on materiality is not set forth in *Brady* but there is -- there's a progeny after it that talks about materiality.

And *Kyles* provides a number of things that the Court needs to weigh in considering materiality.  It tells us that it's important to determine the witnesses that are involved,

10-18-19 - CR 15-707 - USA v Kareem - Evidentiary Hearing - Day 3

the significance of the evidence, and the strength of the prosecution's case.  Goes on to say that the Court should take into account the cumulative effect of suppressed evidence in light of other evidence, not merely the probative value of the suppressed evidence standing alone.

The question generally is phrased by both the U.S. Supreme Court and by the Ninth Circuit as to whether or not without this evidence did the defendant get a fair trial.  And in the Ninth Circuit, unfortunately I can't pronounce it, United States versus *Sedaghaty*, 728 F.3d 885, a 2013 case, says in evaluating materiality, we focus on whether withholding the evidence undermines our trust in the fairness of the trial and the resulting verdict.

And in *Comstock* at 796 Pacific 3.d 701, a 2015 Ninth Circuit case, it says that the information would be advantageous to the defendant or would tend to call the government's case in doubt.  It's considered to be favorable.

The issue really is materiality.  The government didn't disclose it.  We all know that.  We don't know why.  But we know that if the government, if this videotape had shown Kareem with Mr. Simpson and Mr. Soofi, I suggest to you the government would have used this as one of their primary pieces of evidence in the case.

But what does it show us and what does it not show us? What it does, and the reason it's material, is one, Mr. Kareem

took the stand and testified that he rarely went over to Mr. Simpson and Mr. Soofi's apartment.  The tape, and even more importantly, the 302s talking about the surveillance that the FBI did from March until May, supports Mr. Kareem's testimony that he was seldom at Simpson and Soofi's apartment.  You would think if he were the bank roller, the trainer, the promoter, he would have been there when he left.  But you would have thought that somebody in the FBI's office would have seen him there during that six- to seven-week period prior.  And the testimony was nobody saw him.  Nobody recognized him.

The fact of those -- that surveillance by the FBI and the fact that nobody recognized him and the fact that he's not on the pole camera also supports the testimony of Nathaniel Soofi who was Naadir Soofi's young son who got on the stand and testified that he was at his father's house almost every weekend and that he didn't ever see Abdul Kareem at his dad's house.

It also supports the testimony from the agent who went out there to the scene and took pictures of Mr. Abdul Kareem and took it to all of the people who lived in the apartment complex, and not one of them recognized Mr. Abdul Kareem as having been there.

And it contradicts and impeaches the testimony of Ali Soofi, who said that in the latter part of 2015 leading up to this attack that Mr. Kareem was out there three or four times a

UNITED STATES DISTRICT COURT

week and was often sleeping out there as many as three and four times a week.  It also contradicts the testimony of Stefan Verdugo, because Verdugo testified Simpson and Kareem would go out shooting on Fridays after religious ceremonies.  And Simpson was being surveilled by the FBI in both March and April, and some of those are on Fridays, and it doesn't show him having anything or any connection with Mr. Kareem.  So it brings his testimony into question.

And lastly and not as strongly, but does support our contention that the FBI had a bias in its investigation and its testimony in the way it handled witnesses.  And I point to Ali Soofi's testimony the first day he was interviewed the day after his brother had been killed, and he didn't realize that he was being taped, they ask him, who was in your apartment?  Who came over there?  Who were the associates?  He never once mentioned Mr. Kareem.  He did mention a Mr. Wahid.

But as the time went on and he was interviewed more often by agents, all of a sudden we have Mr. Kareem being over there all the time.  He's spending the night.  He's oiling and cleaning guns.  He's doing all kinds of things.  And I suggest to the Court that he was prompted to say that.  It's not consistent with what he said at first.

Why was it not disclosed?  And I think that becomes important.  It doesn't appear that the evidence was hidden in the file.  It was there for anybody to see if they looked at

02:20PM

02:20PM

02:20PM

02:21PM

02:21PM

it.  The testimony was that it was a simple Google search and within minutes Agent Baker found it.  And the testimony seems to be those documents would be in the general file.  Some of those 302s, based on what the testimony was today from Agent Milnor, some of those 302s could have been both in the general file and could have been in the physical surveillance file.

It is almost inconceivable that if an agent actually went out there and did what Agent Whitson said he did, a thorough and material meticulous investigation that he wouldn't have found some of these documents that then would have led him to the others.

It's important to note that the surveillance on Simpson -- Simpson was considered to be a threat.  Agent Milnor testifies about that.  The conduct of the FBI in April of 2015 is consistent with that.  They had, between agents for the FBI and the Joint Terrorist Task Force, there were 16 law enforcement officers in a period of time in April 24th and 25th, they were watching him 24 hours a day.  They were concerned that he was going to do something at the Pat Tillman run.  We don't know -- we still don't know why.  I haven't seen any information that tells us why they believed that.  We heard today for the first time that apparently on May 2nd, Agent Milnor got a call from somebody in LA that says that Simpson is a threat.

We also know based on Agent Fryberger's testimony that

on April 30, that the undercover agent had contacted, with an e-mail, her, Agent Smith, and Agent Nolen and told him that he had sort of connected the dots and thought that the person he had been dealing with was Simpson.  She testified that it was her understanding that Smith got back in contact with the undercover agent.  We don't have a copy of an e-mail that goes back.  We don't know what he said to him.  We don't know what happened.  But what we do know is that the videotape shows that on May 1st, in the late afternoon and early evening, that Simpson and Soofi come back from religious ceremonies.  They load up their car with packages.  Soofi is carrying a sidearm, and they leave and they are not there after about 9, 9:30 on May 1st.  If anybody had taken the trouble to go to the FBI office and look at it, that's what they would have seen.

Agent Milnor just told us that he got a call from Los Angeles FBI on May 2nd, and at 11:00 he drives out to see if Simpson's car is there.  Well, he knows, because he is a supervisor, that there is a video camera back in his office that would have shown whether Simpson was in his apartment or not.  And if they had monitored it, they would have seen that he had left on the evening of May 1st and had not returned that night, neither had Soofi, and he had not returned on May 2nd.  But it was easier to go to Simpson's apartment and look to see if a car is there versus driving down to the office.

Why was this not disclosed?  It either was not

disclosed because Whitson didn't do a very good job and he didn't do what he testified that he said he did; or he did find it and it was embarrassing to the FBI to know that they could have possibly stopped this earlier.  They now have Dallas FBI asking them questions about Simpson.  They've now got Los Angeles FBI asking about Simpson and nobody is going out and looking at the video camera that they have put in place.

Your Honor, additionally in this case, Agent Milnor testified that terrorist cases are staffed differently than other FBI cases are; that they staff it with a case agent on each individual rather than -- my experience has been in trying cases in this courtroom that involve the FBI, that usually there's a case agent that handles the whole case.  And when you have co-conspirators in there there's one agent with maybe some others who are assisting in that case.

It sounds like in these terrorist cases that if they believe an individual is a potential terrorist they staff it with an agent on that terrorist.  So in this case there would have been an agent staffed on Simpson, there may have been one staffed on Soofi, there may have been one -- eventually there's one staffed on Mr. Kareem, there may have been one staffed on Mr. Wahid.  But what it appears that it allows the FBI to do is to say, well, we searched our file but it's the file that they have on that particular individual.

Now, in this case we do have Whitson saying, well,

yeah, I went out and looked into the Simpson file but there was other information that came up at trial, for instance, about Saabir Nurse.  And the Court will recall once we had some information that indicated he had given money to Simpson and I thought he was the bank roll, I had asked Mr. Whitson a number of questions about how he had followed up on investigating Wahid.  It was basically, well, I don't know what they did. Well, I think that's because they departmentalized these the way we have now learned that they departmentalized them.  It gives them the ability to have plausible deniability when they don't see something.

In this particular case it's also the responsibility of the U.S. Attorney's Office to make sure that all material information is gathered and given to us.  I don't have a doubt that the U.S. Attorney didn't learn about the pole camera until November of 2018, but they should have.  I mean, they are responsible for it.  They have abrogated their duty to the FBI in these terrorist cases, or at least in this terrorist case, and let somebody out there determine what is material or what is not.  It's their responsibility to get all the -- look at that information and determine what's material and what isn't. The FBI is supposed to gather the information, but the U.S. Attorney is supposed to review it and then make that determination.

Your Honor, in conclusion, what we know for sure is

10-18-19 - CR 15-707 - USA v Kareem - Evidentiary Hearing - Day 3

that the FBI surveilled Simpson from March until May of 2015, and none of that information was turned over to us until October 7th of 2019, three and-a-half years after the trial. We know that there was a pole camera that was out there, and that information was not turned over to us until three years after the trial.

Judge, there just can't be in any confidence in this verdict.  There just can't be any confidence that there would not have been a change had this been turned over.  It was a close case.  Whitson didn't do his job.  The prosecutors didn't do their job.  Maybe I didn't do my job in exploring it closer. But the one thing I know for sure, Mr. Abdul Kareem did not get a fair trial.  There can't be any confidence in the verdict. And you should either dismiss this case because even to date we're getting documents that should have been turned over three and-a-half years ago, or alternatively, you should grant a new trial.

THE COURT:  Thank you, Mr. Maynard.

MR. KOEHLER:  I'm going to start in the opposite direction of Mr. Maynard, and that is the pole camera itself. The video from the pole camera is not exculpatory.  It is not Rule 16 material.  It's not material, period.  It was a pebble on a beach in this case, Your Honor.

The defense asserted in their supplemental -- in their addendum to their supplemental motion for new trial that this

10-18-19 - CR 15-707 - USA v Kareem - Evidentiary Hearing - Day 3

pole camera conclusively showed that Mr. Kareem did not visit the Simpson apartment on May 1 of 2015.  That's a false assertion.  The pole camera had a view of the west entrance to the breezeway on the opposite side of the Simpson and Soofi apartment on that building on that day.  It didn't start filming until nearly 1:30 in the afternoon that day.  So it couldn't show whether Mr. Kareem visited and left that morning and it couldn't show whether Mr. Kareem came into the apartment from the opposite side at some other point during that day.

THE COURT:  It does show that he wasn't helping them load up the car.

MR. KOEHLER:  Yes.  That is true.  But here's what's important the most.  At no time during the trial in this case did the government ever assert that Mr. Kareem was at the Simpson and Soofi apartment after Ali Soofi moved out in early April, at the latest, of 2015.

Ali Soofi is the only witness the government put on that put Mr. Kareem in the Simpson and Soofi apartment.  And Ali Soofi testified that he moved out of that apartment sometime at the end of March or beginning of April of 2015.  After that point there's no evidence in the government's case that Mr. Kareem was ever there.

THE COURT:  Well, would you accept Mr. Maynard's supposition that if surveillance had shown him there that would have been part of the government's case?

02:31PM

02:32PM

02:32PM

02:32PM

02:33PM

MR. KOEHLER:  Certainly it would have been part of the government's case had we had Agent Whitson seen those reports and wanted to make use of them.  And certainly we would have an issue here in terms of Rule 16 materiality if that is what surveillance had shown.

THE COURT:  But you say you didn't put any evidence on of Mr. Kareem being there after Ali Soofi moved out, but certainly the implications from Ali Soofi's testimony about the frequency with which Mr. Kareem was in the apartment, the inference would be that he, even though Ali Soofi wasn't there to observe it, that he continued to be a three- or four-time-a-week visitor to the apartment, maybe even staying the night and yet never seen on what we now know is surveillance, both physical surveillance and electronic surveillance.

MR. KOEHLER:  I will get to that in a moment in terms of the surveillance part, Your Honor.  But first, I would point out that that might be the implication if you took Mr. Ali Soofi's testimony standing on its own.  But when you evaluate it in light of Stefan Verdugo's testimony and juvenile Juan Carlos's testimony it became more clear that Mr. Kareem had backed away from the idea of participating in the attack himself, and Mr. Kareem had stated to agents that he wasn't around Simpson during that time frame in April.  The government not having any proof to contradict that, never sought to do so.

10-18-19 - CR 15-707 - USA v Kareem - Evidentiary Hearing - Day 3

It simply relied on the testimony of Ali Soofi about the time when Ali Soofi was in the apartment and Mr. Kareem was there going from June of 2014 through the end of March of 2015 or the beginning of April.

THE COURT:  But I don't recall there being any suggestion at the trial that Mr. Kareem withdrew from the conspiracy, only that he had decided that he would not be one of the individuals who went to Garland to participate in the attack on the contest.

MR. KOEHLER:  That is correct.

Now, with respect to surveillance, I believe I counted up 12 surveillance activities, only two of which had any real length to them.  And they are set forth in our hearing memorandum or you can look at them in Exhibit Number 12.

There was -- I guess there were a couple of hours where nothing was seen, nobody going in, nobody coming out. Agents not seeing somebody come in and out of Simpson's apartment during a narrow time window doesn't mean that somebody is there or somebody hasn't walked in from another direction that they haven't seen.  The spot surveillances were simply to determine whether there was a vehicle in the parking lot.

Mr. Maynard pointed out that Simpson was viewed as a threat.  During her testimony, Agent Fryberger testified that Mr. Simpson was not viewed as an imminent threat to public

safety and the surveillance.

THE COURT:  I know she said that, but at the same time we know that they did 24-hour surveillance on Mr. Simpson at or around the Pat Tillman run.  So they must have been pretty worried about him.

MR. KOEHLER:  To that I will say this, Your Honor: Agent Milnor testified that there was a national callout with non-specific information but there was a national callout to do surveillance at gatherings like that.  And Simpson happened to be one of the people that they called out to do surveillance on during that time frame.

But keep in mind, what was Simpson doing?  And I will direct you to -- it's the fourth -- no -- third page up from the bottom of Exhibit Number 12.  Simpson was at a park, Paseo Park, at 75th Avenue and Greenway Road in Peoria, Arizona, at 11:13 a.m.  Around the end of the race at 11:20 a.m., he is seen holding a small child and talking to people.  That hardly comes across as behavior indicative of somebody who is an imminent threat to public safety, keeping in mind that the agents are watching him and this is what they are seeing at that point in time.  We're looking at it in hindsight after he's conducted a terrible attack and after we have learned all the other things that we have learned about Mr. Simpson.

But looking at it from the perspective of agents at that point in time, they are not seeing any threatening

10-18-19 - CR 15-707 - USA v Kareem - Evidentiary Hearing - Day 3

behavior.  They are called out on a vague, non-specific threat so they began 24-hour coverage on the man.  He does nothing untoward at the time they are watching him.

So back to the pole camera.  The only thing the pole camera does at all in this case is corroborate Ali Soofi's testimony that he went to the apartment that day and carried out his weight equipment, his exercise equipment.  That's the only thing that the camera establishes aside from the approximate time that Simpson and Soofi left the apartment that night.  We still don't know if that was before or after they visited Abdul Kabir Wahid.  Mr. Wahid's testimony was the only testimony in this trial that gave us an idea of what time they actually left Phoenix.  He testified that they came by his house in that 9:00 to 10:00 time frame, brought him the soup as well as the envelope with the key to the car and the letter.

So keeping in mind from the perspective of the agents at this point in time, they've got a video, they know that it doesn't have complete coverage of the Simpson apartment.  They have reviewed it.  They haven't seen anything that is going to advance the ball in terms of Simpson and Soofi with any other person going in and out of the apartment, and that's what they have with all this other information coming in in the case.

Let's talk about the surveillance for a moment.  Not only did surveillance agents not see Kareem, they didn't see Wahid.  They didn't see Ali Soofi who actually lived in that

UNCERTIFIED, UNEDITED ROUGH DRAFT

apartment up until early April of 2015.  So the fact that they didn't see something on surveillance doesn't really corroborate anything.  They didn't have good enough coverage to identify somebody who actually lived in the apartment.  In fact, they didn't identify Naadir Soofi as Elton Simpson's roommate until approximately a week before the attack.

So with those things in mind, neither the surveillance nor the video moves the needle in either direction in this case.  It's simply not something significant to the outcome of this case, and it does not, in any way, undermine confidence in the verdict.

But let's talk about it in terms of what the agents knew and Agent Whitson not knowing about it.  Every single witness who has testified who had knowledge of the video at the time testified that they did not say anything about that video in Agent Whitson's presence.

Agent Whitson testified that he went through that file.  And he thought he was going through it methodically.  There's no doubt about that.  He simply didn't find it.  Why didn't he find it?  He told you something very important which was that that file was getting flooded with new information.  He had total access to it.  He could go into every part of that file, and yet despite having that access he did not see these things.  And Mr. Maynard referred to this information being all over that file.  You saw four items relating to the pole camera

10-18-19 - CR 15-707 - USA v Kareem - Evidentiary Hearing - Day 3

video.  There's the import form with the FD 759.  That's the pole camera authorization request.  You saw the evidence collection form.  That's Exhibit Number 17.  You saw the evidence access log, Exhibit Number 18.  And you saw the report of Mr. Gallante that had the attachments to it.  And again, keeping in mind the attachments are still part of the same document, they don't have separate entries in Sentinel.  They are still part of the same one.  So there's four items in Sentinel out of thousands, and somehow that's all over that file?  That's just not a credible claim, Your Honor.

With those four items being there, Agent Whitson testified that every time he opened that file up there are new things there.  That's why I asked Mr. Mullen, what does it look like?  It looks like your Outlook e-mail in box.  But a big difference is items don't get marked read or unread.  And because they don't get marked read or unread, when you come back to that screen and new items have populated, you don't know if you are picking up exactly where you left off unless you are taking careful notes.

Agent Whitson should have kept better notes.  He should have done a better job of being meticulous and making sure that he did, in fact, get every serial out of that file and look at it himself.  But the simple fact is he didn't know about it.

I have another thought in my mind but I lost it if I

UNCERTIFIED, UNEDITED ROUGH DRAFT

can have a moment.

So back to this pebble on a beach.

THE COURT:  Ms. Brook apparently has been reading your mind and is going to remind you what it was you were getting ready to say.

MR. KOEHLER:  This pebble on the beach is four items out of thousands sitting in an electronic case file that every time you open it up, a new wave has come upon the beach and left new items sitting there.  And it's perfectly plausible that Agent Whitson would miss these items.  Now, is it something that he should have done better?  Absolutely.  But that's not the standard when we're talking about deliberate suppression, which is what the defense is alleging.  What motive would anybody at the FBI have to try to suppress something so easily discovered?  It just doesn't make sense.

One more point about the pole camera.  You are correct that it doesn't show Mr. Kareem helping them load things in and out of the apartment.  It doesn't show who was loading things in and out of the car itself.  So there's no way to know whether Mr. Kareem was at the complex but not in the apartment that night.  It's not something that we're claiming, of course, but the point is, the video is incapable of showing an important detail.  And because it's not capable of showing important detail, including the loading of the car, it doesn't move the needle in this case.

10-18-19 - CR 15-707 - USA v Kareem - Evidentiary Hearing - Day 3

I would also point out that if Agent Whitson had known about that video, he would have known that it corroborated Ali Soofi's testimony and we would have used it for that purpose. Mr. Maynard went after Ali Soofi rather vociferously, both during both cross-examination and in closing argument, calling him an a liar, telling the jury to discredit him because he claimed to run 30 miles a day a couple of times a week.  That video would have corroborated him.  And had we known about it it would have been disclosed.  It would have been used in that fashion.

The evidence access log also demonstrates that Agent Whitson never looked at that video.  If he had gotten a copy of that video to review, his name would be on that log somewhere, Exhibit Number 18.  It's not there.  The only person who ever got copies of that video is sitting right here, Agent Mullen.

Mr. Maynard brought up the fact that we, the prosecution team, found out about the existence of the video sometime in late November, 2018 but we didn't disclose it until later than that, and we didn't get it from Agent Mullen until January 29, 2015.

THE COURT:  19.

MR. KOEHLER:  19.  Thank you.

That was why I asked Agent Mullen whether there were concerns about the classification of that video because if the video itself was classified we couldn't just turn it over to

UNCERTIFIED, UNEDITED ROUGH DRAFT

the defense.  We would have to get it declassified.  And as Agent Mullen testified it took months to get the FD 759 that's in Exhibit 13 declassified for release.

The video itself was confirmed not to be classified.  It was brought to our office.  If you take a look at CR 17-360 in this Court you will know that Ms. Brook and I were in the heat of preparing for trial on Mr. Wahid's case at that time.  And once we got a chance to get that copied in our office for disclosure to the defense, we did so.  And despite having had months to look at that video the defense has yet to identify anything exculpatory about it other than the fact that it doesn't show Mr. Kareem coming in and out of the west entrance to the breezeway that led to Mr. Simpson's apartment that day.

The surveillance likewise does not establish anything exculpatory in this case, and the defense has yet to point to a single that thing that it led to that would amount to something that would undermine confidence in the jury's verdict in this case.  The jury's verdict in this case was based on testimony from juveniles, from Stefan Verdugo who used to live with Mr. Kareem, from Sergio Martinez.  And let's not forget Mr. Kareem visiting Mr. Martinez within a couple of days of the attack and whispering in his ear not to say anything to the FBI about going shooting with Simpson and Soofi.

You also had Ali Soofi who testified about being in that apartment with Mr. Kareem, Simpson, and Soofi, and

watching those videos of the person being burned alive the

beheading videos and all the other things he saw in that

apartment and you have Simpson tweeting -- and this is in

Exhibit 480, the Simpson Twitter direct messages -- tweeting to

one of his people on the other end, or direct messaging one of

his people on the other end saying the bro from Philly is in

here rolling.  Mr. Kareem from Philadelphia is in here laughing

at what you are saying to me because they are talking about

calling french fries chips and other things.

Those are the kinds of things -- and remember, that's

in February of 2015.  Those are the kinds of things that

corroborates Ali Soofi's testimony about Mr. Kareem being in

the apartment during that time frame.  There's been not one

shred of anything that contradicts that testimony.  Nothing

about this video or the surveillance changes one single thing

about what the witnesses who saw Mr. Kareem's conduct had to

say about that.  It doesn't change anything from Simpson's

Twitter direct messages, his postings on line, it doesn't

change anything about the Acer computer that we introduced into

evidence and the contents of that the Lenovo computer and the

thumb drive that went with that and all the other material that

we brought into evidence in this courtroom.  Nothing in this

video, nothing in the surveillance changes one bit about the

evidence that we introduced, which basically came to an end in

early April of 2015 when it comes to Mr. Kareem's conduct.

The only thing that we introduced about Mr. Kareem after that date had to do with his access to his own computer when he testified that that computer had stopped working in late 2014, and yet he was still using it and tethering it to his cellphone in May of 2015 even after the attack.  And the witness who testified, it was Mr. Hassan who testified that Mr. Kareem and Simpson and another individual came into the restaurant that he was working at on April 30th, 2015.

But we didn't offer that to show that Mr. Kareem was at the Simpson apartment that day.  We offered that to contradict Mr. Kareem's statement to the FBI that he had completely cut off contact with Mr. Simpson by then.  None of that testimony is changed by this video or by the surveillance.

Because of that, it cannot undermine confidence in the verdict in this case.  And we ask you to deny the defense motion.

THE COURT:  Thank you, Mr. Koehler.

Mr. Maynard.

MR. MAYNARD:  Your Honor, first, the government's argument about another way in and out of the apartment sort of misses the point.  Simpson and Soofi, according to that video that we saw, always went in and out the same way.

THE COURT:  Well, we don't know about always.  All we know about is the few hours.

MR. MAYNARD:  That's true.

THE COURT:  That the pole camera existed before they left.  I think -- don't quote me exactly -- but it was put up after 1:00 in the afternoon, and they left around 9 or 10:00 at night.

MR. MAYNARD:  That's right.  But it also appeared that that was the way Mr. Ali Soofi came in.  We didn't see people coming in from another direction because that seemed to be the way to the parking area.  And I suggest that's the reason the FBI put the pole camera where they put it, so that they could get the most logical view.

The government's argument that the jury relied on all these other things, again, is misplaced.  We don't know what the jury relied upon.  What we do know is the jury was out over three days in this particular case.  We do have some comments that they apparently made to the press.  Don't know if they were reported accurately or not.  But what the press reported was that they came out six/six when they first went out and over three days they changed.

A pebble on a beach.  I guess the government's argument is, jeez, we were getting so much information in, poor Mr. Whitson just couldn't find this.  Although, as I said, it appeared to be all over the file.  What I mean by that, it wasn't just in one place.  It was in numerous places, and Agent Baker didn't seem to have much trouble finding it.  When he looked for it, he found it within minutes.

02:53PM
02:54PM
02:54PM
02:54PM
02:55PM

UNCERTIFIED, UNEDITED ROUGH DRAFT

10-18-19 - CR 15-707 - USA v Kareem - Evidentiary Hearing - Day 3

If Agent Whitson didn't find the pole camera, didn't find any of the surveillance documents, didn't find any of these documents, how can we have confidence that there isn't other things that he didn't find?  And that's the concern we have had.  Judge, from the very beginning, after this trial, we have been going and getting new information often for three years.  We got new information this morning, 302s on surveillance that we had never seen before.  There just can't be confidence that the government has turned over everything.

THE COURT:  Well, putting aside the pole camera surveillance, I'm not sure I understand, other than the fact that you didn't get it until recently, including today, what the significance to Mr. Kareem's case the surveillance of Elton Simpson is.

MR. MAYNARD:  The significance is that Ali Soofi testifies that he is over there all the time.  And by that he went on to say three or four times a week and spent the night over there as much as three or four times a week.  Mr. Kareem testifies, I didn't go over there.  I rarely went over there.  And I never spent the night over there.  We've got surveillance from March at least through May and he's never seen once.

THE COURT:  Well, I mean, other than that brief period of 24-hour surveillance, it's not a lot of surveillance.

MR. MAYNARD:  There's more.  I mean, there's several periods where they are there for two and three hours, and

UNCERTIFIED, UNEDITED ROUGH DRAFT

10-18-19 - CR 15-707 - USA v Kareem - Evidentiary Hearing - Day 3

that's all in Exhibit 12.

THE COURT:  They followed him a little bit and --

MR. MAYNARD:  Well, they went to a restaurant.  They followed him to the mosque.  They actually sat there at the house several times for up to two hours and not once did they ever see Mr. Abdul Kareem.

And additionally, Judge, the testimony from, I believe it was, I think it was Agent Baker, could have been Agent Mullen, that they had done surveillance for a number of years and their policy had been that whenever they did surveillance, even if it was spot surveillance, they did a 302.

THE COURT:  It was -- the circumstances were a little different.  He was engaged full time in surveillance.  That was his assignment.  And therefore, he had to account every day for what he had done.

MR. MAYNARD:  Yeah, but we don't know in these cases, and what we do know from Agent Fryberger is there was more surveillance done than the 302s reflected.  We never got the opportunity to explore that to determine, well, how often?  How much more?  Who did it?  Why didn't you write a 302?  Was it just spot surveillance or did for some reason you didn't see anything so you decided not to write a 302?  We don't know what the answer is to that.

When it gets to -- Mr. Koehler says that Mr. Simpson wasn't a threat.  Well, the FBI didn't put 16 law enforcement

UNCERTIFIED, UNEDITED ROUGH DRAFT

officers surveilling him at the time of the Pat Tillman run if they didn't think he was a threat.  And Agent Milnor testified he wasn't aware of anyone else in Phoenix that the FBI was surveilling other than Mr. Simpson concerning that run.

The government attacked Mr. Kareem's credibility in this case.  This information supports his credibility, and that's important.  It also supports other individuals and their testimony, that being Nathaniel Soofi.  And their argument seems to be now that, well, we didn't say that he was over there in April, but they tried to bring in testimony that Mr. Kareem said wasn't the case, that he had had dinner, I believe, the night before on April 30th or the 29th at a particular restaurant with Mr. Soofi and Mr. Kareem and he said, no, it didn't happen.  He wasn't there.

The government was trying to show a close connection between Mr. Kareem and Mr. Simpson and Mr. Soofi all the way through April -- March, April, and into May when those two fellows left and went to Garland Texas.  This contradicts that.

Judge, this evidence is material.  We would have certainly used it at trial, and we would have actually, we would have been able to explore other things.  I find it offensive, quite honestly, that we get the pole camera information in March but we don't get the surveillance information until October 7th, I mean, eight days ago.  We didn't know anything about it.  So technically we really

10-18-19 - CR 15-707 - USA v Kareem - Evidentiary Hearing - Day 3

weren't even supposed to be talking about it at this evidentiary hearing because it came to us after our last telephone conference with you.

THE COURT:  And the log that the intern did with the attachments?

MR. MAYNARD:  That came to us that day.  But what also came to us on the 7th was the 302s that are Exhibit Number 12. We didn't know that they had ever done that before.  I don't -- I still, to this day, I don't know when Mr. Koehler and Ms. Brook got copies of that and were aware that Mr. Simpson was being surveilled.  The first time we had any knowledge of that was in their memoranda, trial memoranda that they prepared and filed with us on the 7th.  But we didn't -- they filed it on the 3rd, right before, I think, the telephone call we had with you.  But we didn't get the 302s until four days later.

It just seems that Agent Whitson either did a really bad job in finding this stuff or he found it and he didn't disclose it.  He seemed to find whatever he wanted to that he thought was material to support a conviction, but he didn't seem to find the stuff that might have supported the defense.

Judge, I got over 100 interviews from people that were inside the building at the Culwell Center in Garland, Texas. None of them saw anything.  All those interviews were, well, we were scared.  We heard some gunfire.  We were scared.  Somebody determined that was relevant or material.  I guess it must have

UNCERTIFIED, UNEDITED ROUGH DRAFT

10-18-19 - CR 15-707 - USA v Kareem - Evidentiary Hearing - Day 3

been the FBI agents.  But we went through what we were given.  We never got any of this, and we should have.  And it is material in this case for the reasons that I have already articulated to you.

If the Court has any questions I will be happy to try to answer.

THE COURT:  I do not.  Thank you, Mr. Maynard.

MR. KOEHLER:  Your Honor, may I respond to a couple of Mr. Maynard's comments?

THE COURT:  No.  This is -- we have a pattern in the argument, and I don't think that he raised anything that was not addressed in your remarks.

MR. KOEHLER:  The witnesses in the Culwell Center.

THE COURT:  Well, you gave them to him, didn't you?

MR. KOEHLER:  Yes, and we also gave him the witness statements from the apartment complex that showed --

THE COURT:  Well, I'm sure you did.  But I don't think that was the point.

It is ordered taking this matter under advisement.

Court is in recess.

(Proceeding concluded at 3:03 p.m.)

**C E R T I F I C A T E**

I, LAURIE A. ADAMS, do hereby certify that I am duly appointed and qualified to act as Official Court Reporter for the United States District Court for the District of Arizona.

I FURTHER CERTIFY that the foregoing pages constitute a full, true, and accurate transcript of all of that portion of the proceedings contained herein, had in the above-entitled cause on the date specified therein, and that said transcript was prepared under my direction and control.

DATED at Phoenix, Arizona, this 17th day of December, 2019.

s/Laurie A. Adams

_____
Laurie A. Adams, RMR, CRR

UNITED STATES DISTRICT COURT